IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |
|---|---|
| ALABAMA LEGISLATIVE BLACK CAUCUS; BOBBY SINGLETON; ALABAMA ASSOCIATION OF BLACK COUNTY OFFICIALS; FRED ARMSTEAD, GEORGE BOWMAN, RHONDEL RHONE, ALBERT F. TURNER, JR., and JILES WILLIAMS, JR., individually and on behalf of others similarly situated, | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* |
| Plaintiffs, | *  Civil Action No.<br>*  2:12-cv-691-WKW-WC |
| v. | *  (3-judge court requested)<br>*  (Claim of |
| THE STATE OF ALABAMA; BETH CHAPMAN, in her official capacity as Alabama Secretary of State, | *   Unconstitutionality)<br>*<br>* |
| Defendants. | * |

**COMPLAINT**

**INTRODUCTION**

1. This is an action challenging the lawfulness and constitutionality of Act No. 2012-602, which redistricts the Alabama House of Representatives, and Act No. 2012-603, which redistricts the Alabama Senate, alleging they violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

2. Acts 2012-602 and 2012-603 violate the one-person, one-vote standards set out in controlling Supreme Court case law by arbitrarily and impracticably restricting population deviations to $\pm 1\%$, thereby facilitating noncompliance with the whole-county requirements in the Alabama Constitution.

3. Acts 2012-602 and 2012-603 are racial gerrymanders that unnecessarily minimize population deviations and violate the whole-county provisions of the Alabama Constitution with both the purpose and effect of minimizing black voting strength and isolating from influence in the Alabama Legislature legislators chosen by African Americans.

4. Acts 2012-602 and 2012-603 are partisan gerrymanders that unnecessarily minimize population deviations and violate the whole-county provisions of the Alabama Constitution for the purpose and with the effect of impairing the ability of Alabama citizens, based on the content of their political speech and political associations, to elect members of the Legislature who share their political views.

## PARTIES

5. Plaintiff Alabama Legislative Black Caucus is an unincorporated political organization of African Americans elected to the Alabama Legislature. Plaintiff Senator Bobby Singleton is Chair of the Alabama Legislative Black Caucus.

6. Plaintiff Bobby Singleton is an African-American citizen of the United States and the State of Alabama who is a registered voter in Hale County and who represents Senate District 25 in the Alabama Legislature. Acts 2012-602 and 2012-603 intentionally dilute Senator Singleton's voting strength as an African American and as a member of the Democratic Caucus of the Alabama Legislature. Act 2012-603 splits 5 of the 7 counties in Senate District 24, when it is practicable to include 7 whole counties within Senate District 24 while maintaining substantial compliance with the one-person, one-vote standard and the Voting Rights Act.

7. Plaintiff Alabama Association of Black County Officials (AABCO) is an unincorporated organization of African Americans who have been elected to serve in county offices in Alabama. Plaintiff Commissioner Albert F. Turner, Jr., is President of the AABCO, and plaintiff Commissioner George Bowman is Vice President of the AABCO.

8. Plaintiff Fred Armstead is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Marengo County. Acts 2012-602 and 2012-603 intentionally dilute Commissioner Armstead's voting strength as an African American and as a supporter of the Democratic Party. Acts 2012-602 and 2012-603 diminish plaintiff Armstead's ability as a County Commissioner to influence

3

legislation affecting Marengo County, particularly local legislation, by splitting Marengo County among 3 House districts and 2 Senate districts, when Marengo County's population is small enough to be contained entirely within one House district and one Senate district.

9. Plaintiff George Bowman is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Jefferson County. Acts 2012-602 and 2012-603 intentionally dilute Commissioner Bowman's voting strength as an African American and as a supporter of the Democratic Party. Acts 2012-602 and 2012-603 diminish plaintiff Bowman's ability as a County Commissioner to influence legislation affecting Jefferson County, particularly local legislation, by splitting Jefferson County among 18 House districts and 8 Senate districts, when Jefferson County's population is small enough to be contained entirely within 14 House districts and small enough to be represented by 5 Senate districts. Acts 2012-602 and 2012-603 are designed to include 6 more white, Republican members in the Jefferson County Local Legislative Delegation than are required by the county's population, thus purposefully diminishing the Jefferson County Commission's ability to influence local legislation and purposefully diluting black voting strength in the local legislative delegation.

4

10. Plaintiff Rhondel Rhone is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Clarke County. Acts 2012-602 and 2012-603 intentionally dilute Commissioner Rhone's voting strength as an African American and as a supporter of the Democratic Party. Acts 2012-602 and 2012-603 diminish plaintiff Rhone's ability as a County Commissioner to influence legislation affecting Clarke County, particularly local legislation, by splitting Clarke County among 2 House districts and 3 Senate districts, when Clarke County's population is small enough to be contained within one House district and one Senate district.

11. Plaintiff Albert F. Turner, Jr., is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Perry County. Acts 2012-602 and 2012-603 intentionally dilute Commissioner Turner's voting strength as an African American and as a supporter of the Democratic Party. Acts 2012-602 and 2012-603 diminish plaintiff Turner's ability as a County Commissioner to influence legislation affecting Perry County, particularly local legislation, by splitting Perry County between 2 House districts, when Perry County's population is small enough to be contained within one House district.

12. Plaintiff Jiles Williams, Jr., is an African-American citizen of the United

5

States and the State of Alabama who is a registered voter and member of the County Commission in Montgomery County. Acts 2012-602 and 2012-603 intentionally dilute Commissioner Williams' voting strength as an African American and as a supporter of the Democratic Party. Acts 2012-602 and 2012-603 diminish plaintiff Williams' ability as a County Commissioner to influence legislation affecting Montgomery County, particularly local legislation, by splitting Montgomery County among 7 House districts, when Montgomery County's population is small enough to be contained within 5 House districts. Acts 2012-602 and 2012-603 are designed to include 2 more white, Republican members in the Montgomery County Local Legislative Delegation than are required by the county's population, thus purposefully diminishing the Montgomery County Commission's ability to influence local legislation and purposefully diluting black voting strength in the local legislative delegation.

13. Defendant State of Alabama is sued in its own name with respect to plaintiffs' claims under § 2 of the Voting Rights Act, 42 U.S.C. § 1973. Congress has abrogated the State's Eleventh Amendment immunity in civil actions brought to enforce the rights guaranteed by the Voting Rights Act.

14. Defendant Beth Chapman is sued in her official capacity as the chief elections official in the state, who must provide uniform guidance for election

6

activities and certify the election of members of the Alabama Legislature. Ala.
Code §§ 17-1-3 and 17-12-21 (1975) (as amended in 2006).

## JURISDICTION

15. This Court has jurisdiction of the subject matter of this action, pursuant
to 28 U.S.C. § 1343(c), to redress the deprivation of plaintiffs' rights guaranteed by
the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments.

16. A three-judge District Court must be convened, pursuant to 28 U.S.C. §
2284, to decide the challenge in this action of the constitutionality of the
apportionment of a statewide legislative body.

## VENUE

17. Venue of this action lies in the Middle District of Alabama pursuant to
U.S.C. § 1391(b).

## CLASS ALLEGATIONS

18. The named plaintiffs allege that they satisfy the requirements of Rule
23(a) and (b)(2), Fed.R.Civ.P. They ask the Court to certify them as
representatives of the plaintiff classes (1) of residents of Alabama counties whose
boundaries have been unnecessarily split among more House and/or Senate
districts than are necessary to satisfy the Fourteenth Amendment requirement of
substantial population equality, (2) of all African-American voters of Alabama, and

(3) of all Alabama voters who support and wish to elect white and black Democratic members of the Legislature.

    a. The classes are so numerous that joinder of all members is impracticable.

    b. There are questions of law or fact common to the classes.

    c. The claims of the representative parties are typical of the claims of the classes.

    d. The representative parties will fairly and adequately protect the interests of the classes.

    e. The parties opposing the classes have acted or refused to act on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

## ALLEGATIONS OF FACT

19. On May 31, 2012, the Governor signed into law Acts 2012-602 and 2012-603, which redraw the Alabama House and Senate districts with 2010 census data. See Exhibits A, B, C, and D.

20. In the 2010 statewide elections Republicans won filibuster-proof majorities in both Houses of the Alabama Legislature. The Republican leadership of the Legislature controlled the Reapportionment Committee Guidelines adopted

in May 2011, see

http://www.legislature.state.al.us/reapportionment/Guidelines.html, and the

redistricting plans set out in Acts 2012-602 and 2012-603.

21. The Reapportionment Committee Guidelines arbitrarily and

impracticably required that "in every redistricting plan submitted to the

Reapportionment Committee, individual district populations should not exceed a

2% overall range of population deviation." Guidelines at page 2 of 9.

22. The 2% overall ($\pm$ 1%) deviation restriction was one important reason

why Acts 2012-602 and 2012-603 arbitrarily and unnecessarily violate the "whole-

county" requirements in Sections 198-200 of the Alabama Constitution.

23. Taken together, Acts 2012-602 and 2012-603 result in 49 of Alabama's

67 counties having one or more members of their local legislative delegations than

is necessary based on their populations. See Exhibit E. The most extreme cases

are:

a. DeKalb County, which has 6 extra legislators, 4 in the House and 2

in the Senate, when its population is small enough for 2 House members and 1

Senator;

b. Jefferson County, which has 6 extra legislators, 3 in the House and

3 in the Senate, when its population is small enough for 14 House members and 5

9

Senators;

   c. Limestone County, which has 5 extra legislators, 3 in the House and 2 in the Senate, when its population is small enough for 2 House members and 1 Senator;

   d. Marengo County, which has 4 extra legislators, 3 in the House and 1 in the Senate, when its population is small enough for 1 House member and 1 Senator; and

   e. Talladega County, which has 5 extra legislators, 2 in the House and 3 in the Senate, when its population is small enough for 2 House members and 1 Senator.

 24. The House plan, Act 2012-602, splits 44 counties more than are necessary to satisfy the one-person, one-vote requirement, including 22 counties that are small enough to be completely contained within one House district and 7 counties (Baldwin, Jefferson, Lauderdale, Lee, Marshall, Mobile, and Montgomery) which could be divided into two or more complete House districts. See Exhibit E.

 25. The Senate plan, Act 2012-603, splits 31 counties more than are necessary to satisfy the one-person, one-vote requirement, including 26 counties that are small enough to be completely contained within one Senate district and

one county (Mobile) which could be divided into two or more complete Senate districts.  See Exhibit E.

26.  The 2% overall ($\pm$ 1%) deviation restriction and disregard of the "whole-county" requirements in Sections 198-200 of the Alabama Constitution facilitated the Republican majority's efforts to gerrymander the district boundaries in Acts 2012-602 and 2012-603 for the purpose and with the result of diluting black voting strength, by unnecessarily maximizing or "packing" the 27 House districts and 8 Senate districts with majority-black voting-age populations.

27.  Acts 2012-602 and 2012-603 purposefully perpetuate and attempt to restore Alabama's historical policy of segregating African Americans in party politics.  For over a century, the party of white supremacy was the Democratic Party.  Now it is the Republican Party pursuing a policy of isolating black voters and their elected representatives.

28.  African Americans enfranchised by the federal government during Reconstruction supported the Republican Party.  White leaders of the Democratic Party regained control of state government in the 1874 "Redemption" election by drawing the color line, calling on white voters to abandon the "Black" Republican Party.

29.  When a coalition of blacks and white populists threatened its rule in the

11

1890s, the Democratic Party invoked the policy of white supremacy in the elections that convened the 1901 constitutional convention and ratified the 1901 Constitution, although it was necessary for white Democrats in the Black Belt fraudulently to cast blacks' votes in favor of their own disfranchisement in order to overcome opposition by poor whites, who feared – correctly – that they too would be disfranchised.

30. The Democratic Party formally maintained white supremacy with the all-white Democratic primary until the United States Supreme Court declared it unconstitutional in 1944. The Democratic Party did not abandon its motto of white supremacy until after passage of the 1965 Voting Rights Act and the gradual re-enfranchisement of African Americans.

31. Since the mid-1960s, the Republican Party has pursued a "Southern strategy" that has encouraged white voters in Alabama to abandon the Democratic Party, which now is reliably supported by most African Americans. This strategy finally paid off in 2010, when white Republicans gained full control of both houses of the Alabama Legislature and the Governor's office for the first time since 1868.

32. The 2% overall ($\pm$ 1%) deviation restriction and disregard of the "whole-county" requirements in Sections 198-200 of the Alabama Constitution facilitated the Republican majority's efforts to gerrymander the district boundaries

in Acts 2012-602 and 2012-603 for partisan purposes.  By packing the majority-
black House and Senate districts, the plans remove reliable Democratic voters from
adjacent majority-white districts.  On information and belief, the plans' drafters
relied on partisan performance data from prior elections and consulted Republican
incumbents to maximize the number of expected Republican voters in the majority-
white districts.

33.  The Legislature could have reduced substantially the number of county
splits had it employed the 10% overall population deviation ($\pm$ 5%) that constitutes
substantial population equality under controlling Supreme Court precedents.

34.  HB 16 and SB 5, which were sponsored by members of the Alabama
Legislative Black Caucus, contained House and Senate redistricting plans that
illustrate how the Alabama constitutional whole-county requirement could have
been more nearly complied with while still maintaining 27 majority-black voting-
age population (VAP) House districts and 8 majority-black VAP Senate districts.
See Exhibits F, G, H, and I.

35.  Taken together, HB 16 and SB 5 result in only 27 of Alabama's 67
counties having one or more members of their local legislative delegations than are
necessary based on their populations.  See Exhibit J.

36.  The House plan, HB 16, splits only 22 counties more than are necessary

to satisfy the one-person, one-vote requirement, including only 10 counties that are small enough to be in one House district. See Exhibit J. Chilton and Dallas Counties each comprises one whole House district. Baldwin, Jefferson, Lauderdale, and Mobile Counties each contains multiple House districts without crossing their county boundaries.

37. The Senate plan, SB 5, splits only 9 counties more than are necessary to satisfy the one-person, one-vote requirement, including only 7 counties that are small enough to be in one Senate district. See Exhibit J.

38. The House and Senate plans in HB 16 and SB 5 were drawn by an out-of-state cartographer, who attempted to minimize the number of counties split while preserving 27 House districts and 8 Senate districts with majority-black voting-age populations. Plaintiffs do not contend that HB 16 and SB 5 are the best House and Senate plans possible. Only eleven census voter tabulation districts (which generally correspond with precincts) were split in the HB 16 plan, and those splits were necessary because parts of the VTDs either were too large or were noncontiguous. No VTDs were split in the SB 5 plan. If more VTDs were split, more county boundaries might be preserved, at least one additional majority-black House district could be drawn in Madison County, and some incumbent conflicts could be corrected.

39. Plaintiffs are not proposing that the HB 16 and SB 5 plans be adopted by the Legislature or by this Court. Their purpose is only to demonstrate how Alabama's constitutional whole-county provisos can be respected without violating federal equal protection and voting rights requirements. The Legislature should be given the opportunity to tailor whole-county House and Senate plans to legitimate political, state, and local conditions. Should the Legislature fail to do so, this Court should request additional proposals from the parties before adopting court-ordered House and Senate plans.

## ALLEGATIONS OF LAW

### Count I: One Person, One Vote

40. In *Reynolds v. Sims*, 377 U.S. 533, 579 (1964), the Supreme Court held that in drawing district lines for the Alabama House and Senate "the overriding objective must be substantial equality of population among the various districts," as the Reapportionment Committee Guidelines acknowledge at page 2 of 9.

41. However, citing *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), aff'd sub nom *Cox v. Larios*, 542 U.S. 947 (2004), the Guidelines specified:

> In order to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final legislative or State Board of Education redistricting plan, in every redistricting plan submitted to the Reapportionment Committee, individual district populations should not exceed a 2% overall range of population

15

deviation. The Reapportionment Committee will not approve a
redistricting plan that does not comply with this requirement.

Guidelines at page 2 of 9. This was a serious misreading of *Larios*, establishing an

arbitrary and impracticable $\pm$ 1% deviation requirement that is itself

unconstitutional.

42. *Larios* did not hold or suggest that reducing population deviations to $\pm$

1% would eliminate the possibility of invidious discrimination. To the contrary,

*Larios* acknowledged that, under controlling Supreme Court case law, $\pm$ 5%

deviation is prima facie compliance with the constitutional requirement of

population equality, which need not be justified by a state redrawing its legislative

districts. 300 F. Supp. 2d at 1339-40 (citing *Connor v. Finch*, 431 U.S. 407, 418

(1977); *White v. Regester*, 412 U.S. 755, 764 (1973); *Brown v. Thomson*, 462 U.S.

835, 842 (1983)).

43. Rather, *Larios* held that $\pm$ 5% deviation is not a "safe harbor," and that

the prima facie presumption of substantial compliance may be rebutted with

convincing evidence that the deviations are tainted with arbitrariness or

discrimination. 300 F. Supp. 2d at 1340-41 (citations omitted).

44. *Larios* held that the equal protection violation lay not in the size of the

$\pm$ 5% deviation but in evidence that the deviations had been manipulated for the

discriminatory purpose of underpopulating some regions of Georgia while

overpopulating other regions, and that this geographic discrimination could not be justified either by party partisan considerations or by protecting incumbents. 300 F. Supp. 2d at 1322, 1342.

45. The restriction of permissible deviations to $\pm$ 1% in Acts 2012-602 and 2012-603 also is an arbitrary and discriminatory manipulation of population deviations that "violate[s] the fundamental one person, one vote command of *Reynolds*, requiring that states 'make an honest and good faith effort to construct districts ... as nearly of equal population as practicable' and deviate from this principle only where 'divergences ... are based on legitimate considerations incident to the effectuation of a rational state policy.'" *Larios*, 300 F. Supp. 2d at 1341 (quoting 377 U.S. at 577).

46. In this case, the rational state policy violated by the $\pm$ 1% restriction is actually a state constitutional policy, namely, the whole-county requirements of §§ 198, 199, and 200 of the Alabama Constitution. Such a small permissible deviation is not practicable, because it drastically and unnecessarily increases the number of county boundaries that must be split by House and Senate districts.

47. The Alabama Constitution contains the following whole-county provisos:

> The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in

17

which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken.

Ala. Const. § 198.

It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that each county shall be entitled to at least one representative.

Ala. Const. § 199.

It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other.

Ala. Const. § 200.

48. In *Sims v. Baggett*, 247 F. Supp. 96 (1965) (3-judge court), on remand

from *Reynolds v. Sims*, this Court addressed the impact of the one-person, one-vote

rule on §§ 198 and 199 of the Alabama Constitution and held:

> *Reynolds v. Sims*, supra, does not render that [whole-county] proviso
> wholly inoperative. The quoted proviso in section 199 and its
> companion section 198 are intended to insure that each of the counties
> as a political unit of the State have separate representation in the
> House. It is apparent that the framers of the Constitution had at least
> two purposes in mind: First, to prevent gerrymandering, and, second,
> to insure compact geographic districts with legislators attuned to local
> problems. Intelligent and meritorious purposes are not enough to
> sustain application of this initially valid constitutional provision to
> counties whose population falls below the minimum required for valid
> reapportionment, or to counties of larger population whose joinder
> into a single district becomes necessary to reapportionment based on
> population. In those instances, the proviso as applied contravenes the
> Federal Constitution. **In instances where the proviso can be
> applied without bringing about a conflict with federal
> constitutional requirements, the proviso remains operative**.

247 F. Supp. at 101 (footnotes omitted) (bold emphasis added).

49. *Larios* echoed this Court's reasoning that, to limit gerrymandering and

to facilitate responsive local legislation, county boundaries must be respected "as

long as the basic standard of equality of population among districts is maintained."

300 F. Supp. 2d at 1346 (quoting *Reynolds v. Sims*, 377 U.S. at 580-81).

50. Subsequently, in *Bartlett v. Strickland*, 129 S.Ct. 1231 (2009), the U.S.

Supreme Court affirmed the judgment of the North Carolina Supreme Court in

*Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007), which held that

the whole-county provision in North Carolina's constitution "should be adhered to by the General Assembly to the maximum extent possible." 361 N.C. at 493, 649 S.E.2d at 366 (quoting *Stephenson v. Bartlett*, 355 N.C. 354, 374, 562 S.E.2d 377, 391 (2002)). The maximum extent possible meant that "only the smallest number of counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts." *Stephenson v. Bartlett*, 355 N.C. at 384, 562 S.E.2d at 397. The U.S. Supreme Court affirmed and held that the Voting Rights Act could justify violating the state constitutional whole-county requirement only where splitting county boundaries was necessary to draw a reasonably compact black voting-age majority district, not a black influence district. *Bartlett v. Strickland*, 129 S.Ct. at 1246-49.

51. Pursuant to the foregoing controlling federal case law, Acts 2012-602 and 2012-603 violate the one-person, one-vote requirement of the Equal Protection Clause by restricting allowable population deviations more than is practicable to comply with the whole-county provisions in the Alabama Constitution and by failing to comply with those whole-county provisions to the extent practicable. This Fourteenth Amendment claim is enforceable against the defendant Alabama Secretary of State under 42 U.S.C. § 1983.

## Count II: Dilution and Isolation of Black Voting Strength

52. The packing of black voters in the 27 House districts and 8 Senate districts with black voting-age majorities has the purpose and the effect of minimizing the ability of African Americans to form coalitions with white voters to elect legislators of their choice.

53. The packing of black voters in the 27 House districts and 8 Senate districts with black voting-age majorities has the purpose and the effect of politically segregating the elected representatives of African-American voters and of minimizing their ability to participate in the legislative process and to influence the outcomes of legislation.

54. The dilution of black voting strength was aided by the arbitrary and unnecessary restriction of permissible population deviations to $\pm$ 1% and by systematic noncompliance with the whole-county provisions of the Alabama Constitution.

55. For the foregoing reasons, Acts 2012-602 and 2012-603 violate the rights of plaintiffs and the class they seek to represent that are guaranteed by § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, which are enforceable against the defendants State of Alabama and Alabama Secretary of State, and by the Fourteenth and Fifteenth Amendments to the Constitution of the

United States, which are enforceable against the defendant Alabama Secretary of State under 42 U.S.C. § 1983.

### Count III: Partisan Gerrymandering

56. The Republican drafters of Acts 2012-602 and 2012-603 utilized racial demographics and analyses of past elections to determine which voters were likely to vote for Democratic candidates, and, based on the content of voters' political speech at the ballot box, drew House and Senate districts that have the purpose and effect of minimizing the ability of voters who share the political views of and wish to be represented by Democratic legislators.

57. The partisan gerrymanders were aided by the arbitrary and unnecessary restriction of permissible population deviations to $\pm$ 1% and by systematic noncompliance with the whole-county provisions of the Alabama Constitution.

58. For these reasons, Acts 2012-602 and 2012-603 violate the rights of free speech and political association of plaintiffs and the class they seek to represent guaranteed by the First Amendment to the Constitution of the United States, which are enforceable against the defendant Alabama Secretary of State under 42 U.S.C. § 1983.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that this Court will grant them

the following relief:

A. Certify the named plaintiffs as representatives of the plaintiff classes (1) of residents of Alabama counties whose boundaries have been unnecessarily split among more House and/or Senate districts than are necessary to satisfy the Fourteenth Amendment requirement of substantial population equality, (2) of all African-American voters of Alabama, and (3) of all Alabama voters who support Democratic members of the Legislature.

B. Enter a declaratory judgment that the redistricting plans set out in Acts 2012-602 and 2012-603 violate the rights of plaintiffs and the classes they seek to represent guaranteed by Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

C. Enter a preliminary and permanent injunction prohibiting defendants, their political subdivisions, departments, officers, agents, attorneys, employees and those acting in concert with them or at their direction from enforcing Acts 2012-602 and 2012-603.

D. Afford the Alabama Legislature a reasonable opportunity to adopt and to obtain preclearance under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, of new redistricting plans for the House and Senate that comply with Section 2 of the

23

Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First,

Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

E.  Should the Alabama Legislature fail in timely manner to enact lawful,

constitutional, and enforceable redistricting plans for the Alabama House and

Senate, instruct the parties to submit redistricting proposals that this Court would

adopt in time for the orderly conduct of the primary and general elections for

members of the Alabama House and Senate in 2014.

F.  Award plaintiffs their costs incurred in prosecuting this action, including

an award of attorneys' fees and expenses, pursuant to 42 U.S.C. §§ 1973l and 1988.

G.  Grant such other and further equitable relief as the Court may deem just

and equitable.

Respectfully submitted this 10th day of August, 2012,

Edward Still
Bar No. ASB-4786-I 47W
130 Wildwood Parkway
STE 108 PMB 304
Birmingham, AL 35209
     205-320-2882
     fax 205-320-2882
E-mail: still@votelaw.com

James U. Blacksher
Bar No. ASB-2381-S82J
P.O. Box 636
Birmingham AL 35201
     205-591-7238
     Fax: 866-845-4395
E-mail: jblacksher@ns.sympatico.ca

U.W. Clemon
Bar No. ASB-0095-076U
WHITE ARNOLD & DOWD P.C.
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
     Phone:  (205)-323-1888
     Fax:     (205)-323-8907
E-mail: uwclemon@waadlaw.com

Attorneys for Plaintiffs