IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA LEGISLATIVE BLACK CAUCUS; BOBBY SINGLETON; ALABAMA ASSOCIATION OF BLACK COUNTY OFFICIALS; FRED ARMSTEAD, GEORGE BOWMAN, RHONDEL RHONE, ALBERT F. TURNER, JR., and JILES WILLIAMS, JR., individually and on behalf of others similarly situated, | * * * * * * * * * | |
| Plaintiffs, | * * * | Civil Action No. 2:12-CV-691-WKW-MHT-WHP (3-judge court) |
| v. | * * | |
| THE STATE OF ALABAMA; BETH CHAPMAN, in her official capacity as Alabama Secretary of State, | * * * * * | |
| Defendants. | * * | |
| DEMETRIUS NEWTON et al., | * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 2:12-cv-1081-WKW-MHT-WHP |
| THE STATE OF ALABAMA et al., | * * | |
| Defendants. | * | |

**AMENDED COMPLAINT
OF ALABAMA LEGISLATIVE BLACK CAUCUS et al.**

By order entered December 26, 2012, Doc. 53, this Court granted plaintiffs ALBC et al. leave to amend Count III of their complaint. Docs. 1 and 3-1. Pursuant to Middle District Local Rule 15.1, plaintiffs herein reproduce the entire complaint with the amended Count III. The only other changes from the original complaint are the addition of the phrase "and the Voting Rights Act" to ¶ 18(a) and the prayer for relief and the addition of language in ¶ 4 that corresponds with the amendments to Count III. Plaintiffs acknowledge that this Court has dismissed Count I for lack of subject-matter jurisdiction. Doc. 53 at 7. Count I is reproduced in this Amended Complaint to comply with Local Rule 15.1 and to preserve the record in the event the dismissal of Count I is reconsidered in subsequent proceedings.

## INTRODUCTION

1. This is an action challenging the lawfulness and constitutionality of Act No. 2012-602, which redistricts the Alabama House of Representatives, and Act No. 2012-603, which redistricts the Alabama Senate, alleging they violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

2. Acts 2012-602 and 2012-603 violate the one-person, one-vote standards set out in controlling Supreme Court case law by arbitrarily and impracticably

restricting population deviations to $\pm 1\%$, thereby facilitating noncompliance with the whole-county requirements in the Alabama Constitution.

3.  Acts 2012-602 and 2012-603 are racial gerrymanders that unnecessarily minimize population deviations and violate the whole-county provisions of the Alabama Constitution with both the purpose and effect of minimizing black voting strength and isolating from influence in the Alabama Legislature legislators chosen by African Americans.

4.  Acts 2012-602 and 2012-603 are partisan gerrymanders that unnecessarily minimize population deviations and violate the whole-county provisions of the Alabama Constitution for the purpose and with the effect of diluting the votes of county residents without any compelling state justification or rational basis, in violation of the Fourteenth Amendment, and for the purpose and with the effect of impairing the ability of Alabama citizens, based on the content of their political speech and political associations, to elect members of the Legislature who share their political views.

**PARTIES**

5.  Plaintiff Alabama Legislative Black Caucus is an unincorporated political organization of African Americans elected to the Alabama Legislature.  Plaintiff Senator Bobby Singleton is Chair of the Alabama Legislative Black Caucus.

6.  Plaintiff Bobby Singleton is an African-American citizen of the United States and the State of Alabama who is a registered voter in Hale County and who represents Senate District 25 in the Alabama Legislature.  Acts 2012-602 and 2012-603 intentionally dilute Senator Singleton's voting strength as an African American and as a member of the Democratic Caucus of the Alabama Legislature.  Act 2012-603 splits 5 of the 7 counties in Senate District 24, when it is practicable to include 7 whole counties within Senate District 24 while maintaining substantial compliance with the one-person, one-vote standard and the Voting Rights Act.

7.  Plaintiff Alabama Association of Black County Officials (AABCO) is an unincorporated organization of African Americans who have been elected to serve in county offices in Alabama.  Plaintiff Commissioner Albert F. Turner, Jr., is President of the AABCO, and plaintiff Commissioner George Bowman is Vice President of the AABCO.

8.  Plaintiff Fred Armstead is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Marengo County.  Acts 2012-602 and 2012-603 intentionally dilute Commissioner Armstead's voting strength as an African American and as a supporter of the Democratic Party.  Acts 2012-602 and 2012-603 diminish plaintiff Armstead's ability as a County Commissioner to influence

legislation affecting Marengo County, particularly local legislation, by splitting Marengo County among 3 House districts and 2 Senate districts, when Marengo County's population is small enough to be contained entirely within one House district and one Senate district.

9.   Plaintiff George Bowman is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Jefferson County.  Acts 2012-602 and 2012-603 intentionally dilute Commissioner Bowman's voting strength as an African American and as a supporter of the Democratic Party.  Acts 2012-602 and 2012-603 diminish plaintiff Bowman's ability as a County Commissioner to influence legislation affecting Jefferson County, particularly local legislation, by splitting Jefferson County among 18 House districts and 8 Senate districts, when Jefferson County's population is small enough to be contained entirely within 14 House districts and small enough to be represented by 5 Senate districts.  Acts 2012-602 and 2012-603 are designed to include 6 more white, Republican members in the Jefferson County Local Legislative Delegation than are required by the county's population, thus purposefully diminishing the Jefferson County Commission's ability to influence local legislation and purposefully diluting black voting strength in the local legislative delegation.

10.  Plaintiff Rhondel Rhone is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Clarke County.  Acts 2012-602 and 2012-603 intentionally dilute Commissioner Rhone's voting strength as an African American and as a supporter of the Democratic Party.  Acts 2012-602 and 2012-603 diminish plaintiff Rhone's ability as a County Commissioner to influence legislation affecting Clarke County, particularly local legislation, by splitting Clarke County among 2 House districts and 3 Senate districts, when Clarke County's population is small enough to be contained within one House district and one Senate district.

11.  Plaintiff Albert F. Turner, Jr., is an African-American citizen of the United States and the State of Alabama who is a registered voter and member of the County Commission in Perry County.  Acts 2012-602 and 2012-603 intentionally dilute Commissioner Turner's voting strength as an African American and as a supporter of the Democratic Party.  Acts 2012-602 and 2012-603 diminish plaintiff Turner's ability as a County Commissioner to influence legislation affecting Perry County, particularly local legislation, by splitting Perry County between 2 House districts, when Perry County's population is small enough to be contained within one House district.

12.  Plaintiff Jiles Williams, Jr., is an African-American citizen of the United

States and the State of Alabama who is a registered voter and member of the County Commission in Montgomery County.  Acts 2012-602 and 2012-603 intentionally dilute Commissioner Williams' voting strength as an African American and as a supporter of the Democratic Party.  Acts 2012-602 and 2012-603 diminish plaintiff Williams' ability as a County Commissioner to influence legislation affecting Montgomery County, particularly local legislation, by splitting Montgomery County among 7 House districts, when Montgomery County's population is small enough to be contained within 5 House districts.  Acts 2012-602 and 2012-603 are designed to include 2 more white, Republican members in the Montgomery County Local Legislative Delegation than are required by the county's population, thus purposefully diminishing the Montgomery County Commission's ability to influence local legislation and purposefully diluting black voting strength in the local legislative delegation.

13.  Defendant State of Alabama is sued in its own name with respect to plaintiffs' claims under § 2 of the Voting Rights Act, 42 U.S.C. § 1973.  Congress has abrogated the State's Eleventh Amendment immunity in civil actions brought to enforce the rights guaranteed by the Voting Rights Act.

14.  Defendant Beth Chapman is sued in her official capacity as the chief elections official in the state, who must provide uniform guidance for election

7

activities and certify the election of members of the Alabama Legislature.  Ala.

Code §§ 17-1-3 and 17-12-21 (1975) (as amended in 2006).

## JURISDICTION

15.  This Court has jurisdiction of the subject matter of this action, pursuant

to 28 U.S.C. § 1343(c), to redress the deprivation of plaintiffs' rights guaranteed by

the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments.

16.  A three-judge District Court must be convened, pursuant to 28 U.S.C. §

2284, to decide the challenge in this action of the constitutionality of the

apportionment of a statewide legislative body.

## VENUE

17.  Venue of this action lies in the Middle District of Alabama pursuant to

U.S.C. § 1391(b).

## CLASS ALLEGATIONS

18.  The named plaintiffs allege that they satisfy the requirements of Rule

23(a) and (b)(2), Fed.R.Civ.P.  They ask the Court to certify them as

representatives of the plaintiff classes (1) of residents of Alabama counties whose

boundaries have been unnecessarily split among more House and/or Senate

districts than are necessary to satisfy the Fourteenth Amendment requirement of

substantial population equality and the Voting Rights Act, (2) of all African-

American voters of Alabama, and (3) of all Alabama voters who support and wish to elect white and black Democratic members of the Legislature.

      a.  The classes are so numerous that joinder of all members is impracticable.

      b.  There are questions of law or fact common to the classes.

      c.  The claims of the representative parties are typical of the claims of the classes.

      d.  The representative parties will fairly and adequately protect the interests of the classes.

      e.  The parties opposing the classes have acted or refused to act on grounds that apply generally to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

## ALLEGATIONS OF FACT

19.  On May 31, 2012, the Governor signed into law Acts 2012-602 and 2012-603, which redraw the Alabama House and Senate districts with 2010 census data.  See Exhibits A, B, C, and D.

20.  In the 2010 statewide elections Republicans won filibuster-proof majorities in both Houses of the Alabama Legislature.  The Republican leadership of the Legislature controlled the Legislative Reapportionment Committee (LRC)

Guidelines adopted in May 2011, see

http://www.legislature.state.al.us/reapportionment/Guidelines.html, and the

redistricting plans set out in Acts 2012-602 and 2012-603.

21.  The Reapportionment Committee Guidelines arbitrarily and

impracticably required that "in every redistricting plan submitted to the

Reapportionment Committee, individual district populations should not exceed a

2% overall range of population deviation."  Guidelines at page 2 of 9.

22.  The 2% overall ($\pm$ 1%) deviation restriction was one important reason

why Acts 2012-602 and 2012-603 arbitrarily and unnecessarily violate the "whole-

county" requirements in Sections 198-200 of the Alabama Constitution.

23.  Taken together, Acts 2012-602 and 2012-603 result in 49 of Alabama's

67 counties having one or more members of their local legislative delegations than

is necessary based on their populations.  See Exhibit E.  The most extreme cases

are:

　　　　a.  DeKalb County, which has 6 extra legislators, 4 in the House and 2

in the Senate, when its population is small enough for 2 House members and 1

Senator;

　　　　b.  Jefferson County, which has 6 extra legislators, 3 in the House and

3 in the Senate, when its population is small enough for 14 House members and 5

Senators;

  c.  Limestone County, which has 5 extra legislators, 3 in the House and 2 in the Senate, when its population is small enough for 2 House members and 1 Senator;

  d.  Marengo County, which has 4 extra legislators, 3 in the House and 1 in the Senate, when its population is small enough for 1 House member and 1 Senator; and

  e.  Talladega County, which has 5 extra legislators, 2 in the House and 3 in the Senate, when its population is small enough for 2 House members and 1 Senator.

  24.  The House plan, Act 2012-602, splits 44 counties more than are necessary to satisfy the one-person, one-vote requirement, including 22 counties that are small enough to be completely contained within one House district and 7 counties (Baldwin, Jefferson, Lauderdale, Lee, Marshall, Mobile, and Montgomery) which could be divided into two or more complete House districts. See Exhibit E.

  25.  The Senate plan, Act 2012-603, splits 31 counties more than are necessary to satisfy the one-person, one-vote requirement, including 26 counties that are small enough to be completely contained within one Senate district and

one county (Mobile) which could be divided into two or more complete Senate districts.  See Exhibit E.

26.  The 2% overall ($\pm$ 1%) deviation restriction and disregard of the "whole-county" requirements in Sections 198-200 of the Alabama Constitution facilitated the Republican majority's efforts to gerrymander the district boundaries in Acts 2012-602 and 2012-603 for the purpose and with the result of diluting black voting strength, by unnecessarily maximizing or "packing" the 27 House districts and 8 Senate districts with majority-black voting-age populations.

27.  Acts 2012-602 and 2012-603 purposefully perpetuate and attempt to restore Alabama's historical policy of segregating African Americans in party politics.  For over a century, the party of white supremacy was the Democratic Party.  Now it is the Republican Party pursuing a policy of isolating black voters and their elected representatives.

28.  African Americans enfranchised by the federal government during Reconstruction supported the Republican Party.  White leaders of the Democratic Party regained control of state government in the 1874 "Redemption" election by drawing the color line, calling on white voters to abandon the "Black" Republican Party.

29.  When a coalition of blacks and white populists threatened its rule in the

1890s, the Democratic Party invoked the policy of white supremacy in the elections that convened the 1901 constitutional convention and ratified the 1901 Constitution, although it was necessary for white Democrats in the Black Belt fraudulently to cast blacks' votes in favor of their own disfranchisement in order to overcome opposition by poor whites, who feared – correctly – that they too would be disfranchised.

30.  The Democratic Party formally maintained white supremacy with the all-white Democratic primary until the United States Supreme Court declared it unconstitutional in 1944.  The Democratic Party did not abandon its motto of white supremacy until after passage of the 1965 Voting Rights Act and the gradual re-enfranchisement of African Americans.

31.  Since the mid-1960s, the Republican Party has pursued a "Southern strategy" that has encouraged white voters in Alabama to abandon the Democratic Party, which now is reliably supported by most African Americans.  This strategy finally paid off in 2010, when white Republicans gained full control of both houses of the Alabama Legislature and the Governor's office for the first time since 1868.

32.  The 2% overall ($\pm$ 1%) deviation restriction and disregard of the "whole-county" requirements in Sections 198-200 of the Alabama Constitution facilitated the Republican majority's efforts to gerrymander the district boundaries

in Acts 2012-602 and 2012-603 for partisan purposes.  By packing the majority-

black House and Senate districts, the plans remove reliable Democratic voters from

adjacent majority-white districts.  On information and belief, the plans' drafters

relied on partisan performance data from prior elections and consulted Republican

incumbents to maximize the number of expected Republican voters in the majority-

white districts.

33.  The Legislature could have reduced substantially the number of county

splits had it employed the 10% overall population deviation ($\pm$ 5%) that constitutes

substantial population equality under controlling Supreme Court precedents.

34.  HB 16 and SB 5, which were sponsored by members of the Alabama

Legislative Black Caucus, contained House and Senate redistricting plans that

illustrate how the Alabama constitutional whole-county requirement could have

been more nearly complied with while still maintaining 27 majority-black voting-

age population (VAP) House districts and 8 majority-black VAP Senate districts.

See Exhibits F, G, H, and I.

35.  Taken together, HB 16 and SB 5 result in only 27 of Alabama's 67

counties having one or more members of their local legislative delegations than are

necessary based on their populations.  See Exhibit J.

36.  The House plan, HB 16, splits only 22 counties more than are necessary

14

to satisfy the one-person, one-vote requirement, including only 10 counties that are small enough to be in one House district.  See Exhibit J.  Chilton and Dallas Counties each comprises one whole House district.  Baldwin, Jefferson, Lauderdale, and Mobile Counties each contains multiple House districts without crossing their county boundaries.

37.  The Senate plan, SB 5, splits only 9 counties more than are necessary to satisfy the one-person, one-vote requirement, including only 7 counties that are small enough to be in one Senate district.  See Exhibit J.

38.  The House and Senate plans in HB 16 and SB 5 were drawn by an out-of-state cartographer, who attempted to minimize the number of counties split while preserving 27 House districts and 8 Senate districts with majority-black voting-age populations.  Plaintiffs do not contend that HB 16 and SB 5 are the best House and Senate plans possible.  Only eleven census voter tabulation districts (which generally correspond with precincts) were split in the HB 16 plan, and those splits were necessary because parts of the VTDs either were too large or were noncontiguous.  No VTDs were split in the SB 5 plan.  If more VTDs were split, more county boundaries might be preserved, at least one additional majority-black House district could be drawn in Madison County, and some incumbent conflicts could be corrected.

39.  Plaintiffs are not proposing that the HB 16 and SB 5 plans be adopted by the Legislature or by this Court.  Their purpose is only to demonstrate how Alabama's constitutional whole-county provisos can be respected without violating federal equal protection and voting rights requirements.  The Legislature should be given the opportunity to tailor whole-county House and Senate plans to legitimate political, state, and local conditions.  Should the Legislature fail to do so, this Court should request additional proposals from the parties before adopting court-ordered House and Senate plans.

## ALLEGATIONS OF LAW

### Count I: One Person, One Vote

40.  In *Reynolds v. Sims*, 377 U.S. 533, 579 (1964), the Supreme Court held that in drawing district lines for the Alabama House and Senate "the overriding objective must be substantial equality of population among the various districts," as the Reapportionment Committee Guidelines acknowledge at page 2 of 9.

41.  However, citing *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), aff'd sub nom *Cox v. Larios*, 542 U.S. 947 (2004), the Guidelines specified:

> In order to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final legislative or State Board of Education redistricting plan, in every redistricting plan submitted to the Reapportionment Committee, individual district populations should not exceed a 2% overall range of population

16

deviation.  The Reapportionment Committee will not approve a redistricting plan that does not comply with this requirement.

Guidelines at page 2 of 9.  This was a serious misreading of *Larios*, establishing an arbitrary and impracticable $\pm$ 1% deviation requirement that is itself unconstitutional.

42.  *Larios* did not hold or suggest that reducing population deviations to $\pm$ 1% would eliminate the possibility of invidious discrimination.  To the contrary, *Larios* acknowledged that, under controlling Supreme Court case law, $\pm$ 5% deviation is prima facie compliance with the constitutional requirement of population equality, which need not be justified by a state redrawing its legislative districts.  300 F. Supp. 2d at 1339-40 (citing *Connor v. Finch*, 431 U.S. 407, 418 (1977); *White v. Regester*, 412 U.S. 755, 764 (1973); *Brown v. Thomson*, 462 U.S. 835, 842 (1983)).

43. Rather, *Larios* held that $\pm$ 5% deviation is not a "safe harbor," and that the prima facie presumption of substantial compliance may be rebutted with convincing evidence that the deviations are tainted with arbitrariness or discrimination.  300 F. Supp. 2d at 1340-41 (citations omitted).

44.  *Larios* held that the equal protection violation lay not in the size of the $\pm$ 5% deviation but in evidence that the deviations had been manipulated for the discriminatory purpose of underpopulating some regions of Georgia while

overpopulating other regions, and that this geographic discrimination could not be justified either by party partisan considerations or by protecting incumbents.  300 F. Supp. 2d at 1322, 1342.

45.  The restriction of permissible deviations to $\pm$ 1% in Acts 2012-602 and 2012-603 also is an arbitrary and discriminatory manipulation of population deviations that "violate[s] the fundamental one person, one vote command of *Reynolds*, requiring that states 'make an honest and good faith effort to construct districts ... as nearly of equal population as practicable' and deviate from this principle only where 'divergences ... are based on legitimate considerations incident to the effectuation of a rational state policy.'"  *Larios*, 300 F. Supp. 2d at 1341 (quoting 377 U.S. at 577).

46.  In this case, the rational state policy violated by the $\pm$ 1% restriction is actually a state constitutional policy, namely, the whole-county requirements of §§ 198, 199, and 200 of the Alabama Constitution.  Such a small permissible deviation is not practicable, because it drastically and unnecessarily increases the number of county boundaries that must be split by House and Senate districts.

47.  The Alabama Constitution contains the following whole-county provisos:

> The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in

which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken.

Ala. Const. § 198.

It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that each county shall be entitled to at least one representative.

Ala. Const. § 199.

It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other.

Ala. Const. § 200.

48.  In *Sims v. Baggett*, 247 F. Supp. 96 (1965) (3-judge court), on remand from *Reynolds v. Sims*, this Court addressed the impact of the one-person, one-vote rule on §§ 198 and 199 of the Alabama Constitution and held:

> *Reynolds v. Sims*, supra, does not render that [whole-county] proviso wholly inoperative. The quoted proviso in section 199 and its companion section 198 are intended to insure that each of the counties as a political unit of the State have separate representation in the House.  It is apparent that the framers of the Constitution had at least two purposes in mind: First, to prevent gerrymandering, and, second, to insure compact geographic districts with legislators attuned to local problems.  Intelligent and meritorious purposes are not enough to sustain application of this initially valid constitutional provision to counties whose population falls below the minimum required for valid reapportionment, or to counties of larger population whose joinder into a single district becomes necessary to reapportionment based on population.  In those instances, the proviso as applied contravenes the Federal Constitution.  **In instances where the proviso can be applied without bringing about a conflict with federal constitutional requirements, the proviso remains operative**.

247 F. Supp. at 101 (footnotes omitted) (bold emphasis added).

49.  *Larios* echoed this Court's reasoning that, to limit gerrymandering and to facilitate responsive local legislation, county boundaries must be respected "as long as the basic standard of equality of population among districts is maintained." 300 F. Supp. 2d at 1346 (quoting *Reynolds v. Sims*, 377 U.S. at 580-81).

50.  Subsequently, in *Bartlett v. Strickland*, 129 S.Ct. 1231 (2009), the U.S. Supreme Court affirmed the judgment of the North Carolina Supreme Court in *Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007), which held that

the whole-county provision in North Carolina's constitution "should be adhered to by the General Assembly to the maximum extent possible."  361 N.C. at 493, 649 S.E.2d at 366 (quoting *Stephenson v. Bartlett*, 355 N.C. 354, 374, 562 S.E.2d 377, 391 (2002)).  The maximum extent possible meant that "only the smallest number of counties necessary to comply with the at or within plus or minus five percent 'one-person, one-vote' standard shall be combined, and communities of interest should be considered in the formation of compact and contiguous electoral districts."  *Stephenson v. Bartlett*, 355 N.C. at 384, 562 S.E.2d at 397.  The U.S. Supreme Court affirmed and held that the Voting Rights Act could justify violating the state constitutional whole-county requirement only where splitting county boundaries was necessary to draw a reasonably compact black voting-age majority district, not a black influence district.  *Bartlett v. Strickland*, 129 S.Ct. at 1246-49.

51.  Pursuant to the foregoing controlling federal case law, Acts 2012-602 and 2012-603 violate the one-person, one-vote requirement of the Equal Protection Clause by restricting allowable population deviations more than is practicable to comply with the whole-county provisions in the Alabama Constitution and by failing to comply with those whole-county provisions to the extent practicable. This Fourteenth Amendment claim is enforceable against the defendant Alabama Secretary of State under 42 U.S.C. § 1983.

## Count II: Dilution and Isolation of Black Voting Strength

52.  The packing of black voters in the 27 House districts and 8 Senate districts with black voting-age majorities has the purpose and the effect of minimizing the ability of African Americans to form coalitions with white voters to elect legislators of their choice.

53.  The packing of black voters in the 27 House districts and 8 Senate districts with black voting-age majorities has the purpose and the effect of politically segregating the elected representatives of African-American voters and of minimizing their ability to participate in the legislative process and to influence the outcomes of legislation.

54.  The dilution of black voting strength was aided by the arbitrary and unnecessary restriction of permissible population deviations to $\pm$ 1% and by systematic noncompliance with the whole-county provisions of the Alabama Constitution.

55.  For the foregoing reasons, Acts 2012-602 and 2012-603 violate the rights of plaintiffs and the class they seek to represent that are guaranteed by § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, which are enforceable against the defendants State of Alabama and Alabama Secretary of State, and by the Fourteenth and Fifteenth Amendments to the Constitution of the

United States, which are enforceable against the defendant Alabama Secretary of State under 42 U.S.C. § 1983.

## Count III: Partisan Gerrymandering

56.  The Supreme Court has not established a free-standing federal constitutional standard upon which claims of partisan gerrymandering can be based.  But the Court has held that traditional or neutral districting principles may not be subordinated in a dominant fashion by either racial or partisan interests absent a compelling state interest for doing so, particularly where the traditional districting principle is embedded in the state constitution.  E.g., *Shaw v. Reno*, 509 U.S. 630, 642 (1993); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1332-33 (N.D. Ga. 2004), aff'd sub nom *Cox v. Larios*, 542 U.S. 947 (2004); *Bartlett v. Strickland*, 556 U.S. 1, 7 (2009).

57.  The House and Senate districts in Acts 2012-602 and 2012-603 have been designed to promote the agenda of the partisan majority to maximize the number of seats statewide that Republicans will hold in the Legislature.  But this statewide partisan policy has been pursued in a manner that dilutes the voting strength of county residents in electing the members of their local legislative delegations by unnecessarily splitting county boundaries and including in local legislative delegations legislators who are elected in part by voters residing in other counties.

58.  Responsiveness of the local legislative delegation to the voters of the particular county is crucial under Alabama's state constitutional system, which substantially restricts county home rule.  The county's local legislative delegation effectively controls most important local government policies; for example, property and occupational taxes, changes in municipal boundaries, and salaries of elected county officials.  This control operates primarily through written and informal rules of the Legislature, the rule of "local courtesy" in particular, by which local laws affecting only one county are routinely uncontested on the floor of the House and Senate when they are approved by that county's local legislative delegation.

59.  Plaintiffs do not allege that the rule of local courtesy and other constitutional, statutory, and internal legislative rules and procedures governing passage of local laws violate the Equal Protection Clause.  Nor does the inclusion in a county's local delegation of some legislators who also represent voters in other counties always violate federal constitutional or statutory law.  But, as the LRC was reminded in a public hearing, Doc. 30-25 at 15, the indiscriminate multiplication of House and Senate seats that unnecessarily cross county boundaries and increase the number of legislators and/or out-of-county constituents in the local delegation does violate the Equal Protection Clause by diluting the

ability of county voters independently to choose the members of their local

legislative delegation more than is required to comply with the statewide standard

of equal population among House and Senate districts.  Partisan and incumbency

protection interests cannot justify this unnecessary dilution of the votes of a

county's residents.

60.  In Alabama, the primary traditional principle for drawing legislative

districts has always been the preservation of county boundaries.  Since its

admission to the United States in 1819, Alabama has maintained a policy of

utilizing counties as the building blocks of equal representation in the Legislature.

This policy is embedded in the Alabama Constitution of 1901, §§ 50, 198, 199,

200, which prohibit the division of county boundaries among House and Senate

districts, and in the longstanding informal legislative custom of local courtesy, by

which the members of each county's local legislative delegation have virtual

independence in deciding what laws will govern their own county and municipal

governments.

61.  This longstanding policy was acknowledged in the Legislative

Reapportionment Committee's guidelines ("The following redistricting policies

contained in the Alabama Constitution shall be observed to the extent that they do

not violate or conflict with requirements prescribed by the Constitution and laws of

the United States: a. Each House and Senate district should be composed of as few counties as practicable.").  Doc. 30-4 at 3.  The guidelines also recognized compactness and contiguity as having constitutional priority.  Id.

62.  The Fourteenth Amendment rights of plaintiffs and the classes they seek to represent to equal protection of the laws are violated by the unnecessary division of their county boundaries between House and/or Senate districts, under both the strict scrutiny and rational basis standards of federal constitutional law.

a.  The dilution of the voting strength of residents of a county by the inclusion in their local legislative delegation of members whose constituencies unnecessarily include residents of another county violates their fundamental constitutional right to an equal and undiluted vote unless it can be justified by a narrowly tailored, compelling federal or state interest.

b.  There is no rational basis for diluting the voting strength of residents of a county by the inclusion in their local legislative delegation of members whose constituencies unnecessarily include residents of another county.

63.  In short, Acts 2012-602 and 2012-603 violate the Equal Protection Clause (1) because they deny the fundamental rights of county residents to an equal and undiluted vote for the legislators who control the laws governing their local governments, and (2) because they are "crazy quilts" that construct House

and Senate districts with no rational basis.

64.  The promotion of partisan political interests cannot justify the denial by Acts 2012-602 and 2012-603 of plaintiffs' rights to equal protection of the laws by unnecessarily dividing counties among House and Senate districts.  *Reynolds v. Sims*, 377 U.S. 533, 578-79 (1964) ("Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering").  There is no compelling federal or state interest in the promotion of partisan interests, nor is the promotion of partisan interests a rational basis for violating plaintiffs' equal protection right to an undiluted local legislative delegation.

65.  The protection of incumbent interests, including the avoidance of incumbent conflicts, cannot justify denial by Acts 2012-602 and 2012-603 of plaintiffs' rights to equal protection of the laws by unnecessarily dividing counties among House and Senate districts.  The right to an equal and undiluted vote protects voters, not elected officials.  Drawing House or Senate districts that unnecessarily multiply the number of counties represented by incumbents is an irrational justification for denying residents of those counties the equal protection of laws, whose purpose is precisely to restrict such multiple-county constituencies and to protect the independence of voters' county representation in the Legislature.

66.  Only the interests of incumbent Republican legislators were taken into account by Acts 2012-602 and 2012-603.  The expressed interests of incumbent Democratic legislators were systematically ignored or were outright rejected.

67.  The denial by Acts 2012-602 and 2012-603 of plaintiffs' rights to equal protection of the laws by unnecessarily dividing counties among House and Senate districts cannot be justified by the Legislature's arbitrary imposition of a strict rule limiting permissible population deviations among districts to $\pm$ 1%.  There is no compelling federal or state interest, nor is there any rational basis, for such a deviation restriction when federal constitutional law expressly authorizes deviations of $\pm$ 5% or even higher for the purpose of preserving county boundaries, as counsel for the LRC affirmed at a public hearing.  Doc. 30-25 at 8-9.  The Chair of the LRC acknowledged that the $\pm$ 1% restriction was adopted arbitrarily by majority vote of LRC members.  Id. at 10.

68.  The $\pm$ 1% restriction was adopted for an explicit partisan purpose, that is, ostensibly, as an attempt to avoid the type of partisan gerrymandering found unconstitutional in *Larios*.  But the $\pm$ 1% restriction is an irrational response to *Larios*, because imposing such a small deviation requirement made it even easier to include or exclude particular census blocks or tracts based on the likely partisan preferences of their residents.

69.  Comparisons of Acts 2012-602 and 2012-603 with the plans in HB 16 and SB 5 illustrate the severe impact on county boundaries of the Legislature's $\pm$ 1% rule.  See Exhibits K and L to this Amended Complaint.  The House plan in Act 2012-602 splits Greene County in HD 61 to capture only 12 persons.  Pieces of House districts that contain less than 5% of the ideal population split 11 counties unnecessarily, and there are 27 fragments that contain less than 10% of ideal population.  Greene County, Marshall County, Coffee County, Morgan County and Coosa County each contains 2 (Coosa County contains a third fragment containing 10.224% of ideal population), and Dekalb County contains 3 House district fragments smaller than 10% (plus a fourth fragment that contains only 10.085% of ideal population).  By comparison, no county in the HB 16 plan contains a fragment of a district containing less than 5% of the ideal population, and only Etowah County contains a piece smaller than 10% of ideal population.

70.  The Senate plan in Act 2012-603 contains 14 district fragments smaller than 5% of ideal population and 36 fragments smaller than 10% of ideal population.  Choctaw, Hale, Conecuh, Clay, St. Clair, Talladega, Dekalb, Pickens, Monroe, and Winston Counties all have 2 fragments less than 10% of ideal population.  Marengo County has one 4.59% and one 10.81% fragment.  Clarke County has 3 fragments less than 10% of ideal population.  By comparison, in SB

5 only Mobile County contains a piece of a district containing less than 5% of the

ideal population (a cartographer error, see ¶ 79.b. *infra*), and only 3 counties

contain a piece smaller than 10% of ideal population.

71.  The Legislative Reapportionment Committee (LRC) held hearings all

over Alabama purportedly to receive public input to the redistricting process.  But

the hearings all were held before the LRC had proposed any House or Senate plans

using 2010 census data.  Denied the ability to comment on particular district lines,

the citizens and local officials who spoke at these hearings expressed a single,

nearly unanimous concern, namely, that the integrity of their county boundaries be

respected to the extent practicable.  But this paramount constituent concern was

almost completely ignored by the LRC and the Legislature.

72.  The first public hearing by the LRC was held in Fort Payne, Dekalb

County, on October 3, 2011.  Doc. 30-9.  The speakers emphasized the importance

of county integrity, but their comments were ignored by the Legislature:

a.  HD 22 and HD 24 needed to lose population, while HD 23 needed

to gain population.  Exhibits M and Q; Doc. 30-9 at 2.  Most speakers said that 4

House districts were too many, since Dekalb County is small enough for only 2

districts.  Doc. 30-9 at 4, 6, 7, and 8.  But, instead of reducing the number of

districts, Act 2012-602 increases the number of House districts in Dekalb County

from 4 to 6.   See Exhibit N.  Only HD 24 lies entirely within Dekalb County.  The

other five House districts contain only small fragments of Dekalb County: HD 23

(3.48%), HD 27 (7.70%), HD 39 (10.085%), HD 26 (14.791%), and HD 29

(19.174%), Exhibit K, and their incumbents reside in and represent 7 outside

counties: Jackson, Marshall, Blount, Cherokee, Calhoun, Cleburne, and Etowah

Counties.  Exhibit A.  There is no compelling federal or state reason or rational

basis for dividing Dekalb County among so many House districts or for increasing

the size of its local legislative delegation and the number of other counties whose

residents elect members of its local delegation. Neither the arbitrary $\pm$ 1%

deviation rule nor partisan nor incumbent interests can justify diluting the votes of

Dekalb County residents.

b.  SD 8, which in the 2002 Senate plan contained all of Dekalb and

Jackson Counties and a fragment in rural eastern Madison County, had to give up

population.  Exhibits O and Q; Doc. 30-9 at 1.  Speakers at the Dekalb County

hearing, including the Mayor of Fort Payne, asked that all of Jackson and Dekalb

Counties be kept in SD 8 and that Madison County be removed.  Id. at 4, 10.

Instead, Act 2012-603 splits Dekalb County between 3 Senate districts and extends

SD 8 even farther west into the metropolitan Huntsville area of Madison County.

Exhibit P.  There is no compelling federal or state reason or rational basis for

31

dividing Dekalb County among so many Senate districts and placing 2 non-resident Senators in its local delegation, one of whom, Clay Scofield, resides in Blount County, which does not adjoin Dekalb County.  Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Dekalb County residents.

73.  A public hearing by the LRC was held in Guntersville, Marshall County, on October 3, 2011.  Doc. 30-10.  The speakers all asked that Marshall County be kept whole to the extent practicable and that only one other county be included in the local legislative delegation where necessary to balance population. Id. at 6-9.  They expressed preferences for being joined with Blount County and taken out of Madison County.  Id.

a.  In the 2002 plan, Marshall County had only 2 House districts.  HD 27 lay entirely inside Marshall County, and HD 26 contained only part of Dekalb County.  Exhibit M.  Both HD 26 and HD 27 were overpopulated.  Exhibit Q.  But, instead of reducing the number of counties in these two districts, Act 2012-602 dramatically increases them.  Exhibit N.  HD 27 could have been left undisturbed totally within Marshall County.  But Act 2012-602 extended HD 27 into Blount County (5.51%) and Dekalb County (7.70%).  HD 26 retained a part of Dekalb County (14.79%), but 3 additional House districts were added to the Marshall

County local legislative delegation: HD 9 (2.80%) (Morgan and Cullman
Counties), HD 11 (8.84%) (Morgan, Cullman, and Blount Counties), and HD 34
(19.59%) (Blount County).  So the number of House members in the Marshall
County delegation increases from 2 to 5, and the number of counties whose
residents elect members of the Marshall County House delegation increases from 3
to 6.  There is no compelling federal or state reason or rational basis for dividing
Marshall County among so many House districts or for increasing the size of its
local legislative delegation and the number of other counties whose residents elect
members of its local delegation.  Neither the arbitrary $\pm$ 1% deviation rule nor
partisan nor incumbent interests can justify diluting the votes of Marshall County
residents.

      b.  SD 9 contained all of Marshall County and parts of Madison and
Blount Counties in the 2002 plan and was only 5.85% overpopulated.  Exhibits O
and Q.  The incumbent, Republican Clay Scofield, resides just over the Marshall
County border in Blount County, and the speakers at the hearing asked that SD 9
be taken out of Madison County and kept only in Marshall and Blount Counties.
Instead, Act 2012-603 keeps fragments of Madison County (14.13%) and Blount
County (9.31%) and adds a fragment in Dekalb County (9.44%).  Exhibits P and L.
There is no compelling federal or state reason or rational basis for including

residents of 3 other counties in the constituency of the one Senator in the Marshall County local delegation. Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Marshall County residents.

74. Public hearings by the LRC were held in Fayette, Fayette County, and Florence, Lauderdale County, on October 4, 2011. Docs. 30-12 and 30-13. The speakers all asked that their counties be kept whole or, at least, that the number of legislators in their local delegations be minimized.

a. HD 16, which contained all of Lamar and Fayette Counties and a part of Tuscaloosa County, was underpopulated by 12.38%. Exhibits Q and R. Winston County was split between 3 House districts, and Walker County was split between 2 districts. Lauderdale County was whole within 2 House districts, and its county boundaries were not split. All the other counties in northwest Alabama, Colbert, Franklin, Lawrence, and Marion, were not split between House districts. Exhibit R. All of these northwest Alabama House districts, HD 2, 3, 7, 13, 14, 16, 17, and 18, were underpopulated, except for HD 1, the Florence metropolitan area, which was only 3.79% overpopulated. HD 2 was only underpopulated by 0.012%, so there was no need to redraw the House districts that kept Lauderdale County whole. Exhibit Q. But, instead of compressing the House districts south of Lauderdale County and reducing the number of county splits, Act 2012-602 splits

Lauderdale County into 4 districts, leaving only part of HD 2 (85.857%) and adding fragments of HD 3 (3.61%) and HD 18 (13.486%).  Exhibits K and S.  It keeps Winston County split into 3 districts and Walker County split into 2 districts, extending HD 13 beyond Walker County into Blount County (11.241%), then it splits Colbert, Lawrence, and Lamar Counties.  Exhibits K and S.  HD 16 not only splits Lamar County, it extends all the way through Fayette and Tuscaloosa (18.381%) Counties into Jefferson County (27.598%), a gerrymander that was designed purposefully to punish Rep. Dan Boman, the Sulligent Representative who had switched from the Republican Party to the Democratic Party.  Exhibits K and S, Doc. 35-10.  In other words, by adding multiple new county splits and by extending existing House districts into new counties, Act 2012-602 manages to dilute the voting strength of residents in every northwest Alabama county.  There is no compelling federal or state reason or rational basis for dividing Lauderdale, Colbert, Lawrence, Franklin, Winston, Lamar, and Walker Counties among so many House districts or for increasing the size of their local legislative delegations and the number of other counties whose residents elect members of their delegations.  Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of these many county residents.

   b.  SD 1, which contained all of Lauderdale County and the eastern

half of Colbert County, was underpopulated by 1.10%.  SD 6, which contained the rest of Colbert County, parts of Lawrence and Winston Counties, and all of Franklin, Marion, Lamar and Fayette Counties, was underpopulated by 14.29%. Exhibits Q and T.  These two Senate districts are represented by Democratic Senators, Tammy Irons of Florence in SD1 and Roger Bedford of Russellville in SD 6, both of whom testified during the hearings.  Senator Irons requested that if any slight addition were deemed necessary in SD 1 that it be taken from Colbert County.  Doc. 30-13 at 4-5.  Senator Bedford requested that SD 6 be extended farther into Lawrence County.  Doc. 30-12 at 4.  Instead, Act 2012-603 splits Lauderdale County and extends SD 1 all the way through Limestone County (31.97%) into Madison County (16.14%).  Exhibits L and U.  The partisan purpose of this gerrymander was to remove predominately black Madison County precincts to SD 1, avoiding a potential crossover district, like the 40% black SD 7 in SB 5. Exhibits H and I.  SD 6 was also radically reworked.  Lamar and Fayette Counties were completely removed from SD 6, as was the eastern half of Marion County, and non-contiguous fragments of Lauderdale (19.84%) were added to SD 6. Exhibits L and U.  There is no compelling federal or state reason or rational basis for these radical, county-splitting changes to SD 1 and SD 6.  Neither the arbitrary ± 1% deviation rule nor partisan nor incumbent interests can justify diluting the

votes of Lauderdale, Limestone, Madison, Lawrence, and Marion County residents.

75.  A public hearing by the LRC was held in Decatur, Morgan County, on October 4, 2011.  Doc. 30-14.  Only two persons spoke, and they both asked that the integrity of Limestone County be respected.  Id. at 4.

a.  In the 2002 House plan, HD 4, HD 10, and HD 12 (+0.61%) were overpopulated, and HD 7, HD 8, HD 9 (-0.32%), and HD 11 (-3.11%) were underpopulated.  Exhibits Q and R.  Limestone and Cullman Counties each was split among 3 House districts, and Morgan County was split among 4 House districts.  Exhibit R.  Instead of reducing these county splits, Act 2012-602 increases the number of districts in Limestone County from 3 to 5 and in Morgan County from 4 to 5.  Exhibit S.  Cullman County remains split among 3 House districts.  Id.  There is no compelling federal or state reason or rational basis for dividing Limestone, Morgan, and Cullman Counties among so many House districts or for increasing the size of their local legislative delegations and the number of other counties whose residents elect members of their delegations. Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of these many county residents.

b.  In the 2002 Senate plan, SD 2, SD 3, and SD 7 were

overpopulated, and SD 4 was underpopulated.  Exhibits Q and T.  Limestone

County was split between 2 Senate districts, while Morgan and Cullman Counties

were contained whole in Senate districts they each shared with 2 other counties.

Exhibit T.  Act 2012-603 increases the number of Senate districts in Limestone

County from 2 to 3 (only 7.20% of SD 3 is in Limestone County), Exhibits L and

U, which, combined with its House districts, increases the overall size of the

Limestone County local legislative delegation from 5 to 8, when its population

only warrants 3.  Exhibit E.  Cullman County remains whole within one Senate

district, but the boundaries of SD 4 have been extended into Lawrence, Winston,

and Marion (9.04%) Counties, Exhibit L, so that Cullman County's local

legislative delegation now includes one Senator who is elected by citizens of 3

other counties.  There is no compelling federal or state reason or rational basis for

splitting Limestone County among so many Senate districts or for increasing the

size of its local legislative delegation and that of Cullman County.  Neither the

arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify

diluting the votes of Limestone, Morgan, Cullman and Marion County residents.

    76.  A public hearing by the LRC was held in Clanton, Chilton County, on

October 6, 2011.  Doc. 30-15.  All the speakers, including the incumbent Senator,

former House member, Mayor of Clanton, and Chilton County Probate Judge,

pleaded with the LRC to keep Chilton County undivided, as it was in the 2002 House and Senate plans.  Doc. 30-15 at 2-5; Exhibits V and W.

a.  HD 42, which in the 2002 plan contained all of Chilton County and a small part of Shelby County, Exhibit V, was overpopulated by 6.19%.  Exhibit Q. By removing the Shelby County fragment, Chilton County would have made a complete HD 42 underpopulated by 4.13%, as it is in HB 16.  Exhibits F and G. Instead, Act 2012-602 divides Chilton County among 3 House districts, HD 49 (18.040%), which extends into Bibb and Shelby Counties, HD 81, which extends through Coosa County (9.40%) into Tallapoosa County, and HD 42, which extends into Autauga County.  Exhibits A, K, Q, and X.  So the number of House members in the Chilton County local legislative delegation has increased from 1 to 3, and the number of counties outside Chilton County who elect members of the Chilton County legislative delegation has been increased from 2 to 5.  There is no compelling federal or state reason or rational basis for splitting Chilton County among so many House districts or for increasing the size of its local legislative delegation and increasing the number of other counties whose residents elect members of the Chilton County delegation.  Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Chilton County residents.

b. SD 14, which in the 2002 plan contained all of Chilton County and parts of Bibb, Shelby, and Jefferson Counties, was overpopulated by 23.51%. Exhibits W and Q. But, instead of compacting SD 14 into more whole counties, e.g., Exhibit H, Act 2012-603 splits Chilton County between 2 Senate districts, SD 14, which not only extends into Shelby County and Jefferson County (8.14%) and includes all of Bibb County, but now includes a fragment of Hale County (2.27%), and SD 30 (8.08%), which includes all of Autauga and Coosa Counties and a part of Elmore County. Exhibits L and C. So the number of Senate members in the Chilton County local legislative delegation has increased from 1 to 2, and the number of counties outside Chilton County who elect Senate members of the Chilton County legislative delegation has increased from 3 to 6. The combined Chilton County local legislative delegation has increased from 2 to 5 legislators representing 7 other counties. There is no compelling federal or state reason or rational basis for splitting Chilton County among 2 Senate districts or for increasing the size of its local legislative delegation and the number of other counties whose residents elect members of the Chilton County delegation. Neither the arbitrary ± 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Chilton County residents.

77. Public hearings by the LRC were held in Pelham, Shelby County, and

Birmingham, Jefferson County, on October 6, 2011.  Docs. 30-16 and 30-17.  Most of the speakers were incumbent legislators, and they all emphasized the importance of preserving county and municipal boundaries.  Doc. 30-16 at 5; Doc. 30-17 at 4-6, 9.  Some legislators and nearly all the citizen speakers requested the opportunity to review the LRC's proposed plans once they had been drawn.  Doc. 30-16 at 4-5; Doc. 30-17 at 6, 9-14.  Black legislators objected to packing the majority-black districts.  Doc. 30-17 at 6, 9.

     a.  In the 2002 plan Jefferson County had 18 House districts, 9 majority-white and 9 majority-black.  All 9 of the majority-black House districts were contained entirely within Jefferson County, but 4 of the 9 majority-white districts, HDs 34, 43, 45, and 48, included parts of 4 other counties.  Exhibits V and Z.  The House districts in Shelby County, HDs 41, 42, 43, 43, 48, 49, and 50, all were overpopulated.  Exhibits Q, V, Z.  In Jefferson County, all but one, HD 45 (-5.78%), of the majority-white districts were overpopulated, HDs 15, 34, 43, 44, 46, 47, 48, and 51.  All the majority-black districts, HDs 52-60, were underpopulated.  Exhibits Q, V, Z.  Four of the majority-white House districts crossed the Jefferson County boundary to include parts of three other counties, Blount County (HD 34), Shelby County (HD 43 and HD 48), and St. Clair County (HD 45).

b.  The Act 2012-602 plan retains 18 House districts in Jefferson County, but only 8 are majority-black, and they are all located entirely within Jefferson County.  Exhibits AA and B.  Now there are 10 majority-white House districts, and 6 of them cross the Jefferson County boundary to include parts of 6 other counties.  A total of 155,279 people residing outside Jefferson County are represented by members of Jefferson County's local House delegation.  Exhibit DD.  HD 43 contains only 224 residents of Jefferson County (1.14%), and only 8 of them are black.  Exhibit K.  The rest of HD 43 lies entirely in Shelby County.  Exhibit AA.  HD 14 contains 5,338 Jefferson County residents (11.73%), of whom only 18 are black.  Exhibit K.  The rest of HD 14 includes parts of both Walker County and Winston County.  Exhibit A.  Only 27.60% of HD 16's population resides in Jefferson County, 10.91% of whom are black.  Exhibit K.  The rest of HD 16 contains parts of Tuscaloosa, Fayette, and Lamar Counties, including the residence of incumbent Dan Boman of Sulligent, the former Republican who switched to the Democratic Party.  Exhibit A; Doc. 35-10.  Almost half (47.26%) of HD 45's population is located in Jefferson County, of whom 23.33% are black, and the rest is in Shelby County.  Exhibits K and AA.  The vast majority (80.51%) of HD 48's residents are in Jefferson County, only 3.35% of whom are black; the rest reside in Shelby County.  Exhibits K and AA.  Finally, 88.68% of HD 15's

population resides in Jefferson County, of whom 14.17% are black; the rest reside in Shelby County.  Exhibits K and AA.

c.   In the 2002 plan Jefferson County had 8 Senate districts, 5 majority-white and 3 majority-black.  All 3 of the majority-black Senate districts, SDs 18, 19, and 20, were contained entirely within Jefferson County.  But all of the 5 majority-white districts, SDs 5, 14, 15, 16, and 17, included parts of 8 other counties, Winston, Walker, Tuscaloosa, Blount, St. Clair, Shelby, Bibb, and Chilton.  Exhibits BB, T, and W.  All 3 majority-black Senate districts, SDs 18, 19, and 20, were underpopulated.  All but one, SD 5 (-1.16%), of the 5 majority-white districts were overpopulated: SDs 14-17.

d.   The Act 2012-603 plan retains the 8 Jefferson County Senate districts.  All three majority-black districts are contained entirely within Jefferson County.  Exhibit CC.  But only parts of the populations of each of the 5 majority-white districts reside in Jefferson County: SD 5 (13.64%), SD 14 (8.14%), SD 15 (37.76%), SD 16 (69.42%), and SD 17 (56.13%).  Exhibit L.  The number of other counties that provide constituencies for Senators in the Jefferson County local legislative delegation has expanded from 8 to 11: Fayette, Walker, Winston (8.80%), Tuscaloosa, Hale, Bibb, Shelby, Chilton, Talladega (4.24%), St. Clair (5.97%), and Blount.  Exhibits C, L, CC, U, and Y.  A total of 428,101 people

residing outside Jefferson County are represented by members of Jefferson County's local Senate delegation.  Exhibit EE.

       e. Had the Legislature complied with its own redistricting guidelines, 14 House districts could have been drawn entirely within Jefferson County, with no district extending beyond the Jefferson County boundaries, as demonstrated by the HB 16 plan.  Exhibits F and G.  All 9 of the current majority-black House districts could have been maintained.  Similarly, as demonstrated by the SB 5 plan, Exhibits H and I, 5 or 6 Senate districts could have been drawn, 4 of which could have been contained entirely within Jefferson County, while maintaining the current 3 majority-black Senate districts.  The single Senate district crossing Jefferson County's boundaries would have included residents of only one other county.

       f.  Instead, Acts 2012-602 and 2012-603 place 6 more legislators in the Jefferson County local legislative delegation than are required by federal constitutional and statutory law.  A total of 11 House and Senate districts cross Jefferson County's boundaries to include residents of 11 other counties.

       g.  There is no compelling federal or state reason or rational basis for splitting Jefferson County among 11 House and Senate districts or for increasing the size of its local legislative delegation and the number of other counties whose

residents elect members of the Jefferson County delegation.  Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Jefferson County residents.

78.  In the economically depressed Black Belt counties and other rural counties of South Alabama, public hearings were held by the LRC on October 11-13, 2011, in Troy, Pike County, Doc. 30-18, Greenville, Butler County, Doc. 30-19, Dothan, Houston County, Doc. 30-20, Brewton, Escambia County, Doc. 30-21, Thomasville, Clarke County, Doc. 30-23, Demopolis, Marengo County, Doc. 30-24, and Tuscaloosa, Tuscaloosa County, Doc. 30-25, and on October 18, 2011, in Selma, Dallas County, Doc. 30-28.  Most legislators, local officials, and citizens who spoke at these hearings emphasized the importance of keeping their counties whole.  Doc. 30-18 at 6-11; Doc. 30-19 at 4; Doc. 30-20 at 5-9; Doc. 30-21 at 5-8; Doc. 30-23 at 7-12, 15-19; Doc. 30-24 at 7, 12; Doc. 30-25 at 8-10, 13, 15.

a.  In the 2002 House plan, 3 of the Black Belt counties (Marengo, Dallas, and Bullock) had been split more than necessary based on population, as had 8 other South Alabama counties, Choctaw, Tuscaloosa, Clarke, Monroe, Conecuh, Escambia, Dale, Russell, and Bullock.  Exhibits E and V.  Tuscaloosa County, which is large enough for 5 House districts, was split into 7 House districts.  Dale County, which is large enough for 2 House districts, was split into 3

House districts.  And Conecuh, Escambia, and Russell Counties, which are small

enough for 1 House district, each was split into 3 House districts.  Id.  Thus in

South Alabama the 2002 House plan already split a total of 11 counties.

      b.  The Act 2012-602 House plan make the situation worse, splitting

13 counties in South Alabama: Pickens, Sumter, Greene, Perry, Marengo (3x),

Tuscaloosa (6x), Washington, Clarke, Monroe, Escambia, Russell (3x), Coffee

(3x), and Houston (4x).  The first 5 of these counties are in the Black Belt.

Exhibits E and X.  By comparison, the HB 16 House plan, sponsored by members

of the ALBC, showed that it would have been necessary to split no more than 5

South Alabama counties, none of them in the Black Belt: Clarke, Monroe,

Conecuh, Pike, and Houston (which requires only 3 House districts, but is split

among 4 districts).  Exhibits E and F.

      c.  In the 2002 Senate plan, 3 of the Black Belt counties (Marengo,

Perry, and Hale) had been split more than necessary based on population, as had 7

other counties (Tuscaloosa, Choctaw, Clarke, Monroe, Conecuh, Russell, Dale, and

Houston).  Exhibits E and W.  Thus in South Alabama the 2002 Senate plan

already split a total of 10 counties.

      d.  The Act 2012-603 Senate plan splits 11 counties in South

Alabama: the Black Belt counties of Pickens, Marengo, and Hale, plus Tuscaloosa,

Choctaw, Clarke (3x), Monroe, Conecuh (3x), Dale, Russell, and Houston.

Exhibits E and Y.  By comparison, the SB 5 Senate plan, sponsored by members of

the ALBC, showed that it would have been necessary to split no more than one

county (Dale), none in the Black Belt.  Exhibits E and H.

   e.  There is no compelling federal or state reason or rational basis for

splitting so many Black Belt and other South Alabama counties among House and

Senate districts or for increasing the size of their local legislative delegations and

the number of other counties whose residents elect members of their delegations.

Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can

justify diluting the votes of Black Belt and other South Alabama county residents.

 79.  A public hearing was held by the LRC on October 12, 2011, in Mobile,

Mobile County.  Doc. 30-22.  The Mobile County Probate Judge urged the LRC to

avoid crisscrossing the existing county commission and county school board

district lines.  Id. at 5-6.

   a.  The 2002 House plan split Mobile and Baldwin Counties in HD 96

and split Baldwin County in HD 66, which extended into Escambia County, and

again in HD 64, which extended into Escambia, Conecuh, and Monroe Counties.

Exhibit FF.  A speaker at the public hearing representing both the City of

Chickasaw in Mobile County and the State Republican Executive Committee

requested that part of Chickasaw, which was split between majority-black HD 98 and majority-white HD 96, be left in HD 96 for the explicitly partisan purpose of matching Republican voters in Mobile and Baldwin Counties.  Doc. 30-22 at 6-7. Act 2012-602 complies with this partisan request: a majority-white part of Chickasaw is in HD 96, and the majority-black areas of Chickasaw are split between majority-black districts HD 97 and HD 98.  Exhibit GG.  HD 96 is the only House district that splits Mobile County.  But Baldwin County is split at total of 4 times, through HD 96, HD 64, which extends into Monroe County, HD 66, which extends into Escambia County, and HD 68, which extends all the way into Washington, Clarke, Marengo, Monroe, and Conecuh Counties.  Exhibits A and GG.  None of these county splits was necessary.  The HB 16 House plan showed that both Mobile County and Baldwin County could have been kept whole, not splitting either of them.  Exhibit F.

b.  In the 2002 Senate plan, SD 22 split both Mobile and Baldwin Counties and extended into Washington, Choctaw, Clarke, Monroe, Conecuh, and Escambia Counties.  Exhibits W and HH.  Washington and Escambia Counties were kept whole.  In the Act 2012-603 plan, SD 22 keeps only Escambia County whole and keeps parts of all 7 of the other counties.  Exhibits Y and II.  SD 22 splits Mobile County only by including small precincts in Citronelle and Mount

Vernon.  Exhibit II.  The SB 5 Senate plan demonstrated how SD 22 could have been drawn to split only Baldwin County, while including Washington, Escambia, and Covington Counties whole.  Exhibit H.  There was no need to split Mobile County at all.  The Mount Vernon precinct that SB 5 included in SD 22 could be removed without creating any population deviations greater than 5%.

   c.  There is no compelling federal or state reason or rational basis for splitting so many counties in Southwest Alabama among House and Senate districts or for increasing the size of their local legislative delegations and the number of other counties whose residents elect members of their delegations.  Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of Southwest Alabama county residents.

  80.  Public hearings were held by the LRC on October 17, 2011, in Anniston, Calhoun County, and Auburn, Lee County.  Docs. 30-26 and 30-27.  In Anniston, Rep. Jim McClendon, a Co-Chair of the LRC, entered a statement in the record for himself as a representative of St. Clair County and for another citizen of St. Clair County.  Doc. 30-26 at 7-8.  Rep. McClendon said St. Clair County should have only 2 House members and 1 Senator in its local legislative delegation, but under the 2002 House and Senate plans St. Clair County has 6 legislators in its local delegation, 5 of whom reside in and represent other counties.

Id.  This was not right, he said, because, due to the system established by the Alabama Constitution, it allows one out-of-county legislator to veto local bills for St. Clair County and creates confusion among voters.  Id.  Rep. McClendon's concern about unnecessarily splitting counties was echoed by speakers from St. Clair and Cleburne Counties.  Id. at 12, 18.  At the Auburn hearing, Rep. Pebblin Warren and two other Bullock County residents asked that Macon and Bullock Counties be restored whole to the same House district.  Doc. 30-27 at 7, 13, 15. The Lee County Probate Judge and several other citizens complained that Lee County, whose population justifies only 3 House districts and 1 Senate district, Exhibit E, was divided among 5 House districts and 3 Senate districts.  Doc. 30-27 at 8-10, 12, 14.

a.  In the 2002 House plan, St. Clair County, whose population requires only 2 House districts, Exhibit E, is split into 3 House districts, HD 30, HD 50, and HD 36.  Exhibit LL.  Cleburne County is contained whole in HD 39. Id.  Lee County, whose population requires only 3 House districts, is divided among 5 House districts, HD 38, HD 79, HD 80, HD 82, and HD 83.  Exhibits V and LL.  But the Act 2012-602 House plan still splits St. Clair County among the same 3 House districts, and it splits Cleburne County between HD 37 and HD 39. Exhibit MM.  As demonstrated by HB 16, even if St. Clair County remains divided

among 3 House districts, there is no need to split Cleburne County. Exhibit F. Act 2012-602 keeps Macon and Bullock whole, but it does not place them in the same House district. Exhibit X. HB 16 would have joined Macon and Bullock Counties whole in the same House district. Exhibit F. Act 2012-602 retains the same 5 House districts dividing Lee County. Exhibit X. HB 16 would have divided Lee County into 4 House districts, and redrawing the oddly shaped districts in Coosa and Tallapoosa Counties could reduce the number of House districts in Lee County to the minimum 3. Exhibit F.

b. In the 2002 Senate plan, St. Clair County is divided between 2 Senate Districts, SD 12 and SD 17. Exhibit NN. Act 2012-603 increases to 3 the number of Senate districts in St. Clair County: SD 10, SD 11, and SD 17. Exhibit OO. St. Clair County could have been kept whole and not split at all between Senate districts, as demonstrated by SB 5. Exhibit H. Lee County could have been drawn as a single, self-contained Senate district, as demonstrated by SB 5. Id.

c. One of the worst partisan gerrymanders targeted SD 11, whose incumbent, Jerry Fielding, was elected as a Democrat. (Sen. Fielding switched to the Republican Party after the passage of Act 2012-603.) Under the 2002 Senate plan, SD 11 contained all of Talladega and Coosa Counties and the eastern third of Elmore County. Exhibit NN. Act 2012-603 radically changes SD 11 into a

horseshoe shape, leaving it with no whole counties.  Exhibit OO.  Talladega

County now is divided among 4 Senate districts, SD 11, SD 12, SD 15, and SD 17,

which include in Talladega County's local legislative delegation representatives of

6 other counties, Jefferson, Blount, St. Clair, Calhoun, Clay, and Shelby.  Id.

Coosa County's local delegation now includes representatives of 3 other counties,

Elmore, Autauga, and Chilton.  Id.

> d.  There is no compelling federal or state reason or rational basis for

splitting St. Clair, Lee, Talladega, and Coosa Counties among so many House and

Senate districts or for increasing the size of their local legislative delegations and

the number of other counties whose residents elect members of their delegations.

Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can

justify diluting the votes of these county residents.

81.  The 21st and last public hearing was held by the LRC in Montgomery,

Montgomery County, on October 18, 2011.  Doc. 30-29.  Again, elected officials

and private citizens of Montgomery, Elmore, Bullock, and Autauga Counties urged

the LRC to respect county boundaries and limit the number of legislators in each

county's local legislative delegation.  Id. at 9-15, 19-21.  A representative of the

Alabama Association of County Commissions pleaded with the LRC to make as

many counties whole as possible all over the state, saying that the integrity of

counties among House and Senate districts will be vital to the operation of county governments for the next ten years.  Id. at 18.

a.  Based on their populations, Autauga and Elmore Counties each needs only 2 House districts, and Montgomery County is the ideal size for 5 House districts, even within the LRC's ± 1% restriction.  Exhibit E.  The 2002 House plan had only divided Autauga County between the minimum 2 House districts.  Exhibit V.  But Elmore and Montgomery Counties each had one more House district than are required by population, 3 House districts in Elmore County, and 6 House districts in Montgomery County.  Exhibits V and JJ.  Act 2012-602 increases to 4 the number of House districts in Autauga County,  keeps 3 House districts in Elmore County, and adds still another district to Montgomery County, dividing it into 7 House districts.  Exhibits X and KK.

b.  Act 2012-603 decreased the number of Senate districts in Autauga County from 2 to 1, and in Elmore County from 3 to 2, and it maintained the number of Senate districts in Montgomery County at 2.  Exhibits W and Y.  But, overall, the number of members of Montgomery County's local legislative delegation representing outside counties increased from 3 (Coosa, Elmore, and Autauga), Exhibits V and W, to 8 (Elmore, Autauga, Lowndes, Wilcox, Crenshaw, Butler, Conecuh, and Coffee).  Exhibits X and Y.

c.  There is no compelling federal or state reason or rational basis for splitting Autauga, Elmore, and Montgomery Counties among so many House and Senate districts or for increasing the size of their local legislative delegations and the number of other counties whose residents elect members of their delegations. Neither the arbitrary $\pm$ 1% deviation rule nor partisan nor incumbent interests can justify diluting the votes of these county residents.

82.  The denial by Acts 2012-602 and 2012-603 of plaintiffs' rights to equal protection of the laws by dividing counties among House and Senate districts cannot be justified by the need to comply with the Voting Rights Act, either § 2 or § 5, 42 U.S.C. §§ 1973 and 1973c.  The whole-county plans introduced by members of the Alabama Legislative Black Caucus, HB 16 and SB 5, demonstrate that the 27 black VAP-majority House districts and 8 black VAP-majority Senate districts can be preserved while limiting to 27 the number of counties having one or more members of their local legislative delegations than are necessary based on their populations, as compared with 49 such divided counties in Acts 2012-602 and 2012-603.  Indeed, by splitting some precincts and census tracts, and by taking advantage of isolated variances in excess of $\pm$ 5%, the integrity of even more counties could be respected.

83.  Viewed in their entirety, the plans in Acts 2012-602 and 2012-603 are

"crazy quilts" that cannot be justified on any rational basis and thus violate the Equal Protection Clause.  *Reynolds v. Sims*, 377 U.S. 533, 588 (1964) (Clark, J., concurring).

84.  Viewed in their entirety, the plans in Acts 2012-602 and 2012-603 have the purpose and effect of minimizing the opportunities for black and white voters who support the Democratic Party to elect candidates of their choice, and thus they violate the rights of plaintiffs and the class they seek to represent to equal protection under the Fourteenth Amendment and to freedom of speech and association under the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that this Court will grant them the following relief:

A.  Certify the named plaintiffs as representatives of the plaintiff classes (1) of residents of Alabama counties whose boundaries have been unnecessarily split among more House and/or Senate districts than are necessary to satisfy the Fourteenth Amendment requirement of substantial population equality and the Voting Rights Act, (2) of all African-American voters of Alabama, and (3) of all Alabama voters who support Democratic members of the Legislature.

B.  Enter a declaratory judgment that the redistricting plans set out in Acts

2012-602 and 2012-603 violate the rights of plaintiffs and the classes they seek to represent guaranteed by Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

C.  Enter a preliminary and permanent injunction prohibiting defendants, their political subdivisions, departments, officers, agents, attorneys, employees and those acting in concert with them or at their direction from enforcing Acts 2012-602 and 2012-603.

D.  Afford the Alabama Legislature a reasonable opportunity to adopt and to obtain preclearance under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c, of new redistricting plans for the House and Senate that comply with Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the First, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

E.  Should the Alabama Legislature fail in timely manner to enact lawful, constitutional, and enforceable redistricting plans for the Alabama House and Senate, instruct the parties to submit redistricting proposals that this Court would adopt in time for the orderly conduct of the primary and general elections for members of the Alabama House and Senate in 2014.

F.  Award plaintiffs their costs incurred in prosecuting this action, including

an award of attorneys' fees and expenses, pursuant to 42 U.S.C. §§ 1973l and 1988.

G.  Grant such other and further equitable relief as the Court may deem just

and equitable.

Respectfully submitted this 15th day of January, 2013.

| | |
|---|---|
| Edward Still | s/ James U. Blacksher |
| Bar No. ASB-4786-I 47W | Bar No. ASB-2381-S82J |
| 130 Wildwood Parkway | P.O. Box 636 |
| STE 108 PMB 304 | Birmingham AL 35201 |
| Birmingham, AL 35209 | 205-591-7238 |
| 205-320-2882 | Fax: 866-845-4395 |
| fax 205-320-2882 | E-mail: jblacksher@ns.sympatico.ca |
| E-mail: still@votelaw.com | |
| | U.W. Clemon |
| | Bar No. ASB-0095-076U |
| | WHITE ARNOLD & DOWD P.C. |
| | 2025 Third Avenue North, Suite 500 |
| | Birmingham, AL 35203 |
| | Phone:  (205)-323-1888 |
| | Fax:     (205)-323-8907 |
| Attorneys for Plaintiffs | E-mail: uwclemon@waadlaw.com |

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2013, I served the foregoing on the
following electronically by means of the Court's CM/ECF system:

| | |
|---|---|
| Misty S. Fairbanks Messick | John J. Park, Jr. |
| James W. Davis (ASB-4063-I58J) | Deputy Attorney General |
| Assistant Attorney General501 | Strickland Brockington Lewis LLP |
| Washington Avenue | Midtown Proscenium Suite 2200 |
| Post Office Box 300152 | 1170 Peachtree Street NE |
| Montgomery, Alabama 36130-0152 | Atlanta, GA 30309 |
| email: mmessick@ago.state.al.us | email: jjp@sbllaw.net |
| email: jimdavis@ago.state.al.us. | |

57

Walter S. Turner, Esq.
Post Office Box 6142
Montgomery, AL 36106-0142
email: wsthayer@juno.com

John K. Tanner, Esq.
3743 Military Road NW.
Washington, DC 20015
email: john.k.tanner@gmail.com

Joe M. Reed, Esq.
Joe M. Reed & Associates, LLC
524 South Union Street
Montgomery, AL 36104-4626
email: joe@joereedlaw.com

James H. Anderson, Esq.
William F. Patty, Esq.
Jesse K. Anderson, Esq.
Jackson, Anderson & Patty, P.C.
Post Office Box 1988
Montgomery, AL 36102
email: janderson@jaandp.com
email: bpatty@jaandp.com
email: jkanderson@jaandp.com

s/ James U. Blacksher

Attorney for ALBC plaintiffs

58