IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

ALABAMA LEGISLATIVE BLACK CAUCUS, et al., )
)
Plaintiffs, )
) Case No. 2:12-cv-691
) WKW-MHT-WHP
)
THE STATE OF ALABAMA, et al., )
)
Defendants. )
)
_____ )
)
)
DEMETRIUS NEWTON, et al., )
)
Plaintiffs, )
)
)
v. ) Case No. 2:12-cv-1081
) WKW-MHT-WHP
THE STATE OF ALABAMA, et al., )
)
Defendants. )

**AFFIDAVIT OF REP. JIM McCLENDON**

State of Alabama
County of Montgomery

COMES NOW before me, a notary public in and for said county and said State and, being first duly sworn, deposes and states:

1. My name is Jim McClendon. I am over the age of 21 years, have personal knowledge of the facts set forth, and am competent to testify regarding them.

2. Since 2002, I have been a member of the Alabama Legislature. I am presently serving my third term in the Alabama House of Representatives, where I represent House District 50.

3. I was appointed to the Permanent Legislative Committee on Reapportionment for the 2011-2014 Quadrennium as the House representative for the Sixth Congressional District. Together with Senator Gerald Dial from the Senate, I served as the Committee's co-chair during the current redistricting cycle.

4. While I have been in the Legislature for more than 10 years, I have not previously been involved with the redistricting process.

5. The results of the 2010 Census showed that the congressional, State Board of Education, and State legislative redistricting plans were unconstitutionally malapportioned and would have to be redrawn. Because the congressional seats and several of the seats on the State Board of Education were up for election in 2012, the Committee and the Legislature decided to work on those plans first. Before doing so, the Committee conducted seven public hearings at various places throughout the State in May 2011. Those hearings were an attempt to obtain public input on how the new plans should be drawn.

6. After those public hearings and before undertaking to redo the district lines for the State of Alabama's congressional, State Board of Education, and State legislative bodies after the 2010 Census, the Reapportionment Committee adopted Guidelines to assist us in the work to follow. The 2011 version of the Guidelines is very much like the 2001 version. One change that the Committee chose to make is the move from an overall population deviation of ±5%, which was the deviation used in the 1993 and 2001 legislative plans, to an overall population deviation of ±1%. In my judgment, that change was a reasonable attempt to comply with the general constitutional mandate that districts be as nearly equal in population to each other, without the need for absolute equality.

7. Before starting work on the legislative plans, the Committee again conducted a series of public hearings at various places throughout the State. This time, we did 21 hearings, and Senator Dial and I attended each of them. Other Committee members attended one or more of them, and sometimes members of the Legislature spoke at them. At each hearing, Senator Dial and I pointed out that changes in the population and its distribution required that some districts add people and others lose them.

8. As the House co-chair of the Committee, I handled the House side of the process while Senator Dial was responsible for the Senate side. I offered to meet with each of the other 104 members of the House to try to find out from them what they thought should be done, and most, but not all, of my colleagues took me up on that offer.

9. The process of drawing a plan is like putting a puzzle together. We started with the black-majority districts because the Voting Rights Act requires the State of Alabama to, among other things, preserve those districts. I understood our obligation under the Voting Rights Act to include not just preserving the districts but also doing our best to make sure that the new district essentially guaranteed that the African-American community could elect the candidate of its choice in that district. All 27 of the black-majority House districts in the 2001 plan were underpopulated when the 2010 Census results were loaded into them, so we had to add population to those districts. In order to essentially guarantee that the black community could elect the candidate of its choice, we had to add population that was both contiguous to the old district line and had about the same percentage of black population in it. I think that we succeeded in doing that because the House plan was precleared.

226928.4

10. After making sure that the black-majority districts met our obligations under the Voting Rights Act, we tried to take care of the rest of the State. In doing so, our first priority was to meet the overall population deviation of ±1% in the Guidelines. Any accommodation we made to a member had to satisfy that criterion.

11. We also tried to preserve communities of interest, which sometimes included county lines, but that was subject to compliance with the Voting Rights Act and with the ±1% population deviation. While we tried not to put incumbents in the same district, we moved HD 53 from Birmingham to Huntsville and HD 73 from Montgomery to Shelby County. Both of those changes left a member without a district.

12. HD 53 moved to Huntsville, but it remained a black majority district. The black majority House districts in the Birmingham area were sufficiently underpopulated that we could move one of them to Huntsville, where the black population was growing. That change was made in compliance with the Voting Rights Act and with the ±1% population deviation.

13. HD 73 moved to Shelby County, which was another area of the State that had experienced significant population growth. For the Montgomery area districts, I started with a map that was given to me by Representative Thad McClammy, an African-American House member. Mr. McClammy told me to use his plan for Montgomery and not someone else's. I used as much of it as I could, but not all of it.

14. Joe Hubbard was unhappy with what happened to HD 73 and talked with me extensively about it. He proposed several changes, but they would not work with the neighboring districts.

4

15. We completed the draft House Plan shortly before May 17, 2012. That plan was one of the subjects of another public hearing that was held in Montgomery on the morning of May 17, 2012. In addition, each member was offered a hard copy map of their districts and had an opportunity to review and discuss it with constituents over the weekend prior to discussion on the House floor if that member so chose.

16. After the plan made it out of Committee to the House floor, I was able to make some changes to accommodate members. I insisted that, when changes were proposed, each member whose district was affected concur in the change. I recall working with:

a. Barry Mask, Greg Wren, and another House member on an issue that had some effects on Montgomery, but not on the black-majority districts there;

b. Oliver Robinson and Mary Moore, and Patricia Todd, two African-American House members and a white democrat from the Birmingham area, who wanted to trade some precincts. We could accommodate them because the change would not affect the population deviation.

c. In contrast, I could not accommodate Merika Coleman and Juandalynn Givan, two African-American House members from the Birmingham area, who wanted to move 3700 people from one district to the other. I told them to work things out in a population-neutral way and come back to me, but I did not hear from them again.

d. I worked with Greg Burdine, Marcel Black, and Johnny Mack Morrow, three members from Northwest Alabama, to fix some concerns along their shared district borders.

226928.4

  e. I worked with Jeremy Oden, Ed Henry, Wes Long and Kerry Rich to fix some problems on their shared border.

17. In addition, I was able to fix a drafting error that put two members outside their districts. One of those errors resulted from the use of an incorrect home address.

18. In putting the House plan together, I offered each member an opportunity to tell me what he or she wanted. I tried to treat all of them fairly even as I sought to comply with the Voting Rights Act, the ±1% population deviation, and other generally applicable redistricting considerations.

19. I understand that, in the 2012 House plan, we split more counties than were split in the 1993 and 2001 House plans. In my judgment, the additional splits result from the use of the ±1% population deviation. Compliance with that population standard put one-person, one-vote interests ahead of county boundaries when there was a conflict.

FURTHER AFFIANT SAYETH NOT.

_____
Affiant

SWORN and SUBSCRIBED this ___ day of February 2013.

_____
Notary Public
My commission expires: 6/6/2016

226928.4