IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
ALABAMA LEGISLATIVE           )
BLACK CAUCUS, et al.,         )
                              )
    Plaintiffs,               )
                              )
                              )       CIVIL ACTION NO.
    v.                        )       2:12cv691
                              )       (Three-Judge Court)
THE STATE OF ALABAMA,         )
et al.,                       )
                              )
    Defendants.               )


DEMETRIUS NEWTON, et al.,     )
                              )
    Plaintiffs,               )
                              )
                              )       CIVIL ACTION NO.
    v.                        )       2:12cv1081
                              )       (Three-Judge Court)
THE STATE OF ALABAMA,         )
et al.,                       )
                              )
    Defendants.               )
```

**THOMPSON, District Judge, concurring:**

While I agree with the majority that the motion for summary judgment should be denied and I also agree with much of the majority's opinion, there are, however, parts with which I disagree and additional comments I wish to make. Therefore, I write separately to explain.

I.

Assuming that the "should" in Fed. R. Civ. P. 56(a) is, as stated by the majority, precatory rather than mandatory, I am concerned that it could be viewed as disingenuous to fault the ALBC plaintiffs[1] for invoking the rule and then to maintain that, in giving reasons now, the court is acting sua sponte and not (even a little bit) at the behest of the ALBC plaintiffs and pursuant to Rule 56(a)'s precatory "should."  I also see no need, now that our reasons are public, to reach the conclusion that our order is not appealable pursuant to Fed. R. Civ. P. 54(a).  Having said that, I turn to the merits.

---

1.  For ease of discussion, I refer to plaintiffs Alabama Legislative Black Caucus, Alabama Association of Black County Officials, Bobby Singleton, Fred Armstead, George Bowman, Rhondel Rhone, Albert F. Turner, Jr., and Jiles Williams, Jr. collectively as "the ALBC plaintiffs."

II.

I begin by providing the following background facts that I have discerned from the record and which are explained only cursorily by the majority. Under the Alabama Constitution, "local" laws are distinguished from "general" laws: local laws are those that "appl[y] to any political subdivision or subdivisions of the state less than the whole" (including the laws at issue in this case, those affecting individual Alabama counties) and general laws are those that "appl[y] to the whole state." Ala. Const. art. IV, § 110.

All state legislation, both general or local, must be enacted in the state legislature as a whole. Ala. Const. art. IV, § 44; see also Hill v. Moody, 93 So. 422, 424 (Ala. 1922). Thus, Alabama's counties do not have, or have only limited forms of, "home rule," as it is often called. See generally Jim Williams & Randolph Horn, Working Papers, Local Self Government in Alabama, 33 Cumb. L. Rev. 245 (2002-2003) (reviewing laws affecting

local governance in Alabama and other states).  In order for legislation affecting a single county to become law, no matter the extent to which the matter is wholly of local concern, it must be enacted by the entire state legislature, and generally as a constitutional amendment. <u>See, e.g.</u>, Ala. Const. amend. § 482 (authorizing Limestone county to "provide for the disposal of dead farm animals, and the excavating of human graves").

To carry out efficiently the task of managing the affairs of Alabama's 67 counties, the legislature has created the system of local delegations that is at the forefront of this case.  Each Alabama county has a corresponding local delegation in both houses of the state legislature. First, legislation affecting a county originates with the county's local delegation, which, upon agreeing to a bill, then forwards it to the full legislature.  Because local laws must start with local delegation approval, the <u>ALBC</u> plaintiffs refer to the delegations as having a "gate-keeping power over local

4

laws." Pls.' Br. (Doc. No. 67) at 4.  Once in the full legislature, an uncodified rule of so-called "local courtesy" is invoked.  That is, the other members of the legislature defer to the local delegation and allow the bill to pass without objection.  The local courtesy rule is rarely violated.  Lastly, the bill goes to the governor for signature, after which (assuming it is not vetoed, which, although rare, happens), it is law.

At issue in this case is the manner in which members of the counties' local delegations are chosen.  A delegation consists of all legislators whose district boundaries include a part of the county, no matter how small that part is.  For example, if one county is divided among two legislative districts, the representatives of both districts become members of that county's local delegation, even if one of the districts encompasses the vast majority of the county while the other contains only a small portion.  Also, legislators are not limited to joining only a single county's

5

delegation; rather, they join all delegations corresponding to the counties included in their districts.  Once on a local delegation, a legislator casts a single vote.

In this case, the ALBC plaintiffs challenge, essentially, the fact that the local-delegations system results in inequalities of representation and power among county voters.  That is, with respect to local laws affecting a single county, the voters within that county exercise varying degrees of influence on county affairs as a necessary consequence of all legislators in the county's delegation casting a single vote irrespective of how many county residents the legislator represents. For example, the ALBC plaintiffs point to Jefferson county, which, as Alabama's most populous county, has been split among multiple legislative districts, some of which lay wholly within the county and some of which cross into neighboring counties.  One district in Jefferson's delegation contains approximately 45,000 people total,

approximately 200 of whom are in Jefferson county while the remaining 44,800 or so are in neighboring Shelby county.  The ALBC plaintiffs contend, in essence, that affording these 44,800 Shelby residents power over the entirety of Jefferson county merely because they reside in a district with 200 Jefferson residents is unfair. They claim that the same is true in all other instances across the State where similar county splitting has occurred.

### III.

It is against this backdrop that I find most troubling (and confusing) the ALBC plaintiffs' emphasis that they are attacking the redistricting "statutes" rather than the "systems under which local delegations have operated."  Pls.' Br. (Doc. No. 67) at 4; see also Amended Compl. (Doc. No. 60) ¶ 59 (specifying that the ALBC plaintiffs do not claim that Alabama's "internal legislative rules and procedures" violate the one-person,

7

one-vote requirement, but, rather, claim that the State's redistricting plans, which "dilut[e] the ability of county voters independently to choose the members of their local legislative delegation," violate the rule). (Indeed, the majority seems to be making the contrary point that the issue really is the "systems" and not the redistricting "statutes." <u>Ante</u>, at 16.)

To me, the issue is both. It is the congruence of both the system and redistricting statutes that arguably brings about the alleged violation. Without the systems (under which the local delegations operate) in play, the statutes would not have the wrongful impact the <u>ALBC</u> plaintiffs claim. In fact, after noting that the object of their scorn is the redistricting "statutes," the plaintiffs go on to ask and answer the following: "[I]n light of the gate-keeping power local legislative delegations have over local laws that control important functions of government in Alabama, does splitting county boundaries violate the one-person, one-vote rights of

8

county residents, absent a compelling federal or state reason for doing so?  The answer is yes." Pls.' Br. (Doc. No. 67) at 4.

If, as the ALBC plaintiffs assert, the local delegations are gate-keepers; if this gate-keeping role constitutes a "governmental function" within the meaning of Hadley v. Junior College Dist., 397 U.S. 50, 56 (1970); and if this gate-keeper role is so longlasting and substantive that it amounts to a law, Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 369 (1940); Adickes v. S. H. Kress & Co., 398 U.S. 144, 168 (1970), then I think the ALBC plaintiffs may have a viable claim.[2] What I cannot discern from the current record is just how substantive and critical this gate-keeper role is in

---

2.  See generally Binny Miller, Who Shall Rule and Govern? Local Legislative Delegations, Racial Politics, and the Voting Rights Act, 102 Yale L.J. 105, 127 (1992) ("In some states the procedures [local delegations follow] are highly formalized; in others, they more closely resemble customs or practices than rules of law.").

practice in Alabama.³  The evidence is not there, one way or the other.  (The ALBC plaintiffs' factual contention, for example, that the confluence of these factors was the cause of the "failure of the Jefferson County's legislative delegation to re-enact its occupational tax, a delegation impasse that contributed to the county's bankruptcy," Pls.' Reply Br. (Doc. No. 77) at 6, is quite

---

3. At one point in their brief, the ALBC plaintiffs state that the Georgia local-delegations system, as described in DeJulio v. Georgia, 127 F. Supp. 2d 1274 (N.D. Ga. 2001) (Thrash, J.), aff'd, 290 F.3d 1291 (11th Cir. 2002), is "virtually the same" as Alabama's.  Pls.' Br. (Doc. No. 67) at 3.  At another point they seem to suggest that Alabama's local delegations perform a "governmental function."  See id. at 4 ("local legislative delegations have [a gate-keeping power] over local laws that control important functions of county government"); Pls.' Reply Br. (Doc. No. 77) at 7 ("the county's local legislative delegation has more power over local government policies than do the county commissioners").  In contrast, the DeJulio court, in reaching its holding, said the Georgia delegations did not perform governmental functions.  DeJulio, 127 F. Supp. 2d at 1295.  I am therefore not sure if the ALBC plaintiffs are saying that the Georgia and Alabama systems are similar in that they have the same set up or in that they engage in the same practices or in all respects.  The ALBC plaintiffs need to clarify this.

troubling.)[4]  It is for this reason (that the record is so factually undeveloped in this regard) as well as the reason that the ALBC plaintiffs have yet to make clear their claim (which, to be candid, seems to be evolving) that I concur in the denial of summary judgment.[5]

---

    4.  See also In re Jefferson Cnty., 484 B.R. 427, 434 (Bankr. N.D. Ala. 2012) (Bennett, J.) (describing the failure of the local delegation to replace the occupational tax, which "was actually beyond the County's control," as a "major cause" of the bankruptcy).

    5.  Another matter that I think needs clarification is what, precisely, is the nature of the voter inequality that the ALBC plaintiffs contend creates a constitutional problem?  I can think of three theories.  (To help illustrate them, I have added a figure on the next page.) I assume that the ALBC plaintiffs are relying on the first theory, but I could be wrong.

(continued...)

Case 2:12-cv-00691-WKW-MHT-WHP   Document 102   Filed 04/05/13   Page 12 of 15

---

5(...continued)



```
        DISTRICT 1                    DISTRICT 2
   75 voters in district         75 voters in district
  (all 75 are in County A)      (25 are in County A and
                                   50 are in County B)
```

First, there is a difference of representational power among the voters of a single county with respect to legislation affecting that county.  In the figure above, two legislators (those representing Districts 1 and 2) are the gate-keepers for legislation affecting County A, and they both cast a single vote in that regard, even though one is elected by 75 of the county's voters and the other by only 25 (plus 50 out-of-county voters). Therefore, among County A's voters, the 25 residing in District 2 have a 1:3 advantage over the 75 residing in District 1 with respect to legislation affecting their own county.

Second, depending on whether a voter resides in a district that lays entirely within a single county or a district that crosses county lines, the voter's representative is the gate-keeper for either a single

(continued...)

12

IV.

I also take issue with the majority's suggestion that, because the majority foresees issues down the road with the ALBC plaintiffs' particular relief requested, there is reason to have "serious doubts" about the viability of their claim. See ante, at 17-18 (noting that the ALBC plaintiffs have "cited no decision in which a court has concluded that the appropriate remedy for an

---

5(...continued)
county or multiple counties. In the figure above, while both Districts 1 and 2 contain 75 voters, the voters of District 1 are represented by a legislator who is a gate-keeper for a single county (County A) while the voters of District 2 are represented by a legislator who is a gate-keeper for two counties (both Counties A and B).

Third, as a consequence of the prior, there is a difference in the numbers of actual people for whom representatives are gate-keepers. That is, some voters, through their representative, are the gate-keepers for legislation affecting themselves and their neighbors even though those neighbors are so for themselves only. In the figure above, because District 2's legislator is the gate-keeper for both Counties A and B and District 1's legislator is the gate-keeper for County A alone, consequently, the 75 voters of District 2 can affect legislation for 150 people (1:2) while the 75 voters of District 1 can do so for only 100 people (1:1⅓), and, of course, the latter 100 people are included in the prior 150 people.

13

equal protection challenge to a local legislative scheme is to redraw district lines for the entire legislature"). If there is a viable claim and if the evidence reflects that the claim has merit, then I think that it will be up to this court to find the remedy.  Cf. Citizens United v. Fed. Election Comm'n, 130 S.Ct. 876, 893 (2010) ("The parties cannot ... prevent[] the Court from considering certain remedies if those remedies are necessary to resolve a claim."); Bowsher v. Synar, 478 U.S. 714, 781-82 (1986) (Blackmun, J., dissenting) (where the court is faced with a constitutional violation created by "two conjunctively unconstitutional statutory provisions," if the court is to remedy the violation by choosing one of the two provisions to enjoin, the court "surely [should] make that determination as best as [it] can instead of leaving the selection to the litigants").  I think it is premature to say that redistricting is inappropriate, for it could very well be that redistricting is the least

intrusive and most narrowly tailored remedy should there be a violation. One just cannot say at this time.[6]

DONE, this the 5th day of April, 2013.

                           /s/ Myron H. Thompson
                           **UNITED STATES DISTRICT JUDGE**

---

6. I share fully the majority's confusion regarding whether the claim is brought under the First Amendment, the Fourteenth Amendment, or some form of the two together. See ante, at 17.