# DEPOSITION OF GERALD DIAL

## May 21, 2013

## Pages 1 through 125

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, PC**
**Suite 505  -  500 Interstate Park Drive**
**Montgomery, AL  36109**
**Phone:  334.263.4455**
**Fax:  334.263.9167**
**E-mail:  hr@haislipragan.com**
**Web address:  www.haislipragan.com**

Deposition of Gerald Dial | ALBC/Newton vs. State of AL | May 21, 2013

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALABAMA LEGISLATIVE BLACK
CAUCUS, et al.,

    Plaintiffs,

Vs.          CIVIL ACTION NO.:
        2:12-CV-0069-WKW-MHT-WHP
THE STATE OF ALABAMA, et al.,

    Defendants.

* * * * * * * * * * * * *

DEMETRIUS NEWTON, et al.,

    Plaintiffs,

Vs.          CIVIL ACTION NO.:
        2:12-CV-0069-WKW-MHT-WHP
THE STATE OF ALABAMA, et al.,
    Defendants.

* * * * * * * * * * * * *
DEPOSITION OF GERALD DIAL
MAY 21, 2013
* * * * * * * * * * * * *

---

**Page 2**

1    DEPOSITION OF GERALD DIAL, taken pursuant to
2  stipulation and agreement before Pamela A. Wilbanks,
3  Registered Professional Reporter, ACCR #391, and
4  Commissioner for the State of Alabama at Large, in the
5  Law Offices of Balch & Bingham, 105 Tallapoosa Street,
6  Suite 200, Montgomery, Alabama, on Tuesday, May 21,
7  2013, commencing at approximately 9:42 a.m.
8            * * * * * * * * * * * * *
9            APPEARANCES
10
11  FOR THE PLAINTIFF ALABAMA LEGISLATIVE
    BLACK CAUCUS:
12  Mr. James U. Blacksher
    Attorney at Law
13  300 21st Street North
    Birmingham, Alabama  35203
14
15  FOR THE PLAINTIFF NEWTON:

    Mr. William F. Patty
16  JACKSON, ANDERSON & PATTY
    Attorneys at Law
17  250 Commerce Street
    Montgomery, Alabama
18
19  FOR THE DEFENDANT THE STATE OF ALABAMA:

    Mr. John J. Park, Jr.
20  Deputy Attorney General
    Strickland, Brockington, Lewis
21  Midtown Proscenium, Suite 2200
    1170 Peachtree Street NE
22  Atlanta, GA  30309
23

---

**Page 3**

1  FOR THE DEFENDANTS DIAL AND MCCLENDON:
2  Mr. Dorman Walker
   BALCH & BINGHAM
3  Attorneys at Law
   Suite 200
4  105 Tallapoosa Street
   Montgomery, Alabama
5
   ALSO PRESENT:
6
   Mr. Jim McClendon
7
8            * * * * * * * * * * * * *
9            EXAMINATION INDEX
10  BY MR. BLACKSHER . . . . . . . . . . . . . .5
    BY MR. PATTY . . . . . . . . . . . . . . .56
11  BY MR. BLACKSHER . . . . . . . . . . . . .103
    BY MR. PATTY . . . . . . . . . . . . . . .110
12  BY MR. WALKER . . . . . . . . . . . . . . 114
    BY MR. BLACKSHER . . . . . . . . . . . . .117
13  BY MR. PATTY . . . . . . . . . . . . . . .119
14            * * * * * * * * * * * * *
15          PLAINTIFF'S EXHIBIT INDEX
16  1  Copy of Notice of Deposition          7
17  2  Article from the Gadsden Times        106
18  3  Reapportionment Committee Guidelines  109
19
20
21
22
23

---

**Page 4**

1            STIPULATION
2        It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of GERALD DIAL is taken pursuant to the
5  Federal Rules of Civil Procedure and that said
6  deposition may be taken before Pamela A. Wilbanks,
7  Registered Professional Reporter, ACCR #391, and
8  Commissioner for the State of Alabama at Large, without
9  the formality of a commission, that objections to
10 questions other than objections as to the form of the
11 question need not be made at this time but may be
12 reserved for a ruling at such time as the said
13 deposition may be offered in evidence or used for any
14 other purpose by either party provided for by the
15 Statute.
16        It is further stipulated and agreed by and
17 between counsel representing the parties in this case
18 that the filing of said deposition is hereby waived and
19 may be introduced at the trial of this case or used in
20 any other manner by either party hereto provided for by
21 the Statute regardless of the waiving of the filing of
22 the same.
23        It is further stipulated and agreed by and

---

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

---

Page 5

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is hereby
3   not waived.
4
5   * * * * * * * * * * * * * *
6
    GERALD DIAL
7
    The witness, after having first been duly sworn
8
to speak the truth, the whole truth and nothing but the
9
truth testified as follows:
10
    COURT REPORTER:  Is this going to be
11
    usual stipulations?
12
    MR. WALKER:  We would like to read and
13
    sign.
14
    EXAMINATION
15
BY MR. BLACKSHER:
16
Q.  Would you state your full name, please?
17
A.  My name is Gerald Oscar Dial.
18
Q.  And your date of birth?
19
A.  11/17/37.
20
Q.  Place of birth?
21
A.  Delta, Alabama.
22
Q.  What county is Delta in?
23
A.  Clay.

---

Page 6

1   Q.  And what is your residence address?
2   A.  I live at Highway 9 North, Lineville, Alabama
3       92757.
4   Q.  And you're a member of the Alabama Senate; is
5       that correct?
6   A.  Yes, I am.
7   Q.  And you were a co-chair of the Alabama
8       Reapportionment -- Joint Reapportionment
9       Committee?
10  A.  I was.  I was the Senate co-chair, and I shared
11      that with Representative McClendon, who was the
12      House co-chair.
13  Q.  And when were you and Representative McClendon
14      appointed to that committee?
15  A.  I was appointed at the beginning of this
16      quadrennium by the lieutenant governor.  I don't
17      know the exact date.  But when the committee was
18      formed, the lieutenant governor had
19      appointments.  And she appointed me as a member
20      of that committee at the beginning of this
21      quadrennium.  I guess three years ago -- two
22      years ago.
23  Q.  2011?

---

Page 7

1   A.  Yes.
2   Q.  Okay.
3       (Plaintiff's Exhibit 1 marked for
4       identification.)
5   Q.  I'm handing you, Senator Dial, Plaintiff's
6       Exhibit 1, which is the notice of deposition.
7       I'm going to ask you about the documents that we
8       requested that you bring.  And if you would,
9       turn to page 3 of the notice and go to paragraph
10      number 1.  Do you have any of the contracts --
11  A.  No.
12  Q.  -- invoices, and so forth referred to in
13      paragraph 1?
14  A.  No.
15  Q.  Were there any contracts, invoices, et cetera
16      with persons who should be referred to as
17      drafters?
18  A.  Not that I know of.  Not that I'm familiar
19      with.  There probably were, but I'm not -- not
20      from my standpoint.  No, sir.
21  Q.  Okay.  So the reapportionment committee did not
22      enter into any contracts with persons who are,
23      we can call, cartographers who would assist you

---

Page 8

1       with the technical details of redistricting?
2   A.  No, sir, the reapportionment committee did not.
3       Mr. Walker was our reapportionment attorney, and
4       that's the only one that we have.  We have a
5       reapportionment office.
6   Q.  That's the office in the State House --
7   A.  Yes.
8   Q.  -- headed by Bonnie Shanholtzer?
9   A.  Yes, sir.
10  Q.  Okay.  Do you know if other members of the
11      legislature did enter into contracts with
12      cartographers?
13  A.  Other members of the legislature?
14  Q.  Other members of the legislature.
15  A.  We -- Yes.
16  Q.  Who?  Which legislators?
17  A.  I would guess the leadership.  I'm not
18      particular -- I know that they provided an
19      individual who provided us some information as
20      we went through the process.
21  Q.  Okay.  So that would be Senator Marsh?
22  A.  I would suppose so.
23  Q.  And Speaker Hubbard?

---

Pages 5 to 8

Page 9

1  A.  Yes, sir.  But I don't know that specifically,
2      but I know that an individual was provided that
3      was available for us for details about
4      proportions and reapportionment and all that.
5  Q.  Who was that individual made available to you?
6  A.  It was ...
7          MR. WALKER:  Randy Hinaman.
8  A.  Randy Hinaman.  I'm sorry.  Randy Hinaman, who I
9      had worked with on the congressional districts
10     and on the board of education district as well.
11 Q.  Did you ever meet with Randy Hinaman in person?
12 A.  Yes.
13 Q.  Did he come to Alabama?
14 A.  Yes.
15 Q.  On how many occasions did you meet with him in
16     Alabama?
17 A.  Several.  I couldn't give you an exact number.
18 Q.  You say that Mr. Hinaman assisted you and gave
19     you assistance when you were drawing the
20     congressional and state board of education
21     districts?
22 A.  Yes, sir.
23 Q.  And then gave you assistance or gave the

Page 10

1      committee assistance --
2  A.  He gave me.  Not the committee, but he gave me.
3  Q.  He gave you, Senator Dial, as co-chair
4      assistance in drawing the House and Senate
5      plans?
6  A.  He gave me information.  Not assistance, but he
7      gave me information because I would go to him on
8      demographics about -- We were concerned with not
9      regressing in minority districts, and he was
10     able to furnish me that information readily that
11     I had so I would not regress those districts.
12 Q.  So as far as you know, Mr. Hinaman was under
13     contract, was being paid by the leadership --
14 A.  I don't know that particular.  No, sir.
15 Q.  Is it possible that he was being paid by the
16     Alabama Republican Party?
17 A.  I can't answer that for you.
18 Q.  You didn't ask?
19 A.  No, sir.
20 Q.  When was the first occasion that you met with or
21     communicated with Mr. Hinaman?
22 A.  As I --
23 Q.  Since the 2010 Census I mean.

Page 11

1  A.  When we did the reapportionment of the
2      congressional districts and the board of
3      education districts.
4  Q.  Now, when Mr. Hinaman was here in Alabama
5      assisting you and others --
6          I guess he assisted others as well, didn't
7      he?
8  A.  I suppose so.  Yes, sir.
9  Q.  Where did he set up shop?  Where did he operate?
10 A.  He operated on the -- what floor -- fourth floor
11     in Representative McClendon's office.
12 Q.  Okay.  So not in the reapportionment office
13     but --
14 A.  He was in the reapportionment office a lot.  I
15     met with him in there several times too.
16 Q.  But he was sort of headquartered in
17     Representative McClendon's office?
18 A.  Yes, sir.
19 Q.  And in reference to the record, Representative
20     McClendon was the House co-chair --
21 A.  Correct.
22 Q.  -- of the committee.
23          Now, you were first elected to the Alabama

Page 12

1      Legislature when?
2  A.  1974.
3  Q.  And that was to the House?
4  A.  Yes.
5  Q.  When were you first elected to the Senate?
6  A.  1983.
7  Q.  So you were a member of the Senate when the post
8      2000 Census plans --
9  A.  Yes, sir.
10 Q.  -- were drawn?
11          Do you know who -- which Democratic senators
12     were primarily responsible for drafting the 2001
13     Senate plan?
14 A.  Yes, sir.
15 Q.  Who would that have been?
16 A.  Senator Emfinger.
17 Q.  Senator Emfinger, of course.  Right.
18          From Madison County?
19 A.  Yes, sir.
20 Q.  And where did he set up shop so that you could
21     sit and talk to him about --
22 A.  I have no idea.  He never contacted me or sat
23     down with me to discuss my district.  And I was

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 13

1    a Democrat as well as he was, but I got what was
2    left.
3    Q.   When did you become a Republican?
4    A.   In the last election.
5    Q.   2010?
6    A.   Yes, sir.
7         But prior to that, I worked for Governor
8    Riley in the four years I was out, and I changed
9    parties at that time.
10   Q.   All right.  Let's go back to the deposition
11   notice.
12        If you would, look at paragraph 2, please.
13   And ESI is electronically stored information.
14   So we're asking if you -- there were any
15   documents containing instructions from you or
16   other members of the legislature, the committee,
17   or others in the legislature to Mr. Hinaman.
18   A.   Any documents?  I provided him a document in
19   which Senator Smitherman, Senator Coleman, and
20   Senator --
21        Who was the other black lady from -- Give me
22   a second.
23   Q.   From Mobile?

Page 14

1    A.   No.  From Birmingham.
2    Q.   Senator Linda Coleman?
3    A.   Linda Coleman, Senator Smitherman --
4    Q.   Patricia Dunn?
5    A.   And Senator Patricia Dunn.
6         I met with them, and they informed me that
7    they had drawn a plan that met the requirements,
8    and they wanted me to look at that.  They
9    brought that to me.  I furnished that to
10   Mr. Hinaman and asked him to incorporate it into
11   our reapportionment plan, which he did.
12   Q.   And do you still have a copy of that plan?
13   A.   Yes, sir.  Somewhere among this --
14        MR. WALKER:  Would it be in your
15        notebook?
16        THE WITNESS:  It's the big one.
17        MR. WALKER:  Oh.
18        THE WITNESS:  It's a -- Yes, sir.  I
19        have a -- where is that big --
20        MR. WALKER:  The big map.
21        THE WITNESS:  Yeah, the big map.
22        MR. WALKER:  Do you want to go get it
23        now, or do you want --

Page 15

1    A.   I have that plan that they provided me.
2         MR. BLACKSHER:  No.  Let's don't stop
3         and get it right now, but I would
4         like to have it.
5         MR. WALKER:  You may.
6         MR. BLACKSHER:  How big is it?
7         MR. WALKER:  We'll have to have it
8         professionally copied somewhere.
9    Q.   Do you know where Senator Coleman, Senator
10   Dunn --
11        And who was the other person?
12   A.   Senator Coleman, Senator Dunn, and Senator
13   Smitherman.
14   Q.   Smitherman.
15        Do you know who prepared that map for them?
16   A.   No, sir, I do not.
17   Q.   Was it the reapportionment office?
18   A.   I have no idea.
19   Q.   You don't know.  Okay.
20        And you say you passed it on to Mr. Hinaman
21   and asked him to incorporate it?
22   A.   Asked him to see if we could make that fit into
23   the plan, that I had met with those three

Page 16

1    individuals and assured them that I'd do all I
2    could to meet their needs.  And this is what
3    they provided me, and this is what eventually
4    wound up into the plan.
5    Q.   When did you see the first draft of a Senate
6    plan?
7         MR. WALKER:  Post 2010?
8    Q.   Let's talk now about post 2010.  I'm through
9    with the 2001 stuff.
10   A.   Okay.  Gosh, I'm unable to provide that.  I just
11   don't know when I saw the first plans.
12   Q.   Would it have been in 2011?
13   A.   It would have been after we did the public
14   hearings, toured the state, and after we came
15   back to the State House.  It would have been --
16   Q.   Well, the hearings were in October of 2011 more
17   or less.
18   A.   Yes, sir.  So it would have been early 2012.
19   Q.   Okay.  And where did you see it?
20   A.   At the reapportionment office.
21   Q.   And had that draft been prepared by Mr. Hinaman?
22   A.   I'm not sure if that was prepared by him or by
23   the reapportionment office.  I just can't

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of Gerald Dial  ALBC/Newton vs. State of AL  May 21, 2013

Page 17

1 remember because we were working through plans
2 trying to incorporate all that, and I just can't
3 remember which one.
4 Q. Well, who was the primary drafter of the first
5 draft of the Senate plan?
6 A. I would say Mr. Hinaman.
7 Q. And who told Mr. Hinaman what guidelines, what
8 instructions he should follow --
9 A. I did.
10 Q. -- in drawing it?
11  You did?  What did you tell him?
12 A. I told him -- I gave him a copy of the
13 guidelines that were set out by the
14 reapportionment committee in our initial meeting
15 and how we wanted to meet those.  We didn't want
16 to regress any of the minority districts.  We
17 wanted to make sure they stayed as they were and
18 we did not do away with any and that the
19 population, as they grew, that they grew into
20 the same proportion of minorities that they
21 originally had or as close to it as we could get
22 it.
23 Q. Were these oral instructions, or were they

Page 18

1 written instructions that you gave?
2 A. Well, the minutes that we adopted in the
3 committee meeting were written instructions, but
4 I also gave him the oral instructions to do the
5 same thing.  The other thing I told him, that I
6 didn't want any two incumbents in the same
7 district.  And that was the commitment I made to
8 each one of the senators.  I met with all 34
9 senators personally one-on-one, and I made a
10 commitment to those in those meetings that we
11 would not put any two incumbents in the same
12 district.  And then the other commitment was I
13 told them we would not regress any of the
14 minority districts.
15 Q. Did you communicate with Mr. Hinaman by e-mail?
16 A. No, sir.
17 Q. By telephone?
18 A. Maybe just to say are you in town; can I meet or
19 can you come to my office.
20 Q. Most of your communications were in person?
21 A. Yes, sir.
22 Q. Here in Alabama?
23 A. Montgomery.

Page 19

1 Q. In Montgomery?
2 A. Yes.
3 Q. If you would, look at paragraph 3 of the
4 document request, Senator Dial.  I'm not going
5 to read it.  You can read it carefully, please.
6  What databases containing partisan voting
7 patterns were provided to Mr. Hinaman?
8 A. What did we provide to him?
9 Q. Yes.
10 A. Of course, he had the census, and the census
11 numbers were what we were working from.
12 Q. My question was about partisan voting patterns.
13 A. I did not have any partisan voting patterns to
14 provide him.
15 Q. Well, Mr. Hinaman had them, though, didn't he?
16 A. What I asked him and what he provided me was the
17 number of minorities in the districts compared
18 to the number of minorities [sic] in the
19 districts.  Because what I did was begin with
20 the minority districts to ensure they were not
21 regressed, and each one of them had to grow.
22 And as we did those, then I filled in the blanks
23 around those with what was left of the

Page 20

1 districts.  So I didn't look at partisan to say
2 how many Republicans are here or how many
3 Democrats are here.  I began my process by
4 filling in the minority districts, not to do
5 away with any of those and not to regress any of
6 those.  And as they grew, we made sure that they
7 grew in the same proportion that they had or as
8 close to it as possible.  And what was left, we
9 just -- it was basically fill in the blanks with
10 what was left.
11 Q. But my question concerns databases that show
12 where prospective Republican voters resided.
13 That was a database that Speaker Hubbard has
14 written about that was developed during -- in
15 preparation for the 2010 campaign and which was,
16 according to his book, very sophisticated.  And
17 that database presumably was updated and
18 provided to Mr. Hinaman as well, wasn't it?
19 A. I don't know, sir.
20 Q. Who would know?
21 A. I guess Mr. Hubbard if he's the one that said he
22 provided it or he had it.
23 Q. Well, let me ask about the communications

Pages 17 to 20

Deposition of Gerald Dial                ALBC/Newton vs. State of AL                May 21, 2013

Page 21

1  between Speaker Hubbard and Senator Marsh, the
2  president pro tem --
3       Is that right, that's president of the
4  Senate?
5  A.  President pro tem.  You're correct.
6  Q.  -- with Randy Hinaman.
7       Did they have frequent contacts with Randy
8  Hinaman?
9  A.  Sir, I couldn't answer that.
10 Q.  What about your own communications with Senator
11 Marsh or Speaker Hubbard?
12 A.  Met with them on two occasions that I remember
13 about the reapportionment.  The first occasion
14 was that we talked to them about organizing the
15 committee, and the second time we met was could
16 we get this in the regular session or are we
17 going to have to do a special session.  That's
18 the only two meetings I had with those gentlemen
19 in their office concerning reapportionment.
20 Q.  So you did not discuss with either Senator Marsh
21 or Speaker Hubbard any of the details of the
22 House and Senate plans?
23 A.  As we progressed, I probably talked to Senator

Page 22

1  Marsh on the floor -- we're coming -- we're
2  working on the plan -- but not into the minute
3  details.  No, sir.  I didn't have any specific
4  meetings set aside to discuss the issue with
5  those two gentlemen at any time other than the
6  two times I referred to.  I was appointed by the
7  lieutenant governor.  That was -- That was my
8  loyalty to the committee.
9  Q.  Okay.  But back to paragraph 3 of the document
10 request, have you ever seen a database that
11 showed where prospective Republican and
12 Democratic voters resided?
13 A.  No, sir.
14 Q.  You've never seen that?
15 A.  No, sir.
16 Q.  Would you look at paragraph 6, please?  I'll
17 read this:  All records, including telephone
18 logs, and copies of communications or documents
19 sent to or among the members of the Permanent
20 Committee on Reapportionment and, I would say,
21 Randy Hinaman.
22       MR. WALKER:  This is 6?
23       THE WITNESS:  Yes.

Page 23

1       MR. BLACKSHER:  Uh-huh (positive
2    response).
3       MR. WALKER:  We would object to
4    Senator Dial producing documents
5    for all members of the permanent
6    committee.  He can speak for
7    himself.
8       MR. BLACKSHER:  What is the basis of
9    your objection for objecting to
10   what other members of the
11   committee --
12 A.  I have been included --
13       MR. WALKER:  Let me -- what I'm saying
14   is that -- The basis for the
15   objection is you can't send a
16   request for documents to Senator
17   Dial for documents he has never
18   had in his possession or control.
19 Q.  So you don't have access to and don't have
20 possession of any of the communications by other
21 members of the committee with Randy Hinaman?  Is
22 that what you're saying?
23 A.  That's correct.  I only have what they've

Page 24

1  provided me.
2  Q.  Only what who provided you?
3  A.  Well, I had a letter from Senator Irons, which
4  she pointed out how she wanted to keep her
5  district intact.  And that's the only written
6  communication I had from any other senator.
7  Q.  All right.  Well, what about your telephone logs
8  or other communications and documents between
9  you and Randy Hinaman?
10 A.  I don't have any of those.  I don't -- You know,
11 I had no conversation with him other than, as I
12 said earlier, are you coming to town or when can
13 you and I talk.  His and I's communication was
14 face-to-face.
15       MR. BLACKSHER:  Mr. Walker, are the
16   documents that you handed me this
17   morning a complete response to the
18   document request?
19       MR. WALKER:  The documents that I
20   handed you this morning in
21   addition to Senator Dial's
22   redistricting notebook as far as I
23   know are a complete response to

Pages 21 to 24

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 25

1      the document request comprising
2      all of the documents in his
3      possession that related to what
4      you asked for.
5          MR. BLACKSHER:  Okay.  Let me --
6          MR. WALKER:  Is that correct?
7          THE WITNESS:  That's correct, if it's
8      what I have in my notebook.
9          MR. BLACKSHER:  I'm not going to mark
10     these as exhibits, but I would
11     like you to just tell me what we
12     have here.
13         MR. WALKER:  What you have here are
14     three versions of the Dial plan --
15     Dial 1, Dial 2, Dial 3 -- with the
16     reports and with a map of each
17     one.  You've got -- I think you've
18     got four copies to use as
19     exhibits, four sets of Dial 1, 2,
20     and 3.  What you were looking at
21     just now was McClendon, but the
22     Dial stuff is down here on the
23     bottom.

Page 26

1          MR. PATTY:  Is there an extra copy I
2      can get?
3          MR. WALKER:  Well, I've got -- there
4      are four copies.
5          MR. PATTY:  Okay.
6          MR. WALKER:  And if we need to make
7      more copies, we can, but I thought
8      four would be enough.
9          MR. PATTY:  That's fine.  I just
10     wanted to be sure.
11 Q.  Senator Dial, did you personally draw any of the
12     lines in -- at 603?
13 A.  Did I draw the lines --
14 Q.  For any of the districts -- any of the Senate
15     districts in Act 2012-603.
16         MR. WALKER:  Jim, do you mean actually
17     draw the lines at a computer work
18     station?
19         MR. BLACKSHER:  No.  No.
20 Q.  I mean, did you either instruct somebody or
21     yourself say where the lines should go in any of
22     these districts?
23 A.  Yes.

Page 27

1 Q.  Did you give instructions or did you, yourself,
2     draw any of the lines in all of the Senate
3     districts, all 35 of them?
4 A.  I gave basic instructions to draw them.  I did
5     not draw any of the lines to the reapportionment
6     committee, including the map that I provided
7     to -- of the three senators who asked me to
8     include this as their district.
9 Q.  When you met with Mr. Hinaman, did you look at
10    maps he had on a computer screen, or did he have
11    paper copies for you to look at?
12 A.  He had a computer screen.
13 Q.  And was the computer screen in the
14    reapportionment office, or was it in a computer
15    that he had in his possession?
16 A.  A computer he had.  A laptop.
17 Q.  A laptop.
18        Was Mr. Hinaman using the so-called
19    Maptitude for Redistricting software?  Do you
20    know?
21 A.  I can't answer that.
22 Q.  Do you personally have the skills to do --
23 A.  No, sir.

Page 28

1          MR. WALKER:  Let him finish the
2      question so the record is
3      complete.
4 Q.  Do you recall that after the 2000 Census,
5     Representative Ken Guin did learn how to use
6     Maptitude and did himself operate those -- that
7     software and draw the districts?  You're aware
8     of that, aren't you?
9          MR. WALKER:  Depends upon who you talk
10     to.
11 A.  I heard that.  And I guess he spent so much time
12     doing that he didn't get reelected.
13 Q.  But you did not --
14 A.  No, sir.  I don't have those skills.
15 Q.  You don't have those skills.
16        Now, you've told me about a map that the
17    three African-American senators from Jefferson
18    County brought to you that you had asked
19    Mr. Hinaman to incorporate if he could in the
20    plan.  Were there any other legislators,
21    senators who -- or -- I don't know --
22    representatives who asked you to make specific
23    changes in the Senate plan?

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 29

1   A.   Yes.
2   Q.   Who were they?
3   A.   Senator Keahey.
4   Q.   Anyone else?
5   A.   Ms. Irons. I'm sorry. Senator Irons.
6   Q.   And everyone that -- All the senators you've
7        mentioned so far were Democrats -- are
8        Democrats. Are you saying -- Did none of the
9        Republican senators ask you --
10  A.   Yes.
11  Q.   -- to make --
12  A.   Senator Williams.
13  Q.   What district is he?
14  A.   God, I can't tell you that.
15  Q.   Or what area?
16  A.   Gadsden. Etowah County.
17  Q.   That would be maybe 10?
18  A.   Possibly so.
19  Q.   Here. Let's do this. Can you put a copy of the
20       603 map in front of you that you're most
21       comfortable with so we can be talking about the
22       map?
23            MR. WALKER: That would be --

Page 30

1            THE WITNESS: Would that be this?
2            MR. WALKER: Well, that might be. But
3        here's -- that should be the
4        version that passed.
5            THE WITNESS: All right, sir. I don't
6        see the numbers.
7            MR. WALKER: Yeah. They are small.
8        They are like little squares.
9            THE WITNESS: Okay. Squares? Okay.
10           (Brief off-the-record discussion.)
11  Q.   Let me hand you a document that's been filed as
12       Docket Number 60-3, which our cartographer drew
13       and which I find easier to read in terms of
14       locating district numbers and so forth. You can
15       look at that if you want, or you can look at the
16       one that Ms. Shanholtzer printed out. I assume
17       Ms. Shanholtzer printed it out. I don't know
18       what --
19  A.   Yes.
20  Q.   So you said Senator Williams --
21  A.   That would have been District 10.
22  Q.   Who else? What other Republican Senators asked
23       you --

Page 31

1   A.   We worked very closely with the Senators in
2        District 2 -- that would be Bill Holtzclaw --
3        and in District 3. District 2 was overpopulated
4        by 42,000, somewhere in that neighborhood. So
5        it had to be condensed greatly, and so I worked
6        with him because nobody likes to give up voters,
7        and I worked with him to see how we could
8        better -- And I had to compress the other
9        districts in to absorb 42,000 people. And so
10       that created --
11  Q.   When you worked with Senator Holtzclaw and
12       Senator Williams, where would you meet with them
13       to work on the plan?
14  A.   In my office sometime and down in McClendon's
15       office sometime.
16  Q.   And how would you view the map? On a computer?
17  A.   Yes.
18  Q.   Whose computer would you --
19  A.   Mr. Hinaman.
20  Q.   Okay. So this was in the company of
21       Mr. Hinaman, then?
22  A.   Yes.
23  Q.   Right now I want to get back to making sure that

Page 32

1        I've gotten you to recall as many Republican
2        senators as you can who you worked with on
3        specific districts.
4   A.   I worked with Senator Holley in district
5        whatever he is.
6   Q.   That's down in the Wiregrass, isn't it?
7   A.   Yes, sir.
8   Q.   31?
9   A.   31.
10           I worked with Senator Taylor. I worked with
11       Senator --
12  Q.   Where is Senator Taylor? What's his number for
13       the record?
14  A.   30, I suppose.
15  Q.   Well, I'll tell you what. I've got the roster
16       here, so --
17  A.   I know them by name. I'm sorry. I don't know
18       them by district numbers. We don't wear
19       jerseys. Probably should.
20           (Brief off-the-record discussion.)
21  Q.   So Taylor is 30.
22  A.   Okay.
23  Q.   And District 30 --

Pages 29 to 32

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

---

Page 33

1   A.  Holley is --
2   Q.  Wait a minute.  Where is District 30 on the map?
3   A.  It's Autauga --
4   Q.  Okay.  I see.
5   A.  Autauga, Coosa, and part of Elmore and part of
6       Chilton.
7   Q.  You said Holley?
8   A.  Yes.
9   Q.  Holley is 31?
10  A.  Right.
11  Q.  That's Covington, Coffee, et cetera.
12  A.  Right.
13      I worked with Senator Smith in 29.  Well, I
14  discussed districts with every -- all 34
15  members.
16  Q.  And when you were discussing districts, was
17  Mr. Hinaman always --
18  A.  No, sir.  No, sir.  I had a map, which is
19  included here.  I had a map board with each one
20  of them's district that they presently had.  I
21  either met with them in their office or my
22  office.  I asked them -- I would say, look.
23  Your district has got to grow X number.  It's

Page 34

1   got to reduce X number.  What would be your
2   personal -- If you could draw your district,
3   where would you like to draw it?  I took that
4   information and marked it on my maps and used
5   that information and made it work as best as I
6   could.  And I took that information when it was
7   all completed to Mr. Hinaman.
8   Q.  Okay.  But you said -- I'm trying to get you to
9   identify which senators actually worked directly
10  with Mr. Hinaman in your presence.
11  A.  Oh, okay.  That was not the question I was
12  answering originally, then, because you had
13  asked me who I had worked with who brought me
14  information on their plan.
15  Q.  And you said you actually spoke with every
16  member of the Senate.
17  A.  Right.
18  Q.  But I'm trying now to ask which ones actually
19  sat down and worked with Mr. Hinaman and you.
20  A.  That's going to be difficult.  I know that the
21  senator from District 2 did, Holtzclaw, because
22  that was a difficult area to work out.  He in
23  particular.  Senator Williams was the other.

Page 35

1   Q.  Holtzclaw is 2.
2   A.  And Williams is 10.
3   Q.  That's correct.  Etowah County.
4       What was the difficulty Holtzclaw had?
5   A.  He was over -- His district was overpopulated
6   about 42,000 people, so he had to give up 42,000
7   population.  And the difficulty in that is
8   nobody wants to give up their constituents.
9   Q.  Well, which ones did he end up giving up?
10  A.  He ended up giving up on both sides.  I
11  compressed him from both sides.  I moved -- had
12  to move Senate District 1 into that area, and I
13  had to move the Senate District 7 into that area
14  because everything when you move is domino
15  effect.  And I had to compress that in to take
16  away about 42,000.  I don't have the exact
17  numbers but about 42,000 of his voters.
18  Q.  Was Holtzclaw satisfied with the final product?
19  A.  I convinced him he was as well off as he could
20  be.  Nobody is satisfied with giving up your
21  constituents.  But I told him to make the plan
22  work, he had to give up some.  And so we
23  proportionally reduced him on both sides.

Page 36

1   Q.  Did Senator Marsh ever meet with Randy Hinaman
2   in your presence?
3   A.  No, sir.  Not that I know of.
4   Q.  Or Speaker Hubbard?
5   A.  Not that I know of.
6       MR. WALKER:  Wait.  Did Marsh meet
7       with Hubbard or Hubbard meet
8       with -- What was the question?
9       MR. BLACKSHER:  I'm sorry.
10  A.  The question was --
11  Q.  Did Hubbard meet with Hinaman?
12  A.  Not that I know of, sir.
13  Q.  Were there any other -- to finish, so there's no
14  loose ends -- any other senators you can recall
15  besides Holtzclaw and Williams who actually sat
16  down with Randy Hinaman in your presence?
17  A.  There's possibly more.  I would have to just
18  look at the map and try to recall that process.
19  I think the senator from Cullman, Senate 4 --
20  District 4, Senator Bussman, and I met with
21  Senator -- with Hinaman because he had quite a
22  change in his district.  I had to change his
23  district because of what had happened in Senate

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 37

1    District 2.
2    Q.  You had to make changes in District 4 because of
3        what you did in District 2?  Is that what --
4    A.  Yes, sir.
5    Q.  Those aren't contiguous districts.
6    A.  No, sir.  But if you look, 1 had to compress
7        into District 2.  Then -- And 6 had to compress
8        into District 1.  It's just like -- It's a
9        domino effect.  And that forced 4 over into part
10       of 6 and to part of 1.
11   Q.  Now I'm going to change the subject.  I want to
12       ask you about the plus or minus 1 percent,
13       maximum 2 percent deviation restriction that the
14       reapportionment committee adopted.
15           Who first suggested that restriction?
16   A.  When we met with Mr. Walker, we discussed this
17       with Mr. Walker trying to make sure the one vote
18       one person counted.  And so we discussed it with
19       him, and he made the recommendation.  He was the
20       attorney for the committee, and that's where
21       that began.
22   Q.  You were in the courtroom last week when the
23       three-judge court --

Page 38

1    A.  Yes, sir.
2    Q.  -- heard oral argument from the lawyers or some
3        of the lawyers anyway.
4           And did you hear Judge Pryor ask me if
5        adopting the plus or minus 1 percent deviation
6        restriction more or less eliminated the
7        possibility of you being -- the plan being
8        accused of being a partisan gerrymander?  Do you
9        remember him asking me that?
10   A.  Not particular, sir.  I apologize.  I just -- I
11       don't remember that conversation.
12   Q.  Was that one of the reasons that you adopted a
13       plus or minus 1 percent deviation rule, to avoid
14       someone claiming a partisan gerrymander?
15   A.  The major reason that I voted to adopt that is
16       the fact that I wanted something that would
17       preclear justice and ensure one person one vote.
18   Q.  Did you look at the Senate Bill 5 plan that
19       Senator Sanders introduced?
20   A.  Yes, sir.
21   Q.  What were your objections to that plan?
22   A.  The way that -- In my estimation, when I saw
23       that plan, that plan was a direct plan that

Page 39

1    would have forced us to be rejected by Justice
2    because it totally deviated from the minority
3    districts.  It changed their deviation so that
4    Justice would certainly have rejected it in my
5    estimation.  And I thought that was the intent
6    of the plan, to have us to adopt a plan that
7    Justice would reject and let Justice draw the
8    plan rather than the legislature.
9    Q.  It did what to the deviations of the --
10   A.  It changed the black deviation to the point that
11       they would have regressed each of those black
12       districts tremendously.
13   Q.  When you say deviation, do you mean the variance
14       from perfect population equality?
15   A.  I'm talking about it would have deviated or
16       reduced the number of minorities in the minority
17       districts substantially where some of those
18       districts would have not met what we consider in
19       my estimation the requirement to not deviate the
20       minority districts.
21   Q.  Okay.  And was it your opinion that reducing the
22       black percentages in the majority-black
23       districts would violate the Voting Rights Act?

Page 40

1    A.  Yes, sir.
2    Q.  How did you form that opinion?  Are you a
3        lawyer?
4    A.  No, sir.  But I've been around enough lawyers to
5        understand.  And with talking to other people
6        who have been involved in reapportionment, this
7        was the contention I had assumed over the period
8        of time.  No, I'm not an attorney.  But we
9        understand that if you don't -- and we had the
10       same process -- I followed what happened in
11       Texas and Florida and other legislatures where
12       they regressed the minority districts, and the
13       courts threw them out and had the court draw the
14       districts.  And that was my intent not to do
15       that, to pass a plan that the court would
16       approve -- Justice would approve.
17   Q.  What Texas plan are you talking about?
18   A.  Well, I saw where they redid the congressional
19       districts in Texas.
20   Q.  I see.
21           Now, which lawyers advised you that it would
22       violate the Voting Rights Act if you reduced the
23       black percentages in the majority-black

Pages 37 to 40

Page 41

1   districts?
2           MR. WALKER: Objection to form. You
3       may answer.
4   A.  I'm not sure any lawyer -- I relied a lot on
5       Mr. Walker, and I wanted -- I'm not sure he told
6       me that specifically that if we reduced it, it
7       would.  But it was our understanding and
8       assumption that I had taken that if you reduced
9       it and degraded it -- because we're
10      under the Justice -- under the Voting Rights
11      Act, that we cannot regress the minority
12      districts.
13  Q.  Okay.  I just want to be clear.
14          You're taking personal responsibility for
15      your decision --
16  A.  Yes, sir.
17  Q.  -- for that?  Not relying on the advice of
18      somebody else?
19  A.  Right.
20  Q.  What else besides the percentage of blacks in
21      the majority-black districts did you object to
22      in Senator Sanders' --
23  A.  That was basically it.

Page 42

1   Q.  That was the only objection you had?
2           MR. WALKER: Objection.
3   Q.  The only objection you had to his plan was that
4       it reduced the black percentages?
5   A.  I can't remember.  I was thinking that he had
6       added another black Senate district, but I'm not
7       sure of that.  I can't answer that.
8   Q.  Do you recall where the other black Senate
9       district is?  There are eight majority-black
10      districts, right, in the Senate plan?
11  A.  Yeah.  That's correct.  Yes, sir.
12  Q.  Where was the other district that you thought
13      there was in Senator --
14  A.  I just --
15  Q.  -- Sanders' plan?  Excuse me.
16  A.  I can't remember that, sir.
17  Q.  Do you recall the first public hearing you had
18      up in Fort Payne, Alabama?
19  A.  Yes, sir.
20  Q.  And do you recall speakers at that Fort Payne
21      hearing, including the mayor of Fort Payne,
22      asking that all of Jackson and DeKalb counties
23      be kept in Senate District 8 and that Madison

Page 43

1   County be removed?
2   A.  I'm sure it's in the minutes, sir.  I don't
3       remember the specifics, but I remember the mayor
4       and him making a plea to keep his district as
5       intact as he could.
6   Q.  If you would, look at DeKalb County in your
7       Senate plan.
8   A.  Yes, sir.
9   Q.  Why did you split DeKalb County?  Is that the
10      way you say it?  DeKalb County?
11  A.  Yes, sir.  It's DeKalb.
12  Q.  That's the way you say it in Georgia, but I've
13      always wondered --
14  A.  That's the way you say it in Alabama.  I used to
15      represent part of DeKalb.
16  Q.  All right.  Why is DeKalb County split between
17      three Senate districts?
18  A.  As you compressed into District 2, District 7
19      moved over into District 2 and 8 had to move up,
20      and that's why it went into that county.  It
21      originally was DeKalb and Jackson.  So it had to
22      move over to take up part of that 42,000 that
23      we're giving up because we're compressing all

Page 44

1       into Senate 2.  Senate 7 moved in to take up
2       part of those, and Senate 8 had to take in the
3       others.
4   Q.  Now, when you were compressing to remove
5       population from Senate District 2 --
6           That's what you're referring to --
7   A.  Yes, sir.
8   Q.  -- as compressing?
9           -- did you attempt to avoid splitting county
10      boundaries?
11  A.  As much as possible.  But I had 42,000 people I
12      couldn't leave hanging.  I couldn't put them in
13      Tennessee.  And so, as you see, 1, 7, and 3 all
14      compressed into 2.  And when you're doing that,
15      you've got -- there's no place -- you can't do
16      anything but move the other people like a wheel
17      into the other districts.
18  Q.  Did you actually sit with Mr. Hinaman when you
19      were deciding how to draw those Senate districts
20      up in northeast Alabama?
21  A.  I sat with him, as I said, on 2 -- when we were
22      doing 2 with Bill Holtzclaw because that was so
23      contentious with him giving up people.  And once

Page 45

1  we established the lines, then it was pretty
2  much just the process of filling in the blanks.
3  And I consulted with Mr. Hinaman, I'm sure, on
4  several of those.
5  Q.  Was it your decision, Senator Dial, to draw the
6  lines as they appear in Senate Districts 8, 9,
7  and 10?
8  A.  Restate your question.
9  Q.  The lines that are drawn for Senate Districts 8,
10  9, and 10, did you decide how to draw those
11  lines, or did someone else decide?
12  A.  I decided as closely as I could consulting with
13  the legislators in that district.
14  Q.  Which legislators are we talking about now in
15  those three districts?
16  A.  Williams.  And then McGill is in 8, and 9 is --
17  Q.  Scofield?
18  A.  Scofield.
19  Q.  So you consulted with them about how to draw
20  those lines?
21  A.  Right.  Yes, sir.  Because of the fact that
22  communities within those districts were of
23  essential interest to those individuals.

Page 46

1  Q.  Would you say that those three Senators are the
2  ones who primarily decided where those lines
3  should be drawn?
4  A.  Primarily?
5  Q.  Yes.
6  A.  I would say that the final, yes.  They had to
7  understand that each had to give and take
8  districts, and I would point that out to them
9  with how we would have to move their districts
10  into them.  But in the final analysis, I would
11  say that they basically okayed the district line
12  that we provided for them -- that I ...
13  Q.  Do you recall the public hearing held in
14  Guntersville on October 3, 2011?
15  A.  Yes, sir.
16  Q.  Do you recall the speakers of that hearing
17  asking that Senate District 89 be taken out of
18  Madison County and kept only in Marshall and
19  Blount counties?
20  A.  I'm sure that was the conversation.  I don't
21  remember it particularly, but we had a lot of
22  people.  And as you went to each area, everybody
23  wanted their own senator within their own

Page 47

1  geographical area.  And I'm sure that was part
2  of the conversation.  I don't remember it in
3  particular.
4  Q.  Well, since Madison County was the driver in --
5  according to our understanding of what you're
6  saying about how those districts were drawn
7  because Madison County had to give up
8  population.
9  A.  Absolutely.
10  Q.  The districts, that is -- The Senate districts
11  in Madison County had to give up --
12  A.  Yes.
13  Q.  Why wouldn't it have been possible to keep
14  Senate District 9 in Jackson, Marshall, and
15  Blount counties?
16  A.  Well, if I would have kept all of Marshall and
17  Jackson and Blount, then I would have aggravated
18  a problem I had in Jefferson County.  As I grew
19  Jefferson County and the minority districts
20  expanded into that area, it forced them out into
21  the other districts and therefore affected
22  Blount.  Blount had to give up part to 17, and
23  Marshall had to move north.

Page 48

1  Q.  So now we're looking at Jefferson County as
2  being part of the problem?
3  A.  Absolutely.  When you had the three minority
4  districts, all three that we talked about
5  earlier, and the map they gave me, each of them
6  had to grow an appreciable number of votes.  And
7  when you did that, it took that and expanded it
8  out.  And so it forced those legislatures to
9  move just as Senator Beason in 17, I believe,
10  had to move out.  It forced Senator Blackwell in
11  15 to move out because I had to grow those three
12  districts within the geographical area that they
13  were compounded in.  And that created another
14  difficulty that we had to work.
15  Q.  So all three of those majority-black
16  districts -- Senate districts -- excuse me -- in
17  Jefferson County --
18  A.  Yes, sir.
19  Q.  -- are contained entirely within Jefferson
20  County; isn't that correct?
21  A.  Yes, sir.  I believe that -- I'm almost certain
22  that's correct.  Yes, sir.
23  Q.  But all five of the majority-white Senate

Deposition of Gerald Dial                 ALBC/Newton vs. State of AL                      May 21, 2013

Page 49

1    districts that go into Jefferson County take in
2    parts of other counties surrounding Jefferson
3    County?
4    A.  Yes, sir.  But as I grew those three districts,
5    they had to grow with minorities.  They couldn't
6    grow -- I couldn't move Senator Smitherman over
7    the hill into Mountain Brook and Vestavia.  It
8    would have regressed his district.
9    Q.  So if you had consolidated some of the five
10   majority-white Senate districts and reduced,
11   say, the number of majority-white districts in
12   Jefferson County to three or four, that would
13   have been unacceptable to some of the incumbents
14   in those districts.
15   A.  It would have been --
16              MR. WALKER:  Objection to form.  You
17         may answer.
18   A.  It would have been unacceptable to the plans and
19   the guidelines that we had that we would not put
20   any two incumbents in the same district.
21   Q.  Because it's true, isn't it, that you could have
22   avoided having five majority-white Senate
23   districts going out of Jefferson County into

Page 50

1    surrounding counties by simply reducing the
2    number of majority-white districts in Jefferson
3    County?
4              MR. WALKER:  Objection to form.  You
5         can answer.
6    A.  Without the Voting Rights Act, I could have
7    drawn perfect districts throughout the state.
8    But I could not -- I could have done that had I
9    not had the stipulation to comply with the
10   Voting Rights Act.
11   Q.  Okay.  So you felt you had to keep three
12   majority-black districts in Jefferson County?
13   A.  Absolutely.
14   Q.  And you did that?
15   A.  Yes, sir.
16   Q.  But my question is, why couldn't you reduce the
17   number of majority-white districts in Jefferson
18   County and thereby keep Jefferson County from
19   being split further than it already was?
20   A.  I would have had to put incumbents in the same
21   district, and that was not -- that was a
22   violation of the guidelines that we had adopted
23   and the promise I had made to all 34 of the

Page 51

1    senators.
2    Q.  Before we leave north Alabama, let's take a look
3    at Tammy Irons' district, Senate District 1.
4    Her district, which contained all of Lauderdale
5    County and the eastern half of Colbert County,
6    was underpopulated by 1 percent.
7              What were your reasons for taking her all
8    the way through Limestone County into Madison
9    County?
10   A.  She backed up on District 2, and somebody had to
11   assume part of those 42,000 plus people.  As I
12   said all, three of the combining -- Remember,
13   that district is only joined on three sides
14   because Tennessee joins on the north.  So I
15   compressed her into 2, compressed 7 into 2, and
16   compressed 3 into 2 and brought all three of
17   those people to assume part of that 42,000.  In
18   doing that, it shifted her to the right.
19              Now, the other thing that played into this
20   as well is Senate District 2, Senator
21   Singleton's district.  He had to grow.  He had
22   to grow up into Senate District 6.
23   Q.  You said Senate District 2?

Page 52

1    A.  21.  I'm sorry.  21.  Singleton.
2    Q.  Uh-huh (positive response).
3    A.  He had to grow.  He's a minority district.
4    Q.  All right.
5    A.  So he had to grow.  I could not grow him down
6    into Senate District 24 -- I mean, to Senator
7    Sanders' district, which was a concern of both
8    of them when we began the process.  So in moving
9    Senator Singleton up into Senate 6, it pushed
10   Senate 6 up into Senate 1 and pushed Senate 1 to
11   take up part of Senate 2.
12              We had public hearings there.  They, like
13   everybody else, did not want to be divided and
14   did not want to be split, but I couldn't put
15   those people in Tennessee.
16   Q.  If you had been using a plus or minus 5 percent
17   deviation, could you have avoided taking Senator
18   Irons' district all the way over into Madison
19   County?
20   A.  I can't answer that.  I don't know.
21   Q.  Just didn't investigate that?
22   A.  No, sir.  The guideline we had was 1 percent.
23   Q.  Did the 1 percent -- plus or minus 1 percent

Pages 49 to 52

Deposition of Gerald Dial                ALBC/Newton vs. State of AL                May 21, 2013

Page 53

1    restriction make it more difficult for you to
2    keep counties whole?
3    A.  Yes.
4              MR. WALKER:  Jim, when it's
5         convenient, can we take a quick
6         break at some point?  Whenever
7         it's convenient for you.
8              MR. BLACKSHER:  I'm fine right now if
9         you'd like to take a break.
10             MR. WALKER:  I'd like to take a quick
11        one, if I may.
12             (Brief recess.)
13   Q.  (Continuing by Mr. Blacksher) Senator Dial, do
14        you remember the hearing in Clanton -- Chilton
15        County on October 6, 2011?
16   A.  Yes, sir.
17   Q.  And do you recall that all the speakers,
18        including the incumbent senator, former House
19        member, mayor of Clanton, Chilton probate judge
20        all pleading with the committee to keep Chilton
21        County undivided as it had been in the 2001
22        plan?
23             MR. WALKER:  Object to the form.  You

Page 54

1         may answer.
2    Q.  You recall that, don't you?
3    A.  I recall the meeting.  I don't recall the
4         specifics.  But as I said earlier, that's
5         basically the testimony we heard in every
6         district, is keep them intact as much as
7         possible.
8    Q.  That was the one point that you heard, as you
9         say, in just about every one of the hearings?
10        Keep our county whole?
11   A.  Well, most of them wanted to keep the senator
12        they had.  I heard that more than anything
13        else.  We want to keep the senator we have.
14   Q.  So if you look at the map of Chilton County in
15        the Act 603 Senate plan, it ends up splitting
16        Chilton County between two Senate districts,
17        does it not?
18   A.  Yes, sir.
19   Q.  It increased the number of Senate districts in
20        Chilton County from one to two.  And the number
21        of counties outside Chilton County who select --
22        who elect Senate members of the Chilton County
23        Legislative Delegation has increased from three

Page 55

1    to six.  Members of the Chilton County Senate
2    Legislative Delegation now represent six
3    counties outside of Chilton County.
4              Can you see that?
5    A.  Yes.
6    Q.  Would you agree that's a problem for the local
7         delegation of Chilton County to have senators
8         who represent so many other counties?
9    A.  No, sir.
10   Q.  It's not a problem to you, huh?
11   A.  No, sir.
12   Q.  Why not?
13   A.  If you only have one Senator representing one
14        county, he becomes basically the most powerful
15        person in the county.
16   Q.  But it's true, isn't it, that every county
17        commission you run into wants to have fewer
18        members of his local delegation?
19   A.  Well, the same applies to county commissioners,
20        you know.  You've got -- I've got five county
21        commissioners.  I'd like to just have one or
22        two.  But to reach the population requirement, I
23        have to have five.

Page 56

1    Q.  Reducing the number of members of a county's
2         local delegation was not one of your objectives,
3         was it?
4    A.  Reducing the --
5    Q.  Trying to minimize the number of senators in any
6         county's local delegation was not one of your
7         objectives in drawing this plan; isn't that
8         correct?
9    A.  It was one.  But the priorities -- it was not
10        the top priority.  It was probably third or
11        fourth.  To keep counties intact as much as
12        possible was down the line.
13   Q.  Down the list?
14   A.  Yes, sir.
15             MR. BLACKSHER:  I'm going let counsel
16        for the Newton plaintiff ask you
17        questions now, Bill Patty.
18             EXAMINATION
19   BY MR. PATTY:
20   Q.  Good morning, Senator Dial.
21   A.  Good morning.
22   Q.  I'm Bill Patty.  I represent the Newton
23        plaintiffs in this case, and I apologize if I

Pages 53 to 56

Page 57

1    kind of overlap some of the questions.  I'm
2    going to try not to be too redundant, but I'm
3    sure there will be some that will be overlaps.
4         With regard to Mr. Hinaman, do you recall
5    when you first either were introduced to
6    Mr. Hinaman or told this is who you need to talk
7    to, or -- Do you remember when that occurred?
8    A.  I first met Mr. Hinaman when he was working for
9    Congressman Jo Bonner in reapportionment in,
10   gosh -- when Sonny Callahan was the
11   Congressman.  What year would that have been?
12   Q.  I'm sorry.  I asked you a poor question.  I
13   meant with respect to this reapportionment, the
14   plan that we're dealing with today.
15        Do you remember when you were first told if
16   you have questions or need assistance or
17   anything of that nature, talk to Mr. Hinaman?
18        MR. WALKER:  Objection to form.  You
19        may answer.
20        THE WITNESS:  You want me to go ahead
21        and --
22        MR. WALKER:  Yes.
23   A.  As I said, it would have been when we were

Page 58

1    working on the congressional district and the
2    board of education districts.  He began to work
3    with us at that time and continued on into the
4    process.  We were originally going to try to do
5    the congressional and the board of education and
6    the legislative districts all at once.  And we
7    understood that became overwhelming.  We had to
8    do the board of education, congressional
9    districts for that election.  So we began to
10   work on those and set aside the legislative
11   delegation.
12   Q.  Well, how -- I guess what I'm getting at is, how
13   did the two of y'all connect?  I understand your
14   committee didn't hire Mr. Hinaman.  Your
15   committee didn't pay Mr. Hinaman.  So how did
16   you connect with  Mr. Hinaman to know that
17   that's someone you should talk to?
18   A.  Well, I guess -- when he came to Montgomery, he
19   came to my office and said basically like I'm
20   from the government, and I'm here to help you.
21   Q.  Okay.  So did he indicate to you who had sent
22   him to you or --
23   A.  No.

Page 59

1    Q.  -- who had directed him to you?
2    A.  I had been working with him, as I said, through
3    the congressional and board of education, and I
4    just figured it was the continuity.
5    Q.  How did you get in contact with him to work with
6    him on the congressional redistricting or the
7    board of education?
8    A.  I guess he came to Montgomery, and he came to my
9    office.  I had known him for 15, 20 years.  And
10   he said, I'm here to help work on the
11   congressional delegation.
12   Q.  Okay.
13   A.  And I had spoken to Congressman Rogers, who is
14   my Congressman, about it, and he said that he
15   was going to come and help us.  And as I said, I
16   had worked with him -- he had used my office
17   years ago when he worked with Sonny Callahan.
18   So it's not like we didn't know each other.
19   We've known each other for a long time.
20   Q.  What does Mr. Hinaman do?  What is his
21   business?  Do you know?
22   A.  He's a political consultant, I guess, because
23   he -- You know, at one time -- I considered him

Page 60

1    to be my campaign manager at one time, but he
2    chose not to because he lived in Washington.
3    Q.  So he's not an attorney; is that correct?
4    A.  I don't know that.
5    Q.  Okay.  You haven't gone to him for legal advice?
6    A.  No, sir.
7    Q.  And so at the beginning of the congressional
8    redistricting process, Mr. Hinaman came to your
9    office and said he was there to help you with
10   that process; is that correct?
11   A.  Yes, sir.
12   Q.  And you didn't make any inquiries as to who
13   would be paying him for his services?
14   A.  I just assumed it was the congressional folks
15   because he had come from Washington.  I knew
16   him.  He worked there before as we did
17   reapportionments.  So I just assumed it wasn't
18   my job to ask him.
19   Q.  Okay.  With regard to reapportionment of the
20   legislature, did you ask him who was paying for
21   his services for that?
22   A.  No, sir.
23   Q.  He never mentioned who contacted him or directed

Page 61

1   him to work with you on any of these
2   reapportionments?
3   A.  I didn't ask him that.  I assumed somebody was,
4       but I was simply serving as the chairman.  And
5       if you would have shown up and offered me to
6       help, I would have used you.
7   Q.  All right.  And with respect to your initial
8       involvement with Mr. Hinaman regarding the
9       congressional redistricting, you said that there
10      was a conversation you had with
11      Representative --
12  A.  Rogers.
13  Q.  -- Rogers.
14  A.  He's my Congressman.
15  Q.  Okay.  And he -- that's Mike Rogers?
16  A.  Yes.
17  Q.  And he, I guess, indicated to you that
18      Mr. Hinaman may be coming to assist?
19  A.  I think the conversation was that I'm chairing
20      the reapportionment committee, and I'm glad
21      Randy Hinaman is here to help me.
22  Q.  Okay.  So Mr. Hinaman obviously had already
23      contacted you by the time you talked to

Page 62

1       Mr. Rogers?
2   A.  Yes.
3   Q.  Okay.  All right.  Did Mr. Rogers indicate any
4       kind of knowledge of how Mr. Hinaman --
5   A.  No, sir.
6   Q.  -- came about -- who was paying him to assist
7       you or anything?
8   A.  No, sir.
9   Q.  All right.  And with respect to Mr. Hinaman,
10      what was the scope of his services he was
11      providing?  What was he supposed to do or assist
12      you with in this process?
13  A.  I don't know what he was supposed to assist me
14      with.  But as I had questions, he was available
15      to answer them when he was here in town.  And
16      basically I wanted to make sure -- as I said, I
17      start -- I wanted to make sure I did not regress
18      the minority districts.  That was the total
19      beginning of the whole Senate reapportionment
20      plan, and I did not put two senators in the same
21      district.  And as I had questions that was I
22      regressing this district or if I moved this line
23      here, would I do it, he would provide me that

Page 63

1       information.
2   Q.  Okay.  And you've talked some already today
3       about what he did and your involvement -- his
4       involvement.  Okay.
5           I'm trying to understand a little bit about
6       the time line of this process, and so I want to
7       make sure I kind of -- I know you don't know
8       exact dates on a lot of this, but I'm just sort
9       of trying to put things in order.  So I'm not
10      really looking necessarily for an exact date but
11      trying to just get kind of the process of how
12      things happened.
13          You said there were some public -- there
14      were public hearings that were held regarding
15      the reapportionment; is that correct?
16  A.  There were.
17  Q.  All right.  Now, had you met with Mr. Hinaman
18      prior to those public hearings?
19          MR. WALKER:  You're talking about the
20          legislative reapportionment?
21          MR. PATTY:  Yes.  The legislative.
22          I'm sorry.
23  A.  I met with him the whole year before on the

Page 64

1       congressional.
2   Q.  Right.  But with respect --
3   A.  And we had probably discussed -- originally,
4       remember, we were going to do all three.
5   Q.  Right.
6   A.  So we had probably discussed legislative
7       reapportionment in that interim time when we
8       decided to -- that it would be almost impossible
9       under the time frame to do all three.
10  Q.  Okay.
11  A.  So, yes, we had probably discussed it during
12      that time.  But we had not gotten specific about
13      it.
14  Q.  All right.  When were you appointed to the
15      committee for the reapportionment process?
16  A.  Beginning of the quadrennium.  I don't know.
17      The lieutenant governor appointed members.  You
18      get one from each congressional district and so
19      forth.
20  Q.  So you were appointed to this committee.  There
21      was initial thought to maybe do the state board
22      of education, congressional, and legislative
23      altogether?  And they decided just to do the

Page 65

1    legislative reapportionment last; is that right?
2  A.  Yes, sir.
3  Q.  And there may have been some interim discussions
4      with Mr. Hinaman during that process about the
5      legislative --
6  A.  Yes.
7  Q.  Do you remember anything about those
8      discussions -- those general discussions with
9      Mr. Hinaman?
10 A.  Only about -- The only discussion I could recall
11     would be about the process of how we could get
12     it done in time to get it into the legislature
13     and get a legislative act passed because it
14     required a legislative act.  And the discussion
15     was not on what district we were going to make
16     and who is going to be where but could we meet
17     that time frame.
18         And when we determined we could not meet
19     that time frame, we put it aside and began to
20     work on the other two, because we had to pass
21     legislative acts.  And you've got to introduce
22     them and pass them, and they've got to be --
23     pass both houses of the legislature and be

Page 66

1      approved by -- signed by the governor.  So all
2      that had to be done and in place.  And then
3      you've got to have it, as you know, approved by
4      the Justice Department before they can ...
5  Q.  Now, prior to the public hearings, were there
6      any possible working maps or any kind of maps
7      prepared --
8  A.  No.
9  Q.  -- prior to those hearings?
10 A.  Prior to those hearings, no.  The only maps we
11     had when we went to the hearings were the
12     current -- at that time current legislative
13     districts.  We carried a copy of both the House
14     and Senate map to those hearings and let the
15     people then express their intent based on those
16     maps.
17 Q.  Okay.  So the only maps that would have been --
18 A.  There were no maps.
19 Q.  -- shown at the hearing would have been the
20     current maps?
21 A.  Yeah.  There were no maps -- We didn't have maps
22     prior to that.
23 Q.  All right.  Was there any reason why you didn't

Page 67

1      have maps prior to that --
2  A.  Yes.  Because we were getting input to draw the
3      maps.
4  Q.  Okay.  Now, was there -- do you know if in the
5      past that when public hearings have been held if
6      the maps -- there were proposed maps there to
7      show --
8  A.  One of the reasons I wanted to be on the
9      committee was to have public hearings.  There
10     were no public hearings conducted in the last --
11     with the last reapportionment committee except
12     one or two in Montgomery.
13 Q.  Do you know if they had maps at those hearings?
14 A.  No.
15 Q.  So you're saying that prior to these public
16     hearings, there had been no preliminary working
17     maps of trying to see kind of what we could do
18     or what --
19 A.  No.
20 Q.  -- we may --
21         MR. WALKER:  Object to the form.  You
22            may answer.
23 A.  Not that I was ever involved in.

Page 68

1  Q.  Now, you had mentioned that Mr. Hinaman had
2      some -- I guess there had been some discussion
3      with some data or something, that y'all talked
4      about some data, or maybe he was providing you
5      information with data.  I may have that wrong,
6      but was there any -- What was your discussion
7      with Mr. Hinaman prior to this public hearing
8      other than just this process and whether y'all
9      could meet the time lines?
10 A.  As far as legislative, only on the time line.
11 Q.  Okay.  That's all?
12 A.  Yes.
13 Q.  So there hadn't been any exchange of information
14     with Mr. Hinaman --
15 A.  None.
16 Q.  -- prior to that public hearing?
17         Now, when you met with different members of
18     the Senate districts and talked to them about
19     their districts, was that after the public
20     hearings?
21 A.  During the process.
22 Q.  It was during that time frame of the public
23     hearings?

Pages 65 to 68

Page 69

1   A.  Yes.  From the beginning of the public hearings
2       till the bill was introduced in the legislature.
3   Q.  When was the -- When would have been the first
4       map that would have been drawn in this process
5       that we're talking about?
6   A.  It was after the public hearings, during the
7       legislative session.  Gosh.  I don't know.
8       February or March time frame.  I can't give you
9       a specific on that.
10  Q.  When you met with the senators and you described
11      kind of there was some discussions you had with
12      senators where you would say you're
13      overpopulated or underpopulated; what do you
14      think should happen basically, did you have the
15      maps then?
16  A.  No, sir.  I only had -- We didn't have a map
17      finished at that time.  That was where I was
18      trying to gain content to put into the map.
19  Q.  Okay.  Where did you get the data to show
20      overpopulation of districts?
21  A.  Reapportionment office.
22  Q.  Now, we've been produced some maps that say Dial
23      Plan 1, Dial Plan 2, Dial Plan 3.

Page 70

1   A.  Yes, sir.
2   Q.  Can you explain what these are?
3   A.  Yes, sir.  Dial Plan 1 was the original plan
4      that we drew after the public hearings.  We had
5      a public hearing on Dial Plan 1.  We found out
6      that we had inadvertently, because of a glitch
7      in the computer, put two senators in the same
8      district.  Senator Keahey was in Senator
9      Sanders' district and Senator Fielding was in --
10     and Senator Blackwell were in the same
11     district.  That was Dial Plan 1.
12       I went back and had reapportion to
13     change that after we had researched their
14     address, because when you Google it and you
15     look -- it was wrong.  And so when I immediately
16     introduced Dial Plan 1, that became apparent.
17     We redrew it, and it became Dial Plan 2.  And
18     that was the change.  Made sure that I kept my
19     commitment to not put two individuals in the
20     same district.
21  Q.  Was Dial Plan 1 the first map that was drawn?
22  A.  Yes, sir.
23  Q.  And how was that disseminated publicly?

Page 71

1   A.  We had a public hearing at the Capitol
2      auditorium.
3   Q.  Was it made available to the senators?
4   A.  Prior to that -- It was made available to them
5      prior to that to have discussion over the
6      weekend with their constituents and themselves
7      and then come back to the public hearing.
8   Q.  Was it released all at one time to the senators,
9      or was it --
10  A.  Yeah.
11  Q.  How was that done?
12  A.  It was given to them on Thursday afternoon
13     before we adjourned the session so they could
14     carry it home and have it over the weekend
15     because we were going to have a public hearing
16     either Monday or Tuesday.  I can't give you the
17     exact date.
18  Q.  How far in advance of that being distributed
19     was -- When was the plan drawn in relation to
20     when it was passed out?  How much of a time
21     frame was there between the two?
22  A.  I can't answer that.  Not much.  But I can't
23     answer that.  A day or two days, somewhere

Page 72

1     around there.
2   Q.  Was anyone else given copies of the plan prior
3     to it being given to the Senators, from the time
4     it was drawn until the time it was disseminated
5     to the Senators?  Did anybody else get it?
6   A.  Not unless somebody got a copy somewhere that I
7     didn't know about.  We wanted to make sure all
8     the senators had it first.
9   Q.  Okay.
10  A.  I'm not saying somebody didn't.  But as far as I
11     know, they didn't.
12  Q.  All right.  And then what is Dial Plan 3?
13  A.  Dial Plan 3 was -- Senator Irons came to me
14     after Dial Plan 2 and requested we make some
15     changes to better meet some of her demands in
16     her district.  I was able to accomplish that by
17     working with -- in Senate district -- doing some
18     changes in Senate District 6.  And this was Dial
19     Plan 3, to accomplish some of her concerns.  And
20     she and I -- she helped me put together the
21     concerns, and I went back to reapportionment and
22     had them to put it into Dial Plan 3?
23  Q.  Were there public hearings on Dial Plan 2 and 3?

Page 73

1   A.  Not on 3.
2   Q.  And when there were changes that were suggested,
3       like with Dial Plan 2, when there were
4       incumbents that were in the same district, would
5       that information be provided to Mr. Hinaman to
6       provide y'all with some direction on how to
7       redraw those maps?
8   A.  Reapportionment office did it.  They were the
9       ones -- they were the ones -- He may have
10      consulted with the reapportionment office.  But
11      I talked to Bunnie in the reapportionment office
12      and apologized for -- I made an error, and I was
13      responsible.  I didn't actually draw it, but I
14      was in charge.  And I apologized to the
15      individuals.  I asked Bunnie to correct it, and
16      she did.
17  Q.  Did you consult with Mr. Hinaman at all about
18      Dial Plan 2, the changes that were going to be
19      made to Plan 1 to create Dial Plan 2?
20  A.  I think he was in the office when I was talking
21      to Bunnie, but it really --
22  Q.  Do you recall if he had any input in those
23      changes?

Page 74

1   A.  No.  I mean, he was there.
2   Q.  Okay.
3   A.  He didn't say "yes" or "no."  He didn't have
4       that authority.  I was the one that -- I was the
5       one that messed up, and I was the one that was
6       having to change it.
7   Q.  Rough estimate, do you have a judgment as to how
8       many times that you would have met face-to-face
9       with Mr. Hinaman during this process over the
10      legislative reapportionment?
11  A.  No.  No way I can tell you that.
12  Q.  Is it more than 20 times you think?
13  A.  Oh, I don't think it was that many.
14  Q.  Okay.
15  A.  Probably less than a dozen, but I'm just
16      guestimating, you know.
17  Q.  All right.
18  A.  Are you talking about -- If you go all the way
19      through the congressional thing and the other
20      thing, yeah.  Maybe 20 if you go back through
21      that.
22  Q.  All right.  With respect to Dial Plan 3, did you
23      have any discussions with Mr. Hinaman about Dial

Page 75

1       Plan 3?
2   A.  I think he was in the room when I instructed
3       Bunnie to draw Dial Plan 3.
4   Q.  Okay.  Did you talk to him before you told
5       Bonnie how to draw Dial Plan 3?
6   A.  No, sir.
7   Q.  He --
8   A.  Not that I remember.
9   Q.  You didn't ask for any guides from him or advice
10      from him on how to do it?
11  A.  Not that I remember.
12  Q.  Did he approve how you instructed Bonnie to draw
13      it?
14  A.  It wasn't his job to approve it.
15  Q.  But he was there?
16  A.  Yes.
17  Q.  Was anybody -- Do you recall anybody else being
18      present when you gave those instructions
19      regarding Dial Plan 3?
20  A.  I'm not sure if Ms. -- I think Ms. Ikens
21      (phonetic) was with me.  I can't be --
22  Q.  Who was that?
23  A.  Tammy Irons.  I'm sorry.

Page 76

1   Q.  That's okay.
2   A.  I think Tammy was with me.  She had brought it
3       to me.  And I think I either asked her to take
4       it to Bunnie, or she and I both went to Bunnie.
5       I can't remember specifically.  But she was
6       involved in it, and I took it to Bunnie and
7       asked her to put it into Dial Plan 3.
8   Q.  Did Mr. Hinaman review what Ms. Irons had
9       provided?
10  A.  I can't answer that.  I don't know.
11  Q.  But he was present when you gave these
12      instructions about how to redraw it?
13  A.  I'm not sure he was actually in the room at that
14      time.  But I think when I went back to get the
15      plan, he was in the room.  But it was not his
16      choice.  It was my choice.  It was my decision.
17  Q.  Okay.  Before Dial Plan 1 was drafted -- How
18      many times do you think you met with Mr. Hinaman
19      prior to Dial Plan 1 being drawn up?
20  A.  I don't know.
21  Q.  Multiple times?
22  A.  More than once, yes.
23  Q.  Okay.

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 77

1  A.  You know, I could say five or six or -- I
2      just -- There's no way I can tell you that.
3  Q.  As y'all are coming up with this map, would
4      you -- were there preliminary maps that were
5      drawn or is this a -- Tell me how that process
6      was done that you --
7  A.  It's all on computer.
8  Q.  Okay.  You just sit down with a computer and
9      look at the screen and start working from there?
10 A.  I didn't.  But Bunnie did and Randy did, yeah.
11 Q.  Mr. Hinaman and Bonnie.  Who is Bonnie again?
12 A.  Bunnie is the -- She's the chief of the
13     reapportionment office that works for the
14     reapportionment committee.  It's a permanent
15     committee that's there.  Bunnie Shineholder or
16     Shine --
17         MR. WALKER:  Shanholtzer.  And it's
18         Bonnie, not Bunnie.  B-O-N-N-I-E.
19         THE WITNESS:  What am I calling her?
20         MR. WALKER:  S-H-A-N-H-O-L-T-Z-E-R.
21         (Brief off-the-record discussion.)
22 Q.  Anyhow, they would actually work with this
23     computer in those meetings in coming up with the

Page 78

1      actual map, this plan -- the Dial Plan 1; is
2      that right?
3  A.  Yes.
4  Q.  Okay.  Were you present while they were doing
5      all those meetings, or were there some times
6      they met and you weren't present?
7          MR. WALKER:  Objection to form.
8  A.  They would be work -- I was not there all the
9      time.  I gave them instructions.  And when they
10     were through with the instructions, they would
11     call me and I would review it.
12 Q.  Okay.  And those instructions -- you told us
13     earlier about the two things -- main things you
14     wanted.  No incumbents and no regression?
15 A.  Yes, sir.
16 Q.  Before -- During this process where they came up
17     with a map and then you said, okay, I approve
18     it, and it gets passed to the senators, were
19     there any changes that you specifically wanted
20     done to what they had come up with in drafts of
21     the maps?
22         MR. WALKER:  Object to the form.  Go
23         ahead.

Page 79

1  A.  I would say yes.  But then to be specific to
2      what they were, I would be --
3  Q.  Can't remember?
4  A.  I would say that I never went in and said, hey,
5      this -- what you've done is exactly like I want
6      it.  I would look at the -- other aspects of it,
7      but I can't be that specific.
8  Q.  Sitting here today, you can't remember going in
9      any particular time and saying hey, you need to
10     move this here or do this differently or
11     anything like that?
12 A.  Not that specific.
13 Q.  And is it my understanding you don't recall any
14     written communication between you and
15     Mr. Hinaman?
16 A.  No.
17 Q.  Do you recall any documents that you gave to
18     Mr. Hinaman or that Mr. Hinaman gave to you?
19         MR. WALKER:  He's testified to some
20         extent about those.
21 Q.  Other than something you've already mentioned.
22 A.  No, sir.
23 Q.  Do you recall getting any e-mails from other

Page 80

1      legislators about the reapportionment process or
2      the maps?
3  A.  No, sir.
4  Q.  Do you remember talking to Senator Keahey about
5      the reapportionment?
6  A.  Yes.
7  Q.  What do you recall about that conversation?
8  A.  He and I had numerous conversations about his
9      district.
10 Q.  Okay.  What can you recall about those
11     conversations?
12 A.  He presented -- drew me several -- on my map
13     several proposals that he would like to see
14     encompassed into his district.  Each time I
15     tried to encompass those into what I was trying
16     to draw.  And each time it began to impede upon
17     Senator Sanders' district and would violate my
18     proposal to regress Senator Sanders' district,
19     so I couldn't satisfy them.
20 Q.  Okay.  I want to make sure, too, I understand
21     you.  With respect to violating the --
22 A.  Regression of --
23 Q.  -- the concern of the regression, when you're

Page 81

1    using that term about the regression, are you
2    saying that you did not want the voting-age
3    population of African-Americans to drop for a
4    particular district?
5    A.  Total population.
6    Q.  The total population.  So you did not want the
7    total population of African-Americans to drop in
8    that district?
9    A.  That's correct.
10   Q.  Okay.  And if that population dropped a
11   percentage, in your opinion that would have been
12   retrogression?
13   A.  Yes, sir.
14   Q.  So if -- And I'm not saying these are the
15   numbers, but I'm just saying if Senator Sanders'
16   district had been 65 percent African-American,
17   if it dropped to 62 percent African-American in
18   total population, then that would have been
19   retrogression to you?
20   A.  In my opinion, yes.
21   Q.  And so that's what you were trying to prevent?
22   A.  Yes.
23   Q.  All right.  So that when Mr. -- when Senator

Page 82

1    Keahey brought to you some proposals, those
2    would have involved Senator Sanders' district
3    percentage of total African-American population
4    dropping; isn't that correct?
5    A.  Yes.  The other problem we had was that the
6    Baldwin County area had grown so that somebody
7    had to assume some of those voters in Baldwin
8    County.
9    Q.  Okay.  Now, with respect to the proposals that
10   would have involved a drop in the total
11   population of African-Americans in Senator
12   Sanders' district, was any of those -- did any
13   of those proposals by Senator Keahey involve
14   those populations dropping to 55 percent or
15   below 60 percent?  Do you know?
16   A.  I can't remember the specifics.
17   Q.  Would it -- Would the proposals have the total
18   population of African-Americans still being over
19   55 percent in Senator Sanders' district?
20   A.  I'm sorry.  I just can't remember those specific
21   numbers.
22   Q.  Okay.  Do you remember -- Can you remember any
23   specifics about your conversations with Senator

Page 83

1    Keahey when he contacted you?
2    A.  As far as specifics, he met -- he came to my
3    office probably two or three times and looked at
4    the map I had and would show me how he would
5    like to see the district.  I told him I would go
6    back and see how I could work that in without
7    doing -- as I said, regressing.
8        One of his proposals, he wanted part of
9    Mobile County -- more of Mobile County.  I had
10   worked with the total delegation down there.
11   Senator Figures, who is on the committee, and
12   the other delegation had pretty well agreed on
13   what they would like to have in Mobile County.
14   And one of his proposals upset the Mobile
15   delegation, and I told him I could not make that
16   work.
17   Q.  When you said you would try to figure out how
18   you could incorporate these proposals of Senator
19   Keahey, what would you do to determine if those
20   could be incorporated?
21   A.  Well, the Mobile thing was not rocket science.
22   I went to the Mobile delegation, and they said
23   no.

Page 84

1    Q.  Okay.  With respect to Senator Sanders -- the
2    proposal that would have taken some folks from
3    Senator Sanders' district, what did you do
4    there?
5    A.  I looked at the minority that were included in
6    that proportion that he had, and I thought it
7    made the percentage -- violated what we were
8    trying to accomplish.
9    Q.  You did that yourself, or did you ask
10   Mr. Hinaman to do it?
11   A.  I had the minority districts in that.  In some
12   cases I went to Mr. Hinaman and Bonnie.  At that
13   time he would be in Bonnie's office because she
14   had all that on her computer.
15   Q.  So you would, I guess --
16   A.  If I didn't know it myself, yes.  And most of it
17   I -- most of it -- I had not become astute like
18   Representative Guin, but I knew -- I had become
19   quite knowledgeable in how to do some of the
20   reapportionment by that time.
21   Q.  So you would vet these ideas Senator Keahey had
22   with Mr. Hinaman to see if -- get his input on
23   it?

Pages 81 to 84

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 85

1   A.  At times.  He would be in the reapportionment
2       office.
3   Q.  Okay.  Do you know how many times he met with
4       the reapportionment office during this process?
5   A.  No.  I can't answer that.
6   Q.  Do you remember any of the substance of any of
7       those conversations that you had with
8       Mr. Hinaman about Keahey's district?
9   A.  No, sir.
10  Q.  Can you tell me any more detail or any more
11      about the conversations you had with Senator
12      Keahey about his districts?
13  A.  No.  Except I had told Senator Keahey I would
14      like to help him if there's any way I can, but I
15      can't move people into Mississippi and into
16      Florida, and I had to take care of what had come
17      into Baldwin County.  He was one of the
18      individuals that I had drawn -- I had his house
19      in the wrong place because of the Google address
20      and the literal address.  He gave me a hard time
21      about that, and I apologized because I had
22      made -- it was just a simple error on my part.
23      And that was the first conversation we had on

Page 86

1       beginning to work that, and I changed that after
2       he came to me and pointed that out.
3   Q.  With respect to Senator Keahey's district, do
4       you remember if overall his district before
5       reapportionment and district after
6       reapportionment, if the change in population was
7       about 200-and-something people?
8   A.  I can't answer that.
9   Q.  Do you recall if the change between what his
10      district was and what it was under the
11      reapportionment plan approved removed 10,000
12      minorities from his district?
13  A.  I would say that's very likely because Senator
14      Sanders had to pick up minorities.  And as
15      Senator Sanders said at the public hearing in
16      Selma, as I asked him how would his district
17      grow, he said it has to grow into Senator
18      Keahey's district.  So that was Senator Sanders'
19      own words to me.
20  Q.  And is Mobile County and Baldwin County combined
21      in any of the other congressional or state board
22      of education plans?
23  A.  They are combined in the congressional

Page 87

1       district.  And I -- Yeah.  The board of
2       education -- I don't have that right in front of
3       me, but I do know that the board of education
4       and the congressional districts share both those
5       districts.
6   Q.  Do you know if Mobile and Baldwin County are
7       defined in the census as a single metropolitan
8       area?
9   A.  No, sir.
10  Q.  What's your understanding of the term "community
11      of interest"?  What does that mean?
12  A.  Well, it would be a community that has a lot of
13      commonalities, such as roads within the same
14      county or in the same geographical area of
15      trade.
16  Q.  And is a community of interest something that
17      under the reapportionment guidelines you're
18      supposed to take into consideration, to keep
19      community of interests together?
20  A.  It is.  But it's not the top priority.  It's
21      three or four down the list.
22  Q.  But it is something you consider?
23  A.  Yes.

Page 88

1   Q.  Would you agree with me that Mobile and Baldwin
2       County are more likely to be a community of
3       interest than Baldwin and Washington County?
4   A.  Well, Mobile is a trade center for Washington
5       County.  If you're in Washington County and
6       you're going to town, you're going to Mobile.
7   Q.  Would you --
8   A.  And Baldwin County is the Gulf Coast -- they are
9       as common as Jefferson and Shelby, I guess.
10      I mean, they have commonalities.
11  Q.  I'm just asking.  In your opinion, would you say
12      that Washington County has -- excuse me -- would
13      you say that Baldwin County and Mobile are more
14      of a community of interest than Washington
15      County and Baldwin County?
16  A.  I guess, if that's --
17  Q.  Okay.
18  A.  I'm not that certain that it would be, you know.
19  Q.  Was there any consideration with respect to
20      Senator Sanders' district, instead of pushing it
21      into Keahey's district, pushing it into Autauga
22      County?
23  A.  He had in the past, I believe, had part of

Pages 85 to 88

Page 89

1    Autauga County, around just a finger up through
2    there.  And as we moved -- the other issue that
3    we had for him to grow -- if I would have moved
4    him into Autauga, then I would have a lot of
5    excess voters left in Baldwin County to put
6    somewhere because Baldwin County had grown.
7    Q.  Could you not have moved Baldwin County into
8        some of the Mobile County areas?
9    A.  No, sir.
10   Q.  Why is that?
11   A.  Because the districts over there were already in
12       the 1 percent plus or minus, those three
13       districts.
14   Q.  So there was no way to cross --
15   A.  Can't put them --
16   Q.  -- the bay?
17   A.  -- in Mississippi.
18   Q.  Not in Mississippi, but there's no way to cross
19       some of the population from Baldwin County over
20       into Mobile County?
21   A.  Well, if I would have done that, then I would
22       have run the Mobile County delegation up into
23       Washington County and further on up into --

Page 90

1    Anything is possible.  Let's get that correct.
2    But I could not have done that and worked -- I
3    worked diligently with the whole Mobile
4    delegation because I've got to pass this
5    legislatively too.  And I can't just draw up a
6    plan and throw it up against the wall.  I've got
7    to have support when it goes to the floor.  And
8    I had worked diligently with the Mobile
9    delegation, including Senator Figures, who was
10   an important part of our committee.  And she had
11   a lot of input into what went into Mobile
12   because she's one of the members of the
13   committee, and I respected her from that.  And
14   there may be a community of interest between
15   Baldwin and Mobile, but the legislative
16   delegation is not a community of interest.
17   Q.  Let me ask you this way.
18           Was it ever even looked at or considered
19       doing something where Baldwin County would be
20       put together with some of the Mobile --
21   A.  Yes.  I came to the Baldwin and Mobile people
22       and asked could we bring Senator Keahey into
23       north Mobile, move Senator Glover over into

Page 91

1    Baldwin, and I got less than a warm reception.
2    Q.  And who would you have been talking to in
3        Mobile?
4    A.  Talked to the Mobile delegation, Glover and
5        Brooks, and to Senator Pittman and to Senator
6        Figures.
7    Q.  And as you recall, all four were against that
8        type of move?
9    A.  Yes, sir.  I just -- I didn't take a vote, but I
10       did not -- I didn't tarry long.  I was not
11       welcome.
12   Q.  Back to the situation with Autauga County.  What
13       was the reason again that Senator Sanders'
14       district could not grow into Autauga County?
15   A.  Well, if he had, it would have moved him up, and
16       I would have had nobody to fill in the north
17       Baldwin County growth area that Keahey had to
18       pick up.  So if you move him up there, I've
19       got -- whatever he takes in Autauga County, I've
20       got those hanging out down in Baldwin County
21       with nowhere to go.  When you back up and -- And
22       you understand.  But when you back up on state
23       lines, it pretty well hampers which way you go.

Page 92

1            (Off-the-record discussion.)
2    Q.  Both Senate District 22 and 23 were well above
3        60 percent African-American census population,
4        weren't they?
5    A.  22?
6    Q.  22 -- 23 and 24.
7    A.  23 and 24 were what?
8    Q.  The percentage of African-American population
9        was well over 60 percent, wasn't it?
10           MR. PARK:  Object to the form.
11   A.  I don't have those numbers in front of me.  I
12       can't tell you that.  I'm sure they were over,
13       but I don't have those exact numbers.
14   Q.  During this process of producing Dial 1 plan,
15       the persons that would have had access to what
16       you were working on would have been you,
17       Hinaman, and Bonnie?
18   A.  Yes.  And her staff.
19   Q.  And her staff.
20   A.  Of course, she's got a staff.  Yes.
21   Q.  Anybody else?
22   A.  No, sir.  Not that I -- If they did, they were
23       stealing it at night.

Pages 89 to 92

Page 93

1   Q.  During the redistricting reapportionment
2       process, did you have any communications with
3       anyone from the ADC organization?
4           MR. WALKER:  Object to the form.
5   A.  Senator Sanders is ADC, so -- I had a
6       conversation with Senator Sanders.
7   Q.  Anybody else?
8   A.  I don't know any other -- there may -- Some of
9       the people I talked to may have been ADC.
10      Outside the legislature, no.
11  Q.  Let me ask you this.
12          Did you seek out to discuss reapportionment
13      with anyone from the ADC organization?
14          MR. WALKER:  As opposed to a member of
15          the legislature?
16          MR. PATTY:  Right.
17  A.  Wait a minute, now.  I'm confused.
18  Q.  Let me try to ask it better.
19          During this reapportionment process, did you
20      go to anyone who is a member of the ADC
21      organization other than someone who is in the
22      legislature and talk to them about this process
23      or what you were proposing to do or try to get

Page 94

1       information from them as to what they thought?
2   A.  No.
3   Q.  What about with New South Coalition?  Same
4       question with them.  Did you seek any input from
5       anyone with the New South Coalition other than
6       someone that might have been --
7   A.  I'm sorry.  Senator Sanders is New South.  I had
8       him confused.  No.
9   Q.  And what about the NAACP?
10  A.  No.
11  Q.  Did you go to -- seek any input from any other
12      groups that may represent minority interests,
13      like any groups representing Hispanics or any
14      other minorities?
15  A.  No.
16  Q.  In your communications with the public hearings
17      or -- Strike that.
18          Information you got from the public hearings
19      that were taking place around the state, how was
20      that reflected in the final plans?
21  A.  The final plans took into consideration as much
22      of the information as we could gain from them.
23      As I said, number one, we found out early on no

Page 95

1       one wanted to give up their elected officials.
2       And this made it, you know, impossible to meet
3       each of them's requirement.
4           The second thing, we, you know, reiterated
5       to all of them that you either had to gain or
6       lose.  You've got to understand how that's got
7       to work, you know.  You can't move people in to
8       make your district bigger.  So we took -- we
9       relayed to them that information as well, and
10      that's how we took back the information we had,
11      you know.  As we told a district they had to
12      compress or they had to -- some of them would
13      say, well, don't give us up and don't give the
14      others up, and we did that the best we could.
15  Q.  When you would go to these public hearings, do
16      you recall if you would then relay back
17      information that you obtained from those
18      hearings to Mr. Hinaman to use --
19  A.  All those were put online.  All the minutes from
20      that were put online.  I didn't take that -- No,
21      I didn't take that back.  It was all online.  We
22      made it available to anybody that wanted to
23      look.

Page 96

1   Q.  Okay.  So you wouldn't -- you would say you
2       would have a public hearing one night, and the
3       information you acquired that night at that
4       hearing, you would call Mr. Hinaman and say I --
5   A.  I had no contact with him during the public
6       hearing phase.
7   Q.  Okay.  Do you recall if in your district there
8       were any communities of interest that were
9       divided?
10  A.  Yes.
11  Q.  What was that?
12  A.  The city of Ashland.
13  Q.  What was the reason why the city of Ashland was
14      divided?
15  A.  Senator Marsh had to pick up about 5,000
16      population.  Lee County had grown and had to --
17      had about 5,000 over.  I had a portion of Lee
18      County, so it's just another case of -- Senator
19      Marsh had part of Talladega.  He had to move
20      over into Clay.  I had to move into Lee.
21  Q.  Is Ashland actually divided like on the square?
22  A.  Yeah.
23  Q.  Do you remember if in Mr. Keahey's district if

Pages 93 to 96

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 97

1   McIntosh was a community of interest?
2   A.  I can't answer that.
3   Q.  Do you remember if the Native American Mohawk
4       community was a community of interest?
5   A.  I can't answer that.  I'm sure it would be, but
6       I can't answer that.  That was not a point of
7       contention as we had a public hearing in that
8       area, as I remember.
9   Q.  Do you remember if that community of interest
10      was split?
11  A.  No.  I can't remember.
12  Q.  Do you remember if -- You don't remember if
13      McIntosh was split either?
14  A.  No, sir.  I do know where McIntosh is, though,
15      but I don't remember.
16  Q.  All right.  What is packing?
17  A.  Packing?
18  Q.  Yes.  Packing a district.
19  A.  It's my understanding that packing is when you
20      put a concentration of one race or another into
21      a concentrated area to influence the voting in
22      that district.
23  Q.  Do you understand as a member of the

Page 98

1   reapportionment committee and the chair of the
2   reapportionment committee that there's a
3   responsibility not to pack districts with one
4   particular race?
5           MR. WALKER:  Objection to form.
6   A.  I didn't really understand what packing was till
7       we got way into this, but that was not a
8       consideration as I was using any -- drawing any
9       plans.
10  Q.  Okay.  Do you recall at any of the hearings if
11      there was a discussion as to what percentages of
12      a particular race in a district would be
13      acceptable or unacceptable to the Department of
14      Justice?
15  A.  At any of the public hearings?
16  Q.  Yes, sir.
17  A.  No.  I can't ...
18  Q.  Do you recall if there was any discussion of
19      what a particular standard for concentration of
20      voters by race in a particular district?
21  A.  During the public hearings?
22  Q.  Yes, sir.
23  A.  No.  I can't remember.

Page 99

1   Q.  You thought there a discussion of 55 to 60
2       percent might be --
3   A.  I don't remember that.  It may have been, but --
4   Q.  -- the number?
5   A.  I don't remember that.
6   Q.  What was your view as the head of the committee
7       as to what would be too high of a percentage of
8       one particular race in a district?
9           MR. WALKER:  Object to the form.
10  A.  Too high?
11  Q.  Yes.  Too high a percentage.
12  A.  I never even considered too high.  I used the
13      existing numbers from the minority districts.
14      There's a guideline, and that's what I worked
15      from.
16  Q.  Okay.  So you never considered if there was a
17      percentage, say, of 65 percent African-American
18      voters in a district that that was too high of a
19      percentage of African-American voters in that
20      district?
21  A.  No.
22  Q.  Or if that was packing of voters in that
23      district?

Page 100

1   A.  No.
2   Q.  Did you have any kind of opinion as to whether
3       districts were to be set up to guarantee that a
4       minority candidate is elected for that district?
5   A.  State that again.
6   Q.  Was there any kind of consideration on your part
7       as the chair that districts be set up so that
8       they would guarantee that a minority candidate
9       was elected for that district?
10  A.  As I said earlier, I wanted to ensure that the
11      eight minority districts remained eight minority
12      districts so the Justice Department would
13      approve our plan.
14  Q.  And by doing that, you wanted to make sure that
15      the percentage of total population of
16      African-Americans in those districts stayed the
17      same?
18          MR. WALKER:  Object to the form.
19  A.  As close to it as possible.
20  Q.  Now, in some districts the African-American
21      percentages decreased; is that correct?
22  A.  A very small amount, I think, in the -- if I'm
23      not mistaken, in the Smitherman, Dunn, Coleman

Pages 97 to 100

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 101

1    plan that they drew for themselves.
2    Q.  Did Districts 18, 19, and 20 decrease?  Do you
3         remember?
4              MR. WALKER:  That's Birmingham.
5    A.  I think so, yes.
6    Q.  What about 7 and 11?  Do you remember if those
7         districts decreased?
8    A.  Where is 7?  7 and what?
9    Q.  11.
10             MR. WALKER:  There's 11, St. Clair.
11   A.  What's your question on those?
12   Q.  Did the population of African-American voters in
13        those -- the percentage of the population
14        decrease?
15   A.  7 and 11, I don't know because they were not
16        minority districts.  I was not -- That was not a
17        concern of mine in those two districts.
18   Q.  Okay.  Do you recall in any of the hearings if
19        there was a discussion that if you had a
20        percentage of either voting-age population or
21        total population be 65 percent African-American
22        that that would be packing?
23   A.  No.

Page 102

1    Q.  And that would not be acceptable to the Justice
2         Department?
3    A.  No.
4    Q.  Did you say when you met with Taylor and Holley
5         if Mr. Hinaman was present during that meeting?
6    A.  I didn't say -- I -- Oh.  I met with Taylor.  I
7         didn't meet with Taylor and Holley at the same
8         time.
9    Q.  No.  No.  I'm sorry.  I had that in my notes
10        that you met with each one of them, but was
11        Mr. Hinaman present at those meetings?
12   A.  I don't -- I can't remember that.
13   Q.  Maybe?  Maybe not?
14   A.  Maybe.  Maybe not.  Senator Holley is my
15        roommate.  I mean, we share -- I meet with him
16        way too much.
17   Q.  Were you using the 1 percent variance from the
18        ideal districts as some type of safe harbor?  If
19        you used that, then you would have passage by
20        DOJ?
21   A.  Yes, sir.
22   Q.  So you viewed that --
23             MR. WALKER:  Objection to form.

Page 103

1    Q.  -- as a safe harbor?
2              MR. WALKER:  Objection to form.
3    A.  Yes, sir.
4              MR. BLACKSHER:  Let me just follow up
5         real quick, and we'll be almost
6         through with you, Senator Dial.
7              EXAMINATION
8    BY MR. BLACKSHER:
9    Q.  When you were talking about the Mobile County
10        delegation, you said -- and -- you were asked
11        about community of interest.  You said the
12        delegation is not a community of interest.  What
13        did you mean by that?  A delegation is not a
14        community --
15   A.  Oh.
16             MR. WALKER:  Objection to form.
17   A.  I think I was referring to the Mobile, Baldwin
18        delegation.
19   Q.  Right.
20   A.  Neither one wanted the other in their county.
21        That's what I was referring to in that context.
22        I didn't mean that a delegation wasn't a
23        community of interest.  I meant the Baldwin

Page 104

1    County and the Mobile people, neither one wanted
2    the other delegation over into their county.
3    Q.  Okay.  Now, tell me again why you put Senator
4         Keahey in the Mobile delegation even though the
5         Mobile delegation did not want him.
6    A.  No.  He was already in the Mobile delegation.
7    Q.  Keahey was already in?
8    A.  He already had part of Mobile originally.
9    Q.  Well, did Senator Keahey want to keep Mobile
10        County?
11   A.  He wanted to move further into Mobile County.
12   Q.  I see.  In fact, I'm looking at Docket Number
13        60-31, which is a table showing that in Mobile
14        County, Senator Keahey's Senate District 22 has
15        only 6,279 people or 1.52 percent of the
16        population of Mobile County, and only 4.5
17        percent of Senator Keahey's district is in
18        Mobile County.  So he's got a very small part of
19        Mobile County.
20             If it had not been for your plus or minus 1
21        percent restriction, you could have taken him
22        out of Mobile County altogether and left the
23        Mobile County delegation intact, right?

Pages 101 to 104

ALBC/Newton vs. State of AL

Page 105

1      MR. WALKER: Object to the form.
2  A. Well, yes.
3  Q. With respect to those north Alabama Senate
4     districts, partisan politics did play a role in
5     how those districts were formed up there, didn't
6     they? You took into account the likelihood that
7     the district that you were drawing would elect a
8     Republican; isn't that correct?
9  A. Did I take into -- Say that again.
10 Q. You took into account when you were drawing the
11    Senate districts in north Alabama whether the
12    district you were drawing is likely to elect a
13    Republican.
14 A. Not necessarily. Because everything north of
15    Jefferson County is Republican majority with the
16    county officials and their congressional
17    delegation and with the board of education. So
18    it was not a case of picking out Republicans.
19    It was a case of making the numbers meet.
20 Q. But your goal was to make it as strong a
21    Republican district as possible in every case;
22    isn't that correct?
23 A. No, sir.

Page 106

1         (Plaintiff's Exhibit 2 marked for
2             identification.)
3  Q. I've marked as Exhibit 2 an article out of the
4     Gadsden Times, May 13, 2012. This is Dana
5     Beyerle.
6      MR. BLACKSHER: Beyerle is
7      B-E-Y-E-R-L-E.
8      MR. WALKER: Is that May 14, you said?
9      MR. BLACKSHER: May 13.
10 Q. And it says Senator Shad McGill, Republican,
11    Woodville --
12       What's his district?
13 A. It's 8.
14 Q. He's Jackson County, DeKalb County, Madison
15    County. It says, Senator Shad McGill,
16    Republican, Woodville, would lose some of DeKalb
17    County, but he would pick up eastern Madison
18    County. McGill beat longtime incumbent Democrat
19    Lowell Barron of Fyffe --
20       Fyffe is in --
21 A. DeKalb.
22 Q. -- in DeKalb County.
23       -- in the 2010 election, and his seat is

Page 107

1     thought to be vulnerable. And then it quotes
2     McGill as saying, quote, the goal by Senator
3     Dial was to make it a stronger Republican
4     district, closed quote, said McGill.
5  A. He doesn't speak for me.
6  Q. So you deny that you had such a goal when you
7     were drawing Senator McGill's district?
8  A. Absolutely I deny that.
9  Q. Okay. Now, you did, though, have available to
10    you information about how the voters in these
11    districts had in the past voted either Democrat
12    or Republican. You had that information
13    available to you, didn't you?
14 A. Yes, sir.
15 Q. Further in this article, it says, Democratic
16    Senators Tammy Irons of Florence and Mark Keahey
17    of Grove Hill say they have problems with their
18    districts. Irons' new district doesn't even
19    contain the city of Florence and would stretch
20    across Limestone County into Madison County.
21    And then there's a quote of you. Quote: If you
22    use the governor's race in 2010, the numbers in
23    the district she had -- Senator Irons had -- it

Page 108

1     was almost Republican, closed quote, Dial said.
2         Is that what you actually said to the
3     newspaper?
4  A. I suppose so. I don't ...
5  Q. So you were clearly aware of the tendency of the
6     districts you drew to elect Republican
7     candidates as opposed to Democratic candidates.
8  A. In her case, yes. Because her case had brought
9     more attention than anything else. And in Dial
10    Plan 3, I tried to -- I had a Dial Plan 3,
11    was never introduced, which would have corrected
12    some of the concerns she had -- but I never got
13    a chance to introduce it -- in meeting the --
14    her request to me.
15 Q. How did you know what the vote was in her
16    district in the 2010 governor's race? What
17    document did you look at?
18 A. I don't remember what document I had.
19 Q. Didn't Mr. Hinaman have an overlay of the map
20    that showed in colored tones where the
21    Republican voters were?
22 A. I don't remember that. No, sir.
23 Q. I mean, Mr. Hinaman could tell you what the

Page 109

1   people in Tammy Irons' district had voted in
2   past elections.
3   A.  I'm sure he could tell you in any district.
4   That's his profession.
5   Q.  And you discussed that with Mr. Hinaman on
6   occasion?
7       MR. WALKER:  Objection to the form.
8   A.  I discussed it with Senator Irons.
9   Q.  No.  I'm talking about the --
10  A.  And Senator -- He was probably in the
11  conversation, yes.
12  Q.  But you consulted that information about the way
13  voters in these districts had voted in past
14  elections?
15      MR. WALKER:  Objection to the form.
16  A.  In Senator Irons' district.  Not in all the
17  others districts, but in Senator Irons' district
18  because hers was a point of contention.  She and
19  I met on numerous occasions.  She even furnished
20  me a letter of her concern, and I tried to
21  address those in Dial 3, some of them.
22      (Off-the-record discussion.)
23      THE WITNESS:  Can I take about one

Page 110

1       minute?
2       MR. PATTY:  Yes.
3       (Brief recess was taken.)
4       (Plaintiff's Exhibit 3 marked for
5       identification.)
6           EXAMINATION
7   BY MR. PATTY:
8   Q.  Let me show you Plaintiff's Exhibit 3 which
9   we've marked.  Is this the guidelines that were
10  used by the reapportionment committee?
11  A.  It was adopted by the reapportionment committee,
12  yes.
13  Q.  Okay.  And we've talked some in this deposition
14  about the guidelines, and these would have been
15  the guidelines?
16  A.  Yes, sir.
17  Q.  One last area.
18      With respect to Senator Fielding's district,
19  do you remember any communications with him or
20  with others about his district?
21  A.  As I said earlier, communication with Senator
22  Sanders about his district in which Senator
23  Sanders expressed to me the way his would have

Page 111

1   to grow would be into Senator Keahey's district.
2   Q.  What about Felding (phonetic), though?  Do you
3   remember any --
4   A.  Pardon?
5   Q.  Felding.
6       MR. WALKER:  Fielding.
7   Q.  Fielding.
8   A.  Fielding?
9   Q.  I'm sorry.
10  A.  Any conversation with him?
11  Q.  Well, just about his district.  Do you remember
12  talking to him or anybody else about his
13  district?
14  A.  Talked to him.
15  Q.  Okay.  What do you recall about that?
16  A.  He was -- That county wound up being divided up
17  more than it had been in the past, and he was
18  not happy with that.  And originally I had had
19  his house in the wrong district.  That was
20  another -- He lived on a different road than we
21  had his address, and I had to come -- As I told
22  you in Dial 2, that was the two changes I made.
23  Q.  Okay.  Do you recall anything else about those

Page 112

1   conversations with him about his district and
2   having to make changes to it or about the
3   changes to it?
4   A.  I met with him and explained to him why, you
5   know, the fact --
6   Q.  What were the reasons for the change?
7   A.  The reasons were that in the minority districts
8   that grew, it forced Senator Blackwell further
9   south, and he had to move into a new district
10  area-wise.  And he had to move -- he already had
11  part of Shelby.  He had to move into Talladega
12  County.
13  Q.  Any other reasons for the changes in his
14  district?
15  A.  No, sir.
16  Q.  And you say you explained that to him.  Do you
17  recall what his input was on this or what his
18  response was?
19  A.  His first response was about his house, and
20  we -- I went back in Dial 2 and fixed that.  And
21  the second -- his second response was, you know,
22  well, I don't like to have my county split up.
23  I said, you know, I don't like to have Clay

Page 113

1    County split up either.
2  Q.  Was there any -- As y'all worked through the
3    different drafts, besides what you've told us
4    about with the Dial 2 change, were there any
5    other modifications with his district that you
6    recall --
7  A.  In --
8  Q.  -- from what you were originally going to do
9    with the district to where it ended up?  Were
10   there any other alterations or modifications
11   to --
12  A.  Not that I remember.
13  Q.  Do you remember getting input from anybody else
14   regarding his district or talking to anyone else
15   about his district?
16  A.  Talked to former Senator Preuitt who was not
17   happy with the district.
18  Q.  Okay.
19  A.  He let me know he was not happy with dividing up
20   Talladega County because he had been the probate
21   judge there.  The other thing was that the
22   Beason District had to move into part of
23   Talladega County too.  And some of the people in

Page 114

1    Talladega were not excited about that as well.
2  Q.  Okay.  Any other persons that you recall talking
3   to about Senator Fielding's district?
4  A.  I guess the whole -- Well, Senator Marsh,
5   because Senator Marsh had part of that district
6   too.
7  Q.  What do you recall about that conversation?
8  A.  Senator Marsh basically said, you know, draw
9   what you've got to draw.  He didn't get into any
10   specifics because he has a -- had a part and has
11   a part of Talladega County too, the eastern edge
12   of it.
13  Q.  Anybody else that you had any other
14   conversations --
15  A.  Not that I remember.
16       MR. PATTY:  That's all.
17      (Off-the-record discussion.)
18       EXAMINATION
19  BY MR. WALKER:
20  Q.  You were asked a little bit earlier about
21   whether or not you viewed the deviation standard
22   as a safe harbor.  What did you understand the
23   term "safe harbor" to mean?

Page 115

1  A.  Safe harbor meant that you could elect a
2   minority in that district.
3  Q.  Do you know if members of the NAACP or the New
4   South Coalition or the ADC or the Jefferson
5   County Coalition or any other similar entity
6   that particularly represents the interest of
7   African-Americans or Hispanic Americans
8   politically spoke at any of the public hearings?
9  A.  I can't remember.  It seems like that when we
10   came to the Capitol auditorium that Joe Reed was
11   there.  I think Joe Reed came and spoke.
12  Q.  Would it be --
13  A.  He's always somewhere speaking, so I'm sure he
14   was there.
15  Q.  He did speak.  And any of those representatives
16   were welcome to come to any public hearing and
17   speak, were they not?
18  A.  We conducted, what, 22?
19  Q.  Yes.
20  A.  22 public hearings.
21  Q.  When you do redistricting, did you find that
22   there were sometimes competing communities of
23   interest?

Page 116

1  A.  Yes.  When you talk about splitting one
2   community of interest away from the other, you
3   always impact another community of interest.
4   It's kind of like moving the county boundaries.
5   You can't keep everybody intact.  If you keep
6   one community of interest intact, you probably
7   take away the community interest of another one
8   next to it.  So it's very difficult to -- You
9   know, I try -- we're all Alabamians, and that
10   ought to be a community of interest.
11  Q.  At the start of the legislative redistricting
12   this time around, was there any inquiry made
13   into whether it was possible to create a ninth
14   majority-black Senate district?
15  A.  The numbers were just not there.  We looked at
16   the fact that you just could not -- could not
17   draw a ninth district.  And I know that was an
18   early-on consideration.  I think you and I
19   discussed this, Mr. Dorman, that was there any
20   way possible to make a ninth one.  Even had -- I
21   think somebody suggested you run from Montgomery
22   to Dothan down the highway.  And, you know, that
23   was just far-fetched and impractical.

Deposition of Gerald Dial                ALBC/Newton vs. State of AL                May 21, 2013

Page 117

1    MR. WALKER: That's all I have. Thank
2        you, sir.
3        EXAMINATION
4  BY BLACKSHER:
5  Q.  Just to follow up on the 9th Senate district,
6      Senator Dial, if I may, you certainly took care
7      of Senator Sanford who was in a close election
8      with Laura Hall for that vacant seat in District
9      7.  You got all the African-Americans out of his
10     district, didn't you?
11 A.  I'm sorry.  What district?
12 Q.  7.  Madison County?
13 A.  Well, he -- what happened to him, he took part
14     of the 42,000 in Senate District 2.  He
15     collapsed over into that district.
16 Q.  But you gave Tammy Irons all of the black
17     constituents that were in his district.
18 A.  From 7 to 1?
19 Q.  Yeah.  You had the possibility of drawing a 40
20     percent black voting-age population district in
21     Madison County, didn't you?
22     MR. WALKER:  Which district are you
23         talking about, if I may ask?

Page 118

1    MR. BLACKSHER:  Built around Sanford's
2        district.
3  Q.  Is it Sanford at 7?
4  A.  Yes, sir.  Paul Sanford.
5  Q.  Paul Sanford, he's the one who beat Laura Hall
6      in that special election, right?
7  A.  I think so.  Yeah.  When Griffin went to
8      Congress, yes.
9  Q.  When Griffin went to Congress.
10 A.  That wasn't -- My major concern in Madison
11     County was the 42,000 people in District 1, and
12     I just folded them all into it.
13 Q.  But you don't deny, do you, that in deciding
14     which of the districts that Sanford would take
15     or give up as the case may be, one of your
16     objectives was to remove as many
17     African-American voters in his district as you
18     could?
19 A.  I didn't look at that.  No, sir.
20 Q.  You deny that that was a consideration at all on
21     your part?
22 A.  On my part.  Yes, sir.
23 Q.  Do you know whether it was a consideration on

Page 119

1  Randy Hinaman's part?
2  A.  I can't answer that.
3      MR. BLACKSHER:  That's it, then.
4        EXAMINATION
5  BY MR. PATTY:
6  Q.  You mentioned about the safe harbor.  I
7      understood your testimony earlier today when I
8      asked you a question -- I asked you about the 1
9      percent -- your use of the 1 percent in the
10     variation between an ideal district population.
11     And I understood your testimony was that you
12     viewed that as a safe harbor with the DOJ; is
13     that correct?
14 A.  The 1 percent?
15 Q.  Yes, sir.  Did I understand your testimony
16     right?
17 A.  My testimony was that if we used 1 percent, our
18     chances were very good that Justice would
19     approve our plan.  And one of our goals was to
20     get a plan that Justice would approve, which
21     they have approved.
22 Q.  And my question was if you viewed that 1 percent
23     as a safe harbor.  And I think you testified

Page 120

1  earlier, yes; is that correct?
2      MR. WALKER:  Objection to form.
3  A.  I suppose so.  It means that --
4  Q.  Okay.
5  A.  I thought safe harbor, though, was when you made
6      a district where the minorities would be assured
7      of winning that.
8  Q.  But my question was really toward -- when I
9      asked you about the safe harbor, I said about --
10     I asked specifically about the use of that 1
11     percent variance in the ideal population.
12     And --
13 A.  I just -- I didn't understand the context in
14     which you were using safe harbor, then.  The 1
15     percent was to get a plan that Justice would
16     approve.
17 Q.  Right.
18 A.  My concept of a safe harbor is drawing a
19     district where a minority is assured of being
20     elected.
21 Q.  And my question -- I believe the record will
22     reflect -- was did you view the 1 percent as a
23     safe harbor to be -- for variance between

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 121

1   districts.  Are you saying you didn't understand
2   that or --
3         MR. WALKER:  Objection to form.
4   A.  Safe harbor is -- I considered it is a district
5   that you assured that a majority can win that
6   district.  In using safe harbor to refer to the
7   whole plan of 1 percent -- The 1 percent goal
8   was to get a plan that Justice would approve.
9   So if I confused those two points -- That's my
10  concept of safe harbor and 1 percent.
11  Q.  So you used -- the 1 percent variation with the
12  ideal voting population, that was used to get an
13  assurance that Justice would approve this plan?
14  A.  Yes, sir.
15  Q.  Okay.  Now, let me ask you again about -- you
16  said the majority -- minority/majority
17  districts.  You're saying that you wanted to
18  have a population in those districts to -- Use
19  your words.  What would you say?  You wanted to
20  have -- Your concern was to make sure safe
21  harbor-wise -- What was it?
22  A.  That the population within those districts would
23  ensure the election of a minority in the eight

Page 122

1   minority districts we have.
2   Q.  Okay.  So you wanted to make sure that the
3   population in that district was such that it
4   would make sure that a minority was elected in
5   that district; is that correct?
6   A.  That's correct.
7   Q.  And to that end, you would make sure that the
8   minority percentages didn't drop in that
9   district; is that correct?
10  A.  That's correct.
11  Q.  And you didn't think that there was really
12  anything of too high a number for that -- the
13  percentage of African-Americans to be in that
14  district; is that correct?
15  A.  I didn't consider that.
16  Q.  Okay.  What percentage of African-Americans did
17  you feel like was necessary in a district
18  to ensure that a minority was elected?
19  A.  I used the numbers that the district had under
20  the last reapportionment.
21  Q.  Okay.
22  A.  And my goal was not to regress from those except
23  in the three in which they drew their own

Page 123

1   districts.
2   Q.  Okay.  And that was done with the intent to
3   ensure that a minority was elected?
4   A.  Correct.
5         MR. PATTY:  That's all.
6         (Deposition concluded at approximately
7         12:30 p.m.)
8
9   * * * * * * * * * * * * * *
10
     FURTHER DEPONENT SAITH NOT
10
11  * * * * * * * * * * * * * *
12
     REPORTER'S CERTIFICATE
13  STATE OF ALABAMA:
14  MONTGOMERY COUNTY:
15      I, Pamela A. Wilbanks, Registered Professional
16  Reporter, ACCR #391, and Commissioner for the State of
17  Alabama at Large, do hereby certify that I reported the
18  deposition of:
        GERALD DIAL
19  who was first duly sworn by me to speak the truth, the
20  whole truth and nothing but the truth, in the matter of:
21      ALABAMA LEGISLATIVE BLACK
22      CAUCUS, et al.,
23          Plaintiffs,

Page 124

1           Vs.
2       THE STATE OF ALABAMA, et al.,
3       Defendants.
4       In The U.S. District Court
5       For the Middle District of Alabama
6       Northern Division
7       2:12-CV-0069-WKW-MHT-WHP
8       * * * * * * * * * * * * *
9       DEMETRIUS NEWTON, et al.,
10      Plaintiffs,
11      Vs.
12      THE STATE OF ALABAMA, et al.,
13      Defendants.
14      In The U.S. District Court
15      For the Middle District of Alabama
16      Northern Division
17      2:12-CV-0069-WKW-MHT-WHP
18  on Tuesday, May 21, 2013.
19      The foregoing 123 computer printed pages
20  contain a true and correct transcript of the examination
21  of said witness by counsel for the parties set out
22  herein.  The reading and signing of same is hereby not
23  waived.

Case 2:12-cv-00691-WKW-MHT-WHP   Document 125-3   Filed 06/17/13   Page 33 of 49

Deposition of Gerald Dial                    ALBC/Newton vs. State of AL                    May 21, 2013

Page 125

1        I further certify that I am neither of kin nor
2   of counsel to the parties to said cause nor in any
3   manner interested in the results thereof.
4        This 6th day of June 2013.
5
6
7
8
9
10
11
12   _____
     Pamela A. Wilbanks, ACCR #391
13   License Expires:  9/30/2013
     Registered Professional Reporter
14   and Commissioner for the State
     of Alabama at Large
15
16
17
18
19
20
21
22
23

Page 92757

6/6/13
Mr. Gerald Dial
Highway 9 North
Lineville, Alabama
IN RE:  ALABAMA BLACK CAUCUS AND NEWTON VS. THE STATE OF
    ALABAMA

Dear Mr. Dial:

Enclosed is a copy of the transcript of your deposition
taken on Tuesday, May 21, 2013.  Please read the
transcript and make any corrections on the correction
sheet provided specifying the page and line number of
each correction.

You will find the original signature page attached to the
front of the transcript.  Even if there are no
corrections, please sign the original signature page and
have your signature notarized.
Please return the signature page and correction sheet
within thirty days.  The list of corrections will be
attached to the original deposition and all parties will
be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Pamela A. Wilbanks, RPR

cc:  Mr. Jim Blacksher
    Mr. Bill Patty
    Mr. Dorman Walker
    Mr. Jack Park

Page 126

     I, Gerald Dial, hereby certify that I have read the
foregoing transcript of my deposition given on Tuesday,
May 21, 2013, and it is a true and correct transcript of
the testimony given by me at the time and place stated
with the corrections, if any, and the reasons therefor
noted on a separate sheet of paper and attached hereto.

_____
     GERALD DIAL

     SWORN TO AND SUBSCRIBED before me this _____
day of _____, 20__.

_____
     NOTARY PUBLIC

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92758

## A

**able** 10:10 72:16
**Absolutely** 47:9
  48:3 50:13 107:8
**absorb** 31:9
**acceptable** 98:13
  102:1
**access** 23:19 92:15
**accomplish** 72:16
  72:19 84:8
**account** 105:6,10
**ACCR** 2:3 4:7
  123:15 125:12
**accused** 38:8
**acquired** 96:3
**act** 26:15 39:23
  40:22 41:11 50:6
  50:10 54:15
  65:13,14
**ACTION** 1:7,13
**acts** 65:21
**actual** 78:1
**ADC** 93:3,5,9,13
  93:20 115:4
**added** 42:6
**addition** 24:21
**address** 6:1 70:14
  85:19,20 109:21
  111:21
**adjourned** 71:13
**adopt** 38:15 39:6
**adopted** 18:2
  37:14 38:12
  50:22 110:11
**adopting** 38:5
**advance** 71:18
**advice** 41:17 60:5
  75:9
**advised** 40:21
**African-American**
  28:17 81:16,17
  82:3 92:3,8 99:17
  99:19 100:20
  101:12,21 118:17

**African-Americ...**
  81:3,7 82:11,18
  100:16 115:7
  117:9 122:13,16
**afternoon** 71:12
**aggravated** 47:17
**ago** 6:21,22 59:17
**agree** 55:6 88:1
**agreed** 4:2,16,23
  83:12
**agreement** 2:2
**ahead** 57:20 78:23
**al** 1:5,8,11,15
  123:22 124:2,9
  124:12
**Alabama** 1:2,5,8
  1:15 2:4,6,10,13
  2:17,18 3:4 4:8
  5:21 6:2,4,7 9:13
  9:16 10:16 11:4
  11:23 18:22
  42:18 43:14
  44:20 51:2 105:3
  105:11 123:12,16
  123:21 124:2,5
  124:12,15 125:14
  92757:3,4,4
**Alabamians** 116:9
**alterations** 113:10
**altogether** 64:23
  104:22
**American** 97:3
**Americans** 115:7
**amount** 100:22
**analysis** 46:10
**ANDERSON** 2:16
**answer** 10:17 21:9
  27:21 41:3 42:7
  49:17 50:5 52:20
  54:1 57:19 62:15
  67:22 71:22,23
  76:10 85:5 86:8
  97:2,5,6 119:2
**answering** 34:12

**anybody** 72:5
  75:17,17 92:21
  93:7 95:22
  111:12 113:13
  114:13
**anyway** 38:3
**apologize** 38:10
  56:23
**apologized** 73:12
  73:14 85:21
**apparent** 70:16
**appear** 45:6
**APPEARANCES**
  2:9
**applies** 55:19
**appointed** 6:14,15
  6:19 22:6 64:14
  64:17,20
**appointments** 6:19
**appreciable** 48:6
**approve** 40:16,16
  75:12,14 78:17
  100:13 119:19,20
  120:16 121:8,13
**approved** 66:1,3
  86:11 119:21
**approximately** 2:7
  123:6
**area** 29:15 34:22
  35:12,13 46:22
  47:1,20 48:12
  82:6 87:8,14
  91:17 97:8,21
  110:17
**areas** 89:8
**area-wise** 112:10
**argument** 38:2
**article** 3:17 106:3
  107:15
**Ashland** 96:12,13
  96:21
**aside** 22:4 58:10
  65:19
**asked** 14:10 15:21

  15:22 19:16 25:4
  27:7 28:18,22
  30:22 33:22
  34:13 57:12
  73:15 76:3,7
  86:16 90:22
  103:10 114:20
  119:8,8 120:9,10
**asking** 13:14 38:9
  42:22 46:17
  88:11
**aspects** 79:6
**assist** 7:23 61:18
  62:6,11,13
**assistance** 9:19,23
  10:1,4,6 57:16
**assisted** 9:18 11:6
**assisting** 11:5
**assume** 30:16
  51:11,17 82:7
**assumed** 40:7
  60:14,17 61:3
**assumption** 41:8
**assurance** 121:13
**assured** 16:1 120:6
  120:19 121:5
**astute** 84:17
**Atlanta** 2:22
**attached** 126:6
  92757:9,13
**attempt** 44:9
**attention** 108:9
  92757:14
**attorney** 2:12,20
  8:3 37:20 40:8
  60:3
**Attorneys** 2:16 3:3
**auditorium** 71:2
  115:10
**Autauga** 33:3,5
  88:21 89:1,4
  91:12,14,19
**authority** 74:4
**available** 9:3,5

  62:14 71:3,4
  95:22 107:9,13
**avoid** 38:13 44:9
**avoided** 49:22
  52:17
**aware** 28:7 108:5
**a.m** 2:7

## B

**back** 13:10 16:15
  22:9 31:23 70:12
  71:7 72:21 74:20
  76:14 83:6 91:12
  91:21,22 95:10
  95:16,21 112:20
**backed** 51:10
**Balch** 2:5 3:2
**Baldwin** 82:6,7
  85:17 86:20 87:6
  88:1,3,8,13,15
  89:5,6,7,19 90:15
  90:19,21 91:1,17
  91:20 103:17,23
**Barron** 106:19
**based** 66:15
**basic** 27:4
**basically** 20:9
  41:23 46:11 54:5
  55:14 58:19
  62:16 69:14
  114:8
**basis** 23:8,14
**bay** 89:16
**Beason** 48:9
  113:22
**beat** 106:18 118:5
**began** 20:3 37:21
  52:8 58:2,9 65:19
  80:16
**beginning** 6:15,20
  60:7 62:19 64:16
  69:1 86:1
**believe** 48:9,21
  88:23 120:21
**best** 34:5 95:14

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92759

**better** 31:8 72:15
   93:18
**Beyerle** 106:5,6
**big** 14:16,19,20,21
   15:6
**bigger** 95:8
**bill** 31:2 38:18
   44:22 56:17,22
   69:2 92757:20
**Bingham** 2:5 3:2
**Birmingham** 2:13
   14:1 101:4
**birth** 5:18,20
**bit** 63:5 114:20
**black** 1:5 2:11
   13:21 39:10,11
   39:22 40:23 42:4
   42:6,8 117:16,20
   123:21 92757:4
**blacks** 41:20
**Blacksher** 2:12
   3:10,11,12 5:15
   15:2,6 23:1,8
   24:15 25:5,9
   26:19 36:9 53:8
   53:13 56:15
   103:4,8 106:6,9
   117:4 118:1
   119:3 92757:19
**Blackwell** 48:10
   70:10 112:8
**blanks** 19:22 20:9
   45:2
**Blount** 46:19 47:15
   47:17,22,22
**board** 9:10,20 11:2
   33:19 58:2,5,8
   59:3,7 64:21
   86:21 87:1,3
   105:17
**Bonner** 57:9
**Bonnie** 8:8 75:5,12
   77:11,11,18
   84:12 92:17

**Bonnie's** 84:13
**book** 20:16
**bottom** 25:23
**boundaries** 44:10
   116:4
**break** 53:6,9
**Brief** 30:10 32:20
   53:12 77:21
   110:3
**bring** 7:8 90:22
**Brockington** 2:20
**Brook** 49:7
**Brooks** 91:5
**brought** 14:9
   28:18 34:13
   51:16 76:2 82:1
   108:8
**Built** 118:1
**Bunnie** 73:11,15
   73:21 75:3 76:4,4
   76:6 77:10,12,15
   77:18
**business** 59:21
**Bussman** 36:20
**B-E-Y-E-R-L-E**
   106:7
**B-O-N-N-I-E**
   77:18

<br>

**C**

**call** 7:23 78:11
   96:4
**Callahan** 57:10
   59:17
**calling** 77:19
**campaign** 20:15
   60:1
**candidate** 100:4,8
**candidates** 108:7,7
**Capitol** 71:1
   115:10
**care** 85:16 117:6
**carefully** 19:5
**carried** 66:13
**carry** 71:14

**cartographer**
   30:12
**cartographers**
   7:23 8:12
**case** 4:17,19 56:23
   96:18 105:18,19
   105:21 108:8,8
   118:15
**cases** 84:12
**CAUCUS** 1:5 2:11
   123:22 92757:4
**cause** 125:2
**cc** 92757:19
**census** 10:23 12:8
   19:10,10 28:4
   87:7 92:3
**center** 88:4
**certain** 48:21
   88:18
**certainly** 39:4
   117:6
**CERTIFICATE**
   123:11
**certify** 123:16
   125:1 126:1
**cetera** 7:15 33:11
**chair** 98:1 100:7
**chairing** 61:19
**chairman** 61:4
**chance** 108:13
**chances** 119:18
**change** 36:22,22
   37:11 70:13,18
   74:6 86:6,9 112:6
   113:4
**changed** 13:8 39:3
   39:10 86:1
**changes** 28:23 37:2
   72:15,18 73:2,18
   73:23 78:19
   111:22 112:2,3
   112:13 92757:13
**charge** 73:14
**chief** 77:12

**Chilton** 33:6 53:14
   53:19,20 54:14
   54:16,20,21,22
   55:1,3,7
**choice** 76:16,16
**chose** 60:2
**city** 96:12,13
   107:19
**Civil** 1:7,13 4:5
**claiming** 38:14
**Clair** 101:10
**Clanton** 53:14,19
**Clay** 5:23 96:20
   112:23
**clear** 41:13
**clearly** 108:5
**close** 17:21 20:8
   100:19 117:7
**closed** 107:4 108:1
**closely** 31:1 45:12
**Coalition** 94:3,5
   115:4,5
**Coast** 88:8
**Coffee** 33:11
**Colbert** 51:5
**Coleman** 13:19
   14:2,3 15:9,12
   100:23
**collapsed** 117:15
**colored** 108:20
**combined** 86:20,23
**combining** 51:12
**come** 9:13 18:19
   59:15 60:15 71:7
   78:20 85:16
   111:21 115:16
**comfortable** 29:21
**coming** 22:1 24:12
   61:18 77:3,23
**commencing** 2:7
**Commerce** 2:17
**commission** 4:9
   55:17
**Commissioner** 2:4

**4:8** 123:15
   125:14
**commissioners**
   55:19,21
**commitment** 18:7
   18:10,12 70:19
**committee** 3:18 6:9
   6:14,17,20 7:21
   8:2 10:1,2 11:22
   13:16 17:14 18:3
   21:15 22:8,20
   23:6,11,21 27:6
   37:14,20 53:20
   58:14,15 61:20
   64:15,20 67:9,11
   77:14,15 83:11
   90:10,13 98:1,2
   99:6 110:10,11
**common** 88:9
**commonalities**
   87:13 88:10
**communicate**
   18:15
**communicated**
   10:21
**communication**
   24:6,13 79:14
   110:21
**communications**
   18:20 20:23
   21:10 22:18
   23:20 24:8 93:2
   94:16 110:19
**communities** 45:22
   96:8 115:22
**community** 87:10
   87:12,16,19 88:2
   88:14 90:14,16
   97:1,4,4,9 103:11
   103:12,14,23
   116:2,3,6,7,10
**company** 31:20
**compared** 19:17
**competing** 115:22

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92760

**complete** 24:17,23
28:3
**completed** 34:7
**comply** 50:9
**compounded**
48:13
**compress** 31:8
35:15 37:6,7
95:12
**compressed** 35:11
43:18 44:14
51:15,15,16
**compressing** 43:23
44:4,8
**comprising** 25:1
**computer** 26:17
27:10,12,13,14
27:16 31:16,18
70:7 77:7,8,23
84:14 124:19
**concentrated**
97:21
**concentration**
97:20 98:19
**concept** 120:18
121:10
**concern** 52:7 80:23
101:17 109:20
118:10 121:20
**concerned** 10:8
**concerning** 21:19
**concerns** 20:11
72:19,21 108:12
**concluded** 123:6
**condensed** 31:5
**conducted** 67:10
115:18
**confused** 93:17
94:8 121:9
**Congress** 118:8,9
**congressional** 9:9
9:20 11:2 40:18
58:1,5,8 59:3,6
59:11 60:7,14

61:9 64:1,18,22
74:19 86:21,23
87:4 105:16
**Congressman** 57:9
57:11 59:13,14
61:14
**connect** 58:13,16
**consider** 39:18
87:22 122:15
**consideration**
87:18 88:19
94:21 98:8 100:6
116:18 118:20,23
**considered** 59:23
90:18 99:12,16
121:4
**consolidated** 49:9
**constituents** 35:8
35:21 71:6
117:17
**consult** 73:17
**consultant** 59:22
**consulted** 45:3,19
73:10 109:12
**consulting** 45:12
**contact** 59:5 96:5
**contacted** 12:22
60:23 61:23 83:1
**contacts** 21:7
**contain** 107:19
124:20
**contained** 48:19
51:4
**containing** 13:15
19:6
**content** 69:18
**contention** 40:7
97:7 109:18
**contentious** 44:23
**context** 103:21
120:13
**contiguous** 37:5
**continued** 58:3
**Continuing** 53:13

**continuity** 59:4
**contract** 10:13
**contracts** 7:10,15
7:22 8:11
**control** 23:18
**convenient** 53:5,7
**conversation** 24:11
38:11 46:20 47:2
61:10,19 80:7
85:23 93:6
109:11 111:10
114:7
**conversations** 80:8
80:11 82:23 85:7
85:11 112:1
114:14
**convinced** 35:19
**Coosa** 33:5
**copied** 15:8
**copies** 22:18 25:18
26:4,7 27:11 72:2
**copy** 3:16 14:12
17:12 26:1 29:19
66:13 72:6
92757:6
**correct** 6:5 11:21
21:5 23:23 25:6,7
35:3 42:11 48:20
48:22 56:8 60:3
60:10 63:15
73:15 81:9 82:4
90:1 100:21
105:8,22 119:13
120:1 122:5,6,9
122:10,14 123:4
124:20 126:3
**corrected** 108:11
**correction** 92757:7
92757:8,12
**corrections** 126:5
92757:7,10,12
**counsel** 4:3,17
56:15 124:21
125:2

**counted** 37:18
**counties** 42:22
46:19 47:15 49:2
50:1 53:2 54:21
55:3,8 56:11
**county** 5:22 12:18
28:18 29:16 35:3
43:1,6,9,10,16,20
44:9 46:18 47:4,7
47:11,18,19 48:1
48:17,20 49:1,3
49:12,23 50:3,12
50:18,18 51:5,5,8
51:9 52:19 53:15
53:21 54:10,14
54:16,20,21,22
55:1,3,7,14,15,16
55:19,20 82:6,8
83:9,9,13 85:17
86:20,20 87:6,14
88:2,3,5,5,8,12
88:13,15,15,22
89:1,5,6,7,8,19
89:20,22,23
90:19 91:12,14
91:17,19,20
96:16,18 103:9
103:20 104:1,2
104:10,11,14,16
104:18,19,22,23
105:15,16 106:14
106:14,15,17,18
106:22 107:20,20
111:16 112:12,22
113:1,20,23
114:11 115:5
116:4 117:12,21
118:11 123:13
**county's** 56:1,6
**course** 12:17 19:10
92:20
**court** 1:1 5:10
37:23 40:13,15
124:4,14

**courtroom** 37:22
**courts** 40:13
**Covington** 33:11
**co-chair** 6:7,10,12
10:3 11:20
**create** 73:19
116:13
**created** 31:10
48:13
**cross** 89:14,18
**Cullman** 36:19
**current** 66:12,12
66:20

— **D** —

**Dana** 106:4
**data** 68:3,4,5 69:19
**database** 20:13,17
22:10
**databases** 19:6
20:11
**date** 5:18 6:17
63:10 71:17
**dates** 63:8
**day** 71:23 125:4
126:15
**days** 71:23
92757:12
**dealing** 57:14
**Dear** 92757:5
**decide** 45:10,11
**decided** 45:12 46:2
64:8,23
**deciding** 44:19
118:13
**decision** 41:15
45:5 76:16
**decrease** 101:2,14
**decreased** 100:21
101:7
**DEFENDANT**
2:18
**Defendants** 1:9,16
3:1 124:3,13
**defined** 87:7

**degraded** 41:9
**DeKalb** 42:22 43:6
  43:9,10,11,15,16
  43:21 106:14,16
  106:21,22
**delegation** 54:23
  55:2,7,18 56:2,6
  58:11 59:11
  83:10,12,15,22
  89:22 90:4,9,16
  91:4 103:10,12
  103:13,18,22
  104:2,4,5,6,23
  105:17
**Delta** 5:21,22
**demands** 72:15
**DEMETRIUS**
  1:11 124:9
**Democrat** 13:1
  106:18 107:11
**Democratic** 12:11
  22:12 107:15
  108:7
**Democrats** 20:3
  29:7,8
**demographics**
  10:8
**deny** 107:6,8
  118:13,20
**Department** 66:4
  98:13 100:12
  102:2
**Depends** 28:9
**DEPONENT**
  123:9
**deposition** 1:19 2:1
  3:16 4:4,6,13,18
  5:2 7:6 13:10
  110:13 123:6,17
  126:2 92757:6,13
**Deputy** 2:20
**described** 69:10
**detail** 85:10
**details** 8:1 9:3

21:21 22:3
**determine** 83:19
**determined** 65:18
**developed** 20:14
**deviate** 39:19
**deviated** 39:2,15
**deviation** 37:13
  38:5,13 39:3,10
  39:13 52:17
  114:21
**deviations** 39:9
**Dial** 1:19 2:1 3:1
  4:4 5:6,17 7:5
  10:3 19:4 23:4,17
  25:14,15,15,15
  25:19,22 26:11
  45:5 53:13 56:20
  69:22,23,23 70:3
  70:5,11,16,17,21
  72:12,13,14,18
  72:22,23 73:3,18
  73:19 74:22,23
  75:3,5,19 76:7,17
  76:19 78:1 92:14
  103:6 107:3
  108:1,9,10
  109:21 111:22
  112:20 113:4
  117:6 123:18
  126:1,10 92757:2
  92757:5
**Dial's** 24:21
**different** 68:17
  111:20 113:3
**differently** 79:10
**difficult** 34:20,22
  53:1 116:8
**difficulty** 35:4,7
  48:14
**diligently** 90:3,8
**direct** 38:23
**directed** 59:1
  60:23
**direction** 73:6

**directly** 34:9
**discuss** 12:23
  21:20 22:4 93:12
**discussed** 33:14
  37:16,18 64:3,6
  64:11 109:5,8
  116:19
**discussing** 33:16
**discussion** 30:10
  32:20 65:10,14
  68:2,6 71:5 77:21
  92:1 98:11,18
  99:1 101:19
  109:22 114:17
**discussions** 65:3,8
  65:8 69:11 74:23
**disseminated**
  70:23 72:4
**distributed** 71:18
**district** 1:1,2 9:10
  12:23 18:7,12
  24:5 27:8 29:13
  30:14,21 31:2,3,3
  32:4,18,23 33:2
  33:20,23 34:2,21
  35:5,12,13 36:20
  36:22,23 37:1,2,3
  37:7,8 42:6,9,12
  42:23 43:4,18,18
  43:19 44:5 45:13
  46:11,17 47:14
  49:8,20 50:21
  51:3,3,4,10,13,20
  51:21,22,23 52:3
  52:6,7,18 54:6
  58:1 62:21,22
  64:18 65:15 70:8
  70:9,11,20 72:16
  72:17,18 73:4
  80:9,14,17,18
  81:4,8,16 82:2,12
  82:19 83:5 84:3
  85:8 86:3,4,5,10
  86:12,16,18 87:1

88:20,21 91:14
  92:2 95:8,11 96:7
  96:23 97:18,22
  98:12,20 99:8,18
  99:20,23 100:4,9
  104:14,17 105:7
  105:12,21 106:12
  107:4,7,18,23
  108:16 109:1,3
  109:16,17 110:18
  110:20,22 111:1
  111:11,13,19
  112:1,9,14 113:5
  113:9,14,15,17
  113:22 114:3,5
  115:2 116:14,17
  117:5,8,10,11,14
  117:15,17,20,22
  118:2,11,17
  119:10 120:6,19
  121:4,6 122:3,5,9
  122:14,17,19
  124:4,5,14,15
**districts** 9:9,21
  10:9,11 11:2,3
  17:16 18:14
  19:17,19,20 20:1
  20:4 26:14,15,22
  27:3 28:7 31:9
  32:3 33:14,16
  37:5 39:3,12,17
  39:18,20,23
  40:12,14,19 41:1
  41:12,21 42:10
  43:17 44:17,19
  45:6,9,15,22 46:8
  46:9 47:6,10,10
  47:19,21 48:4,12
  48:16,16 49:1,4
  49:10,11,14,23
  50:2,7,12,17
  54:16,19 58:2,6,9
  62:18 66:13
  68:18,19 69:20

84:11 85:12 87:4
  87:5 89:11,13
  98:3 99:13 100:3
  100:7,11,12,16
  100:20 101:2,7
  101:16,17 102:18
  105:4,5,11
  107:11,18 108:6
  109:13,17 112:7
  118:14 121:1,17
  121:18,22 122:1
  123:1
**divided** 52:13 96:9
  96:14,21 111:16
**dividing** 113:19
**Division** 1:3 124:6
  124:16
**Docket** 30:12
  104:12
**document** 13:18
  19:4 22:9 24:18
  25:1 30:11
  108:17,18
**documents** 7:7
  13:15,18 22:18
  23:4,16,17 24:8
  24:16,19 25:2
  79:17
**doing** 28:12 44:14
  44:22 51:18
  72:17 78:4 83:7
  90:19 100:14
**DOJ** 102:20
  119:12
**domino** 35:14 37:9
**Dorman** 3:2
  116:19 92757:20
**Dothan** 116:22
**dozen** 74:15
**draft** 16:5,21 17:5
**drafted** 76:17
**drafter** 17:4
**drafters** 7:17
**drafting** 12:12

Deposition of Gerald Dial  ALBC/Newton vs. State of AL

May 21, 2013
Page 92762

**drafts** 78:20 113:3
**draw** 26:11,13,17
  27:2,4,5 28:7
  34:2,3 39:7 40:13
  44:19 45:5,10,19
  67:2 73:13 75:3,5
  75:12 80:16 90:5
  114:8,9 116:17
**drawing** 9:19 10:4
  17:10 56:7 98:8
  105:7,10,12
  107:7 117:19
  120:18
**drawn** 12:10 14:7
  45:9 46:3 47:6
  50:7 69:4 70:21
  71:19 72:4 76:19
  77:5 85:18
**drew** 30:12 70:4
  80:12 101:1
  108:6 122:23
**driver** 47:4
**drop** 81:3,7 82:10
  122:8
**dropped** 81:10,17
**dropping** 82:4,14
**duly** 5:7 123:19
**Dunn** 14:4,5 15:10
  15:12 100:23

**E**

**earlier** 24:12 48:5
  54:4 78:13
  100:10 110:21
  114:20 119:7
  120:1
**early** 16:18 94:23
**early-on** 116:18
**easier** 30:13
**eastern** 51:5
  106:17 114:11
**edge** 114:11
**education** 9:10,20
  11:3 58:2,5,8
  59:3,7 64:22

86:22 87:2,3
  105:17
**effect** 35:15 37:9
**eight** 42:9 100:11
  100:11 121:23
**either** 4:14,20
  21:20 26:20
  33:21 57:5 71:16
  76:3 95:5 97:13
  101:20 107:11
  113:1
**elect** 54:22 105:7
  105:12 108:6
  115:1
**elected** 11:23 12:5
  95:1 100:4,9
  120:20 122:4,18
  123:3
**election** 13:4 58:9
  106:23 117:7
  118:6 121:23
**elections** 109:2,14
**electronically**
  13:13
**eliminated** 38:6
**Elmore** 33:5
**Emfinger** 12:16,17
**Enclosed** 92757:6
**encompass** 80:15
**encompassed**
  80:14
**ended** 35:10 113:9
**ends** 36:14 54:15
**ensure** 19:20 38:17
  100:10 121:23
  122:18 123:3
**enter** 7:22 8:11
**entirely** 48:19
**entity** 115:5
**equality** 39:14
**error** 73:12 85:22
**ESI** 13:13
**essential** 45:23
**established** 45:1

**estimate** 74:7
**estimation** 38:22
  39:5,19
**et** 1:5,8,11,15 7:15
  33:11 123:22
  124:2,9,12
**Etowah** 29:16 35:3
**eventually** 16:3
**everybody** 46:22
  52:13 116:5
**evidence** 4:13
**exact** 6:17 9:17
  35:16 63:8,10
  71:17 92:13
**exactly** 79:5
**examination** 3:9
  5:14 56:18 103:7
  110:6 114:18
  117:3 119:4
  124:20
**excess** 89:5
**exchange** 68:13
**excited** 114:1
**excuse** 42:15 48:16
  88:12
**Exhibit** 3:15 7:3,6
  106:1,3 110:4,8
**exhibits** 25:10,19
**existing** 99:13
**expanded** 47:20
  48:7
**Expires** 125:13
**explain** 70:2
**explained** 112:4,16
**express** 66:15
**expressed** 110:23
**extent** 79:20
**extra** 26:1
**e-mail** 18:15
**e-mails** 79:23

**F**

**F** 2:15
**face-to-face** 24:14
  74:8

**estimate** 74:7
**fact** 38:16 45:21
  104:12 112:5
  116:16
**familiar** 7:18
**far** 10:12 24:22
  29:7 68:10 71:18
  72:10 83:2
**far-fetched** 116:23
**February** 69:8
**Federal** 4:5
**feel** 122:17
**Felding** 111:2,5
**felt** 50:11
**fewer** 55:17
**Fielding** 70:9
  111:6,7,8
**Fielding's** 110:18
  114:3
**figure** 83:17
**figured** 59:4
**Figures** 83:11 90:9
  91:6
**filed** 30:11
**filing** 4:18,21
**fill** 20:9 91:16
**filled** 19:22
**filling** 20:4 45:2
**final** 35:18 46:6,10
  94:20,21
**find** 30:13 115:21
  92757:9
**fine** 26:9 53:8
**finger** 89:1
**finish** 28:1 36:13
**finished** 69:17
**first** 5:7 10:20
  11:23 12:5 16:5
  16:11 17:4 21:13
  37:15 42:17 57:5
  57:8,15 69:3
  70:21 72:8 85:23
  112:19 123:19
**fit** 15:22
**five** 48:23 49:9,22

55:20,23 77:1
**fixed** 112:20
**floor** 11:10,10 22:1
  90:7
**Florence** 107:16,19
**Florida** 40:11
  85:16
**folded** 118:12
**folks** 60:14 84:2
**follow** 17:8 103:4
  117:5
**followed** 40:10
**follows** 5:9
**forced** 37:9 39:1
  47:20 48:8,10
  112:8
**foregoing** 124:19
  126:2
**form** 4:10 40:2
  41:2 49:16 50:4
  53:23 57:18
  67:21 78:7,22
  92:10 93:4 98:5
  99:9 100:18
  102:23 103:2,16
  105:1 109:7,15
  120:2 121:3
**formality** 4:9
**formed** 6:18 105:5
**former** 53:18
  113:18
**Fort** 42:18,20,21
**forth** 7:12 30:14
  64:19
**found** 70:5 94:23
**four** 13:8 25:18,19
  26:4,8 49:12
  87:21 91:7
**fourth** 11:10 56:11
**frame** 64:9 65:17
  65:19 68:22 69:8
  71:21
**frequent** 21:7
**front** 29:20 87:2

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92763

92:11 92757:10
**full** 5:16
**furnish** 10:10
**furnished** 14:9
109:19
**further** 4:16,23
50:19 89:23
104:11 107:15
112:8 123:9
125:1
**Fyffe** 106:19,20

### G

**GA** 2:22
**Gadsden** 3:17
29:16 106:4
**gain** 69:18 94:22
95:5
**general** 2:20 65:8
**gentlemen** 21:18
22:5
**geographical** 47:1
48:12 87:14
**Georgia** 43:12
**Gerald** 1:19 2:1
4:4 5:6,17 123:18
126:1,10 92757:2
**gerrymander** 38:8
38:14
**getting** 58:12 67:2
79:23 113:13
**give** 9:17 13:21
27:1 31:6 35:6,8
35:22 46:7 47:7
47:11,22 69:8
71:16 95:1,13,13
118:15
**given** 71:12 72:2,3
126:2,4
**giving** 35:9,10,20
43:23 44:23
**glad** 61:20
**glitch** 70:6
**Glover** 90:23 91:4
**go** 7:9 10:7 13:10

14:22 26:21 49:1
57:20 74:18,20
78:22 83:5 91:21
91:23 93:20
94:11 95:15
**goal** 105:20 107:2
107:6 121:7
122:22
**goals** 119:19
**God** 29:14
**goes** 90:7
**going** 5:10 7:7 19:4
21:17 25:9 34:20
37:11 49:23
56:15 57:2 58:4
59:15 64:4 65:15
65:16 71:15
73:18 79:8 88:6,6
113:8
**good** 56:20,21
119:18
**Google** 70:14
85:19
**gosh** 16:10 57:10
69:7
**gotten** 32:1 64:12
**government** 58:20
**governor** 6:16,18
13:7 22:7 64:17
66:1
**governor's** 107:22
108:16
**greatly** 31:5
**grew** 17:19,19 20:6
20:7 47:18 49:4
112:8
**Griffin** 118:7,9
**groups** 94:12,13
**Grove** 107:17
**grow** 19:21 33:23
48:6,11 49:5,6
51:21,22 52:3,5,5
86:17,17 89:3
91:14 111:1

**grown** 82:6 89:6
96:16
**growth** 91:17
**guarantee** 100:3,8
**guess** 6:21 8:17
11:6 20:21 28:11
58:12,18 59:8,22
61:17 68:2 84:15
88:9,16 114:4
**guestimating**
74:16
**guideline** 52:22
99:14
**guidelines** 3:18
17:7,13 49:19
50:22 87:17
110:9,14,15
**guides** 75:9
**Guin** 28:5 84:18
**Gulf** 88:8
**Guntersville** 46:14

### H

**half** 51:5
**Hall** 117:8 118:5
**hampers** 91:23
**hand** 30:11
**handed** 24:16,20
**handing** 7:5
**hanging** 44:12
91:20
**happen** 69:14
**happened** 36:23
40:10 63:12
117:13
**happy** 111:18
113:17,19
**harbor** 102:18
103:1 114:22,23
115:1 119:6,12
119:23 120:5,9
120:14,18,23
121:4,6,10
**harbor-wise**
121:21

**hard** 85:20
**head** 99:6
**headed** 8:8
**headquartered**
11:16
**hear** 38:4
**heard** 28:11 38:2
54:5,8,12
**hearing** 42:17,21
46:13,16 53:14
66:19 68:7,16
70:5 71:1,7,15
86:15 96:2,4,6
97:7 115:16
**hearings** 16:14,16
52:12 54:9 63:14
63:18 66:5,9,10
66:11,14 67:5,9
67:10,13,16
68:20,23 69:1,6
70:4 72:23 94:16
94:18 95:15,18
98:10,15,21
101:18 115:8,20
**held** 46:13 63:14
67:5
**help** 58:20 59:10
59:15 60:9 61:6
61:21 85:14
**helped** 72:20
**hereto** 4:20 5:1
126:6
**hey** 79:4,9
**high** 99:7,10,11,12
99:18 122:12
**highway** 6:2
116:22 92757:2
**hill** 49:7 107:17
**Hinaman** 9:7,8,8
9:11,18 10:12,21
11:4 13:17 14:10
15:20 16:21 17:6
17:7 18:15 19:7
19:15 20:18 21:6

21:8 22:21 23:21
24:9 27:9,18
28:19 31:19,21
33:17 34:7,10,19
36:1,11,16,21
44:18 45:3 57:4,6
57:8,17 58:14,15
58:16 59:20 60:8
61:8,18,21,22
62:4,9 63:17 65:4
65:9 68:1,7,14
73:5,17 74:9,23
76:8,18 77:11
79:15,18,18
84:10,12,22 85:8
92:17 95:18 96:4
102:5,11 108:19
108:23 109:5
**Hinaman's** 119:1
**hire** 58:14
**Hispanic** 115:7
**Hispanics** 94:13
**Holley** 32:4 33:1,7
33:9 102:4,7,14
**Holtzclaw** 31:2,11
34:21 35:1,4,18
36:15 44:22
**home** 71:14
**house** 6:12 8:6
10:4 11:20 12:3
16:15 21:22
53:18 66:13
85:18 111:19
112:19
**houses** 65:23
**Hubbard** 8:23
20:13,21 21:1,11
21:21 36:4,7,7,11
**huh** 55:10

### I

**idea** 12:22 15:18
**ideal** 102:18
119:10 120:11
121:12

**ideas** 84:21
**identification** 7:4
  106:2 110:5
**identify** 34:9
**Ikens** 75:20
**immediately** 70:15
**impact** 116:3
**impede** 80:16
**important** 90:10
**impossible** 64:8
  95:2
**impractical** 116:23
**inadvertently** 70:6
**include** 27:8
**included** 23:12
  33:19 84:5
**including** 22:17
  27:6 42:21 53:18
  90:9
**incorporate** 14:10
  15:21 17:2 28:19
  83:18
**incorporated**
  83:20
**increased** 54:19,23
**incumbent** 53:18
  106:18
**incumbents** 18:6
  18:11 49:13,20
  50:20 73:4 78:14
**INDEX** 3:9,15
**indicate** 58:21 62:3
**indicated** 61:17
**individual** 8:19 9:2
  9:5
**individuals** 16:1
  45:23 70:19
  73:15 85:18
**influence** 97:21
**information** 8:19
  10:6,7,10 13:13
  34:4,5,6,14 63:1
  68:5,13 73:5 94:1
  94:18,22 95:9,10

95:17 96:3
  107:10,12 109:12
**informed** 14:6
**initial** 17:14 61:7
  64:21
**input** 67:2 73:22
  84:22 90:11 94:4
  94:11 112:17
  113:13
**inquiries** 60:12
**inquiry** 116:12
**instruct** 26:20
**instructed** 75:2,12
**instructions** 13:15
  17:8,23 18:1,3,4
  27:1,4 75:18
  76:12 78:9,10,12
**intact** 24:5 43:5
  54:6 56:11
  104:23 116:5,6
**intent** 39:5 40:14
  66:15 123:2
**interest** 45:23
  87:11,16 88:3,14
  90:14,16 96:8
  97:1,4,9 103:11
  103:12,23 115:6
  115:23 116:2,3,6
  116:7,10
**interested** 125:3
**interests** 87:19
  94:12
**interim** 64:7 65:3
**introduce** 65:21
  108:13
**introduced** 4:19
  38:19 57:5 69:2
  70:16 108:11
**investigate** 52:21
**invoices** 7:12,15
**involve** 82:13
**involved** 40:6
  67:23 76:6 82:2
  82:10

**involvement** 61:8
  63:3,4
**Irons** 24:3 29:5,5
  51:3 52:18 72:13
  75:23 76:8
  107:16,18,23
  109:1,8,16,17
  117:16
**issue** 22:4 89:2
**I's** 24:13

## J

**J** 2:19
**Jack** 92757:21
**Jackson** 2:16
  42:22 43:21
  47:14,17 106:14
**James** 2:12
**Jefferson** 28:17
  47:18,19 48:1,17
  48:19 49:1,2,12
  49:23 50:2,12,17
  50:18 88:9
  105:15 115:4
**jerseys** 32:19
**Jim** 3:6 26:16 53:4
  92757:19
**Jo** 57:9
**job** 60:11 75:14
**Joe** 115:10,11
**John** 2:19
**joined** 51:13
**joins** 51:14
**Joint** 6:8
**Jr** 2:19
**judge** 38:4 53:19
  113:21
**judgment** 74:7
**June** 125:4
**justice** 38:17 39:1
  39:4,7,7 40:19
  41:10 66:4 98:14
  100:12 102:1
  119:18,20 120:15
  121:8,13

## K

**Keahey** 29:3 70:8
  80:4 82:1,13 83:1
  83:19 84:21
  85:12,13 90:22
  91:17 104:4,7,9
  107:16
**Keahey's** 85:8 86:3
  86:18 88:21
  96:23 104:14,17
  111:1
**keep** 24:4 43:4
  47:13 50:11,18
  53:2,20 54:6,10
  54:11,13 56:11
  87:18 104:9
  116:5,5
**Ken** 28:5
**kept** 42:23 46:18
  47:16 70:18
**kin** 125:1
**kind** 57:1 62:4
  63:7,11 66:6
  67:17 69:11
  100:2,6 116:4
**knew** 60:15 84:18
**know** 6:17 7:18
  8:10,18 9:1,2
  10:12,14 12:11
  15:9,15,19 16:11
  20:19,20 24:10
  24:23 27:20
  28:21 30:17
  32:17,17 34:20
  36:3,5,12 52:20
  55:20 58:16
  59:18,21,23 60:4
  62:13 63:7,7
  64:16 66:3 67:4
  67:13 69:7 72:7
  72:11 74:16
  76:10,20 77:1
  82:15 84:16 85:3
  87:3,6 88:18 93:8

95:2,4,7,11 97:14
  101:15 108:15
  112:5,21,23
  113:19 114:8
  115:3 116:9,17
  116:22 118:23
**knowledge** 62:4
**knowledgeable**
  84:19
**known** 59:9,19

## L

**lady** 13:21
**laptop** 27:16,17
**Large** 2:4 4:8
  123:16 125:14
**Lauderdale** 51:4
**Laura** 117:8 118:5
**Law** 2:5,12,16 3:3
**lawyer** 40:3 41:4
**lawyers** 38:2,3
  40:4,21
**leadership** 8:17
  10:13
**learn** 28:5
**leave** 44:12 51:2
**Lee** 96:16,17,20
**left** 13:2 19:23 20:8
  20:10 89:5
  104:22
**legal** 60:5
**legislative** 1:5 2:10
  54:23 55:2 58:6
  58:10 63:20,21
  64:6,22 65:1,5,13
  65:14,21 66:12
  68:10 69:7 74:10
  90:15 116:11
  123:21
**legislatively** 90:5
**legislators** 8:16
  28:20 45:13,14
  80:1
**legislature** 8:11,13
  8:14 12:1 13:16

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92765

13:17 39:8 60:20
65:12,23 69:2
93:10,15,22
**legislatures** 40:11
48:8
**letter** 24:3 109:20
**let's** 13:10 15:2
16:8 29:19 51:2
90:1
**Lewis** 2:20
**License** 125:13
**lieutenant** 6:16,18
22:7 64:17
**likelihood** 105:6
**likes** 31:6
**Limestone** 51:8
107:20
**Linda** 14:2,3
**line** 46:11 56:12
62:22 63:6 68:10
92757:8
**lines** 26:12,13,17
26:21 27:2,5 45:1
45:6,9,11,20 46:2
68:9 91:23
**Lineville** 6:2
92757:3
**list** 56:13 87:21
92757:12
**literal** 85:20
**little** 30:8 63:5
114:20
**live** 6:2
**lived** 60:2 111:20
**local** 55:6,18 56:2
56:6
**locating** 30:14
**logs** 22:18 24:7
**long** 59:19 91:10
**longtime** 106:18
**look** 13:12 14:8
19:3 20:1 22:16
27:9,11 30:15,15
33:22 36:18 37:6

38:18 43:6 51:2
54:14 70:15 77:9
79:6 95:23
108:17 118:19
**looked** 83:3 84:5
90:18 116:15
**looking** 25:20 48:1
63:10 104:12
**loose** 36:14
**lose** 95:6 106:16
**lot** 11:14 41:4
46:21 63:8 87:12
89:4 90:11
**Lowell** 106:19
**loyalty** 22:8

---

**M**

**Madison** 12:18
42:23 46:18 47:4
47:7,11 51:8
52:18 106:14,17
107:20 117:12,21
118:10
**main** 78:13
**major** 38:15
118:10
**majority** 105:15
121:5,16
**majority-black**
39:22 40:23
41:21 42:9 48:15
50:12 116:14
**majority-white**
48:23 49:10,11
49:22 50:2,17
**making** 31:23 43:4
105:19
**manager** 60:1
**manner** 4:20 125:3
**map** 14:20,21
15:15 25:16 27:6
28:16 29:20,22
31:16 33:2,18,19
36:18 48:5 54:14
66:14 69:4,16,18

70:21 77:3 78:1
78:17 80:12 83:4
108:19
**maps** 27:10 34:4
66:6,6,10,16,17
66:18,20,21,21
67:1,3,6,6,13,17
69:15,22 73:7
77:4 78:21 80:2
**Maptitude** 27:19
28:6
**March** 69:8
**mark** 25:9 107:16
**marked** 7:3 34:4
106:1,3 110:4,9
**Marsh** 8:21 21:1
21:11,20 22:1
36:1,6 96:15,19
114:4,5,8
**Marshall** 46:18
47:14,16,23
**matter** 123:20
92757:14
**maximum** 37:13
**mayor** 42:21 43:3
53:19
**McClendon** 3:1,6
6:11,13 11:20
25:21
**McClendon's**
11:11,17 31:14
**McGill** 45:16
106:10,15,18
107:2,4
**McGill's** 107:7
**McIntosh** 97:1,13
97:14
**mean** 10:23 26:16
26:20 39:13 52:6
74:1 87:11 88:10
102:15 103:13,22
108:23 114:23
**means** 120:3
**meant** 57:13

103:23 115:1
**meet** 9:11,15 16:2
17:15 18:18
31:12 36:1,6,7,11
65:16,18 68:9
72:15 95:2 102:7
102:15 105:19
**meeting** 17:14 18:3
54:3 102:5
108:13
**meetings** 18:10
21:18 22:4 77:23
78:5 102:11
**member** 6:4,19
12:7 34:16 53:19
93:14,20 97:23
**members** 8:10,13
8:14 13:16 22:19
23:5,10,21 33:15
54:22 55:1,18
56:1 64:17 68:17
90:12 115:3
**mentioned** 29:7
60:23 68:1 79:21
119:6
**messed** 74:5
**met** 10:20 11:15
14:6,7 15:23 18:8
21:12,15 27:9
33:21 36:20
37:16 39:18 57:8
63:17,23 68:17
69:10 74:8 76:18
78:6 83:2 85:3
102:4,6,10
109:19 112:4
**metropolitan** 87:7
**Middle** 1:2 124:5
124:15
**Midtown** 2:21
**Mike** 61:15
**mine** 101:17
**minimize** 56:5
**minorities** 17:20

19:17,18 39:16
49:5 86:12,14
94:14 120:6
**minority** 10:9
17:16 18:14
19:20 20:4 39:2
39:16,20 40:12
41:11 47:19 48:3
52:3 62:18 84:5
84:11 94:12
99:13 100:4,8,11
100:11 101:16
112:7 115:2
120:19 121:23
122:1,4,8,18
123:3
**minority/majority**
121:16
**minus** 37:12 38:5
38:13 52:16,23
89:12 104:20
**minute** 22:2 33:2
93:17 110:1
**minutes** 18:2 43:2
95:19
**Mississippi** 85:15
89:17,18
**mistaken** 100:23
**Mobile** 13:23 83:9
83:9,13,14,21,22
86:20 87:6 88:1,4
88:6,13 89:8,20
89:22 90:3,8,11
90:15,20,21,23
91:3,4 103:9,17
104:1,4,5,6,8,9
104:11,13,16,18
104:19,22,23
**modifications**
113:5,10
**Mohawk** 97:3
**Monday** 71:16
**Montgomery** 2:6
2:17 3:4 18:23

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92766

19:1 58:18 59:8
67:12 116:21
123:13
**morning** 24:17,20
56:20,21
**Mountain** 49:7
**move** 35:12,13,14
43:19,22 44:16
46:9 47:23 48:9
48:10,11 49:6
79:10 85:15
90:23 91:8,18
95:7 96:19,20
104:11 112:9,10
112:11 113:22
**moved** 35:11 43:19
44:1 62:22 89:2,3
89:7 91:15
**moving** 52:8 116:4
**Multiple** 76:21

### N

**NAACP** 94:9
115:3
**name** 5:16,17
32:17
**Native** 97:3
**nature** 57:17
**NE** 2:21
**necessarily** 63:10
105:14
**necessary** 122:17
**need** 4:11 26:6
57:6,16 79:9
**needs** 16:2
**neighborhood**
31:4
**neither** 103:20
104:1 125:1
**never** 12:22 22:14
23:17 60:23 79:4
99:12,16 108:11
108:12
**new** 94:3,5,7
107:18 112:9

115:3
**newspaper** 108:3
**Newton** 1:11 2:14
56:16,22 124:9
92757:4
**night** 92:23 96:2,3
**ninth** 116:13,17,20
**north** 2:13 6:2
47:23 51:2,14
90:23 91:16
105:3,11,14
92757:2
**northeast** 44:20
**Northern** 1:3
124:6,16
**notarized**
92757:11
**NOTARY** 126:18
**notebook** 14:15
24:22 25:8
**noted** 126:6
**notes** 102:9
**notice** 3:16 7:6,9
13:11
**notified** 92757:13
**number** 7:10 9:17
19:17,18 30:12
32:12 33:23 34:1
39:16 48:6 49:11
50:2,17 54:19,20
56:1,5 94:23 99:4
104:12 122:12
92757:8
**numbers** 19:11
30:6,14 32:18
35:17 81:15
82:21 92:11,13
99:13 105:19
107:22 116:15
122:19
**numerous** 80:8
109:19

### O

**object** 23:3 41:21

53:23 67:21
78:22 92:10 93:4
99:9 100:18
105:1
**objecting** 23:9
**objection** 23:9,15
41:2 42:1,2,3
49:16 50:4 57:18
78:7 98:5 102:23
103:2,16 109:7
109:15 120:2
121:3
**objections** 4:9,10
38:21
**objectives** 56:2,7
118:16
**obtained** 95:17
**obviously** 61:22
**occasion** 10:20
21:13 109:6
**occasions** 9:15
21:12 109:19
**occurred** 57:7
**October** 16:16
46:14 53:15
**offered** 4:13 61:5
**office** 8:5,6 11:11
11:12,14,17
15:17 16:20,23
18:19 21:19
27:14 31:14,15
33:21,22 58:19
59:9,16 60:9
69:21 73:8,10,11
73:20 77:13 83:3
84:13 85:2,4
**Offices** 2:5
**officials** 95:1
105:16
**off-the-record**
30:10 32:20
77:21 92:1
109:22 114:17
**Oh** 14:17 34:11

74:13 102:6
103:15
**okay** 7:2,21 8:10
8:21 11:12 15:19
16:10,19 22:9
25:5 26:5 30:9,9
31:20 32:22 33:4
34:8,11 39:21
41:13 50:11
58:21 59:12 60:5
60:19 61:15,22
62:3 63:2,4 64:10
66:17 67:4 68:11
69:19 72:9 74:2
74:14 75:4 76:1
76:17,23 77:8
78:4,12,17 80:10
80:20 81:10 82:9
82:22 84:1 85:3
88:17 96:1,7
98:10 99:16
101:18 104:3
107:9 110:13
111:15,23 113:18
114:2 120:4
121:15 122:2,16
122:21 123:2
**okayed** 46:11
**once** 44:23 58:6
76:22
**ones** 34:18 35:9
46:2 73:9,9
**one-on-one** 18:9
**online** 95:19,20,21
**operate** 11:9 28:6
**operated** 11:10
**opinion** 39:21 40:2
81:11,20 88:11
100:2
**opposed** 93:14
108:7
**oral** 17:23 18:4
38:2
**order** 63:9

**organization** 93:3
93:13,21
**organizing** 21:14
**original** 70:3
92757:9,10,13
**originally** 17:21
34:12 43:21 58:4
64:3 104:8
111:18 113:8
**Oscar** 5:17
**ought** 116:10
**outside** 54:21 55:3
93:10
**overall** 86:4
**overlap** 57:1
**overlaps** 57:3
**overlay** 108:19
**overpopulated**
31:3 35:5 69:13
**overpopulation**
69:20
**overwhelming**
58:7

### P

**pack** 98:3
**packing** 97:16,17
97:18,19 98:6
99:22 101:22
**page** 7:9 92757:8,9
92757:10,12
**pages** 124:19
**paid** 10:13,15
**Pamela** 2:2 4:6
123:14 125:12
92757:18
**paper** 27:11 126:6
**paragraph** 7:9,13
13:12 19:3 22:9
22:16
**Pardon** 111:4
**Park** 2:19 92:10
92757:21
**part** 33:5,5 37:9,10
43:15,22 44:2

Case 2:12-cv-00691-WKW-MHT-WHP   Document 125-3   Filed 06/17/13   Page 43 of 49

Deposition of Gerald Dial   ALBC/Newton vs. State of AL                May 21, 2013
                                                                       Page 92767

47:1,22 48:2
51:11,17 52:11
83:8 85:22 88:23
90:10 96:19
100:6 104:8,18
112:11 113:22
114:5,10,11
117:13 118:21,22
119:1
**particular** 8:18
10:14 34:23
38:10 47:3 79:9
81:4 98:4,12,19
98:20 99:8
**particularly** 46:21
115:6
**parties** 4:3,17 5:1
13:9 124:21
125:2 92757:13
**partisan** 19:6,12
19:13 20:1 38:8
38:14 105:4
**parts** 49:2
**party** 4:14,20
10:16
**pass** 40:15 65:20
65:22,23 90:4
**passage** 102:19
**passed** 15:20 30:4
65:13 71:20
78:18
**Patricia** 14:4,5
**patterns** 19:7,12
19:13
**Patty** 2:15,16 3:10
3:11,13 26:1,5,9
56:17,19,22
63:21 93:16
110:2,7 114:16
119:5 123:5
92757:20
**Paul** 118:4,5
**pay** 58:15
**paying** 60:13,20

62:6
**Payne** 42:18,20,21
**Peachtree** 2:21
**people** 31:9 35:6
40:5 44:11,16,23
46:22 51:11,17
52:15 66:15
85:15 86:7 90:21
93:9 95:7 104:1
104:15 109:1
113:23 118:11
**percent** 37:12,13
38:5,13 51:6
52:16,22,23,23
81:16,17 82:14
82:15,19 89:12
92:3,9 99:2,17
101:21 102:17
104:15,17,21
117:20 119:9,9
119:14,17,22
120:11,15,22
121:7,7,10,11
**percentage** 41:20
81:11 82:3 84:7
92:8 99:7,11,17
99:19 100:15
101:13,20 122:13
122:16
**percentages** 39:22
40:23 42:4 98:11
100:21 122:8
**perfect** 39:14 50:7
**period** 40:7
**permanent** 22:19
23:5 77:14
**person** 9:11 15:11
18:20 37:18
38:17 55:15
**personal** 34:2
41:14
**personally** 18:9
26:11 27:22
**persons** 7:16,22

92:15 114:2
**phase** 96:6
**phonetic** 75:21
111:2
**pick** 86:14 91:18
96:15 106:17
**picking** 105:18
**Pittman** 91:5
**place** 5:20 44:15
66:2 85:19 94:19
126:4
**plaintiff** 2:10,14
56:16
**plaintiffs** 1:6,12
56:23 123:23
124:10
**Plaintiff's** 3:15 7:3
7:5 106:1 110:4,8
**plan** 12:13 14:7,11
14:12 15:1,23
16:4,6 17:5 22:2
25:14 28:20,23
31:13 34:14
35:21 38:7,18,21
38:23,23,23 39:6
39:6,8 40:15,17
42:3,10,15 43:7
53:22 54:15 56:7
57:14 62:20
69:23,23,23 70:3
70:3,5,11,16,17
70:21 71:19 72:2
72:12,13,14,19
72:22,23 73:3,18
73:19,19 74:22
75:1,3,5,19 76:7
76:15,17,19 78:1
78:1 86:11 90:6
92:14 100:13
101:1 108:10,10
119:19,20 120:15
121:7,8,13
**plans** 10:5 12:8
16:11 17:1 21:22

49:18 86:22
94:20,21 98:9
**play** 105:4
**played** 51:19
**plea** 43:4
**pleading** 53:20
**please** 5:16 13:12
19:5 22:16
92757:7,10,12
**plus** 37:12 38:5,13
51:11 52:16,23
89:12 104:20
**point** 39:10 46:8
53:6 54:8 97:6
109:18
**pointed** 24:4 86:2
**points** 121:9
**political** 59:22
**politically** 115:8
**politics** 105:4
**poor** 57:12
**population** 17:19
35:7 39:14 44:5
47:8 55:22 81:3,5
81:6,7,10,18 82:3
82:11,18 86:6
89:19 92:3,8
96:16 100:15
101:12,13,20,21
104:16 117:20
119:10 120:11
121:12,18,22
122:3
**populations** 82:14
**portion** 96:17
**positive** 23:1 52:2
**possession** 23:18
23:20 25:3 27:15
**possibility** 38:7
117:19
**possible** 10:15 20:8
44:11 47:13 54:7
56:12 66:6 90:1
100:19 105:21

116:13,20
**possibly** 29:18
36:17
**post** 12:7 16:7,8
**powerful** 55:14
**preclear** 38:17
**preliminary** 67:16
77:4
**preparation** 20:15
**prepared** 15:15
16:21,22 66:7
**presence** 34:10
36:2,16
**present** 3:5 75:18
76:11 78:4,6
102:5,11
**presented** 80:12
**presently** 33:20
**president** 21:2,3,5
**presumably** 20:17
**pretty** 45:1 83:12
91:23
**Preuitt** 113:16
**prevent** 81:21
**primarily** 12:12
46:2,4
**primary** 17:4
**printed** 30:16,17
124:19
**prior** 13:7 63:18
66:5,9,10,22 67:1
67:15 68:7,16
71:4,5 72:2 76:19
**priorities** 56:9
**priority** 56:10
87:20
**pro** 21:2,5
**probably** 7:19
21:23 32:19
56:10 64:3,6,11
74:15 83:3
109:10 116:6
**probate** 53:19
113:20

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92768

| | | | | |
|---|---|---|---|---|
| **problem** 47:18 48:2 55:6,10 82:5 | 8:18,19 9:2 13:18 15:1 16:3 19:7,16 | **questions** 4:10 56:17 57:1,16 | 86:6,11 87:17 93:1,12,19 98:1,2 | **reelected** 28:12 **refer** 121:6 |
| **problems** 107:17 | 20:18,22 24:1,2 | 62:14,21 | 110:10,11 122:20 | **reference** 11:19 |
| **Procedure** 4:5 | 27:6 46:12 73:5 | **quick** 53:5,10 | **reapportionments** | **referred** 7:12,16 |
| **process** 8:20 20:3 | 76:9 92757:8 | 103:5 | 60:17 61:2 | 22:6 |
| 36:18 40:10 45:2 | **providing** 62:11 | **quite** 36:21 84:19 | **reason** 38:15 66:23 | **referring** 44:6 |
| 52:8 58:4 60:8,10 | 68:4 | **quote** 107:2,4,21 | 91:13 96:13 | 103:17,21 |
| 62:12 63:6,11 | **Pryor** 38:4 | 107:21 108:1 | **reasons** 38:12 51:7 | **reflect** 120:22 |
| 64:15 65:4,11 | **public** 16:13 42:17 | **quotes** 107:1 | 67:8 112:6,7,13 | **reflected** 94:20 |
| 68:8,21 69:4 74:9 | 46:13 52:12 | | 126:5 | **regard** 57:4 60:19 |
| 77:5 78:16 80:1 | 63:13,14,18 66:5 | **R** | **recall** 28:4 32:1 | **regarding** 61:8 |
| 85:4 92:14 93:2 | 67:5,9,10,15 68:7 | **race** 97:20 98:4,12 | 36:14,18 42:8,17 | 63:14 75:19 |
| 93:19,22 | 68:16,19,22 69:1 | 98:20 99:8 | 42:20 46:13,16 | 113:14 |
| **produced** 69:22 | 69:6 70:4,5 71:1 | 107:22 108:16 | 53:17 54:2,3,3 | **regardless** 4:21 |
| **producing** 23:4 | 71:7,15 72:23 | **Randy** 9:7,8,8,11 | 57:4 65:10 73:22 | **Registered** 2:3 4:7 |
| 92:14 | 86:15 94:16,18 | 21:6,7 22:21 | 75:17 79:13,17 | 123:14 125:13 |
| **product** 35:18 | 95:15 96:2,5 97:7 | 23:21 24:9 36:1 | 79:23 80:7,10 | **regress** 10:11 |
| **profession** 109:4 | 98:15,21 115:8 | 36:16 61:21 | 86:9 91:7 95:16 | 17:16 18:13 20:5 |
| **Professional** 2:3 | 115:16,20 126:18 | 77:10 119:1 | 96:7 98:10,18 | 41:11 62:17 |
| 4:7 123:14 | **publicly** 70:23 | **reach** 55:22 | 101:18 111:15,23 | 80:18 122:22 |
| 125:13 | **purpose** 4:14 | **read** 5:12 19:5,5 | 112:17 113:6 | **regressed** 19:21 |
| **professionally** | **pursuant** 2:1 4:4 | 22:17 30:13 | 114:2,7 | 39:11 40:12 49:8 |
| 15:8 | **pushed** 52:9,10 | 126:1 92757:7 | **reception** 91:1 | **regressing** 10:9 |
| **progressed** 21:23 | **pushing** 88:20,21 | **readily** 10:10 | **recess** 53:12 110:3 | 62:22 83:7 |
| **promise** 50:23 | **put** 18:11 29:19 | **reading** 124:22 | **recommendation** | **regression** 78:14 |
| **prompt** 92757:14 | 44:12 49:19 | **real** 103:5 | 37:19 | 80:22,23 81:1 |
| **proportion** 17:20 | 50:20 52:14 | **really** 63:10 73:21 | **record** 11:19 28:2 | **regular** 21:16 |
| 20:7 84:6 | 62:20 63:9 65:19 | 98:6 120:8 | 32:13 120:21 | **reiterated** 95:4 |
| **proportionately** | 69:18 70:7,19 | 122:11 | **records** 22:17 | **reject** 39:7 |
| 35:23 | 72:20,22 76:7 | **reapportionment** | **redid** 40:18 | **rejected** 39:1,4 |
| **proportions** 9:4 | 89:5,15 90:20 | 3:18 6:8,8 7:21 | **redistricting** 8:1 | **related** 25:3 |
| **proposal** 80:18 | 95:19,20 97:20 | 8:2,3,5 9:4 11:1 | 24:22 27:19 59:6 | **relation** 71:19 |
| 84:2 | 104:3 | 11:12,14 14:11 | 60:8 61:9 93:1 | **relay** 95:16 |
| **proposals** 80:13 | **p.m** 123:7 | 15:17 16:20,23 | 115:21 116:11 | **relayed** 95:9 |
| 82:1,9,13,17 83:8 | | 17:14 21:13,19 | **redraw** 73:7 76:12 | **released** 71:8 |
| 83:14,18 | **Q** | 22:20 27:5,14 | **redrew** 70:17 | **relied** 41:4 |
| **proposed** 67:6 | **quadrennium** 6:16 | 37:14 40:6 57:9 | **reduce** 34:1 50:16 | **relying** 41:17 |
| **proposing** 93:23 | 6:21 64:16 | 57:13 60:19 | **reduced** 35:23 | **remained** 100:11 |
| **Proscenium** 2:21 | **question** 4:11 | 61:20 62:19 | 39:16 40:22 41:6 | **remember** 17:1,3 |
| **prospective** 20:12 | 19:12 20:11 28:2 | 63:15,20 64:7,15 | 41:8 42:4 49:10 | 21:12 38:9,11 |
| 22:11 | 34:11 36:8,10 | 65:1 67:11 69:21 | **reducing** 39:21 | 42:5,16 43:3,3 |
| **provide** 16:10 19:8 | 45:8 50:16 57:12 | 70:12 72:21 73:8 | 50:1 56:1,4 | 46:21 47:2 51:12 |
| 19:14 62:23 73:6 | 94:4 101:11 | 73:10,11 74:10 | **redundant** 57:2 | 53:14 57:7,15 |
| **provided** 4:14,20 | 119:8,22 120:8 | 77:13,14 80:1,5 | **Reed** 115:10,11 | 64:4 65:7 75:8,11 |
| | 120:21 | 84:20 85:1,4 86:5 | | |

76:5 79:3,8 80:4
82:16,20,22,22
85:6 86:4 96:23
97:3,8,9,11,12,12
97:15 98:23 99:3
99:5 101:3,6
102:12 108:18,22
110:19 111:3,11
113:12,13 114:15
115:9
**remove** 44:4
118:16
**removed** 43:1
86:11
**reported** 123:16
**Reporter** 2:3 4:7
5:10 123:15
125:13
**REPORTER'S**
123:11
**reports** 25:16
**represent** 43:15
55:2,8 56:22
94:12
**Representative**
6:11,13 11:11,17
11:19 28:5 61:11
84:18
**representatives**
28:22 115:15
**representing** 4:3
4:17 55:13 94:13
**represents** 115:6
**Republican** 10:16
13:3 20:12 22:11
29:9 30:22 32:1
105:8,13,15,21
106:10,16 107:3
107:12 108:1,6
108:21
**Republicans** 20:2
105:18
**request** 19:4 22:10
23:16 24:18 25:1

108:14
**requested** 7:8
72:14
**required** 65:14
**requirement** 39:19
55:22 95:3
**requirements** 14:7
**researched** 70:13
**reserved** 4:12
**resided** 20:12
22:12
**residence** 6:1
**respect** 57:13 61:7
62:9 64:2 74:22
80:21 82:9 84:1
86:3 88:19 105:3
110:18
**respected** 90:13
**response** 23:2
24:17,23 52:2
112:18,19,21
**responsibility**
41:14 98:3
**responsible** 12:12
73:13
**Restate** 45:8
**restriction** 37:13
37:15 38:6 53:1
104:21
**results** 125:3
**retrogression**
81:12,19
**return** 92757:12
**review** 76:8 78:11
**right** 12:17 13:10
15:3 21:3 24:7
30:5 31:23 33:10
33:12 34:17
41:19 42:10
43:16 45:21
51:18 52:4 53:8
61:7 62:3,9 63:17
64:2,5,14 65:1
66:23 72:12

74:17,22 78:2
81:23 87:2 93:16
97:16 103:19
104:23 118:6
119:16 120:17
**Rights** 39:23 40:22
41:10 50:6,10
**Riley** 13:8
**road** 111:20
**roads** 87:13
**rocket** 83:21
**Rogers** 59:13
61:12,13,15 62:1
62:3
**role** 105:4
**room** 75:2 76:13
76:15
**roommate** 102:15
**roster** 32:15
**Rough** 74:7
**RPR** 92757:18
**rule** 38:13
**Rules** 4:5
**ruling** 4:12
**run** 55:17 89:22
116:21

_____

**S**
**safe** 102:18 103:1
114:22,23 115:1
119:6,12,23
120:5,9,14,18,23
121:4,6,10,20
**SAITH** 123:9
**Sanders** 38:19
41:22 42:15 52:7
70:9 80:17,18
81:15 82:2,12,19
84:1,3 86:14,15
86:18 88:20
91:13 93:5,6 94:7
110:22,23
**Sanford** 117:7
118:3,4,5,14
**Sanford's** 118:1

**sat** 12:22 34:19
36:15 44:21
**satisfied** 35:18,20
**satisfy** 80:19
**saw** 16:11 38:22
40:18
**saying** 23:13,22
29:8 47:6 67:15
72:10 79:9 81:2
81:14,15 107:2
121:1,17
**says** 106:10,15
107:15
**science** 83:21
**Scofield** 45:17,18
**scope** 62:10
**screen** 27:10,12,13
77:9
**seat** 106:23 117:8
**second** 13:22 21:15
95:4 112:21,21
**see** 15:22 16:5,19
30:6 31:7 33:4
40:20 44:13 55:4
67:17 80:13 83:5
83:6 84:22
104:12
**seek** 93:12 94:4,11
**seen** 22:10,14
**select** 54:21
**Selma** 86:16
**Senate** 6:4,10 10:4
12:5,7,13 16:5
17:5 21:4,22
26:14 27:2 28:23
34:16 35:12,13
36:19,23 38:18
42:6,8,10,23 43:7
43:17 44:1,1,2,5
44:19 45:6,9
46:17 47:10,14
48:16,23 49:10
49:22 51:3,20,22
51:23 52:6,9,10

52:10,10,11
54:15,16,19,22
55:1 62:19 66:14
68:18 72:17,18
92:2 104:14
105:3,11 116:14
117:5,14
**senator** 7:5 8:21
10:3 12:16,17
13:19,19,20 14:2
14:3,5 15:9,9,12
15:12,12 19:4
21:1,10,20,23
23:4,16 24:3,6,21
26:11 29:3,5,12
30:20 31:11,12
32:4,10,11,12
33:13 34:21,23
36:1,19,20,21
38:19 41:22
42:13 45:5 46:23
48:9,10 49:6
51:20 52:6,9,17
53:13,18 54:11
54:13 55:13
56:20 70:8,8,9,10
72:13 80:4,17,18
81:15,23 82:2,11
82:13,19,23
83:11,18 84:1,3
84:21 85:11,13
86:3,13,15,17,18
88:20 90:9,22,23
91:5,5,13 93:5,6
94:7 96:15,18
102:14 103:6
104:3,9,14,17
106:10,15 107:2
107:7,23 109:8
109:10,16,17
110:18,21,22
111:1 112:8
113:16 114:3,4,5
114:8 117:6,7

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92770

senators 12:11
18:8,9 27:7 28:17
28:21 29:6,9
30:22 31:1 32:2
34:9 36:14 46:1
51:1 55:7 56:5
62:20 69:10,12
70:7 71:3,8 72:3
72:5,8 78:18
107:16
send 23:15
sent 22:19 58:21
separate 126:6
services 60:13,21
62:10
serving 61:4
session 21:16,17
69:7 71:13
set 11:9 12:20
17:13 22:4 58:10
100:3,7 124:21
sets 25:19
Shad 106:10,15
Shanholtzer 8:8
30:16,17 77:17
share 87:4 102:15
shared 6:10
sheet 126:6
92757:8,12
Shelby 88:9 112:11
shifted 51:18
Shine 77:16
Shineholder 77:15
shop 11:9 12:20
show 20:11 67:7
69:19 83:4 110:8
showed 22:11
108:20
showing 104:13
shown 61:5 66:19
sic 19:18
sides 35:10,11,23
51:13
sign 5:13 92757:10

signature 5:2
92757:9,10,11,12
signed 66:1
signing 124:22
similar 115:5
simple 85:22
simply 50:1 61:4
Sincerely 92757:16
single 87:7
Singleton 52:1,9
Singleton's 51:21
sir 7:20 8:2,9 9:1
9:22 10:14,19
11:8,18 12:9,14
12:19 13:6 14:13
14:18 15:16
16:18 18:16,21
20:19 21:9 22:3
22:13,15 27:23
28:14 30:5 32:7
33:18,18 36:3,12
37:4,6 38:1,10,20
40:1,4 41:16
42:11,16,19 43:2
43:8,11 44:7
45:21 46:15
48:18,21,22 49:4
50:15 52:22
53:16 54:18 55:9
55:11 56:14 60:6
60:11,22 62:5,8
65:2 69:16 70:1,3
70:22 75:6 78:15
79:22 80:3 81:13
85:9 87:9 89:9
91:9 92:22 97:14
98:16,22 102:21
103:3 105:23
107:14 108:22
110:16 112:15
117:2 118:4,19
118:22 119:15
121:14
sit 12:21 44:18

77:8
Sitting 79:8
situation 91:12
six 55:1,2 77:1
skills 27:22 28:14
28:15
small 30:7 100:22
104:18
Smith 33:13
Smitherman 13:19
14:3 15:13,14
49:6 100:23
software 27:19
28:7
somebody 26:20
41:18 51:10 61:3
72:6,10 82:6
116:21
Sonny 57:10 59:17
sophisticated
20:16
sorry 9:8 29:5
32:17 36:9 52:1
57:12 63:22
75:23 82:20 94:7
102:9 111:9
117:11
sort 11:16 63:8
south 94:3,5,7
112:9 115:4
so-called 27:18
speak 5:8 23:6
107:5 115:15,17
123:19
Speaker 8:23
20:13 21:1,11,21
36:4
speakers 42:20
46:16 53:17
speaking 115:13
special 21:17 118:6
specific 22:3 28:22
32:3 64:12 69:9
79:1,7,12 82:20

specifically 9:1
41:6 76:5 78:19
120:10
specifics 43:3 54:4
82:16,23 83:2
114:10
specifying 92757:8
spent 28:11
split 43:9,16 50:19
52:14 97:10,13
112:22 113:1
splitting 44:9
54:15 116:1
spoke 34:15 115:8
115:11
spoken 59:13
square 96:21
squares 30:8,9
St 101:10
staff 92:18,19,20
standard 98:19
114:21
standpoint 7:20
start 62:17 77:9
116:11
state 1:8,15 2:4,18
4:8 5:16 8:6 9:20
16:14,15 50:7
64:21 86:21
91:22 94:19
100:5 123:12,15
124:2,12 125:14
92757:4
stated 126:4
STATES 1:1
station 26:18
Statute 4:15,21
stayed 17:17
100:16
stealing 92:23
stipulated 4:2,16
4:23
stipulation 2:2 4:1
50:9

stipulations 5:11
stop 15:2
stored 13:13
Street 2:5,13,17,21
3:4
stretch 107:19
Strickland 2:20
Strike 94:17
strong 105:20
stronger 107:3
stuff 16:9 25:22
subject 37:11
SUBSCRIBED
126:14
substance 85:6
substantially
39:17
suggested 37:15
73:2 116:21
Suite 2:6,21 3:3
support 90:7
suppose 8:22 11:8
32:14 108:4
120:3
supposed 62:11,13
87:18
sure 16:22 17:17
20:6 26:10 31:23
37:17 41:4,5 42:7
43:2 45:3 46:20
47:1 57:3 62:16
62:17 63:7 70:18
72:7 75:20 76:13
80:20 92:12 97:5
100:14 109:3
115:13 121:20
122:2,4,7
surrounding 49:2
50:1
sworn 5:7 123:19
126:14
S-H-A-N-H-O-L...
77:20

T

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92771

table 104:13
take 35:15 43:22
  44:1,2 46:7 49:1
  51:2 52:11 53:5,9
  53:10 76:3 85:16
  87:18 91:9 95:20
  95:21 105:9
  109:23 116:7
  118:14
taken 2:1 4:4,6
  41:8 46:17 84:2
  104:21 110:3
  92757:7
takes 91:19
talk 12:21 16:8
  24:13 28:9 57:6
  57:17 58:17 75:4
  93:22 116:1
talked 21:14,23
  48:4 61:23 63:2
  68:3,18 73:11
  91:4 93:9 110:13
  111:14 113:16
talking 29:21
  39:15 40:5,17
  45:14 63:19 69:5
  73:20 74:18 80:4
  91:2 103:9 109:9
  111:12 113:14
  114:2 117:23
Talladega 96:19
  112:11 113:20,23
  114:1,11
Tallapoosa 2:5 3:4
Tammy 51:3 75:23
  76:2 107:16
  109:1 117:16
tarry 91:10
Taylor 32:10,12,21
  102:4,6,7
technical 8:1
telephone 18:17
  22:17 24:7
tell 17:11 25:11

29:14 32:15
  74:11 77:2,5
  85:10 92:12
  104:3 108:23
  109:3
tem 21:2,5
tendency 108:5
Tennessee 44:13
  51:14 52:15
term 81:1 87:10
  114:23
terms 30:13
testified 5:9 79:19
  119:23
testimony 54:5
  119:7,11,15,17
  126:4
Texas 40:11,17,19
Thank 117:1
  92757:14
them's 33:20 95:3
therefor 126:5
thereof 125:3
thing 18:5,5 51:19
  74:19,20 83:21
  95:4 113:21
things 63:9,12
  78:13,13
think 25:17 36:19
  61:19 69:14
  73:20 74:12,13
  75:2,20 76:2,3,14
  76:18 100:22
  101:5 103:17
  115:11 116:18,21
  118:7 119:23
  122:11
thinking 42:5
third 56:10
thirty 92757:12
thought 26:7 39:5
  42:12 64:21 84:6
  94:1 99:1 107:1
  120:5

three 6:21 15:23
  25:14 27:7 28:17
  43:17 45:15 46:1
  48:3,4,11,15 49:4
  49:12 50:11
  51:12,13,16
  54:23 64:4,9 83:3
  87:21 89:12
  122:23
three-judge 37:23
threw 40:13
throw 90:6
Thursday 71:12
till 69:2 98:6
time 4:11,12 13:9
  21:15 22:5 28:11
  40:8 58:3 59:19
  59:23 60:1 61:23
  63:6 64:7,9,12
  65:12,17,19
  66:12 68:9,10,22
  69:8,17 71:8,20
  72:3,4 76:14 78:9
  79:9 80:14,16
  84:13,20 85:20
  102:8 116:12
  126:4
times 3:17 11:15
  22:6 74:8,12
  76:18,21 78:5
  83:3 85:1,3 106:4
today 57:14 63:2
  79:8 119:7
told 17:7,12 18:5
  18:13 28:16
  35:21 41:5 57:6
  57:15 75:4 78:12
  83:5,15 85:13
  95:11 111:21
  113:3
tones 108:20
top 56:10 87:20
total 62:18 81:5,6
  81:7,18 82:3,10

82:17 83:10
  100:15 101:21
totally 39:2
toured 16:14
town 18:18 24:12
  62:15 88:6
trade 87:15 88:4
transcript 124:20
  126:2,3 92757:6
  92757:7,10
tremendously
  39:12
trial 4:19
tried 80:15 108:10
  109:20
true 49:21 55:16
  124:20 126:3
truth 5:8,8,9
  123:19,20,20
try 36:18 57:2 58:4
  83:17 93:18,23
  116:9
trying 17:2 34:8,18
  37:17 56:5 63:5,9
  63:11 67:17
  69:18 80:15
  81:21 84:8
Tuesday 2:6 71:16
  124:18 126:2
  92757:7
turn 7:9
two 6:21 18:6,11
  21:12,18 22:5,6
  49:20 54:16,20
  55:22 58:13
  62:20 65:20
  67:12 70:7,19
  71:21,23 78:13
  83:3 101:17
  111:22 121:9
type 91:8 102:18

U

U 2:12
Uh-huh 23:1 52:2

unable 16:10
unacceptable
  49:13,18 98:13
underpopulated
  51:6 69:13
understand 40:5,9
  46:7 58:13 63:5
  80:20 91:22 95:6
  97:23 98:6
  114:22 119:15
  120:13 121:1
understanding
  41:7 47:5 79:13
  87:10 97:19
understood 58:7
  119:7,11
undivided 53:21
UNITED 1:1
updated 20:17
upset 83:14
use 23:18 28:5
  95:18 107:22
  119:9 120:10
  121:18
usual 5:11
U.S 124:4,14

V

vacant 117:8
variance 39:13
  102:17 120:11,23
variation 119:10
  121:11
version 30:4
versions 25:14
Vestavia 49:7
vet 84:21
view 31:16 99:6
  120:22
viewed 102:22
  114:21 119:12,22
violate 39:23 40:22
  80:17
violated 84:7
violating 80:21

Deposition of Gerald Dial   ALBC/Newton vs. State of AL

May 21, 2013
Page 92772

**violation** 50:22
**vote** 37:17 38:17
  91:9 108:15
**voted** 38:15 107:11
  109:1,13
**voters** 20:12 22:12
  31:6 35:17 82:7
  89:5 98:20 99:18
  99:19,22 101:12
  107:10 108:21
  109:13 118:17
**votes** 48:6
**voting** 19:6,12,13
  39:23 40:22
  41:10 50:6,10
  97:21 121:12
**voting-age** 81:2
  101:20 117:20
**Vs** 1:7,13 124:1,11
  92757:4
**vulnerable** 107:1

---

**W**

**Wait** 33:2 36:6
  93:17
**waived** 4:18 5:3
  124:23
**waiving** 4:21
**Walker** 3:2,12
  5:12 8:3 9:7
  14:14,17,20,22
  15:5,7 16:7 22:22
  23:3,13 24:15,19
  25:6,13 26:3,6,16
  28:1,9 29:23 30:2
  30:7 36:6 37:16
  37:17 41:2,5 42:2
  49:16 50:4 53:4
  53:10,23 57:18
  57:22 63:19
  67:21 77:17,20
  78:7,22 79:19
  93:4,14 98:5 99:9
  100:18 101:4,10
  102:23 103:2,16

105:1 106:8
109:7,15 111:6
114:19 117:1,22
120:2 121:3
92757:20
**wall** 90:6
**want** 14:22,23
  17:15 18:6 30:15
  31:23 37:11
  41:13 52:13,14
  54:13 57:20 63:6
  79:5 80:20 81:2,6
  104:5,9
**wanted** 14:8 17:15
  17:17 24:4 26:10
  38:16 41:5 46:23
  54:11 62:16,17
  67:8 72:7 78:14
  78:19 83:8 95:1
  95:22 100:10,14
  103:20 104:1,11
  121:17,19 122:2
**wants** 35:8 55:17
**warm** 91:1
**Washington** 60:2
  60:15 88:3,4,5,12
  88:14 89:23
**wasn't** 20:18 60:17
  75:14 92:9
  103:22 118:10
**way** 38:22 43:10
  43:12,14 51:8
  52:18 74:11,18
  77:2 85:14 89:14
  89:18 90:17
  91:23 98:7
  102:16 109:12
  110:23 116:20
**wear** 32:18
**week** 37:22
**weekend** 71:6,14
**welcome** 91:11
  115:16
**went** 8:20 43:20

46:22 66:11
70:12 72:21 76:4
76:14 79:4 83:22
84:12 90:11
112:20 118:7,9
**weren't** 78:6 92:4
**we'll** 15:7 103:5
**we're** 13:14 22:1,1
  41:9 43:23,23
  48:1 57:14 69:5
  116:9
**we've** 59:19 69:22
  110:9,13
**wheel** 44:16
**Wilbanks** 2:2 4:6
  123:14 125:12
  92757:18
**William** 2:15
**Williams** 29:12
  30:20 31:12
  34:23 35:2 36:15
  45:16
**win** 121:5
**winning** 120:7
**Wiregrass** 32:6
**witness** 5:1,2,7
  14:16,18,21
  22:23 25:7 30:1,5
  30:9 57:20 77:19
  109:23 124:21
**wondered** 43:13
**Woodville** 106:11
  106:16
**words** 86:19
  121:19
**work** 26:17 31:13
  34:5,22 35:22
  48:14 58:2,10
  59:5,10 61:1
  65:20 77:22 78:8
  83:6,16 86:1 95:7
**worked** 9:9 13:7
  31:1,5,7,11 32:2
  32:4,10,10 33:13

34:9,13,19 59:16
59:17 60:16
83:10 90:2,3,8
99:14 113:2
**working** 17:1
  19:11 22:2 57:8
  58:1 59:2 66:6
  67:16 72:17 77:9
  92:16
**works** 77:13
**wouldn't** 47:13
  96:1
**wound** 16:4 111:16
**written** 18:1,3
  20:14 24:5 79:14
**wrong** 68:5 70:15
  85:19 111:19

---

**X**

**X** 33:23 34:1

---

**Y**

**yeah** 14:21 30:7
  42:11 66:21
  71:10 74:20
  77:10 87:1 96:22
  117:19 118:7
**year** 57:11 63:23
**years** 6:21,22 13:8
  59:9,17
**y'all** 58:13 68:3,8
  73:6 77:3 113:2

---

**#**

**#391** 2:3 4:7
  123:15 125:12

---

**1**

**1** 3:16 7:3,6,10,13
  25:15,19 35:12
  37:6,8,10,12 38:5
  38:13 44:13 51:3
  51:6 52:10,10,22
  52:23,23 69:23
  70:3,5,11,16,21

73:19 76:17,19
78:1 89:12 92:14
102:17 104:20
117:18 118:11
119:8,9,14,17,22
120:10,14,22
121:7,7,10,11
**1.52** 104:15
**10** 29:17 30:21
  35:2 45:7,10
**10,000** 86:11
**103** 3:11
**105** 2:5 3:4
**106** 3:17
**109** 3:18
**11** 101:6,9,10,15
**11/17/37** 5:19
**110** 3:11
**114** 3:12
**117** 3:12
**1170** 2:21
**119** 3:13
**12:30** 123:7
**123** 124:19
**13** 106:4,9
**14** 106:8
**15** 48:11 59:9
**17** 47:22 48:9
**18** 101:2
**19** 101:2
**1974** 12:2
**1983** 12:6

---

**2**

**2** 3:17 13:12 25:15
  25:19 31:2,3
  34:21 35:1 37:1,3
  37:7,13 43:18,19
  44:1,5,14,21,22
  51:10,15,15,16
  51:20,23 52:11
  69:23 70:17
  72:14,23 73:3,18
  73:19 106:1,3
  111:22 112:20

Case 2:12-cv-00691-WKW-MHT-WHP   Document 125-3   Filed 06/17/13   Page 49 of 49

Deposition of Gerald Dial   ALBC/Newton vs. State of AL                    May 21, 2013
                                                                          Page 92773

113:4 117:14
**2:12-CV-0069-...**
  1:8,14 124:7,17
**20** 59:9 74:12,20
  101:2 126:15
**200** 2:6 3:3
**200-and-somethi...**
  86:7
**2000** 12:8 28:4
**2001** 12:12 16:9
  53:21
**2010** 10:23 13:5
  16:7,8 20:15
  106:23 107:22
  108:16
**2011** 6:23 16:12,16
  46:14 53:15
**2012** 16:18 106:4
**2012-603** 26:15
**2013** 1:20 2:7
  124:18 125:4
  126:3 92757:7
**21** 1:20 2:6 52:1,1
  124:18 126:3
  92757:7
**21st** 2:13
**22** 92:2,5,6 104:14
  115:18,20
**2200** 2:21
**23** 92:2,6,7
**24** 52:6 92:6,7
**250** 2:17
**29** 33:13

---
**3**

**3** 3:18 7:9 19:3
  22:9 25:15,20
  31:3 44:13 46:14
  51:16 69:23
  72:12,13,19,22
  72:23 73:1 74:22
  75:1,3,5,19 76:7
  108:10,10 109:21
  110:4,8
**30** 32:14,21,23

33:2
**300** 2:13
**30309** 2:22
**31** 32:8,9 33:9
**34** 18:8 33:14
  50:23
**35** 27:3
**35203** 2:13

---
**4**

**4** 36:19,20 37:2,9
**4.5** 104:16
**40** 117:19
**42,000** 31:4,9 35:6
  35:6,16,17 43:22
  44:11 51:11,17
  117:14 118:11

---
**5**

**5** 3:10 38:18 52:16
**5,000** 96:15,17
**55** 82:14,19 99:1
**56** 3:10

---
**6**

**6** 22:16,22 37:7,10
  51:22 52:9,10
  53:15 72:18
**6th** 125:4
**6,279** 104:15
**6/6/13** 92757:1
**60** 82:15 92:3,9
  99:1
**60-3** 30:12
**60-31** 104:13
**603** 26:12 29:20
  54:15
**62** 81:17
**65** 81:16 99:17
  101:21

---
**7**

**7** 3:16 35:13 43:18
  44:1,13 51:15
  101:6,8,8,15

117:9,12,18
118:3

---
**8**

**8** 42:23 43:19 44:2
  45:6,9,16 106:13
**89** 46:17

---
**9**

**9** 6:2 45:6,10,16
  47:14 92757:2
**9th** 117:5
**9/30/2013** 125:13
**9:42** 2:7
**92757** 6:3