# DEPOSITION OF JAMES MCCLENDON

## May 21, 2013

## Pages 1 through 125

### PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, PC**
**Suite 505  -  500 Interstate Park Drive**
**Montgomery, AL  36109**
**Phone:  334.263.4455**
**Fax:  334.263.9167**
**E-mail:  hr@haislipragan.com**
**Web address:  www.haislipragan.com**

Deposition of James McClendon                                      May 21, 2013

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALABAMA LEGISLATIVE BLACK
CAUCUS, et al.,

        Plaintiffs,

Vs.                    CIVIL ACTION NO.:
                       2:12-CV-0069-WKW-MHT-WHP
THE STATE OF ALABAMA, et al.,

        Defendants.

* * * * * * * * * * * * *

DEMETRIUS NEWTON, et al.,

        Plaintiffs,

Vs.                    CIVIL ACTION NO.:
                       2:12-CV-0069-WKW-MHT-WHP
THE STATE OF ALABAMA, et al.,
        Defendants.

* * * * * * * * * * * *

DEPOSITION OF JAMES MCCLENDON
MAY 21, 2013
* * * * * * * * * * * *

Page 2

1       DEPOSITION OF JAMES MCCLENDON, taken pursuant
2   to stipulation and agreement before Pamela A. Wilbanks,
3   Registered Professional Reporter, ACCR #391, and
4   Commissioner for the State of Alabama at Large, in the
5   Law Offices of Balch & Bingham, 105 Tallapoosa Street,
6   Suite 200, Montgomery, Alabama, on Tuesday, May 21,
7   2013, commencing at approximately 1:25 p.m.
8       * * * * * * * * * * * *
9              APPEARANCES
10
    FOR THE PLAINTIFF ALABAMA LEGISLATIVE
11  BLACK CAUCUS:
12  Mr. James U. Blacksher
    Attorney at Law
13  300 21st Street North
    Birmingham, Alabama  35203
14
    FOR THE PLAINTIFF NEWTON:
15
    Mr. William F. Patty
16  JACKSON, ANDERSON & PATTY
    Attorneys at Law
17  250 Commerce Street
    Montgomery, Alabama
18
    FOR THE DEFENDANT THE STATE OF ALABAMA:
19
    Mr. John J. Park, Jr.
20  Deputy Attorney General
    Strickland, Brockington, Lewis
21  Midtown Proscenium, Suite 2200
    1170 Peachtree Street NE
22  Atlanta, GA  30309
23

Page 3

1   FOR THE DEFENDANTS DIAL AND MCCLENDON:
2   Mr. Dorman Walker
    BALCH & BINGHAM
3   Attorneys at Law
    Suite 200
4   105 Tallapoosa Street
    Montgomery, Alabama
5
    ALSO PRESENT:
6
    Mr. Gerald Dial
7
8       * * * * * * * * * * * * *
9           EXAMINATION INDEX
10  BY MR. BLACKSHER . . . . . . . . . . . . . . 5
    BY MR. PATTY . . . . . . . . . . . . . . . 76
11  BY MR. PARK . . . . . . . . . . . . . . 117
    BY MR. WALKER . . . . . . . . . . . . . . 118
12  BY MR. PATTY . . . . . . . . . . . . . 120
    BY MR. WALKER . . . . . . . . . . . 121
13  BY MR. PATTY . . . . . . . . . . . . . 122
14
15      * * * * * * * * * * * * *
16          PLAINTIFF'S EXHIBIT INDEX
17  4   Copy of Notice of Deposition          10
    5   Copy of News Article concerning Dan Boman    67
18
19
20
21
22
23              STIPULATION

Page 4

1       It is hereby stipulated and agreed by and
2   between counsel representing the parties that the
3   deposition of JAMES MCCLENDON is taken pursuant to the
4   Federal Rules of Civil Procedure and that said
5   deposition may be taken before Pamela A. Wilbanks,
6   Registered Professional Reporter, ACCR #391, and
7   Commissioner for the State of Alabama at Large, without
8   the formality of a commission, that objections to
9   questions other than objections as to the form of the
10  question need not be made at this time but may be
11  reserved for a ruling at such time as the said
12  deposition may be offered in evidence or used for any
13  other purpose by either party provided for by the
14  Statute.
15      It is further stipulated and agreed by and
16  between counsel representing the parties in this case
17  that the filing of said deposition is hereby waived and
18  may be introduced at the trial of this case or used in
19  any other manner by either party hereto provided for by
20  the Statute regardless of the waiving of the filing of
21  the same.
22      It is further stipulated and agreed by and
23  between the parties hereto and the witness that the

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 5

1    signature of the witness to this deposition is hereby
2    not waived.
3
4              * * * * * * * * * * * * *
5              JAMES MCCLENDON
6      The witness, after having first been duly sworn to
7    speak the truth, the whole truth and nothing but the
8    truth testified as follows:
9              EXAMINATION
10   BY MR. BLACKSHER:
11   Q.  Would you state your full name, please?
12   A.  James Herbert McClendon.
13   Q.  And your residence address?
14   A.  361 Jones Road, Springville, Alabama.
15   Q.  And you're an optometrist?
16   A.  Correct.
17   Q.  Dr. McClendon?
18   A.  Correct.
19   Q.  And you're a member of the Alabama Legislature
20       House of Representatives?
21   A.  That is correct.
22   Q.  And co-chairman of the Alabama Reapportionment
23       Committee?

Page 6

1    A.  And that is correct.
2    Q.  Legislative Reapportionment Committee.
3            Have you had your deposition taken before,
4        Dr. McClendon?
5    A.  Surely, I have.
6    Q.  You were here for Senator Dial's deposition, so
7        you know how it works.
8    A.  I did observe.
9    Q.  And, of course, if you don't understand a
10       question, you'll ask us to clarify it.  You
11       know, there were sometimes when we didn't seem
12       to make connections, and so you'll need to make
13       sure that you understand the question.
14   A.  Okay.  Thank you.
15   Q.  Do you have a copy of the Act 602 House plan in
16       front of you there that you can refer to if we
17       need to?
18   A.  Yeah.
19            MR. WALKER:  A map?
20   Q.  A map.
21   A.  I do have a map right here in front of me of the
22       House districts.
23   Q.  How long have you been in the House of

Page 7

1        Representatives, Dr. McClendon?
2    A.  Eleven years.
3    Q.  So you were first elected in 2002?
4    A.  Correct.
5    Q.  So you were not in the legislature for the post
6        2000 redistricting process?
7    A.  That is correct.
8    Q.  How did you become a member of the
9        reapportionment committee?
10   A.  I was appointed to this position.  The speaker
11       made appointments of House members, and the --
12       based on the number of congressional districts,
13       and then there were some at-large members.  And
14       I was appointed by the speaker.
15   Q.  Did he appoint you the chair?
16   A.  No, sir.  That was -- The committee nominated
17       and voted on the chair -- chairs.
18   Q.  The chairs.
19            Did you have any particular experience or
20       skills that better qualified you to be doing
21       redistricting than some of the other members?
22   A.  I don't know that I was better qualified than
23       any of the other members, but I did go to a

Page 8

1    meeting in Washington.  Maybe it was in
2    December.  I remember it was very, very cold.
3    And it was like one of the conferences in CSL
4    or -- that the National Conference of State
5    Legislatures, I think, put on.  And it was
6    specifically -- it was about redistricting.  And
7    I was very curious about the process.  And I
8    asked to go up there, and I did and that was --
9            (Off-the-record discussion.)
10   Q.  But this was before you were appointed to the
11       committee?
12   A.  Before I had any idea that I would be on the
13       committee.
14   Q.  Do you know how to operate the Maptitude
15       software?
16   A.  I can bring it up -- Well, no.  I don't have
17       Maptitude.  No.  I have never operated the
18       Maptitude.  I've never gotten ahold of the
19       mouse, and that seems to be the key to doing
20       it.  But at that meeting in Washington, you
21       know, we were given some instructions.  But I
22       don't think I ever did it.
23   Q.  Instructions on Maptitude?

Pages 5 to 8

Page 9

1  A.  I don't know if that's -- if -- I think
2      Maptitude is one of the programs that you can
3      use.
4  Q.  One of many, yes.
5  A.  Yeah, one of many.  And I don't know if that was
6      Maptitude that they were using there or not.
7  Q.  Do you know what Bonnie Shanholtzer's job
8      uses -- what software they use?
9  A.  She told me, but I don't remember.
10  Q.  It's not Maptitude, is it?
11  A.  I don't think so.  That doesn't ring a bell.  If
12      I heard it, I might remember.
13  Q.  Could it be something called ARC?
14  A.  I just don't recall.
15  Q.  Did you ever -- Do you know how to operate the
16      redistricting software that's in the
17      reapportionment office at the State House?
18  A.  No.  I didn't never actually do it myself.  I
19      would go in there and get one of the ladies
20      working there, and they would do it.  I would
21      watch what they did.
22  Q.  How often would you do that?
23         MR. WALKER:  During legislative

Page 10

1         redistricting?
2  A.  Yeah.  Are we talking about legislative
3      redistricting?
4  Q.  Okay.  Yes.
5  A.  Okay.  I guess, you know, it would be -- I was
6      in and out of that office a lot.  And some of
7      the time we were moving -- they were moving
8      lines around.  A dozen times or something.  And
9      that's just a guess.  That's kind of in the
10      ballpark.  It wasn't once, and it wasn't a
11      hundred.  But that might give you ...
12         (Plaintiff's Exhibit 4 marked for
13         identification.)
14  Q.  Okay.  Before we go any further, let me mark
15      Plaintiff's Exhibit 4 as your deposition notice.
16  A.  That's for today?
17         MR. WALKER:  Yes, sir.  It actually
18         wasn't updated, I think, in terms
19         of the date, but it's the notice
20         for the deposition now being
21         conducted.
22         THE WITNESS:  Okay.  Thank you.
23  Q.  You heard me ask Senator Dial questions about

Page 11

1      the documents.
2  A.  I did.
3  Q.  Well, let me, first of all, ask you, do you have
4      any of the documents that he said he doesn't
5      have?
6  A.  Any of his documents?
7  Q.  When you were listening to his answers, did you
8      say, well, I have -- he says I don't have those
9      documents --
10  A.  No, sir.  No, sir.
11  Q.  -- but I do?
12  A.  No.  I don't have any of his information at all.
13  Q.  Do you know Randy Hinaman?
14  A.  I do.
15  Q.  Did you work with Randy -- Did Randy Hinaman
16      work for you when you were doing the
17      redistricting of the House and Senate districts?
18  A.  Randy Hinaman, if I understand it correctly,
19      didn't exactly work for me.  He worked -- He was
20      employed or he was paid by a foundation to
21      assist the Republican Caucus in doing the
22      districts and staying in compliance with the
23      Voting Rights Act, making sure we turned out a

Page 12

1      product that was in compliance.
2  Q.  Which foundation?
3  A.  I do not know the name of that foundation.
4  Q.  Did Bill Armstead have anything to do with
5      employing --
6  A.  Not to my knowledge.
7  Q.  So he wasn't employed by the State Republican
8      Executive Committee, was he?
9  A.  Not to my knowledge.
10  Q.  But he was employed by a foundation to work for
11      the Republican Caucus in the legislature; is
12      that right?
13  A.  Yes, sir.  That's my understanding.
14  Q.  Do you know who any of the donors in this
15      foundation are?
16  A.  I do not.
17  Q.  How did you find out that it was a foundation
18      that was paying his salary?
19  A.  I asked.  And I don't know if I asked the
20      majority leader or the speaker or the chief of
21      staff, but I asked somebody in the leadership
22      how Randy Hinaman was getting paid.
23  Q.  Would the speaker know the answer to the

Page 13

1    question who was paying Randy Hinaman?
2    A.  I imagine he would.
3    Q.  Speaker Mike Hubbard specifically.
4    A.  Yes, sir.
5    Q.  When did you first meet Randy Hinaman?
6    A.  When we started on the board of education
7        districts and the congressional districts was
8        the first time I met him.
9    Q.  Was that here in Montgomery?
10   A.  It was.
11   Q.  And where in Montgomery did you meet with him?
12   A.  The State House.
13   Q.  And in whose office?
14   A.  Probably my office.  I had a conference table in
15       my office, and so he ended up -- when he would
16       come to town, that's -- he would set up shop
17       there.
18   Q.  When you are House chair -- co-chair of the
19       reapportionment committee, do you get an office
20       that's designated for the reapportionment
21       committee, or is this just the office that was
22       assigned you as a representative?
23   A.  I don't get a special office.  No.  It's just

Page 14

1        the office that I have.
2    Q.  But you did have a conference table?
3    A.  Right.
4    Q.  And Randy Hinaman sort of used your office as
5        his headquarters?
6    A.  He worked from there, right.
7    Q.  Is he still working out of your office today?
8    A.  No.  I don't even remember the last time I saw
9        Randy.  I guess it would have been back during
10       the session before the House and Senate bills
11       were introduced was the last time I saw Randy
12       Hinaman.
13   Q.  As a defendant intervener in these consolidated
14       actions, who is your counsel?
15   A.  I'm not -- I don't quite understand defendant
16       intervenor, but --
17   Q.  As a party to this lawsuit --
18   A.  I understand that.
19          Dorman Walker.
20   Q.  Did you hire Mr. Walker to represent you?
21   A.  Personally, no, sir.  No.  I'm not exactly sure
22       who -- how that came about.
23   Q.  So do you have a retainer agreement with

Page 15

1    Mr. Walker for representing you in this lawsuit?
2    A.  No.  I do not have anything like that.
3    Q.  Did you ask Mr. Walker to represent you in
4        this --
5    A.  I did not ask Mr. Walker.
6    Q.  Who told you that Mr. Walker was going to
7        represent you in this lawsuit?
8    A.  Once again -- Well, Mr. Walker worked for the
9        redistricting committee.  And so when a lawsuit
10       was filed, I didn't think -- I mean, who else
11       would be familiar with what we were doing from a
12       legal standpoint?
13   Q.  This --
14   A.  So it seems logical to me.
15   Q.  Excuse me.  I didn't mean to interrupt you.
16   A.  That's all right.
17   Q.  Did the speaker ask you to be a party in this
18       lawsuit?
19   A.  No, sir.
20   Q.  Did the committee ask you to be a party in this
21       lawsuit?
22   A.  No, sir.  I'm not even exactly sure what a party
23       is in a lawsuit.  I mean, I don't think I've

Page 16

1        been sued, but I think I'm involved in the
2        process, and I thought that's why I was here.
3    Q.  Well, actually, you have been sued now.
4    A.  Oh, really?
5    Q.  It's sort of --
6    A.  See, I looked at these documents that come
7        through, and I haven't found my name yet.
8    Q.  Well, you know, we just haven't added your name
9        to what we call the style of the case or the
10       caption of the case.  But you can think of this,
11       Dr. McClendon, as sort of a redistricting
12       malpractice lawsuit.
13          (Brief off-the-record discussion.)
14   Q.  Let's take a look at these documents before we
15       get -- to get us back on track a little bit
16       here, Dr. McClendon.
17          If you look at Item 1, if you would, read
18       that and tell me if you have any of those
19       documents.
20   A.  Item 1, I do not have any of those documents.
21   Q.  Have you ever seen any of those documents?
22   A.  I have -- Let me look.  I have not.
23   Q.  Okay.  Do you know if Mr. Walker represents

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                                    May 21, 2013

Page 17

1    Randy Hinaman?
2  A.  I do not.
3  Q.  Let's look -- The contract that we're looking
4      for is whatever contract Randy Hinaman had is
5      the reason I'm asking for it.
6          Was there anybody else besides Randy Hinaman
7      who -- again, aside from the people who were
8      working in Ms. Shanholtzer's office --
9  A.  Right.
10 Q.  -- who gave you or members of your committee
11     technical assistance in the redistricting
12     process for the House and Senate?
13 A.  No, sir.
14 Q.  Were there any technical-type guys, computer
15     guys, cartographers or whatever, who were
16     working for the Democratic Caucus that you had
17     any contact with?
18 A.  You know, I don't know for a fact, but I
19     suspected somebody was back there helping them
20     draw maps.  But ...
21 Q.  I'm sure there was.  But the question is, did
22     you have any contact with those --
23 A.  I did not.

Page 18

1  Q.  You did not.
2          If you would look at Item 2, please, and
3      tell me if you have any of those documents or
4      have seen any of those documents.
5  A.  Electronic --
6          MR. BLACKSHER:  It's electronic --
7          MR. WALKER:  It's electronically
8          stored information.  E-mails and
9          that sort of thing.
10         THE WITNESS:  Okay.
11         (Brief off-the-record discussion.)
12 A.  I don't have anything that's listed in Item 2.
13 Q.  Did you ever give any instructions to
14     Mr. Hinaman?
15 A.  Yeah.  We talked.  He would be at the office,
16     and we talked.
17 Q.  About where to draw the lines?
18 A.  Did I give him instructions about where to draw
19     the lines?
20 Q.  Yes.
21 A.  I was more -- Well, I would have legislators
22     that would meet.  And they might work out
23     something between them, and I would ask him to

Page 19

1      honor their wishes if it didn't throw our
2      numbers off.  That would be an example.  But
3      yeah, that sort of thing went on often.
4  Q.  Let me ask you, when did you see the first House
5      and Senate plan draft?
6  A.  We went in --
7          MR. WALKER:  A complete draft?
8  Q.  Well, let me clarify it then.
9  A.  Okay.
10 Q.  We didn't ask the question -- Did you see the
11     House plan come in parts before it was put
12     together as a whole?
13 A.  Well, we worked on it a district or group of
14     districts at a time, but it was probably toward
15     the end of that regular session before we had a
16     product to come forward with for the
17     redistricting or reapportionment committee.
18 Q.  Before the end --
19 A.  So it was toward the end of that legislative
20     session.
21 Q.  The regular session or the special session?
22 A.  Regular session.  Somewhere in there we began to
23     get ready because the decision had been made to

Page 20

1      have a special session to focus on this.  And so
2      before that special session started, we had a
3      product to put out there for the legislators to
4      see and have copies.
5  Q.  But you had begun working on some districts --
6      some groups of districts less than the entire
7      map of the state; is that right?
8  A.  You've got to start somewhere.  Yes, sir.
9  Q.  Which corner or part of the state did you start
10     looking at first?
11 A.  The minority districts.
12 Q.  Where were they, the ones that you looked at
13     first?
14 A.  Probably over in the -- In the western part of
15     the state is where we had to really gain
16     population.  But as it turned out, I don't
17     believe there were any of the minority districts
18     that did not need to gain citizens to bring them
19     up to numbers.  So all of them had to be worked
20     on.
21         Now, I don't know if we started in the
22     Birmingham area or the Montgomery area or over
23     here, but it was -- that was -- the first target

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                           May 21, 2013

Page 21

1   was getting -- bringing those districts up to
2   within the guidelines that we had stated in the
3   committee. So I don't know if -- you know, that
4   was the first problem that had to be addressed.
5   Q.  Okay. What do the guidelines say about
6   majority-black districts? That's what you're
7   referring to, right, the majority-black
8   districts?
9   A.  Right. Right. The minority districts.
10  Q.  All right, sir. Let's take a look at it here.
11      Docket Number 30-4 is what I'm looking for.
12          Do you have a copy of those in front of you,
13  by the way?
14  A.  That's this right here? The guidelines?
15          MR. WALKER: This is 30-4, yes.
16          THE WITNESS: Thank you.
17          MR. PATTY: I think it was marked
18          earlier as Plaintiff's Exhibit 3.
19  Q.  I'm looking now at page 2, Section 2,
20  Legislative and State Board of Education
21  Districts. Are we looking at the same thing?
22          MR. WALKER: Right there. Yeah. We
23          are.

Page 22

1   A.  Yes, sir.
2   Q.  What is the first guideline, Guideline A --
3   2(a)?
4   A.  Are you asking me to read that to you?
5   Q.  Well, no, you don't have to read it to me. Let
6   me shortcut this.
7       Your first guideline is to comply with the
8   equal population requirement of the U.S.
9   Constitution, right? One person one vote?
10  A.  One person one vote.
11  Q.  2(b) is the plus or minus 1 percent restriction
12  that you adopted -- your committee adopted.
13  A.  Yes, sir.
14  Q.  Now, we heard Senator Dial testify about his
15  reasons for adopting that restriction. What
16  were your reasons for adopting, or were you in
17  favor of a plus or minus 1 percent?
18  A.  I was. I voted for it. I did. I think it
19  hinged on trying to stay in the one-man,
20  one-vote concept. And when the congressional
21  districts were zero deviation, that didn't seem
22  like much of a hurdle.
23  Q.  Okay. Could you explain what you mean, the

Page 23

1   congressional districts?
2   A.  They are plus or minus zero.
3   Q.  And that wasn't hard to do, was it?
4   A.  We did it.
5   Q.  You had to go down to the block level to do it,
6   but you did it?
7   A.  Correct.
8   Q.  And so was it your understanding that the state
9   legislative districts needed to follow the same
10  one-person, one-vote standard as the
11  congressional districts did?
12  A.  No, that was not my understanding.
13  Q.  What was your understanding about the
14  legislative --
15  A.  My understanding was that I guess the courts had
16  mandated that congressional districts have zero
17  deviation. But that same requirement did not
18  apply to legislative districts.
19  Q.  What was your understanding of the requirement
20  that the Supreme Court has put on legislative
21  districts?
22  A.  My understanding was that there was nothing
23  exactly in -- there was not a hard number put

Page 24

1   forward. But it made sense to me the closer you
2   could get to honoring one man one vote, the more
3   appropriate it seemed as far as representation.
4   So we ended up with plus or minus 1. And we
5   talked -- I talked with Mr. Walker about this,
6   about what's good and what's bad. And, of
7   course, the big goal really was to try to make
8   sure what we did was in compliance with the
9   Voting Rights Act and the other requirements.
10  Q.  Let's set aside the Voting Rights Act --
11  A.  All right.
12  Q.  -- and stay with the section -- Roman II, Arabic
13  2, one person one vote in the guidelines is what
14  we're looking at.
15  A.  Roman II -- Oh.
16  Q.  Did Mr. Walker advise you that you should adopt
17  a plus or minus 1 percent restriction?
18  A.  Mr. Walker said he felt like we would come
19  closer to getting through the Department of
20  Justice than having a bigger number than that.
21  But it was somebody on the committee that
22  proposed the plus or minus 1. But Mr. Walker
23  made it clear that while previously plus or

Pages 21 to 24

Deposition of James McClendon                                              May 21, 2013

---

Page 25

1    minus 5 had been done that he felt like there
2    was good justification for tightening it down to
3    plus or minus 1.  He didn't tell us what to do.
4  Q.  Who on the committee recommended --
5  A.  I don't know.  We've got committee amendments --
6    I mean, the committee minutes would say who made
7    the motion and who seconded the motion and what
8    the vote was.
9  Q.  But when you adopted a plus or minus 1 percent
10   population deviation restriction, you knew that
11   that was going to make it a whole lot more
12   difficult to preserve county boundaries when you
13   have 105 House seats to draw, right?
14  A.  Right.
15  Q.  Did that matter to you?
16  A.  Not as much as honoring the Constitution and the
17   one man one vote.  That had a higher priority.
18  Q.  You were in court last week with Senator Dial
19   when Mr. Park and I were arguing before the
20   three-judge court, right?
21  A.  Yes, sir.
22  Q.  So you understand that our arguments or
23   arguments that I was making on behalf of the

Page 26

1    plaintiffs in the case, that county voters have
2    a stake in one person one vote too.
3       MR. WALKER:  Object to the form.
4  Q.  I mean, you heard that.  You heard my argument,
5   didn't you?
6  A.  I listened to every word you said.
7  Q.  But you didn't understand what I was saying, eh?
8  A.  No.  I had a grip on it, a layman's grip on it.
9  Q.  Well, it's really not that hard of a proposition
10   to understand, is it?
11      MR. WALKER:  Objection to form.
12  Q.  The argument on behalf of county residents and
13   their one-person, one-vote rights.
14  A.  Our guidelines say that that's something we
15   should take in consideration and honor when
16   possible.
17      MR. WALKER:  Speaking of the
18       whole-county provision?
19      THE WITNESS:  Yes.
20  Q.  Do you remember the statement you made on behalf
21   of preserving the St. Clair County boundary
22   lines at the hearing -- where was it -- in
23   Gadsden?

Page 27

1  A.  I remember -- maybe it was -- I don't know if it
2   was Gadsden or Anniston.  I think it was --
3  Q.  It was Anniston.
4  A.  I think it was Anniston.
5      What did I say?  Help me.  Help me with my
6  memory.
7  Q.  I knew you were going to ask that.  You'll have
8   to give me a minute here, and I'll pull it up.
9   It's on file already, but let's see if we can
10   find it.
11      The State's lawyer was so impressed with
12   these hearings that he put these in the record.
13   Let's see if I can find it.  Mr. Walker took up
14   most of the space in these transcripts, by the
15   way.  Here we go.
16      Representative McClendon:  Thank you,
17   Mr. Walker.
18      Mr. Walker had finished, and you were
19   thanking him.
20      I am now speaking as a representative of
21   St. Clair County and not a member of this
22   board.  But I wanted to get this -- just as
23   Senator Dial did, I want to get this on the

Page 28

1    record on behalf of my home county.
2      Right now we have six legislators from
3   St. Clair County.  Five of them do not live in
4   St. Clair County.  Five of them have a majority
5   of their voters in some other counties.  That
6   affects accountability for your representatives,
7   your legislators, your lawmakers.  It's a
8   reverse situation from the way we normally
9   think.  Fewer is better than more.  The more you
10   have in a district, the harder it is for them to
11   agree among themselves down in Montgomery.
12      I want to keep reading this because it's
13   all -- I mean, it's -- you're a lay person.
14   You're not a lawyer, right?
15  A.  That is correct.
16  Q.  And a lot of what you're saying here, your other
17   citizens of St. Clair County agree with you.
18   It's just common sense.  Would you agree with
19   that?
20  A.  You know, I don't know that I've ever had that
21   discussion with any of my constituents.
22  Q.  Well, let's continue reading.
23  A.  Go ahead.  I find it fascinating.

Pages 25 to 28

Deposition of James McClendon                                             May 21, 2013

Page 29

1  Q.  At the end here, you say, I would like to enter
2      this statement in the record along with the
3      statement from one of the citizens of the county
4      that supports this position.
5         So you've had at least one other
6      constituent --
7  A.  I had one.
8  Q.  You had one that agreed with you.
9         Now, you went on to say -- and I'll finish
10     this -- the way our Constitution is written,
11     many local issues must be dealt with in
12     Montgomery.  In St. Clair County, any one of
13     those six legislators, whether they live in the
14     county or not, can veto any local legislation.
15     I just -- That is not right, that somebody who
16     represents people who don't reside in St. Clair
17     County vetoing local legislation for St. Clair
18     County.  That is not right.
19        You agree with that, don't you?  You haven't
20     changed your mind.
21 A.  No, I have not changed my mind.
22 Q.  Then you go on to say, now, if you look at the
23     population of our county, we need one senator.

Page 30

1      We have two.  We need two House members.  We
2      have four.  This is in no way to disparage our
3      current legislators.  We get along fine.  They
4      do a good job.  They represent our county well.
5      But while these redistricting lines are going to
6      be around ten years from now -- probably a
7      little less than that, but ten years -- that
8      we're doing now, they will be here for ten
9      years.  Most of these legislators probably will
10     not.  We don't know who is coming next.  In
11     fact, we have a vacancy right now, and it's
12     theoretically in -- that will be decided in
13     another area that will represent us.  We won't
14     have much of a voice in that.
15        So I will acknowledge that legislative
16     districts can't be drawn without consideration
17     to the impact on adjacent districts.  Now,
18     that's a fact of life.  So the perfect setup for
19     my county would be one senator and two House
20     members, but it's extremely difficult to get the
21     perfect setup for anyone.
22        What did you end up getting for St. Clair
23     County?

Page 31

1  A.  Still got six.
2  Q.  Let's see.
3         (Brief interruption.)
4  Q.  Act 602 did continue splitting St. Clair county
5      into three House districts rather than two,
6      right?
7  A.  Correct.
8  Q.  You have to have at least --
9  A.  No.  Wait a minute.  Ask me that again.  I'm
10     sorry.  602 did what?
11 Q.  Splits St. Clair County between three House
12     districts.
13 A.  No, it does not.  No.  Let's see.  Let me think
14     about it.  602, the new House plan, we end up
15     with three House members, correct.
16 Q.  Three House members?
17 A.  Yes, sir.
18 Q.  So you keep the three House members.  Now, you
19     had -- in the existing plan that you're serving
20     under now, the 2001 plan, you have two senators.
21 A.  Correct.
22 Q.  And under the plan that was -- the Senate plan
23     that was passed, you ended up with three

Page 32

1      senators?
2  A.  Correct.
3  Q.  So now your St. Clair delegation has increased
4      from five to six?
5  A.  Incorrect.  Under the current plan, we have two
6      House -- two senators, four House members.
7  Q.  No, sir.  House districts -- The 2002 House
8      plan -- 2001 House plan, St. Clair County, which
9      population requires only two House districts, is
10     split into three House districts --
11        That's Docket Number 60-38.  I'm sorry.  It
12     takes so long with all these documents here to
13     pull up the right stuff.
14        -- which would be House District 30, House
15     District 50, and House District 36.  Is there
16     another one that we've missed?
17        MR. PARK:  45.
18 A.  Yes, sir.  There is.
19        MR. BLACKSHER:  45?
20 Q.  Could I ask you to come around and look at this?
21 A.  Sure.
22 Q.  I'm sorry I don't have a hard copy printed out
23     for you to see.

Pages 29 to 32

Deposition of James McClendon                                          May 21, 2013

Page 33

1   A.   What can I help you with?
2   Q.   This is St. Clair County under the -- We called
3        it the 2002 plan.
4   A.   Right.  And I can -- I see 36.  I see 30, and I
5        see 50.  What's the fourth one, though?
6            MR. WALKER:  Due west.
7   A.   It would be right over here.  Drake.  Do you see
8        where Drake is?
9   Q.   Drake?
10  A.   Yes, sir.
11  Q.   So Drake comes into St. Clair County?
12  A.   Yes, sir, it does.  Does that answer your
13       question?
14  Q.   Yes, it does.  Thank you.
15           So you were able to drop the number of House
16       districts from four to three, but you increased
17       the number of Senate districts from two to
18       three?
19  A.   Correct.
20  Q.   So you still have six members of your St. Clair
21       County local legislative delegation?
22  A.   That is correct.
23  Q.   Let me show you HB-16, which was the plan that

Page 34

1        John Knight introduced -- the House plan that
2        was introduced by John Knight and I think
3        others.  It splits St. Clair County into three
4        districts -- House districts as well.  Do you
5        agree with that?  Can you see that?
6   A.   I believe I do.  Well, no.  Let's see.  It's
7        kind of hard to tell with the colors, so --
8        There's one, two, three, and that's --
9            MR. WALKER:  It's hard to say.  Do you
10       have a report?
11  A.   May I come around there and ask you a question?
12  Q.   Sure.
13  A.   Here's St. Clair County.  So --
14  Q.   I can tell you that on this HB-16 plan, there
15       are no House districts that extend out of
16       Jefferson County, if that's where you're
17       looking.
18  A.   No.  No.  I'm talking about St. Clair County.
19       So the blue area is St. Clair County, right?
20  Q.   Yes.  No.  No.  The boundary --
21  A.   Oh, that's -- Okay.  So -- the colors --
22  Q.   The colors are districts.
23  A.   -- are the districts.  Then it looks like three.

Page 35

1   Q.   Yeah.  Okay.
2            And here is -- I'll show you a map of SB-5.
3        That was the Senate plan that Hank Sanders
4        introduced.
5   A.   Right.  Now, do you have the deviations on these
6        plans?
7   Q.   Yes, we do.  They are within plus or minus 5
8        percent.  So you would agree -- Well, for the
9        record, St. Clair County has one senator under
10       the SB-5, plan?
11  A.   That's what it looks like.
12  Q.   So you would end up with a total -- if those
13       bills had passed, you would end up with a total
14       of four members of your county delegation rather
15       than six.
16  A.   So the Senate is -- one for the Senate --
17  Q.   Three for the House.
18  A.   So how could St. Clair County have a senator
19       with the population of 83,000?
20  Q.   Well, if you'll look at the district -- the
21       Senate district that SB-5 puts St. Clair County
22       in I think goes up into Etowah County.
23  A.   Okay.  I see.

Page 36

1   Q.   Because you're too small to have one complete
2        Senate district.
3   A.   Okay.
4   Q.   But you are a whole within that Senate
5        district.  You only have one senator to deal
6        with in your local delegation.
7            So the question I'm trying -- you're saying
8        that it was worth more to you to reduce the
9        permissible deviation to plus or minus 1 percent
10       than to use the full plus or minus 5 percent
11       that the Supreme Court allows and save some of
12       these county boundaries?
13           MR. WALKER:  Objection to form.
14  A.   The redistricting committee adopted plus or
15       minus 1 percent.  And so that was inside our
16       guidelines, and I was obligated to do my best to
17       stay inside the guidelines adopted by the
18       redistricting committee.  These plans went
19       outside of the guidelines.
20  Q.   So the plus or minus 1 percent restriction was
21       more important than saving the number of splits
22       in St. Clair County?
23           MR. WALKER:  Objection to form.

Pages 33 to 36

Deposition of James McClendon                                           May 21, 2013

Page 37

1        Misconstrues his testimony.
2   A.  Well, the redistricting committee selected that
3       plus or minus 1.
4   Q.  Which you agreed with.  You voted for it?
5   A.  That is correct.  I did.  And so -- And I would
6       say that did take precedence over --
7   Q.  Saving county boundaries?
8   A.  -- saving county boundaries.  I would say it
9       definitely did.
10  Q.  That's what I'm trying to get at.
11        So the speech you gave at the hearing in
12      Anniston sort of fell on deaf ears, didn't it?
13  A.  Well, I was talking to whoever attended the
14      public hearing.
15  Q.  Well, as a member -- you said speaking now as a
16      resident of St. Clair County and not as a board
17      member, I want to present this point of view to
18      the board.
19        So you were talking to yourself?
20  A.  The -- Right.  I had a different hat on.  My hat
21      from a redistricting standpoint was to take care
22      of the state -- the issue for the entire state,
23      not just the district where I lived.

Page 38

1   Q.  Okay.  You know, I'm going to have to backtrack
2       now.  We had not -- We've not gotten out of the
3       document production request.  If you could
4       possibly go back to that.
5   A.  I have it right here.
6   Q.  Let's go to Item 4.  I understand from what
7       Mr. Walker told us before lunch that we had been
8       provided with copies of three drafts, McClendon
9       1, 2, and 3; is that correct?
10  A.  Correct.
11  Q.  And those were the only three drafts --
12  A.  It may be it was McClendon -- Yeah.  It was 1,
13      2, and 3.  I believe it was 1, 2 and 3.  Yes,
14      sir.  Go ahead.
15  Q.  And there were no other drafts than those three?
16  A.  That I participated in?
17  Q.  That you participated in.
18  A.  Right.
19  Q.  Were there drafts of just parts or regions of
20      the city with regard to the state?
21  A.  Yes, sir.
22  Q.  But you have not provided us with those, have
23      you?

Page 39

1   A.  I don't have them.  I presume they would be in
2       the reapportionment office.
3   Q.  Did you have copies -- hard copies printed out
4       of these --
5   A.  Other plans?
6   Q.  -- of these draft segments, if you will, of the
7       plan?
8   A.  I did not print any out.  I would have
9       legislators -- just a few came to me with a
10      plan, and I would go over it -- their
11      suggestions.  Representative McClammy sticks in
12      mind.  He had one for Montgomery County.  And we
13      went over what he was suggesting, and then I
14      turned that over to Mr. Hinaman and said see
15      what you can do to make Mr. McClammy happy.
16  Q.  Mr. McClammy had a plan that showed that you
17      could have avoided crossing Montgomery County
18      boundaries with your House plan and still stayed
19      within plus or minus 1 percent.
20  A.  I'm not sure that Mr. McClammy's plan didn't
21      have an impact on the rest of the state.
22  Q.  But if the top priority for you was plus or
23      minus 1 percent, here was a chance to say plus

Page 40

1   or minus 1 percent and keep Montgomery County
2   intact.  Why wouldn't you start with an
3   opportunity like that?
4   A.  I don't remember that being the case.  I mean, I
5       don't remember it -- exactly what his plan was.
6   Q.  Well, I can tell you that his plan boasted of
7       being able to keep all --
8         How many House districts is it in Montgomery
9       County?  I forget now.  Five?
10  A.  Maybe so.  I'm not sure.
11  Q.  -- keeping five house districts in Montgomery
12      County without crossing the county boundary and
13      staying within plus or minus 1 percent.  If you
14      divided the population of Montgomery County by
15      five, you would get five equal districts.  So
16      there was an opportunity for you to maximize
17      both your priorities, and it seemed like it
18      would have been a starting place.  But what it
19      sounds like to me -- Let me just start over
20      again.
21        It sounds like to me in your answer that it
22      was really up to Mr. Hinaman to figure out
23      whether it would fit into the plan; is that

Pages 37 to 40

Page 41

1  right?
2  A.  Into the overall picture.
3  Q.  The overall picture, yes.
4  A.  Right.  That was part of his job was to make it
5     fit into the overall picture.
6  Q.  And not yours.  So it was not your choice to
7     turn down Mr. McClammy?
8  A.  It was my responsibility to see that ultimately
9     we had a plan that fell within our guidelines.
10 Q.  And my question -- Well, your testimony is,
11    however, that you did not turn down McClammy's
12    plan for Montgomery County which met all of your
13    guidelines.  You did not turn it down, did you?
14 A.  I accepted his plan.  I took it from him, and I
15    talked with Mr. Hinaman about seeing what he
16    could do to accommodate what he did.
17 Q.  And why did Mr. Hinaman say you couldn't adopt
18    Mr. McClammy's plan?
19 A.  He never exactly said that.  He told me that he
20    worked as much of Mr. McClammy's plan into the
21    overall state plan as he could without getting
22    outside our guidelines.
23 Q.  Well, was Montgomery County split unnecessarily

Page 42

1     in the House plan in order to prevent another
2     county nearby from being split?
3        MR. WALKER:  Object to the form.  You
4           may answer.
5  A.  Okay.  Ask me that again, now.
6  Q.  Let me strike the question and start asking a
7     new question.
8  A.  Okay.
9  Q.  Is it your testimony that you do not know
10    exactly why Mr. Hinaman could not fit
11    Mr. McClammy's plan into the overall House
12    plan?  You don't know?  You don't know the
13    reason?
14 A.  I don't know the precise reason as far as the
15    percentages of McClammy's plan.  I don't have it
16    in front of me.
17 Q.  Do you know if Mr. Hinaman -- Did Mr. Hinaman
18    ever show you drafts of House plans or parts of
19    House plans that he had built that you did not
20    use?
21 A.  Yes.
22 Q.  About how many such drafts did you actually look
23    at?

Page 43

1  A.  Of course, they weren't on paper.  This was on
2     the computer.
3  Q.  Exactly.
4  A.  And the plan was rather dynamic.  As different
5     members of the House came in with what they
6     wanted, we would work on that area of the
7     state.  So generally we were working on the
8     counties we were interested in at that point,
9     but it was in a constant flux from the very
10    beginning.
11 Q.  Well, let me ask this about the Montgomery
12    County plan that Mr. McClammy presented.
13 A.  Right.
14 Q.  Was one of the reasons that it did not fit into
15    the overall plan, that some Republican House
16    members objected to it, some of the Republican
17    incumbents?
18 A.  That's possible.  But I don't specifically
19    remember that objection.
20 Q.  Do you remember any Republican member of the
21    Montgomery delegation who objected to
22    Mr. McClammy's plan?
23 A.  I do not.

Page 44

1  Q.  Do you remember any Republican or Democratic
2     member of one of the surrounding county
3     delegations who objected to Mr. McClammy's
4     plan?
5        MR. WALKER:  Objection to form.  You
6           may answer.
7  A.  I don't think so.  I would say -- "No" would be
8     my answer.
9  Q.  So as far as you know, incumbent protection or
10    incumbent interest wasn't the reason that
11    McClammy's plan was rejected or did not make it?
12 A.  There was an issue that involved Montgomery
13    County, Elmore, and maybe a piece of Autauga
14    that I had to work with, and that comprised --
15    overlapped into Montgomery County.  I'm sure
16    that played a part of the big picture role of
17    how Montgomery was done.
18 Q.  Can you look at the Act 602 plan and be more
19    specific about what you're referring to in
20    Autauga and Elmore?
21 A.  Let me get the right one here.  The issue they
22    were concerned with dealt with parts of
23    Prattville and where it was going.

Pages 41 to 44

Deposition of James McClendon                                              May 21, 2013

Page 45

1   Q.  That's District 88?
2   A.  I guess that's right.  It's kind of hard to tell
3       to see where the highway is on this map.  That
4       would help.  But, yeah, it was right in that
5       corner there I think is where -- maybe where
6       that intersection is on I-65, that area right in
7       there.  Right about where that 88 is on the map.
8   Q.  Well, what was the problem for Prattville?
9   A.  I think that had to do with which legislator got
10      all of Prattville, or was that part of it going
11      to be separated?  Maybe the highway was going to
12      divide that up.  I don't remember how it finally
13      got resolved, but those three legislators ...
14  Q.  Who was the incumbent in 88?
15  A.  Is that --
16  Q.  I had the list here.  Hold on.
17  A.  That may be Beckman.  The three legislators were
18      Beckman, Mask, and Wren, if I recall.  And that
19      was something that they had to work out.  But I
20      know it had an impact on the Montgomery plan.
21  Q.  Mask and Wren.  Wren is 75.  Mask is 31.  Who
22      else are we looking for?
23  A.  I'm thinking Beckman is 88.

Page 46

1   Q.  Oh, okay.  Beckman, Paul, 88.  You're right.
2           So Paul Beckman, does he live in Montgomery
3       County or in Autauga County?
4   A.  I believe he lives in Autauga.
5   Q.  Well, he wanted into Montgomery?
6   A.  No, sir.  It was just those three legislators
7       had an impact on the way Montgomery was drawn.
8   Q.  Obviously --
9   A.  Because it spilled over.  Mask, I think, spills
10      over into -- Mask may spill over into
11      Montgomery.  I think Wren spills over into
12      Elmore.  So that was something that had to be
13      resolved, and I'm not sure McClammy's plan took
14      any of that in consideration.
15  Q.  Let's take them one at a time.
16          Greg Wren is District 75, and Greg Wren
17      lives in Montgomery County; is that right?
18  A.  Yes.  I believe that's correct.
19  Q.  Barry Mask is in District 31, and he lives in
20      Elmore County, doesn't he?
21  A.  I believe that is correct.
22  Q.  District 31, Elmore County.
23          And we've just said that Beckman in District

Page 47

1       88 lives in Prattville.
2   A.  Yeah.
3   Q.  So I don't understand --
4   A.  Well -- and it might have been -- See, I knew
5       they had a struggle over that corner, and Love
6       may have been involved in this line that had to
7       do with Elmore -- had to do with -- Wren, Love,
8       and Mask had to get something worked out that
9       overlapped into Montgomery County.
10  Q.  Okay.  And Love is 74.  He lives in Montgomery
11      County?
12  A.  Yes.
13  Q.  What was Love's problem with McClammy's plan?
14      Didn't McClammy's plan take care of Love?
15  A.  I'm not sure that McClammy ever approached
16      Representative Love.  I did not hear from Love
17      supporting McClammy's plan at all.
18  Q.  Well, did Jay Love want part of Elmore County?
19      Is that what you're telling me?  Did he want to
20      go into Elmore County?
21  A.  I think he has part of Elmore now.  I'm not sure
22      about that.  I'm not sure.  But I do know that
23      Love's district was in the middle of that --

Page 48

1   Q.  Okay.  So --
2   A.  -- problem to be resolved.  And I'm not sure
3       that Representative McClammy took their concerns
4       as part of his solution.
5   Q.  The four we've talked about are Beckman and Mask
6       and Love and Wren?
7   A.  Yes, sir.
8   Q.  They are all four white Republicans?
9   A.  Correct.
10  Q.  But it was their interests that trumped a plan
11      to keep Montgomery County intact plus or minus 1
12      percent?
13  A.  I think that -- I think their interests in their
14      existing districts did have something to do with
15      that.
16  Q.  Do you have any -- to go back to the document
17      production -- any -- Item 7 asked for your
18      telephone logs or e-mails communicating with
19      Mr. Hinaman, we can say now, as the drafter.
20  A.  I do not.
21  Q.  Did you ever have some that got erased?
22  A.  Some e-mails?
23  Q.  Yes.

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                                    May 21, 2013

---

Page 49

1   A.  It's possible.  I mean, it's possible way before
2       we ever got to this suit.  But that's -- my main
3       interest in Hinaman was when would he be here.
4   Q.  When would he come --
5   A.  Right.
6   Q.  You couldn't get a lot accomplished without
7       Hinaman being here.  Is that what you're saying?
8   A.  I wouldn't say that.  But I would say that since
9       he was using my office, I needed -- it was very
10      helpful to me on my schedule to know when he
11      would be in there working.
12  Q.  Well, were you able to work with individual
13      legislators concerning their wishes for their
14      districts without Hinaman being around?
15  A.  Yes.
16  Q.  And how would you do that?  Where would you go
17      to do that?  Would you go to the reapportionment
18      office?
19  A.  No.  They would come to my office.
20  Q.  They would come to your office?
21  A.  Yes, sir.
22  Q.  And did you have a map to look at on the
23      computer?

Page 50

1   A.  A hard copy.
2   Q.  A hard copy.  A hard copy of what?
3   A.  Of that district -- the existing district that
4       that representative was in.
5   Q.  Where did you get the hard copy of that
6       district?
7   A.  Printed it off from the reapportionment office.
8   Q.  You would ask the reapportionment office to
9       print it off for you?
10  A.  Yes, sir.
11  Q.  And then the legislator would come in and meet
12      with you about it?
13  A.  Correct.
14  Q.  Would the legislator and you know how to run the
15      numbers; that is, if he wanted to move something
16      one way or another, how that would affect the
17      numbers?
18  A.  Well, of course, we knew what the 2010 Census
19      numbers were for a given district.  So we knew
20      if that district needed to be smaller or bigger
21      to pick up more people.  And in most cases, the
22      Republican districts needed to be more compact
23      and the Democratic districts needed to go up.

Page 51

1       And my question would be if their district
2       needed more people, I would say, where would you
3       like to get these folks?  And they would
4       indicate -- had a marker -- or visa-versa, who
5       would you like to give up.
6   Q.  When they marked a part of the map that they
7       would like to include --
8   A.  Right.
9   Q.  -- would you be able to tell right away how many
10      people were in that part --
11  A.  No.  We were looking at a piece of paper.
12  Q.  So it would have to go back to the
13      reapportionment office or to Mr. Hinaman, or
14      how --
15  A.  Or both.
16  Q.  Or both?
17  A.  Right.
18  Q.  Who finally decided whether or not the change
19      that a legislator suggested could be made?
20  A.  Well, of course, ultimately it went through the
21      reapportionment office's computer.  That was the
22      ultimate plan.  But we worked on Mr. Hinaman's
23      computer in my office.

Page 52

1   Q.  Okay.  Was McClendon House Plan Draft 1 on
2       Mr. Hinaman's computer before it got into the
3       reapportionment office?
4   A.  Yes.
5   Q.  So he would send Bonnie Shanholtzer's office the
6       block file that she would then load into the
7       computer in the reapportionment office?
8   A.  I think that is correct.
9   Q.  To what extent was the speaker a player in this
10      give-or-take process with legislators and Randy
11      Hinaman?
12  A.  The only time the speaker was involved to my
13      knowledge was when it was his turn to come sit
14      down with me about his own personal district.
15  Q.  So Speaker Hubbard was not looking over your
16      shoulder all the time.  Is that what you're
17      saying?
18  A.  He was not.
19  Q.  And you didn't invite him to come in and check
20      up on the latest progress?
21  A.  He was the speaker.  I didn't have to invite
22      him.
23  Q.  No.  I understand that.  But, I mean, did you

---

Pages 49 to 52

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                           May 21, 2013

Page 53

1    want to keep him informed, is what I'm asking,
2    of the changes you were making in the plan?
3    A.  Well, no.  I didn't go to any particular -- No.
4        I didn't keep tabs on the speaker.  The
5        speaker's instructions were very simple:  Draw
6        fair districts.
7    Q.  What about the members of the Republican House
8        Caucus?  Did you meet with the Republic House
9        Caucus periodically?
10   A.  Individually and collectively when what they
11       were looking for involved two or three
12       contiguous counties with common lines.  I would
13       have them all come in together and work it out
14       among themselves.
15   Q.  And where would they go to do that?  In the
16       reapportionment office or in your office with
17       Mr. Hinaman?
18   A.  My office.
19   Q.  With Mr. Hinaman?
20   A.  Yes.  Sometimes -- Most of the time, Mr. Hinaman
21       was there to get a final resolution on if we
22       stayed within our guidelines.  But they did come
23       to my office when Mr. Hinaman wasn't there, and

Page 54

1    we would start the process of getting everybody
2    in agreement.
3    Q.  What about the Alabama Republican Party, Bill
4        Armstead, the executive committee?  Did they
5        play a role at all in this redistricting
6        process?
7    A.  No role at all.
8    Q.  Were just totally absent from the process?
9    A.  That is correct.
10   Q.  Now, you said that you had gone to an NCSL or
11       some --
12   A.  Yeah.
13   Q.  -- conference in D.C.  You said Smitherman was
14       there or somebody was there.
15   A.  Right.
16   Q.  That was before you became chair of the
17       reapportionment committee as I understand it.
18   A.  That is correct.
19   Q.  Did you, before or after you became co-chair,
20       have any communications with legislators in
21       Georgia about their redistricting process?
22   A.  No, sir.
23   Q.  Do you know whether or not the Georgia assembly

Page 55

1    was going through redistricting about the same
2    time?
3    A.  I don't know anything about what was going on in
4        Georgia.
5    Q.  Did you have any communications with any members
6        of the Republican National Committee?
7    A.  I did not.
8    Q.  Or was there anybody in Washington that you
9        consulted with or who consulted with you during
10       the redistricting process?
11   A.  The only -- Randy Hinaman lives in Washington or
12       Virginia.
13   Q.  Virginia, yeah.
14   A.  But no one other than him.  I did not.
15           MR. BLACKSHER:  Off the record.
16           (Brief off-the-record discussion.)
17   Q.  Was there anybody outside of Alabama that you
18       communicated with, consulted with, or who
19       consulted with you about House and Senate
20       redistricting that you haven't told us about?
21   A.  I think the answer is no.  The way you phrased
22       it, I'm not sure.  Let me make a statement.
23           I don't recall anybody outside of Alabama

Page 56

1    that I consulted with during the map-drawing
2    redistricting process.
3    Q.  When you were looking at Randy Hinaman's maps on
4        his computer, didn't he have overlayed on his
5        maps some of the demographics where whites and
6        blacks live?
7    A.  No, sir.
8    Q.  I mean, you couldn't look at the map and see
9        where the black population density was higher
10       rather than lower?
11   A.  No.  No.  I heard you earlier refer to an
12       overlay, I guess you call it, or -- There was no
13       overlay on the maps.
14   Q.  But his maps, if he was using Maptitude, he
15       could click on a particular area, and Maptitude
16       would tell him how many people were there based
17       on the census, right?
18   A.  And it would give racial data.
19   Q.  And racial data?
20   A.  Right.  Black and white.
21   Q.  And he also had partisan voting data too?
22   A.  He might have.
23   Q.  How the governor's race went in that area, or

Pages 53 to 56

Page 57

1   how the last legislative race went in that
2   area?
3   A.  He might have.
4   Q.  You didn't see it?
5   A.  No.  That was not my business.
6   Q.  Now I want to talk for a few minutes about these
7       hearings that you and Senator Dial and
8       Mr. Walker held.
9            You heard Senator Dial say that speakers at
10      almost all these hearings asked the
11      reapportionment committee not to split up their
12      counties.
13  A.  I was there with him.
14  Q.  You heard the same --
15  A.  I heard everything --
16  Q.  -- requests?
17  A.  -- he heard.
18  Q.  In the first hearing -- which was, what, in Fort
19      Payne -- this is where you were dealing with
20      DeKalb County.  Most speakers said that four
21      House districts were too many for DeKalb
22      County.  It's only small enough for two.  But
23      your plan sort of ignored that plea, didn't it?

Page 58

1            MR. WALKER:  Object to the form.
2   Q.  You actually increased the number of House
3       districts in DeKalb County, didn't you?
4   A.  Did I?  I don't remember.
5   Q.  Act 2012-602 increases the number of House
6       districts in DeKalb County from four to six.
7            So little old DeKalb County, who is big
8       enough for two districts in the House, now has
9       six House members.
10           MR. WALKER:  Objection to form.  You
11      may answer.
12  Q.  You were not aware of that?
13  A.  Well, I don't remember the splits on each and
14      every county.
15  Q.  Well, it didn't do those speakers much good to
16      make this request if you didn't even respond to
17      it by checking on whether or not you could
18      comply with their request.  I mean, did you go
19      back and review the requests that various
20      speakers made at these hearings?
21  A.  You know, all of that was -- all of that was on
22      the record.  And we certainly took it down, and
23      we had it and we distributed it and put it

Page 59

1   online.  And I certainly registered -- I
2   certainly understood the concept of the counties
3   wanting as few splits as possible.
4   Q.  But sitting here today, you're unaware that you
5       split -- your plan split DeKalb County among six
6       House districts?
7            MR. WALKER:  Objection to form.  You
8            may answer.
9   A.  I'm unaware -- I'm aware of it now.  And if I
10      wanted to know, I could look at a map or look at
11      the stats on it.  We've got those printed out.
12      But I can't remember all 67 counties.
13  Q.  I'm looking now at Docket Number 60-11, which is
14      a table -- I think -- I'll come over -- rather
15      than pulling this --
16           (Brief off-the-record discussion.)
17  Q.  This is the plan from Act 602, and it's compared
18      with John Knight's HB-16.  But look at Greene
19      County.  You put 12 people from Greene County
20      into District 61.  Why would you do that?
21           MR. WALKER:  Objection to form.
22  A.  You know, of course -- obviously we are trying
23      to stay within our guidelines.  Do you remember

Page 60

1   Drake and that district --
2   Q.  The one that's --
3   A.  The one you couldn't find in St. Clair County.
4   Q.  In Jefferson County.
5   A.  From Jefferson County.  He had 200 people.  Why
6       did they do that?
7   Q.  Wait a minute.  Jefferson --
8   A.  What is Drake's -- Now, that's 2012.
9   Q.  Yeah.  District 43 goes into Jefferson County to
10      pick up 224.  I don't think that's Drake.  I
11      think that's Mary Sue McClurkin.  Is that her
12      name?
13  A.  Yeah, there is a Mary Sue McClurkin.  I guess
14      she's 43.  I don't know.
15  Q.  Yeah, I think she is.  Because the rest of her
16      is in Shelby County, and Drake goes into
17      St. Clair.
18  A.  Which plan are you talking about?  The new or
19      old plan?
20  Q.  The new one.
21  A.  In the new plan, Drake, if I recall, does not
22      have any St. Clair.  He's how we reduced our
23      House numbers from four to three.

Pages 57 to 60

Page 61

1    Q.  Oh, okay.  So you're saying in the old plan,
2         Drake had only about 200 people --
3    A.  Something -- I'm not sure if it was 200 citizens
4         or 200 voters, but I know it was just a
5         handful.
6    Q.  So District 62 is -- who is District 62?  I'm
7         looking at Greene County.  There's 61.  62 is
8         Tuscaloosa.  Who is 62?
9    A.  You'll have to look it up when you've got 105 of
10        them.
11   Q.  I've got a roster here, House of
12        Representatives.  Can you give me a
13        clue? because this is alphabetical.  I'll have
14        to scan down to find 62.  Who do you know from
15        Tuscaloosa County that might be 62?
16   A.  Poole is from Tuscaloosa County.
17   Q.  Bill Poole?  He's 63.
18   A.  Pretty close.  Try Chris England.
19   Q.  Chris England is 70.
20            MR. WALKER:  Is it Nucie (phonetic)?
21            No.  Merrill?
22   A.  Merrill is from Tuscaloosa.
23            THE WITNESS:  Do you want me to find

Page 62

1            it for you?
2            MR. WALKER:  I believe it's Merrill.
3    Q.  It is John Merrill.  John Merrill, white
4         Republican.  Why does he want 12 people in
5         Greene County?
6            MR. WALKER:  Objection to form.
7    Q.  Do you know?
8    A.  Well, I can't answer for John Merrill.
9    Q.  Did you have to approve that?
10   A.  Did I have to --
11   Q.  Uh-huh (positive response).
12   A.  That's the plan that was submitted to the House
13        for approval.
14   Q.  Well, it had to be reported out of your
15        committee --
16   A.  It did.
17   Q.  -- that you chaired.
18   A.  It did.  It got reported out of my committee,
19        and then it got reported out of the
20        constitutional elections.
21   Q.  Greene County.  Greene County is the poorest
22        County in Alabama, isn't it?
23   A.  I don't know.  I wouldn't be surprised, but I

Page 63

1    don't know.
2    Q.  I can't even see how he reaches --
3            MR. WALKER:  It's his grandmother's
4            house.
5            MR. BLACKSHER:  You think?
6            MR. WALKER:  I don't know.  I just
7            made that up.
8    Q.  But -- Look.  See, in your Plan 602, Greene
9         County is split -- appears to be split between
10        District 71 and District 72, and yet -- and 71
11        is an African-American.  Is that McCampbell?
12   A.  A. J. McCampbell?  It could be.
13   Q.  And 72, Hale County, I know Bobby is the
14        Senator, but who is the representative?  He's
15        African-American anyway.
16            What you did here is you voted to put a
17        white Republican into Greene County's local
18        delegation who is able to veto what two
19        African-American House members might want to
20        propose; isn't that correct?
21   A.  You know, veto is correct.  And, practically
22        speaking, that's about what it amounts to.
23        There is a way to override that.  I'm not sure

Page 64

1    what it is.  Every time I proposed it, it was
2    like you don't want to get into that squabble.
3    Q.  There's a way to override everything dealing
4         with local delegations if you wanted to go to
5         the map -- I mean, if you wanted to do what the
6         Congress calls a nuclear option.  But it really
7         would upset a lot of people when you go against
8         these customs, wouldn't it?  These local
9         delegation customs, local courtesy and so forth.
10   A.  Yeah.  We do have local courtesy, which is
11        respected most but not all of the time.
12   Q.  So, I mean, the inference -- clear inference of
13        putting 12 of the white Republican's
14        constituents in Greene County is that there is a
15        white veto for the local legislation that Greene
16        County might want to have enacted.
17            Is there any other inference one could draw
18        from there?
19   A.  There is.
20   Q.  What?
21   A.  They now have bipartisan representation.
22        They've got a Republican to help them with the
23        Republican side if they need it.

Pages 61 to 64

Deposition of James McClendon                                                    May 21, 2013

Page 65

1  Q.  Well --
2  A.  That's the other argument.
3  Q.  Yes, sir.  But does partisanship matter in the
4      local legislation of a small County like
5      Greene?  It matters in Jefferson County, we
6      know, because we read the newspapers.  But what
7      about Greene County?  Does it matter what party?
8  A.  John Merrill could very well be of assistance to
9      them.
10 Q.  How so?
11 A.  Well, he's got his area of influence too.  He's
12     got his contacts wherever they may be throughout
13     the other -- Not everything is legislative.
14     Some of it is agency -- knowing the folks in the
15     agencies.  And he'll have a little different
16     circle of influence than I would.
17 Q.  In which agencies?  State agencies?
18 A.  Right.  Example:  You might need something from
19     DOT.  And usually when you need something like
20     that, the entire delegation makes the visit.
21 Q.  So it could be a beneficial thing to have a
22     white Republican with 12 constituents in Greene
23     County?

Page 66

1  A.  Could be.
2  Q.  Could help him get DOT grants maybe or get a
3      road repaired or something like that?  Is that
4      what you're saying?
5  A.  Yeah.
6  Q.  Does it help when it comes to writing federal
7      grant applications?
8  A.  I'm not familiar with the federal grant
9      application process, so I'm not sure.
10 Q.  Now, let's go down the list here.  This is Mary
11     Sue McClurkin, District 43.  Has 224 people in
12     Jefferson County.  That was necessary in order
13     to make sure that ten of the members of
14     Jefferson County's House delegations were white
15     Republicans.  Isn't that the reason that Mary
16     Sue McClurkin comes into Jefferson County?
17 A.  One of our guidelines is to try to keep the new
18     districts at least -- as much geographically
19     like the old district has been.  Mary Sue
20     McClurkin today represents some -- probably this
21     same part of Jefferson County.  So if it's the
22     same part of the same numbers, we've kept intact
23     what was done ten years ago.  Now, I'm not sure

Page 67

1      if it's -- I imagine it's the same area.  I
2      don't know.  Numbers changed everywhere.
3  Q.  Right now there are -- Wait a minute.  Hold on a
4      second.  Let me have this back from you a
5      second.
6          We'll just have to mark this.  This is a
7      news article about Dan Boman.
8          (Off-the-record discussion.)
9          (Plaintiff's Exhibit 5 marked for
10         identification.)
11 Q.  This was published Tuesday, June 19, AL.com
12     captioned.
13     MR. WALKER:  '12?  2012?
14 Q.  2012.  Captioned Alabama Democrats cry foul over
15     party switcher Daniel Boman's redrawn State
16     House district.
17         What I wanted to call to your attention in
18     particular and have you read is this highlighted
19     section starting right here with your name,
20     McClendon.
21 A.  Do you want me to read this right here?
22 Q.  If you would read it out loud, please.
23 A.  Do you want me to go all the way down?

Page 68

1  Q.  Yes, please.  The highlighted part.
2  A.  McClendon conceded the district does cut across
3      multiple counties, but he argued that is not
4      that unusual.  A major change in the district is
5      that it does come into Jefferson County.
6      McClendon said the 18-member Jefferson County
7      House delegation, which in the past has been
8      split evenly along party lines, is expected to
9      become majority Republican in the next
10     election.  Jefferson County is less likely to
11     have a 9-9 tie vote on important issues in the
12     future.
13         (Off-the-record discussion.)
14 Q.  One of the reasons you brought Dan Boman's
15     district into Jefferson County was to provide a
16     Republican majority in the House delegation, and
17     ceteris paribus, as they say in the law, for the
18     same reason you needed to keep Mary Sue
19     McClurkin in the delegation or else you would
20     lose another Republican; isn't that right?
21 A.  What -- Ask me a question besides --
22 Q.  My question is, isn't the reason you kept 224
23     Jefferson County constituents for Mary Sue

Deposition of James McClendon                                    May 21, 2013

Page 69

1   McClurkin so that she would be counted as one of
2   those Republican members of the Jefferson County
3   House delegation?
4   A.  Well, she will be a Republican member of the
5   Jefferson County House delegation, but we're
6   keeping her -- we're keeping her like her
7   district was drawn by the Democrats ten years
8   ago.  Now, Mr. Boman is a Democrat.
9   Q.  Well, that's true.  But this article also has
10  you saying Jim McClendon dismissed the
11  accusation of political payback.  And it quotes
12  you as saying any claims that Boman was
13  punished, that's just farfetched.  There's
14  absolutely no truth to it whatsoever.  Quote:
15  The fact is, his is district is going to have a
16  slight Republican edge.
17  A.  Okay.  I'm not going to make a comment without a
18  question.
19  Q.  Well, I mean, the purpose for putting Mr. Boman
20  into Jefferson County was so that a Republican
21  would be elected -- another Republican would be
22  elected in the Jefferson County House
23  delegation; isn't that correct?

Page 70

1   A.  That district was drawn based on the needs
2   surrounding it and the other districts.  I just
3   can't say that we -- That district had elected
4   Boman as a Republican, and then Boman became a
5   Democrat.  I think all of that confuses exactly
6   what anybody's intentions are.
7   Q.  Okay.  Let's again look at this table that is
8   Docket Number 60-11.  And if you will count here
9   the highlighted in yellow 27 instances -- Oh,
10  no.  I'm sorry.  I want to count the number of
11  fragments that are less than 5 percent that
12  would start here with Washington County.  Eleven
13  fragments under 5 percent.  If you had not had a
14  plus or minus 1 restriction, you could have
15  prevented those county splits.  Can we agree
16  with that?
17  A.  I can agree with that.
18  Q.  And, in fact, you've got many more that are
19  under 10 percent, which, if you were balancing
20  it out on the other side, might have avoided a
21  county split there as well if you were using
22  plus or minus 5 percent.
23  A.  I would see that's a possibility.

Page 71

1   Q.  There's no dispute, is there, that by adopting
2   plus or minus 1 percent you may not have forced
3   yourself to split more counties, but you
4   certainly ended up creating a lot more splits
5   than was necessary if you were using plus or
6   minus 5 percent.
7           MR. WALKER:  Objection to form.  You
8       may answer.
9   A.  If we had used a -- Let's make sure we're in
10      agreement here.
11          If we used a bigger number for the
12      deviation, there could have been -- likely could
13      have been fewer splits.
14  Q.  But if they had -- you had used plus or minus 5
15      percent, it would have been possible or it might
16      have been possible for some lawyer like Bill
17      Patty to get clients to come in and say you've
18      overpopulated the Democrat districts and
19      underpopulated the Republican districts, just
20      like they did in the Larios case in Georgia.
21      Isn't that something you wanted to avoid as
22      well?  Do you know about the Larios case in
23      Georgia?

Page 72

1   A.  I've heard that name many times, but when
2       that -- when these cases come up like you're
3       talking about like you did in federal court, I
4       would have to turn to Mr. Walker and say what's
5       he talking about.
6   Q.  Well, you heard Judge Pryor ask me, didn't they
7       avoid the Larios problem by reducing the
8       permissible --
9   A.  Right.  I did.
10  Q.  Well, you certainly avoided the likelihood that
11      someone could say you were overpopulated
12      unfairly or for partisan reasons overpopulating
13      some districts and underpopulating others.  But
14      isn't it true from what we've just seen with
15      these small deviations, you also made it
16      possible to do a lot more partisan damage with
17      people like Mary Sue McClurkin or the
18      representative -- the white Republican, whose
19      name I've forgotten now, in Tuscaloosa County?
20          MR. WALKER:  Objection to form.  You
21      may answer.
22  A.  If you'll do it again, I'll be happy to answer,
23      but sometimes you do long questions.

Pages 69 to 72

Deposition of James McClendon                                                    May 21, 2013

Page 73

1   Q. Let's just strike it.
2   A. Yes, sir.
3   Q. Let me ask you about Chilton County. You really
4      did a number on Chilton County, Dr. McClendon.
5      You did some surgery on Chilton County, didn't
6      you?
7            MR. WALKER: Objection to form.
8   Q. In the 2002 plan, Chilton County was contained
9      whole in House District 42, which also included
10     a small part of Shelby County. And that House
11     District 42 was overpopulated by 6.19 percent.
12           MR. BLACKSHER: You can see that in
13              Docket Number 60-17 for the
14              record.
15  Q. By removing the Shelby County fragment, Chilton
16     County would have been made a complete HB-42
17     underpopulated by 4 percent as it is in HB-16,
18     the plan that Representative Knight introduced.
19        But your plus or minus 1 percent restriction
20     would have prevented that from happening, right?
21  A. Mr. Knight's?
22  Q. Yes.
23  A. Correct.

Page 74

1   Q. Well, Act 602 divides Chilton County among three
2      House districts, which extends into Bibb and
3      Shelby Counties which -- and into Coosa County
4      and Tallapoosa County and into Autauga County.
5      All those counties now represent members of
6      Chilton County's local delegation. Why did you
7      do that to poor old Chilton County?
8   A. No. Look at 42. It is -- I believe it's
9      totally contained. No. The dotted line is --
10  Q. The dotted line is the county.
11  A. -- is the county. Okay.
12        So it looks like the county has three House
13     members based on this map right here.
14  Q. Uh-huh (positive response).
15  A. Is that right?
16  Q. That's correct.
17  A. Is that the way --
18  Q. It appears it has three.
19  A. Right.
20  Q. And not only three House members, but look at
21     all the divisional -- previously it had only one
22     representative in its delegation who represented
23     Chilton County -- only Chilton County and a

Page 75

1      small part of south Shelby County. Now it's got
2      three House members under your plan, and look at
3      all the other counties that now elect that
4      Chilton County House delegation. That matters
5      as a practical matter, doesn't it?
6   A. You know, once again, we're back to the main
7      point. What are you going to do? Are you going
8      to put an emphasis on one man one vote, or are
9      you going to put an emphasis on respecting
10     county lines?
11  Q. And which would be your preference?
12  A. One man one vote. One person one vote. One
13     voter one vote.
14  Q. No, it's actually one person, not voter. You
15     don't count voters. You count population.
16  A. Thank you, sir.
17           (Brief off-the-record discussion.)
18           MR. BLACKSHER: Could we take a short
19              break --
20           MR. WALKER: Sure.
21           MR. BLACKSHER: -- and try to finish
22              up soon?
23           (Brief recess.)

Page 76

1                 EXAMINATION
2   BY MR. PATTY:
3   Q. Do you remember any specific adjustments or
4      changes that were made in the early part of the
5      development of the plan for the redistricting
6      before this McClendon 1 map came out? I know
7      you talked about there were some different maps
8      that came out that were for different district
9      areas. Do you remember any of the specific
10     adjustments that were made in those maps?
11  A. I believe those maps I referred to were the ones
12     that others would bring in.
13  Q. Right.
14  A. Members of both caucuses would bring in their
15     own district. But it was a work in progress,
16     you know.
17  Q. Do you remember any of the suggestions that the
18     people had on how to deal with any issues they
19     had with overpopulation or underpopulation?
20  A. Here's the main thing I remember. People were
21     very self-centered on their district, and what
22     happened in the adjacent districts was not much
23     of their concern.

Pages 73 to 76

Page 77

1  Q.  Right.  Right.
2  A.  And that made it hard.  I remember one time in a
3     meeting where we were going over this, I made
4     the statement, if you've got to bring a map --
5     you cannot affect surrounding districts or bring
6     me an entire state, one or the other.  So on
7     those that came in, we would try to accommodate
8     them as best we could.
9  Q.  Can you remember anybody who specifically came
10    in that had adjustments they wanted made or
11    adjustments they were suggesting?
12 A.  With a lot of them, as I mentioned earlier with
13    Mr. Blacksher, we had -- actually, it was
14    11-by-14s, and I would let them draw on those,
15    and that was their suggestions.  But, now, as
16    far as getting that applied inside the computer,
17    I don't have anything to show you.  But I can --
18    this I can show you where we did some
19    sketching.  Now, once we got the initial map
20    printed and circulated around, then we started
21    getting some feedback.  In fact, that's when we
22    discovered we had two House members, and we
23    missed their home.  They were in somebody else's

Page 78

1     district.
2  Q.  So what happened with those drawings that people
3     would come in and say this is what I'd like to
4     do with my district?
5  A.  A good many of them are in my book.
6  Q.  Still in your notebook?
7  A.  Yeah.  You should have them.  I guess you have
8     those, don't you?
9        MR. WALKER:  He's got them.
10 Q.  Those would be where those -- Well, are these
11    that you didn't keep, or you think all of them
12    are in there or most of them?
13 A.  No.  The ones where they sat down with me and
14    worked them?
15 Q.  Right.
16 A.  I think most of those are there.
17 Q.  Okay.  Do you remember if there were any
18    requests -- Do any requests come to mind of
19    things that you just said, no, we can't -- in
20    this preliminary thing -- we can't do this?  You
21    had to turn somebody down?
22 A.  Well, of course, on this preliminary thing, when
23    we were drawing these lines on these new

Page 79

1     imaginary districts, we weren't -- we didn't
2     know the exact numbers.  It was like, well, if
3     I've got to have some more people, let me have
4     this neighborhood, but I don't want this
5     neighborhood.
6  Q.  Right.
7  A.  So when we were doing that, we really didn't
8     know if we were staying inside our guidelines
9     until we got them plugged into the --
10 Q.  So those ideas that people had would go back to
11    Mr. Hinaman, and then he would kind of tell you
12    how that fits with the overall plan?
13 A.  Right.
14 Q.  Do you recall any conversations you had with
15    legislators to tell them, all right, I've taken
16    your proposal.  We've gone and looked at it, you
17    know, and what you're talking about is not going
18    to work or --
19 A.  Oh, yes.
20 Q.  Can you think of any of those right offhand?
21 A.  You know -- Now, are you still before McClendon
22    1 or --
23 Q.  Right.  Before McClendon 1.

Page 80

1  A.  No.  I can't give you any specific examples at
2     that point.
3  Q.  After McClendon 1 can you think of any
4     situations where the map comes out and somebody
5     comes to you and says, look, I've got a problem
6     with the way this map is?
7  A.  I can think of two really good ones --
8  Q.  Give me those two.
9  A.  -- on McClendon 1.
10       A. J. McCampbell came to me and said, I'm
11    not in my district.  And Elaine Beach came to me
12    and said the same thing.
13 Q.  All right.
14 A.  And I think somehow -- I don't know what
15    happened in putting -- We were close on
16    McCampbell, but close doesn't count.  And Elaine
17    was like three counties away.  I don't know if
18    the wrong digits -- I don't know what was put in
19    there wrong, but that correction is what
20    produced McClendon 2.
21 Q.  Okay.
22 A.  Go back and get them in their home districts.
23 Q.  Do you remember any other legislators coming to

Page 81

1    you with McClendon 1 and saying I've got a
2    specific problem with this -- the way this is
3    drawn or --
4    A.  No.  If I'm remembering this correctly, once we
5        found we had two legislators totally out of
6        their district, it wasn't long till we turned
7        out McClendon 2 to get the blatant things --
8    Q.  Right.
9    A.  Then when 2 came out, there was work done before
10       3 was produced.  And that did -- you know, there
11       was some time involved in that.  There were
12       several areas we went in and worked.
13   Q.  When y'all had the public hearings, were there
14       any proposed maps then when you were doing the
15       public hearings?
16   A.  No proposed maps.  At the public hearings, all
17       we had was the current district lines.
18   Q.  Okay.  Did you provide any information to
19       Hinaman about the information you obtained in
20       these public hearings?
21   A.  Yeah.  He had access to all the information.
22   Q.  Okay.
23   A.  Now, what he did with it, I don't know.  But he

Page 82

1        had access to all of that.
2    Q.  So when y'all would have a public hearing and
3        y'all would have notes, would y'all provide
4        those notes to him?
5    A.  We had a court reporter.
6    Q.  Oh, okay.  You would provide those transcripts
7        to him?
8    A.  Provide them to the world.
9    Q.  But do you know -- was he specifically sent
10       those, or you just know that's a public
11       record --
12   A.  They were online, and he was aware of that.  We
13       didn't ship him the documents because it was --
14   Q.  Right.  He knew they were out there and knew
15       that information was available?
16   A.  That is correct.
17   Q.  Okay.  McClendon 2.  Do you recall specific
18       objections about McClendon 2?
19   A.  Let's don't say objections.  There were some
20       opportunities there to make some people happy.
21   Q.  Okay.  All right.
22   A.  In the northern part of Alabama, I worked
23       with -- Actually, Marcel Black was the spokesman

Page 83

1    on behalf of he, Burdine, and Johnny Mack
2    Morrow.  They had districts -- These are all
3    white Dems.  And they had contiguous lines.  And
4    Marcel -- what I wanted to do was get all three
5    of them in a room at the same time.  And Marcel
6    has really been there a long time.  And he said,
7    no.  No.  No.  We don't have to do that.  But he
8    came to me.
9        In fact, we ended up working with Bonnie.
10   Of course, the deal was real simple.  As long as
11   you guys work within your districts, don't
12   effect anything outside and you don't mess up my
13   deviations, it's fine.  And we did.  We worked
14   on that a good while.
15       Another incident similar to that was
16   Robinson, Moore, and Todd.  They were all inside
17   Jefferson County.  Robinson and Moore, a black
18   female and black male, and then a white female,
19   all three Democrats.  They -- It was a similar
20   setup.  They have contiguous lines, and they
21   wanted to make some changes.  And we worked with
22   Bonnie Shanholtzer.  She ran the mouse, you
23   know.  And then she could generate whether we

Page 84

1    were over or under or where we messed up.
2    Q.  The two changes, the first one you talked about
3        with the lower part of Alabama, the one with
4        Robinson, Moore, and Todd, would you provide
5        that information to Mr. Hinaman to make sure he
6        vetted it with the computer and maps and made
7        sure it was --
8    A.  Yeah.  We did it on the reapportionment office
9        computer, so it was right there for him to --
10   Q.  Okay.
11   A.  -- pick it up, however they transfer those.
12   Q.  I've got you.
13   A.  I had another one, and it was -- involved Wes
14       Long, Jeremy Odom, and Kerry Rich.  They are
15       kind of the Guntersville area and maybe spill
16       over into Blount.  I'm not sure.  But they went
17       on and on and on.  But, anyway, once again, they
18       knew if they didn't mess up our numbers that
19       they could work inside their district.  Those --
20       All three of those were Republicans.
21          Now, I had one, Merika Coleman and
22       Juandalynn Givan, both Jefferson County black
23       female Democrats, they -- I never could quite

Deposition of James McClendon                                                    May 21, 2013

Page 85

1   figure out what they wanted to do.  Once again,
2   their lines were contiguous and understood you
3   can trade them back and forth all you want to.
4   But when they got through, I can't remember if
5   it was 2700 or 3700 we were out of balance.  And
6   I got back with them and said, y'all figure this
7   out and come back to me and we'll make it
8   happen, but I can't do it like this because it
9   throws me off.  But they didn't come back.  I
10  didn't hear from them again.  In fact, I
11  contacted them later and said -- I think I even
12  called them over a weekend and said, y'all come
13  on in Monday or Tuesday or something, and let's
14  get this done.  But they did not.
15  Q.  Well, did you have anyone else or did you have
16      anybody who expressed an objection or concerns
17      or disagreement with the plan?
18  A.  Prior to introduction?
19  Q.  Right.  Prior to -- With McClendon 2 rather than
20      McClendon 3.
21  A.  Oh.  Now, that was 3 we just developed.
22  Q.  Oh, okay.
23  A.  Yeah.  That was the transition from 2 to 3.

Page 86

1   Q.  Now --
2   A.  Because the 1 to 2 was these people were out of
3       their districts, so let's solve that because
4       that had to be done because that affected
5       several areas.
6   Q.  But between 2 and 3, was there anyone else
7       besides the folks you've told me about -- Well,
8       strike that.
9           Between 2 and 3 was there anyone who had
10      concerns, expressed objections that were
11      legislators to you about the plan, McClendon 2?
12  A.  I don't recall specifically anyone having a
13      problem.
14  Q.  Did anybody come to you about McClendon 3 and
15      express concerns?
16  A.  You know, McClendon 3 is what eventually came
17      out of the redistricting committee and went to
18      the House floor.  Well -- No.  It went to the
19      Constitution Election Committee prior to going
20      to the House floor.  And I was verbally abused
21      in C & E.  Juandalynn Givan and Demetrius
22      Newton -- Well, yeah.  Yeah.  Demetrius Newton
23      was upset with the plan, and Joe Hubbard was

Page 87

1   upset with the plan.  One white Dem and one
2   black Dem.  They were both upset.  Their
3   districts, because of population changes, were
4   moved.
5   Q.  Okay.  And let's talk a little bit about that.
6       Did you talk to Joe Hubbard about his -- the
7       changes with his plan -- Well, strike that.
8           Did you talk to Joe Hubbard about the
9       changes with his district in this plan?
10  A.  In 3.
11  Q.  Right.
12  A.  We're on 3.
13  Q.  Right.  We're on 3.
14  A.  I listened to Joe Hubbard a great deal, and I
15      responded to his protests.
16  Q.  What was the reason why Joe Hubbard's district
17      was being done away with, or moved rather?
18  A.  Moved.  We needed to repopulate the black
19      districts in Montgomery County.  We had to get
20      the people from somewhere.  All the districts
21      were underpopulated.
22  Q.  Did Hubbard bring you a plan that would have
23      allowed his district to stay in place?

Page 88

1           MR. WALKER:  Object to the form.
2   Q.  Or to stay in Montgomery County?
3           MR. WALKER:  Same objection.
4   A.  Yes.  He may have brought me more than one.  I
5       can't recall.
6   Q.  Do you remember any problem with the plan that
7       Hubbard brought?
8   A.  You know, the most common problem -- I don't
9       remember the specific problem I had with his
10      plan, but the most common problem I had with
11      most of the other plans that were submitted
12      later as we got to the floor was the deviations
13      were outside of our guidelines.  I don't
14      remember what it was with Joe's.
15  Q.  The plans that Mr. Hubbard brought to you, were
16      they sent to Mr. Hinaman to review?
17  A.  I don't think so.  I don't know where they came
18      from.
19  Q.  Oh, no.  Not that they came from Mr. Hinaman.
20      What Joe Hubbard provided you as a plan, did it
21      go to Mr. Hinaman for him to look at?
22  A.  No, it did not.  Any plan that somebody brought
23      to me that was outside of our guidelines, I

Pages 85 to 88

Deposition of James McClendon                                                    May 21, 2013

Page 89

1    didn't forward that one on.
2    Q.  And you believe it was outside the guidelines
3        because it involved over a plus or minus 1?
4    A.  I believe so. I can't specifically recall.
5    Q.  Do you remember if there was a Reed-Buskey plan
6        that was given to you regarding Joe Hubbard's
7        district?
8            (Off-the-record discussion.)
9    A.  I think that is correct. I don't specifically
10       remember. There was a lot going on at that
11       time. I do remember that phrase, the
12       Reed-Buskey phrase. Of course, I thought it was
13       James Buskey or Mr. Buskey as I call him. But I
14       found out later --
15           MR. BLACKSHER: John is dead.
16           THE WITNESS: His brother? His older
17       brother?
18   A.  Yeah. I learned more about that history later
19       on.
20   Q.  Did you -- So you remember hearing about a plan
21       that was called the Reed-Buskey Plan?
22   A.  Yes, I do.
23   Q.  Do you remember if that was --

Page 90

1    A.  I don't remember --
2    Q.  -- if you reviewed that?
3    A.  I'm sure I looked at it.
4    Q.  Do you remember what the problem was with it?
5    A.  No, sir. I don't exactly.
6    Q.  Do you remember if it would have kept Joe
7        Hubbard's district in Montgomery?
8    A.  I'm sure it would have if Mr. Hubbard brought it
9        to him.
10   Q.  What was the reason -- Tell me the reason again
11       why Mr. Hubbard's district needed to be moved
12       to -- out of Montgomery.
13   A.  The minority districts in Montgomery were
14       underpopulated.
15   Q.  So you needed more --
16   A.  We needed to pick up minorities from somewhere.
17   Q.  Did you look at any other districts that could
18       have been used, like District 69?
19   A.  I don't remember about 69, but we did look
20       around. Of course, we had another problem. The
21       other problem was all the districts in Shelby
22       County were heavily overpopulated. I think Mike
23       Hale's district had -- was like 40,000 over or

Page 91

1    something. It was unbelievable. Or 30,000.
2    Anyway, it was big.
3    Q.  And Hubbard's district was essentially moved to
4        Shelby County, which was a majority-white
5        district?
6    A.  Yeah. House District 73 is now in Shelby
7        County.
8    Q.  And is a majority-white district?
9    A.  Yes. Now -- Okay.
10   Q.  Okay. Do you recall if in 2000 to 2010 the
11       white population in Montgomery County decreased
12       by 18,000?
13   A.  The white population?
14   Q.  Yes.
15   A.  I'm not aware of that.
16   Q.  Are you aware in 2000 to 2010 the black
17       population increased around 17,000?
18   A.  Not aware of that.
19   Q.  And that other minorities increased as well in
20       Montgomery County?
21   A.  Not aware of that.
22   Q.  Would that swing of 18,000 decrease in white
23       population and 17,000 in a black population

Page 92

1    roughly be a size of a district -- House
2    district?
3    A.  The numbers were what, now? 17,000 and --
4    Q.  18,000.
5    A.  That's 35. That would be underpopulated by
6        about 10,000.
7    Q.  That's almost a district.
8            MR. WALKER: Objection to form.
9    A.  Not plus or minus 1 it's not.
10   Q.  Right. How many people do you need in a
11       district?
12   A.  It's about 45,521 or something like that.
13   Q.  So you had that swing, but Montgomery County
14       lost a House district, right?
15   A.  Correct.
16   Q.  And the House district it lost was about 44
17       percent white, 48 percent black, 50 percent
18       minority?
19   A.  It could be. I don't know exactly what it was.
20   Q.  And the district was lost to a county that is
21       majority white?
22   A.  It was moved to Shelby County, which is a
23       majority-white population.

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                    May 21, 2013

Page 93

```
 1   Q.  So how many districts now did Montgomery end up
 2       with?  House districts.
 3   A.  I don't know.
 4   Q.  Is it four?
 5   A.  I'd have to look at the map and count.  I can't
 6       answer that question.
 7   Q.  Okay.  Do you recall being contacted by Jay Love
 8       and him asking you to keep your white percentage
 9       vote or the percentage of white population in
10       his district high, above a certain percentage?
11   A.  No.  I was not.
12   Q.  Do you recall Jay Love sending you text messages
13       or contacting you by phone to say --
14   A.  No.
15   Q.  -- the plans that Hubbard is proposing -- Joe
16       Hubbard is proposing need to be voted against or
17       knocked down?
18   A.  No.
19   Q.  Do you recall anything where Jay Love was
20       lobbying to get more whites in his district?
21   A.  No.
22   Q.  Do you recall if Mr. Love ever expressed any
23       concern that if he didn't have more whites in
```

Page 94

```
 1       his district that his district -- he could end
 2       up losing his district down the road?
 3   A.  No.
 4   Q.  Do you remember any other alternative plans that
 5       were submitted for Montgomery for the House
 6       district?
 7   A.  There was one or two maybe statewide plans that
 8       were offered on the House floor which would
 9       encompass Montgomery.
10   Q.  Do you remember Mr. Love ever texting you about
11       the redistricting plans?
12   A.  I do not.
13   Q.  Do you remember him contacting you by e-mails
14       about the plan?
15   A.  No.
16   Q.  Do you remember talking to him verbally about
17       the plan?
18   A.  Oh, yes.
19   Q.  What do you remember Mr. Love telling you about
20       the plan?
21   A.  This is where we were earlier when we talked
22       about Beckman and Mask interacting over that
23       Prattville area and then Mask spilled over and
```

Page 95

```
 1       affected Wren and Love.  So there was a
 2       balancing act on each end of Elmore County, and
 3       that was what I remember.  I think that was --
 4       the biggest part of Love's contact with me dealt
 5       with Mask and Wren.  And I don't remember
 6       exactly how it went, but they were -- it seems
 7       like they could get it worked out on one end of
 8       Elmore, and it didn't work out over here.  But
 9       that was where -- Love's biggest involvement
10       with me was that.
11   Q.  What was Love wanting you to do, or what was he
12       wanting done?
13   A.  I think -- I think the summary would be he was
14       trying to keep the district as much like it had
15       been in the past as far as how Elmore and
16       Montgomery shared somebody.  I think he was
17       trying to keep it as close to the way it had
18       been.
19   Q.  Was that -- Did that affect his district, or was
20       that just dealing with other folks' district?
21   A.  No.  I think it impacted him.  I think it
22       impacted him.  Really, when somebody came in and
23       started telling me how somebody else's district
```

Page 96

```
 1       ought to be, I didn't -- I wasn't interested.
 2   Q.  But you don't ever recall Love contacting you in
 3       any way whatsoever about anything happening with
 4       Hubbard's district or what he wanted to have
 5       happen with Hubbard's district or any plans
 6       Hubbard had proposed?
 7   A.  I do not recall any specific conversation or
 8       text or anything else with Jay Love over
 9       Hubbard's plan.  Now, of course, Jay and I see
10       one another every day, you know, when we're in
11       session.  And we were in session then.  But as
12       far as any kind of -- no.
13   Q.  Do you know before McClendon 1 came out if the
14       plans or any drafts of the plans had been sent
15       to anybody except for you or committee members?
16       Y'all were working through this process coming
17       up with a plan.  Were those plans, either part
18       or all of them, given to anyone other than you
19       or Mr. Hinaman or committee members or the
20       reapportionment office?
21   A.  When 1 came off the press, it was submitted --
22       the first -- I don't know if anybody got any
23       copies of -- it went to the reapportionment
```

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 97

1    committee, and that's where it went public.
2  Q.  But before I came off the press and was given to
3     the reapportionment committee, were any members
4     of the legislature allowed to see, you know,
5     this is what we're working on; look at the
6     computer; see what we've got drawn up?  Given
7     any kind of access to what was being worked on?
8  A.  Individuals could look -- would see their own
9     district or their own area.  But there was
10    not -- if you got the whole state on a computer,
11    you couldn't tell beans.  But you could tell
12    pretty well with a district.
13 Q.  This is before McClendon 1?
14 A.  Yes.
15 Q.  So they could come by and see kind of what y'all
16    were working on?
17 A.  Their own district.
18 Q.  Their own district.  And look at their own
19    district?
20 A.  Yeah.
21 Q.  See what y'all were working on?
22 A.  Right.
23 Q.  Could they give you, I guess, feedback on how

Page 98

1    they thought the draft was going?
2  A.  That was the whole purpose of them coming by to
3     see us is to look at their own districts.
4  Q.  Do you remember anything -- any conversations
5     with anyone about their concerns relative to
6     those others other than what we've talked about?
7  A.  When you're talking about a draft, you're
8     talking about what they are looking at on a
9     computer?
10 Q.  Right.
11 A.  I wouldn't print anything off because --
12 Q.  I'm just talking about the computer before
13    McClendon 1.
14 A.  That was why they were there, to comment and
15    look at it and to look at their own districts,
16    right.
17 Q.  Would you take those comments and provide those
18    to Mr. Hinaman, or was he present when --
19 A.  He would be present.
20 Q.  He would be present when they were looking at
21    it.
22       Do you know if he was present when Democrats
23    were looking at their districts?

Page 99

1  A.  No.
2  Q.  So it was only when the Republicans were looking
3     at their districts?
4  A.  Correct.
5  Q.  Okay.  Do you know if the Democrats looked at
6     their district on the computer prior to
7     McClendon 1 coming out?
8  A.  No.
9  Q.  So it was only Republican legislators who were
10    allowed to look at their districts on the
11    computer with Mr. Hinaman prior to them being --
12 A.  Correct.
13 Q.  -- coming out?  Prior to McClendon 1 coming
14    out.  Okay.
15       I'm sorry.  You nodded your head, but she's
16    got to get the verbalization.  You said correct,
17    right?
18 A.  I did.
19 Q.  Okay.  Did you have any conversation with anyone
20    from ADC or New South Coalition about the plans?
21 A.  No.
22 Q.  Did you have any conversations with anybody from
23    the NAACP or receive any input from them

Page 100

1    regarding the plans?
2  A.  No.
3  Q.  What about any advocacy groups for any other
4     minorities?  Hispanics?  Anyone else?
5  A.  No.
6  Q.  Did you try to seek out any of those contacts --
7  A.  No.
8  Q.  -- with those groups?
9        Now, with respect to Mr. Newton's plan,
10    Representative Newton, what was the reason why
11    his House district was moved?
12 A.  All of the districts -- Jefferson County
13    minority districts were underpopulated, and we
14    had to get the people from somewhere.
15 Q.  Now, there was a plan -- I believe it was the
16    Knight plan, was it not -- that would have left
17    Newton's district in place?
18 A.  Could be.  Could be.  I don't specifically
19    recall the details of the Knight plan.
20 Q.  Okay.  Do you remember there being some
21    alternatives that were proposed --
22 A.  There were --
23 Q.  -- that would have left his in place?

Pages 97 to 100

Deposition of James McClendon                                              May 21, 2013

Page 101

1   A.  There were alternatives proposed.  But as a
2       rule, those alternatives did not fall within our
3       guidelines.
4   Q.  They didn't fall within the 1 percent?
5   A.  Correct.
6   Q.  Do you remember the Reed-Buskey plan that would
7       have left that one in place?
8   A.  I mean, there was Reed-Buskey.  But, you know,
9       Joe Reed wasn't there, and I don't know that --
10      Mr. Buskey may have offered a plan.  I'm not
11      sure.  So I'm not sure which one the Reed-Buskey
12      plan was, but I will tell you this.  It was not
13      the Thad McClammy plan.
14  Q.  But no plan regarding Newton's district that you
15      were given as an alternative was acceptable
16      because they weren't within the 1 percent?
17  A.  That's the best of my knowledge.  That is
18      correct.
19  Q.  And the same way with Hubbard?  None of the
20      alternatives you were given were within the plus
21      or minus --
22  A.  As best I can remember.  That's correct.
23  Q.  House District 53, which was Newton's district,

Page 102

1       where was that moved to?
2   A.  Madison County.
3   Q.  Is that a majority-white or majority-black
4       district?
5   A.  Majority-black district.
6   Q.  Do you know if that area could have been made a
7       majority-black district without having to move
8       House District 53?
9   A.  I don't think so.
10  Q.  Don't think so?  Could it have been -- What had
11      that area been before it was House District 53?
12      What districts had it been comprised of?
13  A.  I don't know.
14  Q.  Do you know if that was looked at as to could
15      that have been drawn so that it would have been
16      either majority-black or had a 50/50 type of
17      racial makeup?
18  A.  Madison County, opposite of Jefferson, had a
19      sufficient increase in population, and we were
20      able to capture another minority district there
21      and took advantage of doing that.
22  Q.  Did y'all -- When you were looking at the
23      minority districts, were you looking at the

Page 103

1       black population or were you also looking at
2       other minorities?  Hispanics?
3   A.  Black.
4   Q.  Just black.  Okay.
5       Do you know if House District 53 or --
6       Strike that.
7       Do you know if the district in Huntsville
8       could have been drawn with the majority of
9       minorities in that district if it had included
10      both Hispanics and blacks?
11  A.  Do that again.
12  Q.  All right.  That was a lot.
13      Do you know if where House District 53 was
14      moved to Huntsville could have been drawn as a
15      district that was a majority-minority district
16      if you were looking at minorities in terms of
17      blacks and Hispanics as minorities?
18  A.  We just -- I don't quite get the question, but I
19      will say that our concern on minority districts
20      was African-Americans.
21  Q.  So you didn't really factor in the Hispanic
22      population?
23  A.  I didn't.

Page 104

1   Q.  Did different committee -- different persons
2       serving on the reapportionment committee have
3       concerns or raise any concerns or questions
4       regarding the plan that was proposed for the
5       House districts?
6   A.  You mean in opposition to what was put before
7       them?
8   Q.  Yes.
9   A.  I would say, generally speaking, in the
10      reapportionment committee and the constitutional
11      elections and the House floor, probably, if you
12      looked at that it, was a partisan vote every
13      time.
14  Q.  I guess what I was wondering is say a committee
15      person had a concern or a question.  Would that
16      information then be passed on to Mr. Hinaman to
17      provide an answer regarding why something was
18      done a certain way or to address that concern?
19  A.  As far as changing them out?
20  Q.  Yes.
21  A.  Proposals came before the committee -- would
22      start out with the reapportionment committee.
23      I'm trying to remember if they were -- I think

Pages 101 to 104

Deposition of James McClendon                                      May 21, 2013

Page 105

1   there was the first meeting where we had a map.
2   I think we did adopt something other than what I
3   brought forward.  Another plan came forward.
4   That had to do with -- I think that was the
5   Shoals area, some kind of changes up there.
6   Q.  Did that --
7   A.  I'm trying to remember if that was House
8   districts or Senate districts.  And I'm not
9   sure, but it seems like we adopted something
10  other than what we put before them to begin with
11  on one of those plans.
12  Q.  Would those proposals then go to Mr. Hinaman to,
13  I guess, provide y'all some feedback or
14  to consult --
15  A.  Or to Bonnie.
16  Q.  So one or both?
17  A.  One or both.
18  Q.  Are you familiar with the term "packing
19  districts"?
20  A.  I have heard that term.
21  Q.  What's your understanding of that term?
22  A.  The first time I heard that, packing and
23  stacking, was on the House floor, and I thought

Page 106

1   what in the world.  But I kind of put it
2   together.
3   Q.  Okay.
4   A.  Which I presume means you intentionally crowd
5   the number of a group.  I guess it could be
6   white Republicans or whites or blacks.  In this
7   case it would be putting as many blacks in a
8   district so you've got whiter districts over
9   here.  I think that's what that means.
10  Q.  With packing, do you understand what -- have you
11  been advised as to what a percentage of either
12  the total population or voting-age population of
13  a specific minority would be considered too high
14  to be so -- that it would be packing?
15         MR. WALKER:  Object to the form.  You
16         may answer.
17  A.  No.  I haven't been advised that if you go over
18  a certain number, you're in trouble.
19  Q.  Right.  You've never heard, you know, we don't
20  want to go over X number in a specific district
21  because if we do, then that will be packing or
22  that would be questionable?
23  A.  Well, let me tell you how I thought about the

Page 107

1   process.  If I could stay -- If a district was
2   57 percent minority as it is today or in 2010
3   and when we redistrict it, if I can stay close
4   to that number, I'm not having an impact, which
5   is -- seems like what you're trying to do is not
6   go in there yourself and monkey with a
7   district.
8        So, you know, if a district was 72 percent,
9   if you made it 69, I don't think that's a big
10  impact.  But if you made it 51, that would be
11  suspicious by anybody's ...
12  Q.  What if like in House District 73 where it comes
13  from a majority black to a majority white?
14         MR. PARK:  Object to the form.
15         MR. WALKER:  Object to the form.
16  A.  In 73?
17  Q.  Uh-huh (positive response).
18  A.  Well, of course, that wasn't a minority district
19  anymore.  In fact, you know, the two legislators
20  out of 73 were white.
21  Q.  Right.  But 73 had 48 percent black, 43 percent
22  white --
23  A.  I remember you said 48.

Page 108

1   Q.  And then other minorities raised the minority
2   level to 50 percent.  It's now majority white.
3   A.  Right.
4   Q.  So I'm asking, is that an adverse effect?
5   A.  We moved --
6         MR. WALKER:  Objection to form.
7   A.  We moved the district to where the people were.
8   I guess sometimes you can't just -- you can't
9   keep everything like it was because populations
10  shift.  If the population didn't shift, you
11  wouldn't do the census.
12  Q.  But you had mentioned that you were trying not
13  to have drastic changes.  I mean, you will agree
14  with me that was a pretty substantial change as
15  far as District 73 goes as to the percentage
16  population of white and black that make up that
17  district.
18  A.  I will agree with you on that.
19  Q.  Okay.  Now -- So you've never been advised that
20  if you have a certain number of a particular --
21  percentage of a particular race in a county --
22  if you increase that percentage to a certain
23  level, that that's going to be too much or is

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon                                    May 21, 2013

Page 109

1    concerning and possibly be packing and that sort
2    of ...
3    A.  My real concern was going the other direction
4        with the minority district.
5    Q.  Going down?
6    A.  Yes.
7    Q.  Yeah.  Because Senator Dial testified that he
8        didn't think there was a problem really with
9        going -- as long as you were going up in the
10       percentage of minorities in a district.  Do
11       you --
12   A.  I differ a little bit on that.  I gave an
13       example.  If you had a district that was 62 and
14       you made it 60, from just a racial standpoint, I
15       don't see how you're having a big outcome on the
16       outcome of an election.
17   Q.  What if -- so you wouldn't have -- you don't --
18       You wouldn't have a concern about packing if it
19       was moved, say, from 60 to 65 percent?
20   A.  No.  I don't see that's a red flag.  And, of
21       course, the red flag we're looking for is what's
22       the DOJ going to think about it.
23   Q.  Or from 65 to 70?  That would not have been

Page 110

1        something you were concerned with?
2    A.  Right.  But I don't think we had any cases like
3        that.
4    Q.  Okay.  Did any of the legislators or any of the
5        folks speaking at the public hearings express
6        any concerns that the plan that was being
7        proposed was going to result in pulling blacks
8        from certain districts and concentrating them in
9        black-majority districts?
10   A.  This would be packing?
11   Q.  Packing, yes.
12   A.  You know, I really -- if that came up, it was
13       not a constant theme by any means.  It was -- It
14       just wasn't a high priority issue that I recall
15       these folks talking about that.
16   Q.  Do you remember anyone saying that by doing --
17       that if there was packing occurring, that it was
18       reducing the influence that African-American
19       voters could have in other districts, if they
20       were being taken from that district and being
21       placed --
22   A.  You know --
23                MR. WALKER:  Object to the form.  You

Page 111

1        may answer.
2    A.  I remember that discussion on the House floor,
3        and it would not surprise me if it came up
4        during our travels around the state to some
5        extent or another.  But I remember that
6        discussion more once we got on the House floor
7        than I do out when we were making the rounds
8        around the state.
9    Q.  Did anybody bring it up in any of the committee
10       meetings?  I mean either the public hearing
11       meetings or when you had the committee meeting
12       to approve the plan.
13   A.  You know, I think quite possibly, but I don't
14       remember a specific conversation on that.
15   Q.  Do you remember that being, you know, addressed
16       with anyone like Mr. Hinaman to get his advice
17       on whether there was a problem with packing or
18       whether that would have an adverse effect on
19       other districts if the percentages of
20       African-American voters were raised in certain
21       districts?
22   A.  You know, when --
23                MR. WALKER:  Object to the form.

Page 112

1    A.  -- when we would have a group, especially
2        several districts that we were fitting the
3        puzzle together to try to make it work, I would
4        get with Mr. Walker.  I'd say, would you please
5        look over -- I did this many times -- look over
6        this and see if we're staying in our own
7        guidelines and see if this looks like it's
8        something that's not going to raise red flags
9        with the DOJ.
10   Q.  Did Mr. Hinaman make the recommendation to move
11       District 73 out of Montgomery to Shelby County?
12   A.  Yes.
13   Q.  Did Mr. Hinaman make the recommendation to move
14       representative Newton's district to Huntsville?
15   A.  Yes.
16   Q.  Representative Newton had been the speaker of
17       the House at one time?
18   A.  Pro temp -- President pro temp of the House.  It
19       would be number two in the pecking order.
20   Q.  Okay.  Was the move -- Well, strike that.
21            Was the origin of the idea to move Newton's
22       district to Huntsville, did that come from
23       Mr. Hinaman?

Pages 109 to 112

Deposition of James McClendon                                                              May 21, 2013

Page 113

1   A.  Yes.
2   Q.  What about to move Hubbard's district to Shelby
3       County?  Did that come from Mr. Hinaman?
4   A.  Yes.
5   Q.  Do you know if any of the alternative plans that
6       were proposed, either with regard to Hubbard's
7       district or with regard to Newton's district, if
8       those alternatives would have met the plus or
9       minus 5 percent variation standard?
10  A.  What I mostly remember is they would not have
11      met plus or minus 1.  So when the numbers went
12      beyond that ...
13  Q.  You just didn't even look at it or consider
14      that?
15  A.  Right.
16  Q.  So you never analyzed it to see, well, you know,
17      this would have come under the plus or minus 5?
18  A.  5 wasn't on my radar.
19  Q.  Okay.  Was there a delay in the maps coming
20      out -- being generated?
21          MR. WALKER:  Objection to form.
22  Q.  Did the --
23  A.  Are you talking about -- Where are we, now?

Page 114

1   Q.  All right.  Was there a delay first where you
2       weren't able to vote in the regular session and
3       you had that special session?  Was there a delay
4       in the maps coming out in time to do that, to
5       get it in front of the legislature?
6   A.  I don't remember about the maps.  I do know that
7       originally in the session, I had actually set up
8       a time -- a schedule where we would sort of
9       recess the -- toward the end of the regular
10      session, we would recess for a week or something
11      like that and then hold a special session within
12      the regular and then go to the last day or last
13      few days -- I mean, hold a special and then
14      resume the regular session and pick it up.  But
15      for whatever reason, the leadership ended up
16      changing that, and we went straight -- we just
17      kept the regular session on the normal schedule
18      you would have and adjourned, I think, just over
19      a weekend and then started on Monday after sign
20      and dial on the regular session and then did
21      five straight days.
22  Q.  Do you remember if there was ever a delay in
23      receiving maps, either the final map or either

Page 115

1   preliminary maps, from Mr. Hinaman because he
2   hadn't been paid?
3   A.  No.
4   Q.  Saying he wouldn't forward them until he got
5       paid?
6   A.  No.  In fact, the plan was to release individual
7       maps a weekend -- at least a weekend prior to
8       coming in to begin the special session.  And I
9       had thought my best bet would be to have those
10      maps ready Thursday upon adjournment.  Everybody
11      get their maps, go home, show it to the mayor or
12      whatever they want to do with it.  But on
13      Wednesday, somehow word got out that if you go
14      up to the reapportionment office, you can get a
15      map of your district.  And it did exactly what I
16      thought it would do.  They were all going up
17      there getting their maps and coming back down,
18      and nobody was paying attention to the business
19      of the State.  So actually the maps really ended
20      up -- I don't know what the Senate did, but in
21      the House, they got their maps a day before our
22      plan.
23  Q.  Why did it have to come before a special session

Page 116

1   instead of going through the regular session?
2   A.  Why have a special --
3   Q.  Yeah.
4   A.  -- to deal with it?  Oh.  Because of the
5       distractions of a regular session.  We could
6       have -- By having it in a special, you focus on
7       that topic that the governor has called.  But
8       when you've got it in a regular, you'll have
9       folks trading district lines for line items in
10      the budget.
11          MR. PARK:  Well, everything has a
12      place.
13  Q.  So that was the reason it was put in a special
14      session instead of being in a regular session?
15  A.  That was the intent from day one.
16  Q.  From day one it was to have it in a special
17      session --
18  A.  That is correct.
19  Q.  -- and not a regular session?
20          MR. PATTY:  That's all I have.
21          MR. BLACKSHER:  I don't have any
22      further questions.
23          MR. WALKER:  I've got a few.

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Page 117

1          Jack?
2          MR. PARK:  I've got one or two.
3          EXAMINATION
4  BY MR. PARK:
5     Q.  They asked you about House Bill 16.  When did
6        you first see House Bill 16?
7     A.  That was Mr. Knight's.
8     Q.  I believe that's what they called it.
9     A.  On the House floor.
10    Q.  On the House floor in the special session?
11    A.  Yes.
12    Q.  What day would that have been?
13    A.  I don't know.  We laid this out so carefully.
14       It was a five-day session.
15    Q.  Committee -- The House committee day 1?  Floor
16       day 2?
17    A.  No.  I think that bill came to us on the House
18       floor, so it would probably be on day 2 of the
19       session, I believe.  I know I got a couple -- we
20       had some things offered in the redistricting
21       committee, but it seems like there was maybe a
22       couple of statewide plans offered on the House
23       floor once we got to the floor.  But I believe

Page 118

1        when Mr. Knight's bill came forward, it was on
2        the floor of the House.
3     Q.  Did Mr. Knight talk to you about it or what was
4        in it before it was filed?
5     A.  No.
6          MR. PARK:  I think that's all the
7             questions I've got.
8          EXAMINATION
9  BY MR. WALKER:
10    Q.  There was also, apparently, a proposed bill by
11       Mr. McClammy.  Was that a statewide plan?
12    A.  I do know Mr. McClammy came to me early on with
13       the Montgomery area, and I'm trying to remember
14       if Mr. McClammy came to me with a statewide bill
15       on the House floor.  He might have, but I cannot
16       say for certain.
17    Q.  Did Mr. McClammy ever talk to you about what you
18       might want for your district?
19    A.  No.
20    Q.  Are you aware if he talked to any white people
21       about how they wanted their districts?
22    A.  Not to my knowledge.
23    Q.  Who did you talk to during the run-up to

Page 119

1        redistricting?
2     A.  You mean getting ready to introduce a bill?
3     Q.  When the new plan was being drawn when you were
4        meeting with people --
5     A.  Oh.
6     Q.  -- were you available to every --
7     A.  Every House member.  I made myself available to
8        every House member.  Now, not every House member
9        came in.
10    Q.  Did any African-American House members come in
11       and talk to you?
12    A.  Oh, yes.
13    Q.  Did any of those people say they wanted fewer
14       blacks in their district?
15    A.  Nobody said that.  None of the African-American
16       members requested fewer blacks.
17    Q.  Did any Democrat request fewer Democrats in
18       their district?
19    A.  No.  That didn't happen either.
20    Q.  You attended all of the public hearings, I
21       believe.
22    A.  Yes.
23    Q.  Did any citizens of the public who were

Page 120

1        African-American come and say they wanted to be
2        put into a majority-white district?
3     A.  That did not happen.
4     Q.  In fact, they all expressed desire for strong
5        majority-black districts, did they not?
6          MR. BLACKSHER:  Object to the form.
7          MR. WALKER:  It was a leading
8             question.  It wasn't proper, but
9             that's okay.
10            I don't think I have anything
11            else.
12         MR. PATTY:  Just a couple.
13         EXAMINATION
14 BY MR. PATTY:
15    Q.  Do you -- I know you may not remember this, but
16       with the Reed-Buskey plan, do you remember if it
17       proposed having -- lowering the number of
18       African-Americans in Ms. Todd's district, who is
19       a Democrat?
20    A.  Lowering the number of African -- I don't
21       remember.  It wouldn't surprise me.
22    Q.  Okay.
23         MR. PATTY:  That's all I've got.

Pages 117 to 120

Page 121

1      MR. WALKER:  I've got one question I
2         forgot to ask, if I may.
3         EXAMINATION
4  BY MR. WALKER:
5  Q.  When you started the redistricting process, was
6      any analysis made of whether, given population
7      changes in Alabama, it was possible to create
8      any additional majority-black districts over
9      what had been in the --
10        Are we calling it the 2001 or 2002 plan?
11        2001 plan.
12  A.  In fact, we did -- we had one -- we had a
13      district with a black representative, and that
14      district was -- if I recall, it was like 48
15      percent black.  And we actually made a conscious
16      effort to bump that up, and I think we may have
17      gotten it to 51-and-a-half percent or
18      something.  So we actually raised that number.
19        Now, as far as --
20  Q.  Raised what number?
21  A.  The number of districts that had a majority of
22      minorities as --
23  Q.  In the House?

Page 122

1  A.  -- in the House.  I don't know about the Senate.
2         And we did that, and we actually looked to
3      see is there a way to configure another
4      majority-minority district, and the numbers were
5      simply not there.
6         Did I answer your question, Dorman?
7         MR. WALKER:  You did answer my
8         question.  Thank you very much.
9         That's all I have.
10        MR. PATTY:  One last one.
11        EXAMINATION
12  BY MR. PATTY:
13  Q.  You mentioned earlier that you talked about how
14      Republican House members came to see the
15      preliminary drafts on the computers with
16      Mr. Hinaman and were able to go through it.  Do
17      you remember if -- I know you testified that the
18      Democrats did not do that.  Do you remember if
19      that was offered to the Democrats, to come sit
20      down with Mr. Hinaman and look at the draft on
21      the computer?
22  A.  It was not offered.
23        MR. PATTY:  That's all.

Page 123

1      THE WITNESS:  Mr. Hinaman worked for
2         the Republicans -- Republican
3         Caucus.
4      (Deposition concluded at approximately
5         4:25 p.m.)
6
       * * * * * * * * * * * * *
7
       * * * * * * * * * * * * *
8
9      FURTHER DEPONENT SAITH NOT
10        * * * * * * * * * * * * *
11     REPORTER'S CERTIFICATE
12  STATE OF ALABAMA:
13  MONTGOMERY COUNTY:
14     I, Pamela A. Wilbanks, Registered Professional
15  Reporter, ACCR #391, and Commissioner for the State of
16  Alabama at Large, do hereby certify that I reported the
17  deposition of:
18        JAMES MCCLENDON
19  who was first duly sworn by me to speak the truth, the
20  whole truth and nothing but the truth, in the matter
21  of:
22        ALABAMA LEGISLATIVE BLACK
23        CAUCUS, et al.,

Page 124

1         Plaintiffs,
2         Vs.
3         THE STATE OF ALABAMA, et al.,
4         Defendants.
5         In The U.S. District Court
6         For the Middle District of Alabama
7         Northern Division
8         2:12-CV-0069-WKW-MHT-WHP
9         * * * * * * * * * * * * *
10        DEMETRIUS NEWTON, et al.,
11        Plaintiffs,
12        Vs.
13        THE STATE OF ALABAMA, et al.,
14        Defendants.
15        In The U.S. District Court
16        For the Middle District of Alabama
17        Northern Division
18        2:12-CV-0069-WKW-MHT-WHP
19  on Tuesday, May 21, 2013.
20     The foregoing 123 computer printed pages
21  contain a true and correct transcript of the examination
22  of said witness by counsel for the parties set out
23  herein.  The reading and signing of same is hereby not

Deposition of James McClendon                                                   May 21, 2013

Page 125

```
 1   waived.
 2        I further certify that I am neither of kin nor
 3   of counsel to the parties to said cause nor in any
 4   manner interested in the results thereof.
 5        This 7th day of June 2013.
 6
 7
 8
 9
10
11
12
13        _____
          Pamela A. Wilbanks, ACCR #391
14        License Expires:  9/30/2013
          Registered Professional Reporter
15        and Commissioner for the State
          of Alabama at Large
16
17
18
19
20
21
22
23
```

6/7/13
Mr. James McClendon
361 Jones Road
Springville, Alabama  35146
IN RE:  ALABAMA BLACK CAUCUS AND NEWTON VS. THE STATE OF
        ALABAMA

Dear Mr. McClendon:

Enclosed is a copy of the transcript of your deposition
taken on Tuesday, May 21, 2013.  Please read the
transcript and make any corrections on the correction
sheet provided specifying the page and line number of
each correction.

You will find the original signature page attached to the
front of the transcript.  Even if there are no
corrections, please sign the original signature page and
have your signature notarized.
Please return the signature page and correction sheet
within thirty days.  The list of corrections will be
attached to the original deposition and all parties will
be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,


Pamela A. Wilbanks, RPR

cc:  Mr. Jim Blacksher
     Mr. Bill Patty
     Mr. Dorman Walker
     Mr. Jack Park

---

     I, James McClendon Dial, hereby certify that I have
read the foregoing transcript of my deposition given on
Tuesday, May 21, 2013, and it is a true and correct
transcript of the testimony given by me at the time and
place stated with the corrections, if any, and the
reasons therefor noted on a separate sheet of paper and
attached hereto.



     _____
          James McClendon



     SWORN TO AND SUBSCRIBED before me this _____
day of _____, 20___.



_____
          NOTARY PUBLIC

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

Deposition of James McClendon

May 21, 2013

Page 128

**A**

**able** 33:15 40:7 49:12 51:9 63:18 102:20 114:2 122:16
**absent** 54:8
**absolutely** 69:14
**abused** 86:20
**acceptable** 101:15
**accepted** 41:14
**access** 81:21 82:1 97:7
**accommodate** 41:16 77:7
**accomplished** 49:6
**accountability** 28:6
**ACCR** 2:3 4:6 123:15 125:13
**accusation** 69:11
**acknowledge** 30:15
**act** 6:15 11:23 24:9 24:10 31:4 44:18 58:5 59:17 74:1 95:2
**ACTION** 1:7,13
**actions** 14:14
**ADC** 99:20
**added** 16:8
**additional** 121:8
**address** 5:13 104:18
**addressed** 21:4 111:15
**adjacent** 30:17 76:22
**adjourned** 114:18
**adjournment** 115:10
**adjustments** 76:3 76:10 77:10,11
**adopt** 24:16 41:17 105:2

**adopted** 22:12,12 25:9 36:14,17 105:9
**adopting** 22:15,16 71:1
**advantage** 102:21
**adverse** 108:4 111:18
**advice** 111:16
**advise** 24:16
**advised** 106:11,17 108:19
**advocacy** 100:3
**affect** 50:16 77:5 95:19
**African** 120:20
**African-American** 63:11,15,19 110:18 111:20 119:10,15 120:1
**African-Americ...** 103:20 120:18
**agencies** 65:15,17 65:17
**agency** 65:14
**ago** 66:23 69:8
**agree** 28:11,17,18 29:19 34:5 35:8 70:15,17 108:13 108:18
**agreed** 4:1,15,22 29:8 37:4
**agreement** 2:2 14:23 54:2 71:10
**ahead** 28:23 38:14
**ahold** 8:18
**al** 1:5,8,11,15 123:23 124:3,10 124:13
**Alabama** 1:2,5,8 1:15 2:4,6,10,13 2:17,18 3:4 4:7 5:14,19,22 54:3 55:17,23 62:22

67:14 82:22 84:3 121:7 123:12,16 123:22 124:3,6 124:13,16 125:15 127:3,4,4
**allowed** 87:23 97:4 99:10
**allows** 36:11
**alphabetical** 61:13
**alternative** 94:4 101:15 113:5
**alternatives** 100:21 101:1,2 101:20 113:8
**AL.com** 67:11
**amendments** 25:5
**amounts** 63:22
**analysis** 121:6
**analyzed** 113:16
**ANDERSON** 2:16
**Anniston** 27:2,3,4 37:12
**answer** 12:23 33:12 40:21 42:4 44:6,8 55:21 58:11 59:8 62:8 71:8 72:21,22 93:6 104:17 106:16 111:1 122:6,7
**answers** 11:7
**anybody** 17:6 55:8 55:17,23 77:9 85:16 86:14 96:15,22 99:22 111:9
**anybody's** 70:6 107:11
**anymore** 107:19
**anyway** 63:15 84:17 91:2
**apparently** 118:10
**APPEARANCES** 2:9

**appears** 63:9 74:18
**application** 66:9
**applications** 66:7
**applied** 77:16
**apply** 23:18
**appoint** 7:15
**appointed** 7:10,14 8:10
**appointments** 7:11
**approached** 47:15
**appropriate** 24:3
**approval** 62:13
**approve** 62:9 111:12
**approximately** 2:7 123:4
**Arabic** 24:12
**ARC** 9:13
**area** 20:22,22 30:13 34:19 43:6 45:6 56:15,23 57:2 65:11 67:1 84:15 94:23 97:9 102:6,11 105:5 118:13
**areas** 76:9 81:12 86:5
**argued** 68:3
**arguing** 25:19
**argument** 26:4,12 65:2
**arguments** 25:22 25:23
**Armstead** 12:4 54:4
**article** 3:17 67:7 69:9
**aside** 17:7 24:10
**asked** 8:8 12:19,19 12:21 48:17 57:10 117:5
**asking** 17:5 22:4 42:6 53:1 93:8 108:4

**assembly** 54:23
**assigned** 13:22
**assist** 11:21
**assistance** 17:11 65:8
**Atlanta** 2:22
**attached** 126:7 127:9,13
**attended** 37:13 119:20
**attention** 67:17 115:18 127:14
**Attorney** 2:12,20
**Attorneys** 2:16 3:3
**at-large** 7:13
**Autauga** 44:13,20 46:3,4 74:4
**available** 82:15 119:6,7
**avoid** 71:21 72:7
**avoided** 39:17 70:20 72:10
**aware** 58:12 59:9 82:12 91:15,16 91:18,21 118:20

**B**

**back** 14:9 16:15 17:19 38:4 48:16 51:12 58:19 67:4 75:6 79:10 80:22 85:3,6,7,9 115:17
**backtrack** 38:1
**bad** 24:6
**balance** 85:5
**balancing** 70:19 95:2
**Balch** 2:5 3:2
**ballpark** 10:10
**Barry** 46:19
**based** 7:12 56:16 70:1 74:13
**Beach** 80:11
**beans** 97:11

Deposition of James McClendon

May 21, 2013
Page 129

**Beckman** 45:17,18
45:23 46:1,2,23
48:5 94:22
**began** 19:22
**beginning** 43:10
**begun** 20:5
**behalf** 25:23 26:12
26:20 28:1 83:1
**believe** 20:17 34:6
38:13 46:4,18,21
62:2 74:8 76:11
89:2,4 100:15
117:8,19,23
119:21
**bell** 9:11
**beneficial** 65:21
**best** 36:16 77:8
101:17,22 115:9
**bet** 115:9
**better** 7:20,22 28:9
**beyond** 113:12
**Bibb** 74:2
**big** 24:7 44:16 58:7
91:2 107:9
109:15
**bigger** 24:20 50:20
71:11
**biggest** 95:4,9
**bill** 12:4 54:3
61:17 71:16
117:5,6,17 118:1
118:10,14 119:2
127:20
**bills** 14:10 35:13
**Bingham** 2:5 3:2
**bipartisan** 64:21
**Birmingham** 2:13
20:22
**bit** 16:15 87:5
109:12
**black** 1:5 2:11 56:9
56:20 82:23
83:17,18 84:22
87:2,18 91:16,23

92:17 103:1,3,4
107:13,21 108:16
121:13,15 123:22
127:4
**blacks** 56:6 103:10
103:17 106:6,7
110:7 119:14,16
**Blacksher** 2:12
3:10 5:10 18:6
32:19 55:15 63:5
73:12 75:18,21
77:13 89:15
116:21 120:6
127:19
**black-majority**
110:9
**blatant** 81:7
**block** 23:5 52:6
**Blount** 84:16
**blue** 34:19
**board** 13:6 21:20
27:22 37:16,18
**boasted** 40:6
**Bobby** 63:13
**Boman** 3:17 67:7
69:8,12,19 70:4,4
**Boman's** 67:15
68:14
**Bonnie** 9:7 52:5
83:9,22 105:15
**book** 78:5
**boundaries** 25:12
36:12 37:7,8
39:18
**boundary** 26:21
34:20 40:12
**break** 75:19
**Brief** 16:13 18:11
31:3 55:16 59:16
75:17,23
**bring** 8:16 20:18
76:12,14 77:4,5
87:22 111:9
**bringing** 21:1

**Brockington** 2:20
**brother** 89:16,17
**brought** 68:14
88:4,7,15,22 90:8
105:3
**budget** 116:10
**built** 42:19
**bump** 121:16
**Burdine** 83:1
**business** 57:5
115:18
**Buskey** 89:13,13
101:10

---

**C**

C 86:21
**call** 16:9 56:12
67:17 89:13
**called** 9:13 33:2
85:12 89:21
116:7 117:8
**calling** 121:10
**calls** 64:6
**caption** 16:10
**captioned** 67:12,14
**capture** 102:20
**care** 37:21 47:14
**carefully** 117:13
**cartographers**
17:15
**case** 4:16,18 16:9
16:10 26:1 40:4
71:20,22 106:7
**cases** 50:21 72:2
110:2
**Caucus** 1:5 2:11
11:21 12:11
17:16 53:8,9
123:3,23 127:4
**caucuses** 76:14
**cause** 125:3
**cc** 127:19
**census** 50:18 56:17
108:11

**certain** 93:10
104:18 106:18
108:20,22 110:8
111:20 118:16
**certainly** 58:22
59:1,2 71:4 72:10
**CERTIFICATE**
123:11
**certify** 123:16
125:2 126:1
**ceteris** 68:17
**chair** 7:15,17
13:18 54:16
**chaired** 62:17
**chairs** 7:17,18
**chance** 39:23
**change** 51:18 68:4
108:14
**changed** 29:20,21
67:2
**changes** 53:2 76:4
83:21 84:2 87:3,7
87:9 105:5
108:13 121:7
127:13
**changing** 104:19
114:16
**check** 52:19
**checking** 58:17
**chief** 12:20
**Chilton** 73:3,4,5,8
73:15 74:1,6,7,23
74:23 75:4
**choice** 41:6
**Chris** 61:18,19
**circle** 65:16
**circulated** 77:20
**citizens** 20:18
28:17 29:3 61:3
119:23
**city** 38:20
**Civil** 1:7,13 4:4
**claims** 69:12
**Clair** 26:21 27:21

28:3,4,17 29:12
29:16,17 30:22
31:4,11 32:3,8
33:2,11,20 34:3
34:13,18,19 35:9
35:18,21 36:22
37:16 60:3,17,22
**clarify** 6:10 19:8
**clear** 24:23 64:12
**click** 56:15
**clients** 71:17
**close** 61:18 80:15
80:16 95:17
107:3
**closer** 24:1,19
**clue** 61:13
**Coalition** 99:20
**cold** 8:2
**Coleman** 84:21
**collectively** 53:10
**colors** 34:7,21,22
**come** 13:16 16:6
19:11,16 24:18
32:20 34:11 49:4
49:19,20 50:11
52:13,19 53:13
53:22 59:14 68:5
71:17 72:2 78:3
78:18 85:7,9,12
86:14 97:15
112:22 113:3,17
115:23 119:10
120:1 122:19
**comes** 33:11 66:6
66:16 80:4,5
107:12
**coming** 30:10
80:23 96:16 98:2
99:7,13,13
113:19 114:4
115:8,17
**commencing** 2:7
**comment** 69:17
98:14

Haislip, Ragan, Green, Starkie & Watson, P.C.
334.263.4455

comments 98:17
Commerce 2:17
commission 4:8
Commissioner 2:4
  4:7 123:15
  125:15
committee 5:23 6:2
  7:9,16 8:11,13
  12:8 13:19,21
  15:9,20 17:10
  19:17 21:3 22:12
  24:21 25:4,5,6
  36:14,18 37:2
  54:4,17 55:6
  57:11 62:15,18
  86:17,19 96:15
  96:19 97:1,3
  104:1,2,10,14,21
  104:22 111:9,11
  117:15,15,21
common 28:18
  53:12 88:8,10
communicated
  55:18
communicating
  48:18
communications
  54:20 55:5
compact 50:22
compared 59:17
complete 19:7 36:1
  73:16
compliance 11:22
  12:1 24:8
comply 22:7 58:18
comprised 44:14
  102:12
computer 17:14
  43:2 49:23 51:21
  51:23 52:2,7 56:4
  77:16 84:6,9 97:6
  97:10 98:9,12
  99:6,11 122:21
  124:20

computers 122:15
conceded 68:2
concentrating
  110:8
concept 22:20 59:2
concern 76:23
  93:23 103:19
  104:15,18 109:3
  109:18
concerned 44:22
  110:1
concerning 3:17
  49:13 109:1
concerns 48:3
  85:16 86:10,15
  98:5 104:3,3
  110:6
concluded 123:4
conducted 10:21
conference 8:4
  13:14 14:2 54:13
conferences 8:3
configure 122:3
confuses 70:5
Congress 64:6
congressional 7:12
  13:7 22:20 23:1
  23:11,16
connections 6:12
conscious 121:15
consider 113:13
consideration
  26:15 30:16
  46:14
considered 106:13
consolidated 14:13
constant 43:9
  110:13
constituent 29:6
constituents 28:21
  64:14 65:22
  68:23
Constitution 22:9
  25:16 29:10

86:19
constitutional
  62:20 104:10
consult 105:14
consulted 55:9,9
  55:18,19 56:1
contact 17:17,22
  95:4
contacted 85:11
  93:7
contacting 93:13
  94:13 96:2
contacts 65:12
  100:6
contain 124:21
contained 73:8
  74:9
contiguous 53:12
  83:3,20 85:2
continue 28:22
  31:4
contract 17:3,4
conversation 96:7
  99:19 111:14
conversations
  79:14 98:4 99:22
Coosa 74:3
copies 20:4 38:8
  39:3,3 96:23
copy 3:16,17 6:15
  21:12 32:22 50:1
  50:2,2,5 127:6
corner 20:9 45:5
  47:5
correct 5:16,18,21
  6:1 7:4,7 23:7
  28:15 31:7,15,21
  32:2 33:19,22
  37:5 38:9,10
  46:18,21 48:9
  50:13 52:8 54:9
  54:18 63:20,21
  69:23 73:23
  74:16 82:16 89:9

92:15 99:4,12,16
  101:5,18,22
  116:18 124:21
  126:3
correction 80:19
  127:7,8,12
corrections 126:5
  127:7,10,12
correctly 11:18
  81:4
counsel 4:2,16
  14:14 124:22
  125:3
count 70:8,10
  75:15,15 80:16
  93:5
counted 69:1
counties 28:5 43:8
  53:12 57:12 59:2
  59:12 68:3 71:3
  74:3,5 75:3 80:17
county 25:12 26:1
  26:12,21 27:21
  28:1,3,4,17 29:3
  29:12,14,17,18
  29:23 30:4,19,23
  31:4,11 32:8 33:2
  33:11,21 34:3,13
  34:16,18,19 35:9
  35:14,18,21,22
  36:12,22 37:7,8
  37:16 39:12,17
  40:1,9,12,12,14
  41:12,23 42:2
  43:12 44:2,13,15
  46:3,3,17,20,22
  47:9,11,18,20
  48:11 57:20,22
  58:3,6,7,14 59:5
  59:19,19 60:3,4,5
  60:9,16 61:7,15
  61:16 62:5,21,21
  62:22 63:9,13
  64:14,16 65:4,5,7

65:23 66:12,16
  66:21 68:5,6,10
  68:15,23 69:2,5
  69:20,22 70:12
  70:15,21 72:19
  73:3,4,5,8,10,15
  73:16 74:1,3,4,4
  74:7,10,11,12,23
  74:23 75:1,4,10
  83:17 84:22
  87:19 88:2 90:22
  91:4,7,11,20
  92:13,20,22 95:2
  100:12 102:2,18
  108:21 112:11
  113:3 123:13
County's 63:17
  66:14 74:6
couple 117:19,22
  120:12
course 6:9 24:7
  43:1 50:18 51:20
  59:22 78:22
  83:10 89:12
  90:20 96:9
  107:18 109:21
court 1:1 23:20
  25:18,20 36:11
  72:3 82:5 124:5
  124:15
courtesy 64:9,10
courts 23:15
co-chair 13:18
  54:19
co-chairman 5:22
create 121:7
creating 71:4
crossing 39:17
  40:12
crowd 106:4
cry 67:14
CSL 8:3
curious 8:7
current 30:3 32:5

81:17
**customs** 64:8,9
**cut** 68:2

**D**

**damage** 72:16
**Dan** 3:17 67:7
68:14
**Daniel** 67:15
**data** 56:18,19,21
**date** 10:19
**day** 96:10 114:12
115:21 116:15,16
117:12,15,16,18
125:5 126:16
**days** 114:13,21
127:12
**dead** 89:15
**deaf** 37:12
**deal** 36:5 76:18
83:10 87:14
116:4
**dealing** 57:19 64:3
95:20
**dealt** 29:11 44:22
95:4
**Dear** 127:5
**December** 8:2
**decided** 30:12
51:18
**decision** 19:23
**decrease** 91:22
**decreased** 91:11
**defendant** 2:18
14:13,15
**Defendants** 1:9,16
3:1 124:4,14
**definitely** 37:9
**DeKalb** 57:20,21
58:3,6,7 59:5
**delay** 113:19 114:1
114:3,22
**delegation** 32:3
33:21 35:14 36:6

43:21 63:18 64:9
65:20 68:7,16,19
69:3,5,23 74:6,22
75:4
**delegations** 44:3
64:4 66:14
**Dem** 87:1,2
**Demetrius** 1:11
86:21,22 124:10
**Democrat** 69:8
70:5 71:18
119:17 120:19
**Democratic** 17:16
44:1 50:23
**Democrats** 67:14
69:7 83:19 84:23
98:22 99:5
119:17 122:18,19
**demographics**
56:5
**Dems** 83:3
**density** 56:9
**Department** 24:19
**DEPONENT**
123:9
**deposition** 1:20 2:1
3:16 4:3,5,12,17
5:1 6:3,6 10:15
10:20 123:4,17
126:2 127:6,13
**Deputy** 2:20
**designated** 13:20
**desire** 120:4
**details** 100:19
**developed** 85:21
**development** 76:5
**deviation** 22:21
23:17 25:10 36:9
71:12
**deviations** 35:5
72:15 83:13
88:12
**dial** 3:1,6 10:23
22:14 25:18

27:23 57:7,9
109:7 114:20
126:1
**Dial's** 6:6
**differ** 109:12
**different** 37:20
43:4 65:15 76:7,8
104:1,1
**difficult** 25:12
30:20
**digits** 80:18
**direction** 109:3
**disagreement**
85:17
**discovered** 77:22
**discussion** 8:9
16:13 18:11
28:21 55:16
59:16 67:8 68:13
75:17 89:8 111:2
111:6
**dismissed** 69:10
**disparage** 30:2
**dispute** 71:1
**distractions** 116:5
**distributed** 58:23
**district** 1:1,2 19:13
28:10 32:14,15
32:15 35:20,21
36:2,5 37:23 45:1
46:16,19,22,23
47:23 50:3,3,6,19
50:20 51:1 52:14
59:20 60:1,9 61:6
61:6 63:10,10
66:11,19 67:16
68:2,4,15 69:7,15
70:1,3 73:9,11
76:8,15,21 78:1,4
80:11 81:6,17
84:19 87:9,16,23
89:7 90:7,11,18
90:23 91:3,5,6,8
92:1,2,7,11,14,16

92:20 93:10,20
94:1,1,2,6 95:14
95:19,20,23 96:4
96:5 97:9,12,17
97:18,19 99:6
100:11,17 101:14
101:23,23 102:4
102:5,7,8,11,20
103:5,7,9,13,15
103:15 106:8,20
107:1,7,8,12,18
108:7,15,17
109:4,10,13
110:20 112:11,14
112:22 113:2,7,7
115:15 116:9
118:18 119:14,18
120:2,18 121:13
121:14 122:4
124:5,6,15,16
**districts** 6:22 7:12
11:17,22 13:7,7
19:14 20:5,6,11
20:17 21:1,6,8,9
21:21 22:21 23:1
23:9,11,16,18,21
30:16,17 31:5,12
32:7,9,10 33:16
33:17 34:4,4,15
34:22,23 40:8,11
40:15 48:14
49:14 50:22,23
53:6 57:21 58:3,6
58:8 59:6 66:18
70:2 71:18,19
72:13 74:2 76:22
77:5 79:1 80:22
83:2,11 86:3 87:3
87:19,20 90:13
90:17,21 93:1,2
98:3,15,23 99:3
99:10 100:12,13
102:12,23 103:19
104:5 105:8,8,19

106:8 110:8,9,19
111:19,21 112:2
118:21 120:5
121:8,21
**divide** 45:12
**divided** 40:14
**divides** 74:1
**Division** 1:3 124:7
124:17
**divisional** 74:21
**Docket** 21:11
32:11 59:13 70:8
73:13
**document** 38:3
48:16
**documents** 11:1,4
11:6,9 16:6,14,19
16:20,21 18:3,4
32:12 82:13
**doing** 7:20 8:19
11:16,21 15:11
30:8 79:7 81:14
102:21 110:16
**DOJ** 109:22 112:9
**donors** 12:14
**Dorman** 3:2 14:19
122:6 127:20
**DOT** 65:19 66:2
**dotted** 74:9,10
**dozen** 10:8
**Dr** 5:17 6:4 7:1
16:11,16 73:4
**draft** 19:5,7 39:6
52:1 98:1,7
122:20
**drafter** 48:19
**drafts** 38:8,11,15
38:19 42:18,22
96:14 98:6
122:15
**Drake** 33:7,8,9,11
60:1,10,16,21
61:2
**Drake's** 60:8

Deposition of James McClendon

May 21, 2013
Page 132

drastic 108:13
draw 17:20 18:17
  18:18 25:13 53:5
  64:17 77:14
drawing 78:23
drawings 78:2
drawn 30:16 46:7
  69:7 70:1 81:3
  97:6 102:15
  103:8,14 119:3
drop 33:15
Due 33:6
duly 5:6 123:19
dynamic 43:4
D.C 54:13

E
E 86:21
earlier 21:18 56:11
  77:12 94:21
  122:13
early 76:4 118:12
ears 37:12
edge 69:16
education 13:6
  21:20
effect 83:12 108:4
  111:18
effort 121:16
eh 26:7
either 4:13,19
  96:17 102:16
  106:11 111:10
  113:6 114:23,23
  119:19
Elaine 80:11,16
elect 75:3
elected 7:3 69:21
  69:22 70:3
election 68:10
  86:19 109:16
elections 62:20
  104:11
electronic 18:5,6

electronically 18:7
Eleven 7:2 70:12
Elmore 44:13,20
  46:12,20,22 47:7
  47:18,20,21 95:2
  95:8,15
else's 77:23 95:23
emphasis 75:8,9
employed 11:20
  12:7,10
employing 12:5
enacted 64:16
Enclosed 127:6
encompass 94:9
ended 13:15 24:4
  31:23 71:4 83:9
  114:15 115:19
England 61:18,19
enter 29:1
entire 20:6 37:22
  65:20 77:6
equal 22:8 40:15
erased 48:21
especially 112:1
essentially 91:3
et 1:5,8,11,15
  123:23 124:3,10
  124:13
Etowah 35:22
evenly 68:8
eventually 86:16
everybody 54:1
  115:10
evidence 4:12
exact 79:2
exactly 11:19
  14:21 15:22
  23:23 40:5 41:19
  42:10 43:3 70:5
  90:5 92:19 95:6
  115:15
examination 3:9
  5:9 76:1 117:3
  118:8 120:13

121:3 122:11
  124:21
example 19:2
  65:18 109:13
examples 80:1
Excuse 15:15
executive 12:8
  54:4
Exhibit 3:15 10:12
  10:15 21:18 67:9
existing 31:19
  48:14 50:3
expected 68:8
experience 7:19
Expires 125:14
explain 22:23
express 86:15
  110:5
expressed 85:16
  86:10 93:22
  120:4
extend 34:15
extends 74:2
extent 52:9 111:5
extremely 30:20
e-mails 18:8 48:18
  48:22 94:13

F
F 2:15
fact 17:18 30:11,18
  69:15 70:18
  77:21 83:9 85:10
  107:19 115:6
  120:4 121:12
factor 103:21
fair 53:6
fall 101:2,4
familiar 15:11
  66:8 105:18
far 24:3 42:14 44:9
  77:16 95:15
  96:12 104:19
  108:15 121:19

farfetched 69:13
fascinating 28:23
favor 22:17
federal 4:4 66:6,8
  72:3
feedback 77:21
  97:23 105:13
fell 37:12 41:9
felt 24:18 25:1
female 83:18,18
  84:23
fewer 28:9 71:13
  119:13,16,17
figure 40:22 85:1,6
file 27:9 52:6
filed 15:10 118:4
filing 4:17,20
final 53:21 114:23
finally 45:12 51:18
find 12:17 27:10
  27:13 28:23 60:3
  61:14,23 127:9
fine 30:3 83:13
finish 29:9 75:21
finished 27:18
first 5:6 7:3 11:3
  13:5,8 19:4 20:10
  20:13,23 21:4
  22:2,7 57:18 84:2
  96:22 105:1,22
  114:1 117:6
  123:19
fit 40:23 41:5
  42:10 43:14
fits 79:12
fitting 112:2
five 28:3,4 32:4
  40:9,11,15,15
  114:21
five-day 117:14
flag 109:20,21
flags 112:8
floor 86:18,20
  88:12 94:8

104:11 105:23
  111:2,6 117:9,10
  117:15,18,23,23
  118:2,15
flux 43:9
focus 20:1 116:6
folks 51:3 65:14
  86:7 95:20 110:5
  110:15 116:9
follow 23:9
follows 5:8
forced 71:2
foregoing 124:20
  126:2
forget 40:9
forgot 121:2
forgotten 72:19
form 4:9 26:3,11
  36:13,23 42:3
  44:5 58:1,10 59:7
  59:21 62:6 71:7
  72:20 73:7 88:1
  92:8 106:15
  107:14,15 108:6
  110:23 111:23
  113:21 120:6
formality 4:8
Fort 57:18
forth 64:9 85:3
forward 19:16
  24:1 89:1 105:3,3
  115:4 118:1
foul 67:14
found 16:7 81:5
  89:14
foundation 11:20
  12:2,3,10,15,17
four 30:2 32:6
  33:16 35:14 48:5
  48:8 57:20 58:6
  60:23 93:4
fourth 33:5
fragment 73:15
fragments 70:11

70:13
**front** 6:16,21 21:12
  42:16 114:5
  127:10
**full** 5:11 36:10
**further** 4:15,22
  10:14 116:22
  123:9 125:2
**future** 68:12

**G**

**GA** 2:22
**Gadsden** 26:23
  27:2
**gain** 20:15,18
**General** 2:20
**generally** 43:7
  104:9
**generate** 83:23
**generated** 113:20
**geographically**
  66:18
**Georgia** 54:21,23
  55:4 71:20,23
**Gerald** 3:6
**getting** 12:22 21:1
  24:19 30:22
  41:21 54:1 77:16
  77:21 115:17
  119:2
**Givan** 84:22 86:21
**give** 10:11 18:13
  18:18 27:8 51:5
  56:18 61:12 80:1
  80:8 97:23
**given** 8:21 50:19
  89:6 96:18 97:2,6
  101:15,20 121:6
  126:2,4
**give-or-take** 52:10
**go** 7:23 8:8 9:19
  10:14 23:5 27:15
  28:23 29:22 38:4
  38:6,14 39:10

47:20 48:16
49:16,17 50:23
51:12 53:3,15
58:18 64:4,7
66:10 67:23
79:10 80:22
88:21 105:12
106:17,20 107:6
114:12 115:11,13
122:16
**goal** 24:7
**goes** 35:22 60:9,16
  108:15
**going** 15:6 25:11
  27:7 30:5 38:1
  44:23 45:10,11
  55:1,3 69:15,17
  75:7,7,9 77:3
  79:17 86:19
  89:10 98:1
  108:23 109:3,5,9
  109:9,22 110:7
  112:8 115:16
  116:1
**good** 24:6 25:2
  30:4 58:15 78:5
  80:7 83:14
**gotten** 8:18 38:2
  121:17
**governor** 116:7
**governor's** 56:23
**grandmother's**
  63:3
**grant** 66:7,8
**grants** 66:2
**great** 87:14
**Greene** 59:18,19
  61:7 62:5,21,21
  63:8,17 64:14,15
  65:5,7,22
**Greg** 46:16,16
**grip** 26:8,8
**group** 19:13 106:5
  112:1

**groups** 20:6 100:3
  100:8
**guess** 10:5,9 14:9
  23:15 45:2 56:12
  60:13 78:7 97:23
  104:14 105:13
  106:5 108:8
**guideline** 22:2,2,7
**guidelines** 21:2,5
  21:14 24:13
  26:14 36:16,17
  36:19 41:9,13,22
  53:22 59:23
  66:17 79:8 88:13
  88:23 89:2 101:3
  112:7
**Guntersville** 84:15
**guys** 17:14,15
  83:11

**H**

**Hale** 63:13
**Hale's** 90:23
**handful** 61:5
**Hank** 35:3
**happen** 85:8 96:5
  119:19 120:3
**happened** 76:22
  78:2 80:15
**happening** 73:20
  96:3
**happy** 39:15 72:22
  82:20
**hard** 23:3,23 26:9
  32:22 34:7,9 39:3
  45:2 50:1,2,2,5
  77:2
**harder** 28:10
**hat** 37:20,20
**HB-16** 33:23 34:14
  59:18 73:17
**HB-42** 73:16
**head** 99:15
**headquarters** 14:5

**hear** 47:16 85:10
**heard** 9:12 10:23
  22:14 26:4,4
  56:11 57:9,14,15
  57:17 72:1,6
  105:20,22 106:19
**hearing** 26:22
  37:11,14 57:18
  82:2 89:20
  111:10
**hearings** 27:12
  57:7,10 58:20
  81:13,15,16,20
  110:5 119:20
**heavily** 90:22
**held** 57:8
**help** 27:5,5 33:1
  45:4 64:22 66:2,6
**helpful** 49:10
**helping** 17:19
**Herbert** 5:12
**hereto** 4:19,23
  126:7
**he'll** 65:15
**high** 93:10 106:13
  110:14
**higher** 25:17 56:9
**highlighted** 67:18
  68:1 70:9
**highway** 45:3,11
**Hinaman** 11:13,15
  11:18 12:22 13:1
  13:5 14:4,12 17:1
  17:4,6 18:14
  39:14 40:22
  41:15,17 42:10
  42:17,17 48:19
  49:3,7,14 51:13
  52:11 53:17,19
  53:20,23 55:11
  79:11 81:19 84:5
  88:16,19,21
  96:19 98:18
  99:11 104:16

105:12 111:16
112:10,13,23
113:3 115:1
122:16,20 123:1
**Hinaman's** 51:22
  52:2 56:3
**hinged** 22:19
**hire** 14:20
**Hispanic** 103:21
**Hispanics** 100:4
  103:2,10,17
**history** 89:18
**hold** 45:16 67:3
  114:11,13
**home** 28:1 77:23
  80:22 115:11
**honor** 19:1 26:15
**honoring** 24:2
  25:16
**house** 5:20 6:15,22
  6:23 7:11 9:17
  11:17 13:12,18
  14:10 17:12 19:4
  19:11 25:13 30:1
  30:19 31:5,11,14
  31:15,16,18 32:6
  32:6,7,7,8,9,10
  32:14,14,15
  35:17 39:18 40:8
  40:11 42:1,11,18
  42:19 43:5,15
  52:1 53:7,8 55:19
  57:21 58:2,5,8,9
  59:6 60:23 61:11
  62:12 63:4,19
  66:14 67:16 68:7
  68:16 69:3,5,22
  73:9,10 74:2,12
  74:20 75:2,4
  77:22 86:18,20
  91:6 92:1,14,16
  93:2 94:5,8
  100:11 101:23

Deposition of James McClendon

May 21, 2013

Page 134

102:8,11 103:5
103:13 104:5,11
105:7,23 107:12
111:2,6 112:17
112:18 115:21
117:5,6,9,10,15
117:17,22 118:2
118:15 119:7,8,8
119:10 121:23
122:1,14
**Hubbard** 13:3
52:15 86:23 87:6
87:8,14,22 88:7
88:15,20 90:8
93:15,16 96:6
101:19
**Hubbard's** 87:16
89:6 90:7,11 91:3
96:4,5,9 113:2,6
**hundred** 10:11
**Huntsville** 103:7
103:14 112:14,22
**hurdle** 22:22

**I**

**idea** 8:12 112:21
**ideas** 79:10
**identification**
10:13 67:10
**ignored** 57:23
**II** 24:12,15
**imaginary** 79:1
**imagine** 13:2 67:1
**impact** 30:17
39:21 45:20 46:7
107:4,10
**impacted** 95:21,22
**important** 36:21
68:11
**impressed** 27:11
**incident** 83:15
**include** 51:7
**included** 73:9
103:9

**Incorrect** 32:5
**increase** 102:19
108:22
**increased** 32:3
33:16 58:2 91:17
91:19
**increases** 58:5
**incumbent** 44:9,10
45:14
**incumbents** 43:17
**INDEX** 3:9,15
**indicate** 51:4
**individual** 49:12
115:6
**Individually** 53:10
**Individuals** 97:8
**inference** 64:12,12
64:17
**influence** 65:11,16
110:18
**information** 11:12
18:8 81:18,19,21
82:15 84:5
104:16
**informed** 53:1
**initial** 77:19
**input** 99:23
**inside** 36:15,17
77:16 79:8 83:16
84:19
**instances** 70:9
**instructions** 8:21
8:23 18:13,18
53:5
**intact** 40:2 48:11
66:22
**intent** 116:15
**intentionally** 106:4
**intentions** 70:6
**interacting** 94:22
**interest** 44:10 49:3
96:1 125:4
**interested** 43:8
**interests** 48:10,13

**interrupt** 15:15
**interruption** 31:3
**intersection** 45:6
**intervener** 14:13
**intervenor** 14:16
**introduce** 119:2
**introduced** 4:18
14:11 34:1,2 35:4
73:18
**introduction** 85:18
**invite** 52:19,21
**involved** 16:1
44:12 47:6 52:12
53:11 81:11
84:13 89:3
**involvement** 95:9
**issue** 37:22 44:12
44:21 110:14
**issues** 29:11 68:11
76:18
**Item** 16:17,20 18:2
18:12 38:6 48:17
**items** 116:9
**I-65** 45:6

**J**

**J** 2:19 63:12 80:10
**Jack** 117:1 127:21
**JACKSON** 2:16
**James** 1:20 2:1,12
4:3 5:5,12 89:13
123:18 126:1,11
127:2
**Jay** 47:18 93:7,12
93:19 96:8,9
**Jefferson** 34:16
60:4,5,7,9 65:5
66:12,14,16,21
68:5,6,10,15,23
69:2,5,20,22
83:17 84:22
100:12 102:18
**Jeremy** 84:14
**Jim** 69:10 127:19

**job** 9:7 30:4 41:4
**Joe** 86:23 87:6,8
87:14,16 88:20
89:6 90:6 93:15
101:9
**Joe's** 88:14
**John** 2:19 34:1,2
59:18 62:3,3,8
65:8 89:15
**Johnny** 83:1
**Jones** 5:14 127:2
**Jr** 2:19
**Juandalynn** 84:22
86:21
**Judge** 72:6
**June** 67:11 125:5
**Justice** 24:20
**justification** 25:2

**K**

**keep** 28:12 31:18
40:1,7 48:11 53:1
53:4 66:17 68:18
78:11 93:8 95:14
95:17 108:9
**keeping** 40:11 69:6
69:6
**kept** 66:22 68:22
90:6 114:17
**Kerry** 84:14
**key** 8:19
**kin** 125:2
**kind** 10:9 34:7
45:2 79:11 84:15
96:12 97:7,15
105:5 106:1
**knew** 25:10 27:7
47:4 50:18,19
82:14,14 84:18
**Knight** 34:1,2
73:18 100:16,19
118:3
**Knight's** 59:18
73:21 117:7

118:1
**knocked** 93:17
**know** 6:7,11 7:22
8:14,21 9:1,5,7
9:15 10:5 11:13
12:3,14,19,23
16:8,23 17:18,18
20:21 21:3,3 25:5
27:1 28:20,20
30:10 38:1 42:9
42:12,12,14,17
44:9 45:20 47:22
49:10 50:14
54:23 55:3 58:21
59:10,22 60:14
61:4,14 62:7,23
63:1,6,13,21 65:6
67:2 71:22 75:6
76:6,16 79:2,8,17
79:21 80:14,17
80:18 81:10,23
82:9,10 83:23
86:16 88:8,17
92:19 93:3 96:10
96:13,22 97:4
98:22 99:5 101:8
101:9 102:6,13
102:14 103:5,7
103:13 106:19
107:8,19 110:12
110:22 111:13,15
111:22 113:5,16
114:6 115:20
117:13,19 118:12
120:15 122:1,17
**knowing** 65:14
**knowledge** 12:6,9
52:13 101:17
118:22

**L**

**ladies** 9:19
**laid** 117:13
**Large** 2:4 4:7

Deposition of James McClendon
May 21, 2013
Page 135

123:16 125:15
**Larios** 71:20,22
72:7
**latest** 52:20
**law** 2:5,12,16 3:3
68:17
**lawmakers** 28:7
**lawsuit** 14:17 15:1
15:7,9,18,21,23
16:12
**lawyer** 27:11 28:14
71:16
**lay** 28:13
**layman's** 26:8
**leader** 12:20
**leadership** 12:21
114:15
**leading** 120:7
**learned** 89:18
**left** 100:16,23
101:7
**legal** 15:12
**legislation** 29:14
29:17 64:15 65:4
**legislative** 1:5 2:10
6:2 9:23 10:2
19:19 21:20 23:9
23:14,18,20
30:15 33:21 57:1
65:13 123:22
**legislator** 45:9
50:11,14 51:19
**legislators** 18:21
20:3 28:2,7 29:13
30:3,9 39:9 45:13
45:17 46:6 49:13
52:10 54:20
79:15 80:23 81:5
86:11 99:9
107:19 110:4
**legislature** 5:19
7:5 12:11 97:4
114:5
**Legislatures** 8:5

**let's** 16:14 17:3
21:10 24:10 27:9
27:13 28:22 31:2
31:13 34:6 38:6
46:15 66:10 70:7
71:9 73:1 82:19
85:13 86:3 87:5
**level** 23:5 108:2,23
**Lewis** 2:20
**License** 125:14
**life** 30:18
**likelihood** 72:10
**line** 47:6 74:9,10
116:9 127:8
**lines** 10:8 18:17,19
26:22 30:5 53:12
68:8 75:10 78:23
81:17 83:3,20
85:2 116:9
**list** 45:16 66:10
127:12
**listed** 18:12
**listened** 26:6 87:14
**listening** 11:7
**little** 16:15 30:7
58:7 65:15 87:5
109:12
**live** 28:3 29:13
46:2 56:6
**lived** 37:23
**lives** 46:4,17,19
47:1,10 55:11
**load** 52:6
**lobbying** 93:20
**local** 29:11,14,17
33:21 36:6 63:17
64:4,8,9,10,15
65:4 74:6
**logical** 15:14
**logs** 48:18
**long** 6:23 32:12
72:23 81:6 83:6
83:10 84:14
109:9

**look** 16:14,17,22
17:3 18:2 21:10
29:22 32:20
35:20 42:22
44:18 49:22 56:8
59:10,10,18 61:9
63:8 70:7 74:8,20
75:2 80:5 88:21
90:17,19 93:5
97:5,8,18 98:3,15
98:15 99:10
112:5,5 113:13
122:20
**looked** 16:6 20:12
79:16 90:3 99:5
102:14 104:12
122:2
**looking** 17:3 20:10
21:11,19,21
24:14 34:17
45:22 51:11
52:15 53:11 56:3
59:13 61:7 98:8
98:20,23 99:2
102:22,23 103:1
103:16 109:21
**looks** 34:23 35:11
74:12 112:7
**lose** 68:20
**losing** 94:2
**lost** 92:14,16,20
**lot** 10:6 25:11
28:16 49:6 64:7
71:4 72:16 77:12
89:10 103:12
**loud** 67:22
**Love** 47:5,7,10,14
47:16,16,18 48:6
93:7,12,19,22
94:10,19 95:1,11
96:2,8
**Love's** 47:13,23
95:4,9
**lower** 56:10 84:3

**lowering** 120:17
120:20
**lunch** 38:7

---

## M

**Mack** 83:1
**Madison** 102:2,18
**main** 49:2 75:6
76:20
**major** 68:4
**majority** 12:20
28:4 68:9,16
92:21 103:8
107:13,13 108:2
121:21
**majority-black**
21:6,7 102:3,5,7
102:16 120:5
121:8
**majority-minority**
103:15 122:4
**majority-white**
91:4,8 92:23
102:3 120:2
**makeup** 102:17
**making** 11:23
25:23 53:2 111:7
**male** 83:18
**malpractice** 16:12
**man** 24:2 25:17
75:8,12
**mandated** 23:16
**manner** 4:19 125:4
**map** 6:19,20,21
20:7 35:2 45:3,7
49:22 51:6 56:8
59:10 64:5 74:13
76:6 77:4,19 80:4
80:6 93:5 105:1
114:23 115:15
**maps** 17:20 56:3,5
56:13,14 76:7,10
76:11 81:14,16
84:6 113:19

114:4,6,23 115:1
115:7,10,11,17
115:19,21
**Maptitude** 8:14,17
8:18,23 9:2,6,10
56:14,15
**map-drawing** 56:1
**Marcel** 82:23 83:4
83:5
**mark** 10:14 67:6
**marked** 10:12
21:17 51:6 67:9
**marker** 51:4
**Mary** 60:11,13
66:10,15,19
68:18,23 72:17
**Mask** 45:18,21,21
46:9,10,19 47:8
48:5 94:22,23
95:5
**matter** 25:15 65:3
65:7 75:5 123:20
127:14
**matters** 65:5 75:4
**maximize** 40:16
**mayor** 115:11
**McCampbell**
63:11,12 80:10
80:16
**McClammy** 39:11
39:15,16 41:7
43:12 47:15 48:3
101:13 118:11,12
118:14,17
**McClammy's**
39:20 41:11,18
41:20 42:11,15
43:22 44:3,11
46:13 47:13,14
47:17
**McClendon** 1:20
2:1 3:1 4:3 5:5,12
5:17 6:4 7:1
16:11,16 27:16

38:8,12 52:1
67:20 68:2,6
69:10 73:4 76:6
79:21,23 80:3,9
80:20 81:1,7
82:17,18 85:19
85:20 86:11,14
86:16 96:13
97:13 98:13 99:7
99:13 123:18
126:1,11 127:2,5
**McClurkin** 60:11
60:13 66:11,16
66:20 68:19 69:1
72:17
**mean** 15:10,15,23
22:23 25:6 26:4
28:13 40:4 49:1
52:23 56:8 58:18
64:5,12 69:19
101:8 104:6
108:13 111:10
114:13 119:2
**means** 106:4,9
110:13
**meet** 13:5,11 18:22
50:11 53:8
**meeting** 8:1,20
77:3 105:1
111:11 119:4
**meetings** 111:10
111:11
**member** 5:19 7:8
27:21 37:15,17
43:20 44:2 69:4
119:7,8,8
**members** 7:11,13
7:21,23 17:10
30:1,20 31:15,16
31:18 32:6 33:20
35:14 43:5,16
53:7 55:5 58:9
63:19 66:13 69:2
74:5,13,20 75:2

76:14 77:22
96:15,19 97:3
119:10,16 122:14
**memory** 27:6
**mentioned** 77:12
108:12 122:13
**Merika** 84:21
**Merrill** 61:21,22
62:2,3,3,8 65:8
**mess** 83:12 84:18
**messages** 93:12
**messed** 84:1
**met** 13:8 41:12
113:8,11
**middle** 1:2 47:23
124:6,16
**Midtown** 2:21
**Mike** 13:3 90:22
**mind** 29:20,21
39:12 78:18
**minorities** 90:16
91:19 100:4
103:2,9,16,17
108:1 109:10
121:22
**minority** 20:11,17
21:9 90:13 92:18
100:13 102:20,23
103:19 106:13
107:2,18 108:1
109:4
**minus** 22:11,17
23:2 24:4,17,22
25:1,3,9 35:7
36:9,10,15,20
37:3 39:19,23
40:1,13 48:11
70:14,22 71:2,6
71:14 73:19 89:3
92:9 101:21
113:9,11,17
**minute** 27:8 31:9
60:7 67:3
**minutes** 25:6 57:6

**Misconstrues** 37:1
**missed** 32:16 77:23
**Monday** 85:13
114:19
**monkey** 107:6
**Montgomery** 2:6
2:17 3:4 13:9,11
20:22 28:11
29:12 39:12,17
40:1,8,11,14
41:12,23 43:11
43:21 44:12,15
44:17 45:20 46:2
46:5,7,11,17 47:9
47:10 48:11
87:19 88:2 90:7
90:12,13 91:11
91:20 92:13 93:1
94:5,9 95:16
112:11 118:13
123:13
**Moore** 83:16,17
84:4
**Morrow** 83:2
**motion** 25:7,7
**mouse** 8:19 83:22
**move** 50:15 102:7
112:10,13,20,21
113:2
**moved** 87:4,17,18
90:11 91:3 92:22
100:11 102:1
103:14 108:5,7
109:19
**moving** 10:7,7
**multiple** 68:3

### N

**NAACP** 99:23
**name** 5:11 12:3
16:7,8 60:12
67:19 72:1,19
**National** 8:4 55:6
**NCSL** 54:10

**NE** 2:21
**nearby** 42:2
**necessary** 66:12
71:5
**need** 4:10 6:12,17
20:18 29:23 30:1
64:23 65:18,19
92:10 93:16
**needed** 23:9 49:9
50:20,22,23 51:2
68:18 87:18
90:11,15,16
**needs** 70:1
**neighborhood**
79:4,5
**neither** 125:2
**never** 8:17,18 9:18
41:19 84:23
106:19 108:19
113:16
**new** 31:14 42:7
60:18,20,21
66:17 78:23
99:20 119:3
**news** 3:17 67:7
**newspapers** 65:6
**Newton** 1:11 2:14
86:22,22 100:10
112:16 124:10
127:4
**Newton's** 100:9,17
101:14,23 112:14
112:21 113:7
**nodded** 99:15
**nominated** 7:16
**normal** 114:17
**normally** 28:8
**North** 2:13
**northern** 1:3 82:22
124:7,17
**notarized** 127:11
**NOTARY** 126:20
**notebook** 78:6
**noted** 126:6

**notes** 82:3,4
**notice** 3:16 10:15
10:19
**notified** 127:13
**Nucie** 61:20
**nuclear** 64:6
**number** 7:12 21:11
23:23 24:20
32:11 33:15,17
36:21 58:2,5
59:13 70:8,10
71:11 73:4,13
106:5,18,20
107:4 108:20
112:19 120:17,20
121:18,20,21
127:8
**numbers** 19:2
20:19 50:15,17
50:19 60:23
66:22 67:2 79:2
84:18 92:3
113:11 122:4

### O

**Object** 26:3 42:3
58:1 88:1 106:15
107:14,15 110:23
111:23 120:6
**objected** 43:16,21
44:3
**objection** 26:11
36:13,23 43:19
44:5 58:10 59:7
59:21 62:6 71:7
72:20 73:7 85:16
88:3 92:8 108:6
113:21
**objections** 4:8,9
82:18,19 86:10
**obligated** 36:16
**observe** 6:8
**obtained** 81:19
**obviously** 46:8

59:22
occurring 110:17
Odom 84:14
offered 4:12 94:8
 101:10 117:20,22
 122:19,22
offhand 79:20
office 9:17 10:6
 13:13,14,15,19
 13:21,23 14:1,4,7
 17:8 18:15 39:2
 49:9,18,19,20
 50:7,8 51:13,23
 52:3,5,7 53:16,16
 53:18,23 84:8
 96:20 115:14
Offices 2:5
office's 51:21
off-the-record 8:9
 16:13 18:11
 55:16 59:16 67:8
 68:13 75:17 89:8
Oh 16:4 24:15
 34:21 46:1 61:1
 70:9 79:19 82:6
 85:21,22 88:19
 94:18 116:4
 119:5,12
okay 6:14 10:4,5
 10:14,22 16:23
 18:10 19:9 21:5
 22:23 34:21 35:1
 35:23 36:3 38:1
 42:5,8 46:1 47:10
 48:1 52:1 61:1
 69:17 70:7 74:11
 78:17 80:21
 81:18,22 82:6,17
 82:21 84:10
 85:22 87:5 91:9
 91:10 93:7 99:5
 99:14,19 100:20
 103:4 106:3
 108:19 110:4

112:20 113:19
 120:9,22
old 58:7 60:19 61:1
 66:19 74:7
older 89:16
once 10:10 15:8
 75:6 77:19 81:4
 84:17 85:1 111:6
 117:23
ones 20:12 76:11
 78:13 80:7
one-man 22:19
one-person 23:10
 26:13
one-vote 22:20
 23:10 26:13
online 59:1 82:12
operate 8:14 9:15
operated 8:17
opportunities
 82:20
opportunity 40:3
 40:16
opposite 102:18
opposition 104:6
option 64:6
optometrist 5:15
order 42:1 66:12
 112:19
origin 112:21
original 127:9,10
 127:13
originally 114:7
ought 96:1
outcome 109:15,16
outside 36:19
 41:22 55:17,23
 83:12 88:13,23
 89:2
overall 41:2,3,5,21
 42:11 43:15
 79:12
overlapped 44:15
 47:9

overlay 56:12,13
overlayed 56:4
overpopulated
 71:18 72:11
 73:11 90:22
overpopulating
 72:12
overpopulation
 76:19
override 63:23
 64:3

────────────

**P**

packing 105:18,22
 106:10,14,21
 109:1,18 110:10
 110:11,17 111:17
page 21:19 127:8,9
 127:10,12
pages 124:20
paid 11:20 12:22
 115:2,5
Pamela 2:2 4:5
 123:14 125:13
 127:18
paper 43:1 51:11
 126:6
paribus 68:17
Park 2:19 3:11
 25:19 32:17
 107:14 116:11
 117:2,4 118:6
 127:21
part 20:9,14 41:4
 44:16 45:10
 47:18,21 48:4
 51:6,10 66:21,22
 68:1 73:10 75:1
 76:4 82:22 84:3
 95:4 96:17
participated 38:16
 38:17
particular 7:19
 53:3 56:15 67:18

108:20,21
parties 4:2,16,23
 124:22 125:3
 127:13
partisan 56:21
 72:12,16 104:12
partisanship 65:3
parts 19:11 38:19
 42:18 44:22
party 4:13,19
 14:17 15:17,20
 15:22 54:3 65:7
 67:15 68:8
passed 31:23 35:13
 104:16
Patty 2:15,16 3:10
 3:12,13 21:17
 71:17 76:2
 116:20 120:12,14
 120:23 122:10,12
 122:23 127:20
Paul 46:1,2
payback 69:11
paying 12:18 13:1
 115:18
Payne 57:19
Peachtree 2:21
pecking 112:19
people 17:7 29:16
 50:21 51:2,10
 56:16 59:19 60:5
 61:2 62:4 64:7
 66:11 72:17
 76:18,20 78:2
 79:3,10 82:20
 86:2 87:20 92:10
 100:14 108:7
 118:20 119:4,13
percent 22:11,17
 24:17 25:9 35:8
 36:9,10,15,20
 39:19,23 40:1,13
 48:12 70:11,13
 70:19,22 71:2,6

71:15 73:11,17
 73:19 92:17,17
 92:17 101:4,16
 107:2,8,21,21
 108:2 109:19
 113:9 121:15,17
percentage 93:8,9
 93:10 106:11
 108:15,21,22
 109:10
percentages 42:15
 111:19
perfect 30:18,21
periodically 53:9
permissible 36:9
 72:8
person 22:9,10
 24:13 26:2 28:13
 75:12,14 104:15
personal 52:14
Personally 14:21
persons 104:1
phone 93:13
phonetic 61:20
phrase 89:11,12
phrased 55:21
pick 50:21 60:10
 84:11 90:16
 114:14
picture 41:2,3,5
 44:16
piece 44:13 51:11
place 40:18 87:23
 100:17,23 101:7
 116:12 126:5
placed 110:21
PLAINTIFF 2:10
 2:14
plaintiffs 1:6,12
 26:1 124:1,11
Plaintiff's 3:15
 10:12,15 21:18
 67:9
plan 6:15 19:5,11

31:14,19,20,22
31:22 32:5,8,8
33:3,23 34:1,14
35:3,10 39:7,10
39:16,18,20 40:5
40:6,23 41:9,12
41:14,18,20,21
42:1,11,12,15
43:4,12,15,22
44:4,11,18 45:20
46:13 47:13,14
47:17 48:10
51:22 52:1 53:2
57:23 59:5,17
60:18,19,21 61:1
62:12 63:8 73:8
73:18 75:2 76:5
79:12 85:17
86:11,23 87:1,7,9
87:22 88:6,10,20
88:22 89:5,20,21
94:14,17,20 96:9
96:17 100:9,15
100:16,19 101:6
101:10,12,13,14
104:4 105:3
110:6 111:12
115:6,22 118:11
119:3 120:16
121:10,11
**plans** 35:6 36:18
39:5 42:18,19
88:11,15 93:15
94:4,7,11 96:5,14
96:14,17 99:20
100:1 105:11
113:5 117:22
**play** 54:5
**played** 44:16
**player** 52:9
**plea** 57:23
**please** 5:11 18:2
67:22 68:1 112:4
127:7,10,12

**plugged** 79:9
**plus** 22:11,17 23:2
24:4,17,22,23
25:3,9 35:7 36:9
36:10,14,20 37:3
39:19,22,23
40:13 48:11
70:14,22 71:2,5
71:14 73:19 89:3
92:9 101:20
113:8,11,17
**point** 37:17 43:8
75:7 80:2
**political** 69:11
**Poole** 61:16,17
**poor** 74:7
**poorest** 62:21
**population** 20:16
22:8 25:10 29:23
32:9 35:19 40:14
56:9 75:15 87:3
91:11,13,17,23
91:23 92:23 93:9
102:19 103:1,22
106:12,12 108:10
108:16 121:6
**populations** 108:9
**position** 7:10 29:4
**positive** 62:11
74:14 107:17
**possibility** 70:23
**possible** 26:16
43:18 49:1,1 59:3
71:15,16 72:16
121:7
**possibly** 38:4
109:1 111:13
**post** 7:5
**practical** 75:5
**practically** 63:21
**Prattville** 44:23
45:8,10 47:1
94:23
**precedence** 37:6

**precise** 42:14
**preference** 75:11
**preliminary** 78:20
78:22 115:1
122:15
**present** 3:5 37:17
98:18,19,20,22
**presented** 43:12
**preserve** 25:12
**preserving** 26:21
**President** 112:18
**press** 96:21 97:2
**presume** 39:1
106:4
**pretty** 61:18 97:12
108:14
**prevent** 42:1
**prevented** 70:15
73:20
**previously** 24:23
74:21
**print** 39:8 50:9
98:11
**printed** 32:22 39:3
50:7 59:11 77:20
124:20
**prior** 85:18,19
86:19 99:6,11,13
115:7
**priorities** 40:17
**priority** 25:17
39:22 110:14
**pro** 112:18,18
**probably** 13:14
19:14 20:14 30:6
30:9 66:20
104:11 117:18
**problem** 21:4 45:8
47:13 48:2 72:7
80:5 81:2 86:13
88:6,8,9,10 90:4
90:20,21 109:8
111:17
**Procedure** 4:4

**process** 7:6 8:7
16:2 17:12 52:10
54:1,6,8,21 55:10
56:2 66:9 96:16
107:1 121:5
**produced** 80:20
81:10
**product** 12:1 19:16
20:3
**production** 38:3
48:17
**Professional** 2:3
4:6 123:14
125:14
**programs** 9:2
**progress** 52:20
76:15
**prompt** 127:14
**proper** 120:8
**proposal** 79:16
**proposals** 104:21
105:12
**propose** 63:20
**proposed** 24:22
64:1 81:14,16
96:6 100:21
101:1 104:4
110:7 113:6
118:10 120:17
**proposing** 93:15
93:16
**proposition** 26:9
**Proscenium** 2:21
**protection** 44:9
**protests** 87:15
**provide** 68:15
81:18 82:3,6,8
84:4 98:17
104:17 105:13
**provided** 4:13,19
38:8,22 88:20
127:8
**provision** 26:18
**Pryor** 72:6

**public** 37:14 81:13
81:15,16,20 82:2
82:10 97:1 110:5
111:10 119:20,23
126:20
**published** 67:11
**pull** 27:8 32:13
**pulling** 59:15
110:7
**punished** 69:13
**purpose** 4:13
69:19 98:2
**pursuant** 2:1 4:3
**put** 8:5 19:11 20:3
23:20,23 27:12
58:23 59:19
63:16 75:8,9
80:18 104:6
105:10 106:1
116:13 120:2
**puts** 35:21
**putting** 64:13
69:19 80:15
106:7
**puzzle** 112:3
**p.m** 2:7 123:5

---

### Q

**qualified** 7:20,22
**question** 4:10 6:10
6:13 13:1 17:21
19:10 33:13
34:11 36:7 41:10
42:6,7 51:1 68:21
68:22 69:18 93:6
103:18 104:15
120:8 121:1
122:6,8
**questionable**
106:22
**questions** 4:9
10:23 72:23
104:3 116:22
118:7

Deposition of James McClendon

May 21, 2013

Page 139

**quite** 14:15 84:23
103:18 111:13
**Quote** 69:14
**quotes** 69:11

**R**

**race** 56:23 57:1
108:21
**racial** 56:18,19
102:17 109:14
**radar** 113:18
**raise** 104:3 112:8
**raised** 108:1
111:20 121:18,20
**ran** 83:22
**Randy** 11:13,15,15
11:18 12:22 13:1
13:5 14:4,9,11
17:1,4,6 52:10
55:11 56:3
**reaches** 63:2
**read** 16:17 22:4,5
65:6 67:18,21,22
126:2 127:7
**reading** 28:12,22
124:23
**ready** 19:23
115:10 119:2
**real** 83:10 109:3
**really** 16:4 20:15
24:7 26:9 40:22
64:6 73:3 79:7
80:7 83:6 95:22
103:21 109:8
110:12 115:19
**reapportionment**
5:22 6:2 7:9 9:17
13:19,20 19:17
39:2 49:17 50:7,8
51:13,21 52:3,7
53:16 54:17
57:11 84:8 96:20
96:23 97:3 104:2
104:10,22 115:14

**reason** 17:5 42:13
42:14 44:10
66:15 68:18,22
87:16 90:10,10
100:10 114:15
116:13
**reasons** 22:15,16
43:14 68:14
72:12 126:6
**recall** 9:14 45:18
55:23 60:21
79:14 82:17
86:12 88:5 89:4
91:10 93:7,12,19
93:22 96:2,7
100:19 110:14
121:14
**receive** 99:23
**receiving** 114:23
**recess** 75:23 114:9
114:10
**recommendation**
112:10,13
**recommended**
25:4
**record** 27:12 28:1
29:2 35:9 55:15
58:22 73:14
82:11
**red** 109:20,21
112:8
**redistrict** 107:3
**redistricting** 7:6
7:21 8:6 9:16
10:1,3 11:17 15:9
16:11 17:11
19:17 30:5 36:14
36:18 37:2,21
54:5,21 55:1,10
55:20 56:2 76:5
86:17 94:11
117:20 119:1
121:5
**redrawn** 67:15

**reduce** 36:8
**reduced** 60:22
**reducing** 72:7
110:18
**Reed** 101:9
**Reed-Buskey** 89:5
89:12,21 101:6,8
101:11 120:16
**refer** 6:16 56:11
**referred** 76:11
**referring** 21:7
44:19
**regard** 38:20 113:6
113:7
**regarding** 89:6
100:1 101:14
104:4,17
**regardless** 4:20
**regions** 38:19
**registered** 2:3 4:6
59:1 123:14
125:14
**regular** 19:15,21
19:22 114:2,9,12
114:14,17,20
116:1,5,8,14,19
**rejected** 44:11
**relative** 98:5
**release** 115:6
**remember** 8:2 9:9
9:12 14:8 26:20
27:1 40:4,5 43:19
43:20 44:1 45:12
58:4,13 59:12,23
76:3,9,17,20 77:2
77:9 78:17 80:23
85:4 88:6,9,14
89:5,10,11,20,23
90:1,4,6,19 94:4
94:10,13,16,19
95:3,5 98:4
100:20 101:6,22
104:23 105:7
107:23 110:16

111:2,5,14,15
113:10 114:6,22
118:13 120:15,16
120:21 122:17,18
**remembering** 81:4
**removing** 73:15
**repaired** 66:3
**repopulate** 87:18
**report** 34:10
**reported** 62:14,18
62:19 123:16
**reporter** 2:3 4:6
82:5 123:15
125:14
**REPORTER'S**
123:11
**represent** 14:20
15:3,7 30:4,13
74:5
**representation**
24:3 64:21
**representative**
13:22 27:16,20
39:11 47:16 48:3
50:4 63:14 72:18
73:18 74:22
100:10 112:14,16
121:13
**representatives**
5:20 7:1 28:6
61:12
**represented** 74:22
**representing** 4:2
4:16 15:1
**represents** 16:23
29:16 66:20
**Republic** 53:8
**Republican** 11:21
12:7,11 43:15,16
43:20 44:1 50:22
53:7 54:3 55:6
62:4 63:17 64:22
64:23 65:22 68:9
68:16,20 69:2,4

69:16,20,21 70:4
71:19 72:18 99:9
122:14 123:2
**Republicans** 48:8
66:15 84:20 99:2
106:6 123:2
**Republican's**
64:13
**request** 38:3 58:16
58:18 119:17
**requested** 119:19
**requests** 57:16
58:19 78:18,18
**requirement** 22:8
23:17,19
**requirements** 24:9
**requires** 32:9
**reserved** 4:11
**reside** 29:16
**residence** 5:13
**resident** 37:16
**residents** 26:12
**resolution** 53:21
**resolved** 45:13
46:13 48:2
**respect** 100:9
**respected** 64:11
**respecting** 75:9
**respond** 58:16
**responded** 87:15
**response** 62:11
74:14 107:17
**responsibility** 41:8
**rest** 39:21 60:15
**restriction** 22:11
22:15 24:17
25:10 36:20
70:14 73:19
**result** 110:7
**results** 115:4
**resume** 114:14
**retainer** 14:23
**return** 127:12
**reverse** 28:8

review 58:19 88:16
reviewed 90:2
Rich 84:14
right 6:21 12:12
  14:3,6 15:16 17:9
  20:7 21:7,9,9,10
  21:14,22 22:9
  24:11 25:13,14
  25:20 28:2,14
  29:15,18 30:11
  31:6 32:13 33:4,7
  34:19 35:5 37:20
  38:5,18 41:1,4
  43:13 44:21 45:2
  45:4,6,7 46:1,17
  49:5 51:8,9,17
  54:15 56:17,20
  65:18 67:3,19,21
  68:20 72:9 73:20
  74:13,15,19
  76:13 77:1,1
  78:15 79:6,13,15
  79:20,23 80:13
  81:8 82:14,21
  84:9 85:19 87:11
  87:13 92:10,14
  97:22 98:10,16
  99:17 103:12
  106:19 107:21
  108:3 110:2
  113:15 114:1
rights 11:23 24:9
  24:10 26:13
ring 9:11
road 5:14 66:3
  94:2 127:2
Robinson 83:16,17
  84:4
role 44:16 54:5,7
Roman 24:12,15
room 83:5
roster 61:11
roughly 92:1
rounds 111:7

RPR 127:18
rule 101:2
Rules 4:4
ruling 4:11
run 50:14
run-up 118:23

S

SAITH 123:9
salary 12:18
Sanders 35:3
sat 78:13
save 36:11
saving 36:21 37:7
  37:8
saw 14:8,11
saying 26:7 28:16
  36:7 49:7 52:17
  61:1 66:4 69:10
  69:12 81:1
  110:16 115:4
says 11:8 80:5
SB-5 35:2,10,21
scan 61:14
schedule 49:10
  114:8,17
seats 25:13
second 67:4,5
seconded 25:7
section 21:19
  24:12 67:19
see 16:6 19:4,10
  20:4 27:9,13 31:2
  31:13 32:23 33:4
  33:4,5,7 34:5,6
  35:23 39:14 41:8
  45:3 47:4 56:8
  57:4 63:2,8 70:23
  73:12 96:9 97:4,6
  97:8,15,21 98:3
  109:15,20 112:6
  112:7 113:16
  117:6 122:3,14
seeing 41:15

seek 100:6
seen 16:21 18:4
  72:14
segments 39:6
selected 37:2
self-centered 76:21
Senate 11:17 14:10
  17:12 19:5 31:22
  33:17 35:3,16,16
  35:21 36:2,4
  55:19 105:8
  115:20 122:1
senator 6:6 10:23
  22:14 25:18
  27:23 29:23
  30:19 35:9,18
  36:5 57:7,9 63:14
  109:7
senators 31:20
  32:1,6
send 52:5
sending 93:12
sense 24:1 28:18
sent 82:9 88:16
  96:14
separate 126:6
separated 45:11
serving 31:19
  104:2
session 14:10
  19:15,20,21,21
  19:22 20:1,2
  96:11,11 114:2,3
  114:7,10,11,14
  114:17,20 115:8
  115:23 116:1,5
  116:14,14,17,19
  117:10,14,19
set 13:16 24:10
  114:7 124:22
setup 30:18,21
  83:20
Shanholtzer 83:22
Shanholtzer's 9:7

17:8 52:5
shared 95:16
sheet 126:6 127:8
  127:12
Shelby 60:16 73:10
  73:15 74:3 75:1
  90:21 91:4,6
  92:22 112:11
  113:2
shift 108:10,10
ship 82:13
Shoals 105:5
shop 13:16
short 75:18
shortcut 22:6
shoulder 52:16
show 33:23 35:2
  42:18 77:17,18
  115:11
showed 39:16
side 64:23 70:20
sign 114:19 127:10
signature 5:1
  127:9,10,11,12
signing 124:23
similar 83:15,19
simple 53:5 83:10
simply 122:5
Sincerely 127:16
sir 7:16 10:17
  11:10,10 12:13
  13:4 14:21 15:19
  15:22 17:13 20:8
  21:10 22:1,13
  25:21 31:17 32:7
  32:18 33:10,12
  38:14,21 46:6
  48:7 49:21 50:10
  54:22 56:7 65:3
  73:2 75:16 90:5
sit 52:13 122:19
sitting 59:4
situation 28:8
situations 80:4

six 28:2 29:13 31:1
  32:4 33:20 35:15
  58:6,9 59:5
size 92:1
sketching 77:19
skills 7:20
slight 69:16
small 36:1 57:22
  65:4 72:15 73:10
  75:1
smaller 50:20
Smitherman 54:13
software 8:15 9:8
  9:16
solution 48:4
solve 86:3
somebody 12:21
  17:19 24:21
  29:15 54:14
  77:23 78:21 80:4
  88:22 95:16,22
  95:23
soon 75:22
sorry 31:10 32:11
  32:22 70:10
  99:15
sort 14:4 16:5,11
  18:9 19:3 37:12
  57:23 109:1
  114:8
sounds 40:19,21
south 75:1 99:20
space 27:14
speak 5:7 123:19
speaker 7:10,14
  12:20,23 13:3
  15:17 52:9,12,15
  52:21 53:4
  112:16
speakers 57:9,20
  58:15,20
speaker's 53:5
speaking 26:17
  27:20 37:15

63:22 104:9
110:5
**special** 13:23 19:21
20:1,2 114:3,11
114:13 115:8,23
116:2,6,13,16
117:10
**specific** 44:19 76:3
76:9 80:1 81:2
82:17 88:9 96:7
106:13,20 111:14
**specifically** 8:6
13:3 43:18 77:9
82:9 86:12 89:4,9
100:18
**specifying** 127:8
**speech** 37:11
**spill** 46:10 84:15
**spilled** 46:9 94:23
**spills** 46:9,11
**split** 32:10 41:23
42:2 57:11 59:5,5
63:9,9 68:8 70:21
71:3
**splits** 31:11 34:3
36:21 58:13 59:3
70:15 71:4,13
**splitting** 31:4
**spokesman** 82:23
**Springville** 5:14
127:3
**squabble** 64:2
**St** 26:21 27:21 28:3
28:4,17 29:12,16
29:17 30:22 31:4
31:11 32:3,8 33:2
33:11,20 34:3,13
34:18,19 35:9,18
35:21 36:22
37:16 60:3,17,22
**stacking** 105:23
**staff** 12:21
**stake** 26:2
**standard** 23:10

113:9
**standpoint** 15:12
37:21 109:14
**start** 20:8,9 40:2
40:19 42:6 54:1
70:12 104:22
**started** 13:6 20:2
20:21 77:20
95:23 114:19
121:5
**starting** 40:18
67:19
**state** 1:8,15 2:4,18
4:7 5:11 8:4 9:17
12:7 13:12 20:7,9
20:15 21:20 23:8
37:22,22 38:20
39:21 41:21 43:7
65:17 67:15 77:6
97:10 111:4,8
115:19 123:12,15
124:3,13 125:15
127:4
**stated** 21:2 126:5
**statement** 26:20
29:2,3 55:22 77:4
**STATES** 1:1
**statewide** 94:7
117:22 118:11,14
**State's** 27:11
**stats** 59:11
**Statute** 4:14,20
**stay** 22:19 24:12
36:17 59:23
87:23 88:2 107:1
107:3
**stayed** 39:18 53:22
**staying** 11:22
40:13 79:8 112:6
**sticks** 39:11
**stipulated** 4:1,15
4:22
**stipulation** 2:2
3:23

**stored** 18:8
**straight** 114:16,21
**Street** 2:5,13,17,21
3:4
**Strickland** 2:20
**strike** 42:6 73:1
86:8 87:7 103:6
112:20
**strong** 120:4
**struggle** 47:5
**stuff** 32:13
**style** 16:9
**submitted** 62:12
88:11 94:5 96:21
**SUBSCRIBED**
126:15
**substantial** 108:14
**Sue** 60:11,13 66:11
66:16,19 68:18
68:23 72:17
**sued** 16:1,3
**sufficient** 102:19
**suggested** 51:19
**suggesting** 39:13
77:11
**suggestions** 39:11
76:17 77:15
**suit** 49:2
**Suite** 2:6,21 3:3
**summary** 95:13
**supporting** 47:17
**supports** 29:4
**Supreme** 23:20
36:11
**sure** 6:13 11:23
14:21 15:22
17:21 24:8 32:21
34:12 39:20
40:10 44:15
46:13 47:15,21
47:22 48:2 55:22
61:3 63:23 66:9
66:13,23 71:9
75:20 84:5,7,16

90:3,8 101:11,11
105:9
**Surely** 6:5
**surgery** 73:5
**surprise** 111:3
120:21
**surprised** 62:23
**surrounding** 44:2
70:2 77:5
**suspected** 17:19
**suspicious** 107:11
**swing** 91:22 92:13
**switcher** 67:15
**sworn** 5:6 123:19
126:15

_____
**T**
**table** 13:14 14:2
59:14 70:7
**tabs** 53:4
**take** 16:14 21:10
26:15 37:6,21
46:15 47:14
75:18 98:17
**taken** 2:1 4:3,5 6:3
79:15 110:20
127:7
**takes** 32:12
**talk** 57:6 87:5,6,8
118:3,17,23
119:11
**talked** 18:15,16
24:5,5 41:15 48:5
76:7 84:2 94:21
98:6 118:20
122:13
**talking** 10:2 34:18
37:13,19 60:18
72:3,5 79:17
94:16 98:7,8,12
110:15 113:23
**Tallapoosa** 2:5 3:4
74:4
**target** 20:23

**technical** 17:11
**technical-type**
17:14
**telephone** 48:18
**tell** 16:18 18:3 25:3
34:7,14 40:6 45:2
51:9 56:16 79:11
79:15 90:10
97:11,11 101:12
106:23
**telling** 47:19 94:19
95:23
**temp** 112:18,18
**ten** 30:6,7,8 66:13
66:23 69:7
**term** 105:18,20,21
**terms** 10:18 103:16
**testified** 5:8 109:7
122:17
**testify** 22:14
**testimony** 37:1
41:10 42:9 126:4
**text** 93:12 96:8
**texting** 94:10
**Thad** 101:13
**Thank** 6:14 10:22
21:16 27:16
33:14 75:16
122:8 127:14
**thanking** 27:19
**theme** 110:13
**theoretically** 30:12
**therefor** 126:6
**thereof** 125:4
**thing** 18:9 19:3
21:21 65:21
76:20 78:20,22
80:12
**things** 78:19 81:7
117:20
**think** 8:5,22 9:1,11
10:18 15:10,23
16:1,10 21:17
22:18 27:2,4 28:9

31:13 34:2 35:22
44:7 45:5,9 46:9
46:11 47:21
48:13,13 52:8
55:21 59:14
60:10,11,15 63:5
70:5 78:11,16
79:20 80:3,7,14
85:11 88:17 89:9
90:22 95:3,13,13
95:16,21,21
102:9,10 104:23
105:2,4 106:9
107:9 109:8,22
110:2 111:13
114:18 117:17
118:6 120:10
121:16
**thinking** 45:23
**thirty** 127:12
**thought** 16:2 89:12
98:1 105:23
106:23 115:9,16
**three** 31:5,11,15
31:16,18,23
32:10 33:16,18
34:3,8,23 35:17
38:8,11,15 45:13
45:17 46:6 53:11
60:23 74:1,12,18
74:20 75:2 80:17
83:4,19 84:20
**three-judge** 25:20
**throw** 19:1
**throws** 85:9
**Thursday** 115:10
**tie** 68:11
**tightening** 25:2
**till** 81:6
**time** 4:10,11 10:7
13:8 14:8,11
19:14 46:15
52:12,16 53:20
55:2 64:1,11 77:2

81:11 83:5,6
89:11 104:13
105:22 112:17
114:4,8 126:4
**times** 10:8 72:1
112:5
**today** 10:16 14:7
59:4 66:20 107:2
**Todd** 83:16 84:4
**Todd's** 120:18
**told** 9:9 15:6 38:7
41:19 55:20 86:7
**top** 39:22
**topic** 116:7
**total** 35:12,13
106:12
**totally** 54:8 74:9
81:5
**town** 13:16
**track** 16:15
**trade** 85:3
**trading** 116:9
**transcript** 124:21
126:2,4 127:6,7
127:10
**transcripts** 27:14
82:6
**transfer** 84:11
**transition** 85:23
**travels** 111:4
**trial** 4:18
**trouble** 106:18
**true** 69:9 72:14
124:21 126:3
**trumped** 48:10
**truth** 5:7,7,8 69:14
123:19,20,20
**try** 24:7 61:18
66:17 75:21 77:7
100:6 112:3
**trying** 22:19 36:7
37:10 59:22
95:14,17 104:23
105:7 107:5

108:12 118:13
**Tuesday** 2:6 67:11
85:13 124:19
126:3 127:7
**turn** 41:7,11,13
52:13 72:4 78:21
**turned** 11:23 20:16
39:14 81:6
**Tuscaloosa** 61:8
61:15,16,22
72:19
**two** 30:1,1,19 31:5
31:20 32:5,6,9
33:17 34:8 53:11
57:22 58:8 63:18
77:22 80:7,8 81:5
84:2 94:7 107:19
112:19 117:2
**type** 102:16

_____
### U

**U** 2:12
**Uh-huh** 62:11
74:14 107:17
**ultimate** 51:22
**ultimately** 41:8
51:20
**unaware** 59:4,9
**unbelievable** 91:1
**underpopulated**
71:19 73:17
87:21 90:14 92:5
100:13
**underpopulating**
72:13
**underpopulation**
76:19
**understand** 6:9,13
11:18 14:15,18
25:22 26:7,10
38:6 47:3 52:23
54:17 106:10
**understanding**
12:13 23:8,12,13

23:15,19,22
105:21
**understood** 59:2
85:2
**unfairly** 72:12
**UNITED** 1:1
**unnecessarily**
41:23
**unusual** 68:4
**updated** 10:18
**upset** 64:7 86:23
87:1,2
**use** 9:3,8 36:10
42:20
**uses** 9:8
**usually** 65:19
**U.S** 22:8 124:5,15

_____
### V

**vacancy** 30:11
**variation** 113:9
**various** 58:19
**verbalization**
99:16
**verbally** 86:20
94:16
**veto** 29:14 63:18
63:21 64:15
**vetoing** 29:17
**vetted** 84:6
**view** 37:17
**Virginia** 55:12,13
**visa-versa** 51:4
**visit** 65:20
**voice** 30:14
**vote** 22:9,10 24:2
24:13 25:8,17
26:2 68:11 75:8
75:12,12,13 93:9
104:12 114:2
**voted** 7:17 22:18
37:4 63:16 93:16
**voter** 75:13,14
**voters** 26:1 28:5

61:4 75:15
110:19 111:20
**voting** 11:23 24:9
24:10 56:21
**voting-age** 106:12
**Vs** 1:7,13 124:2,12
127:4

_____
### W

**Wait** 31:9 60:7
67:3
**waived** 4:17 5:2
125:1
**waiving** 4:20
**Walker** 3:2,11,12
6:19 9:23 10:17
14:19,20 15:1,3,5
15:6,8 16:23 18:7
19:7 21:15,22
24:5,16,18,22
26:3,11,17 27:13
27:17,18 33:6
34:9 36:13,23
38:7 42:3 44:5
57:8 58:1,10 59:7
59:21 61:20 62:2
62:6 63:3,6 67:13
71:7 72:4,20 73:7
75:20 78:9 88:1,3
92:8 106:15
107:15 108:6
110:23 111:23
112:4 113:21
116:23 118:9
120:7 121:1,4
122:7 127:20
**want** 27:23 28:12
37:17 47:18,19
53:1 57:6 61:23
62:4 63:19 64:2
64:16 67:21,23
70:10 79:4 85:3
106:20 115:12
118:18

Deposition of James McClendon
May 21, 2013
Page 143

**wanted** 27:22 43:6
46:5 50:15 59:10
64:4,5 67:17
71:21 77:10 83:4
83:21 85:1 96:4
118:21 119:13
120:1
**wanting** 59:3
95:11,12
**Washington** 8:1,20
55:8,11 70:12
**wasn't** 10:10,10,18
12:7 23:3 44:10
53:23 81:6 96:1
101:9 107:18
110:14 113:18
120:8
**watch** 9:21
**way** 21:13 27:15
28:8 29:10 30:2
46:7 49:1 50:16
55:21 63:23 64:3
67:23 74:17 80:6
81:2 95:17 96:3
101:19 104:18
122:3
**Wednesday** 115:13
**week** 25:18 114:10
**weekend** 85:12
114:19 115:7,7
**went** 19:3,6 29:9
36:18 39:13
51:20 56:23 57:1
81:12 84:16
86:17,18 95:6
96:23 97:1
113:11 114:16
**weren't** 43:1 79:1
101:16 114:2
**Wes** 84:13
**west** 33:6
**western** 20:14
**we'll** 67:6 85:7
**we're** 17:3 24:14

30:8 69:5,6 71:9
75:6 87:12,13
96:10 97:5
109:21 112:6
**we've** 25:5 32:16
38:2 46:23 48:5
59:11 66:22
72:14 79:16 97:6
98:6
**whatsoever** 69:14
96:3
**white** 48:8 56:20
62:3 63:17 64:13
64:15 65:22
66:14 72:18 83:3
83:18 87:1 91:11
91:13,22 92:17
92:21 93:8,9
106:6 107:13,20
107:22 108:2,16
118:20
**whiter** 106:8
**whites** 56:5 93:20
93:23 106:6
**whole-county**
26:18
**Wilbanks** 2:2 4:5
123:14 125:13
127:18
**William** 2:15
**wishes** 19:1 49:13
**witness** 4:23 5:1,6
10:22 18:10
21:16 26:19
61:23 89:16
123:1 124:22
**wondering** 104:14
**word** 26:6 115:13
**work** 11:15,16,19
12:10 18:22 43:6
44:14 45:19
49:12 53:13
76:15 79:18 81:9
83:11 84:19 95:8

112:3
**worked** 11:19 14:6
15:8 19:13 20:19
41:20 47:8 51:22
78:14 81:12
82:22 83:13,21
95:7 97:7 123:1
**working** 9:20 14:7
17:8,16 20:5 43:7
49:11 83:9 96:16
97:5,16,21
**works** 6:7
**world** 82:8 106:1
**worth** 36:8
**wouldn't** 40:2 49:8
62:23 64:8 98:11
108:11 109:17,18
115:4 120:21
**Wren** 45:18,21,21
46:11,16,16 47:7
48:6 95:1,5
**writing** 66:6
**written** 29:10
**wrong** 80:18,19

---
**X**
---
**X** 106:20

---
**Y**
---
**yeah** 6:18 9:5 10:2
18:15 19:3 21:22
35:1 38:12 45:4
47:2 54:12 55:13
60:9,13,15 64:10
66:5 78:7 81:21
84:8 85:23 86:22
86:22 89:18 91:6
97:20 109:7
116:3
**years** 7:2 30:6,7,9
66:23 69:7
**yellow** 70:9
**y'all** 81:13 82:2,3,3
85:6,12 96:16

97:15,21 102:22
105:13

---
**Z**
---
**zero** 22:21 23:2,16

---
**#**
---
**#391** 2:3 4:6
123:15 125:13

---
**1**
---
**1** 16:17,20 22:11
22:17 24:4,17,22
25:3,9 36:9,15,20
37:3 38:9,12,13
39:19,23 40:1,13
48:11 52:1 70:14
71:2 73:19 76:6
79:22,23 80:3,9
81:1 86:2 89:3
92:9 96:13,21
97:2,13 98:13
99:7,13 101:4,16
113:11 117:15
**1:25** 2:7
**10** 3:16 70:19
**10,000** 92:6
**105** 2:5 3:4 25:13
61:9
**11-by-14s** 77:14
**117** 3:11
**1170** 2:21
**118** 3:11
**12** 59:19 62:4
64:13 65:22
67:13
**120** 3:12
**121** 3:12
**122** 3:13
**123** 124:20
**16** 117:5,6
**17,000** 91:17,23
92:3
**18,000** 91:12,22
92:4

**18-member** 68:6
**19** 67:11

---
**2**
---
**2** 18:2,12 21:19,19
24:13 38:9,13,13
80:20 81:7,9
82:17,18 85:19
85:23 86:2,6,9,11
117:16,18
**2(a)** 22:3
**2(b)** 22:11
**2:12-CV-0069-...**
1:8,14 124:8,18
**20** 126:16
**200** 2:6 3:3 60:5
61:2,3,4
**2000** 7:6 91:10,16
**2001** 31:20 32:8
121:10,11
**2002** 7:3 32:7 33:3
73:8 121:10
**2010** 50:18 91:10
91:16 107:2
**2012** 60:8 67:13,14
**2012-602** 58:5
**2013** 1:21 2:7
124:19 125:5
126:3 127:7
**21** 1:21 2:6 124:19
126:3 127:7
**21st** 2:13
**2200** 2:21
**224** 60:10 66:11
68:22
**250** 2:17
**27** 70:9
**2700** 85:5

---
**3**
---
**3** 21:18 38:9,13,13
81:10 85:20,21
85:23 86:6,9,14
86:16 87:10,12

Deposition of James McClendon                    May 21, 2013
                                                   Page 144

87:13
**30** 32:14 33:4
**30,000** 91:1
**30-4** 21:11,15
**300** 2:13
**30309** 2:22
**31** 45:21 46:19,22
**35** 92:5
**35146** 127:3
**35203** 2:13
**36** 32:15 33:4
**361** 5:14 127:2
**3700** 85:5
_____
**4**
**4** 3:16 10:12,15
   38:6 73:17
**4:25** 123:5
**40,000** 90:23
**42** 73:9,11 74:8
**43** 60:9,14 66:11
   107:21
**44** 92:16
**45** 32:17,19
**45,521** 92:12
**48** 92:17 107:21,23
   121:14
_____
**5**
**5** 3:10,17 25:1 35:7
   36:10 67:9 70:11
   70:13,22 71:6,14
   113:9,17,18
**50** 32:15 33:5
   92:17 108:2
**50/50** 102:16
**51** 107:10
**51-and-a-half**
   121:17
**53** 101:23 102:8,11
   103:5,13
**57** 107:2
_____
**6**
**6.19** 73:11

**6/7/13** 127:1
**60** 109:14,19
**60-11** 59:13 70:8
**60-17** 73:13
**60-38** 32:11
**602** 6:15 31:4,10
   31:14 44:18
   59:17 63:8 74:1
**61** 59:20 61:7
**62** 61:6,6,7,8,14,15
   109:13
**63** 61:17
**65** 109:19,23
**67** 3:17 59:12
**69** 90:18,19 107:9
_____
**7**
**7** 48:17
**7th** 125:5
**70** 61:19 109:23
**71** 63:10,10
**72** 63:10,13 107:8
**73** 91:6 107:12,16
   107:20,21 108:15
   112:11
**74** 47:10
**75** 45:21 46:16
**76** 3:10
_____
**8**
**83,000** 35:19
**88** 45:1,7,14,23
   46:1 47:1
_____
**9**
**9-9** 68:11
**9/30/2013** 125:14