**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

```
-----------------------------------------------------------)
                                                           )
ALABAMA LEGISLATIVE                                        )
                                                           )
BLACK CAUCUS, et al.,                                     )
                                                           )
        Plaintiffs,                                        )        CASE NO. 2:12-CV-691
                                                           )
                 v.                                        )        (Three-Judge Court)
                                                           )
THE STATE OF ALABAMA, et al.                              )
                                                           )
        Defendants.                                        )
                                                           )
-----------------------------------------------------------)
                                                           )
DEMETRIUS NEWTON, et al.,                                 )
                                                           )
        Plaintiffs,                                        )        CASE NO. 2:12-CV-1081
                 v.                                        )
                                                           )        (Three-Judge Court)
THE STATE OF ALABAMA, et al.,                            )
                                                           )
        Defendants.                                        )
                                                           )
-----------------------------------------------------------)
```

# DIRECT TESTIMONY OF

# THEODORE S. ARRINGTON, PH.D.

I do solemnly swear that my testimony in this case is the truth and nothing but the truth to the best of my knowledge and belief so help me God.

1.      My name is Theodore S. Arrington.  I am a U.S. citizen, a resident of Bernalillo County, New Mexico, and a judicially recognized expert in the fields of districting, racial and partisan voting patterns, and voting processes in the United States and Canada.

<u>FINDIDNGS</u>

2.      In my professional opinion, Acts 2012-602 and 2012-603, the bills redistricting of the Alabama State Legislature ("enacted plans"), had the effect of reducing the ability of minority voters to participate in the political process and were enacted with the intent or purpose of discriminating against minority voters.

<u>CREDENTIALS</u>

3.      Here is a summary of my experience that is most relevant to this testimony.  The full range of my professional qualifications and experience is described in my Curriculum Vitae that includes a complete listing of all publications authored by me, and all of the voting rights cases in which I have testified by affidavit, report, deposition, or courtroom testimony.

4.      I am Professor Emeritus of Political Science at The University of North Carolina at Charlotte ("UNC Charlotte").  I received my Doctor of Philosophy degree in Political Science from The University of Arizona in 1973.  In graduate school, I elected to receive special instruction in statistics and computer languages in lieu of completing competency in a second foreign language. I joined the UNC Charlotte faculty in 1973, where I taught both undergraduate and graduate courses in topics such as research methodology, voting behavior, political parties, interest groups,

Congress, the Presidency, and Southern politics.  I was awarded emeritus status in July 2010.

During 2010-11, I was President of the North Carolina Political Science Association.

5.      I have co-edited one book and coauthored two monographs, published 36 refereed arti-

cles, and delivered numerous papers in the last 40 years.  Most of these works concern the effects

of party and race on voting behavior.  Much of this work also examined racial and partisan vari-

ables in single-member and multi-seat elections.  My continuing research is focused on: district-

ing; the effects of party, race, and ethnicity on voting; and alternative voting systems in local

elections.  I recently published a detailed analysis of what political scientists know about the re-

districting process in the United States (see "Redistricting in the U.S.: A Review of Scholarship

and Plan for Future Research," *The Forum* 8 (Number 2, Article 7, 2010). DOI: 10.2202/1540-

8884.1351).

6.      I have been a referee for *The American Political Science Review, The Journal of Politics,*

*The American Journal of Political Science, Social Science Quarterly, Political Research Quar-*

*terly,* the National Science Foundation, and others.  Commercial publishers have retained my

services as a consultant, helping them judge the quality of textbooks on American politics, voting

behavior, political parties, elections, and methodology.

7.      I have served as a consultant for the federal courts, the Department of Justice, and local

governmental bodies to advise them on election systems, drawing districts, or redistricting, when

jurisdictions have faced a need to bring their election systems into compliance with the Voting

Rights Act and the United States Constitution.

8.      I have been retained by candidates and campaign managers for local, state, and national

office to give advice on campaign techniques and procedures, including advice on the processes

by which votes are cast and counted by election officials.  I have conducted training seminars

and workshops on campaigning, and have commented in the electronic and print media as an expert on elections, election processes, and districting.

9.     I have had practical responsibility for the conduct of elections.  For twelve years (1979-1991), I was a member of the Charlotte/Mecklenburg Board of Elections, and for six of those years (1985-1991), I served as the Chair of that body.  Mecklenburg County is the largest county in the Carolinas.  The Election Boards in North Carolina have broad authority for regulating and conducting elections, including filing candidates for office, ballot design, purchase and programming of voting equipment, enforcement of election law including campaign finance provisions, hiring of election personnel, selection of voting locations, supervisions of the voting process, and counting of votes.

10.     My academic specialties and practical experience have led to my retention as an expert witness in more than 40 lawsuits involving voting rights.  In more than 20 of these cases I have given trial testimony.  I have been an expert witness or consultant in 18 statewide redistricting cases involving Congressional or state legislative elections.  These cases were in: Alaska, Florida, Georgia, Illinois, Louisiana, Maryland, New Mexico, New York (two cases), North Carolina (four cases), Prince Edward Island Canada (two cases), South Carolina (two cases), and Texas.  I was also an expert witness in the recent South Carolina photo voter ID case.  I have also been an expert witness in cases involving local jurisdictions in many of these states and in Alabama, Montana, and Mississippi as well.

11.     I was first qualified as an expert by the three-judge federal court in *Gingles v. Edmisten*, 590 F. Supp. 345 (E.D.N.C. 1984).  The case became *Thornburg v. Gingles,* 478 U.S. 30 (1986), which established the Supreme Court standard for voting rights cases involving vote dilution claims in election systems.  Republican plaintiff-interveners who worked with African-American

plaintiffs in that case retained my services. My testimony included the presentation of proposed districts for the North Carolina General Assembly, which were drawn under my supervision and presented to the General Assembly by members of that body. I testified regarding the success that minority candidates and Republicans would have had in those districts had they, rather than the multi-member districts, been used for the 1982 elections. I also testified about the difficulties that minority voters have in raising money for their campaigns. The three-judge court cited my testimony in their opinion.

12.     I have been an expert in a wide variety of voting rights cases involving towns, cities, counties, school boards, and other local jurisdictions. In the past, I have been retained as an expert by the federal courts, a special master appointed by the federal courts, the Department of Justice, local units of government, civil rights organizations, political parties, private individuals, and public officials.

13.     I was retained by the United States Department of Justice to prepare a four-district plan for Dallas County (Selma), Alabama. The case was *Dean Butch Wilson et al. vs. John W. Jones Jr. et al.* (1999) CA 96-1052-BH-M. in the United States District Court, Southern District of Alabama, Northern Division. I testified by declaration, at trial, and at a meeting of Commissioners about the districts and the principles used to draw the plan.

14.     In the case of *The State of Texas v. The United States of America* in The United States District Court for the District of Columbia (Civil Action No: 1:11-cv-01303-RMC), I was retained by the U.S. Department of Justice to testify about whether the Congressional and Texas House of Representatives plans submitted to the court for pre-clearance under § 5 of the Voting Rights Act were intentionally drawn to discriminate against minority voters. I testified by decla-

4

ration, deposition, and at trial that the State of Texas intentionally drew plans with the intent of discriminating against minority voters.

15.     I was also an intent expert in the case of *State of South Carolina v. United States of America,* in the United States District Court for the District of Columbia (Civil Action No 12-00203).  I was retained by the U.S. Department of Justice to testify about whether South Carolina had the intent to discriminate against minority voters or to retrogress in the adoption of a photo identification requirement for voting.  I testified by declaration, deposition, and at trial.

<u>STANDARDS FOR DETERMINING INTENT</u>

16.     The United States Supreme Court provides guidelines for courts in the kinds of evidence that could be used to determine intent.  As I understand it, the case that sets forth the guidelines for determining intent is *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252 (1977).  The majority opinion in this case provides guidelines for the direct and circumstantial evidence that would be probative in determining whether a decision was motivated by discriminatory purpose or intent.  In adopting its new procedures for the administration of the reauthorized Voting Rights Act, the U.S. Department of Justice accepted Congress's invitation and included the analysis from *Arlington Heights* into its procedures.  Section 51.57 of the department's procedures, 28 C.F.R. Part 51, states that the department will consider the following factors in reviewing all types of voting changes:

(a) the extent to which a reasonable and legitimate justification for the change exists;

(b) the extent to which the jurisdiction followed objective guidelines and fair and conventional procedures in adopting the change;

(c) the extent to which the jurisdiction afforded members of racial and language Minority groups an opportunity to participate in the decision to make the change;

(d) the extent to which the jurisdiction took the concerns of members of racial and language Minority groups into account in making the change; and

(e) the factors set forth in *Arlington Heights*:

(1) whether the impact of the official action bears more heavily on one race than another;

(2) the historical background of the decision;

(3) the specific sequence of events leading up to the decision;

(4) whether there are departures from the normal procedural sequence;

(5) whether there are substantive departures from the normal factors considered; and

(6) the legislative or administrative history, including contemporaneous statements made by the decision makers.

17.    Governmental actions that have a discriminatory effect on a minority group have often been defended with the argument that the discriminatory effect is merely an incidental result of an otherwise legitimate and racially neutral purpose, such as reducing the population differentials between districts.  However, the application of the *Arlington Heights* standard means that the objecting party is not required to prove that racial discrimination was the sole, primary, or dominant motivation behind a law that adversely affects a minority group.  As I understand it, a court may find that a policy with a clearly foreseeable and significant adverse effect on a minority population was enacted with discriminatory intent even if that adverse effect results from the application of an otherwise neutral state policy.

18.    Political scientists, historians, other social scientists, and legal scholars have written about the application of the *Arlington Heights* and Equal Protection clause standards to determine intent in voting rights and other discrimination litigation.  A selection of some of the most important of these articles and books is at the end of this written testimony.  In determining intent of a legislature, the social scientist reviews the process that led to the adoption of the law and how it might be implemented with the use of depositions, newspapers, official minutes, and other records.  The effect of the law is, of course, a critical piece of evidence.  This scholarship indicates that one can only examine what individuals wrote, said, and did, not what they were

6

thinking.  (See *Washington v. Davis* 426 U.S. 242 (1976) and *Garza,* 918 F.2d at 779.)  But one can determine what the legislators knew and would logically foresee on the basis of evidence presented to them during the legislative process leading up to the adoption of the redistricting statues.  This is often called "foreseeability."

19.     Institutional intention, the sum of a series of decisions by different officials, can also be examined under the *Arlington Heights* standard.  Not all legislators need to have acted with discriminatory intent, just enough to make the difference.  The Alabama redistricting plans were passed on a party-line vote with virtually all Republicans in favor and all but one of the Democrats (including all the minority, i.e., black or African American, members) opposed.  So the intent at issue in this case would be that of the proponents of the enacted plans.

20.     In determining intent, direct evidence would include statements of intent by policy makers in situations where candid rather than artful comments would be expected.  Especially when expecting litigation, policy makers might be cautious in their public commentary, which would then be an unreliable guide to motive.  Circumstantial evidence would be things like the sequence of events or alternatives that are rejected or accepted as the bill progressed through the legislative process.  Discriminatory purpose may be "inferred" indirectly from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than on another.

21.     According to the 1982 Report on the Reauthorization of the Voting Rights Act by Congress, one may rely on: "direct and indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" (S. Rep. No.417, 97th Cong, 2nd Sess. 27 (1982) p. 27 n. 108.)

22.     Kousser (19911) lists elements that are of particular importance in intent cases.  Here are

some that might apply to this case: Often the possible effects of policy maker's actions are common knowledge or just logical results.  These common knowledge effects are "keys" to what decision makers know and foresee.  The historical context of the decision (e.g., a history of discrimination) is always important in understanding the intent of policy makers.  Another important consideration is the personal backgrounds of key decision makers.  Who or what do they campaign for or against?  Who do they appoint for office?  Direct statements of racial animus or desire to discriminate would be an indicator of intent.  But attribution of motive by statements of decision makers after the fact may involve attempts to cover up actual intent.  A history of state policies and formal and informal rules is another guide to intent.  Do the rules differ across the state or over time?  Is there assurance that the implementation of the law at the local level would be non-discriminatory?  What discretion do local decision-makers have and who are they?

23.     When examining the question of intent, one should determine whether there is another reasonable and complete explanation other than discrimination for the law.  If there are other possible rationales, one must weigh the importance of them.  Does the non-discriminatory explanation outweigh the discriminatory effect?  Were there non-discriminatory alternatives reasonably available?  All explanations, not just racial ones, must be examined.  What explanation has the best surviving evidence?  Motives may be intertwined, but if race is part of the mix, that is highly relevant evidence of racially discriminatory intent (see *Arlington Heights,* 429 U.S. at 265-66, and *Garza*, 918 F. 2d at 779 (Kozinski, J., concurring and dissenting in part)).

## REDISTRICTING BEARS MORE HEAVILY
## ON ONE RACE THAN ANOTHER

24.     Convincing evidence that legislation has the effect of reducing or restricting the ability of minority voters to participate equally in the political process would be a justification for a finding of a violation of  § 2 of the Voting Rights Act as it has been explained to me by federal judg-

es and the Department of Justice. But such an effect is also the first, most important, part of an *Arlington Heights* analysis to demonstrate that the legislation was enacted with the intent or purpose, at least in part, to discriminate.

25.    I have observed the evolution of voting rights litigation as an expert since my testimony in the *Gingles* case. Initially the courts were faced with the refusal of jurisdictions to create districts in which minority voters would have a reasonable opportunity to elect some representatives of their choice, even if their choice happened to be a member of that minority race or language group. Once such districts were created, the courts and the Department of Justice assured that the number of such districts did not decline or "retrogress" under § 5 of the Voting Rights Act in covered jurisdictions, such as Alabama, and with § 2 cases everywhere. In the 2000 round of redistricting, and especially in the 2010 round, much more sophisticated discriminatory processes have been involved. A simple count of the number of "majority-minority" districts may no longer be sufficient to determine whether a redistricting plan is discriminatory. This is especially true as partisan gerrymandering and racial discrimination are intertwined.

26.    In my published writing, I have pointed out the danger that a Republican legislative majority might use the Voting Rights Act as a "cover for a naked gerrymander." "Cover" in this case is a synonym for pretext. A plan that artificially reduces or restricts the ability of Democratic voters in Alabama to elect state legislators is also a restriction in the ability of minority voters to participate in the political process, because almost all minority voters (especially blacks) in Alabama vote for Democratic candidates (Charles S. Bullock III and Ronald Keith Gaddie, *The Triumph of Voting Rights in the South,* Oklahoma University Press, 2009, chapter 2 "Alabama"). Not all white voters, however, are Republicans as the Defendants admit (Answer to Complaint of Newton Plaintiffs, 9 January 2013, paragraph 18). Because minorities (especially blacks) are the

9

only geographically distinguishable voters who overwhelmingly oppose Republican candidates and policies, the distribution of minority voters between the districts is the single most important component of a partisan gerrymander in Alabama.

27.     Race and party cannot be separated in Alabama.  The two are inextricably linked as the federal courts have recognized (*Montiel v. Davis,* 215 F.Supp.2nd 1279, U.S.D.C. S.D. Alabama, Southern Division [2002]).  Federal courts in other deep-south states have also recognized this connection.  For example, see two South Carolina cases in which the court cited my testimony: *Colleton County Council v. McConnell*, 201 F. Supp. 2nd 618, D.S.C. (2002), and *United States v. Charleston County Council,* 316 F. Supp. 2nd 268, D.S.C. (2003).  The two are so strongly connected that the intent to restrict one necessarily implies the intent to restrict the other.

28.     The *Arlington Heights* standard does not require that race be the primary motivation.  Indeed, in the *Garza* case (cited above) for example, the Los Angeles County Commissioners were clearly acting to promote their own political interests.  But the court found that they knew this necessarily required them to draw the commission districts in such a fashion that a Latino candidate could not win.  Therefore, they acted with "discriminatory intent."  I present below direct evidence that in the case of Alabama redistricting one can see that racially discriminatory intent is much more than an incidental motivation for the way in which the districts are drawn.

29.     The purpose of the enacted plans is to perpetuate or create a kind of "political apartheid" such as the Supreme Court rejected in *Shaw v. Reno* (509 U.S. 630 [1993]) and its progeny.  That line of cases is sometimes misinterpreted to be about district shape.  But the Supreme Court has upheld more bizarre district shapes in other cases (e.g., *Abrams v. Johnson*, 117 S. Ct. 1925, 1941 [1997]), thus suggesting to political scientists that it is the effect of the districts to unnecessarily segregate the races that is important, not shape *per se*.  The Court has ruled, for example,

that oddly shaped districts for partisan purposes are OK (summarized nicely by Jamin B. Raskin, *The Nation*, 6 February 1995).

30.     Since the face of the Alabama Republican Party is white (e.g., all the G.O.P. legislators are white), the Republican super-majority in the legislature designed the districts to create a situation where the Democratic Party in the legislature would be all black.  This has a number of partisan advantages for the Republicans.  It cuts off an important route to higher office for politically ambitious whites forcing them to choose the Republican Party as the vehicle for their ambitions.  And it creates the impression among white voters that the Democratic Party is a "Black Party," as opposed to a strongly integrated multi-racial/ethnic party.  It also creates the impression that the Republican Party is not just a white party, but is the White Party, the natural home for all white voters.  Even though I grant that the Republican Party is currently the majority party in Alabama, the combined strength of minority and white Democrats could make them a substantial faction in the legislature and capable of winning state-wide office in a good year with an attractive candidate.  Politics is about change, and an integrated Democratic Party could become a future majority party in Alabama, while a minority-only Democratic Party can be only small, ineffective, isolated, and powerless.

31.     One sign of this Republican strategy is that white Democrats in the legislature are frequently asked by their Republican colleagues to switch parties.  Senator Roger Bedford and Representatives Joe Hubbard, Johnny Morrow and Craig Ford have submitted declarations to the court indicating that they are white Democrats who have been recruited by Republican legislators.  Representative Hubbard's declaration is especially enlightening.  He writes:  "I was told that I needed to switch from the Democratic Party to the Republican Party because, in the future, the Democratic Party would be virtually a black party" (Hubbard declaration 14 May 2013).

Hubbard also testifies that the "undertone" to the entreaties to change parties was that he would have to do it to keep his district intact.  Black Democrats are not similarly recruited.[1]  The court will receive declarations to this effect by Senators Henry Sanders, Bobby Singleton, Linda Coleman, Rodger Smitherman, and Quinton Ross as well as Representatives James E. Buskey, Darrio Melton, John Knight, Lawrence McAdory, Merika Coleman, Pebblin Warren, Laura Hall, Mary A. Moore, John W. Rogers, Thad McClammy, Napoleon Bracy, and Oliver Robinson. One of the white legislators elected as a Democrat in 2010, Jerry Fielding (Senate District 11), joined other Democrats in opposing the enacted plans because the senate plan made his district impossible for a Democratic candidate to win.  He subsequently changed parties.  The enacted plans reduced the non-white voting age population (VAP) in his district from 34.2% to 15.3%. Fielding's new district contains only 22% from his old district.  This is a clear example of cracking white Democrats districts by manipulating (i.e., reducing) minority concentrations in order to defeat them or force them to become Republicans.

32.     Another sign of this strategy is in the words of Republican Party legislative leaders. Speaker of the House Mike Hubbard in his book *Storming the State House,* Montgomery: New South Books, 2012 at p. 116, writes: "I commissioned an in-depth study of voting patterns in various districts represented by **white** Democratic legislators across the state. We looked at past results in presidential elections, gubernatorial contests, and other statewide offices and pinpointed the areas that cast the most Republican ballots yet continued to send [white] Democratic lawmakers to Montgomery." (emphasis added).  Senate President Pro Tem, Del Marsh, openly stated his intent to eliminate all of the white Democratic senators (Sebastian Kitchen and Brian Lyman, *Montgomery Advertiser* 22 May 2012), which would have the effect of cementing white

---

[1] One black legislator, however, has indicated that a Republican mentioned switching in a public event, perhaps as a joke or collegial comment, but no serious entreaties were made.

Republican control of the legislature, institutionalizing the minimization of black influence, and leaving the Democratic Party as a black-only party.

33.     In short, the enacted plans are part of a strategy to put the Republican Party in the same position that the segregationist white-only Democratic Party occupied in Alabama prior to the enfranchisement of minority voters by the implementation of the Voting Rights Act.  The Republicans would be both a white-only Party and, for all practical purposes, the only party in the state. Without the ability of some white Democrats to win office and work in coalition with minority Democrats, the racial minority legislators become isolated in a political ghetto, permanently locked out of participation in the political process.[2]

34.     As Patrick Cotter points out, this politico/racial segregation in Alabama may occur through the normal electoral processes – that is, through party campaigns and voter responses. These processes are, I presume, not subject to judicial review under § 2 of the Voting Rights Act. But since the Republican majority in the legislature is seeking to obtain this result by the redistricting process, I presume it is subject to § 2 judicial scrutiny.

PACKING

35.     The basic strategy of a gerrymander is packing and cracking.  The voters of one's opponent are packed by putting more of them than are necessary for them to elect in a few districts. They win in those packed districts, of course, but this wastes votes that would otherwise be used

---

[2] See Patrick R. Cotter, "Alabama: From One Party to Competition, and Maybe Back Again," in *The New Politics of the Old South,* 3rd ed. Charles S. Bullock III and Mark J. Rozell, Lanham, Md: Rowman and Littlefield, 2007; David A. Bositis, "Research Brief: Resegregation in Southern Politics?" Civic Engagement and Governance Institute, Joint Center for Political and Economic Studies, November 2011; and Thomas B. Edsall "The Decline of Black Power in the South" in a *New York Times* blog http://opinionator.blogs.nytimes.com/2013/07/10/the-decline-of-black-power-in-the-south/?_r=0.)

to form majorities in adjoining districts.  Cracking means to divide their other voters into several districts where they are not a majority.

36.     Minorities (especially blacks) are the only geographically identifiable group in Alabama that consistently oppose Republican candidates and Republican policies.  The creation of majority-minority districts with higher minority concentrations than are necessary for them to have a reasonable ability to elect candidates of their choice, even if their choice is a minority candidate, serves both invidious racial and partisan purposes.  First, it can be used as a pretext by claiming that such concentrations are necessary to satisfy § 5 or § 2 of the Voting Rights Act.  And second, it wastes minority Democratic votes that could be used in adjoining districts to elect candidates of choice of minority voters.

37.     These minority concentrations in adjoining districts might be sufficient for minority voters to have a reasonable opportunity to elect a Democratic candidate of their race or ethnicity, but would certainly be sufficient for them to work in coalition with white Democrats and elect a Democratic representative of their choice.  White Democratic candidates are virtually always candidates of choice of minority voters, except when opposed in Democratic primaries by minority candidates.  So a white Democratic candidate may not be the minority voter's first choice, but would certainly still be a candidate of choice.  In some cases a white Democrat may be the first choice of minority voters, even if that is not usually the case.  Such a white Democratic representative would, in turn, work in coalition with minority Democrats in the legislature.  The unanimous votes of white and minority Democratic legislators on redistricting legislation (with one exception, see below) are a good example of such coalition politics.

38.     As I understand the Voting Rights Act (as a political scientist) the purpose is to allow minority voters to elect representatives of their choice, whatever that choice might be.  The Act is

not intended to protect incumbents who happen to be of a minority race or ethnic group or to create opportunities for candidates who happen to be of a minority race or ethnic group.

39.    Table 1 shows the 2010 Census non-white voting age population percentages for the House and Senate districts that were adopted after the 2000 round of redistricting and the enacted 2012 districts.  I use non-white percentages because of the evidence that minorities such as Native American Indians and Latinos work in coalition with blacks (see depositions of Rosa Toussaint 11 June 2013 and Framon Weaver 3 June 2013).  Defendant's expert Thomas Brunell agrees that putting non-whites together for analysis is appropriate in this case (see Brunell deposition, 9 July 2013, p. 28).  The political science literature indicates that such coalitions of minorities under the Democratic label are the norm nationally.  This table shows that these new districts are packed, but indicates that they were packed in the 2002 plans as well.  Alabama DOJ submission Exhibit A-9, shows that the majority-minority districts were also packed after the 1990 census.  This is the point where intent or purpose, changing political circumstances, and improved understanding of racial politics must be considered.

40.    The defendants have written that they drew most of the majority-minority districts with these extreme concentrations of minority voters because they "understood our obligation under the Voting Rights Act to include not just preserving the districts but also doing our best to make sure that the new district essentially _guaranteed_ that the African-American community could elect the candidate of its choice in that district" (emphasis added -- The exact same wording appears in Senator Gerald Dial's Affidavit, 27 February 2013, paragraph 9 and Representative Jim McClendon's Affidavit, 26 February 20, paragraph 9).

41.    But "guaranteed" minority control is not the standard experts like myself, working with advice from the courts and the Department of Justice, have used for creating majority-minority

15

districts.  I have been advised that the Supreme Court expects minority candidates and factions to "pull, haul, and trade" just like everybody else in the competitive political process (*Johnson v. DeGrandy* 512 U.S. 997 [1994].)  A "guarantee" standard might also violate the 14th Amendment following the logic of the *Shaw* line of cases as cited above.  The Department of Justice in determining whether to preclear a redistricting plan has never advocated guaranteed districts, and has twice warned Alabama against packing minority districts.  The Attorney General objected to preclearance of the Alabama House and Senate in the 1980 round of redistricting on the basis of packing (see Plaintiffs Exhibit Q), and objected to packing in the Congressional plan in the 1990 cycle (Plaintiffs Exhibit R).

42.    The standard that I, and other credible experts, have used since the *Gingles* case is that minority voters must have a "reasonable opportunity to elect representatives of their choice, even if their choice is a member of that minority group."  This is the standard I have used when drawing districts for the Department of Justice and federal courts.  This is, I believe, a standard for political scientists and demographers that is in keeping with the Voting Rights Act as interpreted by the Supreme Court.  A more recent legal standard might also specify that the minority in the district be a majority of the voting age population (or even citizen voting age population; see *Gary Bartlett, et al. v. Dwight Strickland, et al.* (556 U.S.1 [2009])), but that would be a legal standard setting a minimum above what is necessary for a political scientist's "reasonable opportunity" standard in some places.

43.    What concentration provides that reasonable opportunity to elect in Alabama?  One answer to that question is the minimum level at which a minority candidate of choice has been elected.  In House district 85, which has only a 48.5% non-white VAP concentration, Dexter Grimsley (a black Democrat) is currently serving.  He was elected in 2010 in the face of the most

extreme Republican landslide.  Black Democrats have represented the district since at least 2002.

Clearly this hints that the opportunity – but not a guarantee – of minorities to elect a representative of their choice can occur right around the 50%+1 VAP level at least in some places in Alabama.

44.      Defendant's expert Thomas Brunell has opined that the concentration at which an opportunity to elect is present would not be the same everywhere in Alabama.  While this assertion is correct, a _minimum_ can be set which would apply everywhere.  Plaintiff's expert Alan Lichtman's declaration and published political science literature on Alabama such as the Bullock and Gaddie book (cited above) indicate that a 51% majority minority concentration is adequate to provide such an opportunity everywhere in Alabama, while a lower concentration may be enough in some parts of the state.  Certainly 54-56% concentration is enough everywhere.

45.      Dorman Walker, the Permanent Legislative Committee on Reapportionment's[3] legal counsel placed the figure in previous years as 54-56% (see Legislative Public Hearing in Birmingham, 6 October 2012, page 8).  In the Tuscaloosa public hearing in 13 October 2012 he was more specific, although it is not clear whether he is speaking of total population (POP) or voting age population (VAP):

> In the past it used to be 65 or 65 – above 65 . . . I'm pretty sure that if you were to send a district that was 65 percent black to the Department of Justice now, they would wonder why you were packing it, and they'll be looking for, my understanding is, much lower levels.  I mean a black majority would certainly be above 50, but 55 may be extreme in some cases.

46.      Mr. Walker went on to in the Tuscaloosa public hearing to indicate his legal advice with regard to packing:

---

[3] I will refer to this committee as just the "Reapportionment Committee" or if not confusing, just the "Committee."

Mr. Walker:  That's a really good point.  And let me – let me point out that I'm a lawyer who was hired by the Legislature to assist and advise with redistricting.  I'm not partisan. I don't represent either party.  I just tell them what the law is as far as I understand it. But you have made a very good point.  And there are – there are protections particularly, as I suspect you know, in Section 2 and Section 5 against packing.

And for those of you who are not familiar with this, packing is the – is the tactic of over-loading a minority district with members of a racial or language minority and putting more in that district than is necessary for it to be a safe minority district, which might be required under Section 2 of the Voting Rights Act.  And if you – if you put all of that in-ventory, if you will, of minority voters into that district, then they're not available to help populate minority districts in other places.

47.    Mr. Walker's warning about packing was not based on speculation.  If the Legislature were really concerned about obtaining preclearance for the plans, they would have been con-cerned about packing.  The Attorney General objected to preclearance of the Alabama House and Senate in the 1980 round of redistricting on the basis of packing (see Plaintiffs Exhibit Q), and to packing in the Congressional plan in the 1990 cycle (Plaintiffs Exhibit R).

48.    Throughout the south in 2013, majority-minority districts require a lower concentration of minority voters than experts thought during the 1990 round of redistricting.  A minority can-didate (that is, a candidate favored by minority voters who is himself or herself a minority) can first win the Democratic primary because whites are mostly voting in the Republican primary. This tendency is stronger, of course, in states with a closed primary.  But even in Alabama, the general pattern holds.  Then the Democratic label allows the minority candidate to attract a somewhat larger crossover vote of whites and win the general election.  In some states, with a closed primary and higher white crossover voting, this means that effective opportunity appears below the 50% level.  In North Carolina, for example, a little over 40% VAP is enough (see dec-laration of Alan Lichtman in *North Carolina Branches of the NAACP et al. v. State of North Carolina, et al.* Civil Action No: 11-CV-01640, in the North Carolina General Court of Justice, County of Wake, Superior Court Division).

49.     Two things have changed as the Voting Rights Act has been implemented.  First, we have acquired with statistical analysis of election data a better understanding of the level of minority concentration required for an opportunity to exist.  In the first redistricting cycle after *Gingles* (in 1992) we simply did not know where to draw the line.  As a result, minority districts were often packed.  A myth had already grown up that 65% of the population was necessary (as Mr. Walker was indicating), although this was never a rule in any court or in the Justice Department.  With this third redistricting cycle (after 2010) we have good evidence of the necessary minority concentration necessary to create an opportunity to elect.

50.     Second, the necessary concentration has steadily declined as minority voters have become more likely to register and better mobilized (Bullock and Gaddie, cited above).  Defendant's expert Brunell also agrees that increased mobilization of minority voters has decreased the necessary minority concentrations to create an opportunity district (see Brunell deposition, p. 46).  In the 2012 election, black voters were more highly mobilized than white voters, although that extreme may have been the result of specific factors in that campaign (Sarah Wheaton, "For the First Time on Record, Black Voting Rate Outpaced Rate for Whites in 2012" *New York Times*, 9 May 2013, p. A16).

51.     Figures 1 and 2 offer a more nuanced view of the way race interacts with party in Alabama legislative districts.  These figures show the results of the 2010 election, which is the extreme Republican end of the possible variation in party success, and the non-white concentrations are the figures for the 2010 census.  With one exception (House District 85, 48.5% nonwhite, Representative Dexter Grimsley), black Democrats were only elected from districts that were more than 54% minority VAP in 2010.  White Democrats, however, win a few seats in many kinds of districts.  Three white Democrats even won in districts that were more than 50%

19

non-white VAP.  Representative Patricia Todd, was unopposed in 2010 in District 54  -- a district that is 57.7% non-white VAP.  Billie Beasley defeated a black candidate in the Democratic primary run-off in 2010 in Senate District 28, which is 55.6% non-white.  And Joe Hubbard was unopposed in the primary in his House District 73, which is 52% non-white VAP.  In some cases a white Democrat may be the first choice of minority voters, even if this is not usually the case. All of the rest of the white Democrats won in districts with less than 37% non-white VAP.

52.      From these data, published research, and Dr. Lichtman's declaration I conclude that any district above 50% non-white VAP could be considered an opportunity district.  In any case, there is no reason for any district to be above 55% non-white VAP in order to create an opportunity for minority voters to elect a candidate of their choice even if their choice is a minority. The ability of white Democrats to win, even in districts with a majority of non-white VAP, shows the futility of trying to create "guaranteed" majority-minority districts in the sense that it would always elect a minority.  Because of the uncertainties of politics, even a packed district is not a guarantee that a minority candidate will win.  Instead of helping minority voters, packing hurts them.

53.      White Democrats can also occasionally win seats where there are very few minority voters, even in 2010.  An example of this is the Muscle Shoals area in northwest Alabama.  In 2002 and 2006, white Democrats won enough of the districts with less than 50% non-white VAP to form large majorities in both houses of the legislature in combination with black Democrats.

54.      With one exception (Senate District 35, 42.6% non-white VAP) Republicans only won districts where the non-white VAP is less than 40%, and 2010 was a good year for them.  Most Republican districts are well below this level of non-white concentration.  Notice a relative absence of districts in that middle 40-50% non-white VAP range.  This is the level where Republi-

cans find it difficult to compete.  An expansion of these districts would increase minority partici-

pation in the political process and keep them from being imprisoned in a political ghetto.  Repre-

sentative Jay Love (a white Republican) told Representative Hubbard that he opposed a district-

ing plan for his (Love's) district because it would fall below 60% white within the decade and

that would hurt his chances to win reelection (Hubbard declaration 14 May 2013).

55.    Figure 2 shows these same data in a box plot.  This figure illustrates statistics describing

the kind of districts that elected each type of candidate in 2010.  It shows the maximum and min-

imum non-white VAP for each kind of incumbent, the mean (average) non-white VAP in those

districts, and standard deviations above and below that mean.

56.    Figure 3 shows that in the enacted plans there are no districts between 36% and 50% non-

white VAP, and only one district between 51% and 55% non-white VAP.  The bi-modal distribu-

tion of the districts is obvious from this figure.  The legislature has created – or maintained and

extended – a system of political apartheid.  Almost all districts are either strongly non-white, or

strongly white.  The districts in the middle, that might be competitive for the parties or oppor-

tunity/non-packed districts for minority voters, are largely missing.

57.    If the packing of minority voters and cracking possible Democratic racial coalition con-

centration reduces minority political participation and harms the Democratic Party, why did the

black legislators agree to such packing in the 2000 redistricting round?  And why did white

Democrats agree as well?  Part of the answer is in the uncertainty on the required concentration

mentioned above.  Part of the answer is in the changing partisan politics of the state.  In 2002 the

common political wisdom was that white Democrats still had enough white voter support to

maintain a majority in the legislature even with the packed majority-minority districts previously

created in the 1990 round.  After all, Democrats had maintained substantial majorities in both

21

houses in spite of these packed minority districts in 1994 and 1998. Black legislators had an incentive to maintain packed districts so that they would not have to pull, haul, and trade to maintain their seats. It is common for incumbents to want their district packed with "their kind of voters," but the interests of a particular black incumbent are not necessarily the interests of black voters at large. The purpose of the Voting Rights Act is to protect minority voters, not minority representatives.

58.      In the 1990 round of redistricting in many southern states, black legislators formed coalitions with Republicans to create packed black districts at the expense of white Democrats. This was a no cost strategy for minority legislators, since the Democrats would still have legislative majorities in which the black legislators would be part of the governing coalition. The Republican Party was still very weak in this region and the increased competition made black Democratic representatives more valued as part of the governing coalition. But with the 2010 election the situation became wholly different in Alabama and some other southern states. Now Republicans in the Alabama legislature (and other southern states) are in a position to retain Republican majorities by creating or maintaining the packed minority-majority districts, and cracking areas of Democratic multi-racial coalition strength. In these new Republican legislative majorities, minority legislators have no coalition bargaining position. In a situation where Republicans are the dominant party, the district arrangements that looked good to black and white Democrats in 2002, have a wholly different character.

59.      One must also take purpose or intent into account. The districts drawn in 2002, with the consent of black legislators, were intended to continue to give minority voters a strong voice in the governing coalition. Whatever the effects of these districts in the 2010 election, the intent of the legislature in 2002 was clearly not racial discrimination. Similar packing, and enhanced

cracking by the Republican majority in 2012 was intended to restrict if not reduce minority influence, as will be shown in the next section of this written testimony.  In the analysis of public policy, political scientists understand that to take no action (a non-decision or maintenance of the *status quo*) is still a policy.  Clearly to act affirmatively to maintain packed districts at the minority concentrations thought to be necessary twenty years ago, is a policy choice.  If that choice is made for a discriminatory purpose, then it is much more than just affirming the *status quo*.

60.     Do the districts that provide "influence" for minority voters, but may not provide an opportunity to elect their first choice when that choice is a minority candidate, matter?  In *Georgia v. Ashcroft* (539 U.S. 461 [2003]) the Supreme Court was widely interpreted as indicating that a legislature could fulfill the non-retrogression requirement of § 5 by substituting "influence districts" for districts where minority voters have the opportunity to elect.  When Congress reauthorized § 5, they clarified the language to indicate that "ability to elect," not influence, was the standard in retrogression analysis.  From the perspective of a political scientist, however, influence districts are part of the "totality of the circumstances" in any § 2 analysis.  In political analysis, consideration of influence districts is part of the second half of the standard.  This standard is to determine whether minority voters have the ability to elect representatives of their choice and participate equally in the political process.  Influence districts are part of the political process and a valid way for minority voters to participate in addition to being able to elect some representatives of their choice even when their first choice is a minority candidate.

61.     One of the many problems with *Georgia v. Ashcroft* is determining when minority voters have influence and when they do not.  Influence is not necessarily proportional to the minority presence in the district.  I define an influence district as one in which a Democratic candidate has a reasonable opportunity to win the district with minority voter support, but it is less likely (but

not impossible) that a Democratic candidate who is a minority could win.  In the modern politics

of Alabama, minority voters would have no influence over a Republican representative, who

would almost certainly have been elected without minority support because of extreme polarized

voting.  And that Republican representative would be part of a party coalition with decided racist

elements as will be shown in the next section of this written testimony.  On the other hand, white

Democrats today work closely with minority Democrats in the legislature.  If the minority VAP

in a district is increased from 10% to 20% in a district that a Republican usually wins, this would

probably not increase minority influence at all.  In the same way, when a district minority con-

centration is increased from 55% to 75%, it does not necessarily enhance minority opportunity to

elect.

CRACKING OR RESTRICTING
MINORITY PARTICIPATION

62.     The switching of a minority-majority district from Jefferson County (Birmingham) to

Madison County (Huntsville) is an example of the way in which the legislature acted to restrict

minority participation in the political process.  During the last decade Jefferson County lost pop-

ulation.  The enacted plans move one minority district out of Jefferson County and create a new

one in Madison County where population increased, with the pretext of maintaining the same

number of majority-minority districts as required by § 5.  There is a difference between "not ret-

rogressing" (§ 5) on the one hand and "not discriminating" (§ 2 and 5) on the other.  As Table 2

shows, it is white population in Jefferson County who moved out (loss of 35,973), while the

black population actually increased by 15,917.  Any reasonable non-racial response to these

changes would be to decrease the number of white districts in Jefferson County and leave the

minority districts intact.  To fail to respond in this fashion is to take an action that bears more

heavily on minority voters than on white voters, a sign of discriminatory intent under the *Arlington Heights* standard.

63.    Moreover, the new House plan does not maintain the same number of majority-minority districts as in the old plan in any meaningful sense.  As Table 1 shows, the new plan drastically reduces the non-white VAP in Joe Hubbard's District 73 from 52% to only 16%.  In my opinion, this is not "balanced off" with the increase in the non-white VAP in Dexter Grimsley's District 85 from 48.5% to 50.2%.  District 85 has elected black Democrats in every election since 2002.  The increase in non-white VAP in this district is trivial, and does not change the nature of that district as one that clearly offers minority voters a reasonable opportunity to elect a candidate of their choice.  Hubbard's district, on the other hand, is clearly an example of the manipulation of minority concentration for the purpose of cracking districts that can be won by both black and white Democrats.  Hubbard's survival is in doubt, and it is almost impossible for a black Democrat to win the new district as drawn.

64.    Why create an additional majority-minority district in Madison County?  The pretext is that this is to make up for the (unnecessary) loss of a majority-minority district in Jefferson County.  The legislature could have avoided retrogression by maintaining the same number of majority-minority districts Jefferson County and Madison County and concentrating the minority population in Madison outside of a de-packed District 19 in two districts with substantial, but less than 50% minority population.  But that would have meant possibly creating a situation where an additional Democrat or two might be elected.  Proposed District 19 has a packed 65.38% non-white VAP (this district is represented by Laura Hall, a black Democrat), while the new majority-minority District 53 in Madison County is a packed 63.79% non-white VAP.

There are also other pockets of minority population in Madison County, which is 30% minority and should have about seven districts within the county.

65.     Or the legislature could have created this additional majority-minority district in Madison County while leaving the same number of majority-minority districts in Jefferson County.  This would give the House an additional majority-minority district.  Alabama is about 30% minority, so this increase would still give minority voters less than proportional representation in the House.  I understand that under the so-called "Dole Amendment" to the Voting Rights Act, no racial category has a "right" to proportional representation.  But this should also mean that white voters have no right to <u>more</u> than proportional representation, which is what they currently enjoy and would continue to enjoy even if this additional majority-minority district were created.

66.     Either approach would have increased minority participation in the political process by increasing the number of minority opportunity districts or the number of districts in which white Democrats could compete with a multi-racial coalition.  The legislature wanted to restrict minority participation as much as possible, while appearing not to retrogress by keeping the same number of majority-minority districts.

<u>DILUTED MINORITY VOTES
IN JEFFERSON COUNTY</u>

67.     Alabama has no "home rule."  This means that many of the policies of each county, city, and town are at the discretion of the state legislative process.  The county's local legislative delegation effectively controls most important local government policies: for example, property and occupational taxes, changes in municipal boundaries, and salaries of elected county officials. The 50 states vary in the discretion given to local units of government, and Alabama is at the far end of little or no general grant of discretion (http://en.wikipedia.org/wiki/Home_Rule_

in_the_United_States, last accessed on the date of my declaration in this case).  This legislative

authority and lack of home rule was a contributing factor to Birmingham's fiscal woes.[4]

68.     As a response to the burden that the lack of home rule places on a part-time legislature, a

system of division of labor has arisen.  The legislature has a tradition of allowing the local dele-

gation of each county to be the primary legislative committee to examine and approve legislation

that applies to a specific local government within that county.  Small delegations operate by una-

nimity, while larger delegations have majority vote rules.  Legislative Courtesy for local bills is

common.  Local bills account for two-thirds of the bills in the Alabama legislature and legislative

courtesy "totally determines the fate of these bills" (Advisory Commission on Intergovernmental

Relations, "Measuring Local Discretionary Authority" (Washington, DC, November 1981) at

page 31 (available online at http://digital.library.unt.edu/ark:/67531/metadc1259/).

69.     While a particular piece of local legislation must pass through the entire legislative pro-

cess and be approved by the Governor or passed over his veto, the power of the county delega-

tion is substantial.  First, a lack of action by the county delegation is almost certainly a veto.  Se-

cond, the large number of local bills and the normal traditions of reciprocity dictate that affirma-

tive actions by the county delegation on most local bills will be honored with little controversy.

This is confirmed in the Alabama legislative glossary:

> "**LOCAL BILL**. A bill which affects only one county or city mentioned by name in
> the bill. It might be an extension of city limits, a pay raise for a county official, or a
> local tax. In the Senate, these bills are usually passed by an automatic 25-0 vote, after
> having been approved by the local delegation. Local bills must be advertised for four

---

[4] Robin Smith, *Southern Discomfort: An Examination of the Financial Crisis in Jefferson County,
Alabama*, 10 *Houston Business and Tax Law Journal* 363, 371-72 (2010) also in Randolph C.
Horn and James W. Williams, Jr., *Re-structuring Jefferson County Government To Minimize
Risk of Poor Financial Decisions*, 40 *Cumberland Law Review* 855, 860-61 (2009-2010) and
Barnet Wright "Jefferson County Lawmakers to Meet for Solution County Fiscal Crisis" *The
Birmingham News,* 22 April 2012.

consecutive weeks in the local newspaper before introduction, and an affidavit of
such advertisement is entered in the journal"
(http://www.legislature.state.al.us/misc/legislativeprocess/legislativeglossary.html).

70.     Representative McClendon (co-chair of the Reapportionment Committee), explains that

this is "respected most but not all of the time" and violation of this norm is a "nuclear option"

(McClendon deposition, 21 May 2013, p. 64).

71.     The make-up of the county delegations is thus an important feature of the legislative pro-

cess and the county delegations become shadow county commissions and city councils with vir-

tual veto power over the local units of government within their county.  The rule is that every

member of the legislature whose district includes even a small part of a county is part of that

county delegation.  Every member of the delegation has one vote, even if the legislator's district

includes only a small portion of population from the county.  These rules are common in other

southern states such as South Carolina.  Thus it is possible to submerge minority votes in a cen-

tral city where minority voters are a large minority, or even a majority, by including in the coun-

ty small pieces of white dominated districts from the surrounding suburban areas and rural hin-

terland.

72.     The Alabama Constitution has "whole county" provisions that would prevent, or at least

discourage, adding many surrounding districts to a large urban county and thus diluting the votes

of those who live in the county.  Here are those provisions:

**SECTION 199**
**Duty of legislature to fix number of representatives and apportion them among
counties following each decennial census; each county entitled to at least one repre-
sentative.**
It shall be the duty of the legislature at its first session after the taking of the decennial
census of the United States in the year nineteen hundred and ten, and after each subse-
quent decennial census, to fix by law the number of representatives and apportion them

among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that each county shall be entitled to at least one representative.

**Section 200**

**Duty of legislature to fix number of senators and divide state into senatorial districts; equality of senatorial districts; senatorial districts not to be changed until next apportioning session; division of counties between senatorial districts prohibited; counties within senatorial districts to be contiguous.**

It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other.

73.     Obviously, these constitutional provisions pre-date the one-person-one-vote revolution initiated by the Supreme Court in the 1960's.  Other states have similar pre-existing constitutional provisions that must be harmonized with equal population rules.  These Alabama provisions are not as rigid as in some other states such as North Carolina and Texas, so the harmonization can take many forms.  These provision, however, strongly suggest that following county lines is an important traditional districting principle in Alabama.  In drawing the Congressional and State Board of Education plans, the legislature followed county lines to a large extent (see http://www.arcgis.com/home/webmap/viewer.html?webmap=ba665f723d7145908f9c31bd52a4f019 for the Congressional plan and http://www.arcgis.com/home/webmap/viewer.html? webmap=5998a96c0e204a488018342d25868d0e for the Board of Education plan).

74.     In my comprehensive analysis of redistricting cited above, I show that every traditional districting principle is more or less incompatible with every other.  The principles of defining districts with "communities of interest" or county lines is incompatible with one-person-one-vote

rules, because communities and counties do not conveniently come in population sizes that are multiples of the size of legislative districts.  When any one principle is carried to an extreme, the other principles suffer accordingly.

75.     Again we see the use of a pretext for the discriminatory actions of the legislative majority. In this case it is the 2% rule.[5]  In the formation of the guidelines for redistricting, the Republican majority on the Reapportionment Committee decided that in drawing legislative districts they would implement the one-person-one-vote principle by requiring the difference between the largest and the smallest district to be no more than 2%.  The minority and white Democrats on the Reapportionment Committee vigorously opposed this stringent standard, trying repeatedly to change it (see Committee Minutes of 3 and 4 May 2011).  But they were outvoted in party-line votes.

76.     In prior Alabama redistricting the tradition was the 10% rule, and this is the usual tradition for state legislative districts in most states and local jurisdictions.  The 2% rule, or similar stringent deviation rules, have become the motif of Republican plans in some states in the 2010 redistricting cycle, for example in the Republican Governor's plans in New Mexico.  The arguments are consistent: the plan with the lowest total deviation has to be accepted because of one-person-one-vote constitutional standards and the decision in *Cox v. Larios et al.* (542 U.S. 947 [2004]) regardless of other traditional districting principles that may be sacrificed.  The Democratic legislators argued that the *Larios* decision was being willfully misinterpreted to require the 2% rule.  Here is the first paragraph of the *Larios* decision at page 947:

---

[5] The 2% rule is sometimes referred to as plus or minus 1%, but this is not the same.  Similarly a 10% rule is sometimes incorrectly referred to as plus or minus 5%.  Under the 2% rule the largest district could be1.5% too big and the smallest .1% too small.  That would comply with a 2% rule, but not a plus or minus 1% rule.  I will consistently refer to the 2% and 10% rule and use the terms correctly.

Today we affirm the District Court's judgment that Georgia's legislative reapportionment plans for the State House of Representatives and Senate violate the one-person, one-vote principle of the Equal Protection Clause. The District Court's findings disclose two reasons for the unconstitutional population deviations in the state legislative reapportionment plans. The first was "a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west of Atlanta." 300 F. Supp. 2d 1320, 1327 (ND Ga. 2004). The second was "an intentional effort to allow incumbent Democrats to maintain or increase their delegation, primarily by systematically underpopulating the districts held by incumbent Democrats, by overpopulating those of Republicans, and by deliberately pairing numerous Republican incumbents against one another." *Id.,* at 1329. The court found that Democratic incumbents "attempted to draw districts that would enhance their own prospects at re-election and further their other political ends (such as building up a support base for a future run for Congress)" and also "targeted particular Republicans to prevent their re-election." *Id.,* at 1330.

77.    In this decision, for the first time, a majority of the Supreme Court was able to identify a partisan gerrymander.[6]  The Democratic legislators argued that the important ruling here is not that the total deviation between districts has to be at any particular level, but that the deviations must not be systematically used to create a partisan or a regional gerrymander.  In public hearings the Committee's legal counsel, Dorman Walker, often represented *Larios* as requiring this lower total deviation standard, but when pressed, he had to admit that it was not so.  Here is his exchange with Representative Chris England (black Democrat) in the public hearing in Tuscaloosa, 13 October 2011:

Representative England: One thing I wanted to address specifically is what you said concerning deviation.  Could you first reveal the case that you're referring to that talks about what the safe harbor is?

Mr. Walker: Sure. That's *Larios v. Cox*, which was a three-judge court in the, I think, Northern District of Georgia.  And the meat of that decision is that – is in that three-judge court decision.  It was appealed directly to the Supreme Court as to what happens with a three-judge court decision.  They affirmed it, but really, if you want to get an understanding of what the law is, you have to read the District Court's decision.

---

[6] There is at least one other case where the federal courts found a partisan gerrymander, *North Carolina Republican Party v. Hunt*, Civil Action No. 88-263-CIV-5 (E.D.N.C.) 1988-1996.  I was the expert witness for the Republican Party in that action.  But the case was not appealed to the Supreme Court.

Representative England: All right.  Would it be safe to say that the court decision doesn't necessarily suggest that the 2 percent deviation is required, other – and there's really no safe harbor and there's no really percentage recommended?

Mr. Walker: the only safe harbor is zero deviation.

. . .

Representative England: So 2 percent, something the legislature established, is not necessarily supported by the case law?

Mr. Walker:  Well, what it says is that you should try to have zero deviation and – and that if – clearly 10 percent deviation is too much, as a – as a bright line, as I read the case, somewhere between 10 and 0 is the ideal.  But the gist of the – the slant of the case law is that you should try to have as little deviation as possible because of one person, one vote in order to affect that principle.  Some—some deviation is allowed, but what the decision says, at least as I read it, is that it – the more deviation you have, the stronger the explanation in terms of traditional redistricting criteria has to be.  So I know that some jurisdictions have gone with 5 percent [he means 10% total deviation].  I'm not aware of any jurisdiction that has gone higher than that.

In light of the – of the consequences – because there is no threshold established. It's just a gradation, if you will. In light of the consequences of getting that wrong, which would leave the state without a plan that could be pre-cleared, the legislature chose 2 percent, which is probably a little conservative, but it was – it was done in order to make sure that all of the work that goes into passing a plan didn't get wasted by choosing a standard that was higher than the courts in an area at the time when the law was very dynamic would not approve.

Representative England:  But it's safe to say, though, that you could – as long as you can justify it by the needs of the communities, maybe keeping communities together, packing – to avoid packing and so forth, that you could actually go beyond 2 percent deviation, if necessary?

Mr. Walker:  The case law would allow that.

Representative England:  OK. So when – so the 2 percent is not anything that's established in law; it's something that we've adopted as a – so far as a principle in order to, I guess, create our own safe harbor, but the court could actually say that 2 percent is too much or, if our plans aren't good enough, it could say that 2 percent is not enough, is that right?

Mr. Walker:  That is correct.

78.   By choosing to adopt a restrictive 2% rule, the Reapportionment Committee made it impossible, or at least very difficult, to follow county lines in drawing the districts.  The 2% rule gives them a pretext for their failure to follow the dictates of the state constitution, although plaintiffs argue that some county lines could be preserved even within the 2% rule.  It also gives

them a pretext for ignoring the principle of community of interest.  This allows the legislature to

adopt a plan with no identifiable underlying rationale other than partisanship.  I will not reiterate

the plaintiff's county splits analysis here.  Table 3, however, summarizes the splits and shows by

direct side-by-side comparison that the enacted plans split counties to a much greater degree than

the alternative Democratic plans or the 2002 plans.  Instead, my focus will be on one obvious

case where the enacted plans submerge minority votes in a large urban county delegation, and

therefore is clearly relevant to a § 2 and *Arlington Heights* analysis.

79.     Jefferson County is about 47% minority.  The city of Birmingham is 78% minority.  The

Jefferson County delegation will have jurisdiction over this heavily minority city as well as other

smaller towns and the evenly divided county as a whole.  Given the continuing loss of white

population, gains in minority population, and the known undercount of minority populations in

the census (http://www.census.gov/newsroom/releases/archives/2010_census/cb12-

95.html, last accessed on the date of my declaration in this case), Jefferson County may be ma-

jority-minority by this date.  The County 2010 population is 658,466, which is enough for 14

whole House districts at the ideal population with one-half of a district left over.  With the tradi-

tional 10% deviation rule, it would be possible to place either 14 or 15 House districts entirely

within Jefferson County in accord with the Alabama Constitution.  Jefferson County would ac-

commodate four Senate districts at the ideal population with 112,214 people becoming part of a

district that crosses the county line.  Using the traditional 10% deviation it would be possible to

place five whole senate districts in Jefferson County in compliance with the Alabama Constitu-

tion, and three would be majority-minority.

80.     In the 2002 redistricting, the county delegation was set up with nine majority-minority

House districts and nine white dominated districts.  This arrangement neatly mirrors the racial

composition of the county. But this is not the arrangement in the enacted plans. First of all, as noted above, one of the majority-minority districts was removed from Jefferson County despite the fact that the minority population in the county had grown and the white population declined. But the enacted plan then adds six House districts, five of which have less than ten percent of their population in Jefferson County (see Table 4). These added districts are all white dominated. This makes the House delegation ten white districts and 8 minority districts. So a 50/50 county with the largest city in the state that is overwhelmingly minority would be governed by a House delegation that is dominated by whites, and almost certainly white Republicans.

81.     On the other hand, none of the minority-majority districts in Jefferson County extent into the surrounding counties. Thus the white (certainly Republican) representatives in the larger urban area have a "say" in the affairs of Jefferson County, but the black Democratic representatives have no comparable "say" in the affairs of the surrounding suburban counties.

82.     The enacted Senate plan adds five Senate districts that swoop into Jefferson County from the surrounding counties (Table 4). Jefferson County population is not a significant part of any of these five, and all of them are white districts. This makes the Senate delegation three minority members and five white members. And in similar fashion to the arrangement in the House, the majority-minority Senate districts in Jefferson County do not extend into the surrounding counties.

83.     This racially unequal treatment of the Jefferson County delegation is not unique. Montgomery County among others, were treated in a similar fashion in the enacted plans. In Montgomery County the black population increased by 16,894 from 2000 to 2010, while the white population declined by 18,524. Yet the enacted plan eliminated one minority-majority House district in Montgomery rather than one white district. But I have cited Jefferson County in detail

as the clearest example of this kind of disparate treatment of minority voters in the enacted plans.

84.     From a political perspective, this treatment of Jefferson and Montgomery counties is analogous to situations in which there is at-large voting or other arrangements that submerge minority voters.  It is ironic that minority voters in Jefferson County are treated this way, since the lack of home rule is itself a product of Alabama's racist past:

> [G]eneral hostility to home rule in the 1901 Constitution, as well as the 1875 Constitution, was motivated at least in part by race: 'white control of the state government ... is an important fall-back provision for guaranteeing the maintenance of white supremacy in majority black counties. And so it's important not to have too much power in the hands of the counties, or to make sure that the power ... that is at the local level is safe, that is, Democratic [now Republican] and white hands.' (*Knight v. Alabama*, 458 F.Supp.2d 1273, 184-85 (N.D. Ala. 2004), aff'd 476 F.3d 1219 (11th Cir.), cert. denied, 127 S.Ct. 3014 (2007) (citation omitted).

## SPLITTING PRECINCTS SHOWS RACIAL INTENT

85.     As far as I know, splitting precincts or VTDs[7] when drawing districts is not necessarily a violation of the Voting Right Act or any other legal requirement.  In some states, however, (e.g., New Mexico) the law requires following precinct lines unless necessary to provide the almost exact one-person-one-vote precision assumed to be required in Congressional districts.  Given the costs and voter confusion that ensues from split precincts, most states consider splitting precincts to be unwise, and avoiding such splits is a kind of universal traditional districting principle.

86.     In my experience as an election administrator and scholar who studied election processes, I have found that splitting precincts places a special burden on minority voters because of their greater reliance on precinct political organization and the inevitable effects of any election relat-

---

[7] The distinction between a precinct and a VTD (voter tabulation district in Census language) is subtle.  For all practical purposes when the districts are drawn the two are synonymous terms, and will be so treated here.  Over time, after the redistricting is completed, some VTDs are split into two or more precincts.  To emphasize that these are real entities with which voters are familiar and depend on, I will use the term precinct.

ed disruption on those with less education and financial resources to deal with bureaucracy. Splitting precincts along racial lines can result in segregating polling places. The financial costs of precinct splits are borne by the counties, which are often cash-poor in rural states like Alabama. Heavily black counties in Alabama (the so-called "black belt") are especially likely to be struggling financially.

87.     Some precinct splits can be handled by simply changing the borders of existing precincts. This may not be possible when the proposed Senate and House districts cut across each other. If simply moving the lines will not suffice, election officials can handle other precinct splits by creation of an expensive mini-precinct or the use of different ballot styles for different voters depending on where they live in the precinct. The former approach may involve finding a suitable location for the voting, staffing a precinct for only a handful of voters, and informing voters of the new voting location. The latter approach creates confusion in the voting process. Often voters are given a ballot style that does not match the particular combination of districts for the block in which they reside.

88.     In any case, data on split precincts tells us a great deal about how the plans were drawn and how racial data were used in constructing the districts. There are available political data on precincts. So that a line drawer who uses whole precincts to form districts knows how the district is likely to behave politically. For example, by combining the vote for partisan statewide offices in the precincts that make up the district, the line drawer can determine more or less whether the district would be favorable to Republican or Democratic candidates for legislative office. Such a combination of statewide votes for the past decade would be called the "normal vote."

89.     No political data is available for census blocks, the basic units of analysis available from

the 94-171 Census data used in redistricting throughout the country.  A block is simply a piece of land surrounded on all sides by a physical feature such as a road, river, creek, railroad line, or a recognized political boundary such as a county or city limit.  Election results are tabulated only at the precinct level.  Because of the secret ballot, one cannot know from available data how the voters in a given census block voted.  Since voters in Alabama do not register by political party, block data on the partisanship of registered voters is not even available in those larger counties where it might be possible to geocode the location of each registered voter.  As Mr. Hinaman (the author of the enacted plans, see below) admitted in his deposition (25 June 2013, p. 113), the program he used to create the plans does not accurately divide political data when precincts are split.  He had political data on precincts obtained from the Republican National Committee's extensive database.

90.     But the 94-171 data is rich in racial data and data on Latinos.  It follows that a line drawer can use racial or ethnicity data to draw districts at the block level.  This is useful, if the purpose of the line drawer is to segregate the races with the full understanding that racial data is highly important politically, especially in Alabama.  A line drawer who wishes to increase the segregation of the races to pack and isolate non-white voters and improve the chances of white Republican legislative victories in "bleached" districts might split many precincts.

91.     Table 5 compares the numbers of split precincts in the enacted House plan to the Democratic House plan (HB16) and the enacted Senate plan to the Democratic Senate plan (SB5).  There is no question that Mr. Hinaman relied heavily on racial data in drawing the districts, as he split 164 precincts in his Senate plan and 423 in his House plan.  These precinct splits mainly divided heavily minority blocks from heavily white ones.  There are about 2,000 precincts in Alabama.  A few of these splits may have been created by minor changes made in his plans by the

Committee and on the floor of the two chambers.  But almost all of them were present in his original plans.

92.     Mr. Hinaman split 47 precincts into three in the house plan, six into four pieces, and one into an unbelievable five pieces.  There are fewer splits in senate plans because the districts are so much larger.  The Hinaman Senate plan splits 46 precincts around white Democrat Marc Keahey's District 22 in order to reduce the non-white VAP from 34% down to 27%.  This is another example of cracking a white Democrat's district by manipulating the concentration of minority voters.

93.     The Democratic plans drawn by Mr. William S. Cooper split no precincts in the Senate, and only 11 in the House.  These 11 were split only because some of the precincts had discontinuous territory and in one or two cases the size of the precincts may have necessitated splitting for one-person-one vote purposes.  To be sure, it is easier to form districts without splitting precincts when the allowable deviation is 10% (Cooper's plans) than when a conservative 2% deviation (Hinaman's plans) is demanded.  But as one who has drawn districts for jurisdictions, the Department of Justice, and the Federal Courts since the mid-1980s, I can say that it is not necessary to split such a larger proportion of the precincts in order to achieve less than a 2% deviation.  Even when drawing Congressional districts with zero deviation, it is rarely necessary to split more than one or at most two precincts for each district.

94.     It is clear to me that Mr. Hinaman was drawing districts with racial data, not political data *per se*, and his goal, as shown in Figure 3, was to increase the racial segregation of the districts to create an all non-white Democratic Party and an all white Republican Party.

OTHER § 2 SENATE FACTORS IN THE
TOTALITY OF THE CIRCUMSTANCES

95.     Defendants admit that minority citizens in Alabama suffer from disparities in income,

education, health, etc.  In their answer to Complaint of Newton Plaintiffs 9 January 2013, ¶ 19 they write: "With respect to the allegations of paragraph 19, the State Defendants admit that, as a historical matter, black citizens in Alabama generally suffer from disparities in income, education, employment, and health."  It is not just history, of course.  Current American Community Survey data from the U.S. Census confirms that these differences still exist.  This is the first of what are commonly called the "Senate factors" in a § 2 analysis.  These are things that enhance the discriminatory effect of governmental actions that submerge minority populations or otherwise inhibit their political participation or opportunity to elect representatives of their choice.

96.     Alabama also admits that elections are racially polarized. In their Answer to Complaint of Newton Plaintiffs 9 January 2013, ¶ 18: "With respect to the allegations of paragraph 18, the State Defendants admit that, when partisan campaigns are involved, African-American voters in Alabama generally vote for Democratic candidates and that many, but not all, white voters often vote for Republican candidates. They deny that such partisan alignment, in and of itself, constitutes racially polarized voting."  They can deny it if they wish, but when one race votes differently than the other, it is racially polarized voting by definition as the *Gingles* case made clear.  The only question is how great is the polarization.  The answer, from a multitude of academic studies and expert testimony in Alabama voting rights case, is extreme polarization (see for example, Bullock and Gaddie, Tables 2.5 and 2.6).  Dr. Alan Lichtman's declaration in this case provides ample proof that elections continue to be extremely polarized in Alabama.

97.     While the Latino population in Alabama is still small, Republican legislators worry that Latino numbers will grow unless illegal immigration is curbed and this is important to them because Latino citizens vote for Democrats (see

http://www.cullmantimes.com/local/x2072622472/Beason-Dems-don-t-want-to-solve-illegal-

immigration-problem).

98.     The defendants also admit (Answer to Complaints of Newton Plaintiffs, 9 January 2013, ¶ 20 and 22) that Alabama has a history of racial discrimination in voting and other areas: "white officials in Alabama – who for the past 150 years have been almost exclusively Democrats – acted to deter participation by black citizens and to disrupt and hamper black political organizations."  And in ¶ 23 they admit that federal courts and the U.S. Justice Department have found state and local voting practices to be racially discriminatory.

<u>DIRECT EVIDENCE OF INTENT TO DISCRIMINATE</u>

99.     It is rare today to find direct evidence of intent to discriminate, because legislators are aware of the laws against discrimination, and usually hide racist motives in public statements.  There are, however, two recent decisions in which the federal courts have found direct evidence that powerful Alabama Republican legislators, who were elected or reelected in 2010, were guilty of intentionally acting in their legislative capacity with the intent to discriminate against racial or ethnic minorities.

100.    The first of these federal court cases is *Central Alabama Fair Housing Center et al. v. Magee  835 F.Supp.2d 1165 (2011)* Civil Action No. 2:11cv 982-MHT in the United States District Court, Middle District of Alabama, Northern Division, 12 December 2011. This lawsuit was a challenge to the application of § 30 of the Beason-Hammond Alabama Taxpayer and Citizen Protection Act (commonly called "HB 56").  The court granted a preliminary injunction against enforcement.  This was a part of a series of court cases challenging the constitutionality of HB 56.[8]  I will focus only on those aspects of the decision in

---

[8] In different ways, prior litigation claimed that HB 56, in its entirety and in specific provisions, was unlawful on its face, that is.  In that litigation, which was filed in the Northern

which the court found intentional discrimination by the Republican majority in the legislature under the *Arlington Heights* factors. Specifically, the court wrote as follows, excerpts from 1189-1195 footnotes excluded:

> Nevertheless, after considering the factors listed in *Arlington Heights* — the effect of the bill, its historical background, the sequence of events leading up to its enactment, its substantive departures, and the contemporaneous statements of legislators — the court is convinced that, while the record clearly establishes that concern about illegal immigration was a substantial factor behind the passage of HB 56, there is substantial evidence that race and national origin also played a role in the passage of HB 56. First, the effect of HB 56 falls disproportionately upon Latinos. Until recently, Alabama had only a minuscule Latino population. Today, however, Latinos comprise approximately 3.7% of the State's population. And like the broader national trend, the unauthorized immigrant population in Alabama has increased dramatically in recent years: from 5,000 in 1990 to 120,000 in 2010. Though unauthorized immigrants account for roughly 2.5% of the State's population, *id.* at 52, the overwhelming majority (between 65% and 77%) of these immigrants in Alabama are Latino. In short, Latinos make up a disproportionate share of the State's foreign-born population and constitute a large majority of the State's non-citizen population, which is why HB 56 has the greatest impact on this community.

> Second, while the plaintiffs do not allege that there were any deviations of procedure with respect to HB 56, they do argue that the State departed substantively from values it would normally prioritize when it passed the statute. The court agrees that, with HB 56, the State departed dramatically from the way it has historically treated, indeed, prioritized the treatment of, children. . .

> In sum, the court finds that the evidence in this record indicates that HB 56 is a substantive departure from the State's typical treatment of families and children in particular; in other words, the court has serious doubts that children — and, in particular, children who are actually citizens of this Nation — who are of a different hue, race, and nationality would have been treated so adversely. "[T]he factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. 555.

---

District of Alabama, the court temporarily enjoined all of HB 56 until September 28, 2011, at which time it declined to enjoin the entire Act preliminarily, but found a number of individual sections likely unlawful. *Hispanic Interest Coal. of Ala. v. Bentley,* __ F.Supp.2d __, 2011 WL 5516953 (Sept. 28, 2011) (Blackburn, J.); *United States v. Alabama,* 813 F.Supp.2d 1282 (N.D.Ala.2011) (Blackburn, J.). The court held that § 30 of HB 56 should not be enjoined. *United States v. Alabama,* 813 F.Supp.2d at 1349-51, 2011 WL 4469941, at *59-60. Both the private parties and the United States sought a stay of enforcement pending the outcome of their appeal for the non-enjoined sections of HB 56. The Eleventh Circuit Court of Appeals granted in part and denied in part the stay. *United States v. Alabama,* 443 Fed.Appx. 411, 420, 2011 WL 4863957, at *6 (11th Cir.2011).

Moreover, that HB 56's treatment of children in mixed status families, who are over-whelmingly Latino, is so markedly different from the State's historical treatment of children in general suggests strongly that the difference in treatment was driven by animus against Latinos in general and thus that the statute was discriminatorily based.

Third, with regard to the *Arlington Heights* factors of background and contemporaneous statements of legislators, two concerns counsel that these two factors should be considered with caution but still critically. The first concern is that, throughout its history, the United States has experienced multiple waves of immigrants. In turn, these influxes often produce backlash. *See Mojica v. Reno,* 970 F.Supp. 130, 145 (E.D.N.Y.1997) (Weinstein, J.) ("It is well known that prejudice against the Irish, the Chinese, the Japanese, the Italians, the Jews, the Mexicans and other emerged as these groups emigrated in substantial numbers."). . .

While this background teaches that backlashes to influxes of immigrants have been regularly a part of our national history, it does not warrant the conclusion that, in Alabama, HB 56 was product of such backlash. This history does, however, teach that legislation that comes on the heels of a substantial immigrant influx — in particular, where the legislation, as demonstrated above, has a disproportionate impact on these immigrants — should be eyed carefully.

The court's second concern is the fact that, in their statements about HB 56, Alabama legislators often spoke about illegal immigrants and Latinos in the same breath and the fact that Latinos were mentioned often in the debate on HB 56 should not be taken as conclusive, or even necessarily indicative, that Latinos were the discriminatory target of HB 56. The plaintiffs themselves have argued, and the court has agreed, that Latinos make up 64.8% of the non-citizens residing in Alabama. The topic of Latinos is unavoidable in the discussion immigration in Alabama. Indeed, legislative arguments against the passage of HB 56 often centered on the statute's impact on Latinos.

At the same time, however, the court must be sensitive to the use, in the legislative debates, of illegal immigrant as a code for Latino or Hispanic, with the result that, while addressing illegal immigrants was the target, discriminating against Latinos was the target as well. This use is dramatically reflected in how HB 56's drafter, Representative Hammon, conflated race and immigration status. After a reporter inquired about Hammon's oft-repeated comment that "Alabama has the second-fastest-growing illegal immigrant population in the nation" and asked for evidence substantiating Hammon's claim, Hammon sent the journalist a news article that indicates Alabama's *Hispanic* population had the second-largest percentage growth between 2000 and 2010, and says nothing about unauthorized immigration whatsoever. *Hammon Doesn't Know Difference Between `Hispanic' and Illegal Immigrant* (June 23, 2011), in (Doc. No. 14-3, at 117); *see* Jeremy Gray, *Alabama Hispanic Population growth 2nd Highest in the U.S.,* The Birmingham News (Mar. 26, 2011) (article that Hammon sent journalist).

101.   The court cited a number of other state legislators who made racist statements on the

floor of the legislature during the debate on this bill.  While black Democrats made some of these

unfortunate racist statements, the legislation was a Republican vehicle from the beginning, and

opposed by most Democrats and almost all black Democrats.  Both sponsors (Beason and Hammon) are Republicans.  When a delegation of Latinos came to the legislature to object to the legislation, black Democratic legislators were the only ones who came out and welcomed their support (Toussaint deposition, 11 June 2013, p. 20).

102.    In the Senate the critical vote was on the Smitherman motion to "non-concur" to the House bill, which would have killed it or forced revision.  All the Democrats voted to non-concur, and all the Republicans voted to pass it, including Jerry Fielding who was then a Democrat but later switched to Republican.  Even on final passage in the Senate, only one black Democrat and three white Democrats voted for passage.  Again, all the Republicans voted for the bill.  In the House all of the Republicans voted to pass the bill except for Alan Baker.  Seven white Democrats voted for the bill, while three white Democrats voted against it.  Twenty-four black Democrats voted against the bill, and only two voted to pass it.

103.    The second case is directly on point for this litigation.  This case is *United States v. McGregor et al.*, Criminal Action No 2:10cr186-MHT (WO), In the Middle District of Alabama, Northern Division, 20 October 2011.  The court found that powerful members of the Republican majority in the legislature acted specifically and intentionally to minimize or cancel out the ability of black voters to participate equally in the political process.  This evidence came to light in a criminal case about vote buying in the legislature, not popular voting and elections.  It was alleged that votes were bought to ensure the passage of Senate Bill 380 ("SB380"), which would have authorized a constitutional referendum on legalization of electronic bingo.  The bill passed the Senate, but after the federal investigation into vote buying was known, the House of Representatives declined to vote on SB380.  The opposition to the bill among Republicans centered on the belief that a referendum on the question would increase the turnout of minority voters.

43

104.    During the investigation Republican Senators Scott Beason and Benjamin Lewis, and Republican Representative Barry Mask wore "wires" that recorded conversations with lobbyists and other legislators and their phones were tapped.  The court's direct evidence of intent to discriminate against black voters comes from these recorded conversations.  The court states in footnote 1 that it is unclear why Beason recorded these racist discussions with his political allies.  The government acknowledges that it was an inadvertent recording.  Beason may have simply forgotten he was wearing a wire after recording numerous conversations with other lawmakers.  The court notes (footnote 4) that this evidence exists only because Beason voluntarily wore surreptitious recording devices.  Such indisputable evidence of intentional racial discrimination is rarely available.  This explains why there is no comparable <u>direct</u> evidence of intent in the passage of the redistricting plans.  In footnote 5 the court dispenses with the argument of the government that Beason and Lewis did not make all of the racist commentary in the recording.  They were simply present during the discussions.  This argument is unpersuasive to the court given Beason's and Lewis's own statements.  And, in the same footnote, the court states that: "it is still clear that such sentiments remain regrettably entrenched in the high echelons of state government."

105.    The court wrote (starting at p. 9, footnotes omitted):

> As a preliminary matter, the court finds that Beason and Lewis lack the credibility that the government sought to establish. The evidence introduced at trial contradicts the self-serving portrait of Beason and Lewis as untouchable opponents of corruption. In reality, Beason and Lewis had ulterior motives rooted in naked political ambition and pure racial bias.
>
> The court finds that Beason and Lewis lack credibility for two reasons. First, their motive for cooperating with F.B.I. investigators was not to clean up corruption but to increase Republican political fortunes by reducing African-American voter turnout. Second, they lack credibility because the record establishes their purposeful, racist intent.
>
> Beason, Lewis, and their political allies sought to defeat SB380 partly because they believed the absence of the referendum on the ballot would lower African-American voter

turnout during the 2010 elections. One of the government's recordings captured Beason and Lewis discussing political strategy with other influential Republican legislative allies. A confederate warned: "Just keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help." Trial Transcript, Doc. No. 1298, at 80. The participants predicted: "Every black, every illiterate" would be "bused on HUD financed buses." Id. Beason agreed: "That's right. This will be busing extra. . . . Because you gotta have somebody to pay for those buses." Id. At 81. One participant replied that casinos would provide "free food" and gambling certificates to get black voters to the polls. Id.

In a separate conversation, during which Lewis asked whether the predominantly black residents of Greene County were "y'all's Indians?," id. at 86, Beason responded by derisively referring to blacks as "Aborigines." Id. At 87.

The court finds that Beason and Lewis cooperated with the F.B.I. in order to secure political advantage. The evidence at trial showed that black communities in Alabama tend to support electronic bingo. The evidence further demonstrated that black voters tend to be Democrats. See Trial Transcript, Doc. No. 1298, at 75-90; ex. J-504 & J-505. Indeed, Beason's and Lewis's scheme was predicated on their belief that blacks supported electronic bingo and Democratic candidates.

In an environment characterized by racially polarized voting, politicians can predictably manipulate elections--either by drawing districts or setting an issue for a referendum--to "minimize or cancel out [minority voters'] ability to elect their preferred candidates." Thornburg v. Gingles, 478 U.S. 30, 48 (1986). By preventing SB380 from appearing on the 2010 ballot, Beason and Lewis believed that black voters would stay home on election day, thereby increasing Republican chances to take control of the state legislature. The evidence indicates that Beason and Lewis sought to inculpate the defendants primarily to neutralize a potential political threat. Beason's and Lewis's political objective undercuts the anti-corruption motive they advanced at trial.

The racially discriminatory purpose expressed in the recordings further undermines Beason's and Lewis's credibility. It is, perhaps, unsurprising that politicians have political motives to disrupt and defeat legislation advanced by opponents. But Beason, Lewis, and other influential Republican politicians did not target Democrats generally in their opposition to SB380; they plainly singled out African-Americans for mockery and racist abuse. Cf. LULAC v. Clements, 999 F.2d 831, 854 (5th Cir. 1993) (en banc) (commenting that § 2 of the Voting Rights Act, 42 U.S.C. § 1973, "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats").

Beason's and Lewis's statements demonstrate a deep seated racial animus and a desire to suppress black votes by manipulating what issues appeared on the 2010 ballot. Lawmakers who harbor such sentiments lack the integrity expected from elected officials.

The intersection of political strategy and purposeful racial prejudice is nothing new. Alabama has a lengthy and infamous history of racial discrimination in voting. See, e.g., City of Pleasant Grove v. United States, 479 U.S. 462 (1987); Hunter v. Underwood, 471 U.S. 222 (1985); Gomillion v. Lightfoot, 364 U.S. 339 (1960); Harris v. Siegelman, 695 F. Supp. 517 (M.D. Ala. 1988) (Thompson, J.); Dillard v. Crenshaw County, 640 F. Supp. 1347 (M.D. Ala. 1986) (Thompson, J.); Buskey v. Oliver, 565 F. Supp. 1473 (M.D. Ala.

1983) (Thompson, J.); United States v. Alabama, 252 F. Supp. 95 (M.D. Ala. 1966) (Rives, J.); Sims v. Baggett, 247 F. Supp. 96 (M.D. Ala. 1965) (per curiam); United States v. Parker, 236 F. Supp. 511 (M.D. Ala. 1964) (Johnson, J.); United States v. Penton, 212 F. Supp. 193 (M.D. Ala. 1962) (Johnson, J.); Section 5 Objections, U.S. Dep't of Justice, http://www.justice.gov/crt/about/vot/sec_5/al_obj2.php (last visited Oct. 14, 2011) (listing all objection imposed against Alabama under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, including 24 from 1990 to present). In light of this history, the court cannot disregard clear evidence of political manipulation motivated by racism.

To some extent, "[t]hings have changed in the South." Northwest Austin Mun. Util. Dist. No. One v. Holder, 129 S. Ct. 2504, 2514 (2009). Certain things, however, remain stubbornly the same. In an era when the "degree of racially polarized voting in the South is increasing, not decreasing," Alabama remains vulnerable to politicians setting an agenda that exploits racial differences. H.R. Rep. No. 109-478, at 34 (2006) (internal quotation marks omitted). The Beason and Lewis recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this State. Today, while racist sentiments may have been relegated to private discourse rather than on the floor of the state legislature, see Busbee v. Smith, 549 F. Supp. 494, 500 (D.D.C. 1982) (Edwards, J.) (labeling a state lawmaker a "racist" for using racial slurs to refer to majority-minority districts), it is still clear that such sentiments remain regrettably entrenched in the high echelons of state government.

The government has repeatedly argued that the issue of racism is irrelevant to the crimes alleged in the indictment.   But the court cannot consider this evidence a mere distraction. As the court has explained, the issues of motive and bias are directly relevant to evaluating the credibility of the government's cooperating witnesses.

Furthermore, Beason's and Lewis's wrongful motivations are relevant to the political corruption at the heart of this trial. As detailed below, the government has proven the existence of an illegal vote buying conspiracy by a preponderance of the evidence. The government rightly seeks to prosecute illicit bribery in the guise of campaign contributions. Campaign support explicitly conditioned on a specific vote or other official action distorts the political process by placing lawmakers into the pockets of the most generous donors.  Tolerating such bribery schemes leaves the public with no assurance that its elected officials will consider the general merits of legislation, rather than its impact on the wealthiest donors.

At the same time, the discriminatory intent expressed by Beason, Lewis, and their influential legislative friends represents another form of corruption infecting the political system. Like the defendants, Beason's and Lewis's opposition to the bill was not grounded in impartial evaluation of the merits of SB380. Rather, they were motivated by a fear of who might turn out to vote. The purpose of their competing scheme was to maintain and strengthen white control of the political system. It is intolerable in our society for lawmakers to use public office as a tool for racial exclusion and polarization. This form of race discrimination is as profoundly damaging to the fabric of democracy as is the bribery schemes the government seeks to punish.

106.    The racism of these powerful Republicans is not confined to animosity toward blacks

alone.   As the court notes in footnote 2, although various remarks are aimed primarily at blacks, Beason's racist animus extends to Native Americans in jokes about "aboriginals."

107.    In addition to Beason, who was retained as the chair of the powerful Senate Rules Committee after the racist tapes became public, and Lewis, who was rewarded by the Republican Governor with a state judgeship, other powerful Republican legislators were also caught on tape making racist comments and indicating that they wished to diminish black voting.  Among them were then Senator Larry Dixon of Montgomery, Chair of the Senate Energy and Natural Resources Committee, Judiciary Committee Co-Chair and Local Legislation 3 Chair Ben Brooks of Mobile, Senate Governmental Affairs Chair and Rules Committee Vice-Chair Jimmy Holley of the "Wiregrass" region of the state, Senate Finance and Taxation Education Chair Trip Pittman of Baldwin County, and Monica Cooper, a Republican Senate Caucus staff member.

108.    None of the other White Republican leaders involved in these and other recorded calls made objections to the racist comments of and to Beason, Lewis, and Mask.  After the public release of the tape recordings, there was no response from the Republican leadership in the legislature.  The State Republican Chair defended Beason as late as June 2011.  Senator Beason has never offered a public apology for his recorded racist comments.  Senate President Pro Tem, Del Marsh, retained Beason as the Chair of the powerful Rules Committee until 15 November 2011.  The Republican Governor subsequently rewarded Lewis with a state court judgeship.  Media accounts suggest Lewis was not the most qualified for the judgeship, perhaps not qualified at all (http://blog.al.com/spotnews/2010/10/alabama_legislator_benjamin_le.html, last accessed on the date of my declaration in this case).

INDIRECT EVIDENCE OF INTENT

109.    Indirect evidence of intent in an *Arlington Heights* analysis includes evidence that the normal procedures were not followed and that the representatives of minority group members were excluded from meaningful participation in the process.  There is evidence of both of these in the process by which the Alabama Legislature considered and passed the enacted redistricting bills.

110.    As discussed above, the legislative super-majority used the pretexts of an artificially re-strictive 2% deviation rule and the idea that § 5 requires packed districts to give their line drawer a free hand in drawing districts to maximize white Republican advantage.  This is what I call the "devil made me do it" defense.  But the process by which these lines were drawn and adopted is also crucial indirect evidence of intent.

111.    To facilitate discussion of the process, I have prepared a time line of the major steps in the process (Table 6).  The first page of this table reflects the actions of the Reapportionment Committee, while the second page reflects the action of the House and Senate in the special ses-sion of the legislature that enacted the bills.

112.    The redistricting cycle starts with the February 2011 release of the 94-171 dataset show-ing the block level census data by race and Hispanic or Latino identification of residents above and below age 18.  (These data are the source for all the district statistics I cite in this written tes-timony.) The Reapportionment Committee began meeting in March 2011.  The Committee con-sists of 22 members, which included two black senators and three black representatives.  That is 23% of the membership in a state where minority residents are 30% of the population.  There were a total of only 2 Democratic senators on the Committee, and four Democratic representa-tives (27% of the committee membership).  So the white Republicans held a comfortable 16 to 6

majority on the Committee.  Whatever the minority race or party representation, this was not a deliberative body in which even this minority could meaningfully contribute.

113.    The first order of business was the adoption of the official guidelines.  The minority members saw the danger in the 2% rule immediately, argued against it, and voted to amend it repeatedly.  Representatives Ford and Boyd offered a substitute set of guidelines that would not specify the total deviation allowed.  The substitute was tabled by a party line vote (Committee Minutes of 4 May 2011).  This was followed by seven statewide hearings on Congressional and Board of Election districts.  After these plans were adopted by the legislature, pursuant to the Alabama Constitution in the first regular session of the legislature following the release of census data, the attention of the Committee shifted to the legislative districts.

114.    The Committee arranged for 21 public hearings held throughout the state during October of 2011, allegedly to gather information from the public for use in constructing the districts for the legislature.  Often Committee's legal counsel, Dorman Walker, would mention that the hearings were in some way required by the Department of Justice as part of preclearance.  This hinted that the hearings were not to be taken seriously.  And, in reality they were window dressing and played no part in the construction of the plans, as I will show below.

115.    I have performed a content analysis of the minutes of these meetings (Table 7).  Content analysis is a systematic methodology for turning oral or written material into numeric codes for analysis.  The procedures are common in the social sciences, and I was trained in these methods and have evaluated articles using these methods for peer reviewed publications.  Each number in the table represents one speaker mentioning that subject.  For example, only 12 speakers mentioned the question of how much deviation in population between districts is allowed.  Some members of the Reapportionment Committee, and the Committee legal counsel, attended all or

many of the meetings. Their repetitive introductory comments at the beginning of each meeting are not counted. However, when these representatives spoke after the introductions at a meeting in their region they were counted.

116.    The meetings were held prior to the presentation of any proposed maps. Therefore, the discussion could only involve abstract principles, not implementation. Indeed, 49 different speakers complained about the lack of any meaningful participation in the process absent some maps to consider. These comments came in 13 of the hearings. Thirty-eight speakers mentioned the importance, in principle, of recognizing race in Alabama politics by appropriate districting. No one suggested that the current packing of minority districts was appropriate, and many speakers suggested that the majority-minority districts should be de-packed. Similarly, the importance, in principle, of being fair to both political parties was mentioned 13 times.

117.    But the bulk of the comments, and by far the largest amount of time in all 21 of the hearings, concerned the importance of specific county lines. Many speakers implored the Committee to keep their county in one district. Others requested that particular combinations of smaller counties be continued as in existing districts. These comments came from those who identified themselves as Republicans as well as those who identified themselves as Democrats. They came from community leaders as well as evident political party activists. These were not abstract requests based on the Alabama Constitution or some assumption of the importance of county lines. These speakers gave specific reasons to believe that their county or some particular combination of whole smaller counties constituted a community of interest. The comments were also very specific. These were not general principles, but specific requests to draw the lines in particular ways. Rarely was the conflict between the 2% rule and following county lines mentioned. One

of the exceptions is quoted in the exchange between Committee Counsel Walker and Representative England quoted above.

118.    It would be impossible for anyone to read these transcripts or attend the meetings in person as the co-chairs of the Committee did, and not be struck by the importance of county lines to the attentive publics.  County line concerns were overwhelmingly dominant, and the totals in Table 7 only hint at the lop-sided amount of time devoted to this subject.  Indeed, even Committee co-chair Representative McClendon spoke in favor of county lines in the hearing in Anniston on 17 October 2011.  Some of the combinations of counties and requests to keep specific counties whole would have been impossible even with a more generous 10% deviation rule.  But the total abandonment of concern for county integrity, as implied in the Alabama Constitution, is evident from the data in Table 3.  The hearings evidently had no impact on the way the plans were drawn.  Ignoring the hearings and Alabama Constitutional sanction of county boundaries constitute procedural irregularities important for an *Arlington Heights* analysis.

119.    The rules of the Permanent Legislative Committee on Reapportionment provide:

> Rule 24. Drafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data Bank at least ten (10) days prior to introduction.

120.    The first redistricting plans from the Reapportionment Committee co-chairs (called "working plans") were developed by Mr. Randy Hinaman, and delivered to the Reapportionment Office less than ten days before the end of the regular legislative session.  The attempt was made in the Senate to change or suspend rule 24 to allow consideration of the Hinaman plans.  But such a change is difficult since a hurried rule change faces procedural hurdles.  A unified Democratic minority may or may not have been able to block the rule change in the Senate.  But it was,

in any case, blocked in the House.  Since the rules of the Committee are joint rules agreed to by both houses, it takes both houses to change them.  Because of some parliamentary maneuvers in the House, the change in Rule 24 would have required a four-fifths vote, and the unified Democrats had enough votes to block the change even in the face of a unified Republican caucus.  This meant that the redistricting was postponed to a special session.  It may be, however, that consideration of the legislative redistricting plans in a special session was contemplated all along (see below).

121.    It is perhaps telling that at least some counties must submit their redistricting plans to the public in final form four weeks before adoption to allow for full public comment on the actual implementation (Montgomery hearing on 18 October 2011, page 15).  There was only one "official" public hearing on the actual plans, in Montgomery on 17 May 2011, the same day the plans were adopted by the Committee, and a week before the plans were enacted by the legislature.  The Democrats, however, held five public hearings throughout the state on 11 May 2012 presenting the maps of the various plans as alternatives.

122.    The co-chairs presented the Hinaman-developed "working plans" to the Committee on 9 May 2012.  These plans were ready by 3 January 2012, and Mr. Hinaman admits that all changes to those initial plans made after being presented in May were minor involving limited swaps of precincts or blocks between a few districts (Hinaman deposition, p. 95).  Such exchanges would have to be limited to maintain the 2% overall deviation under which Mr. Hinaman was working.  Thus the overall pattern of the plans was complete in January and could have been submitted, considered, and passed during the regular legislative session as required by the Alabama Constitution.  Instead, the plans were concealed from the public and the legislature for months until the very end of the regular legislative session.  Representative McClendon testifies that violating the

Alabama Constitution by delaying the consideration of redistricting until a special session was planned from the beginning, and not a result of some unplanned circumstances such as, for example, a conflict with Rule 24 (deposition, p. 115-6).

123.    By delaying the consideration of the plans until a special session where they would have to be rushed through the process, the co-chairs and Mr. Hinaman prevented any possible mobilization of the public against the plans or serious consideration of their effects.  Mr. Hinaman's overall design of the plans could not be contested or amended except in minor detail.  This is an extreme procedural irregularity (i.e., an intentional violation of the Alabama Constitution) that worked to the disadvantage of minority voters and legislators, a consideration in an *Arlington Heights* analysis.

124.    Mr. Hinaman is a Republican activist and lobbyists, who was once a principal of the lobbying and consulting firm Smith, Hinaman & Associates, which may now be defunct.  He is well known in his home state, Virginia, and Alabama as a consultant and manager of campaigns for Republican candidates such as Jo Bonner, Congressman in the Alabama 1st District.  Mr. Hinaman was paid to draw the plans by a group called "Citizens for Fair Representation, Inc."  Whatever the origins and financial basis of this group, the co-chairs and Mr. Hinaman agree that his job was to work exclusively for the Republican caucuses (see McClendon deposition, 21 May 2013, pp. 11, 97, 122-3; Hinaman deposition, p. 130).  Yet there is nothing submitted in discovery by the co-chairs, Senator Dial and Representative McClendon, to indicate any communication with Mr. Hinaman.  They testify only to giving him the Guidelines, asking him to monitor the hearings on line, and requiring that the minority districts have approximately the same concentration of minorities as in the old plans.  There is no sign from the results of his efforts that he responded to any comments in the hearings.

125.    By deposition testimony of Representative McClendon, Senator Dial, and Mr. Hinaman we know how the plans were constructed to some extent.  Mr. Hinaman started work on the House and Senate plans as early as September 2011, when he met with the Republican Party leaders in the legislature, Speaker of the House Mike Hubbard and Senate President Pro Tem Del Marsh.

126.    In the redistricting process, the co-chairs and Mr. Hinaman treated white Republican legislators very differently than the black and white Democrats, to the special disadvantage of the latter.  Mr. Hinaman worked directly with Republican legislators to formulate the districts they would prefer.  These work sessions involved the use of his computer to draw and revise districts with real-time feedback on the population numbers and the political and racial nature of the districts being constructed (McClendon deposition, p. 97; Dial deposition, p. 31).

127.    Black and white Democratic legislators worked with one of the co-chairs (Senators with Dial, Representatives with McClendon) on paper copies of their own district without any statistics involved beyond notice of whether the existing district was too large or too small for the 2% deviation rule.  Legislators concerns were then passed on to Mr. Hinaman via these scribblings on the maps, to work the suggestions into the plans as he saw fit and within the general rules of a total 2% deviation, retention of packed black districts, and the preferences of the white Republicans (Hinaman deposition, p. 47; McClendon deposition, p. 18-20, 40-55, and 79).  There are some copies of these paper maps in the materials provided by the co-chairs in discovery with markings showing how the legislators indicated they would prefer their districts to be redrawn.

128.    But Mr. Hinaman testified that he initially drew the black districts "on his own" (Hinaman deposition, p. 39).  The extent to which he could or did include suggestions from the black and white Democrats is unclear.  He later worked directly with some Democrats on minor

changes to their districts as the proposals were going to the floor of the legislature for passage (Hinaman deposition, pp. 40-1), but by then the overall pattern of the districts had long been set in stone, and these changes could only have been minor swaps between adjacent districts.

129.    All of the work with the Democrats was through one of the co-chairs and using the re-strictive procedure of drawing preferred changes of on a paper map of that member's district.  It is not clear whether these one-on-one consultations included all of the Democrats and all of the blacks.  Some of the minority legislators testify that they tried to get an appointment with one of the co-chairs, but were unable to do so.  Moreover, these one-on-one sessions put the minority legislators at a decided disadvantage.  While they have at least the illusion of some control over their own district lines, they have no way to even see the way the plans are developing overall. They have no way to publicize the development of the plans or to criticize their development. What one member wants may conflict with another member's needs.  Once they have given their paper and crayon desires to the co-chair, they had no way to know how their wishes were incor-porated into the final plan by Mr. Hinaman until the plans were presented in May.

130.    It is not clear who had overall access to Mr. Hinaman's developing plans.  Representative McClendon testifies that individual members only had access to their own district until the "working plans" were introduced (deposition, p. 97).  In addition to the co-chairs, the staff of the Reapportionment office had access (Dial deposition, p.92). We do not know the extent to which Mr. Hinaman's work or statistics on the effects of the plans might have been shared with other party leaders such as Speaker Hubbard and President Pro Tem Marsh.

131.    This "divide and conquer" approach of appearing to involve some minority legislators in the development of the plan is comparable to the procedure used by the Texas legislative redis-tricting committees in drawing their plans for the Texas House and Congress.  That process was

found to be intentionally discriminatory by the D.C. District Court in the *Texas v. U.S.* case cited above.  In fact, minority legislators in Texas had far more control over the design of their own districts than did minority legislators in Alabama.

132.    The original "working plans" from Mr. Hinaman, were changed very little in versions "2" and "3."  These later versions of the House and Senate plans were the ones enacted and submitted to the Department of Justice for preclearance.  In a couple of places Mr. Hinaman had evidently placed a legislator out of his or her district and minor line changes were made to correct this.  In a couple of cases districts were corrected so that two Republican legislators would not be facing off in a primary.  Also in one situation the lines between two white Democrats were adjusted at their mutual request.  In other cases where Democratic legislators will be competing in a primary, the lines were not changed.  One of these districts where two Democratic incumbents will face each other in a primary was made necessary by the elimination of one majority-minority district in Jefferson County.  There is some finger pointing between Mr. Hinaman and Representative McClendon on who is responsible for the elimination of the black districts in Jefferson and Montgomery counties (McClendon deposition, pp. 112-3; Hinaman declaration, p. 3).

133.    Some minor changes were made on the floor of the House and Senate.  But no changes after the 9 May 2011 presentation of the "working plans" were consequential to the overall pattern of the original plans drawn by Mr. Hinaman.  The white Republicans had substantial input into their own districts.  The input of black and white Democratic legislators was not only confined to their own district, but that input was general and subject to the priorities given to Mr. Hinaman and enforced by the co-chairs.  Those priorities were: packing of the majority-minority districts, reduction of the minority concentrations in other districts by cracking, and accommoda-

tion of the wishes of the white Republican legislators.  And all of this within the bounds of the ultra-conservative 2% deviation rule.

134.    There was certainly no way that the original "working plans" could be changed in this process to take account of county lines, communities of interest, balance between the political parties, other traditional districting principles enunciated in the Committee Guidelines, or the wishes of the attentive publics as expressed in the hearings during October.  Any such changes would have required wholesale redesign of the Hinaman plans.  Neither the time schedule nor the institutional arrangements made such redesign possible.  The overall pattern of the plans was virtually locked in from the beginning of the process.

135.    In both the Committees and on the floor of the House and Senate, the minority legislators offered their plans as substitutes for the co-chair's plans.  These efforts were all defeated along party line votes in the various committees and on the floor of both houses (Table 6).  The only exception I could find to party-line voting was one white Democratic Representative (Charles Newton) who voted for the Republican House plan, but not for the Republican Senate plan.  While Representative Newton remains a Democrat, he is known as being very conservative and often votes with the Republicans.  There are various absences or voting "present" noted in many of these votes, but these don't necessarily mean anything.  Certainly absences can't be counted as being contrary to the pattern of the legislator in other votes.

136.    To summarize briefly, the black and white Democratic representatives and senators had the illusion of participation in the process in the sense that they could offer amendments, vote, speak freely, and provide suggestions for their own district.  But it is an illusion of participation.  The plans were drafted out of state and submitted to the Committee as basically a *fait accompli*.  Minor, almost cosmetic, changes were made that had no bearing on the opportunity of minority

voters to participate in the political process.  The plans were driven strictly by partisanship and pushed through by a super-majority that has no need to seriously consider the legitimate concerns of minority legislators or the minority party in an extra-constitutional special session.  The process was first delayed in a manner contrary to the explicit wording of the Alabama Constitution and then rushed along with no provision for public comment or the ability of minority legislators to rally public opposition.  This inordinate rush is contrary to the original rules, which called for a ten-day waiting period during the regular legislative session, and the expectation of public participation.  The public hearings were meaningless exercises in window dressing.

<u>CONCLUSIONS</u>

137.    The enacted House and Senate plans bear more heavily on minority voters than on white voters in a number of ways.  Minority voters are bunched together in packed districts thereby diluting their voting strength in surrounding districts.  A minority district in Jefferson County was moved out of that county despite the fact that minority population in the county has increased while white population has declined.  The minority voters' representatives and senators in the Jefferson County delegation are submerged by the unnecessary inclusion of white districts that swoop in from surrounding counties to become part of that county delegation.  Montgomery County minority voters were similarly discriminated against.

138.    The districts were drawn using racial and political data.  The number of split precincts in the enacted plans, however, show that race, not merely partisanship, was used in drawing the plans.  Political data exists only at the precinct level.  When one draws a plan at the block level, only racial data is available.

139.    The aim of the Republican super-majority in the legislature is to create a kind of politico/racial apartheid in which there will be only white Republicans and minority Democrats in Al-

abama.  Figure 3 shows graphically how the districts have been bifurcated or segregated.  Republican legislators have not been shy about stating their desire to eliminate all of the Democrats in the legislature except those elected from packed majority-minority districts.  Part of this process has been to entice white Democrats to switch parties, while making no such entreaties to black Democrats.

140.   Recent federal court decisions have found direct evidence of discriminatory intent to document the racial motives of the Alabama legislature.  Specifically, one court has found that the Republican leadership was motivated by a desire to suppress minority votes.  Indirect evidence of intent can be found in procedural irregularities and the way in which the redistricting plans were enacted without actual meaningful participation by minority legislators.

141.   In my professional opinion, sufficient evidence has been presented in this written testimony for the court to determine whether the enacted redistricting plans have the effect of discriminating against minority voters and were enacted with that intent or purpose.

I declare under penalty of perjury,

that the foregoing is true and correct,

to the best of my knowledge and belief,

so help me God.

Executed this ___27th___ day of ___July___ 2013.


_Theodore S. Arrington_

_____

**Theodore S. Arrington, Ph.D.**

# SELECTED REFERENCES ON INTENT

Binion, Gayle. 1983. "'Intent' and Equal Protection: A Reconsideration." *Supreme Court Review*: 397-457.

Eisenberg, Theodore, and Sheri Lynn Johnson. 1991. "The Effects of Intent: Do We Know How Legal Standards Work?" *Cornell Law Review* 76: 1151-97.

Ely, John Hart. 1970. "Legislative and Administrative Motivation in Constitutional Law." *Yale Law Journal* 79: 1025-1341.

Karlan, Pamela S. 1983. "Discriminatory Purpose and Mens Rea: The Tortured Argument of Invidious Intent." *Yale Law Journal* 93: 111-34.

Karst, Kenneth L. 1978. "The Costs of Motive-Centered Inquiry." *San Diego Law Review* 15:1163-66.

Kousser, J. Morgan. 1988. "Expert Witnesses, Rational Choice and the Search for Intent." *Constitutional Commentary* 5:352-53.

Kousser, J. Morgan. 1991. "How to Determine Intent: Lessons From L.A." *Journal of Law and Politics* 7:591-732.

Kousser, J. Morgan. 1992. "Was Memphis's Electoral Structure Adopted or Maintained for a Racially Discriminatory Purpose?" *Caltech Social Science Working Paper No. 807.* Pasadena: California Institute of Technology.

Kousser, J. Morgan. 1999. *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* Chapel Hill: The University of North Carolina Press [especially chapters 2 and 7].

McCrary, Peyton. 1985. "Discriminatory Intent: The Continuing Relevance of 'Purpose' Evidence in Vote-Dilution Lawsuits." *Howard Law Journal* 28:463-93.

Mele, Alfred R. 1992. *Springs of Action: Understanding Intentional Behavior.* New York: Oxford University Press.

Miller, Andrew P., and Mark A. Packman. 1987. "Amended Section 2 of the Voting Rights Act: What is the Intent of the Result Test?" *Emery Law Journal* 36:1-73.

Miller, Barry A. 1977. "Proof of Racially Discriminatory Purpose Under the Equal Protection Clause: *Washington v. Davis, Arlington Heights, Mt. Healthy, and Williamsburgh*." *Harvard Civil Rights-Civil Liberties Law Review* 12: 725-70.

Note. 1976. "Reading the Mind of the School Board: Segregative Intent and the De Facto/ De Jure Distinction." *Yale Law Journal* 86:317-55.

Note. 1982. "Making the Violation Fit the Remedy: The Intent Standard and Equal Protection Law." *Yale Law Journal* 92:328-51.

Ortiz, Daniel R. 1989. "The Myth of Intent in Equal Protection." *Stanford Law Review* 41:1105-52.

Parker, Frank R. 1983. "The 'Results' Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard." *Virginia Law Review* 69: 715-64.

Weinzweig, Marjorie J. 1983. "Discriminatory Impact and Intent Under the Equal Protection Clause: The Supreme Court and the Mind-Body Problem." *Law and Inequality* 1: 277-339.

Table 1 – Percentage Non-White Voting Age Population
Majority-Minority House Districts 2010 Census

| District Number | % Non-White VAP Districts Used 2002-2010 | % Non-White VAP Enacted Plans 2012-602 & 603 |
|---|---|---|
| House | | |
| 19 | 73 | 65 |
| 32 | 59 | 61 |
| 52 | 65 | 64 |
| 53 | 60 | 64 |
| 54 | 58 | 56 |
| 55 | 73 | 75 |
| 56 | 64 | 65 |
| 57 | 69 | 68 |
| 58 | 77 | 71 |
| 59 | 69 | 79 |
| 60 | 68 | 69 |
| 67 | 67 | 67 |
| 68 | 62 | 64 |
| 69 | 63 | 64 |
| 70 | 60 | 61 |
| 71 | 64 | 66 |
| 72 | 59 | 63 |
| 73* | 52* | 16* |
| 76 | 71 | 77 |
| 77 | 74 | 67 |
| 78 | 76 | 73 |
| 82 | 58 | 64 |
| 83 | 60 | 60 |
| 84 | 54 | 56 |
| 85** | 48.5** | 50.2** |
| 97 | 60 | 59 |
| 98 | 64 | 60 |
| 99 | 72 | 65 |
| 103 | 68 | 65 |
| Senate | | |
| 18 | 67 | 65 |
| 19 | 75 | 68 |
| 20 | 81 | 67 |
| 23 | 66 | 66 |
| 24 | 65 | 66 |
| 26 | 78 | 80 |
| 28 | 56 | 64 |
| 33 | 68 | 74 |

*Actual loss of one majority-minority district at the VAP level, represented by white Democrat.
**This district has had a black Democratic Representative in all elections since 2002.

**Figure 1 -- Race and Party of Candidates Who Won Legislative Elections in 2010 by the Percentage of the Non-White Voting Age Population in the Districts, House and Senate Combined**



**Figure 2 -- Box Plot of Race and Party of Candidates Who Won Legislative Elections in 2010 by the Percentage of the Non-White Voting Age Population in the Districts, House and Senate Combined  (Plots show minimum, maximum, mean, and standard deviations above and below the mean)**



## Figure 3 -- Percentage Non-White Voting Age Population in Enacted Senate and House Districts



Table 2

Changes in Population in Jefferson County 2000-2010 by Race

| Year of the Census | Population | Whites | Blacks |
|---|---|---|---|
| 2000 Census | 662,047 | 384,639 | 260,608 |
| 2010 Census | 658,466 | 349,166 | 276,525 |
| Difference | 3,581 | -35,473 | +15,917 |

Table 3

Comparison of County Splits in Old Plans, Democratic
Alternatives HB16 and SB5, and Enacted Plans
(Number of Districts Split Across Counties)

| Number of Districts In that Many Counties | Old 2002-2010 District Plans | Democratic Plans 2012 -- SB5 & HB16 | Enacted Plans 2012 |
|---|---|---|---|
| Senate Plans | | | |
| All in One County | 12 | 17 | 9 |
| Two Counties | 15 | 12 | 1 |
| Three Counties | 5 | 6 | 8 |
| Four Counties | 0 | 0 | 12 |
| Five Counties | 1 | 0 | 2 |
| Six Counties | 1 | 0 | 1 |
| Seven Counties | 1 | 0 | 1 |
| Eight Counties | 0 | 0 | 1 |
| House Plans | | | |
| All in One County | 69 | 69 | 48 |
| Two Counties | 32 | 11 | 6 |
| Three Counties | 2 | 20 | 30 |
| Four Counties | 1 | 5 | 14 |
| Five Counties | 1 | 0 | 4 |
| Six Counties | 0 | 0 | 1 |
| Seven Counties | 0 | 0 | 2 |

Table 4

House and Senate Districts in Enacted Plans that are in Jefferson County
Showing Percent Non-White VAP And Percentage of District in the County

| House or Senate and District Number | Percent of District Population In Jefferson | Percent Non-White VAP In the District |
|---|---|---|
| Senate 18 | 100% | 70% |
| Senate 19 | 100 | 74 |
| Senate 20 | 100 | 72 |
| Senate 5 | 3 | 29 |
| Senate 14 | 2 | 40 |
| Senate 15 | 8 | 40 |
| Senate 16 | 14 | 37 |
| Senate 17 | 12 | 30 |
| | | |
| House 44 | 100% | 34 |
| House 46 | 100 | 33 |
| House 47 | 100 | 46 |
| House 51 | 100 | 29 |
| House 52 | 100 | 71 |
| House 54 | 100 | 66 |
| House 55 | 100 | 81 |
| House 56 | 100 | 73 |
| House 57 | 100 | 76 |
| House 58 | 100 | 79 |
| House 59 | 100 | 85 |
| House 60 | 100 | 76 |
| House 14 | 81 | 25 |
| House 15 | 6 | 37 |
| House 16 | 2 | 32 |
| House 43 | 1 | 34 |
| House 45 | 3 | 37 |
| House 48 | 6 | 32 |

Table 5

Comparison of Precinct (VTD) Splits Between

SB5, HB16, and the House and Senate Enacted Plans

| Number of VTD (Precinct) Splits | Enacted Senate Plan 2012-603 | SB5 Democratic Plan | Enacted House Plan 2012-602 | HB16 Democratic Plan |
|---|---|---|---|---|
| Split in Two | 157 | 0 | 369 | 11* |
| Split in Three | 6 | 0 | 47 | 0 |
| Split in Four | 1 | 0 | 6 | 0 |
| Split in five | 0 | 0 | 1 | 0 |
| Total Number of Split Precincts (VTDs) | 164 | 0 | 423 | 11* |

*According to the declarations of Williams S. Cooper, who drew the Democratic plans, these precincts had to be split because they had discontinuous territory (satellite areas), or were too big to include in one district or another for one-person-one-vote reasons.

| Date | Table 6 -- Time Line<br>Permanent Joint Legislative Committee<br>on Reapportionment for 2011-2014 |
|---|---|
| **2011** | |
| February | Census Data Released |
| 23 March | Meeting |
| 30 March | Meeting |
| 3 May | Guidelines discussed Ford offers amendment |
| 4 May | Ford amendment revoked, Guidelines adopted |
| May | 7 hearings on Congressional and Board of Education |
| 18 May | Meeting |
| 19 May | Meeting |
| October | 21 hearings on State Legislative Districts* |
| **2012** | |
| 9 May | "working" plans for House and Senate presented |
| 11 May | Democrats conduct five public hearings with proposed maps** |
| 17 May 9:30am | House and Senate "plans 2" adopted |
| 17 May 11:00am | Public Hearing in Montgomery |
| 17 May 1:00 pm | House and Senate "plan3" adopted |

* Fort Payne, Dekalb County 3 Oct 2011. Doc.30-9
> Huntsville, Madison County, 3 Oct 2011. Doc 30-11
> Fayette, Fayette County, 4 Oct 2011. Doc 30-12
> Florence, Lauderdale County, 4 Oct 2011. Doc 30-13
> Decatur, Morgan County, 4 Oct 2011. Doc 30-14
> Clanton, Chilton County, 6 Oct 2011. Doc 30-15
> Pelham, Shelby County, 6 Oct 2011. Doc 30-16
> Birmingham, Jefferson County, 6 Oct 2011. Doc 30-17
> Troy, Pike County, 11 Oct 2011. Doc 30-18
> Greenville, Butler County, 11 Oct 2011. Doc 30-19
> Dothan, Houston County, 11 Oct 2011. Doc 30-20
> Brewton, Escambia County, 11 Oct 2011. Doc 30-21
> Thomasville, Clarke County, 11 Oct 2011. Doc 30-23
> Demopolis, Marengo County, 11 Oct 2011. Doc 30-24
> Tuscaloosa, Tuscaloosa County, 11 Oct 2011. Doc 30-25
> Mobile, Mobile County, 12 Oct 2011. Doc 30-22
> Anniston, Calhoun County, 17 Oct 2011. Doc 30-26
> Auburn, Lee County, 17 Oct 2011. Doc 30-27
> Selma, Dallas County, 18 Oct 2011. Doc 30-28
> Montgomery, Montgomery County, 18 Oct 2011. Doc 30-29
> Guntersville, Marshall County, 30 Oct 2011. Doc 30-10

**Held at Bessemer, Birmingham, Mobile, Montgomery, and Tuscumbia

| Table 6 (continued) -- Time Line Legislative Actions by Separate Houses* | | |
|---|---|---|
| **2012** | Action by<br>House of Representatives | Action by<br>Senate |
| 17 May<br>Thursday | House plan Read 1st time<br>Referred to Committee | Senate plan Read 1st time<br>Referred to Committee |
| 18 May<br>Friday | House plan passes Constitu-<br>tion, Campaigns & Elections<br>Committee<br>---------------------------<br>House plan Read 2nd time<br>placed on House Calendar | Senate plan passes Judiciary<br>Committee<br>---------------------------------<br>Senate plan Read for 2nd time<br>And placed on the Calendar |
| 21 May<br>Monday | House Plan Read 3rd time<br>Six Substitutes tabled<br>House plan passes the full<br>House | Four Senate plan substitutes<br>Rejected<br>Motion to end debate adopted |
| 22 May<br>Tuesday | Senate plan Read 1st time<br>Referred to Committee | House plan read 1st time<br>House plan referred to commit-<br>tee<br>---------------------------------<br>Senate plan read 3rd time<br>passes the full Senate |
| 23 May<br>Wednesday | Senate plan passes Constitu-<br>tion, Campaign and Election<br>Committee<br>---------------------------------<br>Senate plan Read 2nd time<br>And placed on Calendar | House plan passes Government<br>Affairs Committee<br>---------------------------------<br>House plan Read for 2nd time<br>Placed on Calendar |
| 24 May<br>Thursday | Senate plan 3rd Reading<br>Two Substitutes tabled<br>Previous Question passed<br>Senate Plan passes in the full<br>House | House plan 3rd reading<br>Three Substitutes defeated<br>House plan passes in the full<br>Senate |
| 31 May<br>Friday | Both plans signed by the Governor | |

*All party line votes, except for Representative Charles Newton (white Democrat), who voted for the final Republican House bill.  Senator Jerry Fielding, who was a white Democrat at the time of these votes, voted with the Democrats.  He subsequently changed parties.

Table 7

Content Analysis of Minutes of October Hearings Throughout State

| Date | Place | Deviations | County lines | Partisan-ship | VRA & Race | See map |
|------|-------|-----------|-------------|--------------|-----------|---------|
| 3 Oct | Ft Payne | 0 | 5 | 0 | 2 | 2 |
| 3 Oct | Huntsville | 0 | 0 | 0 | 0 | 0 |
| 4 Oct | Decatur | 0 | 3 | 0 | 0 | 0 |
| 4 Oct | Florence | 0 | 3 | 0 | 0 | 0 |
| 4 Oct | Fayette | 0 | 6 | 0 | 0 | 0 |
| 6 Oct | Pelham | 1 | 1 | 0 | 1 | 1 |
| 6 Oct | Clanton | 0 | 4 | 0 | 0 | 0 |
| 6 Oct | Birmingham | 0 | 3 | 0 | 5 | 9 |
| 11Oct | Troy | 0 | 12 | 0 | 0 | 0 |
| 11 Oct | Dothan | 0 | 3 | 0 | 0 | 1 |
| 11 Oct | Greenville | 0 | 10 | 0 | 0 | 0 |
| 11 Oct | Brewton | 1 | 11 | 0 | 0 | 0 |
| 11 Oct | Thomasville | 3 | 16 | 1 | 4 | 3 |
| 11 Oct | Demopolis | 1 | 2 | 2 | 2 | 5 |
| 11 Oct | Tuscaloosa | 2 | 4 | 2 | 6 | 2 |
| 12 Oct | Mobile | 1 | 1 | 1 | 4 | 7 |
| 17 Oct | Anniston | 0 | 6 | 3 | 5 | 6 |
| 17 Oct | Auburn | 0 | 12 | 2 | 5 | 1 |
| 18 Oct | Selma | 2 | 2 | 2 | 4 | 4 |
| 18 Oct | Montgomery | 1 | 12 | 0 | 0 | 7 |
| 30 Oct | Guntersville | 0 | 6 | 0 | 0 | 1 |
| Total | All locations | 12 | 122 | 13 | 38 | 49 |

Unit of analysis is one speaker mentioning that subject. For example,, 122 different speakers mentioned county lines, while only 12 people mentioned population deviation rules. Mentions of members of the Reapportionment Committee were counted only when they were speaking in the one meeting in their region. Other subjects were mentioned on occasion, but these encompass almost all statements made at the hearings.

Deviation: These were mentions of the population deviations allowed between largest and smallest district. Occasional mentions of "one person one vote" were not counted unless it was clear whether they were advocating 2% or 10% or suggesting that a small or larger deviation was wise.

County lines: These were mentions of keeping counties or a particular county whole or reducing the number of different districts in the county. No one suggested that a county should be divided or divided more, but one speaker did seem to advocate keeping one particular town split. These comments dominated the hearings. Only a few speakers seemed to recognize the conflict between a 2% rule and keeping any counties whole or even reducing the number of spits.

Partisanship: These were any mention of the role that partisanship does or should play in the process. Most were advocates of being fair to both parties. Few of these were specific references, except a couple that discussed the relationship of partisanship to race.

VRA and Race: These were comments on the importance of recognizing the opportunity of blacks to elect representatives of their choice.  Some advocated de-packing districts. No one suggested increasing black concentrations.  There was some discussion of the concentration necessary to give black voters a reasonable opportunity to elect candidates of their choice.  No one advocated creating sure-thing districts.

See Map:  These were very consistent comments that the hearing was not as useful as a hearing with map proposals available.  Indeed, some of these individuals testified that hearings without the maps were useless.  Promises were made that the maps would be available to the public before they were voted on, but no specific timetable was given.