IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALABAMA LEGISLATIVE          )
BLACK CAUCUS, et al.,        )
                             )
          Plaintiffs,        )
                             )   CASE NO. 2:12-CV-691
     v.                      )      (Three-Judge Court)
                             )
THE STATE OF ALABAMA, et al.,)
                             )
          Defendants.        )
_____    )
                             )
DEMETRIUS NEWTON, et al.,    )
                             )
          Plaintiffs,        )
                             )   CASE NO. 2:12-CV-1081
     v.                      )      (Three-Judge Court)
                             )
THE STATE OF ALABAMA, et al.,)
                             )
          Defendants.        )

**<u>MEMORANDUM OPINION AND ORDER</u>**

On April 3, 2013, the State of Alabama and Beth Chapman, in her official

capacity as Secretary of State of Alabama, filed a motion for a partial summary

judgment against count three of the amended complaint of the Alabama Legislative

Black Caucus, Bobby Singleton, the Alabama Association of Black County

Officials, Fred Armstead, George Bowman, Rhondel Rhone, Albert F. Turner Jr.,

and Jiles Williams Jr.  On April 17, 2013, the Black Caucus plaintiffs filed motions

for this Court to reconsider our denial of their second motion for a partial summary judgment and for the entry of a permanent injunction.  For the reasons explained in this memorandum opinion and order, we **GRANT IN PART** the motion for a partial summary judgment in favor of the State defendants as to the first claim in count three and **DISMISS** the second claim in count three for lack of subject matter jurisdiction.  In the alternative, we **GRANT** a summary judgment in favor of the State defendants as to the second claim in count three.  We **DENY** the Black Caucus plaintiffs' motion for reconsideration and **DENY AS MOOT** their motion for the entry of a permanent injunction.

## I.  BACKGROUND

This case concerns the redistricting of the Alabama Legislature, and this order concerns claims of partisan gerrymandering and a denial of equal protection. The Black Caucus plaintiffs contend that the new districts for the election of the Alabama Legislature violate their rights under the First and Fourteenth Amendments.  And the Black Caucus plaintiffs allege that one key problem with the new districts involves the malapportionment of county residents in the districts of local delegations for various counties.  To understand the context of those claims, we will explain the organization of the legislature, the most recent effort of the legislature to redistrict itself, and the procedural history of this litigation.

The legislative power of Alabama is vested in the Alabama Legislature, which consists of the Senate and the House of Representatives.  Ala. Const. Art. IV, § 44.  Members of the Legislature are elected on the first Tuesday after the first Monday in November, and they serve for terms of four years.  Id. § 46.

Because all members of the Legislature are elected on the same day, each new four-year session of the Legislature begins with an organizational session.  Id. § 48.01.  At this organizational session, the only business that may be conducted is "the organization of the legislature, the election of officers, the appointment of standing committees of the senate and the house of representatives for the ensuing four years," and the certification of elections.  Id.  Each Legislature is free to adopt its own internal rules and committees for the facilitation of lawmaking.  The current session of the Alabama Legislature employs standing committees to study the subject matter of legislation and make recommendations to the houses about bills, as well as a Rules Committee to determine the order of business in each house.  But a bill cannot become law in Alabama until that bill has been approved by a majority of each house of the Legislature and signed by the Governor or approved again by a majority of the Legislature over the veto of the Governor.  Id. Art. V, § 125.

Because the Constitution of Alabama limits the power of local governments, the Alabama Legislature is responsible for a significant amount of local legislation,

and the current Legislature uses local delegations to facilitate the passage of this legislation. Each house has similar, but not identical, customs for local bills.

All members of the Senate are members of local delegations for the counties that they represent. The local delegation of a particular county must approve local legislation before it can move forward to a local legislation committee and again before it can be sent to the floor. The local delegations of Jefferson County, Mobile County, and Madison County each have a standing local legislative committee made up of the same members as the local delegation, and the rest of the local delegations use another local legislative committee whose members are appointed. The latter committee does not vote on the local legislation; instead, the local delegations of the counties sign the legislation out of that committee. Although local legislation is often uncontested on the Senate floor as a matter of local courtesy, there is no Senate rule that requires deference to delegations. Any senator may oppose local legislation on the floor of the Senate. And on tax and alcohol related matters, Senate members routinely contest legislation for other localities.

All members of the House of Representatives too are members of local delegations for the counties that they represent. Each local delegation with more than five members has a corresponding standing committee in the House of Representatives to consider its local legislation, and a separate standing committee

4

considers local legislation from all other delegations.  A local delegation with more than five members must approve local legislation by a majority vote before it is sent to the House floor, but a local delegation with fewer than five members must unanimously approve the bill before it is sent to the House floor.  House members are free to oppose local legislation on the floor, but local legislation is often uncontested as a matter of courtesy.  Although local legislation is often uncontested in the House of Representatives, legislators can and do deviate from this practice.  House Rule 23 allows any member of the House of Representatives to file a contest on a local bill as long as he or she does so in written form with the Clerk.  See Ala. H. Rule 23.  If the member of the House of Representatives wishes to contest a bill for more than one day, that member can submit one letter and inform the Clerk each day that the contest is still active.  While the bill is under contest, it cannot be presented to the full House, unless four/fifths of those present and voting suspend the rules to bring the bill to the floor or the rules committee places the bill on a special order calendar.  Local legislation is not enacted until it receives a majority vote in both houses of the Alabama Legislature and is signed by the Governor.

The rules for local legislation, including the use of local delegations, are adopted in the organizational session held each quadrennium and can be modified at any time.  At the end of a quadrennium, the rules and committees that protect the

system of local delegation cease to exist until such time as the Legislature adopts a system of local delegation again.  Although the rules for local legislation that have been adopted by each Legislature have been fairly consistent over the last twenty years, new local legislative committees have been created.  The House of Representatives has created new local delegation committees when new district lines have split counties so that at least five members of the Legislature represent voters of that county.  And the Senate has increased the number of standing committees.

After the census in 2010 revealed the malapportionment of the Alabama Legislature, the Legislature created a Joint Legislative Reapportionment Committee to establish guidelines for new legislative districts.  The guidelines provided that, "to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final [] redistricting plan, . . . individual district populations should not exceed a 2% overall range of population deviation." Guidelines Art. II, § 2(b), available at http://www.legislature.state.al.us/ reapportionment/Guidelines.html.  The Guidelines also provided that "[a] redistricting plan will not have either the purpose or the effect of diluting minority voting strength, shall not be retrogressive, and shall otherwise comply with Sections 2 and 5 of the Voting Rights Act and the Fourteenth and Fifteenth

6

Amendments to the Constitution" and that "[a]ll legislative and congressional districts will be composed of contiguous and reasonably compact geography." Id. Art. IV, §§ 2, 4. After public comment, the Legislature approved new district maps, and, on May 31, 2012, Governor Robert Bentley signed into law Acts 2012-602 and 2012-603, which established the new districts.

After Governor Bentley signed the Acts, the Black Caucus plaintiffs filed a complaint against the State and Chapman, in her official capacity as the Secretary of State of Alabama. The complaint asserted three counts: violation of the guarantee of one person, one vote under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. Amend. XIV, § 2; dilution and isolation of the strength of black votes in violation of section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, the Fourteenth Amendment, U.S. Const. Amend. XIV, and the Fifteenth Amendment, U.S. Const. Amend. XV; and partisan gerrymandering in violation of the First Amendment, U.S. Const. Amend. I. The Black Caucus plaintiffs moved for partial summary judgment and preliminary and permanent injunctive relief on count one of their complaint.

The State defendants filed a motion to dismiss or, in the alternative, to stay the action until the Attorney General of Alabama, Luther Strange, obtained either administrative or judicial preclearance of the new districts under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. We granted the motion of the State

7

defendants to stay the matter until either the Attorney General of the United States, Eric Holder, or the United States District Court for the District of Columbia decided whether to preclear the districts.  After Attorney General Holder precleared the new districts, we lifted the stay of the action and denied the motion to dismiss filed by the State defendants.  The State defendants then filed an answer to the complaint and a motion for judgment on the pleadings with respect to all three counts.

After a hearing on the latter motions, another complaint was filed challenging the new districts.  Demetrius Newton, the Alabama Democratic Conference, Stacey Stallworth, Framon Weaver Sr., Rosa Toussaint, and Lynn Pettway filed a complaint against the State; Bentley, in his official capacity as the Governor of Alabama; and Chapman, in her official capacity as the Secretary of State of Alabama.  The Newton plaintiffs asserted three counts in their complaint: violation of section 2 of the Voting Rights Act; racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments; and violations of constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments.  After the Newton action was assigned to this three-judge court, we determined that both the Black Caucus action and the Newton action involve common questions of law and fact and consolidated them to avoid unnecessary repetition and confusion.  See Fed R. Civ. P. 42(a)(2).

8

On December 26, 2012, we denied the first motion for a partial summary judgment filed by the Black Caucus plaintiffs with respect to count one, granted the motion of the State defendants for judgment on the pleadings as to count one, denied the motion by the State defendants for judgment on the pleadings as to count two, and dismissed without prejudice count three of the complaint filed by the Black Caucus plaintiffs.  We granted the Black Caucus plaintiffs leave to amend their complaint "to allege more facts and constitutional grounds to support [their] claim of political gerrymandering and to identify a judicial standard by which we can adjudicate the claim."

The Black Caucus plaintiffs timely filed an amended complaint with a new count three entitled "Partisan Gerrymandering."  The amended complaint identifies as the standard of adjudication for count three "that traditional or neutral districting principles may not be subordinated in a dominant fashion by either racial or partisan interests absent a compelling state interest for doing so, particularly where the traditional districting principle is embedded in the state constitution."  The complaint alleges that the Acts were "designed to promote the agenda of the partisan majority to maximize the number of seats statewide that Republicans will hold in the Legislature" and that the Acts "dilut[e] the voting strength of county residents in electing the members of their local legislative delegations by unnecessarily splitting county boundaries and including in local legislative

9

delegations legislators who are elected in part by voters residing in other counties." The complaint also alleges that a "county's local legislative delegation effectively controls most important local government policies."

The Black Caucus plaintiffs then filed a second motion for a partial summary judgment with respect to count three. On March 27, 2013, we denied the motion for a partial summary judgment. The Black Caucus plaintiffs responded to our denial of their motion with a motion to alter or amend our order. The Black Caucus plaintiffs argued that we failed to state a reason for our decision in contradiction of Federal Rules of Civil Procedure 56(a) and 52(a)(2). Although we denied the motion, we <u>sua</u> <u>sponte</u> vacated our previous order, again denied the motion for a partial summary judgment, and substituted a new memorandum opinion and order. We explained that the claim of partisan gerrymandering filed by the Black Caucus plaintiffs failed to provide a judicial standard for the adjudication of the claim and that, under any standard of adjudication, the Black Caucus plaintiffs failed to explain how they are entitled to a judgment in their favor as a matter of law. We also explained that the Black Caucus plaintiffs failed to establish the absence of a genuine issue of material fact.

On April 3, 2013, the State defendants moved for a partial summary judgment on count three, and made three arguments in support of their motion. First, the State defendants argued that the claim of partisan gerrymandering was

"so closely related to the earlier county-splitting claim as to be another question of state law" that this Court lacks jurisdiction to consider.  Second, the State defendants argued that the Black Caucus plaintiffs have still failed to provide the court any administrable standard by which to assess their claim of partisan gerrymandering.  Third, the State defendants argued that the decision of the Eleventh Circuit in DeJulio v. Georgia, 290 F.3d 1291 (11th Cir. 2002), establishes that the requirement of one person, one vote does not apply to local delegations in Alabama because they do not exercise "general governmental powers."

On April 17, 2013, along with their response to the motion for a partial summary judgment filed by the State defendants, the Black Caucus plaintiffs filed a motion to reconsider our denial of their second motion for a partial summary judgment and a motion for a permanent injunction.  The Black Caucus plaintiffs argued that "[t]he equal protection rights of residents of any county are violated whenever any nonresidents are allowed to vote for the county's local delegation— unless the inclusion of those nonresidents is necessary to comply with statewide equal population requirements."  The Black Caucus plaintiffs also argued that the Acts "unnecessarily allow[] nonresidents to dominate residents of a county," unnecessarily multiply the number of counties that members of the House and Senate represent, and dilute "[t]he voting strength of county residents whose House or Senate district lies entirely within the county . . . when compared with the voting

strength of residents of the same county whose districts extend out of the county."
And the Black Caucus plaintiffs argued that this matter is distinguishable from the
decision of the Eleventh Circuit in DeJulio.  In reply to the Black Caucus plaintiffs,
the State defendants urged us to grant their motion for a partial summary judgment
and deny the motions of the Black Caucus plaintiffs for reconsideration and for
permanent injunction for the same reasons identified in their initial brief.

 At a hearing on the pending motions, the Black Caucus plaintiffs announced
for the first time that count three encompassed two claims: an as-applied challenge
for partisan gerrymandering in violation of the First Amendment and a facial
challenge to the districts based on the Equal Protection Clause of the Fourteenth
Amendment.  The Black Caucus plaintiffs argued that the Acts violate the Equal
Protection Clause because the districts are apportioned to satisfy the requirement of
one person, one vote for the Legislature as a whole, but not for the local
delegations.  And the Black Caucus plaintiffs argued that the districts violate the
First Amendment because the Legislature allegedly acted with partisan motives
when it approved the districts that dilute the votes of county voters for their local
delegations.  The Black Caucus plaintiffs explained that their motion for
reconsideration concerns only the facial challenge under the Equal Protection
Clause, not the as-applied challenge for partisan gerrymandering, even though the
State defendants seek a partial summary judgment against all of count three.

Based upon the arguments made by the Black Caucus plaintiffs at the hearing, we ordered the parties to submit simultaneous briefs on the justiciability of the facial challenge to the districts based on the Equal Protection Clause of the Fourteenth Amendment. In the order, we asked the parties whether the facial challenge to the districts was ripe for our review or whether it was contingent on the decision of the next Legislature to adopt a system of local delegations at the next organizational session. We also questioned whether the Black Caucus plaintiffs could establish Article III standing to bring its claim. And we invited the parties to submit any evidence that might help us to resolve these jurisdictional questions.

The Black Caucus plaintiffs argued that the claim under the Equal Protection Clause in count three is ripe. With respect to ripeness, the Black Caucus plaintiffs asserted that their claim about the interaction of the district lines with the local delegation system is not contingent on future events because "[n]o House or Senate rule or committee structure or assignments adopted in the 2015 organizational session of the Legislature can compel an end to – or even any change in – the local delegation customs the parties now agree are in place." And the Black Caucus plaintiffs argued that they will suffer hardships as voters if judicial review of the new district lines is delayed because their votes for county delegations will be diluted. But the Black Caucus plaintiffs offered no evidence to support their

assertions that the local delegations exist continuously without any action from the Legislature at the organizational session.

The Black Caucus plaintiffs also argued that they had standing to bring the claim.  The Black Caucus plaintiffs explained that their injury-in-fact would be the dilution of their votes for county delegations when the new districts are used.  The Black Caucus plaintiffs disclaimed any injury that they as legislators or candidates might experience.  They argued that the vote dilution of which they complain is "directly traceable to the county-blasting districts" and will be redressed by an injunction to prohibit use of the new districts.

The State defendants argued that the claim under the Equal Protection Clause is not ripe.  The State defendants explained that the injury of which the Black Caucus plaintiffs complain—the interaction of the new district lines with the local delegation system—is contingent upon the decision of the next Legislature to adopt a local delegation system at its organizational session.  And the State Defendants submitted the deposition testimony of the Clerk of the House and the Clerk of the Senate to establish that the Alabama House and Senate adopt their committee rules at the organizational session that follows each election.  As an example of the ways in which the rules of the Legislature can change dramatically between organizational sessions, the State Defendants submitted copies of the rules adopted in the 1995 and 1999 organizational sessions to establish that the

Democratic-controlled Senate in 1999 stripped the newly elected Republican

Lieutenant Governor of the powers that his predecessor had exercised.

The State defendants also argued that the Black Caucus plaintiffs lacked

standing to bring the claim under the Equal Protection Clause.  To the extent that

the Black Caucus plaintiffs had tried to assert legislative standing, the State

defendants explained that the argument would fail because none of the legislators

have a personal stake in the number of counties they represent.  See Raines v.

Byrd, 521 U.S. 811, 821, 829, 117 S. Ct. 2312, 2318, 2322 (1997).  The State

defendants also argued that the Black Caucus plaintiffs, whether suing in their

individual or legislative capacities, lack a concrete, particularized injury-in-fact

because no local delegation system has been adopted for the Legislature that will

be elected in 2014 and we cannot know whether the Legislature will adopt a local

delegation system and, if adopted, what form it would have.  And the State

defendants argued that the harm alleged by the Black Caucus plaintiffs is not fairly

traceable to the districts because the harm is caused by the local delegation system.

Finally, the State defendants contended that "[o]nly a different system for local

legislation would cure the alleged injury" because any plan that would satisfy the

requirement of one person, one vote for the legislature as a whole would require

the splitting of counties.

## II.  DISCUSSION

We grant a summary judgment in favor of the State defendants and against the claim of partisan gerrymandering, see Fed. R. Civ. P. 56(a), and we dismiss for lack of subject matter jurisdiction the claim under the Equal Protection Clause. The Black Caucus plaintiffs have failed to provide a judicial standard by which we can adjudicate their claim of partisan gerrymandering.  And we lack jurisdiction to consider the claim under the Equal Protection Clause both because the Black Caucus plaintiffs lack standing under Article III and because the claim is not ripe. In the alternative, controlling Eleventh Circuit precedent establishes that the challenge under the Equal Protection Clause to the interaction of the districts with the local delegation system fails as a matter of law.

### A. The Black Caucus Plaintiffs Have Failed to Provide a Standard for the Adjudication of Their Claim of Partisan Gerrymandering.

The Black Caucus plaintiffs have failed to provide us what we sought when we dismissed their claim of partisan gerrymandering without prejudice and gave them leave to amend their complaint: "a judicial standard by which we can adjudicate the claim."  Where a court "ha[s] no standard by which to measure the burden [plaintiffs] claim has been imposed on their representational rights, [plaintiffs] cannot establish that the alleged political classifications burden those same rights."  Vieth v. Jubelirer, 541 U.S. 267, 313, 124 S. Ct. 1769, 1796 (2004) (Kennedy, J., concurring in the judgment).  In their amended complaint, the Black

16

Caucus plaintiffs identify the following standard of adjudication for their First Amendment claim: "[T]raditional or neutral districting principles may not be subordinated in a dominant fashion by either racial or partisan interests absent a compelling state interest for doing so, particularly where the traditional districting principle is embedded in the state constitution."  But we cannot adjudicate the claim of partisan gerrymandering under this standard.

The standard proposed by the Black Caucus plaintiffs is inconsistent with the clear statement of Justice Kennedy in his controlling concurrence that a claim for partisan gerrymandering should not be evaluated under the standard used for a claim of racial gerrymandering.  Claims of racial gerrymandering "implicate a different inquiry" from claims of partisan gerrymandering because "[r]ace is an impermissible classification" and political belief is not.  Vieth, 541 U.S. at 307, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment).  "A determination that a gerrymander violates the law must rest on something more than the conclusion that political classifications were applied."  Id.  That determination "must rest [] on a conclusion that the classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective."  Id. ; see also id. at 286, 124 S. Ct. at 1781 (plurality opinion) ("Determining whether the shape of a particular district is so substantially affected by the presence of a rare and constitutionally suspect motive as to

invalidate it is quite different from determining whether it is so substantially affected by the excess of an ordinary and lawful motive as to invalidate it.").  But the standard of adjudication proposed by the Black Caucus plaintiffs makes no distinction between racial and political gerrymandering.  Indeed, the decisions that the Black Caucus plaintiffs offered in support of their standard involved allegations of racial, not political, gerrymandering.  Bartlett v. Strickland, 556 U.S. 1, 6, 129 S. Ct. 1231, 1238 (2009); Shaw v. Reno, 509 U.S. 630, 636 113 S. Ct. 2816, 2821 (1993).  And the standard proposed by the Black Caucus plaintiffs bears a striking similarity to one of the standards borrowed from the context of racial gerrymandering and rejected by five justices of the Supreme Court in Vieth.  See Vieth, 541 U.S. at 284, 124 S. Ct. at 1780 (plurality opinion) (rejecting as vague and unworkable a proposed standard under which a plaintiff "must show that the mapmakers acted with a predominant intent to achieve partisan advantage [statewide], which could be shown by direct evidence or by circumstantial evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of achieving partisan advantage"); id. at 308, 124 S. Ct. at 1794 (Kennedy, J., concurring in the judgment).

The Black Caucus plaintiffs conceded at the hearing on the pending motions that the standard of adjudication for their claim of partisan gerrymandering is "unknowable."  When asked at the hearing how we could "allow a claim to go

18

forward that no one understands" and for which the Black Caucus plaintiffs "don't even know what evidence [they can] marshal to either support it or reject it," the Black Caucus plaintiffs responded that they "simply rely on the credibility of Justice Kennedy's suggestion that lower courts explore what facts might constitute a First Amendment claim."  But relying on that suggestion is not enough.  The Black Caucus plaintiffs bear the burden of providing us a standard to adjudicate their First Amendment claim under count three.  Because they have failed to do so, they have failed to state a claim upon which relief can be granted, see Vieth, 541 U.S. at 313, 124 S. Ct. at 1796–97, and the State defendants are entitled to a partial summary judgment against the first claim in count three, see Fed. R. Civ. P. 56(a).

### B. We Lack Subject Matter Jurisdiction to Review the Black Caucus Plaintiffs' Theory Under the Fourteenth Amendment.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies."  Raines, 521 U.S. at 818, 117 S. Ct. at 2317 (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37, 96 S. Ct. 1917, 1924 (1976)).  Because we have "an independent obligation to examine [our] own jurisdiction," we asked the parties to submit briefs on the justiciability of the claim brought by the Black Caucus plaintiffs under the Equal Protection Clause.   United States v. Hays, 515 U.S. 737, 742, 115 S. Ct. 2431, 2435 (1995) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230–31, 110 S. Ct. 596, 607–08 (1990)).  Based on

the arguments made by the parties and the evidence in the record, we must dismiss the claim under the Equal Protection Clause as nonjusticiable.

We conclude that we lack subject matter jurisdiction to consider the Black Caucus plaintiffs' claim under the Equal Protection Clause for two separate reasons. First, the claim under the Equal Protection Clause is not ripe for review. See United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 89–90, 67 S. Ct. 556, 564 (1947). Second, the Black Caucus plaintiffs do not meet "the irreducible constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992).

1. The Claim Under the Equal Protection Clause Is Not Ripe.

"When determining [whether] a claim is ripe for judicial review, we consider both constitutional and prudential concerns." Nat'l Adver. Co. v. City of Miami, 402 F.3d 1335, 1339 (11th Cir. 2005). "The ripeness doctrine is one of the several 'strands of justiciability doctrine . . . that go to the heart of the Article III case or controversy requirement.'" Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1291 (11th Cir. 2010) (quoting Harrell v. Fla. Bar, 608 F.3d 1241, 1246 (11th Cir. 2010)). "Article III of the United States Constitution limits the jurisdiction of the federal courts to cases and controversies of sufficient concreteness to evidence a ripeness for review." Digital Properties, Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997); see also United Pub. Workers, 330

U.S. at 89–90, 67 S. Ct. at 564 ("The power of courts . . . to pass upon the constitutionality of acts . . . arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference.  A hypothetical threat is not enough.").  "Even when the constitutional minimum has been met, however, prudential considerations may still counsel judicial restraint." Digital Properties, 121 F.3d at 589 (quoting Action Alliance of Senior Citizens v. Heckler, 789 F.2d 931, 940 n. 12 (D.C. Cir. 1986)).  "The ripeness doctrine keeps federal courts from deciding cases prematurely, and protects them from engaging in speculation or wasting their resources through the review of potential or abstract disputes."  United States v. Rivera, 613 F.3d 1046, 1050 (11th Cir. 2010) (internal quotation marks, citations, and alterations omitted).

"To determine whether a claim is ripe, we assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review." Harrell, 608 F.3d at 1258.  "The fitness prong is typically concerned with questions of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.'" Id. (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)).  "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." Id.

21

The claim under the Equal Protection Clause in count three of the amended complaint of the Black Caucus plaintiffs is not yet ripe for judicial review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259 (1998) (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81, 105 S. Ct. 3325, 3333 (1985)). Under the Constitution of Alabama, a newly elected Legislature must convene on the second Tuesday in the January immediately following the general election to organize the Legislature for the next four years. Ala. Const. Art. IV, § 48.01; see also Rules of the Senate of Alabama, Alabama State Senate, available at http://www.legislature.state.al.us/senate/senaterules/senaterulesindex.html (last visited June 11, 2013) (explaining that the rules adopted by the Legislature elected in 2010 govern only the 2011–2014 legislative quadrennium). The Black Caucus plaintiffs allege that the redistricting Acts violate the Equal Protection Clause because of the way in which they interact with the system of local delegations, but that system has not been adopted for the Legislature that would be elected in 2014 in accordance with the new district maps. And only the newly elected Legislature will be able to adopt that system. Because we can neither know whether the Legislature elected in 2014 will adopt a system of local delegations, nor how that system, if adopted, will be structured, the claim under the Equal Protection Clause

22

in count three rests on contingent future events and is not sufficiently concrete and definite to be fit for judicial review. And to withhold consideration of the claim at present will not cause the parties significant hardship because the use of the new districts will not, by itself, cause any harm to the interests of the Black Caucus plaintiffs. The harm of which the Black Caucus plaintiffs complain is dependent upon the future decision of the Alabama Legislature to adopt a system of local delegations.

The Black Caucus plaintiffs argue that the local delegation system has existed continuously from time immemorial, but the undisputed record evidence forecloses that argument. The Black Caucus plaintiffs bear the burden to establish our jurisdiction over their claims, McCormick v. Aderholt, 293 F.3d 1254, 1257 (11th Cir. 2002), and "[i]n response to a summary judgment motion, [they] can no longer rest on [] 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992) (internal quotation marks omitted). The State defendants have submitted sworn testimony from the clerks of both houses of the Alabama Legislature that the rules of the Legislature, including those governing local legislative delegations, are adopted each quadrennium at the organizational session. The Clerk of the House testified in his deposition that the

rules and committees for the Senate "are formed in every organizational session by the speaker of the House and adopted by the House when they adopt the rules" and that the current rules and committees will expire at the end of the current Legislature. The Clerk of the Senate also testified in his deposition that the Senate "adopt[s] [its] operational rules during the organizational session at the beginning of each quadrennium." Although both the Clerk of the House and the Clerk of the Senate acknowledged that the rules for local legislation have rarely changed, both agreed that the rules are adopted in the organizational session and apply only to the sitting Legislature. The next legislature will establish its own rules and committees in January 2015. And the Black Caucus plaintiffs have submitted no evidence to contradict this testimony, but have relied solely on bald assertions in their complaint and in their brief about the continuous existence of the local delegations. Based on the undisputed record evidence, we must conclude that the claim under the Equal Protection Clause, which rests upon the interaction between the districts and the local delegation system, is contingent upon the future adoption of such a system and, as a result, is not ripe for judicial review.

Our dissenting colleague argues that the record, viewed in the light most favorable to the Black Caucus plaintiffs, would support the conclusion that the local delegations exist as a matter of custom and that the Legislature creates only the rules and standing committees during its organizational session, Dissenting Op.

at 26, but the rules and standing committees are the formal governmental mechanisms through which the local delegations operate. For example, all local legislative bills must pass through those standing committees, and it is only by the agreement of the standing committees that the local delegations are able to serve as effective gatekeepers for local legislation. To the extent that the entire theory advanced by the Black Caucus plaintiffs relies on the ability of local delegations to serve as gatekeepers for local legislation, that ability is dependent upon and enshrined in the formal rules and standing committees. And the unrebutted record establishes that those rules and standing committees are created in the organizational session held each quadrennium.

Our dissenting colleague argues, apparently in the alternative, that "the ripeness inquiry this court faces is whether it is sufficiently likely that the State will carry out the anticipated conduct that the plaintiffs contend will cause unconstitutional vote dilution," Dissenting Op. at 17, but that argument fails. Our dissenting colleague relies for this substantial-likelihood test on a decision of the Eleventh Circuit that spoke to an entirely different circumstance than the one we face here. See Mulhall, 618 F.3d at 1291–92. In Mulhall, the Eleventh Circuit faced a claim that was already ripe for review because the defendant was under the compulsion of an arbitral award to take the action that would injure the plaintiff. Mulhall, 618 F.3d at 1292; see also United States v. Zinn, 321 F.3d 1084, 1088

25

(11th Cir. 2003) (holding that a claim was ripe where the controversy concerned a condition of a defendant's supervised release mandated by the district court in its final and immediately appealable sentencing order).  And the question on appeal was whether the outcome of another lawsuit was likely to "<u>deprive</u> the plaintiff of an injury."  <u>Mulhall</u>, 618 F.3d at 1291–92.  But the question we face with respect to the claim advanced by the Black Caucus plaintiffs is whether the injury alleged by the Black Caucus plaintiffs will occur at all, not whether an injury that has already occurred is likely to be cured by some future contingency.  Our dissenting colleague misunderstands our opinion when he suggests that the future contingency with which we are concerned is whether the State will "abolish or materially alter the system."  <u>See</u> Dissenting Op. at 21.

### 2.  The Black Caucus Plaintiffs Lack Article III Standing.

Another "element of the case-or-controversy requirement is that [the plaintiffs], based on their complaint, must establish that they have standing to sue." <u>Raines</u>, 521 U.S. at 818, 117 S. Ct. at 2317.  "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit, although that inquiry 'often turns on the nature and source of the claim asserted.'"  <u>Id.</u> (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 500, 95 S. Ct. 2197, 2206 (1975)) (internal citation omitted). "[S]tanding is perhaps the most important jurisdictional doctrine and, as with any jurisdictional requisite, we are powerless to hear a case when it is lacking.  Simply

put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974–975 (11th Cir. 2005) (internal quotation marks and citations omitted).

To have standing under Article III, a plaintiff must establish three elements. "First, the plaintiff must have suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560, 112 S. Ct. at 2136 (internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Id. at 560–61, 112 S. Ct. at 2136 (internal quotation marks and alterations omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at 561, 112 S. Ct. at 2136 (internal quotation marks omitted).

The Black Caucus plaintiffs cannot satisfy any of these elements for their claim under the Equal Protection Clause. And the failure to satisfy any of these elements is fatal to the justiciability of their claim. The Black Caucus plaintiffs cannot establish an actual or imminent injury, causation, or redressability.

27

The Black Caucus plaintiffs cannot establish the existence of an injury-in-fact for many of the same reasons that their claim under the Equal Protection Clause is not ripe.  "A plaintiff is deemed to have suffered an injury in fact—'an invasion of a judicially cognizable interest'—when he demonstrates a harm that is '(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'"  Elend v. Basham, 471 F.3d 1199, 1207 (11th Cir. 2006) (quoting 31 Foster Children v. Bush, 329 F.3d 1255, 1263 (11th Cir. 2003)).  "If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing."  Id. at 1205.  Although "there is no per se rule denying standing to prevent probabilistic injuries," Fla. State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1162 (11th Cir. 2008), "the threatened future injury must pose a 'realistic danger' and cannot be merely hypothetical or conjectural," id. at 1161.  When a threatened future injury is dependent upon "conjecture about how individuals will intentionally act in the future," id. at 1163, that injury will be "cast . . . into the realm of conjecture and speculation," id. at 1162.  The Black Caucus plaintiffs argue that the implementation of the redistricting Acts during the 2014 election will violate their rights under the Equal Protection Clause because their votes for their county delegation will be diluted by the votes of nonresidents.  But no system of local delegation has been adopted for the Legislature that will be

28

elected in 2014, and the injury alleged by the Black Caucus plaintiffs is dependent entirely on the independent action of a future Alabama Legislature that will be elected in accordance with the independent actions of over one million voters. The threatened injury "depend[s] on conjecture about how [at least two different groups of] individuals will intentionally act in the future"— voters and the legislators who will be elected in 2014. Viewing the evidence in the light most favorable to the Black Caucus plaintiffs, we cannot conclude that the Black Caucus plaintiffs have met their burden to establish the existence of an injury-in-fact. Compare Henderson v. Stalder, 287 F.3d 374, 380 (5th Cir. 2002) (finding that an injury was "based in conjecture" and insufficient to support standing when it was based solely on how the plaintiffs expected the members of a Choose Life Council to administer the Choose Life Fund based on the Christian ideologies held by those members) with Awad v. Ziriax, 670 F.3d 1111, 1123–24 (10th Cir. 2012) (finding that an injury was not conjectural or hypothetical when it was based on a constitutional amendment in Oklahoma already passed by the Legislature and approved by the voters and subject only to certification by the state election board).

Our dissenting colleague argues that the Black Caucus plaintiffs have established the existence of an injury-in-fact because he views it as likely that the future Alabama Legislature will adopt a system of local delegations. Dissenting Op. at 34. He bases that conclusion on the affidavits offered by the State

defendants that the rules governing local legislation have been adopted by each legislature over the past 40 years in approximately the same form, id. at 18; the absence of evidence that anyone "has expressed a desire to abolish or materially alter the system," id. at 21; and his own theory that it would be potentially illegal under the Voting Rights Act for the Alabama Legislature to not adopt a system of local delegation because "it would have the effect of transferring power away from the black legislators who represent the majority-black counties and to the white majority of the State as a whole," id. at 23.

Our dissenting colleague's analysis is fundamentally flawed for at least two reasons. First, our dissenting colleague engages in unwarranted speculation about the legality of the decision of a future Alabama Legislature not to adopt a system of local delegations even though no federal court has ever considered—let alone decided—that issue. And second, our dissenting colleague incorrectly weighs the evidence in the record. Although the record contains evidence that the Alabama Legislature has adopted similar rules governing local delegations for at least the last thirty years, the record also contains evidence that the Alabama Legislature has altered longstanding rules in response to political changes in memberships. Notably, the Democratic majority in the Alabama Senate elected in November 1998 dramatically reduced the power of the Lieutenant Governor when a Republican was elected to that position. Contrary to the suggestion of our

30

dissenting colleague, the requirement that we view the evidence in the light most favorable to the Black Caucus plaintiffs does not require us to disregard this unrebutted evidence about a jurisdictional fact, but instead to weigh it against the other evidence in the record.  And, contrary to the suggestion of the dissent, the absence of evidence does not weigh in favor of the Black Caucus plaintiffs.  The Black Caucus plaintiffs bear the burden to put forth affirmative evidence in the record to establish their standing, and we invited them to do so.  But the Black Caucus plaintiffs instead rested on their bare allegations and offered us no evidence.  The evidence presented by the State defendants, when viewed in the light most favorable to the Black Caucus plaintiffs, establishes the absence of an actual, not conjectural or hypothetical, injury-in-fact.

The Black Caucus plaintiffs also cannot satisfy the second element of standing because the allegedly unconstitutional interaction between the redistricting Acts and the local delegations is not fairly traceable to the implementation of the redistricting Acts.  Standing requires "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Lujan, 504 U.S. at 560, 112 S. Ct. at 2136 (quoting Simon v. E. Ky. Welfare Rights. Org., 426 U.S. 26, 41–42, 96 S. Ct. 1917, 1926 (1976)).  The Black Caucus plaintiffs argue that

31

the redistricting Acts violate the Equal Protection Clause when they provide for the election of legislators who, in turn, represent unequal numbers of county voters in the local delegations, but the redistricting Acts do not create or otherwise provide for the local delegations.  Only the next Alabama Legislature can create the system of local delegations.  Because the constitutional injury alleged by the Black Caucus plaintiffs under the Equal Protection Clause can arise only if the next Alabama Legislature adopts a system of local delegations at its organizational session, the injury of which they complain is not "fairly traceable" to the State defendants' enforcement of the redistricting Acts.

Our dissenting colleague argues that "[t]he injury alleged in this case is caused by the redistricting plans as much as it is by the rules affording all Local Delegation members equal power," Dissenting Op. at 36, but that argument fails. Although "the fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing," it may make it "substantially more difficult . . . to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." Warth v. Seldin, 422 U.S. 490, 504–05, 95 S. Ct. 2197, 2208 (1975).  "[The Black Caucus plaintiffs] must allege facts from which it reasonably could be inferred that, absent the [redistricting plans], there is a substantial probability that [their rights to elect representatives for their local delegations in accordance with the requirement of

one person, one vote would not have been infringed] and that, if the court affords

the relief requested, the asserted [infringement] of [the rights of the Black Caucus

plaintiffs] will be removed." See id. at 504, 95. S. Ct. at 2208. But the Black

Caucus plaintiffs cannot make this showing because, even if the Legislature had

adopted their proposed plans or maintained the malapportioned plans from 2000,

the local delegations would still not be elected in accordance with the requirement

of one person, one vote. The Black Caucus plaintiffs, who bear the burden to

establish our jurisdiction, have submitted no evidence that it would even be

possible for the Legislature to adopt districts that would elect legislators in

accordance with the requirement of one person, one vote for both the Alabama

Legislature and the local delegations.

The Black Caucus plaintiffs also cannot satisfy the third element of standing

because an injunction to prevent the use of the redistricting Acts would not remedy

the injury caused by the adoption of a local delegation system at a future

organizational session of a Legislature elected in accordance with different district

maps. For an injury to be redressable, "it must be 'likely,' as opposed to merely

'speculative,' that the injury will be redressed by a favorable decision." Lujan, 504

U.S. at 561, 112 S. Ct. at 2136 (quoting E. Ky. Welfare Rights, 426 U.S. at 38, 43,

96 S. Ct. at 1924, 1926). As the Eleventh Circuit has explained, "Redressability is

established when a favorable decision would amount to a significant increase in the

likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist., 647 F.3d 1296, 1303–04 (11th Cir. 2011). The only remedy sought by the Black Caucus plaintiffs is an injunction to prevent the use of the new district maps. The Black Caucus plaintiffs have repeatedly asked us not to enjoin the use of local delegations. At oral argument, the Black Caucus asserted that such an injunction "would fly squarely in the face of DeJulio." And in their brief on justiciability, the Black Caucus plaintiffs contended that "[a]ny change in the local delegation customs would not be desirable and might be unlawful." But an injunction to prevent the use of the redistricting acts would not "amount to a significant increase in the likelihood" that the Black Caucus plaintiffs' votes for the members of their local delegations would satisfy the requirement of one person, one vote. Neither the Acts, nor the proposed plans of the Black Caucus plaintiffs, nor the districts created in 2002 satisfy that requirement, and no party has contended that it would be possible to create a plan that is equitably apportioned at both the statewide and local delegation levels.

We also could not enjoin the Legislature from adopting a system of local delegation because the presently unknown officers of the next legislature are not parties to this appeal. See Lujan, 504 U.S. at 568–69, 112 S. Ct. at 2140–41 (explaining that "redress of the only injury in fact respondents complain of requires

action (termination of funding until consultation) by the individual funding agencies; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action" because the agencies were not parties in the matter).  The only official who is a named defendant in this action is Beth Chapman, in her official capacity as Secretary of State, who is not responsible for or in any way connected to the decision of the Legislature to adopt a local delegation system.  And for the same reasons described above, an injunction to prevent the use of the new districts would not redress an injury caused by the failure to elect the members of the local delegations in accordance with the requirement of one person, one vote.

Our dissenting colleague argues that this claim is redressable because "a redistricting remedy by itself could remedy the one-person, one-vote violation in at least some Local Delegations," Dissenting Op. at 36, but a failure to comply with the requirement of one person, one vote is not the sort of injury that can be redressed by partial compliance.  Unlike global warming or illegal immigration, both of which could be somewhat ameliorated by judicial action, see Massachusetts v. EPA, 549 U.S. 497, 526, 127 S. Ct. 1438, 1458 (2007); Chiles v. United States, 69 F.3d 1094, 1096 (11th Cir. 1995), a governmental body is either elected in accordance with the requirement of one person, one vote, or it is not.  No

court has held that partial compliance can be sufficient to redress an injury caused by inequitable apportionment.

And our dissenting colleague's view of redressability is logically inconsistent with the position he takes with respect to ripeness.  Our dissenting colleague would rule that the claim under the Equal Protection Clause is ripe because "[t]he evidence overwhelmingly indicates that the Local Delegations system will almost certainly continue to exist with Alabama's next Legislature," Dissenting Op. at 28, and because any deviation from that local delegation system "would raise serious concerns under the Voting Rights Act," id. at 23.  But our dissenting colleague also contends that a decree from our court that the redistricting acts violate the requirement of one person, one vote because of the local delegation system "would alter legal duties such that the injury would be remedied in part (that is, in some Local Delegations), and, two, the practical consequences of the decree would be a significant increase in the likelihood that the injury would be remedied in full (that is, in all Local Delegations acrosst eh State)."  Id. at 38 (internal quotation marks omitted).  We do not understand, nor do we expect that the State defendants would understand, how they could remedy the injury alleged by the Black Caucus plaintiffs when, on the one hand, no party has offered any plan that would satisfy the requirement of one person, one vote for

both the Legislature and the local delegations, and, on the other hand, any elimination of the local delegations system would be "potentially unlawful."

Although we conclude that the claim under the Equal Protection Clause of count three is nonjusticiable, local delegations in Alabama are not insulated from judicial review.  The Black Caucus plaintiffs could have sued the officers of the Alabama Legislature to challenge the current system of local delegations.  See DeJulio, 290 F.3d at 1292–3.  And, if the next Legislature were to adopt a system of local delegations, the Black Caucus plaintiffs could then challenge that system and seek to enjoin its use.  That challenge would be brought before a single-judge district court, with review in the Eleventh Circuit, not before a three-judge district court.  See 28 U.S.C. § 2284.  But a challenge to hypothetical local delegations cannot be brought as a challenge to the redistricting Acts.

### C.  In the Alternative, the Black Caucus Plaintiffs' Theory Under the Fourteenth Amendment Fails Under Binding Eleventh Circuit Precedent.

We also conclude, in the alternative, that the State defendants have established that they are entitled to a partial summary judgment against the second claim in count three.  The second claim presents a facial challenge under the Equal Protection Clause based on the interaction between the local legislative system of Alabama and the voting districts for the Legislature as a whole.  At the hearing on the pending motions, the Black Caucus plaintiffs alleged that, because the districts are apportioned to satisfy the requirement of one person, one vote only for the

Legislature as a whole, "the[] redistricting acts dilute[] the votes of county voters within [] count[ies] [] governed by a local legislative delegation."

As with their claim under the First Amendment, the Black Caucus plaintiffs have failed to identify the constitutional standard that we should employ to adjudicate this claim under the Equal Protection Clause. The Black Caucus plaintiffs argue that, when a state enacts voting districts that elect members "for both the state legislature and for local legislative delegations, which exercise general governing authority over counties, the state can deviate from the principle of one-person, one-vote for the local delegations only to the extent that such deviations are necessary to comply with one-person, one-vote . . . for the legislature as a whole." But the Black Caucus plaintiffs fail to define the word "necessary" or provide any other standard with which we could adjudicate this claim. To the extent that the Black Caucus plaintiffs argue that a deviation is "unnecessary" unless it is based on the whole-county provisions of the Alabama Constitution, we rule, as we did when we dismissed count one of the initial complaint, that we lack the subject-matter jurisdiction to entertain a claim that state officials violated state law. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 117, 104 S. Ct. 900, 917 (1984). And the Black Caucus plaintiffs have not explained why, if the requirement of one person, one vote applies to the

election of local delegations, the rights of county voters should be subrogated to the rights of state voters.

Controlling Eleventh Circuit precedent also establishes that the local delegations in Alabama are not subject to the requirement of one person, one vote. Sitting as a three-judge district court within the Eleventh Circuit, we are bound by Eleventh Circuit precedent. And the decision in <u>DeJulio</u> establishes that local delegations in Alabama do not exercise general governmental functions and, as a result, are not subject to the requirement of one person, one vote. <u>See</u> 290 F.3d at 1296. But even if we were not bound by <u>DeJulio</u>, we would conclude that local delegations in Alabama are not subject to the requirement of one person, one vote.

### 1. This Court Is Bound by Eleventh Circuit Precedent.

It is well settled that we are bound by Eleventh Circuit precedent when we sit as a three-judge district court. Three-judge district courts within the former Fifth Circuit have so held. <u>See</u> <u>Ala. NAACP State Conf. of Branches v. Wallace</u>, 269 F. Supp. 346, 350 (M.D. Ala. 1967) (three-judge court) ("It is the clear duty of this [three-judge] district court to follow the decision of our Court of Appeals"); <u>Willis v. Pickrick Rest.</u>, 231 F. Supp. 396, 400 (N.D. Ga. 1964) (three-judge court) (noting that Fifth Circuit decisions are binding on a three-judge district court). And the former Fifth Circuit reasoned that three-judge courts are bound by decisions of the circuit court. <u>See</u> <u>Finch v. Miss. State Med. Ass'n, Inc.</u>, 585 F.2d

765, 773 (5th Cir. 1978) (explaining that "[i]n <u>Athanson v. Grasso</u>, the three-judge court was required to analyze carefully the interpretation placed upon <u>Allen</u> in <u>City of New York</u> and <u>Aguayo</u> because, as a district court within the Second Circuit, it was bound to follow the law of the circuit" (citation omitted)).

Although our dissenting colleague suggests that there exists some debate about this issue, <u>see</u> Dissenting Op. at 101 n.13, he does not deny that no three-judge district court outside of the Eleventh Circuit has ever held that it is not bound by the precedents of its circuit court.  Three-judge district courts outside of this circuit instead have repeatedly held that they are bound by the precedents of their circuit courts.  See <u>Parker v. Ohio</u>, 263 F. Supp. 2d 1100, 1105 (S.D. Ohio 2003) (three-judge court) ("While plaintiffs are correct that the First Circuit and the Supreme Court have not yet ruled on influence districts, we are bound by precedent in this circuit."); <u>Baksalary v. Smith</u>, 579 F. Supp. 218, 226 n.13 (E.D. Pa. 1984) (three-judge court) ("We [] feel ourselves bound not only by pertinent decisions of the Supreme Court, but also by pertinent decisions of the Court of Appeals for the Third Circuit."); <u>Russell v. Hathaway</u>, 423 F. Supp. 833, 835 (N.D. Tex. 1976) (three-judge court) ("A three-judge court is bound by apposite decisions of the Court of Appeals for its circuit.  The addition by Congress in the three-judge court acts of a second district judge and a Circuit Judge together with direct appeal to the Supreme Court was not a grant of authority with elevated

precedential stature but a withdrawal of power from a single judge."); Athanson v. Grasso, 411 F. Supp. 1153, 1157 (D. Conn. 1976) (three-judge court) ("As a district court, although composed of three judges, we are required to follow the law of our own circuit insofar as it is pertinent."); Hamar Theatres, Inc. v. Cryan, 390 F. Supp. 510, 512 (D. N.J. 1974) (three-judge court) ("We, as a district court, albeit a Three-Judge Court, are similarly bound by the precedent of Cine-Com, a Court of Appeals decision in this Circuit." (citations omitted)); Wilczynski v. Harder, 323 F. Supp. 509, 513 n.8 (D. Conn. 1971) (three-judge court) ("Sitting as a district court, this panel is bound by decisions of the court of appeals for this circuit.").  And both the Second and Fourth Circuits have suggested that three-judge district courts within their circuits are bound by the precedent of their respective circuits.  See Lewis v. Rockefeller, 431 F.2d 368, 371 (2d Cir. 1970) ("[E]ven if a three-judge court were to be convened here, it would sit as a district court and be bound by the decision of this court in [a previous Second Circuit decision]."); Jacobs v. Tawes, 250 F.2d 611, 614 (4th Cir. 1957) ("The court of three judges is not a different court from the District Court, but is the District Court composed of two additional judges sitting with the single District Judge before whom the application for injunction has been made." (internal citation omitted)).

The settled view that three-judge district courts are bound by circuit precedent is consistent with the structure of a three-judge district court.  17A

CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, & VIKRAM DAVID AMAR, Federal Practice and Procedure § 4235, at 224 (3d ed. 2007) ("Far the more common view . . . is that the three-judge court is sitting as a district court and is bound by decisions of the court of appeals for its circuit.").  A three-judge district court is still a district court within the ordinary hierarchical structure of the federal judiciary.  "Congress established the three-judge-court apparatus for one reason: to save state and federal statutes from improvident doom, on constitutional grounds, at the hands of a single federal district judge." Gonzalez v. Automatic Emp. Credit Union, 419 U.S. 90, 97, 95 S. Ct. 289, 294 (1974).  For this reason, the Supreme Court has refused to exercise mandatory appellate review over decisions of three-judge courts that "den[y] a plaintiff injunctive relief on grounds which, if sound, would have justified dissolution of the court as to that plaintiff, or a refusal to request the convention of a three-judge court ab initio." Id. at 101, 95 S. Ct. at 296.  Instead, the Court has required appellate review of those decisions by the circuit courts in which those three-judge district courts were convened.  Id. Because circuit courts can review some decisions of three-judge district courts, it would be illogical to contend that three-judge district courts are not bound by circuit precedent on at least some issues.  And because no clear line can be drawn between precedents that are binding and those that are not, we accept the settled

view that a three-judge district court convened within the Eleventh Circuit is, like

all other district courts within the circuit, bound by circuit precedent.

 2. The Decision of the Eleventh Circuit in DeJulio Forecloses the Challenge to the
 Acts Based on the Dilution of County Voters in the Election of Local Delegations.

    Under binding Eleventh Circuit precedent, the equal protection claim in

count three fails as a matter of law.  The Black Caucus plaintiffs argue that the

Acts violate the Equal Protection Clause because they dilute the votes of county

voters for members of the local delegations.  The Supreme Court has explained as

follows that local government officials are subject to the requirement of one

person, one vote under the Fourteenth Amendment only when the officials are

selected by popular election to perform governmental functions:

> [W]henever a state or local government decides to select persons by
> popular election to perform governmental functions, the Equal
> Protection Clause of the Fourteenth Amendment requires that each
> qualified voter must be given an equal opportunity to participate in
> that election, and when members of an elected body are chosen from
> separate districts, each district must be established on a basis that will
> insure, as far as is practicable, that equal numbers of voters can vote
> for proportionally equal numbers of officials.

Hadley v. Junior Coll. Dist., 397 U.S. 50, 56, 90 S. Ct. 791, 795 (1970).  The

Eleventh Circuit held in DeJulio that local delegations in Georgia are not subject to

the requirement of one person, one vote because the legislature, not the local

delegations, is engaged in the governmental function of lawmaking.  290 F.3d at

1296.  Because the parties agree that the local delegation system is virtually the

same in Alabama as it is in Georgia, we must conclude that the local delegations in Alabama are not subject to the requirement of one person, one vote and the equal protection claim in count three fails as a matter of law.

DeJulio involved a challenge to the local delegation system in Georgia as violative of the requirement of one person, one vote.  Each county, municipality, or other jurisdiction in Georgia has a local delegation that consists of "any legislator whose district encompasses territory within a specific city or county."  290 F.3d at 1293.  "Local bills" that apply only to a particular county, municipality, or other jurisdiction are sent to the delegation, which then makes recommendations to standing committees in the House and Senate.  Id.  To receive a "do pass" recommendation from the standing committee in the House, the local delegation must be unanimously in favor of the legislation.  Id.  To receive a "do pass" recommendation from the standing committee in the Senate, Senate Rule 187(u) requires the approval of a majority of the local delegation.  Id.  Because members of the Georgia Legislature "become delegation members by virtue of their popular election, not through appointment," the Eleventh Circuit concluded that the delegations are "popularly elected."  Id. at 1295.  But the Eleventh Circuit also concluded that the delegations do not "engage in governmental functions" because all legislation has to be passed by the legislature and signed by the Governor.  Id. (internal quotation marks omitted).

44

In DeJulio, the Eleventh Circuit considered and rejected the argument that local delegations carry out the general governmental function of lawmaking.  The court explained that a local bill had to receive at least a majority vote from a delegation to be reported with a "do pass" recommendation to the Georgia House and Senate, and when local legislation received the requisite level of support from the local delegation, ordinarily the Georgia Legislature enacted the legislation "on an uncontested basis as a matter of local courtesy."  Id. at 1296.  But nothing in Georgia law required the legislature to defer to local courtesy.  Id.  Members of the House or Senate could contest local bills, and the court held that the lack of such contests did not "render plenary authority to the local delegations with respect to the enactment of local legislation."  Id.  The court explained that, although delegations were given substantial deference with respect to local legislation, local legislation was not enacted until it was "voted on by a majority of the full House and Senate and signed by the Governor."  Id.  The court held that the Georgia Legislature, not the delegations, engaged in lawmaking.  Id.

The local delegations in the Alabama Legislature perform materially the same role as the local delegations in the Georgia Legislature.  A local delegation for a particular county in the Senate consists of all senators whose districts include any portion of that county.  And the members of a local delegation must approve any local legislation that would affect the county before that legislation may be

considered by one of the four Local Legislation Committees in the Senate. Depending upon the internal protocols of each local delegation, local legislation can move forward after either a majority vote in favor of the legislation or a unanimous vote in favor of the legislation.  Although local legislation is often uncontested on the Senate floor as a matter of local courtesy, there is no Senate rule that requires deference to delegations.  Local legislative delegations in the House also consist of all representatives whose districts include a portion of the particular county, and these local delegations must approve local legislation before it is sent to the House floor.  House members are free to oppose local legislation on the floor, but local legislation is often uncontested as a matter of courtesy. Nevertheless, local legislation, like all other legislation, is not officially enacted until it is approved by majorities of both houses and signed by the Governor or approved by majorities of both houses over the veto of the Governor.  As the Black Caucus plaintiffs have conceded in both filings to this Court and at the hearing on the pending motions, the local legislative system in Georgia is "virtually the same [as] Alabama's."

The record contains several news articles, submitted by the State defendants without objection, about Alabama legislators who disregarded local courtesy to prevent the enactment of certain pieces of local legislation.  According to one article, Representative Johnny Mack Morrow stated his intention to "file a written

46

notice [to] contest all local legislation in the Alabama House of Representatives"
because the Alabama Legislature did not override a gubernatorial veto of
legislation he sponsored.  That article also reported that Representative Craig Ford
filed a notice to contest all local legislation as part of a strategy to slow the
business of the Alabama Legislature.  And another news article reported that
Representative Joseph Mitchell contested at least two pieces of local legislation
that affected his county, even though a majority of his local delegation had
approved the legislation.  These examples, all occurring in 2013, establish that
local courtesy, although prevalent, can be thwarted by the objection of a single
legislator.  And the Black Caucus plaintiffs conceded at the hearing that these
articles were accurate and that legislators can and have disregarded local courtesy.

The Black Caucus plaintiffs attempt to distinguish their facial challenge
from the one in DeJulio on the ground that DeJulio involved a direct challenge to
the local legislative system and count three challenges "the statutory boundaries
that define who the member of each local delegation will be," but this argument
fails.  The argument advanced by the Black Caucus plaintiffs cannot be squared
with an issue actually decided in DeJulio: that elected members of local
delegations, like those in Georgia, do not perform governmental functions of the
kind that would subject them to the requirement of one person, one vote under the
Fourteenth Amendment.  See 290 F.3d at 1296.  We have no basis on which to

conclude that the Acts violate the requirement of one person, one vote because of the effect they have on the local delegations when that requirement does not apply to the local delegations at all.  See Hadley, 397 U.S. at 56, 90 S. Ct. at 795.

In the end, this facial claim would make more sense if it had been brought as a direct challenge to the local delegation system instead of the redistricting Acts. The Acts are not responsible for the local delegation system in Alabama.  The rules for local delegations are created by the action of newly elected legislators at the organizational session held each quadrennium.  Even if we were to enjoin the use of the Acts for elections, a new legislature, elected in accordance with new district maps, could still adopt the same system of local delegation.  To the extent that the Black Caucus plaintiffs challenge the district lines instead of the local legislative system to avoid the adverse circuit precedent in DeJulio, we reject that strategy.

In a final attempt to escape the conclusion that their claim fails as a matter of law under DeJulio, the Black Caucus plaintiffs challenge that decision as wrong, but we cannot accept that argument.  The Black Caucus plaintiffs contend, "DeJulio's conclusion that local delegations are not exercising general governmental functions, notwithstanding the gatekeeping and local courtesy customs that empower local delegations in Georgia, just as they do in Alabama, was erroneous."  Even if we agreed with that dubious proposition, we would lack the power to deviate from the controlling precedent of the Eleventh Circuit.  See

Wallace, 269 F. Supp. at 350 ("It is the clear duty of this [three-judge] district court to follow the decision of our Court of Appeals.  All of the cases which have spoken on the subject so hold.").  The State defendants have established that they are entitled to judgment as a matter of law on the equal protection claim in count three under DeJulio and that no genuine dispute of a material fact would prevent the entry of a partial summary judgment in their favor.  See Fed. R. Civ. P. 56(a).

   3.  Even If We Were Not Bound by DeJulio, We Would Conclude that the
       Alabama Local Delegations Do Not Exercise Governmental Functions.

       Even if we were not bound by the decision of the Eleventh Circuit in DeJulio, we would conclude that local delegations in Alabama are not subject to the requirement of one person, one vote.  Supreme Court precedent makes clear that the requirement of one person, one vote applies only when "a state or local government decides to select persons by popular election to perform governmental functions."  Hadley, 397 U.S. at 56, 90 S. Ct. at 795.  And local delegations do not perform the kind of governmental functions identified by the Supreme Court as necessary to subject a local governmental official to the requirement of one person, one vote.

       The exercise of governmental functions was a key factor in the decision of the Supreme Court to apply the requirement of one person, one vote to the board of trustees of a consolidated junior college district at issue in Hadley.  The Court explained that, in Avery v. Midland County, 390 U.S. 474, 88 S. Ct. 1114 (1968),

it had applied the one person, one vote principle to a local election "where the elected officials exercised 'general governmental powers over the entire geographic area served by the body.'" Hadley, 397 U.S. at 53, 90 S. Ct. at 793 (quoting Avery, 390 U.S. at 485, 88 S. Ct. at 1120). And the Court applied that principle in Hadley, where the trustees "perform[ed] important governmental functions within the districts" and exercised powers "general enough" and with "sufficient impact throughout the district." Id. at 53–54, 90 S. Ct. at 794. As examples of these governmental functions, the Court noted that the trustees "can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college." Id. at 53, 90 S. Ct. at 794. Officials selected by popular election who do not perform important governmental functions would not fall within the Hadley rule. See id. at 53–54, 90 S. Ct. at 794. But the Court further explained that, even when the officials do perform important governmental functions that would otherwise fall within the scope of the rule it announced, "there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups" that the election of those functionaries

need not comply with the requirement of one person, one vote.  Id. at 56, 90 S. Ct. at 795.

Since Hadley, the Supreme Court has considered, on three occasions, the scope of the rule it established in Hadley.  See Ball v. James, 451 U.S. 355, 371, 101 S. Ct. 1811, 1821 (1981); Associated Enters., Inc. v. Toltec Watershed Improvement Dist., 410 U.S. 743, 93 S. Ct. 1237 (1973); Salyer Land Co. v. Tulane Lake Basin Water Storage Dist., 410 U.S. 719, 730, 93 S. Ct. 1224, 1231 (1973).  In Salyer and Associated Enterprises, the Supreme Court concluded that two water districts fell within the exception identified in Hadley for special-purpose functionaries.  See Associated Enters., 410 U.S. at 745, 93 S. Ct. at 1238; Salyer, 410 U.S. at 728, 93 S. Ct. at 1229.  The Court explained that the water storage district in Salyer was "vested with some typical governmental powers," including the power to take private property for the construction of district projects, the power to contract for the construction of those projects, and the power to employ and discharge its staff, but it had "relatively limited authority" and its actions "disproportionately affect[ed] landowners."  Id. at 728–29, 93 S. Ct. at 1230.  And in Associated Enterprises, the Court reasoned that the water district fell within the special purpose exception to the rule in Hadley.  See 410 U.S. at 744, 93 S. Ct. at 1237.  The Court also explained that the "statute authorizing the establishment of improvement districts was enacted by a legislature in which all of

the State's electors have the unquestioned right to be fairly represented." Id., 93 S.

Ct. at 1237–38.  But in Ball, the Court said more than in either Salyer or

Associated Enterprises.  The Court explained that the water district in Ball "d[id]

not exercise the sort of governmental powers that invoke the strict demands of

Reynolds."  451 U.S. at 366, 101 S. Ct. at 1818.  And the Court reasoned, in the

alternative, that, even if one were to accept the governmental functions as

described by the Court of Appeals, "[a]s in Salyer, the nominal public character of

[the] entity c[ould not] transform it into the type of governmental body for which

the Fourteenth Amendment demands a one-person, one-vote system of election."

Id. at 368, 101 S. Ct. at 1819.

     The decisions of the Supreme Court in Hadley, Salyer, and Ball guide our

understanding of the kinds of governmental functions or powers that officials must

exercise for their popular election to be subject to the requirement of one person,

one vote.  The body that administers a school system, for example, performs a

"vital governmental function" that triggers the requirement of one person, one vote

for the election of its members.  See Hadley, 397 U.S. at 56, 90 S. Ct. at 795.  And

the elected body that provides general public services, including police, fire,

"housing, transportation, utilities, roads, or anything else of the type ordinarily

financed by a municipal body" performs the kind of governmental function that

triggers the requirement of one person, one vote.  See Salyer, 410 U.S. at 729, 93

S. Ct. at 1230.  And the same can be said for the elected bodies with the power to impose ad valorem property taxes or sales taxes; the power to enact laws to govern the conduct of citizens; and the power to administer sanitation, health, and welfare services are all important and traditional governmental powers.  See Ball, 451 U.S. at 366, 101 S. Ct. at 1818.  By contrast, "the provision of electricity is not a traditional element of governmental sovereignty and so is not in itself the sort of general or important governmental function that would make [a] government provider subject to the doctrine of the Reynolds case."  Id. at 368, 101 S. Ct. at 1819–20 (internal citation omitted).

The local delegations in Alabama do not exercise general governmental powers or functions of the kind that the Supreme Court has identified as necessary to trigger the requirement of one person, one vote.  As a matter of courtesy, local delegations review and recommend local legislation to the Alabama Legislature as a whole.  Local delegations exercise no general regulatory powers over counties; that is, local delegations cannot impose taxes; administer schools; or provide emergency services, housing, transportation, utilities, roads, sanitation services, health services, or welfare.  See Ball, 451 U.S. at 366, 101 S. Ct. at 1818.  And local delegations cannot enact laws for the counties.  See id.  Local legislation must be passed by a majority of the legislature and signed by the governor, or passed by a majority of the legislature over a governor's veto.  Although the

practice of local courtesy makes it likely that local legislation recommended by the local delegations will be passed by the Alabama Legislature, that likelihood depends entirely on the will of the whole body, which need not continue or honor the practice of local courtesy.  Because local delegations do not exercise any general regulatory powers and the power of lawmaking is reserved to the legislature as a whole, we cannot conclude that local delegations "perform important governmental functions" that are "general enough" and with "sufficient impact" to justify the extension of Reynolds to the election of local delegations. See Hadley, 397 U.S. at 53–54, 90 S. Ct. at 794.

Our dissenting colleague would apply the requirement of one person, one vote to all governmental bodies unless they fall within the special purpose exception described in Hadley, Dissenting Op. at 74, but the Supreme Court made clear in Hadley that the requirement of one person, one vote applies only when "a state or local government decides to select persons by popular election to perform governmental functions."  397 U.S. at 56, 90 S. Ct. at 795.  That statement necessarily implies that the requirement of one person, one vote does not apply when the officials either are not popularly elected or do not perform governmental functions.  And the Court reiterated in Salyer that it had extended the requirement of one person, one vote to school districts exercising powers that "show[ed] that the trustees perform[ed] important governmental functions within the districts, and

54

[that were] general enough and ha[d] sufficient impact throughout the district to justify the" application of the requirement.  Salyer, 410 U.S. at 727, 93 S. Ct. at 1229 (quoting Hadley, 397 U.S. at 53–54, 90 S. Ct. at 794).

Several courts have concluded that state and local government officials do not exercise governmental functions of the sort that trigger the requirement of one person, one vote for their elections when the officials only recommend action to voters or to another governmental body that is apportioned in compliance with the requirement of one person, one vote.  See Educ./Instruccion, Inc. v. Moore, 503 F.2d 1187, 1189 (2d Cir. 1974) (concluding that a regional council did not have to comply with the requirement of one person, one vote because the "powers and functions of the council[] are essentially to acquire information, to advise, to comment and to propose," none of which constituted governmental functions within the meaning of Hadley); Driskell v. Edwards, 413 F. Supp. 974, 977–78 (W.D. La. 1976) (three-judge court) (concluding that "the principles of one-man, one vote had no application to the selection of delegates to the Louisiana Constitutional Convention of 1973" at least in part because "[n]o act of the Convention takes on the force of law unless and until ratified by the people in a referendum election"); McMillan v. Love, 842 A.2d 790, 799–801 (Md. 2004) (reasoning that the Anne Arundel County delegation operates in a factually analogous manner as the local delegations in Georgia and concluding that the

55

delegation is not subject to the requirement of one person, one vote because the delegation only refers and recommends legislation to the Maryland General Assembly); Polk Cnty. Bd. of Sup'rs v. Polk Commonwealth Charter Comm'n, 522 N.W.2d 783, 788–90 (Iowa 1994) (concluding that the Mayors' Commission, which studies and formulates resolutions that are proposed to the Commonwealth Council to be approved, rejected or amended by that body, is not subject to the requirement of one person, one vote because it cannot meet the "threshold determination [that] the body performs governmental functions"); see also Kessler v. Grand Cent. Dist. Mgmt. Ass'n, Inc., 158 F.3d 92, 95–96, 107 (2d Cir. 1998) (concluding that the Grand Central Management Association, which employed security guards and sanitation workers, assisted retailers in improving the attractiveness of the district, contributed to the funding and operation of an outreach facility for homeless persons, and operated tourist information booths, fell within the special purpose exception under Salyer because its functions were overseen by the City, served a narrow purpose, and were secondary to the services provided by the City).  These courts argue that the Supreme Court has made clear that a state or local official must perform governmental functions to be subject to the requirement of one person, one vote.  Because local delegations in Alabama do not perform those functions, we would conclude, even absent the binding

precedent of <u>DeJulio</u>, that the equal protection claim in count three fails as a matter of law.

Our dissenting colleague argues that the decision in <u>Polk</u> was based on the flawed reasoning of the Missouri Supreme Court overturned by the Supreme Court in <u>Quinn v. Millsap</u>, 491 U.S. 95, 109 S. Ct. 2324 (1989), Dissenting Op. at 95, but we disagree.  In <u>Quinn</u>, the Supreme Court of the United States reversed a decision of the Supreme Court of Missouri that "the Equal Protection Clause ha[d] no relevancy" to a membership requirement for a board of freeholders that did not exercise general governmental powers.  <u>Id.</u> at 104–05, 109 S. Ct. at 2330.  The Supreme Court of the United States explained that the Supreme Court of Missouri had conflated the one person, one vote requirement with the Equal Protection Clause.  <u>See id.</u>  But a state or local body must respect the general demands of the Equal Protection Clause even when the election of its members is not governed by the requirement of one person, one vote.  <u>See id.</u> at 104–05, 109 S. Ct. at 2330–31. The Supreme Court of Iowa made no such error in <u>Polk</u>; the court held only that "the Mayors' Commission does not exercise general governmental powers" and, therefore, "the one person, one vote constitutional principle is not violated by the structure of the proposed commonwealth charter."  <u>Polk</u>, 522 N.W.2d at 790.

Our dissenting colleague also suggests that, after its decision in <u>Educ./Instruccion</u>, the Second Circuit rejected our reasoning in <u>Baker v. Regional</u>

High School District Number 5, 520 F.2d 799 (2d Cir. 1975), Dissenting Op. at 94

n.12, but that decision is distinguishable.  Baker involved a one person, one vote

challenge to a school board that had the power to initiate and propose budgets to

the voters for ratification, to propose bond ordinances to the voters, to hire and fire

teachers, to supervise and discipline students, and to manage all of the schools in

the district.  Id. at 801–02.  The Second Circuit explained that, in the light of these

powers, "there can be no question but that the board members perform important

governmental functions within the districts and . . . these powers are general

enough and have sufficient impact throughout the district to justify the conclusion

that [one person-one vote] should be applied here."  Id. at 802 (quoting Hadley,

397 U.S. at 53–54, 90 S. Ct. at 794).  Although the Second Circuit suggested that

the gatekeeping role of the school board was an important governmental function,

id., that gatekeeping role differed significantly from the role of the local

delegations.  The school boards exercised actual regulatory authority over the

schools, and the voters could consider only proposals recommended to them by the

school boards, id. at 801–02.  By contrast, the local delegations have no regulatory

authority and operate solely by virtue of informal courtesy.  The Alabama

Legislature could deviate from the recommendations of local delegations at any

time.

Our dissenting colleague also argues that our reasoning that the governmental function of lawmaking is carried out by the Legislature, not the local delegations, is flawed because neither house of the legislature by itself can make laws, Dissenting Op. at 83, but that argument fails too.  The passage of legislation by each house of the legislature is a traditional government function and quintessential aspect of governmental sovereignty.  See Ball, 451 U.S. at 368, 101 S. Ct. at 1819. And the Supreme Court has explicitly held that "seats in both houses of a bicameral state legislature must be apportioned on a population basis," so we need not engage in the analysis under Hadley at all.  See Reynolds, 377 U.S. at 568, 84 S. Ct. at 1385.

Our dissenting colleague's reading of the relevant precedents would radically expand the scope of the one person, one vote requirement.  All legislatures, including the Alabama Legislature, rely on committees to facilitate their work.  In Alabama, each house of the legislature has several committees charged with examining bills on a particular subject matter and recommending action on those bills to the House or Senate.  See Ala. Const. Art. IV, § 62.  And the Rules Committee of each house determines the order in which bills that have been reported from the committees may be considered by the House or Senate.  If our dissenting colleague were correct that the "gatekeeping function" performed by the legislative delegations triggers the requirement of one person, one vote, then

that requirement would, as a matter of logic, apply to other legislative committees as well.  We agree with the reasoning of the district court in DeJulio that "a mere advisory role in lawmaking as typically exists with legislative committees, subcommittees, and local legislative delegations cannot trigger the 'one person, one vote' requirement."  DeJulio v. Georgia, 127 F. Supp. 2d 1274, 1298 (N.D. Ga. 2001), affirmed by DeJulio, 290 F.3d at 1291. "The Equal Protection Clause of the Fourteenth Amendment and the 'one person, one vote' principle does not limit a legislative body to functioning as a committee of the whole.  It does not require a properly apportioned legislative body to distribute power and influence so that every legislator is as powerful and influential as every other member of the body." Id.

Our dissenting colleague argues that committee members are appointed and local delegations are elected, but there can be no dispute that both members of committees and local delegations are selected through a process that occurs after the election of the legislators.  See Dissenting Op. at 62 ("Excluded from the rule would, therefore, be appointed officials, for they are not elected, and legislative, executive, and administrative committees and other intra-structural bodies, for officials are not elected to those bodies (although they may nevertheless be elected to a different body, i.e., the legislature itself, and then 'appointed,' in a sense, to the other, i.e., the legislative committee).").  In Alabama, the legislative

committees and local delegations are all appointed in the same organizational session that occurs each quadrennium.  Until that meeting, no such internal organization exists.  Our dissenting colleague relies on dicta in <u>DeJulio</u> in which the Eleventh Circuit stated in passing that local delegations in Georgia were popularly elected under <u>Hadley</u> because legislators become members of the local delegation by virtue of their election to the legislative seat, but the Eleventh Circuit did not purport to decide a contested point about the selection of local delegations. <u>Cf.</u> <u>United States v. Kaley</u>, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us.") (internal quotation marks omitted).  The Eleventh Circuit also did not explore the implications of that point with respect to other subparts of the legislature.  The Eleventh Circuit instead rested its decision on the narrow point that local delegations do not perform the kind of governmental functions that trigger the requirement of one person, one vote.  We see no logical distinction between the manner in which local delegations are created and the manner in which all legislative committees are created.  If our dissenting colleague were correct that local delegations in Alabama are subject to the requirement of one person, one vote, we would also have to conclude that all legislative committees are subject to that requirement.

We decline to interpret the requirement of one person, one vote to prohibit the ordinary manner in which legislatures conduct business.  The Equal Protection Clause is satisfied by the apportionment of the legislature in accordance with the requirement of one person, one vote.  Intrastructural bodies, whether committees or local delegations, need not satisfy the same requirement.  The Legislature is free to assign legislators from rural areas to a committee on agriculture and legislators from coastal areas to a committee on tourism without regard to concerns of apportionment.  And the Legislature is free too to assign members with constituents in a certain county to the local delegation for that county without requiring that every member represent the same number of constituents in that county.

### III. CONCLUSION

On consideration of the motions, reply, and response (Docs. # 95, 106, 107, 108, 109) as well as supporting and opposing authority, it is **ORDERED** that the motion by the State defendants for a partial summary judgment as to the claim of partisan gerrymandering in count three of the amended complaint filed by the Black Caucus plaintiffs is **GRANTED**.  We **DISMISS** the facial challenge under the Equal Protection Clause in count three of the amended complaint filed by the Black Caucus plaintiffs for lack of subject matter jurisdiction.  The motion by the Black Caucus plaintiffs for reconsideration of our order denying their motion for a

partial summary judgment as to count three of their amended complaint is

**DENIED**.  The motion by the Black Caucus plaintiffs for entry of a permanent

injunction is **DENIED AS MOOT**.

DONE this 2nd day of August, 2013.

_____/s/ William H. Pryor Jr._
UNITED STATES CIRCUIT JUDGE
PRESIDING

_____/s/ W. Keith Watkins_
CHIEF UNITED STATES DISTRICT
JUDGE