IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

ALABAMA LEGISLATIVE            )
BLACK CAUCUS, et al.,          )
                               )
     Plaintiffs,               )
                               )        CIVIL ACTION NO.
     v.                        )        2:12cv691
                               )        (Three-Judge Court)
THE STATE OF ALABAMA,          )             (WO)
et al.,                        )
                               )
     Defendants.               )


DEMETRIUS NEWTON, et al.,      )
                               )
     Plaintiffs,               )
                               )        CIVIL ACTION NO.
     v.                        )        2:12cv1081
                               )        (Three-Judge Court)
THE STATE OF ALABAMA,          )
et al.,                        )
                               )
     Defendants.               )

THOMPSON, District Judge, concurring in part and
dissenting in part:

     I agree with the majority's disposition of the First

Amendment partisan gerrymandering claim and with much of

its reasoning in support of that disposition.  As for the

one-person, one-vote claim, while I agree that the issue

of justiciability has been properly raised by the court,
I respectfully disagree with the majority's dismissal of
the claim on that ground.  And, second, I respectfully
disagree with the majority's reasoning on the merits.


## I. BACKGROUND

In Alabama, during each election for members of the
State Legislature (the House of Representatives and
Senate), when Alabamians cast a vote for a single
legislative representative, they are actually electing
one official who will serve in two capacities tied to the
geographic locations from which they are elected.  For
one, the legislator will represent a particular district
in the State Legislature as a whole.  Second, the
legislator, depending on the location of the district,
will become a member of one or more "Local Delegations"
(or, as they are sometimes called, "Legislative
Delegations"), which are formally subdivisions of the
Legislature charged with the origination of "local" laws

2

generally affecting a single county alone.  See Ala. Const. art. IV, § 110 (defining "general" and "local" laws).  Although Alabama has created certain local bodies of county governance, such as county commissions, see 1975 Ala. Code. § 11-3-1, state law generally vests those bodies with very limited authority, if any at all, to legislate for the county.  Compare, e.g., Ala. Const. amend. 783 (affording the Baldwin County Commission comparatively broad, albeit still limited, legislative authority), with, e.g., amend. 482 ("The Limestone county commission is hereby authorized ... to provide for the disposal of dead farm animals, and the excavating of human graves.").

Rather, state law generally requires that local laws, no matter how purely local their character may be, must be enacted by the Legislature as a whole (and, for reasons unnecessary to discuss here, often as amendments to the State Constitution rather than as mere statutes). The Alabama Constitution has been amended hundreds of

times with such laws addressing an enormous range of wholly local concerns, from the mundane to the very important.  <u>Compare, e.g.,</u> Ala. Const. amend. 497 (authorizing prohibition of "the overgrowth of weeds and the storage and accumulation of junk, inoperable motor vehicles and other litter" in Jefferson County), <u>with, e.g.,</u> amend. 429 (authorizing governing authorities in Jefferson County to conduct a range of activities related to economic and industrial development).

Because the Alabama Legislature as a whole must address the varying interests across all of Alabama's 67 counties, it has created a system of Local Delegations to carry out the task efficiently.  Each Alabama county has a corresponding Local Delegation in both houses of the State Legislature.  Every legislator elected to the Senate or House, upon his election, automatically becomes a member of the Local Delegation for every county that lies within his district, no matter how large or small is the part of the county falling within the district

boundaries.   If a legislator's district lies almost entirely in one county and only slightly in another, that legislator nevertheless joins the respective Local Delegations for both counties.   Within any given delegation, all members cast equal votes regardless of the comparative sizes of their constituencies in the county at issue.

In order to be enacted eventually, all proposed local laws must be first proposed by the Local Delegation for the county affected.   Some Local Delegations require majority approval in the delegation and others require unanimous approval.   Without the approval of the delegation for the county at issue, the bill proceeds no further.   In that sense, the delegations are the "gatekeepers" of local legislation.

Once the delegation approves a local law, the bill is sent to a legislative committee.[1]   After committee

---

1.  Both the Alabama House and Senate have a handful of legislative committees dedicated to local legislation, and those committees divide up the State's counties among (continued...)

approval, the bill is sent to the Legislature as a whole. There, after approval by the requisite number of legislators in both chambers, the bill is sent to the governor for signature, after which it becomes binding law.   When a proposed local law is being considered by the Legislature as a whole, the Legislature generally applies an unwritten rule of so-called "local courtesy" holding that the delegations deserve significant deference and their proposed laws should be enacted as a matter of course.   While the rule of courtesy is sometimes violated, such violations are more the exception than the rule.   In any event, regardless of what happens in the Legislature as a whole, the gatekeeping requirement that the bill be first approved

---

1(...continued)
them.  A few committees take up local legislation from a single large county alone.   In those cases, the membership of the delegation and the committee is identical and the delegation and the committee are, for all intents and purposes, one and the same.  Most Local Delegations send their bills to committees that are responsible for reviewing the proposed laws from a large number of smaller counties.

by the applicable Local Delegation is steadfastly applied. There is no indication in the record that the gatekeeping requirement has ever been violated. In short, the Local Delegations, although subdivisions of the Legislature for the State as a whole, are geographically based on the State's individual counties and are the single most important legislating bodies for those counties.

The State Legislature is established by formal state law. Ala. Const. art. III, § 42 & art. IV, § 44. The Local Delegations, by contrast, are generally creatures of custom. The delegations' core local-law-gatekeeping function is not an enumerated power in any particular part of Alabama's Constitution or statutory law, and likewise, no written law provides for the whole of the delegations' operations. However, provisions scattered throughout the State Constitution and Code appear to recognize the existence of the delegations and control a number of aspects of their existence. See, e.g., 1975

7

Ala. Code §§ 36-6-12 (relating to Local Delegation employee salaries), 36-27-5.1 (pensions), 45-22-130.02 (providing for Local Delegation involvement in certain intra-governmental disputes), 45-24-210 (providing for certain Local Delegation funding), and 45-27A-60 (relating to town trust account).   In particular, a number of Constitution and Code provisions appear to afford various Local Delegations the power to appoint officers of various other governmental agencies.  See, e.g., 1975 Ala. Code §§ 9-14C-3 (park commission), 45-2-243.22 (tourism board), 45-5-90 (economic development authority), 45-6-231 (prison work-release program regulatory board), 45-8-90 (economic development authority), 45-8-150.02 (bingo regulatory agency), 45-8A-24 (water and sewage board), 45-8A-130.04 (civil service board), 45-25-92.30 (economic development authority), 45-28-91.01 (tourism board), 45-28-244.01(d) (taxing agency), 45-28-244.01(e) (library committee), and 45-30-101.01 (board of education); Ala. Const. amend. 677

(water and sewage board), amend. 741 (judicial commission), and 780 (judicial commission).

While the Local Delegations are formally part of the Legislature as a whole and are generally maintained through unwritten custom, one would be mistaken to assume that they are nothing more than amorphous practices that can be found in the halls of Montgomery's legislative buildings. While the delegations differ, at least some appear to maintain local office space and regular paid staff, like any typical governmental agency that serves the public in a defined geographic region. See, e.g., 1975 Ala. Code §§ 45-2-190 ("There is hereby established the Baldwin County Legislative Office. The County Commission of Baldwin County shall provide office space, office furniture, office equipment, telephone service, and accommodation for the members of the legislative delegation from the county. The personnel for the legislative delegation office shall be selected by the members of the legislative delegation...."), 45-6-190

9

(similar, for Macon and Bullock counties), 45-24-190
(similar, for Dallas County), 45-27-190 (similar, for
Escambia County), and 45-29-190 (similar, for Fayette and
Lamar counties).

This Local Delegations system has existed in some
form for decades at least, if not since the enactment of
the 1901 State Constitution.  It is, in short, the mostly
unwritten law of county governance in Alabama.


## II. JUSTICIABILITY

The plaintiffs' one-person, one-vote claim contends,
essentially, that Alabama's Local Delegations system
causes unconstitutional discrimination as to voters'
representation in government because all Local Delegation
members have equal powers in the delegation while
representing disproportionate numbers of voters in the
county at issue, and members often representing
constituencies outside the county as well.  They base
their claim not on the legislative districts currently in

10

place, which are set to expire soon, but rather on the redistricting plans that have already been enacted and will be in effect for the next election, and under which, the plaintiffs allege, the State divides an excessive and unprecedented number of counties among multiple legislative districts.  The county splitting is relevant, the plaintiffs explain, because now, more than ever before, more Local Delegation members will represent larger out-of-county interests over and to the detriment of smaller in-county interests, thus diluting the ability of a county's residents to affect their county's affairs. In essence, the plaintiffs seek to have greater local control over local affairs than the State's redistricting plans provide.  In response, the majority says that Alabama's next Legislature may choose to abandon entirely or alter materially the whole Local Delegations system, and therefore, the voter inequality feared by the plaintiffs would never come to be.  That possibility, the

majority concludes, means that the claim should be dismissed on grounds of ripeness and standing.

### A.

As for ripeness, the majority states correctly the general proposition that, "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Ante, at 22 (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). The majority, however, fails to apply that principle properly. The mere existence of any future contingency is not enough to render a claim unripe. If it were, litigants would never be able to assert claims seeking to enjoin future injurious conduct, as there is always at least a mere theoretical possibility that circumstances between now and then could somehow change so as to stave off the injury. See Doe v. Bush, 323 F.3d 133, 138 n.4 (1st Cir. 2003) ("[The defendants' argument] would seem to say that

a case cannot be ripe on the basis of reasonably predictable future injury. This is not the law. The doctrine of ripeness asks whether an injury that has not yet happened is sufficiently likely to happen to warrant judicial review.") (punctuation and citation omitted).

Rather, when the plaintiffs' feared injury is contingent on future events, to determine whether the claim creates ripeness concerns, "a court must assess the <u>likelihood</u> that a contingent event will deprive the plaintiff of an injury. In other words, it is not merely the existence, but the '<u>degree</u> of contingency that is an important barometer of ripeness.'" <u>Mulhall v. UNITE HERE Local 355</u>, 618 F.3d 1279, 1291-92 (11th Cir. 2010) (emphasis in original) (quoting <u>Riva v. Massachusetts</u>, 61 F.3d 1003, 1011 (1st Cir. 1995)); <u>see also</u> <u>Riva</u>, 61 F.3d at 1011 ("[A] litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted."); <u>Martin Tractor Co. v. Fed. Election Comm'n</u>, 627 F.2d 375, 379 (D.C. Cir.

1980) ("If the injury be a future one, the occurrence of the injury must be reasonably certain and clearly describable for the action to be deemed 'ripe' for adjudication.").

The majority ignores this degree-of-likelihood inquiry, explaining that the inquiry is relevant only where a future contingency may "deprive the plaintiff of an injury" that is already felt; not where an inchoate injury is dependent on a future contingency (and thus, the question is whether the injury "will occur at all"). Ante, at 26. That distinction is not supported by any case law (the majority cites none, nor can it) and is not logically consonant with the central purpose of the ripeness doctrine: to protect courts "from engaging in speculation or wasting their resources through the review of potential or abstract disputes." E.g., United States v. Rivera, 613 F.3d 1046, 1050 (11th Cir. 2010).

In cases where the plaintiffs' feared injury is contingent on substantially uncertain future events,

14

courts cannot reliably apply legal principles to the facts at hand, facts which may be hazy, changing, or otherwise amorphous, to determine whether or not there is or will be an actual violation of legal right.  See, e.g., Elend v. Basham, 471 F.3d 1199, 1211 (11th Cir. 2006) (holding a First Amendment claim involving the right to protest unripe where the "analysis depends so critically on the location and circumstances of the protest zone" and "we don't know when [the plaintiffs] will protest, we don't know where they will protest, and we don't know how they will protest"); Johnson v. Sikes, 730 F.2d 644, 649 (11th Cir. 1984) (holding a claim unripe so as to avoid "render[ing] an opinion advising what the law would be on an assumed set of facts"). There, the circumstances are, in short, "not fit for adjudication." Texas, 523 U.S. at 300.  By contrast, in cases where it is anticipated that the injury will be caused by future events that are sufficiently certain and the relevant contours sufficiently delineated, the facts are concrete enough to be amenable to application of law;

15

and, there, the court should discharge its duty of declaring legal rights.  See, e.g., Riva, 61 F.3d at 1011-13 (holding ripe a challenge to a statute anticipated to cause future injury: "The paramount harm to [the plaintiff]--the eventual reduction in his benefits--is distant in time, but its incidence seems highly probable."  "There is no basis to suppose that any adjudication will be hampered by factual uncertainty.... The retirement scheme must now face judicial scrutiny."). A central goal of the ripeness doctrine is to separate those cases amenable to legal analysis from those that are not, and, thus, when legal claims involve future events, it is critical to assess the likelihood of those events occurring as anticipated.  Cf. Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 297 (1979) ("The difference between an abstract question and a 'case or controversy' is one of degree, of course.").

Properly understood, the ripeness inquiry this court faces is whether it is sufficiently likely that the State will carry out the anticipated conduct that the

plaintiffs contend will cause unconstitutional vote dilution: that is, one, conducting an election for members of the Legislature and the Local Delegations in accordance with the already enacted redistricting plans, and, two, continuing the operation of the State's longstanding Local Delegations system.  As there is no doubt that the election will occur along the lines drawn by the redistricting plans, the only remaining question is whether it is sufficiently likely that the Local Delegations system will continue to operate in the same manner it has for decades.  If the court agrees that the system will probably continue as the plaintiffs expect (that is, how it has historically operated), then all relevant facts are sufficiently concrete for the application of bedrock one-person, one-vote principles. And here, based on the evidence in the record, it is apparent that the actual likelihood of the State abandoning or materially altering the longstanding system is essentially nonexistent.  The record shows as follows:

17

First, there is the fact that the Local Delegations system at issue in this case is not some hypothetical future legislative innovation, but rather, "the parties appear to agree that the local delegations system has been adopted by every Alabama Legislature for decades." Order (Doc. No. 130) at 4.  In addition to the parties agreeing that the system is decades old, the evidence in the record is corroborative.  According to the Clerk of the Alabama House, who has worked for the House for over 20 years, the system has been in place the entire time. Likewise, the Secretary of the Alabama Senate, who has worked for or with the Legislature for 40 years, agreed with respect to his tenure.  Also corroborative are published judicial decisions discussing or at least mentioning a Local Delegations system of some sort from years past, one from as far back as 1936.  See Hardy v. Wallace, 603 F. Supp. 174, 176-77 (N.D. Ala. 1985) (three-judge court); Buskey v. Oliver, 565 F. Supp. 1473, 1476-77 (M.D. Ala. 1983) (Thompson, J.); Birmingham-Jefferson Civic Ctr. Auth. v. Hoadley, 414 So.

2d 895, 906 (Ala. 1982) (Maddox, J., dissenting); <u>Bolden</u>
<u>v. City of Mobile</u>, 423 F. Supp. 384, 397 (S.D. Ala. 1976)
(Pittman, J.); <u>Brown v. Moore</u>, 428 F. Supp. 1123, 1138
(S.D. Ala. 1976) (Pittman, J.); <u>Ala. State Teachers Ass'n</u>
<u>v. Lowndes Cnty. Bd. of Educ.</u>, 289 F. Supp. 300, 311
(M.D. Ala. 1968) (three-judge court); <u>Yeilding v. State</u>
<u>ex rel. Wilkinson</u>, 167 So. 580, 593 (Ala. 1936) (Brown,
J., dissenting).

Second, the record also shows that, not only has the
system been in place for decades, but also the system's
procedural rules have not changed materially throughout
that time.  According to the House Clerk, the "local
legislation rules" have been "fairly consistent" or "a
constant" throughout his tenure.  Woodard Dep. (Doc. No.
132-1) at 11:13-12:2.  Specifically, he stated that the
rule that a legislator join the delegations for all
counties in his district in any small part, no matter how
small (the key issue at the center of this litigation),
had not changed "since [he had] been involved" with the
House.  <u>Id</u>. at 15:22-16:6.  The Senate Secretary's

19

testimony was similar: for "as long as [he could] remember," the "rules regarding local legislation [had] changed very little." Harris Dep. (Doc. No. 132-2) at 6:10-21. Also in the record is an affidavit of a legislator and Local Delegation member describing the system's rules, and, although he does not explicitly say so, it is apparent from the context that he believes that those same rules will be in effect during the next legislative session. See Newton Decl. (Doc. No. 35-9).

Third, because we are dealing with probabilistic predictions, the gaps in the evidence are just as relevant as the evidence in the record; and here, the evidentiary gaps are telling. For one, there has been no testimony of anyone who remembers any time when either house of the Alabama Legislature actually chose to abolish or materially alter the system, to take any steps in that direction, or to even consider doing so. And, there has been no testimony of anyone in this case, not the House Clerk, Senate Secretary, defendant legislators, plaintiff legislators, or anyone else, that they think it

likely, or even reasonably plausible, that the system will be abolished or materially altered at any time in the foreseeable future.  And, there is no indication in the record that any legislator, or even any member of the public who intends to seek office as a legislator, has expressed a desire to abolish or materially alter the system.  In short, there is no evidence in the record that anyone has ever before attempted to eliminate the Local Delegations, or that anyone intends to do so in the future.

Indeed, even the plaintiffs in this case have represented that they desire for the system to remain in place in some form.  To the extent that the majority seems to believe that the plaintiffs seek to eliminate the system, the majority wholly misconceives what this litigation is about.  While the system as used with the challenged redistricting plans will allegedly cause unnecessary and unconstitutional vote dilution, the complete elimination of the Local Delegations system, which provides at least some measure of local control,

would be worse.  "[G]iven the absence of home rule powers for counties in the Alabama Constitution, eliminating the ability of legislators to control local laws affecting the county they represent would further dilute the ability of county residents to govern themselves and would subject them to tighter control by central state government in Montgomery."  Pls.' Br. (Doc. No. 133) at 5.  In short, the basic goal of this litigation is to increase local control over local affairs, and the elimination of the Local Delegations system, if not replaced with something else that provides for comparable local control, would have the precise opposite effect. Moreover, it would have a racial dimension that would raise serious concerns under the Voting Rights Act, as it would have the effect of transferring power away from the black legislators who represent the majority-black counties and to the white majority of the State as a whole.  "Doing away with the Local Delegations custom ... would impair 'the way blacks are gaining true political power in Alabama.'"  Id. at 6.  Compare Hardy v. Wallace,

603 F. Supp. 174, 175-77 (N.D. Ala. 1985) (three-judge court) (after it became clear that the majority-black Greene County was going to soon elect its first black legislators, the outgoing white Local Delegation amended a statute affording the delegation the power to make certain agency appointments to instead give the appointment power to Governor Wallace); see also Binny Miller, Who Shall Rule and Govern? Local Legislative Delegations, Racial Politics, and the Voting Rights Act, 102 Yale L.J. 105, 115 (1992) (discussing Hardy and contending that its facts "powerfully demonstrate [that] legislative delegations have often been the objects of intense racial maneuvering aimed at undercutting their authority").[2]

---

      2.   In fact, reported cases suggest that Alabama's preference for centralized, rather than local, control embedded in the State Constitution to some extent is rooted in racist motives at the 1901 convention.   It is well known that "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks."  Hunter v. Underwood, 471 U.S. 222, 229 (1985) (citations omitted).  "[Z]eal for white supremacy ran rampant at the
(continued...)

Fourth, the majority states that the next Legislature may abandon or materially alter the Local Delegations system during the next organizational session required by § 48.01 of the Alabama Constitution, but it is not clear whether doing so would even be lawful, as § 48.01 enumerates the "[only] business [that] can be transacted at such sessions" and it does not specifically mention Local Delegations at all. See Ala. Const. art. IV, § 48.01. As such, there seems to be a real question as to whether abolishing or altering the system during an organizational session would in fact violate § 48.01. See generally Van Hart v. deGraffenried, 388 So. 2d 1196,

---

2(...continued)
convention." Id. One district court found that the 1901 Constitution's hostility to county home rule was "motivated at least in part by race.... [It was] important not to have too much power in the hands of the counties, or to make sure that the power ... that is at the local level [was] in safe, that is, Democratic and white hands." Knight v. Alabama, 458 F. Supp. 2d 1273, 184-85 (N.D. Ala. 2004) (Murphy, J.) (punctuation and citation omitted); see also Dillard v. Crenshaw Cnty., 640 F. Supp. 1347, 1357-58 (M.D. Ala. 1986) (Thompson, J.) (discussing efforts to keep political power out of the hands of black voters in the heavily black counties by favoring centralized over local authority).

1199 (Ala. 1980) (discussing the actions that may
constitutionally be taken in organizational sessions).
The question seems to have never been faced because, as
mentioned, it appears that the Legislature has never once
actually attempted to abolish the Local Delegations
system during an organizational session.  And, while the
majority has concluded that the rules adopted by the
Alabama House and Senate at the organizational session
control whether and to what extent the delegations will
have "gatekeeping" power over local laws, in fact the
current rules of the current Legislature do not anywhere
mention Local Delegations even though, as all agree, the
current Legislature unquestionably uses the Local
Delegations system.[3]  The fair inference is that the Local

---

3.   See Rules, Alabama State Senate, available at
http://www.legislature.state.al.us/senate/senaterules/s
enaterulesindex.html (last visited July 11, 2013); Rules,
Alabama State House of Representatives, available at
http://www.legislature.state.al.us/house/houserules/hou
serulesindex.html (last visited July 11, 2013).

Delegations system is separate and apart from the rules drafted in the organizational sessions.[4]

Fifth, the majority's analysis does not include the fact that aspects of the Local Delegations system are enshrined in written law: as already mentioned, scattered provisions of the Alabama Constitution and Code appears to provide for the Local Delegations to have certain specified powers, office space, employees with salaries and pensions, and more. As the State Constitution recognizes and controls the existence of Local Delegations in certain respects, there is a state-law issue as to whether the next Legislature could constitutionally eliminate the delegations without first repealing these constitutional provisions that presuppose

---

4. Additionally, there may be evidence in the record that the Alabama Legislature may not attach the same importance to remaking itself anew each organizational session that the majority seems to imply it does: the House Clerk wanted to "[m]ake clear" during his deposition that the House is "supposed to" adopt rules during its organizational session, but "[i]t doesn't always happen." Woodard Dep. (Doc. No. 132-1) at 17:9-13.

their existence.  And the same issue would seem to be
present with respect to the Alabama Code, which also
appears to presuppose the delegations' existence in
numerous places.  While it is theoretically possible, of
course, that the Legislature could lawfully eliminate the
Local Delegations one way or another despite their being
recognized and controlled by provisions of the State
Constitution and Code, we should be hesitant to find it
likely that the next Legislature will do so, especially
here, where not one single legislator is on the record as
indicating any intent in this regard.

Viewing this evidence in the light most favorable to
the plaintiffs, see Lujan v. Defenders of Wildlife, 504
U.S. 555, 561 (1992); Matsushita Elec. Indus. Co. Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986), or viewing
the evidence without favor to either side, the conclusion
is obvious: The evidence overwhelmingly indicates that
the Local Delegations system will almost certainly
continue to exist with Alabama's next Legislature and the
material aspects of the delegations will be the same as

27

they are today, the same as they were last century, the century before that, and as far back as anybody involved in this litigation knows.  This case, in short, bears out the maxim that the past is prologue to the future.  The record simply contains no good reason to think that the next Legislature may abandon the delegations, which appears to have never happened before, never been attempted before, and is not something anybody actually wants.  "[A] litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted," and that, the State has not done.  See <u>Riva</u>, 61 F.3d at 1011.[5]

_____

    5.  The majority cites evidence of a 1999 episode in which a Democratic-controlled Alabama Senate revised its rules to "dramatically reduce" the Republican Lieutenant Governor's powers and argues that, since the Legislature made such changes then, it may make comparable changes again, say, maybe this time by eliminating the Local Delegations system.  See <u>ante</u>, at 30-31.  I find it quite telling that the example of a past change to legislative procedures is one so dramatic and unique.  That this 1999 change is put forward as comparable in likelihood to a change in the Local Delegations system shows just how unlikely a change in the system is for the next session. In any event, the singular, 1999 episode can hardly
                                                    (continued...)

While the majority states unequivocally that, "The rules for local legislation, including the use of local delegations, are adopted in the organizational session," ante, at 5, I do not read the sources on which the majority relies, the Alabama House Clerk's and Senate Secretary's depositions, to say that.  Indeed, both persons testified that legislative rules are adopted in the organizational session, but as already mentioned, those rules say nothing about whether the State will have Local Delegations or what powers those delegations will have.  See supra, note 3.  The majority leaps from "during the organizational session, the Legislature enacts rules" to "during the organizational session, the Legislature enacts the rules that sub silentio determine whether Local Delegations exist," but I do not see how that leap is supported by anything the House Clerk or

_____

5(...continued)
outweigh the evidence that Local Delegations have been used for decades, nobody has ever attempted to eliminate them, and nobody has indicated a desire to do so in the future.

Senate Secretary actually said.  And, more importantly, the leap seems to be in contradiction of all the formal law providing that the Local Delegations "shall" exercise certain powers, _e.g._, Ala. Const. amend. 677, they "shall" have offices, _e.g._, 1975 Ala. Code § 45-2-190, their employees "shall" have pensions, _e.g._, Ala. Code § 36-27-5.1, etc.

   As the Local Delegations continue to exist in Alabama in fact and in law, as recognized by a number of statutes, constitutional provisions, and decades of custom, and there is no reason to think that that existence will cease, the alleged harm the delegations' malapportionment will cause in the imminent future is ripe for review.  Cf. Glavin v. Clinton, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998) (three-judge court) ("Defendants suggest that the case is not ripe because 'Congress has not reached its ultimate legislative conclusion regarding a sampling census.'  Although it is certainly possible that Congress may seek to prevent the Department from conducting its plan to utilize sampling, there is no

legal significance to this observation. Congress may always moot out a controversy by passing new legislation, but that fact does not shield agency action from judicial review. There is always the possibility that settlement or some external event will render a case moot, but that hardly renders the litigation nonjusticiable before that event occurs."), aff'd sub nom. Dep't of Commerce v. House of Representatives, 525 U.S. 316, 329 (1999) ("[T]he District Court below correctly found that the case is ripe for review, and that determination is not challenged here."). Unless and until the State actually elects to eliminate the Local Delegations, they, like all other local bodies of government, are subject to judicial review. See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents, 633 F.3d 1297, 1309-10 (11th Cir. 2011) (once a governmental defendant's challenged conduct voluntarily ceases, the defendant "enjoy[s] a rebuttable presumption that the objectionable behavior will not recur" and, if not rebutted, the case is moot).

31

B.

As for standing, as an initial matter, it cannot be questioned that the plaintiffs' asserted vote-dilution injury is a judicially cognizable one.  See Fairley v. Patterson, 493 F.2d 598, 603 (5th Cir. 1974) ("[T]he Supreme Court has conclusively established ... that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present.") (citations omitted).  Once again, the only question here is whether that injury will actually come to pass.  While the majority states correctly that there is no standing if the injury is merely "conjectural or hypothetical," ante, at 27 (quoting Lujan, 504 U.S. at 560-61), it is also true that "there is no per se rule denying standing to prevent probabilistic injuries."  Fla. State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1162 (11th Cir. 2008); see also id. ("[W]e have repeatedly upheld plaintiffs' standing when the alleged injury was prospective and probabilistic in nature.").  Put another

way, "[i]njury sufficient to meet the standing requirement ... may involve a contingent risk of injury." Ore. Envtl. Council v. Kunzman, 817 F.2d 484, 491–492 (9th Cir. 1987).  In such cases, whether the contingent risk of injury is sufficient to support standing turns on whether the plaintiffs are "likely" to suffer the injury feared.  City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983); see also Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1205 (11th Cir. 1991) (aggregating cases and concluding, "[i]n sum, a plaintiff seeking declaratory and injunctive relief [must] show[] that the defendant is likely to injure the plaintiff"); cf. Va. State Corp. Comm'n v. F.E.R.C., 468 F.3d 845, 848 (D.C. Cir. 2006) (requiring a "substantial probability").  The degree of probability required to support standing is "undemanding." Fla. State Conference of N.A.A.C.P., 522 F.3d at 1163; see also Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin., 903 F.2d 445, 451 (7th Cir. 1990) (although the likelihood of the alleged injury occurring was "thin gruel, it [was] no thinner than"

33

other cases finding standing). Based on the evidence already discussed and viewing that evidence in the light most favorable to the plaintiffs, it is clear that a sufficient likelihood of injury to support standing has been shown here. See also Arrington v. Elections Bd., 173 F. Supp. 2d 856, 861-62 (E.D. Wis. 2001) (three-judge court) ("To achieve standing, all one needs to do is allege a 'threat' that one's voting rights may be diluted.... [Here,] the plaintiffs have met the 'relatively modest' burden of alleging a realistic threat of imminent injury to their voting rights.").

The next element of standing is causation. The majority concludes that there is none here because it is the Local Delegations system's procedural rules, not the redistricting maps that the plaintiffs seek to enjoin, that causes the vote-dilution injury. That argument misconceives the nature of the injury. In all one-person, one-vote cases, the unconstitutional vote dilution is brought about by two factors acting in conjunction, one, that elected officials represent

34

disproportionate numbers of voters, and two, that those officials exercise equal power despite having unequal constituencies. <u>Cf</u>. <u>Roxbury Taxpayers Alliance v. Delaware Cnty. Bd. of Supervisors</u>, 80 F.3d 42, 49 (2d Cir. 1996) (declining to find a one-person, one-vote violation because, even though the districts were not equipopulous, the legislators were afforded weighted votes in accordance with their respective constituency sizes); <u>Thigpen v. Meyers</u>, 231 F. Supp. 938, 941 (W.D. Wash. 1964) (three-judge court) (ordering weighted voting, rather than redistricting, to remedy a one-person, one-vote violation).  The injury alleged in this case is caused by the redistricting plans as much as it is by the rules affording all Local Delegation members equal power.

Likewise, the injury is redressable for purposes of standing.  It cannot be questioned that a redistricting remedy by itself could remedy the one-person, one-vote violation in at least some Local Delegations.  Given the tension between the State's competing one-person, one-

35

vote obligations vis-à-vis the Local Delegations and the Legislature as a whole (since one individual serves in both capacities), redistricting alone could probably not, without some additional other sort of remedy, eliminate the violation in all Local Delegations across the full length of the State.   But, that fact does not defeat standing.  See Massachusetts v. E.P.A., 549 U.S. 497, 526 (2007) ("[The risk of global warming causing harm] would be reduced to some extent if petitioners received the relief they seek."); Chiles v. United States, 69 F.3d 1094, 1096 (11th Cir. 1995) (Florida had standing to pursue claims that the U.S. Attorney General was unlawfully failing to stem the tide of illegal immigration because, even though "illegal immigration is dependent on many other factors outside the control of the Attorney General," the court "could offer some relief to Florida").[6]

_____

      6.  The majority's argument that "one person, one vote is not the sort of injury that can be redressed by partial compliance," ante, at 35-36, forgets that the
                                              (continued...)

Even if the majority is correct that this court could not order any of the named defendants to remedy the full extent of the one-person, one-vote violation across the entirety of the State, that does not defeat standing; it is enough that, one, the court's decree would alter legal duties such that the injury would be remedied in part (that is, in some Local Delegations), and two, "the practical consequences" of the decree would be "a significant increase in the likelihood that" the injury would be remedied in full (that is, in all Local Delegations across the State). Utah v. Evans, 536 U.S. 452, 464 (2002) (finding an injury redressable even though the President, who had ultimate power over whether the injury would continue, was not a named defendant and would not be bound by any decree issued by the court, but

---

6(...continued)
standing doctrine itself often precludes plaintiffs from challenging the full makeup of a governmental body and rather limits the legal challenge to discrete districts. See, e.g., United States v. Hays, 515 U.S. 737 (1995). Despite the majority's dicta without citation to authority, there never has been an "all-or-nothing" requirement in redistricting cases.

would nevertheless likely honor the judiciary's judgment); see also Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59 (1978) (finding an injury redressable when the injury was caused by a third party, not the defendants against whom the desired decree would run, because of the possibility of the third party reacting voluntarily to the decree so as to cease injurious conduct). If this court were to declare Alabama's Local Delegations system to violate constitutional requisites, it is substantially likely that State officials, even those not formally bound by this court's decree, would take the message to heart, and it is plainly apparent that the State could, should it desire, eliminate the violation in full through any number of procedural devices, whether having weighted voting in the Local Delegations, having different persons serve in the Local Delegations and the Legislature as a whole, or otherwise.[7]

---

7.   Indeed, the State has repeatedly argued
(continued...)

In sum, the vote-dilution injury alleged by the plaintiffs is both likely and redressable, and the plaintiffs have standing to seek that redress.

### C.

While the State may currently feel discontent over the existing degree of federal judicial involvement in its redistricting, I fear that the majority's ripeness and standing analysis may unintentionally sentence the State to a quagmire of perpetual litigation much greater than that occurring now.  Suppose the plaintiffs wait until after the election to challenge the State's redistricting plans as they relate to the Local Delegations (as the majority says they must), and the

_____

7(...continued)
throughout this litigation that the redistricting plans challenged in this case were the result of a good-faith attempt at complying with principles of law explicated by a three-judge district court in Georgia, Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge court). While Alabama was, of course, not bound by the Georgia court's decree, it nevertheless claims to have put great effort into honoring it.

court finds the case to have merit and orders remedial redistricting. Because each member of a Local Delegation is also a member of the Legislature as a whole, the remedial redistricting may then invite a claim that, as a result of the attempt at remedying the Local Delegations violation, the redistricting plans now violate one-person, one-vote in the Legislature as a whole. If that claim has merit and a second round of remedial redistricting is required, the State may, once again, be open to a new round of litigation over the Local Delegation districts. This may proceed ad infinitum until the State succumbs to a drastic remedy, replacing the current system with something entirely different. In short, I think the law not only allows this court to consider at the same time the redistricting plans as they relate to the Local Delegations and the Legislature as a whole, but furthermore, sound public policy prefers that this court do so.

## III. MERITS

### A.

I now turn to the merits.  The "one-person, one-vote" rule under the equal protection clause of the Fourteenth Amendment requires that "the vote of any citizen [be] approximately equal in weight to that of any other citizen in the State."  Reynolds v. Sims, 377 U.S. 533, 579 (1964) (holding that the Alabama Legislature as a whole must adhere to one-person, one-vote).  While that principle was at first applied to state legislatures, it is now "beyond question" that, because "[t]he Equal Protection Clause reaches the exercise of state power however manifested, whether exercised directly or through subdivisions of the State," the one-person, one-vote rule applies with equal force to the State's subdivisions as well, including city, county, and other bodies of local government.  Avery v. Midland Cnty., 390 U.S. 474, 479-80 (1968); see also Bd. of Estimate v. Morris, 489 U.S. 688 (1989); Hadley v. Junior College Dist., 397 U.S. 50 (1970).

41

Where the State has, without rational justification, through its districting plans or other forms of state action, created preferred classes of citizens who cast votes of a greater weight than others, the State has denied the equal protection of the laws. See Reynolds, 377 U.S. at 563 (the "right to vote" of "individual voters living in disfavored areas" "is simply not the same right to vote as that of those living in a favored part of the State"). "The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." Moore v. Ogilvie, 394 U.S. 814, 819 (1969).

Here, Alabama's Local Delegations system creates clear differences of voting power among the State's citizens, and the "discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically." Reynolds, 377 U.S. at 563. The Local Delegations system results in several forms of discrimination among Alabamians and the legislators elected to serve their interests.

The first distinction is between Alabamians of a particular county. After discounting the out-of-county voters who have no interest in a foreign county's local affairs (but elect members to the county's Local Delegation anyways), there is a difference of voting power among any given county's residents with respect to their ability to select members of their own Local Delegation. For example, in Jefferson County, the most populous county in Alabama, reside approximately 658,000 people. As explained, the Jefferson County Local Delegation's core function, legislating, and its lesser functions, such as agency appointments, relate to a single geographic region's population alone: the 658,000 residents of Jefferson County. However, under the challenged redistricting plans, those county residents will have dramatically different voices in the delegation charged with legislating in their interest. The Jefferson County Local Delegation in the House of Representatives will include the legislators from 18 districts (HD 14-16, 43-48, 51, 52, and 54-60). All of

43

those districts will contain approximately 45,000 people each.  Some of the districts, however, will be made up of Jefferson County residents exclusively (that is, about 45,000 Jefferson County residents per district), while others will include large numbers of people residing in other counties as well.  One district in the delegation, HD 43, for example, will include only 200 or so Jefferson County residents and about 44,800 neighboring Shelby County residents who, as residents of an area in which the Jefferson County Local Delegation exercises no powers, lack a legitimate interest in the delegation's affairs.   It is apparent that, when selecting members of the Jefferson County Local Delegation, the 200 Jefferson County voters residing in HD 43, after discounting the 44,800 disinterested Shelby County voters, cast votes of far greater strength than do Jefferson County voters residing in any of the delegation's other districts "merely because of where they happen to reside" in the county. Reynolds, 377 U.S. at 563.  Those 200 voters exercise the same power over

county affairs (a single vote on the Local Delegation) as do 45,000 others. In short, the Local Delegation "give[s] the same number of representatives to unequal numbers of constituents" in the county, id. at 563, and that discrimination among county residents seeking to influence their county's affairs "is hostile to the one man, one vote basis of our representative government." Moore, 394 U.S. at 819.

The second distinction is between legislators. Depending on whether a legislator's district lies entirely within a single county or instead crosses county lines, the legislator exercises differing powers in the Legislature: he has either the ability to serve as the "gatekeeper" of local laws for either a single county (if his district falls within a single county alone) or multiple counties (if his district touches multiple counties). As for Jefferson County, again, some of the county's Local Delegation districts lie entirely within the county; the representatives of those districts will be able to legislate for Jefferson County and no other.

By contrast, the representative of HD 43 will have equal ability to influence the affairs of both Jefferson County and Shelby County, even though only about 200 of the legislator's constituents will live in the former and about 44,800 will live in the latter.  It is obvious that, in a political body like the State Legislature, where horse trading is a necessary part of business, affording some members greater powers than others is not without consequence.  Cf. Bannister v. Davis, 263 F. Supp. 202, 209 (E.D. La. 1966) (three-judge court) ("[A] representative does more than simply vote for legislation.  He [also] exerts personal influence on other representatives ....").  The HD 43 representative, who will legislate for both Jefferson and Shelby counties, simply does not stand on an equal footing with a representative empowered to legislate for Jefferson County alone; the former is empowered to influence legislation affecting the latter's constituents, but the latter lacks a corresponding power.  And, of course, that power differential is not a result of political acumen,

46

but is rather predetermined at the time of every election on the basis of nothing more than whether the legislator's district is in a favored or disfavored part of the State.

The third distinction is between the Alabamians who elect legislators to represent their interests.  Because of the fact that some legislators are afforded greater legislative powers than others, it is, correspondingly, also the case that, within a particular area of the State, certain Alabamians may, through their representatives, influence the local legislative affairs of their neighbors in other counties, although those neighbors cannot do the same for them.  Cf. Bd. of Estimate, 489 U.S. at 698 ("[A] citizen is ... shortchanged if he may vote for only one representative when citizens in a neighboring district, of equal population, vote for two.").

Consider the following example.  Jefferson County has approximately 658,000 residents and neighboring Shelby County has approximately 195,000; together, the combined

47

two-county area contains about 853,000 people.  Among those 853,000 people, about 45,000 of them, the residents of HD 43, will be able to, through their representative, exercise legislative power over themselves and all of their neighbors in both counties in the area; they will have a voice in the local affairs of all 853,000 people.  Others, those residing slightly further down the road, in a district wholly in Jefferson County, will be able to legislate for about 658,000 people, the residents of Jefferson County alone.  And, finally, a third group, those residing in a district wholly in Shelby County, will be able to legislate for about 195,000 people, the residents of Shelby County alone.  There is simply no rational justification for the State affording the HD 43 voters such an amplified voice, giving them dominion over their neighbors who are not similarly empowered.  In short, the Local Delegations system divides this community of about 853,000 people into classes, affording the "individual voters living in disfavored areas" a "right to vote [that] is simply not the same right to

vote as that of those living in [the] favored [areas]."
Reynolds, 377 U.S. at 563; see also id. at 563-64 ("To
say that a vote is worth more in one district than in
another would run counter to our fundamental ideas of
democratic government.") (punctuation and citation
omitted).

Although I have focused on Jefferson County and its
neighbors, lest I be misunderstood, I emphasize here that
such discrimination will exist across Alabama.  In the
challenged redistricting plans, 50 of the State's 67
counties are split among multiple legislative districts
in the State House of Representatives and 33 are split in
the State Senate, and this is far more county splits than
had occurred in prior redistrictings.  What I have
described is found in each of those places.

While the three forms of discrimination already
discussed are enough to show the constitutional infirmity
in this case, there is a fourth, closely related, reason
to think the State's legislative delegations scheme may
be unconstitutional.  That is, the State has given people

49

(say, the HD 43 voters who reside in Shelby County) the power to influence a governmental body that they have no legitimate interest in (say, the Jefferson County Local Delegation), thereby diluting the votes of the legitimately interested voters. Although the Supreme Court has never directly addressed the matter, other courts have suggested that such circumstances are unconstitutional. E.g., Cantwell v. Hudnut, 566 F.2d 30, 36 (7th Cir. 1977) ("Although there are no decisions on the point, we shall assume the correctness of the District Court's view that a state law allowing strangers to participate in the vote for representatives to a local legislative body having general governmental powers over a particular territory would offend the equal protection rights of the resident voters in that territory.").

Under the law of the Eleventh Circuit Court of Appeals, the State unconstitutionally violates the rights of voters with legitimate interests in a particular governmental body when the State extends the franchise to other persons lacking a "substantial interest." Sutton

<u>v. Escambia Cnty. Bd. of Educ.</u>, 809 F.2d 770, 772 (11th Cir. 1987) ("The test for whether the statute is irrational as applied to the particular county is whether the city residents have a substantial interest in the operation of the county school system. If the city residents do not have a substantial interest, then the state must exclude the city residents from voting."). Other circuits have come to similar conclusions. <u>See Creel v. Freeman</u>, 531 F.2d 286, 288 (5th Cir. 1976) (same); <u>Duncan v. Coffee Cnty.</u>, 69 F.3d 88, 94 (6th Cir. 1995) (same); <u>cf</u>. <u>Locklear v. North Carolina State Bd. of Elections</u>, 514 F.2d 1152 (4th Cir. 1975) ("compelling state interest").

Here, there has been no legitimate (let alone "substantial") interest proffered for Shelby County residents voting for the Jefferson County Local Delegation. (In fact, there is reason to think that residents of Shelby County may have adverse interests to those of the neighboring Jefferson County.) A quick look at the State's redistricting plans reveals that, across

51

the State, residents of numerous counties are authorized, through their representatives, to legislate for other, neighboring, and, in many cases, even distant, counties. In the case of HD 16, residents of the rural Lamar County, which is on Alabama's western border with Mississippi, may legislate for the distant, comparatively urban, Jefferson County, the third county to the east, in the middle of the State.  In the case of HD 68, Conecuh County residents may legislate for three-county-away Marengo County.  There are too many other similar instances to list.  (And of course, other voters, by contrast, do not extend such reach; in the case of HD 86, for example, the voters of Houston County may legislate for themselves alone.)  It strains credulity to imagine that this hodgepodge of authorizing certain Alabamians to cast votes for "local" (a misleading term here) delegations that do not affect them and only affect far-away others is justified by legitimate state interests.

In fact, defendant State Representative Jim McClendon, who served on the State's legislative

reapportionment committee that drew the redistricting plans challenged in this case, raised his own similar concerns in this regard at one of the committee's hearings: "I am now speaking as a representative of St. Clair County and not a member of this board.... I want to get this on the record on behalf of my home county. Right now we have six legislators from St. Clair County. Five of them do not live in St. Clair County. Five of them have a majority of their voters in some other counties. That affects accountability.... In St. Clair County, any one of those six legislators, whether they live in the county or not, can veto any local legislation.... [T]hat is not right." Legislative Reapportionment Comm. Hr'g Tr. (Doc. No. 30-26) at 7. The irrational scheme for enacting local legislation about which McClendon complains violates the constitutional rule of Sutton and related circuit court decisions.

In sum, Alabama has discriminated against certain of its citizens as to their opportunity for democratic

participation merely because of where they live in the State and it has done so without any rational justification. That discrimination denies Alabamians the equal protection of the law.

B.

As McClendon acknowledged, Alabama's scheme for enacting local legislation has obvious deleterious effects. The plaintiffs in this case allege that the most drastic instance of a Local Delegation failing to respond to the needs of its citizens can be found in Jefferson County. Based on the present record, it is impossible to determine whether the allegations about Jefferson County have merit, but, in the interest of illustrating what may be at stake in this case, it is worth noting the contentions.

As the plaintiffs explained it, until recent years, Jefferson County collected an "occupational tax" from persons who resided outside the county and commuted in for business. The Alabama Supreme Court invalidated the

tax for reasons unrelated to the issues in this case, thereby causing Jefferson County to lose a significant source of revenue.  <u>See</u> <u>Jefferson Cnty. Comm'n v. Edwards</u>, 32 So. 3d 572 (Ala. 2009); <u>Jefferson Cnty. v. Weissman</u>, 69 So. 3d 827 (Ala. 2011).  Although it was clear that new revenue was needed, the county's Local Delegation, which, of course, included legislators whose primary constituencies were outside the county, failed to reenact the occupational tax (in a manner permissible under state law, that is) or to provide for any alternative.  That failure was, as the bankruptcy court would describe it, a "major cause" of Jefferson County's subsequent bankruptcy, the largest governmental bankruptcy in American history at the time.  <u>In re Jefferson Cnty.</u>, 484 B.R. 427, 434 (Bankr. N.D. Ala. 2012) (Bennett, J.); <u>see also</u> <u>id</u>. at 436 ("All those who attribute Jefferson County's bankruptcy case ... only to conduct and actions by the County are ill-informed.  The State of Alabama and its legislators are a significant, precipitating cause.").  According to a newspaper story

in the record, a legislator from Shelby County credited legislators like herself, representing out-of-county interests, with averting reenactment of the occupational tax: "When you add up those people that represent counties surrounding Jefferson, that's a lot of folks.... They don't want their constituents to have to pay an occupational tax for Jefferson County." Barnett Wright, <u>Jefferson County Lawmakers to Meet, Try Again for Solution [to] County Financial Crisis</u>, The Birmingham News, April 22, 2012 (Doc. No. 35-4).

Whether the Jefferson County bankruptcy could have been avoided had the county been governed by a system that respected the rule of one-person, one-vote cannot be known but, as this court adjudges the constitutionality of Alabama's Local Delegations scheme, the possibility should be considered.[8]

---

8. Additionally, given the history of racism to some extent underlying the Local Delegations system's roots, <u>see</u> <u>supra</u>, note 2, and issues with racially discriminatory governance in this part of the State in the recent past, <u>see</u> <u>Shelby Cnty. v. Holder</u>, ___ S. Ct. (continued...)

## C.

For the foregoing reasons, I believe that Alabama's Local Delegations scheme, which irrationally empowers certain of the State's citizens to the disadvantage of others, violates the equal protection clause. The majority, however, in its alternative holding on the merits, erroneously decides otherwise because, as the majority explains it, the Local Delegations do not exercise "governmental functions."

---

8(...continued)
___, ___, 2013 WL 3184629, at *34 (June 25, 2013) (Ginsburg, J., dissenting) (discussing <u>Dillard v. Crenshaw Cnty.</u>, 748 F. Supp. 819 (M.D. Ala. 1990) (Thompson, J.)), the appearance of the Local Delegation for Jefferson County, a black population center, being diluted by interests from Shelby County, an overwhelmingly white constituency, is troubling. Another county split may be even more questionable. In the case of HD 61, which is approximately 80 % white, that district crosses into Greene County, which is approximately 80 % black, to capture a mere 12 people. The effect is, a majority-white constituency can exercise a veto over a majority-black county's residents' wishes, all because a mere 12 people were placed in one district rather than another. Whether these circumstances are evidence of race discrimination, however, is a question for this court for another day.

1.

Like the majority, I begin my analysis regarding "governmental functions" with <u>Hadley v. Junior College Dist.</u>, 397 U.S. 50 (1970). <u>Hadley</u> was decided in 1970, six years after <u>Reynolds</u>, which, for the first time, applied the one-person, one-vote rule to a state legislature. During the intervening six years between <u>Hadley</u> and <u>Reynolds</u>, there was uncertainty in the lower courts regarding the sorts of state governmental bodies besides legislatures, if any, to which the one-person, one-vote rule applied. For example, some courts distinguished between "legislative" and "administrative" bodies, assuming that the rule applied to the former but not the latter. <u>See, e.g.</u>, <u>Hyden v. Baker</u>, 286 F. Supp. 475, 483 n.13 (M.D. Tenn. 1968) (three-judge court) (collecting cases).

In <u>Hadley</u>, the Court, addressing this confusion, repudiated distinctions based on the nature of a governmental body's functions, repeatedly eschewing the

distinctions that were proposed to limit application of the one-person, one-vote rule: "When a court is asked to decide whether a State is required by the Constitution to give each qualified voter the same power in an election open to all, there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election.... While there are differences in the powers of different officials, the crucial consideration is the right of each qualified voter to participate on an equal footing in the election process." 397 U.S. at 54-55. The Court declined to recognize a distinction based on the "importance" of the governmental body. Id. at 55. It also declined to recognize a distinction based on whether governmental bodies exercised "legislative" or "administrative" functions. Id. at 55-56.

Immediately after having rejected these possible narrowing principles on the application of the one-person, one-vote rule, the Court announced its holding in the very next sentence:

> "We therefore hold today that as a
> general rule, whenever a state or local
> government decides to select persons by
> popular election to perform governmental
> functions, the Equal Protection Clause
> of the Fourteenth Amendment requires
> that each qualified voter must be given
> an equal opportunity to participate in
> that election, and when members of an
> elected body are chosen from separate
> districts, each district must be
> established on a basis that will insure,
> as far as is practicable, that equal
> numbers of voters can vote for
> proportionally equal numbers of
> officials."

Id. at 56.

This holding contains two essential teachings.  The equal protection clause reaches "an elected body," first, whose "members ... are chosen from separate districts" and, second, which performs a "government function."  If these two factors are present, the "district[s] must be established on the basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials," or to put it more succinctly, the one-person, one-vote rule applies.

As to the first teaching, the Court is essentially saying that the clause reaches multi-member bodies whose members are elected from separate districts.  This, to me, is the quintessential entity to which the one-person, one-vote rule should apply.  It should be emphasized that, <u>Hadley</u>'s language is quite narrowly confined to those circumstances where "a state or local government decides to select persons by popular election" to serve in the governmental body at issue (and, within that category, "when members of [a governmental] body are [elected] from separate districts").  <u>Id</u>. at 56.  Excluded from the rule would, therefore, be appointed officials, for they are not elected, and legislative, executive, and administrative committees and other intra-structural bodies, for officials are not elected to those bodies (although they may nevertheless be elected to a different body, <u>i.e.</u>, the legislature itself, and then "appointed," in a sense, to the other, <u>i.e.</u>, the

legislative committee).[9]  <u>See</u> <u>Sailors v. Bd. of Educ</u>., 387
U.S. 105 (1967) (one-person, one-vote rule does not apply
to appointed officials).

As to the second teaching, that the Court used the
word "governmental," a word that literally reaches all
aspects of what the government does, to modify the word
"functions" reflects that the court was emphasizing that
the former word should be broadening rather than
narrowing.  This makes sense since, as the Court
indicates, the nature of the bodies' functions is not the

---

9.  The majority says that it "see[s] no logical
distinction between the manner in which local delegations
are created and the manner in which all legislative
committees are created" because the members of both "are
all appointed in the same organizational session that
occurs each quadrennium."  <u>Ante</u>, at 61.  The difference
is obvious: even assuming that committee and Local
Delegation "appointments" happen at the same time, the
Local Delegations system assigns legislators to
delegations "automatically" on the basis of geography,
versus the committee system, in which legislators are
appointed to committees based on political acumen.  As
for committees, even though not every legislator will
ultimately serve on, say, the agriculture committee, all
legislators have the opportunity to seek to do so.  In
turn, all voters have the equal opportunity to influence
the business of the agriculture committee.

decisive factor, but rather, it is the structure of the means of selecting the body (that is, that members are selected by voters) that determines whether the requirements of one-person, one-vote are triggered.  If the entity is a multi-member body whose members are elected from separate districts, it makes no difference whether its functions are administrative, executive, legislative or whatever, as long as they are governmental. The Court could have used a more limiting modifier, such as by requiring "important," "plenary," or "final" functions, but it did not.  See Hadley, 397 U.S. at 60 (Harlan, J., dissenting) ("[This] case forebodes, if indeed it does not decide, that the [one-person, one-vote] rule is to be applied to every elective public body, no matter what its nature."); Twp. of Marlboro v. Bd. of Educ., 992 F. Supp. 756 (D.N.J. 1998) (Wolin, J.) ("In essence, the Supreme Court held [in Hadley] that all elections must comply with the 'one person, one vote'

principle.")[10]   The Court imposed no such limiting modifier, instead concluding simply that, "[w]hile there are differences in the powers of different officials," "there is no discernible, valid reason why constitutional distinctions should be drawn on [that] basis."  <u>Hadley</u>, 397 U.S. at 55-56.

If <u>Hadley</u> itself is not enough to show that the one-person, one-vote rule is broadly applicable to multi-member bodies whose members are elected from separate districts, additional Supreme Court decisions should bolster that conclusion.  The first case is <u>Board of Estimate v. Morris</u>, 489 U.S. 688 (1989), where the Court held that the New York City "Board of Estimate" was

---

10.  In Chief Justice Burger's dissenting opinion criticizing the majority's holding, the Chief Justice restated the holding with a notable omission as follows: "'[A] general rule, (that) whenever a state or local government decides to select persons by popular election * * *,' the Constitution commands that each qualified voter must be given a vote which is equally weighted with the votes cast by all other electors."  <u>Hadley</u>, 397 U.S. at 70 (Burger, C.J., dissenting).  Apparently, the Chief Justice thought the "governmental functions" language was not important enough to warrant repeating.

subject to one-person, one-vote.   There, the Court discussed a broad array of the board's functions, but it did so only insofar as those functions were relevant in determining that the board did, in fact, have some sort of "sufficient impact throughout the district" to invoke the requirements of one-person, one-vote.   Id. at 696 (quoting Hadley, 397 U.S. at 54).

Importantly, in a footnote in the Court's opinion, the Court, quoting from a party submission, listed the board's functions, dividing them between plenary functions that the board handled "exclusively" and non-plenary functions that the board handled "in conjunction with the New York City Council."   Id. at 694 n.4.   In the opinion's body text to which that footnote was appended, the Court, referring to these functions, stated simply that, "New York law assigns to the board a significant range of functions common to municipal governments."   Id. at 694. Again, the Court here had the opportunity to draw a distinction of constitutional significance based on the nature of those functions, but the Court did not do so.

Moreover, in deciding that the board's functions were "governmental" ones invoking the one-person, one-vote rule, the Court did attach "major significance" to one of the board's non-plenary powers in particular: that is, that "the board shares legislative functions with the city council with respect to modifying and approving the city's capital and expense budgets."  Id. at 696.  The board "recommend[ed]" a budget, but did not have plenary authority to enact its recommendation; rather, "[a]pproval or modification of the proposed budget require[d] agreement between the board and the city council."  Id. at 694 n.4, 696.

In short, Board of Estimate reflects that, as for the nature of a governmental body's functions, the relevant inquiry for determining whether those functions invoke the one-person, one-vote rule is whether those functions cause the body to have some sort of impact in the geographic area it serves, whatever that impact may be, and, furthermore, even non-plenary legislative functions may be highly significant in causing such an impact.  So long

as the threshold "impact" requirement is met, courts should not second guess whether, given the nature of the body's functions, the effect of the impact is felt strongly enough to warrant equal voting requirements. See also Hadley, 397 U.S. at 55 ("If the purpose of a particular election were to be the determining factor in deciding whether voters are entitled to equal voting power, courts would be faced with the difficult job of distinguishing between various elections. We cannot readily perceive judicially manageable standards to aid in such a task.... If there is any way of determining the importance of choosing a particular governmental official, we think the decision of a State to select that official by popular vote is a strong enough indication that the choice is an important one.").

In all its years of adjudicating one-person, one-vote cases since these decisions, the Supreme Court has recognized a single limitation on the one-person, one-vote rule's application to multi-member bodies whose members are elected from separate districts, the so-called

"special-purpose" exception. The special-purpose exception was first invoked as a possibility in Avery, the first Court decision to apply the one-person, one-vote rule to a local governance body: "Were the Commissioners Court a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." 390 U.S. at 483-84. Next, in Hadley, after announcing the general rule that the one-person, one-vote rule applies to all elected officials that "perform governmental functions" in defined geographic areas, the Court revisited the possibility although, again, did not apply it: "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different

groups that a popular election in compliance with <u>Reynolds</u> [] might not be required."   397 U.S. at 56.

The exception, as described in those cases, is common sense.  Although place of residence within a State is an irrational basis for discriminating as to voting power when electing members of the statewide legislature, a body charged with duties impacting all of the State's citizens, <u>Reynolds</u>, 377 U.S. at 563, the special-purpose exception simply recognizes that, in other cases, where a governmental body's more narrow functions (that is, not "typical" governmental functions) disproportionately affect some citizens to a greater extent than others, it is entirely rational, perhaps even sensible, that those citizens disproportionately impacted exercise correspondingly disproportionate voting power in electing the members of that body.

The first of three Supreme Court cases to actually apply the exception was <u>Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.</u>, 410 U.S. 719 (1973).  There, the Court concluded that, because the operations of a

California "water storage district," distributing water and charging for it according to land ownership, affected citizens to varying degrees according to the amount of land they owned, the State may constitutionally weigh its citizens' votes accordingly to allow those most affected to have the loudest voice when electing members of the body. Id. at 729-30; see also Ball v. James, 451 U.S. 355, 362 (1981) ("[T]he question in this case [is] whether the purpose of the [governmental body at issue] is sufficiently specialized and narrow and whether its activities bear on landowners so disproportionately as to distinguish the [body] from those public entities whose more general governmental functions demand application of the Reynolds principle."); Associated Enters., Inc. v. Toltec Watershed Improvement Dist., 410 U.S. 743, 744 (1973) (similar).

Years later, in Quinn v. Millsap, 491 U.S. 95 (1989), rev'g 757 S.W.2d 591 (Mo. 1988), the Court revisited these special-purpose cases (albeit not in the context of one-person, one-vote). There, the Court reversed a Missouri

state-court decision holding that the Missouri "Board of Freeholders" may constitutionally limit its membership to landowners. The state court, relying on the three special-purpose cases, read those decisions to stand for the principle that the equal protection clause applied to the board only if it had "general governmental powers." 757 S.W.2d at 594-95 (citing Salyer, Associated Enters., Inc., and Ball). The board did not have such "general governmental powers," the state court held, because "[t]he Board of Freeholders serves only to recommend a plan of reorganization to the voters of St. Louis City and St. Louis County." Id. at 595. It could not, by itself, implement such a plan; therefore, the state court concluded, "the Equal Protection Clause [had] no relevancy." Id.

The Supreme Court reversed because the state court's "ruling reflect[ed] a significant misreading of our precedents." Quinn, 491 U.S. at 96. The Court explained, "In holding the board of freeholders exempt from the constraints of the Equal Protection Clause, the Missouri

Supreme Court [] relied [in part] on the fact that the Board of Freeholders serves only to recommend a plan of reorganization to the voters of St. Louis City and St. Louis County and does not enact any laws of its own.  But this fact cannot immunize the board of freeholders from equal protection scrutiny"; the special-purpose cases "do not support that conclusion."  Id. at 104-05 (punctuation omitted).  Rather, in each of those special-purpose cases, "the Court expressly applied equal protection analysis and concluded that the voting qualifications at issue passed constitutional scrutiny."  Id. at 105.  In short, regardless of whether a governmental body "enact[s] laws directly" or merely "recommends a proposal," that distinction does not allow the body to escape the ordinary equal-protection scrutiny, and the Court's special-purpose exception jurisprudence does not provide otherwise.

In sum, these decisions, read together, create the following framework.  As an initial matter, the Fourteenth Amendment's equal protection clause reaches all governmental bodies regardless of what functions those

72

bodies exercise or what purposes they serve (<u>Quinn</u>). Because all governmental bodies (state or local) are subject to equal-protection requirements, those bodies consisting of multiple members each elected from a discrete geographical district are subject to the one-person, one-vote rule (<u>e.g.</u>, <u>Reynolds</u>, <u>Hadley</u>), unless there is a rational basis warranting otherwise (<u>Salyer</u>, <u>Associated Enterprises</u>, and <u>Ball</u>).  If the body has a meaningful impact throughout the geographic region it serves, affording unequal votes on the basis of where within the region the voters happen to reside is irrational (<u>e.g.</u>, <u>Reynolds</u>, <u>Hadley</u>).  That is true regardless of whether the body is important, whether its functions are best characterized as administrative, legislative, or otherwise (<u>Hadley</u>), or whether its powers are plenary or are instead limited by some manner of checks and balances (<u>Board of Estimate</u>).  Simply stated, so long as a governmental body is popularly elected in a defined geographic region and has some sort of meaningful presence across that region, it is subject to one-person,

one-vote.  In general, almost all governmental multi-member bodies whose members are elected from separate districts will meet that description because, in a democratic system like ours, where government is expected to respond to the people, it is a rare occasion when politicians are elected to do nothing.  Cf. Hadley, 397 U.S. at 55 ("[I]n our country popular election has traditionally been the method followed when government by the people is most desired.").

The Supreme Court has recognized only these circumstances when it is rational, and thus constitutional, to give voters unequal votes: they are when the governmental body at issue does not sufficiently impact all persons in its defined geographic region, but, on the contrary, serves a narrow purpose that, one, affects only some and not others, or two, affects all, albeit disproportionately, and persons have recognizably different stakes in the governmental body than others. See Salyer, 410 U.S. at 736-37 (only landowners, not non-landowners, had stake in water district because there was

"no way that the economic burden of district operations [could] fall on residents qua residents, and the operations of the district primarily affect[ed] the land within [the district] boundaries"); Associated Enters., Inc., 410 U.S. at 745 ("landowners [were] primarily burdened and benefitted by the establishment and operation of watershed district" and thus, the "State could rationally" "condition the vote accordingly"); Ball, 451 U.S. at 370 (while water district had some impact on non-landowners denied the franchise, the voting scheme was nevertheless constitutional because landowners, who had the franchise, had disproportionately high stakes in the body as they "[were] the only [persons] whose lands [were] subject to liens to secure [] bonds," were the only residents "subject to the ... taxing power of the [body]," and "[were] the only residents who ha[d] ever committed capital to the [body] through stock assessments").  In those cases, it is rational to preclude from the franchise those not affected by the body or to otherwise tie the franchise to the degree to which persons are affected.

There, the persons not affected cannot contend that they are being refused representation that should be fairly expected under principles of democratic governance. Whenever a governmental body that is popularly elected in a defined geographic area seeks to avoid the mandate of one-person, one-vote, the sole inquiry before the court is whether the body has such a narrow purpose and disproportionate effect and, if so, whether the voting scheme is rationally related to those circumstances. All other inquiries are without matter. See Ball, 451 U.S. at 377 (White, J., dissenting) ("[N]othing in Salyer changed the relevant constitutional inquiry. Rather, the Court held the Reynolds-Avery[] line of cases inapplicable to the water district because of its 'special limited purpose' and the disproportionate effect of its activities on landowners as a group.") (emphasis in original).

Therefore, the initial critical question here is whether Alabama's Local Delegations are multi-member bodies whose members are elected from separate districts. That the answer to this question is yes is dictated not

only by the facts in this case but also by Eleventh Circuit precedent.   As stated, when Alabamians cast a vote for a single legislative representative, they are actually electing one official who will serve in two capacities tied to the geographic locations from which they are elected: for one, the legislator will represent a particular district in the State Legislature as a whole, and, second, the legislator, depending on the location of the district, will become a member of one or more Local Delegations.   That one legislator is elected to two offices is of no consequence.   See Morris v. Bd. of Estimate, 707 F.2d 686, 689 (2d Cir. 1983) ("We are impelled to the realistic recognition that a citizen entering the voting booth chooses at one and the same time a member of the Board of Supervisors and his town supervisor."   "The mere fact that board members may be characterized as 'delegates' and perform functions in addition to their duties on the board, does not provide a meaningful distinction.") (punctuation and citation omitted), aff'd, 489 U.S. 688, 694 (1989) ("All eight

77

officials become members as a matter of law upon their various elections."). Likewise, that the Local Delegations are mostly not maintained through written law is also without consequence. See Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 369 (1940) ("It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice ... can establish what is state law. The equal protection clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text."); Adickes v. S. H. Kress & Co., 398 U.S. 144, 168 (1970) (similar).

Moreover, Eleventh Circuit precedent addressing a Local Delegations scheme virtually identical to Alabama's likewise concluded that the delegations were multi-member bodies elected from separate districts. See DeJulio v. Georgia, 290 F.3d 1291, 1295 (11th Cir.) (holding that,

78

with respect to Georgia's Local Delegations, Hadley's requirement that officials be "elected" is "clearly satisfied" because, "[w]hen public officials become members of [the delegations] simply by virtue of their popular election to the legislature, they are deemed popularly elected [to the delegations] for the purposes of the one person, one vote requirement") (punctuation and citation omitted), cert. denied, 537 U.S. 948 (2002).

Thus, Alabama's Local Delegations are on a par with all other Alabama elected multi-member bodies, such as city governments, county commissions, school boards, regulatory boards, etc. whose members are elected from separate districts. And, it is quite clear that the delegations' powers that they have a meaningful and significant impact throughout the counties they serve. The second question is whether to treat the Local Delegations, multi-member bodies whose members are elected from separate districts, differently from other similar bodies. Absent some special circumstances justifying the refusal to afford equal voting power, Supreme Court

precedent says no, and there are no such special circumstances with regard to Local Delegations--or, at least, Alabama has not articulated any.

In stark contrast to that legal framework, the majority today decides that Alabama's Local Delegations are not subject to the one-person, one-vote rule because they do not perform "the kind of governmental functions" that invoke the rule. <u>Ante</u>, at 49. Several paragraphs, in particular, in the majority's opinion demonstrate best the flaw in its reasoning. The first paragraph reads in part:

> "The local delegations in Alabama do not exercise general governmental powers or functions of the kind that the Supreme Court has identified as necessary to invoke the requirement of one person, one vote.... [L]ocal delegations cannot enact laws for the counties. Local legislation must be passed by a majority of the legislature and signed by the governor, or passed by a majority of the legislature over a governor's veto."

<u>Ante</u>, at 53-54 (citations omitted). However, neither of the houses of the Alabama Legislature, acting alone, has these powers either. Each house alone, without approval

from the other house, "cannot enact laws"; rather, laws
"must be passed by a majority of the legislature [of both
houses] and signed by the governor, or passed by a
majority of the legislature [of both houses] over a
governor's veto."   In short, the State House of
Representatives, the State Senate, and the Governor each
play a role in the legislating process and none, acting
alone, can "enact laws."  And yet, elections for each of
these are subject to the requirements of voter equality.

The majority goes on the say that:

> "[L]ocal delegations cannot enact laws
> for the counties....  Although the
> practice of local courtesy makes it
> likely that local legislation
> recommended by the local delegations
> will be passed by the Alabama
> Legislature, that likelihood depends
> entirely on the will of the whole body,
> which need not continue or honor the
> practice of local courtesy. Because ...
> the power of lawmaking is reserved to
> the legislature as a whole, we cannot
> conclude that local delegations perform
> important governmental functions that
> are general enough and with sufficient
> impact to justify the extension of
> <u>Reynolds</u> to the election of local
> delegations."

81

<u>Ante</u>, at 53-54 (punctuation and citation).  However, this language misses the point for two reasons.  First, when the plaintiffs talk about a practice that is never breached, it is not the local courtesy rule (which comes into play after proposed legislation makes it out of the Local Delegation) that is at issue but rather the gatekeeper function (which allows or prohibits local legislation from emerging from the Local Delegations to be considered by the Legislature).  But, second, and most importantly, it is not the nature of the governmental function alone that triggers the application of the one-person, one-vote rule, but rather it is, as discussed, the electoral structure.

The majority seems to suggest that, given that passage of local legislation requires at least two steps, initial approval by the delegation and then subsequent approval by the full legislature, so long as the second step satisfies the mandate of voter equality, then there is no harm caused by any inequality at the first step. <u>See</u> <u>ante</u>, at 62 ("The Equal Protection Clause is satisfied

by the apportionment of the legislature in accordance with the requirement of one person, one vote.  Instrastructural bodies, [including] local delegations, need not satisfy the same requirement.").  Put another way, even if there is inequality in the delegations, whatever harm that inequality causes is remedied at the second step, in the properly apportioned Legislature as a whole.  That argument is without merit.  As I have described, the Local Delegations are the sole bodies charged with beginning the local legislating process.  If the delegations do not send a bill proposing a local law to the Legislature as a whole, the desired law will never be enacted.[11]  As such,

_____

11.   The majority repeatedly uses the word "recommend" to describe the legislative function of the delegations.  See, e.g., ante, at 53 ("As a matter of courtesy, local delegations review and recommend local legislation to the Alabama Legislature as a whole.").  It should be emphasized here that use of the word "recommend" can be misleading insofar as it may imply that the Legislature itself is in the business of independently drafting local laws and the delegations merely suggest proposals for the legislature to consider. But that is not the case.  The Local Delegations are the sole bodies charged with beginning the local legislating process.  If a delegation does not propose a desired
(continued...)

the harm caused by the inequality in the delegations has
an obvious continuing effect that is not remedied in the
legislature as a whole.  See Baker v. Reg'l High Sch.
Dist. No. 5, 520 F.2d 799, 802 (2d Cir. 1975) ("While [the
board's decision to borrow money] must be [subsequently]
approved by the voters of the regional district in a
referendum, it is or should be clear that this does not
substantially undercut the significance of the boards'
function....  While the voters have the final word, what
they ratify or disapprove can be only what the board
decides to present to them."); cf. Avery, 390 U.S. at 481
("That the state legislature may itself be properly
apportioned does not exempt subdivisions from the
Fourteenth Amendment.").

The next paragraph of the majority's opinion with
which I find fault is as follows:

> "[I]n Ball, the Court said more than in
> either Salyer or Associated Enterprises.
> The Court explained that the water

---

11(...continued)
local law, the Legislature will never enact it.

84

> district in <u>Ball</u> 'did not exercise the
> sort of governmental powers that invoke
> the strict demands of <u>Reynolds</u>.'   And
> the Court reasoned, in the alternative,
> that, ... 'as in <u>Salyer</u>, the nominal
> public character of the entity could not
> transform it into the type of
> governmental body for which the
> Fourteenth Amendment demands a one-
> person, one-vote system of election.'"

<u>Ante</u>, at 52 (punctuation and citations omitted).  In <u>Ball</u>,

like the earlier special-purpose cases, while the Supreme

Court <u>did</u> address the governmental body's functions, it

did so for the purpose of explaining why it was reasonable

and thus constitutional for the weight of voters' votes

to differ.   As I described earlier in my discussion of

<u>Ball</u> and the other special-purpose cases, the central

issue is still voters and whether their votes are equal,

and, if not, whether that inequality is rationally

justified.   The critical determination in <u>Ball</u> was not

just that the body exercised functions that were, in

certain respects, more limited than other bodies, but

rather that, those narrow functions had a disproportionate

effect.   <u>See</u> <u>Ball</u>, 451 U.S. at 362 ("[T]he question in

**85**

this case [is] whether the purpose of the [body] is
sufficiently specialized and narrow <u>and</u> whether its
activities bear on landowners so disproportionately as to
distinguish [it] from those public entities whose more
general governmental functions demand application of the
<u>Reynolds</u> principle.") (emphasis added); <u>see also</u> <u>id</u>. at
377 (White, J., dissenting) ("[T]he relevant
constitutional inquiry [is whether the body has a]
'special limited purpose <u>and</u> [] disproportionate effect.")
(emphasis in original). <u>Ball</u> did not create some sort of
freestanding and freewheeling "governmental functions"
limitation divorced from the reason for which those
functions are relevant. Such a restricted view of the
reach of the one-person, one-vote rule is, as I have
already explained, wholly inconsistent with the Supreme
Court's jurisprudence.

Indeed, the Local Delegations scheme before this
court does the precise opposite of that which the special-
purpose cases like <u>Ball</u> allow: In special-purpose cases,
the State affords unequal voting power because doing so

allows people uniquely affected by government operations
to have greater influence over those operations; but,
here, Alabama has taken a class of citizens uniquely
affected by a governmental body's operations (the
residents of a particular county with respect to their
county's Local Delegation) and has, through extending the
franchise to entirely disinterested citizens (those in
other, sometimes far away, counties), diluted their
influence such that it is lesser than it otherwise would
be.  In other words, the majority's reasoning imposes an
exception to the one-person, one-vote rule's application
to geographically elected bodies that is precisely the
opposite of the single exception the Supreme Court has
recognized.

While purporting to rely on <u>Ball</u> and other cases, the
majority states conclusorily that the limited legislative
functions of Alabama's Local Delegations are not "the kind
of governmental functions" that invoke the one-person,
one-vote rule, <u>ante</u>, at 49, but the majority offers
entirely no principled basis for determining what "kind"

of functions are the right kind. Instead of offering a principle of some sort that can be applied in later cases, the majority rattles off a series of good and bad functions with no apparent unifying principles at play: for unexplained reasons, "administer[ing] a school system," "provid[ing] [] police, fire, [and other services]," and "impos[ing] ad valorem property taxes or sales taxes," are all the right kind, but "provi[ding] [] electricity" is the wrong kind. Ante, at 52-53. For reasons I am at a loss at understanding, the majority seems to think that Alabama's Local Delegations' county-law-gatekeeping function is more akin to that wrong kind of function than it is to the right kinds of functions. The majority's inability to articulate any sort of principled basis for its reasoning is unsurprising since, as the Supreme Court has said, "judicially manageable standards" for "distinguishing between [the purposes of] various elections" are not "readily perceiv[able]." Hadley, 397 U.S. at 55; see also id. (refusing to distinguish between "legislative" and "administrative"

functions because requiring lower courts to do so "would leave courts with an equally unmanageable principle since governmental activities cannot easily be classified in the neat categories favored by civics texts") (punctuation and citation omitted).  To the extent that the majority seems to think that it has found such a judicially manageable standard in this regard, it should say what it is.

And furthermore, the majority's reasoning that Local Delegations "exercise no general regulatory powers over counties," ante, at 53, overlooks the numerous statutes allowing Local Delegations to appoint the officials who do.  If "administer[ing] a school system" is the right kind of function, as the majority says it is, ante, at 52, it is relevant that the Franklin County Local Delegation appoints an official to the board of education which does just that.  See 1975 Ala. Code. § 45-30-101.01.  If "impos[ing] ad valorem property taxes or sales taxes" is the right kind of function, ante, at 53, it is relevant that the Etowah County Local Delegation appoints the members of an agency that "receive[s] and administer[s]

[certain] tax proceeds" and "issue[s] bonds, secure[s] financing, and retire[s] debt." See 1975 Ala. Code. § 45-28-244.01(d). If "the power to administer sanitation [and] health [] services" is the right kind of function, ante, at 53, it is relevant that the Calhoun County Local Delegation appoints members of the water and sewer board. See 1975 Ala. Code. § 45-8A-24; Ala. Const. amend. 677. The list goes on.

Next, the majority turns to a series of state court and lower federal court opinions that it contends "have concluded that state and local government officials do not exercise government functions of the sort that trigger the requirement of one person, one vote for their elections when the officials only recommend action to voters or to another governmental body that is apportioned in compliance with the requirement of one person, one vote." Ante, at 55. But those decisions do not lend the majority the support it believes.

For one, the majority cites a Second Circuit Court of Appeals decision, Kessler v. Grand Cent. Dist. Mgmt.

90

Ass'n, 158 F.3d 92 (2d Cir. 1998).  This case, however, applies the special-purpose exception.  Thus, for the same reasons already explained, Kessler, like Ball and the other special-purpose cases, does not support the majority's reasoning; it highlights its wrongfulness. Moreover, the Kessler court even cited approvingly the Second Circuit's earlier Baker decision, a case rejecting expressly the reasoning the majority adopts today.  See Kessler, 158 F.3d at 103 (citing Baker, 520 F.2d at 802, and stating that, there, the circuit court "concluded that [the one-person, one-vote] rule applied to elections for a regional school board that had 'the exclusive power to initiate and propose' expenditures and borrowing").  Much like the governmental body the Baker court decided was subject to one-person, one-vote, Alabama's Local Delegations have the "exclusive power to initiate and propose" certain governmental action (in Baker, borrowing

money, here, enacting local laws).  In sum, <u>Kessler</u> in no
way supports the majority.[12]

    Next, the majority points to <u>Polk Cnty. Bd. of Sup'rs</u>
<u>v. Polk Commonwealth Charter Comm'n</u>, 522 N.W.2d 783 (Iowa
1994).  What the majority does not say, however, is that
that case, in adopting reasoning like the majority's,
relied on the overturned Missouri state-court decision in
<u>Quinn v. Millsap</u>: "Like the Board of Freeholders in [<u>Quinn</u>
<u>v. Millsap</u>], the Mayors' Commission does not exercise
general governmental powers" because "its purpose is to
collate information [and] mak[e] a recommendation to
[another body]."  <u>Polk Cnty. Bd. of Sup'rs</u>, 522 N.W.2d at
790.  That case, in short, did nothing but perpetuate bad

---

    12.   As for the second opinion from the Second
Circuit the majority cites, <u>Educ./Instruccion, Inc. v.</u>
<u>Moore</u>, 503 F.2d 1187 (2d Cir. 1974), there, the circuit's
opinion is so terse, it is difficult to discern what were
the functions of the governmental body at issue.  But if
I read the case properly, it seems that the body's sole
duties were to propose non-binding recommendations wholly
without legal effect, which is obviously distinguishable
from Alabama's Local Delegations.  <u>See</u> <u>supra</u>, note 11.  In
any event, both <u>Baker</u> and <u>Kessler</u> were decided after that
case, so surely those decisions are better indicators of
the circuit's current thinking.

law that the majority seeks to revive, closing its eyes to the fact that the Supreme Court has already spoken.

Lastly, it must be conceded that the majority has indeed found two cases with reasoning similar to its own. In Driskell v. Edwards, 413 F. Supp. 974 (W.D. La.) (three-judge court), aff'd mem., 425 U.S. 956 (1976), the district court concluded that the makeup of Louisiana's state constitutional convention was not subject to one-person, one-vote, reasoning that, since the convention's proposed revised constitution would not be enacted until ratified by the voters, the rule did not apply. See id. at 977-78. For the reasons I have explained at length, I think that the district court's reasoning there, like the majority's today, is inconsistent with the present body of Supreme Court jurisprudence. Moreover, "summary affirmances have considerably less precedential value than an opinion on the merits.... [U]pon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established." Illinois

93

State Bd. of Elections v. Socialist Workers Party, 440
U.S. 173, 180-81 (1979) (punctuation and citations
omitted).   And finally, the majority cites McMillan v.
Love, 842 A.2d 790 (Md. 2004), which, in reasoning
similarly to the majority, relied on the Eleventh Circuit
Court of Appeals decision in DeJulio v. Georgia, 290 F.3d
1291 (11th Cir. 2002), the same decision from which this
court draws its analysis and which I contend below is,
like the majority's reasoning today, erroneous.


                              2.

     The   majority   also   faults   the   plaintiffs   for
"fail[ing] to identify the constitutional standard that
we should employ to adjudicate [the] claim under the Equal
Protection Clause."     Ante, at 38.    The standard for
adjudicating the one-person, one-vote rule is far from
unresolved: "[E]very district must be established on a
basis that will insure, as far as is practicable, that
equal numbers of voters can vote for proportionally equal
numbers of officials."   Hadley, 397 U.S. at 56.

                              94

Admittedly, Alabama may not be able to achieve one-person, one-vote equally for all Local Delegations while doing the same for both houses of the Legislature.  (But then again it may.  See, e.g., Thigpen v. Meyers, 231 F. Supp. 938, 941 (W.D. Wash. 1964) (three-judge court) ("The weighting of a legislator's vote is but a form of reapportionment, and hence is within the equitable powers of this court, and such weighting gives constitutional validity to the statutes creating legislative districts which we have heretofore declared unconstitutional.") (citation omitted)).  And I fully agree with the majority's criticism of the plaintiffs' suggestion that, "when a state enacts voting districts that elect members 'for both the state legislature and for local legislative delegations, ... the state can deviate from the principle of one-person, one-vote for the local delegations only to the extent that such deviations are necessary to comply with one-person, one-vote ... for the legislature as a whole.'"  Ante, at 38 (quoting Pls.' Br. (Doc. No. 106) at 1).  Not only do I agree that the plaintiffs fail to

define "necessary," I also cannot find anything in the law, constitutional or statutory, that says that achieving one-person, one-vote for Local Delegations should be subordinated to achieving one-person, one-vote for both houses of the Legislature or vice versa.

Instead, that the State is confronted with conflicting legal demands is not new.  Compare, e.g., Thornburg v. Gingles, 478 U.S. 30 (1986) (the Voting Rights Act requires the State to, when redistricting, consider race and ensure minority voting strength to a certain extent), with Miller v. Johnson, 515 U.S. 900 (1995) (the State violates the equal protection clause where race is the "overriding and predominant force" in redistricting).  What the State must do is resolve that conflict "as far as is practicable."  Hadley, 397 U.S. at 56; cf. id. at 58 ("We have said before that mathematical exactitude is not required, but a plan that does not automatically discriminate in favor of certain districts is.").  To the extent that the State falls short in one regard or in another regard or both, that failure, as long

96

as rationally justified, does not violate the one-person, one-vote rule.  What the State cannot do is to fail to recognize at all its one-person, one-vote obligations to the voters residing in the Local Delegations across the State.

### 3.

The majority's reasoning regarding "governmental functions" was drawn from an Eleventh Circuit Court of Appeals decision, DeJulio v. Georgia, 290 F.3d 1291 (11th Cir.), cert. denied, 537 U.S. 948 (2002).  As explained by the majority, that case decided that Georgia's Local Delegations system, which, all parties in this case agree, functioned identically to Alabama's system in all material respects, was not subject to one-person, one-vote. Although the plaintiffs attempt to distinguish DeJulio on the basis of the remedy requested in that case, I agree with the majority that the distinction is without merit because both cases involved identical claims: one-person, one-vote challenges.  Thus, although I think DeJulio's

reasoning, which the majority now adopts as its own, contravenes the law as explained by the Supreme Court, I nevertheless recognize that that decision is on point here.[13]

***

Accordingly, I believe that this court should have reached the merits of the one-person, one-vote claim, and

---

13.   There is a separate question as to whether this three-judge district court convened under 28 U.S.C. § 2284, for which appellate jurisdiction bypasses the Eleventh Circuit and proceeds directly to the Supreme Court, must apply the case law of the Eleventh Circuit. See Parker v. Ohio, 263 F. Supp. 2d 1100, 1112 n.3 (S.D. Ohio 2003) (three-judge court) (Gwin, J., concurring); Poe v. Werner, 386 F. Supp. 1014, 1016-17 (M.D. Pa. 1974) (three-judge court).   Under the circumstances of this case, where no party has argued or briefed (or, as they conceded at oral argument, even researched) what I consider to be a very complicated issue; where the majority has decided that it will apply DeJulio's reasoning regardless of whether it must; where a three-judge court from our own circuit has already stated that this circuit's law was binding on it, Ala. NAACP State Conf. of Branches v. Wallace, 269 F. Supp. 346, 350 (M.D. Ala. 1967) (three-judge court); and where whether DeJulio is binding would not, as a practical matter, be determinative in the resolution of any appeal, I think it unnecessary for me to take issue with the majority's statement that DeJulio is binding precedent.

not merely as an alternative holding, and, based on my understanding of Supreme Court jurisprudence, the claim has merit.  I respectfully dissent.

Now, only the Supreme Court can correct this injustice to thousands and thousands of citizens across all of Alabama whose votes are being inequitably and greatly discounted.

DONE, this the 2nd day of August, 2013.

     /s/ Myron H. Thompson     
UNITED STATES DISTRICT JUDGE