IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA LEGISLATIVE<br>BLACK CAUCUS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:12-CV-691<br>(Three-Judge Court) |
| THE STATE OF ALABAMA, et al., | ) ) ) | |
| Defendants. | ) ) | |
| ALABAMA DEMOCRATIC<br>CONFERENCE, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:12-CV-1081<br>(Three-Judge Court) |
| THE STATE OF ALABAMA, et al., | ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Before PRYOR, Circuit Judge, WATKINS, Chief District Judge, and THOMPSON, District Judge.

PRYOR, Circuit Judge:

> *"There's no perfect reapportionment plan.  A reapportionment plan depends on what the drafter wants to get, and he can draw them many, many, many ways."  Dr. Joe Reed, Chairman, Alabama Democratic Conference.*  (Trial Tr. vol. 2, 155, Aug. 9, 2013).

The Constitution of Alabama of 1901 requires the Alabama Legislature to redistrict itself following each decennial census of the United States, Ala. Const. Art. IX, §§ 199–200, but for a half century—from 1911 to 1961—the Legislature failed to fulfill that duty.  Then the Supreme Court of the United States ruled that this abdication could be tolerated no longer, and it affirmed the judgment of this Court that the Alabama Legislature had to be apportioned after each census based on the principle of one person, one vote.  *Reynolds v. Sims*, 377 U.S. 533, 568, 586, 84 S. Ct. 1362, 1385, 1394 (1964).  The Supreme Court explained, "[T]he basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives.  Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies."  *Id.* at 567, 84 S. Ct. at 1384.

After the decision in *Reynolds v. Sims*, the Legislature struggled to redistrict itself and to satisfy the requirements of the federal Constitution.  When the Alabama Legislature failed to perform its duty to redistrict itself after the 1970 Census, this Court adopted new district lines to protect the rights of the voters under the Fourteenth Amendment.  *Sims v. Amos*, 336 F. Supp. 924 (M.D. Ala. 1972).  In the 1980s, the Legislature successfully redistricted itself only after it twice failed to obtain administrative preclearance of its first redistricting plans, under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and this Court then ordered Alabama to hold a special election using the new districts, *Burton v. Hobbie*, 561 F. Supp. 1029,

2

1035 (M.D. Ala. 1983).  In the 1990s, the Legislature again failed to redistrict itself, and new districts were adopted instead by the Alabama judiciary.  *See Brooks v. Hobbie*, 631 So. 2d 883, 884 (Ala. 1993).

After the 2000 and 2010 Censuses, the Legislature finally fulfilled its responsibility to redistrict itself without any federal or judicial interference.  *See Montiel v. Davis*, 215 F. Supp. 2d 1279, 1281–82 (S.D. Ala. 2002).  Both times, the Senate adopted a redistricting plan for itself, and the House adopted a plan for itself.  Each chamber then, in turn, passed the plan adopted by the other chamber.  And each time, the governor signed the redistricting acts, and the state attorney general then obtained administrative preclearance of the acts as required by the Voting Rights Act.

As the Legislature complied with *Reynolds v. Sims* and the Voting Rights Act, black voters enjoyed increasing success in electing their preferred candidates for the Alabama Legislature.  In 1970, voters elected to the House of Representatives Fred Gray and Thomas Reed, the first two black legislators since Reconstruction.  (Ex. SDX 448, 15).  After the 1980 Census, voters elected 17 black candidates to the House and three black candidates to the Senate.  *Id.*  After the 1990 Census, voters elected 27 black candidates to the House and 8 black candidates to the Senate.  *Id.* After the 2000 Census, the Legislature adopted a redistricting plan that maintained 27 majority-black House districts and 8 majority-black Senate districts.  Because most of the majority-black districts were substantially underpopulated, the Legislature redrew the districts by shifting more black voters into the majority-black districts to maintain

the same relative percentages of black voters in those districts.  (Ex. CE 30; Ex. CE 32; Ex. APX 4; Ex. CE 34).

Legislative redistricting regularly provokes partisan controversies.   In the 1990s, Republicans filed lawsuits to challenge the districts adopted by the Alabama judiciary and favored by the Democrats, but those lawsuits failed.  *Brooks*, 631 So. 2d 883; *Sinkfield v. Kelley*, 531 U.S. 28, 121 S. Ct. 446 (2000).  After the 2000 Census, the Democrat-controlled Legislature adopted districts that favored its partisan interests. *Montiel*, 215 F. Supp. 2d at 1283.  Republicans again challenged the districts in litigation, but their lawsuits failed.  *See Gustafson v. Johns*, 434 F. Supp. 2d 1246, 1248–49 (S.D. Ala. 2006); *Montiel*, 215 F. Supp. 2d at 1281–82.

When Republicans challenged the district lines adopted after the 2000 Census, they targeted the systematic underpopulation of the majority-black districts, but State officials and Democratic leaders successfully defended the population deviations as "the product of the Democratic Legislators' partisan political objective to design Senate and House plans that would preserve their respective Democratic majorities." *Montiel*, 215 F. Supp. 2d at 1283.  State officials and Democratic leaders presented "abundant evidence . . . that black voters and Democratic voters in Alabama are highly correlated."  *Id.*   After the Republicans' complaint of racial gerrymandering failed, they filed another complaint that challenged the population deviations as an unlawful partisan gerrymander, but that complaint failed because it was barred by res judicata. *Gustafson*, 434 F. Supp. 2d at 1255–67.   In a filing in the Supreme Court of

the United States, the Democratic leadership of the Legislature openly touted the districts adopted in 2001 as a lawful partisan gerrymander that enabled black legislators to serve in positions of unprecedented leadership.  (Ex. SDX 448.)

The partisan gerrymander that protected Democratic control of the Legislature collapsed in 2010 when Republicans gained supermajority control of both houses of the Legislature, which then adopted new redistricting acts based on the 2010 Census. 2010 Ala. Acts No. 602 (House plan); *id.* No. 603 (Senate plan).  The Republican-controlled Legislature adopted district lines with smaller deviations in population equality, which upended the partisan gerrymander adopted by the Democrat-controlled Legislature after the 2000 Census.  Not surprisingly, that result did not sit well with the Democratic leaders who filed these complaints.  As a result, we must be careful not to take one side in a partisan battle masquerading as a legal controversy; our task is to evaluate whether the new redistricting Acts violate the Constitution or federal law.

In these consolidated actions, Alabama has now come full circle.  In the first civil action, several plaintiffs—the Alabama Legislative Black Caucus, Bobby Singleton, the Alabama Association of Black County Officials, Fred Armstead, George Bowman, Rhondel Rhone, Albert F. Turner Jr., and Jiles Williams Jr.— complain that the purpose and effect of the new districts is to dilute and isolate the strength of black voters, in violation of section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments.  In the second civil action, several other

5

plaintiffs—the Alabama Democratic Conference, Demetrius Newton, Framon Weaver Sr., Stacey Stallworth, Rosa Toussaint, and Lynn Pettway—complain that the purpose and effect of the new districts is to dilute the opportunities for minority voters to participate in the political process and that the new districts are products of racial gerrymandering. The plaintiffs in these actions, in contrast with the plaintiffs in *Reynolds*, complain that the Legislature redistricted itself based on too little deviation in population equality and paid too little attention to considerations of where voters live based on the jurisdictional lines of counties and other subdivisions. They also complain that the Legislature diluted the voting strength of black voters by moving them into underpopulated majority-black districts, even though the Democratic majority of the Legislature employed the same technique ten years earlier to maintain the same relative percentages of black voters in those districts.

For the reasons explained in this memorandum opinion and order, we reject these complaints. We **DISMISS** the claims of racial gerrymandering filed by the Democratic Conference plaintiffs because they lack standing to maintain those claims; in the alternative, we **GRANT** judgment in favor of the State defendants on the claims of racial gerrymandering filed by the Democratic Conference plaintiffs. We **DISMISS** as not justiciable the claim of vote dilution based on the local House delegation in Jefferson County; in the alternative, we **GRANT** judgment in favor of the State defendants on the claim of vote dilution based on the local House delegation

in Jefferson County.  We **GRANT** judgment in favor of the State defendants on the remaining claims in both actions.

# I.  BACKGROUND

We divide our discussion of the background in two parts.  First, we explain the procedural history of this matter.  Second, we explain our findings of fact about the creation of the new districts for the Alabama Legislature based on the testimony and evidence introduced at a consolidated trial of these actions.

## A.  Procedural History

The Black Caucus plaintiffs filed a complaint against the State and Beth Chapman, in her official capacity as the Secretary of State of Alabama.  The complaint asserted three counts: violation of the guarantee of one person, one vote under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. Amend. XIV, § 2; dilution and isolation of the strength of black votes in violation of section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, the Fourteenth Amendment, U.S. Const. Amend. XIV, and the Fifteenth Amendment, U.S. Const. Amend. XV; and partisan gerrymandering in violation of the First Amendment, U.S. Const. Amend. I.  The Black Caucus plaintiffs moved for partial summary judgment and preliminary and permanent injunctive relief on count one of their complaint.

The State defendants filed a motion to dismiss or, in the alternative, to stay the action until the Attorney General of Alabama, Luther Strange, obtained either administrative or judicial preclearance of the new districts under section 5 of the

Voting Rights Act, 42 U.S.C. § 1973c.  We granted the motion of the State defendants to stay the matter until either the Attorney General of the United States, Eric Holder, or the United States District Court for the District of Columbia decided whether to preclear the districts.  After Attorney General Holder precleared the new districts, we lifted the stay of the action and denied the motion to dismiss filed by the State defendants.  The State defendants then filed an answer to the complaint and a motion for judgment on the pleadings with respect to all three counts.

After a hearing on the latter motions, the Democratic Conference plaintiffs filed a complaint against the State; Robert Bentley, in his official capacity as the Governor of Alabama; and Chapman, in her official capacity as the Secretary of State of Alabama.  The Democratic Conference plaintiffs asserted three counts: violation of section 2 of the Voting Rights Act; racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments; and violations of constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments.  After the Democratic Conference action was assigned to this three-judge court, we determined that both the Black Caucus action and the Democratic Conference action involve common questions of law and fact and consolidated them to avoid unnecessary repetition and confusion.  *See* Fed. R. Civ. P. 42(a)(2).

On December 26, 2012, we denied the first motion for a partial summary judgment filed by the Black Caucus plaintiffs with respect to count one, granted the motion of the State defendants for a judgment on the pleadings as to count one,

denied the motion of the State defendants for a judgment on the pleadings as to count two, and dismissed without prejudice count three of the complaint of the Black Caucus plaintiffs.  We granted the Black Caucus plaintiffs leave to amend their complaint "to allege more facts and constitutional grounds to support [their] claim of political gerrymandering and to identify a judicial standard by which we can adjudicate the claim."

On March 13, 2013, Senator Gerald Dial and Representative Jim McClendon filed an unopposed motion to intervene as defendants.  Senator Dial and Representative McClendon are the Chairpersons of the Permanent Legislative Committee on Reapportionment of the State of Alabama.  The Court granted the motion to intervene.

After the Black Caucus plaintiffs timely filed an amended complaint with a new count three entitled "Partisan Gerrymandering" and a second motion for a partial summary judgment on that claim, we again denied their motion.  The Black Caucus plaintiffs responded to our denial of their motion with a motion to alter or amend our order.  The Black Caucus plaintiffs argued that we failed to state a reason for our decision in contravention of Federal Rules of Civil Procedure 56(a) and 52(a)(2).  Although we denied the motion, we *sua sponte* vacated our previous order, again denied the motion for a partial summary judgment, and substituted a new memorandum opinion and order.  We explained that the claim of partisan gerrymandering filed by the Black Caucus plaintiffs failed to identify a judicial

standard by which we could adjudicate the claim and that, under any standard of adjudication, the Black Caucus plaintiffs failed to explain how they are entitled to a judgment in their favor as a matter of law. We also explained that the Black Caucus plaintiffs failed to establish the absence of a genuine issue of material fact.

The State defendants then moved for a partial summary judgment on count three, and the Black Caucus plaintiffs filed a motion to reconsider our denial of their second motion for a partial summary judgment and a motion for a permanent injunction. At a hearing on the pending motions, the Black Caucus plaintiffs announced, for the first time, that count three encompassed two claims: an as-applied challenge for partisan gerrymandering in violation of the First Amendment and a facial challenge to the districts based on the Equal Protection Clause of the Fourteenth Amendment. We granted in part the motion for a partial summary judgment and entered judgment in favor of the State defendants on the claim of partisan gerrymandering and dismissed the claim under the Equal Protection Clause for lack of subject matter jurisdiction. We also explained, in the alternative, that the claim under the Equal Protection Clause failed on the merits. We denied the motion for reconsideration and denied as moot the motion for a preliminary injunction.

The State defendants filed motions for summary judgments against the remaining claims filed by the Black Caucus plaintiffs and the Democratic Conference plaintiffs, and we denied those motions. We concluded that the State defendants had

failed to explain the absence of genuine issues of material fact or how they were entitled to a judgment as a matter of law.

On August 8, 9, 12, and 13, 2013, we conducted a consolidated bench trial at which the plaintiffs presented arguments and evidence about two distinct kinds of claims. First, the plaintiffs argued that the State defendants had diluted the black vote in Alabama in violation of section 2 of the Voting Rights Act. (Trial Tr. vol. 1, 4, 6, Aug. 8, 2013). Second, the plaintiffs argued that the State defendants had engaged in intentional discrimination in violation of the Fourteenth and Fifteenth Amendments when they drew the new districts. (Trial Tr. vol. 1, 5, 6, Aug. 8, 2013). During the trial, we substituted Jim Bennett for Beth Chapman as a defendant, in Bennett's official capacity as the new Secretary of State of Alabama. Demetrius Newton died after the trial.

The State defendants responded that the redistricting plans violate neither section 2 of the Voting Rights Act nor the Constitution. They argued that the plaintiffs could not prove vote dilution because it is not possible to draw another compact, majority-black district, (Trial Tr. vol. 1, 11, Aug. 8, 2013), and that the Legislature acted with lawful motives, not with any unconstitutional racially discriminatory purpose, (Trial Tr. vol. 1, 14, Aug. 8, 2013). The State defendants argued that the Legislature adopted an overall deviation in population of 2 percent to comply with the requirement of one person, one vote, under the Equal Protection Clause of the Fourteenth Amendment. (Trial Tr. vol. 1, 12–13, Aug. 8, 2013). They

also argued that the Legislature preserved the majority-black districts with roughly the same percentage of black voters to comply with the nonretrogression principle of section 5 of the Voting Rights Act so as to obtain preclearance from the Attorney General of the United States.

Although the Black Caucus plaintiffs and the Democratic Conference plaintiffs both asserted claims under section 2, they framed their claims differently. The Black Caucus plaintiffs argued that the State defendants diluted black voting strength across the State by packing majority-black districts and ignoring traditional districting criteria, including the preservation of county lines. (Trial Tr. vol. 1, 4–6 Aug. 8, 2013). The Black Caucus plaintiffs also asserted claims of local vote dilution in Madison County based on the changes to Senate District 7 and in Jefferson County based on the changes to the balance of members of the local delegation. (Trial Tr. vol. 1, 5, Aug. 8, 2013). The Democratic Conference plaintiffs asserted claims of only local vote dilution. They argued that the plans failed to create a majority-black House district in Jefferson County and in Montgomery County and a minority opportunity Senate district in Madison County. (Trial Tr. vol. 1, 7–8, 11, Aug. 8, 2013).

The Black Caucus plaintiffs and Democratic Conference plaintiffs also made different arguments in support of their claims of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments. The Black Caucus plaintiffs argued that the Legislature discriminated on the basis of race when it drew the districts to preserve the existing percentages of blacks in the majority-black districts

and that this discrimination could not survive strict scrutiny after the decision of the Supreme Court in *Shelby County, Alabama v. Holder*, --- U.S. ---, 133 S. Ct. 2612 (2013). (Trial Tr. vol. 1, 4–5, Aug. 8, 2013). The Democratic Conference plaintiffs argued that the Legislature subordinated traditional redistricting criteria to racial criteria when it drew the majority-black districts; that the impact of the redistricting plans falls more heavily on minority voters; that the Republican-controlled Legislature had a desire to cement its supermajority status by inadequately representing minorities in the redistricting plans; and that the plans were drafted by a Republican consultant without input from black legislators, were not provided to the public until May, and were adopted in a special session of the Legislature. (Trial Tr. vol. 1, 8–9, Aug. 8, 2013).

## B. Findings of Fact

We divide our findings of fact in five parts. In the first part, we describe the 2010 Census data and the information that it conveyed about the population of the State of Alabama. In the second part, we describe the 2001 districting plans and the effects of the population shifts on those plans. In the third part, we describe the redistricting process that followed the 2010 Census. In the fourth and fifth parts, we discuss the evidence presented at trial; we first consider the evidence presented by the plaintiffs and then consider the evidence presented by the State defendants.

### 1. The 2010 Census Data for the State of Alabama

Every ten years, the United States is required to make an "actual Enumeration" of its residents. *See* U.S. Const. Art. I, § 2, cl. 3. Based on the results of the census,

each state must consider whether the methods it uses to elect its state officials comply with the requirement of one person, one vote under the Equal Protection Clause.  *See Reynolds*, 377 U.S. at 568, 84 S. Ct. at 1385.  This requirement applies to the election of officials in Congress, state legislatures, and local governments.

Between 2000 and 2010, the overall population of Alabama grew by 7.48 percent.  Although the absolute number of the white non-Hispanic population increased, the percentage of the population composed of white non-Hispanic residents decreased by 3.3 percent.  The absolute numbers of the black and Native American populations increased, but the percentages of the population composed of black residents and Native American residents remained relatively constant.  Only the absolute number of the Hispanic population and the percentage of the population composed of Hispanic residents increased between 2000 and 2010.  The 2010 Census reported that Alabama had 4,779,736 residents, including 3,204,402 white non-Hispanic persons (67 percent), 1,244,437 black persons (26 percent), 25,907 Native American persons (0.5 percent), and 185,602 Hispanic or Latino persons (3.9 percent).  In 2000, Alabama had 4,447,100 residents, including 3,125,819 white non-Hispanic persons (70.3 percent), 1,155,930 black persons (26 percent), 22,430 Native American persons (0.5 percent), and 75,830 Hispanic persons (1.7 percent).  (Ex. NPX 325; Ex. NPX 326).  The Court calculated the above percentages using the population statistics of the U.S. Census Bureau that the plaintiffs provided.  When

available, the Court elected to use the population data for each race that was identified as that racial group alone.

Alabama comprises 67 counties, and three of the most populous counties are Jefferson County, Madison County, and Montgomery County. According to the 2010 Census, Jefferson County had a total population of 658,466; a white population of 349,166; and a black population of 276,525. Between 2000 and 2010, the total population of Jefferson County decreased by 3,581; the white population decreased by 35,473; and the black population increased by 15,917. (Ex. NPX 328; Ex. NPX 329). In 2010, Madison County had a total population of 334,811; a white population of 228,280; and a black population of 80,376. Between 2000 and 2010, the total population of Madison County increased by 58,111; the white population increased by 28,879; and the black population increased by 17,351. (Ex. NPX 328; Ex. NPX 331). In 2010, Montgomery County had a total population of 229,363; a white population of 90,656; and a black population of 125,477. Between 2000 and 2010, the total population of Montgomery County increased by 5,853; the white population decreased by 18,524; and the black population increased by 16,894. (Ex. NPX 328; Ex. NPX 330).

The legislative power of Alabama is vested in the Alabama Legislature, which consists of the Senate and the House of Representatives. Ala. Const. Art. IV, § 44. Members of the Legislature are elected on the first Tuesday after the first Monday in November, and they serve for terms of four years. *Id.* § 46. The next general election

will take place on November 4, 2014. The Senate has 35 members elected by single-member voting districts. The House of Representatives has 105 members also elected by single-member voting districts. Based on the 2010 Census data, the ideal Senate district would have a total population of 136,564, and the ideal House district would have a total population of 45,521. (Ex. SDX 402; Ex. SDX 406).

## 2. The 2001 Districting Plans

In this subsection, we review two aspects of the 2001 districting plans that are relevant to this litigation. We explain that the districts established in 2001 were severely malapportioned in the light of the population data from the 2010 Census, and we describe the systematic underpopulation of the majority-black districts in the 2001 plans.

The new data from the 2010 Census revealed severe malapportionment of the House districts established in 2001 for use in the 2002 election. The population in 80 of the 105 districts for the Alabama House of Representatives deviated from the ideal population by more than 5 percent. (Ex. NPX 332). Of those malapportioned districts, 22 deviated above or below the ideal population by more than 20 percent. (Ex. NPX 332). The most malapportioned district was District 41, a majority-white district in Shelby County, which was overpopulated by 60.76 percent. (Ex. NPX 332). Two other majority-white districts that included portions of Shelby County—Districts 43 and 50—were overpopulated by 23.14 percent and 21.65 percent respectively. (Ex. NPX 332). District 50 also reached into St. Clair County. All three of these districts

in Shelby and St. Clair Counties were in the Birmingham metropolitan area.  Two majority-white districts in Baldwin County near Mobile—Districts 94 and 95—were overpopulated by 31.29 percent and 35.41 percent respectively.  And Districts 6 and 25, majority-white districts in Madison and Limestone Counties near Huntsville, were overpopulated by 26.70 percent and 42.68 percent respectively.  (Ex. NPX 332).

The malapportionment was especially severe in the majority-black House districts that the Democrat-controlled Legislature had drawn as part of their successful partisan gerrymander in 2001.  After the 2010 Census, all of the 27 majority-black districts in the House were underpopulated, and 25 were underpopulated by more than 5 percent, the maximum deviation used under the 2001 plans.  (Ex. NPX 332).  Nine of the majority-black districts were underpopulated by more than 20 percent.  (Ex. NPX 332).

The new census data also revealed the malapportionment of the Senate districts.  The population in 24 of the 35 districts for the Alabama Senate deviated from the ideal population by more than 5 percent.  (Ex. NPX 340).  Of those malapportioned districts, four of the districts deviated from the ideal population by more than 20 percent.  (Ex. NPX 340).  Like the House districts, the most malapportioned districts included portions of Shelby County, Limestone County, and Madison County.  The most malapportioned district was District 2, a majority-white district in Limestone and Madison Counties, which was overpopulated by 31.12 percent.  (Ex. NPX 340).  Districts 14 and 15, majority-white districts that included

17

portions of Shelby County, were overpopulated by 23.51 percent and 17.50 percent respectively.  District 17, a majority-white district that included portions of St. Clair, Jefferson, and Blount Counties, was overpopulated by 15.09 percent.

As with the House districts, the malapportionment was especially severe in the majority-black Senate districts drawn by the Democrat-controlled Legislature as part of their successful partisan gerrymander in 2001.  All of the eight majority-black districts were underpopulated.  (Ex. NPX 340).  Seven of the eight majority-black districts were underpopulated by more than 10 percent, and two of those districts were underpopulated by more than 20 percent.  (Ex. NPX 340).  Many of these malapportioned districts were located within the "Black Belt," a south-central region of the State named for its black soil.  A large black population resides there because of a history of agriculture and slavery.

The underpopulation of the majority-black House and Senate districts reflected the systematic underpopulation of those districts in previous rounds of redistricting over the last twenty years.  In the 1993 Reed-Buskey plans, which Democratic legislators proposed and a state court approved, 25 of the 27 majority-black districts in the House of Representatives were underpopulated, and 19 of those 25 were underpopulated by more than 4 percent.  (Ex. SDX 417).  All eight of the majority-black districts for the Senate were underpopulated, and six of them were underpopulated by more than 4 percent.  (Ex. SDX 414).  In the 2001 plans, adopted by the then-Democratic Legislature, 22 of the 27 majority-black House districts were

underpopulated, and 10 of those districts were underpopulated by greater than 4 percent.  (Ex. SDX 411).  Six of the eight majority-black Senate districts were underpopulated, and four of those districts were underpopulated by greater than 4 percent.  (Ex. SDX 407).

In 2001, the Democrat-controlled Legislature repopulated the majority-black districts by shifting thousands of black people into those districts to maintain the same relative percentages of the black population in those districts.  The following table illustrates how the Legislature repopulated the majority-black House districts by adding thousands of black people to 26 of those districts.

| House District | 2001 Plan | Total Black Pop. (%) | 1993 Plan Using 2000 Census Data | Black Total Pop. (%) | 1993 Plan Using 1990 Data | Total Black Pop. (%) |
|---|---|---|---|---|---|---|
| 19 | 28,011 | 66.039 | 25,869 | 78.565 | 25,118 | 66.27 |
| 32 | 24,975 | 59.598 | 22,704 | 63.490 | 24,626 | 63.93 |
| 52 | 27,716 | 65.848 | 25,799 | 73.870 | 24,825 | 67.72 |
| 53 | 26,247 | 64.445 | 21,312 | 65.298 | 24,136 | 66.01 |
| 54 | 25,563 | 63.276 | 20,153 | 63.061 | 23,567 | 63.95 |
| 55 | 27,344 | 67.772 | 27,217 | 76.270 | 22,534 | 61.57 |
| 56 | 26,546 | 62.665 | 23,896 | 70.268 | 23,326 | 63.52 |
| 57 | 25,373 | 62.967 | 28,593 | 82.615 | 23,453 | 63.90 |
| 58 | 25,937 | 63.518 | 24,284 | 74,163 | 22,969 | 62.75 |
| 59 | 25,449 | 63.241 | 20,459 | 66.255 | 23,367 | 63.86 |
| 60 | 26,693 | 64.348 | 23,455 | 74.876 | 24,380 | 66.22 |
| 67 | 25,663 | 63.447 | 23,358 | 71.032 | 23,247 | 63.50 |
| 68 | 25,227 | 62.211 | 23,051 | 62.938 | 23,774 | 63.58 |
| 69 | 26,417 | 65.308 | 25,198 | 64.855 | 23,149 | 63.29 |
| 70 | 26,587 | 62.827 | 23,375 | 75.603 | 24,460 | 64.60 |
| 71 | 25,872 | 64.191 | 24,041 | 67.736 | 24,390 | 66.16 |
| 72 | 25,561 | 60.748 | 24,825 | 64.652 | 24,436 | 65.36 |
| 76 | 30,117 | 73.309 | 29,655 | 76.527 | 24,427 | 66.69 |
| 77 | 28,546 | 69.677 | 23,986 | 74.802 | 26,704 | 71.93 |
| 78 | 29,390 | 72.697 | 23,911 | 68.874 | 26,468 | 72.37 |
| 82 | 27,605 | 62.663 | 30,493 | 78.826 | 30,503 | 79.73 |
| 83 | 24,651 | 61.214 | 26,144 | 60.782 | 25,957 | 64.52 |
| 84 | 21,696 | 52.360 | 16,235 | 39.353 | 13,832 | 37.81 |
| 85 | 19,964 | 47.863 | 16,934 | 53.312 | 18,696 | 51.13 |
| 97 | 27,667 | 64.738 | 24,414 | 67.243 | 23,878 | 65.22 |
| 98 | 27,393 | 64.448 | 22,935 | 69.401 | 24,062 | 65.72 |
| 99 | 27,674 | 65.250 | 25,950 | 74.916 | 24,033 | 65.09 |
| 103 | 26,570 | 63.049 | 25,832 | 75.299 | 24,003 | 65.58 |

(Ex. CE 30; Ex. CE 32; CE 31).  In total, the Democrat-controlled Legislature moved

62,376 black people into the majority-black House districts to maintain the same

relative percentages of black population in those districts.  In 2001, 62,376 black

people constituted 5.4 percent of the total black population in Alabama.

The following table illustrates that the Legislature repopulated the majority-black Senate districts by adding thousands of black people to all but one of those districts.

| Senate District | 2001 Plan | Total Black Pop. (%) | 1993 Plan Using 2000 Data | Total Black Pop. (%) | 1993 Plan Using 1990 Data | Total Black Pop. (%) |
|---|---|---|---|---|---|---|
| 18 | 82,769 | 66.865 | 67,264 | 67.588 | 72,528 | 65.89 |
| 19 | 80,662 | 66.227 | 79,706 | 76.452 | 69,313 | 63.00 |
| 20 | 80,075 | 65.697 | 68,198 | 71.829 | 70,716 | 64.28 |
| 23 | 75,380 | 62.305 | 71,607 | 66.081 | 70,170 | 63.46 |
| 24 | 75,520 | 62.409 | 72,245 | 68.964 | 73,286 | 65.36 |
| 26 | 92,486 | 71.507 | 77,552 | 73.485 | 77,599 | 70.34 |
| 28 | 71,653 | 56.458 | 72,872 | 59.269 | 70,292 | 61.09 |
| 33 | 79,492 | 62.451 | 73,299 | 70.483 | 71,973 | 65.34 |

(Ex. APX 4; Ex. CE 34; Ex. SDX 415).  In total, the Democrat-controlled Legislature moved 55,294 black people into the majority-black Senate districts to maintain the same relative percentages of black population in those districts.  In 2001, 55,294 black people constituted 4.8 percent of the total black population in Alabama.

The Democratic leaders of the previous Legislature were never shy about their partisan strategy in redistricting.  After the adoption of the 2001 districts, the Democratic leaders filed, as amici curiae, a brief in the Supreme Court of the United States that described the districts as an example of a successful partisan gerrymander.  *See* Brief for Leadership of the Alabama Senate and House of Representatives: Lowell Barron, et al. as Amici Curiae Supporting Appellees, *Vieth v. Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769 (2004) (No. 02-1580) (Ex. SDX 448).  The brief explained that,

during the redistricting process after the 2000 Census, "the Democratic leadership pursued a biracial strategy aimed at safeguarding its governing majorities in both houses of the Legislature." *Id.* The brief bragged that the partisan strategy succeeded: "The 2002 general election returned Democratic candidates to 71% of the Senate seats and 60% of the House seats, with 52% of the statewide vote supporting Democrats in Senate races and 51% supporting Democrats in House races." *Id.* But this partisan gerrymander, during a period of realignment when Republicans won presidential and other statewide elections with increasing frequency, rested on a shaky foundation that collapsed in 2010 when Republicans won supermajorities in both houses of the Legislature.

### 3.  The Redistricting Process After the 2010 Census

After the 2010 Census, the Alabama Legislature began the process of redistricting itself. We describe that process from its inception to the adoption of the final plans by the Legislature. In so doing, we describe the work of the permanent legislative committee on reapportionment, the guidelines adopted by the committee, and the consultant hired by the committee to draw the new district lines.

### a.  The Permanent Legislative Committee on Reapportionment

The Alabama Code provides for a Permanent Legislative Committee on Reapportionment to address the problems of malapportionment that may arise after each new census. *See* Ala. Code §§ 29-2-50, -51. When the Legislature is not actively involved with the reapportionment process, the Committee comprises six members,

three from each house of the Legislature. *Id.* § 29-2-51(b). During the
reapportionment process, Alabama law requires that the Committee expand to 22
members. *Id.* § 29-2-51(c). Those 22 members must include "[o]ne member of the
House of Representatives from each congressional district, four members of the
House of Representatives at-large . . . appointed by the Speaker of the House and one
member of the Senate from each congressional district, four members of the Senate
at-large . . . appointed by the Lieutenant Governor." *Id.* The current members of the
Committee include Senator Trip Pittman (R), Senator Jimmy Holley (R), Senator
Gerald Dial (R), Senator Clay Scofield (R), Senator William L. Holtzclaw (R), Senator
Cam Ward (R), Senator Linda Coleman (D), Senator Gerald Allen (R), Senator Vivian
Davis Figure (D), Senator Arthur Orr (R), Senator Bryan Taylor (R), Representative
George Bandy (D), Representative Randy Davis (R), Representative Steve Clouse (R),
Representative Barbara Boyd (D), Representative Craig Ford (D), Representative
Lynn Greer (R), Representative Jim McClendon (R), Representative Ralph Howard
(D), Representative Jamie Ison (R), Representative Mike Hill (R), and Representative
Micky Hammon (R). (Joint Stip. 2–3). Senator Dial and Representative McClendon
co-chair the Committee. (Joint Stip. 3). All of the Republicans on the Committee are
white. (Joint Stip. 2–3). Representative Ford is the only white Democrat on the
Committee; all of the other Democrats on the Committee are black. (Joint Stip. 2–3).

   The Committee is primarily charged with the creation of each new
reapportionment plan for the State. *See* Ala. Code § 29-2-50(2). The Committee is

23

required to "make a continuous study of the reapportionment problems in Alabama"; "make reports of its investigations, findings[,] and recommendations to the Legislature at any time, during any regular or special session of the Legislature, as it may deem necessary"; and "engage in such activities as it deems necessary for the preparation and formulation of a reapportionment plan" for the Alabama Legislature and the congressional districts of the State. *Id.* § 29-2-52(a), (b), (c). The Committee has the authority "to employ consultants, technicians, attorneys[,] and any other experts needed to prepare maps and make professional appearances to support any plan of reapportionment adopted by the Legislature" and to "meet within and without the state, hold public hearings[,] and otherwise have all of the powers of a legislative committee." *Id.* § 29-2-52(d), (g).

### b.  Guidelines Adopted by the Committee

To guide its work, the current Committee established written guidelines for drawing the new district lines for members of Congress, the State Board of Education, and the Legislature.  (Joint Stip. 3).  In these guidelines, the Committee changed the allowable overall deviation in population for the State Board of Education and the Legislature from 10 percent, which had been used in the 1993 and 2001 plans, to 2 percent.  (Joint Stip. 3; Doc. 30-4, 2).  The guidelines also provided that the districts be drawn in accordance with the Voting Rights Act, be contiguous and reasonably compact, be composed of as few counties as practicable, avoid contests between incumbent members whenever possible, and respect communities

of interest.  (Ex. SDX 420).  The guidelines acknowledged that not all of the redistricting goals could be accomplished and provided that, in cases of conflict, priority would be given to the requirement of one person, one vote and to the requirements of the Voting Rights Act.  (Ex. CE 1).  Senator Dial and Representative McClendon believed that the Legislature was obligated, under the Voting Rights Act, to preserve the existing number of majority-black districts.  (Joint Stip. 5).  And Senator Dial personally promised the other members of the Senate that he would try to make sure that none of the incumbents would have to run against each other in the new plan.  (Joint Stip. 4).

The Committee adopted the guideline of an overall deviation in population of 2 percent to comply with the requirement of one person, one vote under the Fourteenth Amendment after a recent decision of another district court sitting in the Eleventh Circuit that cast doubt on the presumptive constitutionality of a deviation of 10 percent.  In *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd*, 542 U.S. 947, 124 S. Ct. 2806 (2004), the district court concluded that a redistricting plan in Georgia, which had used an overall deviation in population of 10 percent, violated the Equal Protection Clause because the "population deviations in the Georgia House and Senate were not driven by any traditional redistricting criteria such as compactness, contiguity, and preserving county lines," but were the result of a "concerted effort to allow rural and inner-city Atlanta regions of the state to hold on to their legislative influence (at the expense of suburban Atlanta), even as the rate of population growth

25

in those areas was substantially lower." *Id.* at 1341–42.  The district court also cast doubt on the notion that an overall deviation of 10 percent could always serve as a "safe harbor" for a state, especially in the light of developing technology that made it possible to achieve substantially greater population equality.  *Id.* at 1341 ("It is [] apparent that any efforts to minimize population deviations ceased once the ± 5 % level was reached, even though perfect equality was certainly attainable given current technology.  Such use of a 10% population window as a safe harbor may well violate the fundamental one person, one vote command of *Reynolds*, requiring that states 'make an honest and good faith effort to construct districts . . . as nearly of equal population as practicable' and deviate from this principle only where 'divergences . . . are based on legitimate considerations incident to the effectuation of a rational state policy.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 577, 579, 84 S. Ct. 1362, 1390, 1391 (1964))).  The Supreme Court affirmed that decision.  *Larios*, 542 U.S. at 947, 124 S. Ct. at 2806.

Many states across the country adopted an overall deviation in population of 2 percent or less for the redistricting of their state legislatures after the 2010 Census.  Florida used an overall deviation of 2 percent in its State Senate districts and an overall deviation of 4 percent in its State House districts.  (Ex. APX 76).  Georgia used an overall deviation of 2 percent in both houses of its legislature.  (Ex. APX 76).  California, Illinois, Iowa, Minnesota, Nevada, Utah, Washington, and Wisconsin used an overall deviation of 2 percent or less for both houses of their legislatures.  (Ex.

APX 76).  And Indiana, Oklahoma, and Virginia used an overall deviation of 2 percent or less for at least one house of their legislatures.  (Ex. APX 76).

### c.  Public Hearings

At the beginning of the reapportionment process, the Committee conducted public hearings at 21 locations throughout Alabama.  (Joint Stip. 4).  The hearings occurred during October 2011 in DeKalb County, Marshall County, Madison County, Lauderdale County, Fayette County, Morgan County, Chilton County, Shelby County, Jefferson County, Houston County, Pike County, Butler County, Escambia County, Mobile County, Clarke County, Marengo County, Tuscaloosa County, Calhoun County, Lee County, Dallas County, and Montgomery County.  (Ex. NPX 350).  The Committee used the schedule of public hearings that had taken place during the last round of reapportionment in 2001 as the template for its schedule of public hearings and made changes to the locations based only on specific requests from members of the Committee.  (Ex. NPX 350).  Senator Dial and Representative McClendon attended all of the hearings.  (Joint Stip. 4).  The other members of the Committee attended some of the hearings, and other members of the Legislature occasionally spoke at the hearings.  (Joint Stip. 4).  The first 21 meetings were held before the Committee had completed any draft plans.  Members of the public who attended these hearings asked the Legislators to keep counties whole to the extent possible, preserve communities of interest, and allow voters to keep the representatives and senators with whom they were already familiar.  At the public hearing in Dallas

County, Senator Hank Sanders (D), a black senator who represents a majority-black district, asked Senator Dial to use 62 percent as a minimum for the majority-black districts because often the population statistics for a district do not reflect the actual voters in that district.  (Ex. CE 21, 6).  At the public hearing in Clarke County, Representative Thomas Jackson (D), a black representative of a majority-black district, asked that his district be 62 to 65 percent black.  (Ex. CE 16, 8).

### d.  Randy Hinaman Hired as Consultant To Draw the Redistricting Plans

Senator Dial and Representative McClendon worked with Randy Hinaman to draw the new districts for the Legislature.  (Ex. APX 68).  Hinaman is a political consultant with experience working in Alabama.  (Ex. NPX 352).  He drew the congressional districts in Alabama after the 2010 Census, (Ex. NPX 352); worked with Democratic leaders after the 2000 Census to draw the congressional districts adopted by the Legislature and precleared by the Department of Justice, (Trial Tr. vol. 3, 115–16, Aug. 12, 2013); and drew congressional districts that were adopted by another three-judge district court in 1992 and affirmed by the Supreme Court, *see Wesch v. Hunt*, 785 F. Supp. 1491, 1500 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902, 112 S. Ct. 1926 (1992).  (Trial Tr. vol. 3, 114–15, Aug. 12, 2013).  He also served as the campaign manager and then as chief of staff for Alabama Congressman Sonny Callahan during the 1980s.  (Ex. NPX 352).  In 2011, Hinaman contracted with Citizens for Fair Representation, a nonprofit organization, to coordinate with the

Republican leadership of the Legislature to redraw the district lines for the Legislature after the 2010 Census. (Ex. NPX 352).

Hinaman used a computer program known as Maptitude to draw the plans. Maptitude allows the user to draw districts based on the data from the census. (Hinaman Depo. 15:16–18, June 25, 2013). The program also allows the user to load additional data into the program to assist with the drawing of the districts. (Hinaman Depo. 15:16–23, June 25, 2013). Hinaman collected political data from the Republican National Committee for every election in Alabama between 2002 and 2010 and imported that data into Maptitude. (Hinaman Depo. 15:3–13, June 25, 2013). Hinaman also collected and imported information about the residences of incumbents from the Reapportionment Office. (Hinaman Depo. 36–38, June 25, 2013).

On September 22, 2011, Hinaman met with Speaker of the House Mike Hubbard, President Pro Tempore Del Marsh, Senator Dial, Representative McClendon, attorney Dorman Walker, and staff to agree upon goals and establish a timeline for the drawing of the new districts. (Hinaman Depo. 23, 156, June 25, 2013). The participants understood that, under the Voting Rights Act, the new districts could not reduce the total number of majority-black districts for each house and that the new majority-black districts should reflect as closely as possible the percentage of black voters in the existing majority-black districts as of the 2010 Census. (Hinaman Depo. 24, June 25, 2013). Hinaman suggested that he should

29

begin with the majority-black districts when he drew the map, and all of the participants agreed.  (Hinaman Depo. 24, June 25, 2013).  The legislators also asked Hinaman to avoid the placement of two incumbent members of the Legislature in a single new district.  (Hinaman Depo. 26, June 25, 2013).  And the participants agreed that Hinaman should try to maintain the characteristics of the preexisting districts to the extent possible.  (Hinaman Depo. 26–27, June 25, 2013).

Senator Dial, Representative McClendon, and Hinaman understood "retrogression" under section 5 of the Voting Rights Act to mean the reduction in the number of majority-black districts or a significant reduction in the percentage of blacks in the new districts as compared to the 2001 districts with the 2010 data. (Trial Tr. vol. 3, 221, Aug. 8, 2013).  Section 5 requires that a covered jurisdiction obtain preclearance of a new voting "standard, practice, or procedure" by either the Attorney General of the United States or the United States District Court for the District of Columbia to ensure that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color."  42 U.S.C. § 1973c.  "Whether a voting procedure change should be precleared depends on whether the change would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."  *Georgia v. Ashcroft*, 539 U.S. 461, 466, 123 S. Ct. 2498, 2504 (2003).  When the Attorney General evaluates whether a new redistricting plan has a "retrogressive" effect, the Attorney General compares the old districts in the light of updated census data with the new

plans.  *See* Dep't of Justice, *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7471-01 (Feb. 9, 2011).

Hinaman worked alone on the new districts during the fall of 2011.  He began with the majority-black districts.  (Hinaman Depo. 38, June 25, 2013).  Although during this phase Hinaman did not personally speak with the black members of the Legislature who represented those districts, he incorporated proposals that he received from Senator Dial and Representative McClendon after they met with the representatives from those districts.  (Hinaman Depo. 39, June 25, 2013).  After he drafted the majority-black districts, Hinaman started in the southern corners of the State and worked toward the center of the map.  (Hinaman Depo. 38–39, June 25, 2013).  He provided an initial plan to Senator Dial and Representative McClendon around February 2012.

During the spring of 2012 while the Legislature was in regular session, Hinaman continued to work on the district plans and incorporate feedback from the legislators.  Hinaman traveled to Alabama to meet in person with many of the Republican legislators.  (Trial Tr. vol. 3, 119–20, Aug. 12, 2013).  Although he did not meet with Democratic legislators, he incorporated suggestions that Senator Dial and Representative McClendon received from Democratic legislators.  (Trial Tr. vol. 3, 120, Aug. 12, 2013).  Senator Dial gave Hinaman proposed maps for the three majority-black Senate districts in Jefferson County that Senator Rodger Smitherman (D), a black legislator from Jefferson County, had provided him.  (Hinaman Depo. 43,

31

June 25, 2013).  Senator Dial instructed Hinaman to incorporate those maps into the

Senate plan to the extent possible because they represented the wishes of the three

senators from those districts.  (Hinaman Depo. 43, June 25, 2013).  Hinaman drew

the majority-black districts in Jefferson County to be substantially the same as the

maps provided to him by Senator Dial.  (Hinaman Depo. 43, June 25, 2013).

Representative McClendon gave Hinaman proposed maps for the drawing of

Montgomery County that McClendon had been given by Representative Thad

McClammy (D), a black legislator from that county.  (Hinaman Depo. 45, June 25,

2013).  Notably, the McClammy map proposed the move of House District 73 from

Montgomery County.  It was a consensus map among the black Democratic

representatives of Montgomery County.  House District 73 is represented by Joe

Hubbard, a white freshman Democrat.  (Trial Tr. vol. 2, 25, Aug. 9, 2013).

Representative McClendon told Hinaman to adopt as many of Representative

McClammy's ideas as possible, and Hinaman followed that instruction.  (Hinaman

Depo. 45–46, June 25, 2013).

Senator Dial and Representative McClendon unveiled the plans to the

Committee on May 9, 2012.  The plan for the House of Representatives increased the

total number of majority-black districts from 27 to 28 based on total population

figures.  The new majority-black district was District 85, which had previously been a

plurality-black district.  District 85 is located in southeast Alabama in Henry and

Houston Counties.  (Ex. SDX 404; Ex. CE 41).  Because of the severe

malapportionment of most of the majority-black districts, the new plans had to incorporate significant changes to those districts.

### e.  The Six Districts Challenged by Plaintiffs

Primarily at issue in this matter are six decisions made by Hinaman, in consultation with members of the Legislature.  In the map for the House of Representatives, Hinaman moved one majority-white district, House District 73, out of Montgomery County, and moved one majority-black district, House District 53, out of Jefferson County.  In the map for the Senate, Hinaman reworked the boundaries of Senate Districts 7, 11, 22, and 26.

### i.  House District 73

Hinaman moved House District 73, a majority-white House district, from Montgomery County to Shelby and Bibb Counties to avoid retrogression of the majority-black House districts in Montgomery County.  The 2001 plan divided Montgomery County into six House districts—Districts 73, 74, 75, 76, 77, and 78— three of which were majority-white and three of which were majority-black.  (Ex. SDX 406).  The new plan divided Montgomery County into seven House districts— Districts 69, 74, 75, 76, 77, 78, and 90—four of which are majority-black districts, and three of which are majority-white districts.  (Ex. APX 15).  Although House District 73 was a majority-white district under the 2001 plan, its black population had grown since 2000, and Hinaman was able to use that population to repopulate the majority-black districts in Montgomery County without retrogression.  (Ex. APX 15; Ex. APX

16).  Hinaman placed the new District 73 in Shelby County, one of the fastest growing areas of the State.  (Ex. APX 15).  Although Hinaman had begun working on this idea in early 2012, he refined the concept after he received a map from Representative McClammy that also used the former District 73 to repopulate the majority-black districts.  (Hinaman Depo. 134, June 25, 2013).

ii.  House District 53

Hinaman also moved House District 53, a majority-black district, from Jefferson County to the Huntsville area in Madison County because of the substantial underpopulation of the majority-black districts in Jefferson County.  (Ex. APX 15).  Under the 2001 plan, Jefferson County had nine majority-black House districts and nine majority-white House districts.  (Hinaman Depo. 60–61, June 25, 2013).  Although the black population in Jefferson County increased between 2000 and 2010, that change was not reflected in the majority-black districts in the County.  Instead, all of the majority-black districts in Jefferson County were significantly underpopulated.  Because of that underpopulation, Hinaman could not comply with the guideline for population deviation adopted by the Committee and maintain nine majority-black House districts within Jefferson County without significantly reducing the percentage of black voters in each district.  (Hinaman Depo. 60–61, June 25, 2013).  To preserve the total number of majority-black districts and avoid a problem of retrogression under section 5 of the Voting Rights Act, Hinaman moved District 53 to Madison County and used the population that had previously been located within District 53 to

34

repopulate the other majority-black districts in Jefferson County.  (Hinaman Depo. 60–61, June 25, 2013).  Under the new plan, the same number of House districts include a portion of Jefferson County, but ten of those districts are majority-white and eight of those districts are majority-black.  (Hinaman Depo. 62–63, June 25, 2013).  Although the racial balance of the districts has changed, the partisan balance of incumbents has not: nine of the House districts have Republican incumbents as residents, and nine of the House districts have Democratic incumbents as residents.  But the majority-white district with a Democratic incumbent might elect a Republican, which would likely shift the partisan balance to 10 Republicans and 8 Democrats.  Jefferson County is 53.62 percent white and 42.47 percent black.  (Ex. APX 19; Ex. NPX 328).

### iii.  Senate District 7

Hinaman reduced the population of Senate District 7 to accommodate the overpopulation of it and its neighboring districts.  District 7, a majority-white district in Madison County with a substantial minority population, was overpopulated by 9.04 percent.  (Ex. SDX 402; Ex. CE 29).  To the west, District 7 shared a border with District 2, which was overpopulated by 31.12 percent.  (Ex. SDX 402; Ex. CE 29).  To the south, District 7 shared a border with Districts 3 and 9, which were overpopulated by 10.69 percent and 5.85 percent respectively.  (Ex. SDX 402; Ex. CE 29).  To the east, District 7 shared a border with District 8, which was overpopulated by 4.07 percent.  (Ex. SDX 402; Ex. CE 29).  To the north, District 7 shared a border

with Tennessee.  (Ex. SDX 402; Ex. CE 29).  Under the new map, Hinaman took

some residents of Limestone and Madison Counties from District 2 and moved them

into District 1.  (Ex. APX 17).  Hinaman removed a total of 10,994 people from

District 7, and 10,151 of those people were black.  He moved most of that population

into Senate District 1, which was represented by Senator Tammy Irons (D).

### iv.  Senate District 11

Hinaman significantly altered the shape of Senate District 11, a majority-white

district formerly located in Calhoun, Talladega, Coosa, and Elmore Counties, because

of changes to nearby districts.  Hinaman testified that the changes made to District 11

were the result of "a combination of how the rest of those districts were moved

around."  (Trial Tr. vol. 3, 125, 171, Aug. 12, 2013).  Under the 2001 plan, Senate

District 30 was a bizarre district drawn in the shape of an Elmo projector, with Butler,

Crenshaw, and Pike Counties forming a sturdy base for the district, and a portion of

Lowndes County forming a thin neck to its head in Autauga County.  (Ex. APX 37).

Under the new plan, District 30 is a more compact district that includes all of Autauga

and Coosa Counties and portions of Chilton and Elmore Counties.  (Ex. APX 17).

Because District 30 now encompasses all of Coosa County, the district shares a

border with the new District 11, which includes portions of St. Clair, Shelby, and

Talladega Counties.  (Hinaman Depo. 127, June 25, 2013).  The former District 11

was 62.59 percent white and 33.95 percent black.  (Ex. NPX 340).  The new District

11 is 81.66 percent white and 14.96 percent black.  (Ex. APX 6).  The incumbent

36

senator from District 11, Jerry Fielding, switched from the Democratic Party to the Republican Party after the Legislature approved the new districts.

### v.  Senate District 22

Although Senate District 22 in southwest Alabama was not malapportioned in 2010, Hinaman redrew its borders to accommodate shifts in population from neighboring districts that were significantly malapportioned.  In 2010, three of the Senate districts in Mobile County—Districts 33, 34, and 35—were underpopulated by a total of 15,656 people.  (Ex. SDX 402).  Senate District 32, which was located in Baldwin County on the eastern shore of Mobile Bay, was overpopulated by 19,055. (Ex. SDX 402).  Baldwin County is bordered on the east by Florida, the south by the Gulf of Mexico, and the west by Mobile Bay and Mobile County.  Mobile County is bordered on the west by Mississippi, the south by the Gulf of Mexico, and the east by Mobile Bay and Baldwin County.  Senate District 22, which included portions of Washington, Clarke, Choctaw, Escambia, Monroe, and Conecuh Counties, bordered District 34 on the north, and extended down into a strip of land in Mobile and Baldwin Counties between Districts 33 and 34 on the west and District 32 on the east. (Ex. APX 48).  Senate Districts 23 and 24 bordered Senate District 22 on the north and both were majority-black districts with significant underpopulation.  (Ex. APX 48).  Hinaman considered moving District 35 across Mobile Bay to gain some of the overpopulation from Baldwin County, but Senator Trip Pittman (R) of District 32 objected to that proposal.  (Hinaman Depo. 108–09, June 25, 2013).  Hinaman

decided instead to repopulate District 35 by taking population from District 34; to

transfer population from a portion of District 22 in Mobile County to District 34; to

move northern portions of District 32 in Baldwin County into District 22; and to

repopulate Districts 23 and 24 with some of the portions of District 22.  (Ex. APX

49).  As a result, District 22 crossed into all of the same counties as in the 2001 plan,

but the District included smaller portions of Mobile, Choctaw, and Washington

Counties.  (Ex. APX 49).  The new map divided the MOWA Band of Choctaw

Indians, a small Native American tribe not recognized by the federal government,

between District 22 and District 34.  (Ex. APX 49).

### vi.  Senate District 26

Hinaman substantially decreased the land size of Senate District 26, a majority-

black district in Montgomery County.  (Trial Tr. vol. 2, 123, Aug. 9, 2013).  Under the

2001 plan, Senate District 26 included the majority of Montgomery County, following

the county lines.  (Trial Tr. vol. 3, 122, Aug. 12, 2013).  In 2010, the total population

of District 26 was underpopulated by 11.64 percent and was 22.03 percent white and

72.75 percent black.  (Ex. NPX 340; Ex. APX 7).  To comply with the guideline of an

overall deviation in population of 2 percent, Hinaman moved some of the densely

populated precincts in the City of Montgomery into Senate District 26.  (Trial Tr. vol.

3, 129, Aug. 12, 2013).  Under the 2001 plan, Senate District 25 was located primarily

in Elmore County to the northeast of Senate District 26.  (Ex. SDX 477).  To

maintain contiguous districts and as a result of moving other districts, Hinaman

created a land bridge through Montgomery County to connect District 25 with Crenshaw County to the south. (Trial Tr. vol. 3, 127–29, Aug. 12, 2013). This land bridge removed a large geographic portion of District 26, although it did not significantly reduce the population of the district. (Trial Tr. vol. 3, 128–29, Aug. 12, 2013). Under Act 603, the new redistricting plan for the Senate, Senate District 26 maintains much of its former shape by following the county lines at the northern borders. (Ex. SDX 476). The district remains underpopulated by .08 percent and the percentage of the population that is black has increased slightly, from 72.75 percent to 75.22 percent. (Ex. APX 7).

### f. Adoption of the Plans by the Committee

The Committee adopted these plans on May 9, 2012, as working drafts, and then officially adopted the plans on May 17, 2012. (Ex. CE 24; Ex. CE 25). In both meetings, Senator Dial and Representative McClendon explained the plans, and the Committee discussed them. The Committee adopted the McClendon House plan as a working draft by a recorded vote of 16 yeas and 3 nays and the Dial Senate plan by a voice vote. (Ex. CE 24). The Committee officially adopted the plans one week later by the same votes. (Ex. CE 25).

The Committee conducted a twenty-second public hearing in Montgomery approximately an hour and a half after it adopted the plans. (Ex. CE 23). At that hearing, several legislators objected to particular splits of counties and to the decision to split Lauderdale and Colbert Counties into two different Senate districts because

those counties form a community of interest known as the "Shoals."  (Ex. CE 23).

Under the 2001 plan, all of Lauderdale County and most of Colbert County had been

located within District 1.  Under the new plan, part of Lauderdale County and all of

Colbert County are now located in District 6, and District 1 now includes portions of

Lauderdale, Limestone, and Madison Counties.  Representative Merika Coleman (D)

from Jefferson County objected to what she viewed as the "packing and stacking" of

the black vote.  (Ex. CE 23).  Representative Joe Hubbard (D) objected to the districts

for Montgomery County, which he viewed as disrespectful of communities of

interests, and to the decision to move his district, District 73, to Shelby County.  (Ex.

CE 23).  Two local officials from Clay County objected to its division into two

districts because the 2001 plan had included the county in a single House district.

(Ex. CE 23).  And voters from several counties raised objections to the lack of

sufficient advance notice for the hearing and to the splitting of certain counties.

In the final week before the passage of Act 602 and Act 603, Hinaman met

with legislators at a computer in the Reapportionment Office to make final

adjustments to the maps.  (Hinaman Depo. 41–42, June 25, 2013).  Hinaman met with

several Democratic members of the Legislature during this process.  (Hinaman Depo.

41–42, June 25, 2013).  Representative McClendon and Hinaman were able to

accommodate some of the representatives, including Barry Mask (R) and Greg Wren

(R), who had some issues that affected Montgomery; Oliver Robinson (D), Mary

Moore (D), and Patricia Todd (D), who wanted to swap precincts in the Birmingham

area; Greg Burdine (D), Marcel Black (D), and Johnny Mack Morrow (D), who had requests for their shared borders in northwest Alabama; Jeremy Oden (R), Ed Henry (R), Wes Long (R), and Kerry Rich (R), who also had problems with their shared border in northeast Alabama; and two representatives who had initially been drawn outside of their districts. (Ex. APX 64-5, 5–6). But Representative McClendon and Hinaman were not able to accommodate requests from Representative Merika Coleman and Representative Juandalynn Givan, two members from the Birmingham area, who wanted to move 3,700 people from one district to another because that change would have violated the guideline of an overall deviation of 2 percent. (Ex. APX 64-5, 5–6). Senator Dial tried to accommodate a request from Senator Tammy Irons (D) to move her law office into her district, but he was unable to offer an amendment on the Senate floor because another senator, Mark Keahey (D), called for a third reading of the bill at length and the rules of the Legislature require an immediate vote on a bill after it has been read three times. (Ex. APX 64-4, 5).

Throughout the process, Senator Dial and Representative McClendon had to balance the requirements of the committee guidelines against the preferences of incumbents. And the new districts needed to be passed by the Legislature. (Trial Tr. vol. 1, 42, Aug. 8, 2013). Senator Dial adjusted the Senate plan repeatedly to satisfy legislators so that the bill could be passed. But many legislators, both Republican and Democrat, were dissatisfied with the plans. (Trial Tr. vol. 3, 42, Aug. 8, 2013).

g.  The Final Redistricting Plans: Act 602 and Act 603

The final versions of the House and Senate bills preserved the majority-black districts with roughly the same percentages of black population as in the 1993 and 2001 plans.  (Ex. APX 6; Ex. APX 7).  The statistics are consistent with the agreement between Hinaman, the Republican leadership, and the co-chairs of the Committee to preserve the majority-black districts without retrogression.  As the following table illustrates, Act 602 increased slightly the percentage of the black population in 14 of the original 27 majority-black House districts, decreased slightly the percentage of the black population in the other 13 majority-black House districts, and created one new majority-black House district in total population.

| House District Number | Act 2012-602 Total Black Pop. (%) | Overpop. (+) or Underpop. (−) of 2001 District Using 2010 Census Data (%) | 2001 House Total Black Pop. (%) | 1993 House Total Black Pop. (%) |
|---|---|---|---|---|
| 19 | 61.5 | −6.90 | 66.039 | 66.27 |
| 32 | 60.3 | −14.76 | 59.598 | 63.93 |
| 52 | 60.1 | −5.19 | 65.848 | 67.72 |
| 53 | 56.2 | −22.28 | 64.445 | 66.01 |
| 54 | 56.9 | −23.32 | 63.276 | 63.95 |
| 55 | 73.6 | −21.86 | 67.772 | 61.57 |
| 56 | 62.3 | −9.79 | 62.665 | 63.52 |
| 57 | 68.5 | −20.48 | 62.967 | 63.90 |
| 58 | 73.0 | −17.75 | 63.518 | 62.75 |
| 59 | 76.8 | −27.86 | 63.241 | 63.86 |
| 60 | 67.9 | −19.37 | 64.348 | 66.22 |
| 67 | 69.2 | −16.79 | 63.447 | 63.50 |
| 68 | 64.6 | −20.40 | 62.211 | 63.58 |
| 69 | 64.2 | −17.46 | 65.308 | 63.29 |
| 70 | 62.2 | −13.77 | 62.827 | 64.60 |
| 71 | 66.9 | −16.32 | 64.191 | 66.16 |
| 72 | 64.5 | −13.42 | 60.748 | 65.36 |
| 76 | 73.9 | −1.38 | 73.309 | 66.69 |
| 77 | 67.0 | −23.12 | 69.677 | 71.93 |
| 78 | 70.2 | −32.16 | 72.697 | 72.37 |
| 82 | 62.2 | −4.68 | 62.663 | 79.73 |
| 83 | 57.7 | −9.85 | 61.214 | 64.52 |
| 84 | 52.4 | −9.24 | 52.360 | 37.81 |
| 85 | 50.5 | −6.79 | 47.863 | 51.13 |
| 97 | 60.8 | −22.22 | 64.738 | 65.22 |
| 98 | 60.0 | −16.89 | 64.448 | 65.72 |
| 99 | 65.7 | −12.59 | 65.250 | 65.09 |
| 103 | 65.3 | −10.79 | 63.049 | 65.58 |

(Ex. APX 6; Ex. SDX 403; Ex. NPX 310).

And the following table illustrates that Act 603 increased the percentage of the black population in five of the majority-black Senate districts and decreased the percentage of the black population in the other three majority-black Senate districts.

| Senate District Number | Act 2012-603 Total Black Pop. (%) | Overpop. (+) or Underpop. (−) of 2001 District Using 2010 Census Data (%) | 2001 Senate Total Black Pop. (%) | 1993 Senate Total Black Pop. (%) |
|---|---|---|---|---|
| 18 | 59.12 | −17.64 | 66.685 | 65.89 |
| 19 | 65.39 | −20.06 | 66.227 | 63.00 |
| 20 | 63.38 | −21.37 | 65.697 | 64.28 |
| 23 | 64.81 | −18.03 | 62.305 | 63.46 |
| 24 | 63.30 | −12.98 | 62.409 | 65.36 |
| 26 | 75.22 | −11.64 | 71.507 | 70.34 |
| 28 | 59.96 | −3.80 | 56.458 | 61.09 |
| 33 | 71.71 | −18.05 | 62.451 | 65.34 |

(Ex. APX 7; Ex. NPX 310, Ex. NPX 312).

The following table illustrates the percentages of total black population and black voting-age population for each majority-black House district under Act 602 and the percentage of overall deviation in total population from ideal population for each majority-black House district.

| House District Number | Act 2012-602 Total Black Pop. (%) | Act 2012-602 Voting-Age Black Pop. (%) | Deviation from Ideal Total Pop. (%) |
|---|---|---|---|
| 19 | 61.5 | 60.15 | -.97 |
| 32 | 60.3 | 57.68 | -.04 |
| 52 | 60.1 | 57.21 | -.96 |
| 53 | 56.2 | 52.98 | -.91 |
| 54 | 56.9 | 52.50 | -.99 |
| 55 | 73.6 | 70.60 | -.99 |
| 56 | 62.3 | 59.71 | -.99 |
| 57 | 68.5 | 65.96 | -.99 |
| 58 | 73.0 | 67.99 | -.95 |
| 59 | 76.8 | 74.28 | -.67 |
| 60 | 67.9 | 65.68 | -.96 |
| 67 | 69.2 | 65.73 | -.97 |
| 68 | 64.6 | 61.82 | -.99 |
| 69 | 64.2 | 61.83 | -.10 |
| 70 | 62.2 | 57.13 | .99 |
| 71 | 66.9 | 64.42 | -.38 |
| 72 | 64.5 | 61.88 | -.38 |
| 76 | 73.9 | 71.24 | .99 |
| 77 | 67.0 | 64.20 | .95 |
| 78 | 70.2 | 67.43 | .96 |
| 82 | 62.2 | 60.48 | .74 |
| 83 | 57.7 | 55.53 | .99 |
| 84 | 52.4 | 50.99 | .98 |
| 85 | 50.5 | 47.22 | -.64 |
| 97 | 60.8 | 56.73 | -.99 |
| 98 | 60.0 | 57.96 | -.99 |
| 99 | 65.7 | 62.07 | -.99 |
| 103 | 65.3 | 60.18 | -.98 |

(Ex. APX 6; Ex. SDX 403).

The following table illustrates the percentages of total black population and black voting-age population for each majority-black Senate district under Act 603 and

the percentage of overall deviation in total population from ideal population for each

majority-black Senate district.

| Senate District Number | Act 2012-603 Total Black Pop. (%) | Act 2012-603 Voting-Age Black Pop. (%) | Deviation from Ideal Total Pop. (%) |
| --- | --- | --- | --- |
| 18 | 59.12 | 56.43 | -.96 |
| 19 | 65.39 | 62.68 | -.99 |
| 20 | 63.38 | 59.03 | -.99 |
| 23 | 64.81 | 61.67 | -.90 |
| 24 | 63.30 | 59.74 | .85 |
| 26 | 75.22 | 72.70 | -.08 |
| 28 | 59.96 | 58.03 | .98 |
| 33 | 71.71 | 68.10 | -.26 |

(Ex. APX 7; Ex. SDX 400).

The following table compares the percentages of black voting-age population for each majority-black House district using the 2010 Census data under Act 602 and under the 2001 plan.

| House District Number | Act 2012-602 Voting-Age Black Pop. (%) Using 2010 Census Data | 2001 House Plan Voting-Age Black Pop. (%) Using 2010 Census Data |
|---|---|---|
| 19 | 60.15 | 67.70 |
| 32 | 57.68 | 56.62 |
| 52 | 57.21 | 58.52 |
| 53 | 52.98 | 52.49 |
| 54 | 52.50 | 53.37 |
| 55 | 70.60 | 71.22 |
| 56 | 59.71 | 59.42 |
| 57 | 65.96 | 66.52 |
| 58 | 67.99 | 74.02 |
| 59 | 74.28 | 64.25 |
| 60 | 65.68 | 65.15 |
| 67 | 65.73 | 65.59 |
| 68 | 61.82 | 59.97 |
| 69 | 61.83 | 61.99 |
| 70 | 57.13 | 56.31 |
| 71 | 64.42 | 62.04 |
| 72 | 61.88 | 57.52 |
| 76 | 71.24 | 67.48 |
| 77 | 64.20 | 71.48 |
| 78 | 67.43 | 72.57 |
| 82 | 60.48 | 54.19 |
| 83 | 55.53 | 55.51 |
| 84 | 50.99 | 49.23 |
| 85 | 47.22 | 45.64 |
| 97 | 56.73 | 57.35 |
| 98 | 57.96 | 62.23 |
| 99 | 62.07 | 70.09 |
| 103 | 60.18 | 64.83 |

(Ex. APX 6).

The following table compares the percentages of black voting-age population for each majority-black Senate district using the 2010 Census data under Act 603 and under the 2001 plan.

| Senate District Number | Act 2012-603 Voting-Age Black Pop. (%) Using 2010 Census Data | Act 2001 Senate Plan Voting-Age Black Pop. (%) Using 2010 Census Data |
|---|---|---|
| 18 | 56.43 | 57.31 |
| 19 | 62.68 | 69.31 |
| 20 | 59.03 | 74.44 |
| 23 | 61.67 | 61.79 |
| 24 | 59.74 | 59.38 |
| 26 | 72.70 | 70.87 |
| 28 | 58.03 | 49.82 |
| 33 | 68.10 | 61.55 |

(Ex. APX 7).

Most of the majority-black districts under the new plan remain underpopulated, but within 1 percent of the ideal population. Of the 28 majority-black House districts, 20 remain underpopulated. Six of the eight majority-black Senate districts remain underpopulated.

Because the Legislature used a tighter deviation in population compared to the Democrat-controlled Legislature in 2001, the number of black people and the percentage of the black population moved into majority-black districts were higher under the Acts than compared to those same numbers in 2001. In 2012, the Legislature moved 9.8 percent of the total black population into the majority-black House districts and 8.5 percent of the total black population into the majority-black

Senate districts. (Ex. APX 6, 7).  If the Democrat-controlled Legislature in 2001 had drawn the redistricting lines in accordance with an overall deviation in population of 2 percent, they would have needed to move 6.6 percent of the total black population into the majority-black House districts and 5.8 percent of the total black population into the majority-black Senate districts.  The following table illustrates how the Legislature repopulated the majority-black House districts in 2001 and how many additional black people would have been required had that Legislature complied with the guideline of 2 percent deviation used in 2012.

| HD # | Total Black Pop. in 2001 Plan | Deviation in 2001 Plan (%) | Total Black Pop. (%) in 2001 Plan | Black Pop. of 1993 Plan Using 2000 Census | Black People Moved To Create 2001 Plan | Act 602 Deviation from Ideal Total Pop. (%) | Black People Moved To Create 2001 Plan Using Act 602 Deviations (Redistribution / Total Black Pop.) |
|---|---|---|---|---|---|---|---|
| 19 | 28,011 | 0.149 | 66.039 | 25,869 | 2,142 | -0.97 | 1,947 / 27,816 |
| 32 | 24,975 | -1.055 | 59.598 | 22,704 | 2,271 | -0.04 | 1,631 / 24,335 |
| 52 | 27,716 | -0.619 | 65.848 | 25,799 | 1,917 | -0.96 | 1,088 / 26,887 |
| 53 | 26,247 | -3.837 | 64.445 | 21,312 | 4,935 | -0.91 | 5,848 / 27,161 |
| 54 | 25,563 | -4.614 | 63.276 | 20,153 | 5,410 | -0.99 | 6,494 / 26,647 |
| 55 | 27,344 | -4.736 | 67.772 | 27,217 | 127 | -0.99 | 1,323 / 28,540 |
| 56 | 26,546 | 0.021 | 62.665 | 23,896 | 2,650 | -0.99 | 2,493 / 26,389 |
| 57 | 25,373 | -4.857 | 62.967 | 28,593 | -3,220 | -0.99 | -2,076 / 26,517 |
| 58 | 25,937 | -3.587 | 63.518 | 24,284 | 1,653 | -0.95 | 2,475 / 26,759 |
| 59 | 25,449 | -4.987 | 63.241 | 20,459 | 4,990 | -0.67 | 6,259 / 26,718 |
| 60 | 26,693 | -2.057 | 64.348 | 23,455 | 3,238 | -0.96 | 3,651 / 27,106 |
| 67 | 25,663 | -4.498 | 63.447 | 23,358 | 2,305 | -0.97 | 3,366 / 26,724 |
| 68 | 25,227 | -4.255 | 62.211 | 23,051 | 2,176 | -0.99 | 3,147 / 26,198 |
| 69 | 26,417 | -4.493 | 65.308 | 25,198 | 1,219 | -0.10 | 2,552 / 27,750 |
| 70 | 26,587 | -0.083 | 62.827 | 23,375 | 3,212 | 0.99 | 3,612 / 26,987 |
| 71 | 25,872 | -4.836 | 64.191 | 24,041 | 1,831 | -0.38 | 3,158 / 27,199 |
| 72 | 25,561 | -0.652 | 60.748 | 24,825 | 736 | -0.38 | 914 / 25,740 |
| 76 | 30,117 | -3.001 | 73.309 | 29,655 | 462 | 0.99 | 1,834 / 31,489 |
| 77 | 28,546 | -3.268 | 69.677 | 23,986 | 4,560 | 0.95 | 5,931 / 29,917 |
| 78 | 29,390 | -4.545 | 72.697 | 23,911 | 5,479 | 0.96 | 7,306 / 31,217 |
| 82 | 27,605 | 4.014 | 62.663 | 30,493 | -2,888 | 0.74 | -3,643 / 26,850 |
| 83 | 24,651 | -4.918 | 61.214 | 26,144 | -1,493 | 0.99 | 161 / 26,305 |
| 84 | 21,696 | -2.165 | 52.360 | 16,235 | 5,461 | 0.98 | 6,254 / 22,489 |
| 85 | 19,964 | -1.516 | 47.863 | 16,934 | 3,030 | -0.64 | 3,293 / 20,227 |
| 97 | 27,667 | .907 | 64.738 | 24,414 | 3,253 | -0.99 | 2,848 / 27,262 |
| 98 | 27,393 | .357 | 64.448 | 22,935 | 4,458 | -0.99 | 4,205 / 27,140 |
| 99 | 27,674 | .139 | 65.250 | 25,950 | 1,724 | -0.99 | 1,528 / 27,478 |
| 103 | 26,570 | -.498 | 63.049 | 25,832 | 738 | -0.98 | 722 / 26,554 |

(Ex. CE 30; CE 32; SDX 403).

The following table illustrates how the Legislature repopulated the majority-black districts in the Senate in 2001 and how many additional black people would have been required had that Legislature complied with the guideline of 2 percent deviation used in 2012.

| SD # | Total Black Pop. in 2001 Plan | Deviation in 2001 Plan (%) | Total Black Pop. (%) In 2001 Plan | Black Pop. of 1993 Plan Using 2000 Census | Black People Moved To Create 2001 Plan | Act 603 Deviation from Ideal Total Pop. (%) | Black People Moved To Create 2001 Plan Using Act 603 Deviations (Redistribution / Total Black Pop.) |
|---|---|---|---|---|---|---|---|
| 18 | 82,769 | -2.577 | 66.865 | 67,264 | 15,505 | -0.96 | 16,879 / 84,143 |
| 19 | 80,662 | -4.142 | 66.227 | 79,706 | 956 | -0.99 | 3,609 / 83,315 |
| 20 | 80,075 | -4.072 | 65.697 | 68,198 | 11,877 | -0.99 | 14,450 / 82,648 |
| 23 | 75,380 | -4.781 | 62.305 | 71,607 | 3,773 | -0.90 | 6,845 / 78,452 |
| 24 | 75,520 | -4.762 | 62.409 | 72,245 | 3,275 | 0.85 | 7,726 / 79,971 |
| 26 | 92,486 | 1.794 | 71.507 | 77,552 | 14,934 | -0.08 | 13,250 / 90,802 |
| 28 | 71,653 | -0.116 | 56.458 | 72,872 | -1,219 | 0.98 | -433 / 72,439 |
| 33 | 79,492 | .179 | 62.451 | 73,299 | 6,193 | -0.26 | 5,845 / 79,144 |

(Ex. APX 4; CE 34; Ex. SDX 400).

Although the Constitution of Alabama prohibits the division of a county among districts, *see* Ala. Const. Art. IX, § 200, the final plans split some counties to comply with the overall deviation in population of 2 percent used to satisfy the federal requirement of one person, one vote.  The final plans split 33 counties for the Senate districts and 50 counties for the House districts.  The 1993 plans split 32 counties for Senate districts and 36 counties for the House districts, and the 2001 plans split 31

counties for the Senate districts and 39 counties for the House districts. But those earlier plans used an overall deviation in population of 10 percent. (Ex. APX 62).

Other counties were split to further the interests of incumbents. For example, Representative Alan Harper, who switched to the Republican Party in 2012, asked to have his district include a portion of Greene County in which he owned property. (Hinaman Depo. 68, June 25, 2013). Representative Harper stated that he might move to that property in the future, and the representative whose district had previously included that property agreed to a change in which 12 people were moved to District 61. (Hinaman Depo. 68, June 25, 2013). The rest of Greene County is divided between Districts 71 and 72.

The final plan also kept incumbent conflicts to a minimum. No two incumbent Senators were in the same district. The House plan had only two incumbent conflicts. Two black incumbent Democrats, Representative Juandalynn Givan and Representative Demetrius Newton, lived in District 60. Representative Demetrius Newton has since died. Another black incumbent Democrat, Representative John Knight, and a white incumbent Democrat, Representative Joe Hubbard, lived in District 77, but Representative Hubbard has since moved to District 74. The former incumbent conflict was the result of the decision to move District 53 to Huntsville and use its former population to repopulate the majority-black districts in Jefferson County, and the latter incumbent conflict was the result of

52

the decision to move District 73 to Shelby County and use its former population to repopulate the majority-black districts in Montgomery County.

### h.  Adoption of the Acts into Law

The Alabama Legislature considered the proposed districts in a special session that began on May 17, 2012, and ended on May 24, 2012.  (Joint Stip. 6).  The Legislature made only minor changes to the bills during that week.  The bills proceeded along the normal legislative process through committees and debate on the floor of each house of the Legislature.  Democratic legislators offered substitute plans in committee and on the floors of both houses of the Legislature, but none of their plans complied with the guideline of an overall deviation in population of 2 percent adopted by the Committee.  Senator Hank Sanders (D) introduced HB16 and SB5 as alternatives, both of which were drafted with an overall deviation of 10 percent. Those plans placed several incumbents in the same districts, and those plans included 27 majority-black House districts.  All of the proposed substitutes were defeated.

Both houses of the Legislature approved the Acts, and the Governor signed them into law.  The Senate approved its new districts by a vote of 20 to 13 along party lines, with an Independent, Harri Ann Smith, joining the Democrats in the minority. (Ex. NPX 315).  The Senate approved the new House districts by a vote of 23 to 12 along party lines, with the Independent joining the Republicans in the majority.  (Ex. NPX 314).  The House approved its new districts by a vote of 66 to 35, with one Democrat, Charles Newton, voting in favor of the plan and three Democrats

abstaining from voting.  (Ex. NPX 314).  The House approved the new Senate

districts by a vote of 61 to 34 along party lines, with 4 Republicans and 5 Democrats

abstaining from the vote.  (Ex. NPX 314).  Governor Bentley signed the Acts into law

on May 31, 2012.

### 4.  Evidence Presented by the Plaintiffs at Trial

At trial, the plaintiffs introduced the live testimony of 13 lay witnesses and 3

expert witnesses.  The lay witnesses included Senator Tammy Irons (D); Senator Mark

Keahey (D); Senator Rodger Smitherman (D); Senator Vivian Davis Figures (D);

Senator Quinton Ross (D); Representative Laura Hall (D); Representative Joe

Hubbard (D); Democratic Conference plaintiff Lynn Pettway; Democratic

Conference plaintiff Rosa Toussaint; Democratic Conference plaintiff Framon

Weaver; Democratic Conference plaintiff Isabel Rubio; the Chairman of the Alabama

Democratic Conference, Dr. Joe Reed; and the President of the Alabama Chapter of

the National Association for the Advancement of Colored People, Bernard Simelton.

The expert witnesses included William S. Cooper, who drew alternative maps for the

Black Caucus plaintiffs; Allan J. Lichtman, who testified about racial polarization in

Alabama elections; and Theodore S. Arrington, who testified that, in his opinion, the

Acts packed black voters into majority-black districts to isolate and diminish their

political strength.

### a.  Testimony of Senator Tammy Irons

Senator Tammy Irons (D) testified that, in her opinion, the only explanation for the changes made to her district in Act 603 is an intent to "crack" a minority-opportunity district in Senate District 7.  (Trial Tr. vol. 1, 149–51, Aug. 8, 2013).  She explained that her old district included all of Lauderdale County and part of Colbert County, a community of interest commonly known as "the Shoals," but that her new district includes only a portion of Lauderdale County, a strip of land in the northern portion of Limestone County that used to belong to District 2, and a section of Madison County heavily populated by minorities that used to belong to District 7. (Trial Tr. vol. 1, 148–51, Aug. 8, 2013).  According to the 2010 Census, Senate District 7 had a voting-age population that was 62.61 percent white and 30.90 percent black.  (Ex. NPX 351).  Under Act 603, Senate District 7 will have a voting-age population that is 67.83 percent white and 26.14 percent black.  (Ex. NPX 361; Ex. NPX 362).  According to the 2010 Census, Senate District 1 had a voting-age population that was 84.93 percent white and 12.20 percent black.  (Ex. NPX 351). Under Act 603, Senate District 1 will have a voting-age population that is 85.56 percent white and 10.66 percent black.  (Ex. NPX 361; Ex. NPX 362).

Senator Tammy Irons also testified that she believes that the Republican Party has a culture of hate toward women and minorities.  (Trial Tr. vol. 1, 180, Aug. 8, 2013).  As support for this point, she testified that Republicans attempted to invoke the rule of cloture 48 times in 2011 and were successful 43 times, which in her view

had the effect of silencing the voices of women and minorities.  (Trial Tr. vol. 1, 181, Aug. 8, 2013).  She also testified that she based her opinion on laws she had read, but did not provide any specific examples.  (Trial Tr. vol. 1, 166, Aug. 8, 2013).  And she testified that, although she expressed her opinion to officials of the Department of Justice, Attorney General Holder later precleared the Acts.  (Trial Tr. vol. 1, 178, Aug. 8, 2013).

We do not doubt that Senator Tammy Irons testified truthfully about her opinions, but we do not credit her conclusions about the changes to her district or about the Republican Party.  The population statistics for the districts in the northern portion of the State reveal the overpopulation of Senate District 7 and all of the districts surrounding it.  (Ex. APX 7).  Senator Dial and Hinaman testified consistently that the significant overpopulation of the northern districts, as well as the underpopulation of the majority-black districts in the Black Belt caused a domino effect that required changes to Senate District 7.  (Trial Tr. vol. 1, 35, 48, Aug. 8, 2013; Hinaman Decl.; Hinaman Depo. 31–32, June 25, 2013).  And the decision to invoke the rule of cloture to pass legislation that is being filibustered by a minority party is not an invidiously discriminatory tactic.

### b.  Testimony of Senator Marc Keahey

Senator Marc Keahey (D) also testified on behalf of the plaintiffs.  Senator Keahey represents District 22, a sprawling district in southwest Alabama.  (Trial Tr. vol. 1, 182, Aug. 8, 2013; Ex. APX 48; Ex. APX 49).  He testified that, after the

56

landslide elections for the Republicans in 2010, he was, at 17 months, the second-longest serving white Democrat in the Senate.  (Trial Tr. vol. 1, 183, Aug. 8, 2013). District 22 was a crossover district because its voting-age population in 2010 was only 27.50 percent black, but the district elected a Democrat preferred by black voters. (Ex. APX 7; Tr. Trans. vol. 1, 182, Aug. 8, 2013).  Under Act 603, District 22 has a voting-age population that is 20.70 percent black.  (Ex. APX 7).  Senator Keahey testified that, after he saw the working draft of the new districts, he brought several proposed amendments to Senator Dial, all of which Senator Dial rejected on the ground that the changes would result in the retrogression of Districts 23 and 24 to the north, majority-black districts represented by Senator Hank Sanders (D) and Senator Bobby Singleton (D) respectively.  (Trial Tr. vol. 1, 188–90, Aug. 8, 2013).  Some of Senator Keahey's proposed amendments would have placed all of the MOWA Band of Choctaw Indians in the same district.  (Trial Tr. vol. 1, 199, Aug. 8, 2013).  He also testified that, when he asked for changes to the districts, other senators asked him to switch parties, but he declined.  (Trial Tr. vol. 1, 199–200, Aug. 8, 2013).  We credit Senator Keahey's testimony.

### c.  Testimony of Senator Rodger Smitherman

Senator Rodger Smitherman (D), who represents majority-black Senate District 18 in Birmingham, testified that the new districts were unfair to the voters of Jefferson County because of the structure of the local delegation, which is composed of every legislator who represents voters in Jefferson County.  (Trial Tr. vol. 2, 11,

15–16, Aug. 9, 2013).  Under both the 2001 Senate plan and Act 603, Jefferson County residents vote in eight Senate districts, three of which are majority-black districts and five of which are majority-white districts.  (Trial Tr. vol. 2, 7–8, Aug. 9, 2013; Ex. APX 17).  But Act 602 changes the House districts in Jefferson County because it moves one majority-black district to Huntsville and moves an additional majority-white district into the County.  Under the previous House plan, residents of Jefferson County had voted in nine majority-black districts and nine majority-white districts.  (Trial Tr. vol. 2, 7, Aug. 9, 2013; Ex. APX 41).  Under the new House plan, residents of Jefferson County will vote in eight majority-black districts and ten majority-white districts.  Because the new majority-white district that crosses into Jefferson County includes a Democratic incumbent as a resident, the partisan balance of the districts remains the same.  (Trial Tr. vol. 2, 7, 23–24, Aug. 9, 2013).

Senator Smitherman testified that, in his view, the balance of the Jefferson County local delegation is unfair to black residents of Jefferson County and dilutes their voting power.  (Trial Tr. vol. 2, 11, 13, Aug. 9, 2013).  Local delegations act as gatekeepers for county legislation in the Legislature, which ordinarily will not consider or pass local legislation not approved by the local delegation.  (Trial Tr. vol. 2, 15–16, Aug. 9, 2013).  Although black voters in Jefferson County are ordinarily successful in electing their preferred candidates in county-wide elections, they are unable to exercise the same control over the local delegation because of the influence of suburban voters on many of its members.  (Trial Tr. vol. 2, 15–16, Aug. 9, 2013).  As an example,

Senator Smitherman cited an occupational tax supported by the senators elected by the majority-black districts within Jefferson County, but opposed by the senators elected by majority-white districts that extend to suburban counties, where many people commute to work in Birmingham.  (Trial Tr. vol. 2, 16–17, Aug. 9, 2013).  Because a majority of the local delegation opposed the occupational tax, the Legislature did not pass it.  (Trial Tr. vol. 2, 16–17, Aug. 9, 2013).  Senator Smitherman testified that, as a result of the failed tax, Jefferson County closed Cooper Green Mercy Hospital, a charitable hospital for the indigent that formerly served many of his constituents.  (Trial Tr. vol. 2, 19–21, Aug. 9, 2013).  Senator Smitherman also testified that the failure to pass the occupational tax had resulted in a loss of security jobs at the state courthouses in Jefferson County.  (Trial Tr. vol. 2, 18–19, Aug. 9, 2013).

Senator Smitherman acknowledged that he provided Senator Dial with a map for the majority-black Senate districts in Jefferson County and that Senator Dial adopted the substantial majority of that map.  (Trial Tr. vol. 2, 29–30, 40–41, Aug. 9, 2013).  Senator Smitherman asked Senator Dial to maintain a similar racial balance in the district, and Senator Dial agreed that he would try to accommodate that request, so long as doing so would not result in retrogression in other districts.  (Trial Tr. vol. 2, 25, Aug. 9, 2013).  As of 2010, Senate District 18 had a black voting-age population of 57.31 percent, and under Act 603, District 18 has a black voting-age population of 56.43 percent.  (Ex. APX 7; Ex. NPX 362).

59

We credit most of Senator Smitherman's testimony.  We credit his testimony about the makeup of the local delegation for Jefferson County and his testimony that the occupational tax failed because of opposition from legislators who represent suburban counties.  And we credit Senator Smitherman's testimony that he provided Senator Dial a proposed map of the majority-black Senate districts in Jefferson County and that Senator Dial incorporated a majority of that map into the new districts.  But we cannot credit Senator Smitherman's testimony that Act 603 dilutes the votes of the black population of Jefferson County as that testimony calls for a legal conclusion that we must decide for ourselves.

### d.  Testimony of Senator Vivian Davis Figures

Senator Vivian Davis Figures (D), who represents District 33, a majority-black district in Mobile County, testified on behalf of the plaintiffs.  (Trial Tr. vol. 2, 43, Aug. 9, 2013).  Senator Figures served on the Reapportionment Committee and testified that, when the Committee met to establish guidelines for redistricting, the Democratic members of that Committee had favored an overall deviation in population of 10 percent because it allowed for more leeway, but the Republican members of the Committee favored a lower overall deviation in population because of the decision in *Larios*.  (Trial Tr. vol. 2, 46–49, Aug. 9, 2013).  She testified that she had no input in the creation of her district and that she never asked for the black voting-age population to be increased in her district, but that the final plan increased the black voting-age population in her district from 61.55 percent to 68.10 percent.

60

(Trial Tr. vol. 2, 45–46, Aug. 9, 2013; Ex. APX 7).  She testified that, although she had not examined the boundaries of her district, she knew it was packed.  (Trial Tr. vol. 2, 50, Aug. 9, 2013).

Senator Figures testified that, since the Republican takeover of the Legislature in 2010, she has felt that she has not had a voice in the Senate.  (Trial Tr. vol. 2, 51, Aug. 9, 2013).  She explained that she has served in the Legislature for 17 years and is the Senate Minority Leader, but that the Republican supermajority is able to invoke the rule of cloture and end debate on controversial issues.  (Trial Tr. vol.2, 51–55, Aug. 9, 2013).  For example, Senator Figures explained that she had asked the Senate Majority Leader not to close debate on the last version of the Alabama Accountability Act—a controversial education bill—because she and some other Democratic senators wanted to propose amendments to the bill, but a different Republican Senator filed a cloture petition and the Democrats were not able to introduce amendments.  (Trial Tr. vol. 2, 52–53, Aug. 9, 2013).

Senator Figures testified that she also felt her voice was silenced during the passage of the new Senate districts, but she admitted on cross-examination that many of the incidents she had cited as examples occurred for race-neutral reasons.  For example, she testified that she had not seen the final version of the bill until the day it was introduced on the Senate floor, but she admitted that she had seen the first plan of the new Senate districts two weeks before the Acts were passed and that the only changes made to the second plan were minor alterations to put two Democratic

senators back in their districts because Senator Dial and Hinaman had inadvertently drawn those senators out of their districts in the initial plan.  (Trial Tr. vol. 2, 62–64, Aug. 9, 2013; Ex. CE 24).  And she testified that debate on the Senate plan had been cut off, but she also admitted that, under the Senate rules, a vote had to be immediately taken on the bill when her Democratic colleague, Senator Keahey, asked for the bill to be read at length a third time.  (Trial Tr. vol. 2, 61–62., Aug. 9, 2013).  She agreed that Senator Keahey's request to have the bill read at length for the third time, not any action by the Republicans, had the effect of cutting off debate on the redistricting Acts.  (Trial Tr. vol. 2, 62, Aug. 9, 2013).

We credit most of Senator Figures's testimony.  We credit her testimony that the Democratic members of the Committee voted in favor of a higher overall deviation in population because it would give more leeway to meet other priorities and that the Republican members favored a lower overall deviation in population because of *Larios*.  (Trial Tr. vol. 2, 49, Aug. 9, 2013).  We credit her testimony that she did not meet with Hinaman or otherwise give input about her district and that she never requested an increase in the percentage of the black population in her district.  (Trial Tr. vol. 2, 45–46, Aug. 9, 2013).  And we credit her testimony that she believes that her voice has been silenced because the Republicans are able to and have invoked cloture on multiple occasions, including during consideration of the Alabama Accountability Act.  (Trial Tr. vol. 2, 51–55, Aug. 9, 2013).  But we do not credit her

testimony that her district is packed because that testimony amounts to a legal conclusion.

### e.  Testimony of Senator Quinton Ross

Senator Quinton Ross (D) also testified on behalf of the plaintiffs.  Senator Ross represents Senate District 26, a majority-black district in Montgomery.  (Trial Tr. vol. 2, 123, Aug. 9, 2013).  He testified that he had some limited conversations with Senator Dial about the redistricting plans, but never sat down with Hinaman to draw his district.  (Trial Tr. vol. 2, 124, Aug. 9, 2013).  And he testified that the percentage of black population in his district is much higher than it was under the 2001 plan. (Trial Tr. vol. 2, 127, Aug. 9, 2013).  He testified that Act 603 split several precincts in his district, which will have a major economic impact on Montgomery County because it will require the County to hire new personnel for the voting precincts. (Trial Tr. vol. 2, 134–35, Aug. 9, 2013).

Senator Ross testified that the Republican supermajority has abused its power. He used, as an example, the procedures followed by the Republican supermajority when they passed the education bill known as the Alabama Accountability Act.  (Trial Tr. vol. 2, 135–41, Aug. 9, 2013).  He explained that an initial draft of the bill that had passed the Senate and passed, with some alterations from the House, was only eight pages and had broad support from the Democratic members of the Legislature, but that the Republican members of the conference committee substituted a significantly longer bill for it over the objections of the Democratic members of the committee.

(Trial Tr. vol. 2, 135–38, Aug. 9, 2013).  The Republican supermajority of the Legislature then passed the conference bill over the strenuous objections of the Democrats.  (Trial Tr. vol. 2, 138–41, Aug. 9, 2013).

We credit most of Senator Ross's testimony.  We credit his testimony that he was never given the opportunity to work on his district with Hinaman, but we rely on the statistics introduced into evidence about his districts instead of his description of those statistics.  In 2010, the total population of Senate District 26 was 72.75 percent black, and the voting-age population was 70.87 percent black.  (Ex. APX 7).  Under Act 603, the total population of Senate District 26 is 75.22 percent black, and the voting-age population is 72.70 percent black.  (Ex. APX 7; Ex. SDX 400).  And we credit Senator Ross's testimony about the procedures used by the Republicans when they passed the Alabama Accountability Act, but not his opinion that the procedures amounted to an abuse of power.

### f.  Testimony of Representative Laura Hall

Representative Laura Hall (D) also testified on behalf of the Democratic Conference plaintiffs.  Representative Hall represents House District 19 in Madison County.  (Trial Tr. vol. 3, 6, Aug. 12, 2013).  In 2010, the total population of House District 19 was 70.04 percent black.  (Ex. APX 6).  Under the new plans, District 19 gained some rural population, and the percentage of black population decreased to 61.5 percent.  (Ex. APX 6).  Representative Hall testified that she met with Representative McClendon to discuss possible areas in which her district could gain

additional population because it was underpopulated, but she did not sit with Hinaman at a computer to consider different options. (Trial Tr. vol. 3, 22–24, Aug. 12, 2013).

Representative Hall also testified about the changes to Senate District 7 because she ran as the Democratic nominee for that district in 2010, but she lost in the general election to Senator Paul Sanford (R). (Trial Tr. vol. 3, 8–9, Aug. 12, 2013). Under the 2001 plan, District 7 included a strip of land in the middle of Madison County from the Alabama-Tennessee border down the center of the County through Huntsville. (Trial Tr. vol. 3, 11, Aug. 12, 2013; Ex. SDX 477). The district included most of urban Huntsville. (Trial Tr. vol. 3, 12, Aug. 12, 2013; Ex. SDX 476). Representative Hall testified that the new plan moved a portion of southwest Huntsville, which is sometimes called "Little Mexico" because it has a "very viable" Hispanic community, into Senate District 2 and moved a portion of northwest Huntsville, which is predominantly black, into Senate District 1. (Trial Tr. vol. 3, 13–16, Aug. 12, 2013; Ex. NPX 353C). Senator Bill Holtzclaw (R) represents District 2, and Senator Tammy Irons (D) represents District 1. Representative Hall agreed that the "socioeconomic community interests" of the black population moved into Senator Irons's district is different from the black population formerly in Senator Irons's district because the black population in Huntsville "has a high population of engineers [and] scientists" whereas the Florence area has "a very hard-working union type of community." (Trial Tr. vol. 3, 21–22, Aug. 12, 2013).

Representative Hall testified that Act 603 provides less favorable opportunities for minorities in Huntsville than alternative plans advanced by the plaintiffs, (Trial Tr. vol. 3, 18–20, Aug. 12, 2013), but she also acknowledged that all of the alternative plans follow an overall deviation in population of 10 percent, (Trial Tr. vol. 3, 35, Aug. 12, 2013).  Under Act 603, Senate District 7 is overpopulated by just under 1 percent and has a total population that is 65.56 percent white, 27.34 percent black, and 2.58 percent other.  (Ex. SDX 400).  The voting-age population is 67.83 percent white and 26.14 percent black.  (Ex. NPX 362).  Under an alternative plan proposed by Dr. Reed, District 7 would be underpopulated by 2.81 percent, and the proposed district would have a total population that is 47.17 percent black, 43.58 percent white, and 3.69 percent other.  (Ex. CE 48).  The plaintiffs failed to provide the Court with voting-age statistics for that plan.  The illustrative district introduced by the Democratic Conference plaintiffs would be underpopulated by 4.96 percent and would have a total population that is 42.02 percent white, 48.36 percent black, and 7.29 percent Hispanic.  (Ex. NPX 302).  The illustrative district would have a voting-age population that is 45.18 percent white, 46.45 percent black, and 6.51 percent Hispanic.  (Ex. NPX 302).  Representative Hall testified that both the plan proposed by Dr. Reed and the Democratic Conference illustrative district would allow black and Hispanic voters to form a coalition to reach 50 percent, but Act 603 has a smaller minority population.  (Trial Tr. vol. 3, 18–19, Aug. 12, 2013).

And Representative Hall testified about a voter-suppression incident that occurred in Senate District 7 during the last general election.  Although she initially testified that a conservative radio show host tried to suppress votes in District 7 during the general election by sending out a flier with the seal of the Secretary of State that Republicans should vote Tuesday and African Americans should vote Wednesday, (Trial Tr. vol. 3, 9, Aug. 12, 2013), she acknowledged on cross-examination that the announcement was about Republicans and Democrats, not race.  (Trial Tr. vol. 3, 36, Aug. 12, 2013).  And she acknowledged that the Secretary of State countered that misinformation and told the radio show host to cease and desist, but Representative Hall insisted that the damage had already been done.  (Trial Tr. vol. 3, 36, Aug. 12, 2013).  Plaintiffs offered no evidence that any State official had anything to do with the actions of the radio show host.

Representative Hall also testified, like several of her other Democratic colleagues, that she is upset about the ability of the Republican supermajority in the Legislature to invoke cloture.  (Trial Tr. vol. 3, 32, Aug. 12, 2013).  She testified about her dissatisfaction with the process by which the Republicans passed the Alabama Accountability Act.  (Trial Tr. vol. 3, 27–32, Aug. 12, 2013).  And she testified that she felt that she had been "clotured more during this last quadrennium than the entire 20 years [she had] been in session."  (Trial Tr. vol. 3, 32, Aug. 12, 2013).  Under the new Republican supermajority, Representative Hall explained that she views it as challenging at best to advocate on behalf of her district.  (Trial Tr. vol. 3, 32, Aug. 12,

2013).  She testified that she has not been asked to switch parties, but that she would not be very happy as a Republican.  (Trial Tr. vol. 3, 32, 36, Aug. 12, 2013).

We credit most of Representative Hall's testimony.  We credit her testimony that she discussed her district with Representative McClendon, but did not sit down with Hinaman to discuss potential changes.  We credit her testimony that some of the minorities who previously resided in Senate District 7 reside in new districts under Act 603 and that those minorities will probably be less able to elect the candidate of their choice under Act 603 than in the illustrative districts.  And we credit her testimony that the Republicans have invoked the rule of cloture to end debate by the Democrats.  We do not credit her initial testimony that the fliers were directed at only African Americans because it is inconsistent with her later acknowledgement that the flier was about Democratic voters and with the testimony of Senator Irons about the incident.  (Trial Tr. vol. 4, 153, Aug. 13, 2013).

### g.  Testimony of Representative Joe Hubbard

Initially elected in 2010, Representative Joe Hubbard (D) testified for the Democratic Conference plaintiffs.  Representative Hubbard represents House District 73, which Act 602 moved from Montgomery County to Shelby County.  (Trial Tr. vol. 3, 37–38, Aug. 12, 2013).  He testified that, after he had voted with Republicans on a controversial jobs bill, the Republican Speaker of the House, Mike Hubbard, told him that if he "played [his] cards right, [he] could have a long future in the Alabama House of Representatives."  Representative Hubbard assumed that the Speaker was asking

him to switch parties, given that the Speaker's chief of staff previously had extended

that invitation.  (Trial Tr. vol. 3, 40–41, Aug. 12, 2013).  After he rejected that

invitation, the Committee introduced a new House plan, in which District 73 had

been moved to Shelby County.  (Trial Tr. vol. 3, 41–42, Aug. 12, 2013).

Representative Hubbard testified that he tried to get the agreement of the other

representatives in Montgomery County to reconstitute some of the neighborhoods he

had represented, but that Representative Jay Love (R), who has since resigned his

position, rejected the proposed amendments because they would have reduced the

percentage of the voting-age population in District 74 that was white.  (Trial Tr. vol.

3, 42–43, Aug. 12, 2013).  Representative Hubbard has purchased a new home in

District 74, the majority-white district formerly represented by Representative Love.

(Trial Tr. vol. 3, 45–46, Aug. 12, 2013).  We credit this testimony.

### h.  Testimony of Dr. Joe Reed

The Democratic Conference plaintiffs also introduced the testimony of Dr. Joe

Reed, who appeared as a representative of the Alabama Democratic Conference.

(Trial Tr. vol. 2, 153, Aug. 9, 2013).  He testified that the Alabama Democratic

Conference is an organization of Democrats founded in 1960 to advance the political

influence of blacks in Alabama.  (Trial Tr. vol. 2, 153–54, Aug. 9, 2013).  The

organization is involved in voter registration and lobbying and, according to Reed, has

chapters in most of the counties in Alabama.  (Trial Tr. vol. 2, 153, 159, Aug. 9, 2013).

In those counties where the Conference does not have chapters, the Conference has

at least a contact.  (Trial Tr. vol. 2, 159, Aug. 9, 2013).  The Conference endorses candidates in almost every race for the Legislature.  (Trial Tr. vol. 2, 159–160, Aug. 12, 2013).

Reed testified that he has been involved in redistricting in Alabama since the 1970s and that he became involved to elect black candidates.  (Trial Tr. vol. 2, 154–56, Aug. 9, 2013).  He testified that, for a long time, he believed that a district needed to be at least 65 percent black to allow the black voters to elect the candidate of their choice because some blacks either are not registered to vote or are ineligible to vote.  (Trial Tr. vol. 2, 156–57, Aug. 9, 2013).  And he testified that he now believes that a district should be about 60 percent black to allow the voters to elect their candidate of choice, although in some circumstances the percentage may need to be closer to 65 percent.  (Trial Tr. vol. 2, 156–58, Aug. 9, 2013).

Reed testified that he drafted an alternative plan for the Alabama Legislature, which he showed Senator Dial at one of the public hearings.  (Trial Tr. vol. 2, 164–65, Aug. 9, 20913; Ex. CE 42; Ex. CE 45).  He testified that he viewed the plan as a "status quo plan."  (Trial Tr. vol. 2, 165, Aug. 9, 2013).  He testified that he tried only to satisfy incumbents and meet the requirement of one person, one vote.  (Trial Tr. vol. 9, 165, Aug. 9, 2013).  To accomplish the latter objective, he used an overall deviation of 10 percent because that is the deviation that the Legislature had used in the 2001 plan.  (Trial Tr. vol. 2, 165, Aug. 9, 2013).  With this deviation, he was able to keep District 73 in Montgomery County, but reduce the black population in that

district.  (Trial Tr. vol. 9, 165–66, Aug. 9, 2013).  Despite his efforts to satisfy all incumbents, his plan caused one incumbent conflict in the House.  (Trial Tr. vol. 2, 166, Aug. 9, 2013).

He testified that, as compared to his plans, the plans adopted by the Legislature were bad for both blacks and whites.  (Trial Tr. vol. 2, 167–68, Aug. 9, 2013).  He explained that the adopted plans will cause significant problems for boards of registrars because of the county and precinct splits, (Trial Tr. vol. 2, 168, Aug. 9, 2013), but he also acknowledged that the boards of registrars had fulfilled their duties when the plans adopted in 1993 and 2001 split counties and precincts (Trial Tr. vol. 2, 171–73, Aug. 9, 2013).  And he testified that the new plans would cause confusion for voters for the same reasons, (Trial Tr. vol. 2, 168, Aug. 9, 2013), but acknowledged that the boards of registrars were required by law to send postcards to voters about their polling places and that he could challenge any failure to do so in court, (Trial Tr. vol. 2, 173–74, Aug. 9, 2013).  Reed asked the Court to send the issue of redistricting back to the Legislature and tell it to apply an overall deviation in population of 10 percent.  (Trial Tr. vol. 2, 169–70, Aug. 9, 2013).

We credit most of Reed's testimony.  We credit Reed's testimony that redistricting is an inherently political process and that a drafter can draw a plan in many ways.  We credit Reed's testimony that he formerly believed that a larger black population was often needed to guarantee black voters the opportunity to elect their candidate of choice than he now believes is necessary.  And we credit Reed's

testimony about his redistricting plan and about the reaction of registrars to the precinct splits in the 1993 and 2001 redistricting plans, but we do not credit his testimony that the plans adopted by the Legislature are bad for all black and white citizens of Alabama.

### i.  Testimony of Lynn Pettway

Lynn Pettway testified as one of the Democratic Conference plaintiffs.  He explained that he resides in House District 73, which had experienced significant minority growth between 2000 and 2010 and had elected Joe Hubbard, a white Democrat, in 2010.  (Trial Tr. vol. 2, 177–79, Aug. 9, 2013).  Pettway agreed that, based on the statistics of Montgomery County in 2010, the majority-black districts needed to gain population and that the districts in Shelby County needed to lose population, (Trial Tr. vol. 2, 186, 189–91, Aug. 2, 2013), but he was dissatisfied with the decision to move District 73 to address this problem, (Trial Tr. vol. 2, 185, Aug. 9, 2013).  Pettway offered no alternative plan, but asserted that he believed that another approach could have been taken to keep his district in place.  (Trial Tr. vol. 2, 189, Aug. 9, 2013).

We credit most of Pettway's testimony.  We credit Pettway's testimony that he resides in District 73, that he believes that the minority population in that district has increased over the last ten years, and that he is dissatisfied with the redistricting plans. (Trial Tr. vol. 2, 177–79, 185, Aug. 9, 2013).  But we rely on the census to determine

the shift in demographics of his district and the feasibility of maintaining District 73 within Montgomery County.

j.  Testimony of Rosa Marie Toussaint

Rosa Marie Toussaint also testified as one of the Democratic Conference plaintiffs.  Toussaint voted in House District 19 under the districts established in 2001, but will vote in House District 10 under Act 602.  (Trial Tr. vol. 4, 32–33, Aug. 13, 2013).  Toussaint is a black citizen of Hispanic ethnicity.  (Trial Tr. vol. 4, 19, Aug. 13, 2013).  Toussaint lives in the Huntsville area and is a member of the Hispanic-Latino Advisory Committee, a member of the Hispanic American International Chaplain Association, and a member of the National Association for the Advancement of Colored People.  (Trial Tr. vol. 4, 20–21, Aug. 13, 2013).  She testified that she worked on Representative Laura Hall's successful campaign for House District 19 and her unsuccessful campaign for Senate District 7.  (Trial Tr. vol. 4, 23, Aug. 13, 2013).  Toussaint translated campaign signs into Spanish to reach out to the Hispanic community in Huntsville and met weekly with several black and Hispanic leaders to build a coalition between those two groups.  (Trial Tr. vol. 4, 24–25, Aug. 13, 2013).  She testified that she believes her efforts have been successful and that she believes the black and Hispanic communities in Huntsville vote for Democratic candidates.  (Trial Tr. vol. 4, 27, Aug. 13, 2013).  And she testified that the new Senate District 7 would give Hispanic voters less of an opportunity to elect the candidate of their choice than the alternative illustrative districts provided by the

73

plaintiffs. (Trial Tr. vol. 4, 27–28, Aug. 13, 2013). She testified that, under either the alternative plan proposed by Reed or the illustrative District 7 introduced by the Democratic Conference plaintiffs, Hispanic voters would have a reasonable opportunity, working in coalition with black voters, to elect a candidate of their choice. (Trial Tr. vol. 4, 27–28, Aug. 13, 2013).

We credit much of Toussaint's testimony. We credit her testimony that she worked on Hispanic outreach for Representative Hall's campaign and that she believes her efforts were successful. We also credit her testimony that many Hispanic voters in the Huntsville area have voted in a coalition with the black population. But we do not credit her opinion testimony about whether Hispanics in Huntsville would be able to elect the candidate of their choice under any of the plans presented because she did not offer any factual basis to support her opinion that the candidate of choice for the Hispanic population would necessarily be the same candidate of choice for the black population. Her testimony that Hispanics and blacks have worked together in a political coalition in Huntsville does not, by itself, prove that the candidate of choice for the Hispanic population would regularly be the same candidate of choice for the black population.

### k.  Testimony of Framon Weaver

Framon Weaver testified as a Democratic Conference plaintiff. Weaver is the Chief of the MOWA Band of Choctaw Indians, which has approximately 4,000 members in the State of Alabama. (Trial Tr. vol. 4, 41, Aug. 13, 2013). The State of

Alabama has recognized the MOWA Band of Choctaw Indians, but the federal government has not.  (Trial Tr. vol. 4, 39, 47, Aug. 13, 2013).  The Band lives along the border between Washington County and Mobile County.  (Trial Tr. vol. 4, 40–41, Aug. 13, 2013; Ex. NPX 353-M).  Weaver testified that the Band has worked closely with black groups on political campaigns and that the Band has predominantly supported Democratic candidates.  (Trial Tr. vol. 4, 42–44, Aug. 13, 2013).  And he testified that, although the Band was able to elect its candidate of choice in coalition with blacks in the old Senate District 22, it will not be able to do so under the Acts because the Band is split between three different Senate districts—District 22, 23, and 34—and the black population is predominantly in District 23.  (Trial Tr. vol. 4, 44–46, Aug. 13, 2013).

We credit most of Weaver's testimony.  We credit Weaver's testimony that he has been elected the Chief of this state-recognized Band, and we credit Weaver's testimony about the size and location of the Band.  And we credit Weaver's testimony that members of the Band are divided among three different senate districts, which will make it more difficult for the Band to influence elections in those districts.  We do not credit Weaver's testimony about the Band's ability to elect its candidate of choice under any of the plans presented because he did not offer any factual basis to support his opinion that the candidate of choice for the black population would necessarily be the same candidate of choice for the Band population.

75

<u>l.  Testimony of Isabel Rubio</u>

The Executive Director of the Hispanic Interest Coalition of Alabama, Isabel Rubio, testified on behalf of the Democratic Conference plaintiffs.  She explained that the Coalition is a nonprofit organization founded in 1999 to facilitate the social, civic, and economic integration of Hispanics in Alabama.  (Trial Tr. vol. 4, 9–10, Aug. 13, 2013).  She acknowledged that much of the Hispanic population in Alabama is made up of aliens, but she explained that some of those aliens have had children who are now old enough to vote.  (Trial Tr. vol. 4, 10–11, Aug. 13, 2013).  Rubio testified at length about her opinion that the Legislature has not been sensitive to the Hispanic community in the State and that, as a result, many Hispanics have left the State and others have become more politically active.  (Trial Tr. vol. 4, 11–16, Aug. 13, 2013).  Rubio explained that Hispanics in the United States exhibited strong support for President Obama in 2008 and 2012.  (Trial Tr. vol. 4, 17, Aug. 13, 2013).  And she testified that the immigration legislation in Alabama has caused the Hispanic population to work more closely with the black population in Alabama.  (Trial Tr. vol. 4, 17–18, Aug. 13, 2013).

We credit much of Rubio's testimony.  We credit her testimony about the Coalition and its work in Alabama.  We also credit her testimony that, although a substantial number of Hispanics in Alabama are aliens, some of those noncitizens have citizen children of voting age.  And we credit her testimony that the Hispanic population in Alabama has begun to work more closely with the black population and

become more mobilized.  But we decline to adopt, as immaterial, the opinions

expressed by Rubio about the immigration policies in Alabama.

### m.  Testimony of Bernard Simelton

The president of the National Association for the Advancement of Colored

People in Alabama, Bernard Simelton, testified on behalf of the Democratic

Conference plaintiffs.  (Trial Tr. vol. 2, 194, Aug. 9, 2013).  He testified that the

Association has been engaged in efforts to improve the relationship between the black

and Hispanic communities in Alabama.  (Trial Tr. vol. 2, 195, Aug. 9, 2013).  He

testified that the communities have become closer because of their shared

disagreement with bills passed by the Republican Legislature.  (Trial Tr. vol. 2, 198–

99, Aug. 9, 2013).  And he testified that the Association works actively with the

MOWA Indians in the Baldwin and Washington County area.  (Trial Tr. vol. 2, 202–

03, Aug. 9, 2013).  We credit Simelton's testimony about the Association's

involvement with the Hispanic population and the MOWA Indians.

### n.  Testimony of Professor Allan J. Lichtman

Professor Allan J. Lichtman provided expert testimony that voting is racially

polarized in Alabama.  (Ex. NPX 324).  Lichtman conducted ecological regression

analysis based on county-level and precinct-level election returns to calculate how

black and white persons voted in recent senatorial, presidential, and judicial elections.

(Ex. NPX 324, 4).  Based on this analysis, Lichtman concluded that in Alabama

"African Americans invariably prefer Democratic candidates in general elections and

[] whites invariably prefer Republican candidates." (Ex. NPX 324, 4). In six general elections, Lichtman determined that the mean support of blacks for black Democrats was 94 percent and that the mean support of blacks for white Democrats was 92 percent. (Ex. NPX 324, 6-7). By contrast, the mean level of support by white voters for black Democrats was 19 percent and the mean level of support by white voters for white Democrats was 29 percent. (Ex. NPX 324, 6-7). Based on this data, Lichtman found that "polarization between African Americans and whites in general elections is greater when the Democratic candidate is African American rather than white." (Ex. NPX 324, 4). Lichtman's ecological regression analysis also suggested that 100 percent of black voters in Jefferson County, Madison County, and Montgomery County vote for Democrats, regardless of whether the candidate is black or white. (Ex. NPX 324, 13–15). Comparatively, white voters in Jefferson County had a mean level of support for black Democrats of 19 percent and a mean level of support for white Democrats of 33 percent, (Ex. NPX 324, 13); white voters in Madison County had a mean level of support for black Democrats of 24 percent and a mean level of support for white Democrats of 36 percent, (Ex. NPX 324, 14); and white voters in Montgomery County had a mean level of support for black Democrats of 20 percent and a mean level of support for white Democrats of 41 percent, (Ex. NPX 324, 15).

We credit Lichtman's testimony that most black voters in Alabama favor Democrats and that most white voters in Alabama favor Republicans, but we do not

credit Lichtman's opinion that race is the motivating factor for this voting pattern in Alabama.  Lichtman did not conduct any statistical analysis to determine whether factors other than race were responsible for the voting patterns.  He did not consider affluence, strength of a political campaign, or party loyalty.  (Trial Tr. vol. 3, 102–05, Aug. 12, 2013).  Instead, he asserted repeatedly that the resulting voter patterns were similar, which suggests that race is the motivating factor.  (Trial Tr. vol. 3, 91, 101–05, Aug. 12, 2013).  Lichtman also did not conduct any analysis of Democratic primaries between black and white candidates, which might have offered further evidence about whether white voters are more likely to support white Democrats and black voters are more likely to support black Democrats.  (Trial Tr. vol. 3, 101–102, Aug. 12, 2013).

Lichtman also testified that the evidence suggests that Native Americans and Hispanics in Alabama are politically cohesive.  (Ex. NPX 324, 17).  Lichtman explained that 41 percent of the registered voters who vote at the McIntosh High School precinct in Senate District 22 are Native Americans, and 23 percent of the registered voters who vote at that precinct are black persons.  (Ex. NPX 324, 17).  The precinct cast 75 percent of its votes for the Democratic incumbent, W.J. Pat Lindsey, during the 2006 general election for the Legislature, and the precinct cast 87 percent of its votes for the Democratic candidate, Mark Keahey, during the 2010 general election.  (Ex. NPX 324, 17–18).  Based on these numbers from a single precinct, Lichtman concluded that blacks and Native Americans ordinarily vote in coalition.  (Ex. NPX 324, 17, 20).  Lichtman also reasoned that, because, "with the

exception of Cuban-Americans, Hispanics are overwhelmingly Democratic in their choice of candidates" and because most of the Hispanic population in Alabama is not Cuban American, the Hispanic population in Alabama must be politically cohesive. (Ex. NPX 324, 20).

We do not credit Lichtman's opinions about the political cohesiveness of Native Americans and Hispanics in Alabama.  Lichtman acknowledged that "[t]here is an insufficient concentration of Native Americans or Hispanics in the state of Alabama for ecological regression analysis."  (Ex. NPX 324, 17).  And he relied upon data from a single precinct to speculate about the voting behavior of Native Americans and generalizations about Hispanics across the United States to speculate about Hispanic voting patterns in Alabama.  (Ex. NPX 324, 17).  Lichtman's conclusions about the political cohesiveness of these groups are insufficiently supported in the record.

Lichtman next testified that the illustrative districts introduced by the Democratic Conference plaintiffs would give minorities a better opportunity to elect the candidates of their choice.  The Democratic Conference plaintiffs introduced an illustrative map of Montgomery County that includes an additional majority-black House district, (Ex. NPX 300); an illustrative map that preserves nine majority-black House districts in Jefferson County, (Ex. NPX 301); and an illustrative map of a minority-opportunity Senate district in Madison County, (Ex. NPX 302).  Lichtman acknowledged that he did not look at any statewide plans, (Trial Tr. vol. 2, 97, Aug.

12, 2013), but testified that the data from previous elections suggests that these districts would provide minority voters a very good opportunity to elect candidates of their choice, (Trial Tr. vol. 3, 97–98, Aug. 12, 2013).  We credit Lichtman's testimony about these illustrative districts.

### o.  Testimony of William S. Cooper

William S. Cooper provided expert testimony about alternative redistricting plans for the Black Caucus plaintiffs.  Cooper testified that he has been preparing redistricting plans for approximately 25 years and has worked with Maptitude since the late 1980s.  (Ex. APX 69, 2).  Cooper drew the redistricting maps, HB16 and SB5, introduced by Democratic members of the Legislature as alternatives to the plans adopted by the Committee.  (Ex. APX 69, 2).  He used the data produced by the 2010 Census; the block equivalency files from the Alabama Reapportionment Office, which were linked to the versions of the plans produced by the Committee; and lists of some of the addresses of the incumbents.  (Ex. APX 1, 2–4).  When counsel for the Black Caucus plaintiffs hired Cooper to draft alternative plans, counsel instructed Cooper to preserve the same number of majority-black districts and to avoid county splits to the extent possible, particularly within the Black Belt.  (Ex. APX 1, 3).  Cooper testified that he drew the plan without any knowledge of Alabama politics, geography, or the locations of incumbents, and that he spent only 40 hours on the project.  And he explained that he intended the plans that became HB16 and SB5 to serve as initial drafts that he would alter based on input from legislators, (Ex. APX 1, 4), but the

schedule of the Legislature did not permit any changes to the plans before the Democratic legislators introduced them. (Trial Tr. vol. 2, 110, Aug. 12, 2013).

Cooper acknowledged that the Legislature needed to make significant changes to the district lines because of the severe malapportionment of the existing districts, (Trial Tr. vol. 2, 90, Aug. 9, 2013), but he explained that the Legislature could have split fewer counties and precincts if the Committee had followed an overall deviation in population of 10 percent, (Trial Tr. vol. 2, 69, Aug. 9, 2013). Cooper testified that HB16 and SB5, which follow an overall deviation of 10 percent, split fewer counties and precincts than the Acts. (Trial Tr. vol. 2, 69, Aug. 9, 2013); *see also* (Ex. APX 25; Ex. APX 26). Cooper explained that traditional redistricting principles protect the integrity of precincts, but he admitted that the districts adopted in 2001 had a similar number of precinct splits as the Acts. (Trial Tr. vol. 2, 107, Aug. 9, 2013).

Cooper also testified that, in his opinion, the Acts pack the majority-black districts. (Trial Tr. vol. 2, 82–83, Aug. 9, 2013). He testified that the margins between the white population and the black population in those districts are much larger in Act 602 than in the HB16 plan, which he referred to as "smoking gun evidence that shows that there's been some packing in the Act 602 house plan." (Trial Tr. vol. 2, 82, Aug. 9, 2013). He also explained that the margins were smaller for the Senate districts, but that the margins again suggest packing. (Trial Tr. vol. 2, 83, Aug. 9, 2013). But he acknowledged that most of the majority-black districts in his plans were underpopulated by more than an overall deviation in population of 2 percent and that

82

his plan for the House did not increase the total black population in District 84 to create a new majority-black district.  (Trial Tr. vol. 2, 83–84, Aug. 9, 2013).

We credit much of Cooper's testimony.  We credit Cooper's testimony that the Legislature could have split fewer county and precinct lines if it had adopted a higher overall deviation in population.  And we credit Cooper's testimony that his plans lowered the margins between the black and white populations in majority-black districts.  But we do not credit Cooper's testimony that the Acts packed the majority-black districts based solely on data that compares the Acts to Cooper's plans without any consideration of the previous plans and the Committee's asserted goals to maintain a lower overall deviation in population equality and to avoid retrogression in those districts.

### p.  Testimony of Theodore S. Arrington

Theodore S. Arrington provided expert testimony on behalf of the Democratic Conference plaintiffs that the majority-black districts were packed to isolate and diminish the strength of black voters.  Arrington testified that the 1993 and 2001 redistricting plans drawn by Democratic legislators constituted a "dummymander" because they packed majority-black districts in a manner intended to help the Democratic Party, but the plans in fact hurt the Party.  (Trial Tr. vol. 3, 49–50, Aug. 12, 2013).  He testified that a 51 percent voting-age population is enough to give minority voters the opportunity to elect the candidate of their choice anywhere in the State, and he suggested that, "[c]ertainly, 54-56% concentration is enough

everywhere." (Ex. NPX 323, 15, 17). He explained that, although experts used to think that a minority presence of 65 percent was necessary to ensure that the minority group would be able to elect the candidate of its choice, the increased registration and mobilization of black voters has reduced that number. (Ex. NPX 323, 19). Arrington speculated that black leaders may have agreed to have their districts "packed" in the last round of redistricting because of uncertainty over the percentage of black voters required to have an opportunity to elect their candidate of choice and because black officials had a strong voice in the governing coalition. (Ex. NPX 323, 22).

We do not credit Arrington's opinion that the districts in the new plan are packed. Arrington admitted on cross-examination that, in 2000, he testified that a district in which black persons made up a voting-age population of 61 percent would offer only an opportunity for black voters to elect the candidate of their choice, not a guarantee that black voters would be able to elect the candidate of their choice. (Trial Tr. vol. 3, 80–81, Aug. 12, 2013). And he had also testified in 2000, contrary to his testimony on direct examination in this matter, that no clear minimum could be set to determine across jurisdictions what voting-age population is necessary to give a minority group the opportunity to elect its candidate of choice. (Trial Tr. vol. 3, 78, Aug. 12, 2013). Arrington conceded that, if the Legislature had intended to pack black voters, the Legislature could have overpopulated all of the majority-black districts and that the new plans did not systematically overpopulate those districts. (Trial Tr. vol. 3, 62–63, Aug. 12, 2013).

84

Arrington also testified that, in his view, the districts were enacted for a discriminatory purpose.  In his expert report, Arrington asserted that "[t]he purpose of the enacted plans is to perpetuate or create a kind of 'political apartheid' such as the Supreme Court rejected in *Shaw v. Reno* (509 U.S. 630 [1993]) and its progeny." (Ex. NPX 323, 10).  He reasoned, "Since the face of the Alabama Republican Party is white (e.g., all the G.O.P. legislators are white), the Republican super-majority in the legislature designed the districts to create a situation where the Democratic Party in the legislature would be all black."  (Ex. NPX 323, 11).  As further support for the existence of this strategy, Arrington cited as evidence the affidavits of several white Democratic legislators who have been asked by Republicans to switch parties and the affidavits of several black Democratic legislators who have never been asked.  (Ex. NPX 323, 11–12).  Arrington also testified that, because the splitting of precincts bears more heavily on minority voters, the high number of precinct splits in the Acts is evidence of discriminatory purpose.  (Ex. NPX 323, 36–38).  And Arrington suggested that the departure from normal procedures in the passage of the legislation in a special session evidenced discriminatory intent, as did the greater access of Republican legislators to see and make changes to the plans because Democrats had only the illusion of participation in the process.  (Ex. NPX 323, 54–59).

We do not credit Arrington's opinion that the districts were enacted for an invidious discriminatory purpose.  On cross-examination, Arrington retreated from many of the points he made in his report.  For example, he admitted on cross-

85

examination that a party in power typically develops its plan by itself and that process is not, standing alone, evidence of an intent to discriminate on the basis of race. (Trial Tr. vol. 3, 71, Aug. 12, 2013). Arrington also admitted that he was unaware that the Alabama Legislature had never redistricted itself during the first regular session after the census, which undermined his opinion that the Legislature had deviated from normal procedures when it enacted the redistricting plans. (Trial Tr. vol. 3, 73, Aug. 12, 2013).

### 5.  Evidence Presented by the State Defendants at Trial

The State defendants introduced the testimony of four witnesses to rebut the evidence introduced by the plaintiffs. Senator Dial and Representative McClendon testified at length about the goals of the Reapportionment Committee, the development of the plans, and the input they received from legislators. Randy Hinaman testified about his work on the plans. And Thomas L. Brunell testified as an expert on behalf of the State defendants.

### a.  Testimony of Senator Gerald Dial

Senator Dial testified on behalf of the State defendants that the Committee had six primary goals. First, the Committee wanted to comply with the requirement of one person, one vote by making the districts as equally populated as possible. (Trial Tr. vol. 1, 27, Aug. 8, 2013; Ex. CE 27). Second, the Committee wanted to avoid future litigation about compliance with the requirement of one person, one vote. (Trial Tr. vol. 1, 27, Aug. 8, 2013; Ex. CE 27). Third, the Committee wanted to

comply with the Voting Rights Act. (Trial Tr. vol. 1, 27–28, Aug. 8, 2013; Ex. CE 27).

Fourth, the Committee wanted to comply with section 5 of the Voting Rights Act,

which it understood to require that it not reduce the number of majority-black

districts or the approximate levels of black population within those districts. (Trial Tr.

vol. 1, 28, Aug. 8, 2013; Ex. CE 27). Fifth, the Committee wanted to draw districts to

avoid incumbent conflicts. (Trial Tr. vol. 1, 28, Aug. 8, 2013; Ex. CE 27). Sixth, the

Committee wanted to preserve communities of interest when possible. (Trial Tr. vol.

1, 28, Aug. 8, 2013; Ex. CE 27). With the exception of the decision to adopt an

overall deviation in population of 2 percent, the guidelines adopted by the Committee

were the same guidelines that had been used in 2001. (Trial Tr. vol. 1, 27, 29, Aug. 8,

2013). And he testified that the Committee adopted the overall deviation of 2 percent

before Hinaman became involved in the process. (Trial Tr. vol. 1, 138, Aug. 8, 2013).

Senator Dial testified that the Committee held public hearings to obtain input

from the public about how to draw the districts. (Trial Tr. vol. 1, 30, Aug. 8, 2013).

The Committee held those hearings in 21 locations throughout Alabama before the

Committee produced any new plans, and the Committee advertised the hearings

through various forms of media. (Trial Tr. vol. 1, 27–32, Aug. 8, 2013; Ex. CE 2). At

those hearings, members of the public asked the Committee not to split their

counties, and Senator Dial relayed that information to Hinaman. (Trial Tr. vol. 1, 91,

Aug. 8, 2013). Senator Dial thought that the process was fairer than the process used

in the past because the Committee sought comments from the public before it

produced the plans, instead of afterward.  (Trial Tr. vol. 1, 25–26, 30–32, Aug. 8, 2013).  But he also knew that it would be unable to accommodate all of the requests of the public if the legislators were to comply with federal law.  (Trial Tr. vol. 1, 68–69, Aug. 8, 2013).

Senator Dial also testified that he consulted each of his 34 colleagues in the Senate about their preferences for their districts.  (Trial Tr. vol. 1, 34, Aug. 8, 2013).  He showed each senator the statistics for his or her district to explain how many people the district needed to gain or lose to fall within the guideline for population deviation.  (Trial Tr. vol. 1, 34–35, Aug. 8, 2013).  And he asked each senator about his or her preferences on population to gain or lose.  (Trial Tr. vol. 1, 34–35, Aug. 8, 2013).  He promised each senator that he would not draw districts with incumbent conflicts, but he could not accommodate all of the requests from his colleagues.  (Trial Tr. vol. 1, 36, Aug. 8, 2013).

Senator Dial explained that the systematic underpopulation of the majority-black districts required significant changes to the district lines in the Senate, but that he incorporated input from the legislators who represented those districts as he enlarged those districts.  (Trial Tr. vol. 1, 37–38, 48, Aug. 8, 2013).  He often refereed disputes among senators to try to accommodate particular requests.  (Trial Tr. vol. 1, 119, Aug. 8, 2013).  And he specifically incorporated ideas from black legislators.  (Trial Tr. vol. 1, 37–38, Aug. 8, 2013).

In Jefferson County, all three majority-black districts needed to gain population, and Senator Smitherman, a Democrat who represented one of those districts, supplied Senator Dial with a map of proposed districts.  (Trial Tr. vol. 1, 40–41, Aug. 8, 2013).  Under that plan, Districts 18, 19, and 20 would gain population to fall within the overall deviation of 2 percent and would remain entirely within Jefferson County.  (Ex. SDX 469).  Dial adopted about 99 percent of that plan.  (Trial Tr. vol. 1, 96, Aug. 8, 2013).  And Dial divided the rest of the population of Jefferson County among five majority-white districts that extend outside of the County boundaries.  (Trial Tr. vol. 1, 70–71, Aug. 8, 2013).  Although Dial could have used white population within Jefferson County to repopulate the majority-black districts, he was concerned that doing so would have resulted in the retrogression of the majority-black districts and potentially created a problem for preclearance.  (Trial Tr. vol. 1, 66, 69, Aug. 8, 2013).

In Mobile County, Senator Dial sought input from Senator Figures, who represented a majority-black district in Mobile that needed to gain population.  (Trial Tr. vol. 1, 40, Aug. 8, 2013).  Neither Senator Figures, nor any of the other senators from Mobile County, wanted another senator to join the Mobile County delegation, and the new plan accomplished that goal by changing the shape of District 22 to absorb much of the overpopulation from District 32 across the Mobile Bay in Baldwin County.  (Trial Tr. vol. 1, 40–41, 45, Aug. 8, 2013; Ex. APX 49).  Senator Sanders, who represented District 23, which bordered District 22 to the north, wanted

to gain minority members from District 22 and give up population in Autauga County. (Trial Tr. vol. 1, 36–38, Aug. 8, 2013). Senator Dial partially accommodated those requests by removing District 23 from Autauga County and extending the district partially into District 22. (Trial Tr. vol. 1, 38, Aug. 8, 2013; Ex. APX 49).

Senator Dial also testified that the need to "grow" the majority-black districts in the Black Belt had a domino effect on the districts along the western edge of Alabama. (Trial Tr. vol. 1, 35–36, Aug. 8, 2013). District 24 moved north, District 21 moved north, District 6 moved north, and District 1 moved west to accommodate some of the overpopulation in the former District 2. (Ex. APX 17; Ex. APX 49; Ex. APX 50). Senator Dial met with the senator from District 1, Senator Tammy Irons (D), about the proposed changes to her district and accommodated some of her requests, but was unable to accommodate further requests because he had no time to introduce an amendment during the consideration of the Senate plan by the Legislature. (Trial Tr. vol. 1, 46–47, Aug. 8, 2013).

Senator Dial explained that the plans were introduced, considered, and approved in a special session of the Legislature. He explained that the plans went through the same process of committee hearings and consideration and debate on the floor that any other piece of legislation would undergo in the Alabama Legislature. (Trial Tr. vol. 1, 51, Aug. 8, 2013). He testified that a special session allows for greater opportunity to engage in debate and consideration because the Legislature considers no other bills during that time. (Trial Tr. vol. 1, 51–52, Aug. 8, 2013). He also

testified that the Legislature in 2001 had also adopted its redistricting plans during a special session. (Trial Tr. vol. 1, 136–37, Aug. 8, 2013). He testified that the first time he saw the alternative plans introduced at the special session, including the Sanders plan and the Reed-Buskey plan, was in committee or on the Senate floor and that none of the Senators who developed those plans ever consulted him or other Republican legislators about those plans. (Trial Tr. vol. 1, 141–42, Aug. 8, 2013).

Senator Dial testified that he had no goal or intent to discriminate against the black population in Alabama during the redistricting. (Trial Tr. vol. 1, 143–44, Aug. 8, 2013). He testified that no member of the Senate who represented a majority-black district had ever asked for a district with a black population of only 55 percent, and Senator Hank Sanders (D) told Senator Dial that he thought that all of the majority-black districts should have a black population of at least 62 percent. (Trial Tr. vol. 1, 36–37, Aug. 8, 2013). Senator Dial testified that, if he had suggested to the senators who represented the majority-black districts that new districts with black populations of only 55 percent would be better for the black population in Alabama, those senators would not have responded favorably to his suggestion that he knew better than they did. (Trial Tr. vol. 1, 43–44, Aug. 8, 2013). A former Democrat turned Republican, Senator Dial testified that he had no contact with the Republican National Committee during the reapportionment process, was not aware of any national strategy to make the Republican Party the "white party" and the Democratic Party the "black party," and had no private conversations about that alleged strategy.

(Trial Tr. vol. 1, 59–60, Aug. 8, 2013).  And he testified that, although the new districts the Legislature adopted were not perfect or the only way to draw the districts, they met the goals of the Committee to maintain the number of majority-black districts, to maintain the approximate percentages of the black population in those districts, to avoid incumbent conflicts, and to draw districts of approximately equal size.  (Trial Tr. vol. 1, 143–44, Aug. 8, 2013).

### b.  Testimony of Representative Jim McClendon

Representative McClendon testified consistently with Senator Dial about the adoption by the Committee of the guidelines.  He explained that an overall deviation of 2 percent just "ma[de] good sense" to him because it makes the districts more equal.  (Trial Tr. vol. 3, 220, Aug. 12, 2013).  He also testified that his impression was that the Department of Justice did not have a specific baseline for retrogression, but that it looked at relative numbers, so the Committee tried to match the percentages of the total black population in majority-black districts to the percentages in the 2001 districts based on the 2010 Census numbers.  (Trial Tr. vol. 3, 221, Aug. 12, 2013).

Representative McClendon testified that he tried to accommodate requests from his colleagues, Democratic and Republican, in the plan for the House of Representatives.  (Trial Tr. vol. 3, 222, Aug. 12, 2013).  Representative McClendon testified that he offered to meet with all of the members of the House of Representatives to discuss their new districts, but that not every member of the House accepted that offer.  (Trial Tr. vol. 3, 222–23, Aug. 12, 2013).  Representative Thad

McClammy (D) arranged a meeting with McClendon and, during that meeting, provided McClendon a proposed plan for the majority-black districts in Montgomery to which the other legislators had agreed. (Trial Tr. vol. 3, 228–29, Aug. 12, 2013). McClendon passed that map along to Hinaman, with the instructions to incorporate that plan if possible. (Trial Tr. vol. 3, 228–29, Aug. 12, 2013). And when Representative Harper asked to gain 12 people from Greene County and the neighboring representative agreed, he incorporated that change into the plan. (Trial Tr. vol. 3, 229–30, Aug. 12, 2013).

Representative McClendon admitted that redistricting is a political process, but denied having any racially discriminatory motive in his development of the redistricting plans. (Trial Tr. vol. 3, 234, Aug. 12, 2013). McClendon acknowledged making several statements that, under the new plans, the number of Republicans in the Alabama House would likely increase from 66 representatives to 68 to 70 representatives and that the number of Republicans in the Senate would increase from 22 senators to 23 to 25. (Trial Tr. vol. 3, 240, Aug. 12, 2013; Ex. APX 58). McClendon also admitted that, although he met with any member of the House who wanted to meet with him, only Republicans were given the opportunity to meet with Hinaman to work on their districts. (Trial Tr. vol. 3, 246, Aug. 12, 2013). But he denied any intent to eliminate white Democratic members from the Legislature. (Trial Tr. vol. 3, 240, Aug. 12, 2013). He testified that he had no racially discriminatory motive when he agreed to the adoption of an overall deviation of 2 percent. (Trial Tr.

vol. 3, 234, Aug. 12, 2013).  And he testified that he had no racially discriminatory motive when he worked with Hinaman and the members of the Alabama House of Representatives to draft the new districts.  (Trial Tr. vol. 3, 234, Aug. 12, 2013).

c.  Testimony of Randolph L. Hinaman

Randolph L. Hinaman also testified on behalf of the State defendants. Hinaman is a political consultant who works primarily for members of the Republican Party and who has been involved in Alabama politics since the mid-1980s, when he served as the campaign manager and then the chief of staff for Congressman Sonny Callahan (R-AL-01).  (Ex. NPX 352).  In 2011 and 2012, he worked on the redistricting plans for the Alabama congressional delegation, which included six Republicans and one Democrat, and he drew plans for that delegation with zero deviation in population equality.  (Trial Tr. vol. 3, 116, Aug. 12, 2013; Ex. NPX 352). Citizens for Fair Representation, Inc., a 501(c)(4) nonprofit organization located in Alabama, hired Hinaman to redraw the districts for the Alabama Legislature too.  (Ex. NPX 352).  In accordance with his contract, Hinaman met with the Republican leadership to determine the goals of the redistricting, and those leaders instructed him to use an overall deviation in population of 2 percent, to preserve the majority-black districts without retrogression, to avoid incumbent conflicts if at all possible, and to comply with the other instructions included in the guidelines approved by the Reapportionment Committee.  (Trial Tr. vol. 3, 117-18, Aug. 12, 2013).

Hinaman explained that the effort to preserve the majority-black districts and bring them into compliance with the requirement of one person, one vote drove the development of the Acts.  All of the majority-black districts were underpopulated, many significantly, and he needed to add population from contiguous districts to increase the total population of the districts without significantly lowering the percentage of the population in each district that was majority-black.  (Trial Tr. vol. 3, 122–23, Aug. 12, 2013).  He explained that the underpopulation of the majority-black districts in the Black Belt caused Senate Districts 21 and 6 to move north; Senate Districts 4, 5, and 1 to move east; and Senate District 22 to move south.  (Trial Tr. vol. 3, 122–24, Aug. 12, 2013).  He also explained that the underpopulation in Senate District 33 in Mobile County caused Senate District 34 to move and Senate District 22 to gain population from the overpopulated areas of Baldwin County.  (Trial Tr. vol. 3, 130–31, Aug. 12, 2013).  And Hinaman explained that the majority-black House districts in Jefferson County were around 70,000 people short of the ideal population and any attempt to repopulate all nine of the majority-black districts with the population in Jefferson County would cause retrogression to the point that the plan might not be precleared.  (Trial Tr. vol. 3, 132–33, Aug. 12, 2013).  For that reason, Hinaman moved House District 53 to the Huntsville area, where he was able to create another majority-black House district.  (Trial Tr. vol. 3, 131–32, Aug. 12, 2013).  When necessary to avoid retrogression, Hinaman split precincts at the census block level.  (Trial Tr. vol. 3, 143, Aug. 12, 2013).

Hinaman testified that "no one gets everything they want in redistricting," but he tried to accommodate the wishes of legislators where possible. (Trial Tr. vol. 3, 137, Aug. 12, 2013). He traveled to Alabama to meet with Republican legislators every couple of weeks during the regular session of the Legislature. (Trial Tr. vol. 3, 119–20, Aug. 12, 2013). Where the Republican legislators agreed upon boundaries and those particular boundaries did not pose a problem for either the requirement of one person, one vote or for the preservation of the majority-black districts, he accommodated those requests. (Trial Tr. vol. 3, 120–21, Aug. 12, 2013). Hinaman also accommodated the suggestions from Democratic legislators that he received from Senator Dial and Representative McClendon. (Trial Tr. vol. 3, 120, Aug. 12, 2013). Hinaman incorporated almost in its entirety a map of the majority-black districts in Jefferson County drawn by one of the representatives for those districts. (Trial Tr. vol. 3, 120, Aug. 12, 2013). And Hinaman partially incorporated a map of the majority-black districts in Montgomery County produced by one of the representatives for those districts. (Trial Tr. vol. 3, 121, Aug. 12, 2013). Hinaman also spoke with several Democratic members of the Legislature during the final week before the passage of the bill and accommodated requests from those legislators when all of the legislators affected by the requests agreed. (Trial Tr. vol. 3, 135–36, Aug. 12, 2013).

Hinaman denied that he had any invidious purpose to discriminate against blacks when he drew the new districts. When asked on cross-examination about

particular changes he could have made to the map, he responded that "you can pull out any district and draw it without taking regard to all the things that are around it[,] [b]ut unfortunately the whole map has to fit together." (Trial Tr. vol. 3, 160, Aug. 12, 2013). He explained, for example, that a map that draws an additional majority-black district in Montgomery County, like the Democratic Conference plaintiffs' illustrative map, does not account for the need to bring District 69, another majority-black district, into Montgomery County. (Trial Tr. vol. 3, 159–61, Aug. 12, 2013). Hinaman also testified that he tried to draw another majority-black Senate district in Madison County, but that he could not draw such a district within deviation. (Trial Tr. vol. 3, 187, Aug. 12, 2013).

We credit the consistent testimony of Senator Dial, Representative McClendon, and Hinaman about the Committee's goals and the creation of the new districts. And we credit the consistent and unequivocal testimony of Senator Dial, Representative McClendon, and Hinaman that none of them acted with a racially discriminatory purpose or motive during the redistricting process.

### d.  Testimony of Thomas L. Brunell

The State defendants introduced the expert testimony of Thomas L. Brunell to refute the expert testimony offered by the plaintiffs. Brunell testified that the adoption of the overall deviation in population of 2 percent is consistent with the decisions of other states around the country after *Larios* and benefits all citizens in Alabama. (Trial Tr. vol. 3, 197–201, Aug. 12, 2013; Ex. SDX 458). He explained that,

although the Acts created many safe Republican seats, the overall deviation of 2 percent prevented the Legislature from creating a severe partisan gerrymander.  (Trial Tr. vol. 3, 198–99, Aug. 12, 2013).  He testified that the statistics from other states confirm that lower population deviations are less closely aligned with partisanship.  (Trial Tr. vol. 3, 205, Aug. 12, 2013).  And he explained that a lower population deviation is inherently more equal than a higher population deviation and that equality was the driving force behind the redistricting revolution.  (Trial Tr. vol. 3, 197–98, Aug. 12, 2013).

Brunell also testified that Arrington and Lichtman drew improper inferences about the voting behavior of the black population in Alabama when those experts opined that the districts were packed.  Brunell explained that Arrington relied on the voting behavior in House District 85 to extrapolate about behavior across the State, but that voting behavior is affected by a number of factors that will vary across the State, including the proportion of black and white voting-age population, the degree of cohesiveness among black and white voters, and the typical proportion of turnout.  (Ex. SDX 456, 4–5).  He testified that none of the experts in this matter has offered any empirical evidence to substantiate the opinion that a district with a voting-age population that is 51 percent black will provide black voters the opportunity to elect the candidate of their choice.  (Ex. SDX 456. 4–5).

And Brunell testified, contrary to Cooper and Arrington, that the bimodal distribution of white and black populations in districts is neither bad policy nor illegal.

98

As he explained, elected officials who represent highly competitive districts will find it more difficult to represent their districts because the voters of those districts will be so closely divided on controversial issues.  (Trial Tr. vol. 3, 206, Aug. 12, 2013).  If 50 percent of the voters in a district support a higher minimum wage and 50 percent want to abolish the minimum wage, the representative will have represented only half of the voters in the district no matter which policy option the representative favors. (Trial Tr. vol. 3, 206, Aug. 12, 2013).

We credit Brunell's testimony that lower population deviations constrain the partisan desires of Legislatures, that the record evidence is insufficient to support any conclusion about the minimum level of the black voting-age population necessary to allow the black population to elect its candidate of choice, and that representation of competitive districts is more difficult than representation of a politically cohesive district.

## II.  CONCLUSIONS OF LAW

We divide our discussion in two parts.  First, we consider the claims of vote dilution made by the Black Caucus and Democratic Conference plaintiffs.  Second, we consider the claims based on intentional discrimination made by the Black Caucus and Democratic Conference plaintiffs.

### A.  Vote Dilution

"A plaintiff claiming vote dilution under § 2 must initially establish that: (i) the racial group is sufficiently large and geographically compact to constitute a majority in

a single-member district; (ii) the group is politically cohesive; and (iii) the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479, 117 S. Ct. 1491, 1498 (1997) (internal quotation marks omitted); *see Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S. Ct. 2752, 2766–67 (1986).  The Supreme Court first established these conditions in *Gingles*, when it interpreted for the first time the 1982 revisions to section 2 of the Voting Rights Act.  *See Gingles*, 478 U.S. at 50–51, 106 S. Ct. at 2766–67.  "When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008, 114 S. Ct. 2647, 2655 (1994).  When no showing of intentional discrimination has been made, "a sufficiently large minority population" means greater than 50 percent of the voting-age population. *Bartlett v. Strickland*, 556 U.S. 1, 15, 18-19, 129 S. Ct. 1231, 1244-46 (2009) (plurality opinion).  And the first *Gingles* condition should not be read to define dilution as a failure to maximize.  *De Grandy*, 512 U.S. at 1016, 114 S. Ct. at 2659; *see also id.* at 1017, 114 S. Ct. at 2660 ("One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast. . . . Failure to maximize cannot be the measure of § 2.").

The Supreme Court has never explicitly recognized the ability of a minority voter to state a claim for vote dilution in violation of section 2 of the Voting Rights

Act based on evidence of a coalition of two different minority groups, *see Strickland*, 556 U.S. at 13–14, 129 S. Ct. at 1242–43, but the Eleventh Circuit has held that "[t]wo minority groups (in this case blacks and hispanics) may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." *Concerned Citizens of Hardee Cnty. v. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990). Although other circuits have disagreed with that decision, *see, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) ("A redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution 'on account of race' in violation of Section 2."); *Frank v. Forest Cnty.*, 336 F.3d 570, 575 (7th Cir. 2003) (describing as "problematic" the argument that a voter can state a claim for vote dilution based on a coalition of two minority groups); *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1387 (6th Cir. 1996) ("A textual analysis of § 2 reveals no word or phrase which reasonably supports combining separately protected minorities."), we are bound by it, *see Ala. NAACP State Conf. of Branches v. Wallace*, 269 F. Supp. 346, 350 (M.D. Ala. 1967) (three-judge court). A plaintiff who proves that two minority groups are politically cohesive may satisfy the first *Gingles* factor if a reasonably compact district could be formed in which those two minority groups make up a majority of the voting-age population.

After the plaintiff has established the three *Gingles* elements, the plaintiff must also establish that the totality of the circumstances supports a finding that the voting

scheme is dilutive. *Bossier Parish*, 520 U.S. at 479, 117 S. Ct. at 1498. Relevant factors to this analysis include (1) the history of voting-related discrimination in the State; (2) the extent to which voting is racially polarized in the State; (3) the extent to which the State has used voting practices that tend to enhance the opportunity of discrimination against the minority group; (4) if there is a candidate slating process, the extent to which members of the minority group have been denied access to that process; (5) the extent to which members of the minority "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"; (6) the extent to which political campaigns have included overt or subtle racial appeals; and (7) the extent to which members of the minority have been elected to public office. *See Gingles*, 478 U.S. at 36–37, 106 S. Ct. at 2759. Proportionality of majority-minority districts at the statewide level is a relevant fact in the totality of the circumstances. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437, 126 S. Ct. 2594, 2620 (2006). And, in some cases, a "significant lack of responsiveness" by elected officials to the needs of a minority group or a tenuous policy underlying the voting procedure adopted might also be probative of vote dilution. *See Gingles*, 478 U.S. at 37, 106 S. Ct. at 2759. But the "defendant in a vote dilution case may always attempt to rebut the plaintiff's claim by introducing evidence of objective, non-racial factors under the totality of the circumstances standard." *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994).

1.  The Black Caucus Plaintiffs Failed To Prove the First *Gingles* Requirement for All of Their Claims.

The Black Caucus plaintiffs raise three different theories of vote dilution, but they failed to prove the first *Gingles* condition for all three theories.  The Black Caucus plaintiffs argue that the Acts dilute the voting strength of blacks across the State, but they failed to prove that an additional majority-black district could be created anywhere in the State.  The Black Caucus plaintiffs argue that the Acts dilute the voting strength of blacks in Madison County, but they failed to prove that the Legislature could have created a coalitional district in Senate District 7 in which the coalition made up a simple majority of the district.  And the Black Caucus plaintiffs argue that the Acts dilute the voting strength of blacks in Jefferson County because they shift the balance between majority-white and majority-black House districts, but they failed to introduce a plan that draws another majority-black district in Jefferson County within the allowable population deviation.  (Doc. 174: Mem. Op. & Order).

First, the Black Caucus plaintiffs argued that the Acts dilute the voting strength of blacks across the State, but they failed to prove that the Legislature could have created an additional reasonably compact district with a black voting-age population of greater than 50 percent anywhere in the State.  *See Johnson v. De Grandy*, 512 U.S. 997, 1008, 114 S. Ct. 2647, 2655 (1994); *see also Bartlett v. Strickland*, 556 U.S. 1, 18–19, 129 S. Ct. 1231, 1245 (2009) (plurality opinion).  The Black Caucus plaintiffs introduced HB16 and SB5 as evidence, but those plans do not create any additional

majority-black districts.  Instead, those plans actually create fewer opportunities for black voters to elect the candidates of their choice than does Act 602.  Act 602 preserved the same 27 majority-black districts from the 2001 plan and increased the black percentage in District 85 to make it a majority-black district in total population, though only a plurality district in voting-age population.  HB16 also increased the voting-age black population in District 85 to make it a majority-black district, but did so at the cost of a formerly majority-black district.  Under that plan, District 84, which was a majority-black district under the 2001 plan, would have a voting-age population that is only 24.73 percent black.  Because the Black Caucus plaintiffs have failed to prove that the Legislature could have created an additional majority-black district and because the only plan they offered actually creates fewer opportunities for black voters in Alabama to elect their candidates of choice, the Black Caucus plaintiffs have failed to satisfy their burden.

And even if the plans offered by the Black Caucus plaintiffs contained an additional majority-black district, we would conclude that the Black Caucus plaintiffs failed to satisfy the first *Gingles* requirement because the plans do not comply with the guideline of an overall deviation in population of 2 percent.  The Committee adopted a guideline that required the redistricting plans to comply with an overall deviation of 2 percent, and the Committee was entitled to adopt that guideline.  Section 2 of the Voting Rights Act concerns political processes that "are not equally open to participation by [minority groups] . . . in that its members have less opportunity than

other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).  Nothing in section 2 of the Voting Rights Act would require the State to adopt a higher population deviation and a less equal system for the election of its representatives to give minorities a better opportunity than other members of the electorate to participate in the political process.  Stated differently, minority voters are not entitled to greater voting power than non-minority voters.  The Black Caucus plaintiffs cannot satisfy the first *Gingles* requirement with an illustrative plan that fails to meet the guideline of an overall deviation of 2 percent.

Second, the Black Caucus plaintiffs argued that Act 603 diluted the voting strength of black and Hispanic voters in Senate District 7, but they again failed to prove that the Legislature could have created a majority-minority district in that area. Under SB5, Senate District 7 would have a voting-age population that is 40.10 percent black and 5.46 percent Hispanic.  (Ex. APX 23).  The Black Caucus plaintiffs presented some testimony that the Hispanic voters in Senate District 7 are politically cohesive with black voters, but we need not decide whether they have met their burden on that point.  Even if the black and Hispanic voters in Senate District 7 are politically cohesive, the minority groups do not make up a simple majority of the voting-age population in the district drawn in SB5.  *See Strickland*, 556 U.S. at 15, 129 S. Ct. at 1243.  Because the Black Caucus plaintiffs have not proved that any coalition of black and Hispanic voters in Madison County is sufficiently large and

105

geographically compact to make up a simple majority of Senate District 7, the Black Caucus plaintiffs cannot establish the first *Gingles* requirement. *See id.* And, in the alternative, we conclude that the Black Caucus plaintiffs failed to meet their burden to establish the first *Gingles* requirement because their plan for Senate District 7, like their plan for the State as a whole, follows an overall deviation in population of 10 percent.

Third, the Black Caucus plaintiffs argue that Act 602 dilutes the votes of black voters in Jefferson County because the Act moved one of the majority-black House districts out of Jefferson County, but the Black Caucus plaintiffs have not produced a plan that would draw an additional majority-black district in Jefferson County without eliminating a majority-black district in another part of the State and would comply with the allowable overall deviation of 2 percent. HB16 draws nine majority-black districts in Jefferson County, (Ex. APX 11), but it follows an overall deviation of 10 percent. For the reasons already explained, the State was entitled to try to comply with the requirement of one person, one vote by setting an overall deviation in population of 2 percent. And the Black Caucus plaintiffs cannot prove vote dilution with illustrative maps that do not meet this requirement.

The Black Caucus plaintiffs also argue that the new Acts dilute the voting strength of black voters in Jefferson County because of the change in the balance of the local House delegation, but that claim is not justiciable for the reasons stated in our previous order, (Doc. 174: Mem. Op. & Order), and even if it were, the claim would fail on the merits. Any system of local delegations for the next Legislature has

not been adopted and will not be adopted until the organizational session conducted by the newly elected members in January 2015.  Because we cannot know if a system of local delegations will be adopted by the next Legislature or how it will be structured, the claim is not ripe for review and the Black Caucus plaintiffs lack standing to raise it.  But, even if we could consider the claim, it would fail on the merits because the Black Caucus plaintiffs failed to prove that a plan could be drawn within the overall deviation in population of 2 percent that would contain the balance they seek.

2.  The Democratic Conference Plaintiffs Also Failed To Prove the First *Gingles* Requirement for All of Their Claims.

The Democratic Conference plaintiffs also raised three claims of vote dilution, each of which fails on the first *Gingles* requirement.  The Democratic Conference plaintiffs argued that Act 602 dilutes the strength of black voters in Jefferson County, but failed to provide an illustrative statewide plan that includes an additional majority-black House district in Jefferson County.  The Democratic Conference plaintiffs argued that Act 602 dilutes the strength of black voters in Montgomery County, but they failed to provide an illustrative statewide plan that includes an additional majority-black district in Montgomery County.  And the Democratic Conference plaintiffs argued that Act 603 dilutes the strength of minority voters in Madison County, but they failed to provide an illustrative map for a majority-minority coalitional district in Senate District 7.

First, the Democratic Conference plaintiffs argued that Act 602 dilutes the voting strength of black voters because it fails to create a minority opportunity House district in Jefferson County, but they failed to prove that the Legislature could have created an additional majority-black district in Jefferson County. The Democratic Conference plaintiffs submitted an illustrative map that divides Jefferson County into 15 House districts, nine of which are majority-black districts. But the illustrative map cannot satisfy the first *Gingles* requirement because it does not fit within a statewide plan as a whole. Act 602 includes several House districts that cross into Jefferson County, and a new plan for Jefferson County cannot be simply inserted into the state plan. As Hinaman repeatedly explained, one can always redraw lines in a particular county, but the key is to fit the illustrative map into a statewide plan. The illustrative map also underpopulates each majority-black district by almost 5 percent. (Ex. NPX 301). As we explained, the State was entitled to choose a lower population deviation, and the plaintiffs cannot establish a results claim under section 2 when the black population of Jefferson County is not sufficiently large and compact to create an additional majority-minority district within that deviation.

The Democratic Conference plaintiffs also argued that Act 602 dilutes the voting strength of blacks because it fails to create an additional majority-black House district in Montgomery County, but the Democratic Conference plaintiffs have again failed to prove the first *Gingles* requirement. The Democratic Conference plaintiffs introduced an illustrative map that divides all of Montgomery County into five House

districts.  Four of those districts are majority-black districts.  And, unlike the

Democratic Conference plaintiffs' illustrative map for Jefferson County, the

illustrative map for Montgomery County complies with the overall deviation of 2

percent.  But, again, the illustrative map is not drawn in the context of a statewide

plan.  Act 602 brought an additional majority-black House district, District 69, into

Montgomery County.  The Democratic Conference plaintiffs' illustrative map does

not account for the domino effect that its plan could have on District 69 or the other

neighboring majority-black districts.  In the absence of a statewide plan drawn to

comply with overall deviation in population of 2 percent, we cannot conclude that the

Democratic Conference plaintiffs have met the first *Gingles* requirement.

The Democratic Conference plaintiffs also argue that Act 603 dilutes the black

voting strength in Madison County, but the Democratic Conference plaintiffs have

again failed to satisfy the first *Gingles* requirement.  The Democratic Conference

plaintiffs introduced an illustrative map in which Senate District 7 would be

underpopulated by 4.96 percent and would have a voting-age population that is 45.18

percent white, 46.45 percent black, and 6.51 percent Hispanic.  But this illustrative

map fails to satisfy the first *Gingles* requirement for the same reasons that the other

illustrative maps failed: it does not comply with the overall deviation in population of

2 percent, and it is drawn in isolation instead of as part of a statewide plan.

Additionally, the record is not clear that the minority population would reach a

majority of the voting-age population in this illustrative district, even if we concluded

109

that the black and Hispanic populations in the area were politically cohesive.  Both Rubio and Toussaint testified that a significant number of the Hispanics in the Huntsville area are not eligible to vote because they are not citizens.

### 3.  The Plaintiffs' Claims of Dilution by Packing Fail Too.

Both the Black Caucus plaintiffs and the Democratic Conference plaintiffs also contend that Acts 602 and 603 dilute the strength of black voters by "packing" them into majority-black districts, that is, by "concentrati[ng] . . . blacks into districts where they constitute an excessive majority," *Gingles*, 478 U.S. at 46 n.11, 106 S. Ct. at 2764 n.11, but the record establishes otherwise.  As the previous sections explain, neither set of plaintiffs offered any evidence that the Legislature could have drawn another majority-black district for either the House or the Senate as part of a statewide plan with an overall deviation in population of 2 percent.  Even though the former districts in both houses, after the 2010 Census, were systematically and, in many cases, severely underpopulated, the Legislature chose to maintain 8 majority-black districts in the Senate and to increase the number of majority-black districts in the House from 27 to 28 based on total population.  Act 602 increased slightly the percentage of the black population in 14 of the former majority-black House districts, decreased slightly the population in the other 13 majority-black House districts, and created 1 new majority-black House district in total population.  Act 603 increased slightly the percentage of the black population in 5 of the 8 majority-black Senate districts and decreased slightly the percentage of the black population in the other 3 majority-black Senate districts.

110

The percentages of the black voting-age population in majority-black House districts range from 47.22 percent to 74.28 percent, and the percentages of the black voting-age population in majority-black Senate districts range from 56.43 percent to 72.70 percent.  The percentages of black voters in 20 of the 28 majority-black House districts are below 65 percent, and the percentages of black voters in 11 of those House districts are below 60 percent.  Only 3 of the 28 majority-black House districts have a black voting-age population in excess of 70 percent, and two of those three districts are underpopulated.  The percentages of black voters in 6 of the 8 Senate districts are below 65 percent, and the percentages of black voters in 4 of those Senate districts are below 60 percent.  Only 1 majority-black Senate district has a black voting-age population in excess of 70 percent, and that district is underpopulated. The overwhelming majority of the majority-black districts, under both Acts, remain underpopulated, which is the opposite of what we would expect in a plan that packs black voters into majority-black districts.  Of the 28 majority-black House districts, 21 remain underpopulated, and 6 of the 8 majority-black Senate districts remain underpopulated.  Even the 8 House districts and 2 Senate districts that are overpopulated are within 1 percent of the ideal population for a district.  And the majority-black districts under the Acts are roughly proportional to the black voting-age population.  That is, black persons are 24.86 percent of the voting-age population in Alabama, and under the Acts, 22.86 percent of the Senate districts and 26.67

percent of the House districts are majority-black districts.  Nothing about Acts 602 and 603 suggests that the Legislature diluted black voting strength through packing.

The plaintiffs complain that the Legislature should have reduced substantially the percentages of black voters in several of the majority-black districts to increase the influence of black voters in adjacent majority-white districts, but there are, at least, two problems with that argument.  First, the Supreme Court has held that section 2 of the Voting Rights Act does not require the creation of either influence districts, *League of Latin Am. Citizens*, 548 U.S. at 445, 126 S. Ct. at 2594, or crossover districts, *Strickland*, 556 U.S. at 14, 129 S. Ct. at 1243.  These decisions make clear that the central concern of section 2 in redistricting is the creation of compact, majority-black districts where necessary to allow black voters an opportunity to elect their preferred candidates: "Nothing in § 2 grants special protection to a minority group's right to form political coalitions."  *Id.*  Second, the plaintiffs utterly failed to prove how the Legislature could have accomplished this task.  The plaintiffs again offered no evidence that the Legislature could have drawn more majority-black districts.  Reed testified at trial that a majority-black district ordinarily needs to be about 60 percent black to allow black voters to elect their candidate of choice, and he stated that sometimes the percentage may need to be closer to 65 percent.  And black legislators told the Committee at public hearings that majority-black districts ordinarily needed to have similar percentages of black voters.  But the plaintiffs failed to present any evidence of how the Legislature could have drawn, in a statewide plan, the same

number of majority-black districts with 60 or more percent black voters in those

districts with an overall deviation in population of 2 percent while still increasing the

number of influence or crossover districts.

4.  Even if the Plaintiffs Had Proved All Three *Gingles* Requirements or the Packing of
    Black Voters, the Totality of the Circumstances Does Not Support a Claim of Vote
    Dilution.

Even if the plaintiffs had proved all the *Gingles* requirements or the packing of

black voters, they still would have been required to prove that "the totality of the

facts, including those pointing to proportionality, showed that the new scheme would

deny minority voters equal political opportunity." *De Grandy*, 512 U.S. at 1013–14,

114 S. Ct. at 2658.  Relevant factors include the history of voting-related

discrimination in the State; the racial polarization of voting in the State; the extent to

which the State has used discriminatory voting practices to enhance the opportunity

for discrimination against the minority group; the extent to which minority group

members bear the effects of past discrimination in areas such as education,

employment, and health; the extent to which political campaigns have included overt

or subtle racial appeals; the extent to which members of the minority have been

elected to public office; the level of responsiveness of elected officials to the needs of

a minority group; and the proportionality of majority-minority districts.  *See League of*

*United Latin Am. Citizens*, 548 U.S. at 437, 126 S. Ct. at 2620; *Gingles*, 478 U.S. at 36–

37, 106 S. Ct. at 2759.

No one can deny the abhorrent history of racial and voting-related discrimination in Alabama.  The egregious practices of the past led to some of the landmark decisions in this area of law.  *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 84 S. Ct. 1362 (1964); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125 (1960).  For nearly 50 years, Alabama was subject to the preclearance requirement under section 5 of the Voting Rights Act.  *See Shelby Cnty., Ala. v. Holder*, --- U.S. ---, 133 S. Ct. 2612 (2013).

But that history of discrimination alone cannot establish that these particular Acts would deny minority voters equal political opportunity today.  Earlier this year, the Supreme Court declared the coverage formula in section 4 of the Voting Rights Act, which subjected Alabama to the preclearance requirement, to be unconstitutional because Congress had not made sufficient findings to support its conclusion that the preclearance requirement is still necessary in Alabama.  As the Supreme Court explained, "[v]oter turnout and registration rates now approach parity," "minority candidates hold office at unprecedented levels," and "[t]he tests and devices that blocked access to the ballot have been forbidden nationwide for over 40 years."  *See id.* at 2625 (internal quotation marks omitted).

We conclude that the totality of the circumstances does not support the conclusion that the Acts would deny black voters an equal opportunity to participate in the political process, and four factors weigh heavily in favor of our conclusion.  First, black voters in Alabama are highly politically active.  Second, black voters have successfully elected the candidates of their choice in the majority-black districts.

114

Third, the majority-black districts are roughly proportional to the black voting-age population in Alabama.  Fourth, the record contains no evidence of racial appeals in recent political campaigns or of a significant lack of responsiveness to the needs of the black population.

First, as the plaintiffs' own experts testified, black voters in Alabama are politically active and registered to vote in high numbers.  Lichtman testified that "[t]oday African American participation in elections in Alabama is at least comparable and likely above white participation."  (Ex. NPX 324, 20).  And Arrington agreed that "minority voters have become more likely to register and better mobilized," which informed his opinion that majority-black districts could be created with smaller percentages of blacks.  (Ex. NPX 323, 19–20).  Reed testified that the Alabama Democratic Conference, which is an organization dedicated to the improvement of political opportunities for black voters, is active across the State and endorses candidates in almost every race.  And Bernard Simelton testified that the Alabama Chapter of the National Association for the Advancement of Colored People has also worked to build coalitions around the State with Hispanics and Native American groups like the MOWA Band of Choctaw Indians to increase the political influence of black voters.

Second, black voters have successfully elected the candidates of their choice in the majority-black districts.  In the House of Representatives, all 27 of the majority-black House districts are represented by Democrats, and 26 of those 27 districts are

represented by black Democrats.  In the Senate, all of the majority-black Senate districts are represented by Democrats, and seven of those eight districts are represented by black Democrats.  (Ex. NPX 350, 60–62).  The Acts preserve and indeed increase the number of these majority-black districts.

Third, the majority-black districts are roughly proportional to the black voting-age population.  Blacks constitute 24.86 percent of the voting-age population in Alabama.  Under the Acts, 22.86 percent of the districts in the Senate will be majority-black districts and 26.67 percent of the districts in the House will be majority-black districts.  *See De Grandy*, 512 U.S. at 1020, 114 S. Ct. at 2661 ("[P]roportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization 'to participate in the political process and to elect representatives of their choice.'" (quoting 42 U.S.C. § 1973(b))).

Fourth, the record contains no evidence of racial appeals in recent political campaigns in Alabama or of a significant lack of responsiveness to the needs of blacks.  The plaintiffs introduced some testimony about a partisan campaign trick during the last election in which a conservative radio host announced that, because of staffing problems, Democrats should vote a day later than Republicans, but the record establishes that the Secretary of State immediately countered that misinformation.  There is no evidence that any state official was involved in the trick.  And the evidence establishes that the announcement was directed at Democratic voters generally, not minority voters.  The plaintiffs also introduced evidence that Jefferson

County recently closed Cooper Green, a hospital that served the indigent population in the County, many of whom are black, but the record establishes that Cooper Green had recently undergone extensive renovations before the fiscal crisis in the County led to its closure. And the plaintiffs introduced evidence that the Legislature has not been sensitive to the needs of the Hispanic population in Alabama, but that evidence is not relevant to the question whether the Legislature has been responsive to the needs of black voters.

Because the overwhelming evidence in the record suggests that black voters have an equal opportunity to participate in the political process the same as everyone else, we conclude that the totality of the circumstances would not support a claim of vote dilution even if the plaintiffs could establish the *Gingles* requirements.

### B. *Intentional Discrimination*

The plaintiffs next argue that the State defendants engaged in intentional discrimination on the basis of race when they drafted and adopted the new districts in violation of section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. The filings and arguments made by the plaintiffs on these claims were mystifying at best. The Black Caucus plaintiffs routinely cited decisions of the Supreme Court on claims of racial gerrymandering, but never identified which districts they alleged were racially gerrymandered and introduced little evidence to prove a discriminatory intent. The Democratic Conference plaintiffs referred to their claims as claims of racial gerrymandering, but alternated between discussions of

specific districts and the Acts as a whole and offered little guidance about how we should evaluate the Acts under strict scrutiny. We were presented with one set of plaintiffs who argued about discriminatory purpose and another set of plaintiffs who argued about strict scrutiny, but no set of plaintiffs who argued both.

We construe the filings as making three different claims based on intentional discrimination. First, we construe the filings of the Black Caucus plaintiffs and the Democratic Conference plaintiffs to argue that the Acts were promulgated for an invidious discriminatory purpose and have the effect of diluting minority voting strength. *See Vill. of Arlington Heights v. Metro. Hous. Dev't Corp.*, 429 U.S. 252, 264–65, 97 S. Ct. 555, 563 (1977). Second, we construe the filings of the Black Caucus plaintiffs and the Democratic Conference plaintiffs as arguing that the Acts as a whole constitute racial gerrymanders. *See Shaw v. Reno*, 509 U.S. 630, 642, 113 S. Ct. 2816, 2024 (1993). Third, we construe the filings of the Democratic Conference plaintiffs as also arguing that Senate Districts 7, 11, 22, and 26 constitute racial gerrymanders. *See id.* The Democratic Conference plaintiffs lack standing to maintain the claims of racial gerrymandering, and all the claims of intentional discrimination, in any event, fail on the merits.

### 1. The Plaintiffs Failed To Prove that the Acts Were Motivated by an Invidious Discriminatory Purpose.

The plaintiffs argue that the Acts not only result in the dilution of black voting strength in violation of section 2 of the Voting Rights Act, but were motivated by an

invidious discriminatory purpose, in violation of the Fourteenth and Fifteenth Amendments. Although the Supreme Court earlier interpreted section 2 of the Voting Rights Act to require proof of a discriminatory purpose, Congress later amended the statute to allow proof of only discriminatory results. *See Gingles*, 478 U.S. at 43, 106 S. Ct. at 2762. Congress created the results test by deleting the phrase "to deny or abridge" and replacing it with the following language: "in a manner which results in a denial or abridgement of." 42 U.S.C. § 1973(a) (amended 1982). In its amendments, Congress "dispositively reject[ed] the position of the plurality in *Mobile v. Bolden*, 446 U.S. 55, [100 S. Ct. 1490] (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters." *See Gingles*, 478 U.S. at 43-44, 106 S. Ct. at 2762-63. But insofar as section 2 still forbids purposeful discrimination, it should be interpreted consistently with the Fourteenth and Fifteenth Amendments, which require the plaintiffs to prove both that the redistricting plan was created with an invidious discriminatory purpose and that it results in the dilution of a minority's voting strength. *See Bolden*, 446 U.S. at 62–63, 100 S. Ct. at 1497; *see also Rogers v. Lodge*, 458 U.S. 613, 617, 102 S. Ct. 3272, 3276 (1982); *White v. Regester*, 412 U.S. 755, 765, 93 S. Ct. 2332, 2339 (1973).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. at 564.

"Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . But such cases are rare." *Id.*  When no such pattern emerges, we consider evidence such as "[t]he impact of the official action," "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and "[t]he legislative or administrative history." *See id.* at 266–68, 97 S. Ct. at 564–65.

Based on the application of the *Arlington Heights* factors, we conclude that an invidious discriminatory purpose was not a motivating factor in the creation of the Acts.  First, the impact of the Acts weighs against a finding of invidious discriminatory purpose because the Acts draw as many majority-black districts as possible within an overall deviation in population of 2 percent and leave many of the majority-black districts underpopulated.  Second, the historical background of the decision weighs against a finding of invidious discriminatory purpose because the Legislature used appropriate guidelines to fulfill its constitutional duty to redistrict itself without judicial intervention, contrary to the discriminatory failures to redistrict that mar the State's past.  Third, the sequence of events leading up to the enactment of the Acts weighs against a finding of an invidious discriminatory purpose because Senator Dial and Representative McClendon solicited and incorporated comments from the public and from their colleagues in the Legislature.  The Acts adopted large portions of maps provided to Senator Dial and Representative McClendon by black

legislators.  And the Committee developed the Acts in compliance with neutral districting principles including the preservation of the core of existing districts, the requirement of one person, one vote, and respect for communities of interest. Fourth, the Legislature did not depart from normal procedures to pass the Acts, but followed roughly the same procedures as had the Legislature in 2001 when it enacted the last districts.  Indeed, the Legislature improved upon those procedures:  the Committee held even more public hearings than had the Committee in 2001; the Committee solicited public comment before the plans were drafted so as to enable the public to have greater influence on the product; and the Legislature passed the Acts in a special session that complied with all normal legislative procedures.  Fifth, the record contains no contemporaneous statements made about the redistricting plan that suggest an invidious discriminatory purpose in the creation of the Acts; statements by Republicans that they desired to gain seats with the new districts speak to partisan, not racial, motives.

The Democratic Conference plaintiffs argue that the passage of the Acts in a special session suggests discriminatory intent, but we disagree.  The Democratic Conference plaintiffs identify several alleged procedural defects including the failure of the Legislature to redistrict itself in the first regular session after the census as required by the state constitution, the short notice for the final public hearing on the proposed districts, and the efforts of the Republicans to draft the districts behind closed doors.  But these facts do not evidence discriminatory intent.  The Legislature

has never redistricted itself in the first regular session, and the Legislature followed the precedent established in 2001 of drawing the districts in a special session.  Senator Dial explained that the Committee conducted the first 21 public hearings before the initial plans were completed to give the public a greater opportunity to comment, in contrast with the public hearings held in 2001 when the plans were presented as a fait accompli.  And the final hearing was held on short notice because of the short time left to pass the Acts in the special session.

The Democratic Conference plaintiffs also argue that the drawing of the district lines by Hinaman behind closed doors suggests an invidious racial purpose, but we disagree.  As the plaintiffs' own expert conceded, the party in power ordinarily drafts redistricting plans behind closed doors.  If anything, the record suggests that the Republicans were more open to discussion with the Democratic members of the Legislature than would be expected, particularly in the light of the Republican supermajority in each house.  Senator Dial and Representative McClendon offered to meet with all of their colleagues, and the record is clear that they met with both Republicans and Democrats and that they incorporated suggestions from Democratic legislators into the plans.  Even Hinaman, who contracted to assist the Republicans with the districts, worked on some boundary changes with Democratic representatives in the final week before the passage of the Acts.  No invidious racial purpose has been proved about this process.

The Black Caucus plaintiffs and the Democratic Conference plaintiffs also argued that the Acts were the product of a grand Republican strategy to make the Democratic Party the "black party" and the Republican Party the "white party," but the record does not support that theory.  Senator Dial and Representative McClendon credibly testified that they had never heard of such a strategy, had no personal interest in any such strategy, and did not even discuss the reapportionment process with the Republican National Committee.  And the documentary evidence establishes that the Committee adopted the guidelines for reapportionment before Hinaman arrived to help the Republican leadership draft the new lines and that the only paperwork that Senator Dial and Representative McClendon received from the national party involved election returns and district statistics.  The record contains no evidence that the Alabama Republican Party is engaged in any grand strategy to eliminate white Democrats.

### 2.  We Reject the Plaintiffs' Claims of Racial Gerrymandering.

A claim of racial gerrymandering is "analytically distinct from a vote dilution claim." *Miller v. Johnson*, 515 U.S. 900, 911, 115 S. Ct. 2475, 2485 (1995).  "Whereas a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities, an action disadvantaging voters of a particular race, the essence of the equal protection claim [for racial gerrymandering] is that the State has used race as a basis for separating voters into districts." *Id.*  The Supreme Court first recognized this

equal protection claim in *Shaw*, in which the Court explained that the segregation of races of citizens into different voting districts violates not only the Fifteenth Amendment, as it had previously determined in *Gomillion v. Lightfoot*, 364 U.S. 339, 342–48, 81 S. Ct. 125, 127–30 (1960), but also the Equal Protection Clause of the Fourteenth Amendment.  *See Shaw*, 509 U.S. at 645, 113 S. Ct. at 2826.

### a.  The Black Caucus Plaintiffs Have Standing To Maintain Claims of Racial Gerrymandering Against the Acts as a Whole, but the Democratic Conference Plaintiffs Do Not.

We must decide whether the plaintiffs in each action have standing to challenge the Acts as racial gerrymanders, and "the irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992).  "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *United States v. Hays*, 515 U.S. 737, 742–43, 115 S. Ct. 2431, 2435 (1995).

The Supreme Court has explained that "[d]emonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to discern why a particular citizen was put in one district or another."  *Id.* at 744, 115 S. Ct. at 2436.  "Only those citizens able to

allege injury as a direct result of having *personally* been denied equal treatment may bring a challenge [of racial gerrymandering to a redistricting Act as a whole], and citizens who do so carry the burden of proving their standing, as well as their case on the merits." *Id.* at 746, 115 S. Ct. at 2437.  A citizen who files a claim of racial gerrymandering about a particular district will meet the requirement of personal injury when that plaintiff resides in the district that he alleges was the product of a racial gerrymander. *Id.* at 744–45, 115 S. Ct. at 2436.  But "where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745, 115 S. Ct. at 2436.

The Alabama Legislative Black Caucus has organizational standing to maintain its claim of racial gerrymandering because its members reside in nearly every challenged district.  Ordinarily, "[a]n association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 169, 120 S. Ct. 693, 697 (2000).  The parties stipulated that the Alabama Legislative Black Caucus is "composed of every African-American member of the House and Senate." (Doc. 182, 10).  The State defendants submitted a list of each house representative that

includes the legislator's party and race.  (Ex. SDX 459, 1470–72).  According to that

list, 26 black Democrats are currently incumbents in House districts drawn under the

2001 plan.  All black incumbents remain residents of their current House districts

under the new House plan because the Legislature was mostly successful in avoiding

incumbent conflicts when drawing the new districts.  There was an incumbent conflict

in House District 60 until the recent death of Representative Newton.  All 26

incumbents are members of the Alabama Legislative Black Caucus and, as individual

voters, would have standing to maintain a claim of racial gerrymandering because they

are, by necessity, residents of the districts they represent.  There is not a

corresponding list of each senator that includes the legislator's party and race, but

Senator Smitherman, Senator Ross, and Senator Figures are black incumbents who

testified at trial about how the new senate plan affected their senate districts.  Because

the Legislature avoided all incumbent conflicts in the new Senate districts, these

senators are residents of the new districts and would have standing as voters to

maintain a claim of racial gerrymandering.  Like the 26 representatives, all black

senators are also members of the Alabama Legislative Black Caucus.  The black

legislators represent the majority-black House and Senate districts that are the subject

of the racial gerrymandering claim.  A claim of racial gerrymandering is germane to

the purpose of the Alabama Legislative Black Caucus, an unincorporated political

organization of African Americans elected to the Alabama Legislature, and the

Alabama Legislative Black Caucus represents voters whose rights to equal protection

of law would be violated by redistricting plans that constitute a racial gerrymander. And their claim for injunctive relief does not require the participation of individual plaintiffs. Because we hold that the Alabama Legislative Black Caucus has organizational standing, we need not decide whether the Alabama Association of Black County Officials or any of its members have standing.

The Democratic Conference plaintiffs, on the other hand, have not met their burden to establish standing to bring a claim of racial gerrymandering to the Acts as a whole. The record does not clearly identify the districts in which the individual members of the Alabama Democratic Conference reside under the Acts. Without that testimony, we cannot determine whether the plaintiffs were personally subjected to any racial classification when they were assigned to their districts. And the Alabama Democratic Conference similarly offered no specific evidence that any of its members were subjected to a racial classification.

### b. We Dismiss the District-Specific Claims of Racial Gerrymandering Filed by the Democratic Conference Plaintiffs for Lack of Standing.

We construe the filings of the Democratic Conference plaintiffs also to present district-specific racial gerrymandering challenges to Senate Districts 7, 11, 22, and 26 under Act 603. But the Democratic Conference plaintiffs have not proved that they have standing to bring any of these claims. The Alabama Democratic Conference presented insufficient evidence that it has members who reside in these districts. And the individual Democratic Conference plaintiffs presented insufficient evidence that

they reside in these districts or were otherwise personally subjected to a racial classification during the districting process.

The Alabama Democratic Conference has not proved that it has members who would have standing to pursue any district-specific claims of racial gerrymandering. At trial, Reed testified on behalf of the Conference that it has members in almost every county in Alabama, but the counties in Alabama are split into many districts. The Conference offered no testimony or evidence that it has members in all of the districts in Alabama or in any of the specific districts that it challenged in this matter. Because we cannot conclude, based on the evidence in the record, that the Alabama Democratic Conference has members who would have standing to bring the district-specific claims of racial gerrymandering in their own right, we must dismiss those claims for lack of standing.

And the individual Democratic Conference plaintiffs have failed to prove that they have standing to bring any district-specific claims of racial gerrymandering. None of the individual plaintiffs testified that he or she will reside in any of those districts under the Acts. The parties agree that Toussaint is a registered voter in Madison County, and the record suggests that she voted in the former Senate District 7. (Doc. 176, 15). But the record contains no evidence of her Senate district under the new map. The parties agree that Weaver is a registered voter in Washington County who votes in the former Senate District 22, (Doc. 176, 15), but the record is silent about his assignment to a district under the Acts, (Trial Tr. vol. 4, 44–45, Aug.

13, 2013).  And the parties agree that Pettway is a registered voter in Montgomery County in the former House District 73, (Doc. 176, 15), but the record contains no evidence about either the Senate district where he currently votes or the Senate district where he would vote under the new Acts.  None of the individual Democratic Conference plaintiffs reside in Senate District 11.

c.  Even if All the Plaintiffs Had Standing To Assert Their Claims of Racial Gerrymandering, Those Claims Would Fail Because Race Was Not the Predominant Motivating Factor in the Creation of the Districts.

Even if all the plaintiffs could establish that they have standing to bring their claims of racial gerrymandering, the claims would fail.  Race was not the predominant motivating factor for the Acts as a whole.  And race was not the predominant motivating factor for drawing Senate Districts 7, 11, 22, or 26.

"Electoral district lines are facially race neutral, so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of classification based explicitly on race."  *Vera*, 517 U.S. at 958, 116 S. Ct. at 1951 (internal quotation marks omitted).  On its face, "[a] reapportionment statute typically does not classify persons at all; it classifies tracts of land, or addresses."  *Shaw*, 509 U.S. at 646, 113 S. Ct. at 2826.  And "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race.  Nor does it apply to all cases of intentional creation of majority-minority districts."  *Vera*, 517 U.S. at 958, 116 S. Ct. at 1951.  But strict scrutiny will apply when a state has subordinated traditional, legitimate districting principles to race, so that race was the predominant factor

motivating the decision of the Legislature. *See id.* And when strict scrutiny is invoked, the State must establish that its districting legislation is narrowly tailored to achieve a compelling interest. *Id.*

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915, 115 S. Ct. at 2489. "The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Id.* at 915–16. Only when race is the "*predominant* factor motivating the legislature's redistricting decision" will strict scrutiny apply. *Vera*, 517 U.S. at 959, 116 S. Ct. at 1952. "The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916, 115 S. Ct. at 2489.

### i.   The Acts

When the Legislature undertook the task of drawing the new House and Senate districts after the 2010 Census, the main priority of the Legislature was to comply with the constitutional mandate of one person, one vote. To accomplish this task, the Reapportionment Committee selected a guideline of an overall deviation in population of plus or minus 1 percent, and the Legislature applied this guideline of an

overall deviation of 2 percent to every district before satisfying any other redistricting principles.  The guidelines adopted by the Reapportionment Committee and the consistent testimony of Senator Dial, Representative McClendon, and Hinaman establish that the Legislature also considered race when required by federal law: the Legislature sought to comply with sections 2 and 5 of the Voting Rights Act by preserving—and, in the House, increasing—the majority-black districts and by not substantially reducing the percentage of black persons in those districts.  But the guidelines and the consistent testimony of Senator Dial, Representative McClendon, and Hinaman proved that the State followed the guideline of an overall deviation of 2 percent, without exception, and then applied the following neutral redistricting principles when feasible: to preserve the core of existing districts; to avoid incumbent conflicts; to draw compact and contiguous districts; and to appease incumbents by accommodating their preferences whenever possible.  Finally, the Legislature considered partisan data to preserve the Republican supermajority in the Legislature. "The record does not reflect a history of *purely* race-based districting revisions." *Vera*, 517 U.S. at 959, 116 S. Ct. at 1952 (internal quotation marks omitted).

Although race was a factor in the creation of the districts, we find that the Legislature did not subordinate traditional, race-neutral districting principles to race-based considerations.  The Legislature did not create majority-black districts for the first time nor aim to increase or decrease the percentage of the black populations within the majority-black districts, most of which remained in the same geographic

areas.  The 2010 Census revealed relatively modest growth of the black population in Alabama from 2000 to 2010.  (Ex. NPX 325; Ex. NPX 326).  But the concentrations of the black population had declined in some areas and shifted in other areas, leaving all majority-black districts significantly underpopulated.  And the Legislature moved districts to correspond with population growth and to comply with the overall deviation in population of 2 percent.  The Legislature moved House District 53, a majority-black district, from Jefferson County, where there were several severely underpopulated majority-black districts, to Madison County, where the black population had increased and where a new, compact majority-black district could be drawn instead.  The Legislature moved House District 73, which had never been a majority-black district, from Montgomery County, another area with underpopulated majority-black districts, to Shelby County, an area with severely overpopulated majority-white districts.  Above all, the Legislature followed a lower overall deviation in population to create more equality among districts throughout the State.

As it corrected the malapportionment of the districts, the Legislature avoided reducing significantly the proportion of black persons in each majority-black district, but it followed no bright-line rule.  The Legislature reduced the percentage of black persons in majority-black districts where necessary to achieve other objectives.  The Legislature maintained the cores of existing districts, made districts more compact where possible, kept almost all of the incumbents within their districts, and respected communities of interest where possible.  The new districts are not so "bizarre on

[their] face that [they are] unexplainable on grounds other than race," *Shaw*, 509 U.S. at 644, 113 S. Ct. at 644 (internal citations omitted), nor were they approved after the Department of Justice had rejected two previous redistricting plans under a "max-black" plan, *Miller*, 515 U.S. at 907, 115 S. Ct. at 2484, nor is there "overwhelming evidence that the shape[s] [of the districts were] essentially dictated by racial considerations of one form or another," *Vera*, 517 U.S. at 973, 116 S. Ct. at 1958. We find that the Legislature was not predominantly motivated by racial considerations when it adopted the new districts.

When the Legislature adopted a guideline for less deviation in population equality, it reduced, from the outset, its ability to pack voters for any discriminatory purpose, whether partisan or racial. After the 2000 Census, the Legislature adopted an overall deviation of 10 percent and systematically underpopulated majority-black districts at the expense of majority-white districts that the Legislature, in turn, overpopulated. When the Legislature, after the 2010 Census, adopted a guideline that required a smaller deviation in population equality, it reduced the potential for this kind of discrimination, whether in favor of or against a racial minority. Had the Legislature intended to pack black voters in majority-black districts, after the 2010 Census, the Legislature could have adopted, as before, a guideline that allowed more population inequality and then overpopulated the majority-black districts. But the Legislature did the opposite: it adopted a guideline for greater population equality and slightly underpopulated the vast majority of the majority-black districts. And the

guideline for greater population equality limited the ability of the drawer of the district lines, Hinaman, to place more voters of any kind into a particular district.

With a tighter guideline for population equality, geography also limited the potential for discrimination. Voters are not fungible commodities that can be moved anywhere in a state. Hinaman took population concentrations, including racial groups tied to particular geographical locations, as fixed numbers for purposes of drawing the new districts. Hinaman used existing House and Senate districts to draw the new district lines, and his choice of which voters to add or subtract from each district was limited by which populations abutted the existing districts. Hinaman also could not abandon the previous district lines without invariably creating more incumbent conflicts and disrupting communities of interest.

Above all, the guideline for greater population equality eliminated the partisan gerrymander that existed in the former districts. Indeed, this fact explains why both the Black Caucus plaintiffs and the Democratic Conference plaintiffs have challenged the use of an overall deviation in population of 2 percent throughout this litigation and have refused to offer into evidence an alternative statewide plan for redistricting that conforms to this guideline. Although the plaintiffs have argued that this guideline contributed to a racial discriminatory purpose in the design of the new districts, the plaintiffs have advanced that losing argument precisely because they have recognized all along that this guideline eliminates the partisan advantage that the plaintiffs created and enjoyed in the former districting plan.

134

Our dissenting colleague contends that the Legislature created a "racial quota" for the majority-black districts. He laces his dissenting opinion with myriad uses of the loaded term "quota," but the record, taken as a whole, establishes that the Legislature employed no quota.

Hinaman balanced and satisfied five lawful objectives with respect to the majority-black districts. First, to comply with the guarantee of one person, one vote and avoid litigation of the kind that occurred in *Larios*, Hinaman repopulated the majority-black districts, all of which were underpopulated, and brought them within the guideline for population equality. Second, to comply with sections 2 and 5 of the Voting Rights Act, Hinaman maintained the same number of majority-black districts. A decade earlier, the plaintiffs who served as Democratic leaders in the Legislature did the same thing when they drew new district lines, and the plaintiffs do not contend that Hinaman should have done otherwise in 2012. Third, to comply with section 5, Hinaman avoided a significant reduction in the percentages of black voters in the majority-black districts that he preserved. Again, a decade earlier, several of the plaintiffs did the same thing, but now they contend that Hinaman was wrong to do so. Fourth, to assist the passage of the redistricting plan in the Legislature, Hinaman avoided, as much as possible, the placement of more than one incumbent legislator in each district. And fifth, to preserve communities of interest, Hinaman preserved, as much as possible, the core of each existing district. As he had done before for both

the federal judiciary and the Legislature in earlier cycles of redistricting, Hinaman ably balanced all these objectives and avoided the pitfalls of racial gerrymandering.

Our dissenting colleague relies on testimony by Senator Dial, Representative McClendon, and Hinaman as proof that race predominated over other considerations in drawing the majority-black districts, but the record establishes that the drafters of the new districts, above all, had to correct the severe malapportionment that inevitably followed the partisan gerrymander of the previous districts.  Senator Dial, for example, testified about redistricting in Jefferson County and explained that the majority-black districts were expanded because they were underpopulated.  (Trial Tr. vol. 1, 112–13, Aug. 8, 2013).  Senator Dial testified that "[e]very minority district in this state had lost population and had to grow."  (Trial Tr. vol. 1, 35, Aug. 8, 2013). He described the need for majority-black districts to comply with the guideline of an overall deviation of 2 percent as the need "to grow," and he repeated that phrase several times during his testimony.  (Trial Tr. vol. 1, 36, Aug. 8, 2013) ("[Senator Sanders] realized his district had to grow . . . he gave me some instructions on how he thought his district should grow."); *id.* at 37; *id.* at 41 ("[Senator Figures's] district had to grow also."); *id.* at 44; *id.* at 47 ("Senator Bobby Singleton's district . . . also had to grow."); *id.* at 48; *id.* at 55 ("I did not consider any [black percentage] too high, based on what – the plus or minus variance and the fact that the districts had to grow proportionately."); *id.* at 69; *id.* at 109 ("I kn[e]w that the Jefferson County having to grow would affect the other areas."); *id.* at 110 ("I had the numbers of Senator

Smitherman's district and how many he had to grow.  I knew how many Senator Dunn had to grow and I knew how many that Senator Coleman had to grow."); *id.* at 133; *id.* at 141 ("[Senator Beasley's] district is basically a minority district and had to grow.").  Senator Dial further explained, "My goal was, based on what had happened in prior reapportionments, to not retrogress the minority districts in this state.  All of them had to grow by population.  And if they grew in population, they had to grow in the same percentage that they already have and not retrogress that district."  (Trial Tr. vol. 1, 79, Aug. 8, 2013).  And it makes sense that the "first qualification" after meeting the guideline of an overall deviation of 2 percent was not to retrogress minority districts when repopulating them.  Representative McClendon's testimony reflects the same understanding that Senator Dial expressed.  Immediately before acknowledging that approval by the Department of Justice was a priority, Representative McClendon explained that the overall deviation of 2 percent "just makes good sense to me."  (Trial Tr. vol. 3, 220, Aug. 12, 2013).  Although Hinaman testified that he "was concerned [that percentages of the black population significantly lower than the 2001 plans would be considered] retrogression that would be looked upon unfavorably by the Justice Department under Section 5," he also testified that "all [the majority-black districts were] underpopulated [in] comparison to ideal [when he began work on them], and [he] had to find population to repopulate them."  (Trial Tr. vol. 3, 145, 122, Aug. 12, 2013).  Hinaman explained, "When I was adding population to majority black districts, my goal was not to retrogress the number that

137

they had in 2001, meaning 2010 Census, as applied to the 2001 lines." (Trial Tr. vol. 3, 142, Aug. 12, 2013). Hinaman's concern about retrogression arose only in conjunction with the need to remedy the malapportionment of the majority-black districts and satisfy the guideline of an overall deviation in population of 2 percent.

The trial testimony of Senator Dial, Representative McClendon, and Hinaman, taken on whole, establishes that the primary reason they added population to majority-black districts was because those districts were severely underpopulated. What population was added to a particular district was then informed by other considerations, including avoiding retrogression and dilution of minority votes. The Committee established the 2 percent guideline as the nonnegotiable baseline for redistricting, and Hinaman satisfied that guideline in every district. And the percentage of black population in many majority-black districts decreased, which supports the inference that Hinaman subordinated racial considerations to the guideline of an overall deviation in population of 2 percent.

Our dissenting colleague faults the Legislature for adding over 120,000 black people to the majority-black House districts, which he states represents "19.7 % of the black people in the State of Alabama who did not already live in a majority-black House District," but these skewed statistics do not tell the whole story. After the 2010 Census, every majority-black House District was underpopulated, and many were grossly underpopulated. That problem came about as a result of the partisan gerrymander designed by the Democrat-controlled Legislature a decade earlier. The

Legislature had to add large populations to these gerrymandered districts to comply with the constitutional guarantee of one person, one vote. To avoid a potential violation of section 5 of the Voting Rights Act, Hinaman also added enough contiguous black populations to maintain the same relative percentages of black populations in the majority-black districts. Of course, the Legislature 10 years earlier, led by many of the plaintiffs in this litigation, had done the same thing. To accomplish these tasks in this redistricting cycle, Hinaman moved only 9.8 percent of the total black population in the State of Alabama into the majority-black House districts, which means that more than 90 percent of the total black population remained in the same kind of district where they had resided earlier. And had the Legislature in 2001 complied with an overall deviation of 2 percent like Hinaman did, it would have needed to move 6.6 percent of the total black population in the State of Alabama into the same majority-black House districts instead of only the 5.4 percent it moved to comply with its more lenient overall population deviation of 10 percent.

We agree with our dissenting colleague that all districting principles were subordinated to a single consideration, but our dissenting colleague identifies the wrong one. Our dissenting colleague asserts that race predominated over every other districting principle, but the consistent testimony of Senator Dial, Representative McClendon, and Hinaman established that the constitutional requirement of one person, one vote trumped every other districting principle. Each district in both houses satisfies the guideline of an overall deviation in population of 2 percent. To

comply with that guideline, Hinaman had to repopulate severely underpopulated majority-black districts and depopulate severely overpopulated majority-white districts. While accomplishing this primary task, Hinaman also tried to satisfy sections 2 and 5 of the Voting Rights Act. Our dissenting colleague discounts Hinaman's paramount commitment to population equality and instead faults a few majority-black districts and several precinct splits as examples that the drafters employed a "rigid quota."

Our dissenting colleague, for example, contends that the Legislature gerrymandered Senate District 26 by sifting black voters, but the record proves otherwise. Under the 2001 plan, Senate District 26 covered an expansive area, including the majority of Montgomery County. (Trial Tr. vol. 3, 122, Aug. 12, 2013; Ex. SDX 477). In 2010, District 26 was underpopulated by 11.64 percent and was 72.75 percent black in total population. (Ex. NPX 340; Ex. APX 7). To comply with the 2 percent guideline, Hinaman added portions of Senate District 25 that were located in the City of Montgomery to repopulate District 26 and to maintain roughly the same black percentage of the total population. (Trial Tr. vol. 3, 129–130, Aug. 12, 2013). Hinaman also reassigned to Senate District 25 the largely white rural population in the southeast corner of Montgomery County. (Trial Tr. vol. 3, 128–129, Aug. 12, 2013). This decision increased the total black population in Senate District 26 to 75.22 percent, which is an unremarkable 2.44 percent difference. (Ex. APX 7). Our dissenting colleague points to this slight increase as proof that black

voters were gerrymandered into District 26 because it is over 70 percent black.  But

Senate District 26 has historically been over 70 percent black:  in 1993, District 26 was

70.34 percent black in total population, (Ex. NPX 310, 12); in 2001, District 26 was

71.51 percent black in total population, (Ex. NPX 310, 12); and in 2010, District 26

was 72.75 percent black in total population and 70.87 percent black in voting-age

population, (Ex. APX 7).  This slow, slight percentage increase of the black

population in District 26 does not evidence gerrymandering of black voters; instead, it

evidences consistent concentrations of black population in the City of Montgomery.

Our dissenting colleague also declares that "the resulting district is not compact," but

the exhibit he cites as evidence supports the opposite finding.  District 26 is far more

compact under the new plan than under the 2001 plan.  The district is concentrated in

the urban northeast corner of Montgomery County where the City of Montgomery

lies instead of stretching across the entire county to envelop sparsely populated rural

precincts.  (Ex. SDX 476).  Communities of interest in that district have been

strengthened, the percentage of the black total population has remained relatively

constant, and District 26 is now underpopulated by only .08 percent.  (Ex. SDX 400).

Our dissenting colleague also contends that Hinaman "hunted" for additional

black populations throughout Alabama, but the record again shows otherwise.  For

example, the percentage of the black total population of House District 19 decreased

substantially under the new plan.  In 2001, District 19 was 66.039 percent black in

total population.  (Ex. SDX 403; Ex. NPX 310).  In 2010, it had increased to 70.04

percent black in total population and was underpopulated by 6.9 percent. (Ex. APX
6; Ex. SDX 406). Under the new plan, District 19 is now 61.5 percent black in total
population, and it remains underpopulated by .97 percent. (Ex. APX 6; Ex. SDX
403). The record provides many other examples: Hinaman reduced the percentage of
black total population from 65.848 to 60.1 in House District 52; from 64.445 to 56.2
in House District 53; from 63.276 to 56.9 in House District 54; from 69.677 to 67
percent in House District 77; from 72.697 to 70.2 in House District 78; from 61.214
to 57.7 in House District 83; from 64.738 to 60.8 in House District 97; from 64.448 to
60 in House District 98; from 66.685 to 59.12 in Senate District 18; from 66.227 to
65.39 in Senate District 19; and from 65.697 to 63.38 in Senate District 20.

    Our dissenting colleague cites no credible evidence for his assertion that
"Hinaman split … precincts largely along racial lines statewide." He cites the
Democratic Conference plaintiffs' exhibit 357, which is a map of Alabama divided by
counties with yellow highlighted areas that represent precinct splits under the Acts.
(Ex. NPX 357). Majority-black districts do not overlay this map to show the reader
which districts experienced precinct splitting nor does our dissenting colleague point
to any testimony at trial that majority-black districts incurred more precinct splits.
Indeed, exhibit 357 shows high concentrations of precinct splitting in 26 counties
composed *exclusively* of majority-white House and Senate districts, including Blount,
Calhoun, Chambers, Chilton, Clay, Cleburne, Coffee, Colbert, Coosa, Cullman, Dale,
Dekalb, Escambia, Etowah, Franklin, Houston, Jackson, Lauderdale, Limestone,

Marion, Marshall, Morgan, Shelby, St. Clair, Walker, and Winston Counties. (Ex. NPX 357). Admittedly, precinct splitting occurred in 24 counties that *include* majority-black districts, such as Autauga, Baldwin, Bibb, Choctaw, Clarke, Conecuh, Elmore, Greene, Hale, Jefferson, Lee, Madison, Marengo, Mobile, Monroe, Montgomery, Perry, Pickens, Russell, Sumter, Talladega, Tallapoosa, Tuscaloosa, and Washington Counties. (Ex. NPX 357). But the precinct splits that occurred in some of these counties, like Baldwin, were predominately in the majority-white districts. The map also shows that the Legislature split *zero* precincts in the majority-black counties of Dallas (69.4 percent), Wilcox (72.5 percent), Lowndes (73.5 percent), Bullock (70.2 percent), and Macon (82.6 percent). U.S. Census Bureau, *Census Data Mapper*, (Oct. 18, 2013, 9:12 AM), http://tigerweb.geo.census.gov/datamapper/map.html. It is impossible to determine accurately where the majority of precinct splits occurred based on exhibit 357, and the exhibit does not support the inference that race motivated Hinaman's decision to split any particular precinct. The map, at best, tells the reader that precinct splits occurred throughout the State.

Our dissenting colleague does not cite other documentary evidence for support of his assertion that majority-black districts suffered the brunt of the precinct splits, even though the parties jointly submitted two charts that detail each House and Senate precinct split. The charts show the reader nothing about an improper intent of the Legislature. (Ex. CE 40, CE 41). These charts are over 325 pages long; surely, if the Legislature acted with a racially discriminatory purpose when splitting precincts,

143

the charts would reveal it.  (Ex. CE 40, CE 41).  But the charts emphasize one point: precinct splits occurred with no discernible pattern.  The House and Senate have a total of 3,487 precincts, (Ex. CE 40; Ex. CE 41), and the Legislature split 1,287 of those precincts, (Ex. CE 40; EX. CE 41).  Precinct populations range from 0 people in several precincts to 44,728 in the Auburn Precinct in House District 79.  (Ex. CE 41, 167).  House districts contain as few as three precincts and as many as 81 precincts, and Senate districts contain as few as 10 precincts and as many as 108 precincts.  (Ex. CE 40, 41).  In the House, the Legislature split 44.2 percent of all precincts, 39 percent of majority-white precincts, and 57 percent of majority-black precincts.  (Ex. CE 41).  In the Senate, the Legislature split 25.4 percent of all precincts, 26 percent of majority-white precincts, and 23 percent of majority-black precincts.  (Ex. CE 40).  And the racial composition of the precincts varies.  The Dodge City Precinct in House District 12 has 1,415 white people and 5 black people; the McIntyre Precinct in House District 78 has 52 white people and 2,178 black people; and the Loosier Precinct in Senate District 4 has 590 white people and 2 black people.  (Ex. CE 41, 166, 24; Ex. CE 40, 10).  Our dissenting colleague does not point to specific precinct splits as evidence of a racially discriminatory purpose, and he cannot do so because the plaintiffs did not introduce evidence of the demographic data relevant to each split.  The vast amount of information located in the two charts confirms that nothing can be derived about the intent of the Legislature from the precinct splits.

Our dissenting colleague finds persuasive Cooper's testimony that, "[i]f the only concerns were maintaining 27 majority black districts and achieving a plus or minus 1 percent deviation, you wouldn't need to split anywhere near that many precincts," but Cooper failed to support this statement with any specific evidence nor did he submit to plaintiffs' counsel a map that complies with the guideline of an overall deviation of 2 percent and splits fewer precincts. (Trial Tr. vol. 2, 105, Aug. 9, 2013). Cooper testified that, although he had drawn a plan that conformed to the guideline of an overall deviation of 2 percent, he could not recall how many precinct splits that plan created. (Trial Tr. vol. 2, 85–86, Aug. 9, 2013). Cooper admitted that he "know[s] there were lots of county splits and lots of precinct splits" under the 2001 plan, (Trial Tr. vol. 2, 70, Aug. 9, 2013), and Reed confirmed that "there are going to be some precincts split. There are going to be some split, however you do it," (Trial Tr. vol. 2, 172, Aug. 9, 2013).

Hinaman split many precincts to comply with the guideline of an overall deviation in population of 2 percent. When asked why he would split a voting precinct, Hinaman replied, "I guess the categories for splitting a voting precinct would be for the creation of a black [m]ajority district, for not retrogressing a black [m]ajority district, for deviation *obviously because you had to get to plus or minus 1 percent*. Those would be the normal reasons." (emphasis added). (Ex. APX 75, 117–118). This testimony explains why precinct splitting occurred often in counties with only

145

majority-white districts, and it suggests that at least some of the precinct splits in majority-black districts also were attributable to the 2 percent guideline.

Hinaman honored requests from incumbents too, even when it meant splitting precincts. For example, Hinaman moved 12 people in Greene County from House District 71 and relocated them in House District 61 at the request of Representative Harper who owned a home in Greene County. (Trial Tr. vol. 3, 151, Aug. 12, 2013; Ex. APX 75, 66-67). To accommodate Harper's request, Hinaman had to split two precincts on the border of those two districts, but that split was not motivated by race. Hinaman also adopted in large part Senator Smitherman's proposed plans for Senate Districts 18, 19, and 20 in the Birmingham area. (Ex. APX 68, 3). Hinaman testified that Senator Smitherman's "map did not include any demographic information with it, but . . . I saw that the black population in the proposed new districts was about the same percentage as in the old districts. That map also split a number of precincts, which I input into the draft plan as they came to me." (Ex. APX 68, 3). Hinaman estimated that he incorporated 90 to 95 percent of Senator Smitherman's map into the Senate plan. (Ex. APX 68, 3).

Taken as a whole, Hinaman's testimony confirms that race was not the predominant motivating factor in precinct splitting. And, even where it occurred, precinct splitting was less of an evil to be avoided in redistricting than the subordination of other redistricting criteria, such as compliance with the Constitution and the Voting Rights Act. *See Larios*, 314 F. Supp. 2d at 1360 (stating that traditional

146

districting principles "of *compactness, contiguity, minimizing the splits of counties, municipalities, and precincts, and recognizing communities of interest*" were secondary to ensuring compliance with the Constitution and the Voting Rights Act) (emphasis in original); Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7471-01 (explaining that "compliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain redistricting criteria," such as precinct splitting, "to avoid retrogression").

Our dissenting colleague also fails to highlight several notable statistics that undermine his argument about racial gerrymandering.  First, he observes that "[s]even house districts and three senate districts have an even higher percentage of black population than before," but the more informative statistics are that 13 House districts and 3 Senate districts have lower percentages of black populations than before.  (Ex. SDX 403; Ex. NPX 310).  Second, our dissenting colleague asserts that incumbency protection was subordinated in favor of race-based decisions, but he ignores the undisputed facts that Hinaman avoided all incumbency conflicts in the Senate and permitted only two conflicts in the House.  Neither of those House conflicts remains because afterward Representative Newton died and Representative Hubbard moved his residence.  Third, our dissenting colleague cites the number of majority-black House and Senate districts that are "within one percentage point of the goal of maintaining the same percentage of black residents," but he fails to mention that there are 5 majority-black House districts below 60 percent under the new plan in

147

contrast with only 2 majority-black House districts below 60 percent under the 2001 plan and only 1 majority-black House district below 60 percent under the 1993 plan. (Ex. SDX 403; Ex. NPX 310).

The Black Caucus plaintiffs argue that the percentages of black populations in the majority-black districts evidence that race was the predominant factor when the Legislature drew the new House and Senate plans, even though these percentages closely resemble the percentages that the Black Caucus endorsed and helped to enact into law only a decennial census ago. Our dissenting colleague joins their lament and expresses frustration with the "high percentages" of the black population in the majority-black districts although he acknowledges that "conditions 30 years ago or 20 years ago or even a decade ago (in or around 2001) may have justified" them. These arguments beg a question: what has changed in the last few years to support the conclusion, from the perspective of the Black Caucus plaintiffs, that the new majority-black districts are unconstitutional when the old majority-black districts were constitutional? The answer is simple: the Republicans now control the Legislature instead of the Democrats.

Our dissenting colleague states that "it appears that the only racial dynamic at play in Alabama's plans is that the white members of the Alabama legislature, and the white ones alone, have expressly and specifically targeted black legislators and the members of their districts for difference in treatment solely because of the race of those legislators and over those black legislators vocal objections," but our dissenting

colleague ignores the stronger evidence that partisanship explains what happened here.  As in the last round of redistricting, the vote to approve the new districts fell on party lines, not racial lines.  Republicans, with supermajorities in both houses of the Legislature, voted together in favor of the new districts.  White Democrats voted with black Democrats against the new districts.  At trial, three white Democrats testified in support of the plaintiffs' complaints: Senator Tammy Irons, Senator Marc Keahey, and Representative Joe Hubbard.  In 2001, when Democrats controlled the Legislature, they created a partisan gerrymander that substantially underpopulated majority-black districts and maintained the same relative percentages of black population in those districts.  But in 2012, the same Democratic leaders filed these actions to complain that it was wrong for the Republicans to demand greater population equality among districts while maintaining the same relative percentages of black population in the majority-black districts.  The Democratic leaders complain about maintaining the relative percentages of black population in districts they designed even after the voters of these districts elected these very Democratic leaders.  The Democratic leaders complain of racial unfairness even though black legislators—Senator Rodger Smitherman and Representative Thad McClammy—helped draw the new lines for the majority-black districts.  They complain of racial unfairness after they told Senator Dial and Representative McClendon in public hearings that the majority-black districts needed to be at least 60 percent black.  They complain of racial unfairness even though they presented testimony at trial from Dr. Joe Reed, the dean

of redistricting in Alabama, that the majority-black districts ordinarily should be 60 percent black and sometimes 65 percent black. To suggest that race is the only dynamic at play here is absurd.

We also reject our dissenting colleague's comparison of this controversy to the landmark decision in *Gomillion*. These consolidated actions challenge district lines that preserve majority-black districts in the Legislature that several of the plaintiffs helped create, and the redistricting Acts maintain an unprecedented level of population equality for those districts. Let us not forget too that the Attorney General of the United States precleared these new districts. This political landscape offers no parallel to the nakedly racist decision of the Alabama Legislature in 1957 to alter the municipal boundaries of Tuskegee "from a square to an uncouth twenty-eight-sided figure" so as "to remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident." *Gomillion*, 364 U.S. at 340–41, 81 S.Ct. at 126–27. Our colleague compares the plight of Senator Figures, the Democratic leader of the Alabama Senate, with the discrimination against Dr. Gomillion, but Senator Figures voted for majority-black districts with similar percentages of black voters a decade ago. And her vote supported a partisan gerrymander that deliberately discriminated against Republican voters. Now that Senator Figures has had her political power diminished by the voters of Alabama, in an election conducted with the districts that favored her party, she seeks to have this Court enter the partisan fray and change the rules for redistricting for her future

political benefit.  Her position of diminished, though substantial, political power looks nothing like the disenfranchised status of Dr. Gomillion.

We refuse to apply a double standard that requires the Legislature to follow one set of rules for redistricting when Democrats control the Legislature and another set of rules when Republicans control it.  After the 2000 Census, nothing changed that would have relaxed the constitutional and statutory standards that governed redistricting.  On the contrary, in 2006, Congress amended section 5 of the Voting Rights Act to make the standard for retrogression "more stringent."  *Shelby Cnty.*, 133 S. Ct. at 2617.  And in *Larios*, a three-judge district court in this Circuit expressed concern that an overall deviation in population of 10 percent was no longer a "safe harbor" for purposes of the one person, one vote command of the Equal Protection Clause, particularly in the light of developing technology that makes it possible to achieve substantially greater population equality.  At trial, the plaintiffs offered no credible evidence that the percentages of the black population in the majority-black districts adopted only ten years earlier were no longer warranted.  Although Arrington opined that a 51 percent black majority is now sufficient to allow black voters to elect their preferred candidates of choice, he offered no election data for any of the majority-black districts in Alabama to support that conclusion.  (Ex. NPX 323, 15, 17).  Arrington admitted that he testified in another action in 2000 regarding a four-district plan for Dallas County, Alabama, that a district in which black persons made up a voting-age population of 61 percent would be considered "a swing district" that

151

would offer only an opportunity for black voters to elect the candidate of their choice, not a guarantee that black voters would be able to elect the candidate of their choice. (Trial Tr. vol. 3, 80–81, Aug. 12, 2013). And Arrington acknowledged that "I haven't drawn any plans for Alabama, so I don't know some of the nitty-gritty of some of the districts." (Trial Tr. vol. 3, 58, Aug. 12, 2013). Reed testified, on the other hand, that a majority-black district in Alabama ordinarily needs to be about 60 percent black in total population to allow black voters to elect their candidate of choice and, in some cases, might need to be closer to 65 percent. (Trial Tr. vol. 1, 156–57, Aug. 8, 2013). Reed has, of course, been the chairman of the Alabama Democratic Conference since 1970 and has designed several redistricting plans in Alabama. As he testified at trial, "I've been involved in reapportionment legislation and litigation [in Alabama] for many years. . . . I've been actively involved in drawing district lines and participating in the reapportionment process, as well as drafting plans for reapportionment, the Legislature, state board of education, and many, many local jurisdictions." (Trial Tr. vol. 2, 154, Aug. 9, 2013). We credit Reed's testimony based on his wealth of experience in redistricting and elections in Alabama.

Our dissenting colleague ponders, "I feel as if I were in a time warp carried back into the past, with the arguments being the same but the parties having switched sides," but we see the problem here as involving a rule of "heads I win, tails you lose." This record offers no reason to conclude that the rules for redistricting were turned upside down when Republicans gained control of the Alabama Legislature. The

parties have switched sides, but the law that governs their disputes remains the same. We refuse to read the Voting Rights Act and the Fourteenth and Fifteenth Amendments as mandating some kind of "Democratic candidate protection program." Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 223 (2007).

### ii. Senate District 7

The Democratic Conference plaintiffs argue that the Legislature subordinated traditional redistricting principles when it drew Senate District 7. Under the 2001 plan, Senate District 7 is located entirely within Madison County and runs from the Alabama-Tennessee border down the center of the County through Huntsville. The district divides into two feet-like segments at the bottom. According to the 2010 Census, the 2001 Senate District 7 had a total population that was 60.28 percent white and 32.14 percent black. The left foot of the district reached into a small portion of southwest Huntsville known as "Little Mexico" because its population is largely Hispanic. The majority-white district was overpopulated by 9.04 percent and surrounded by other majority-white districts that were also overpopulated. District 2, its western neighbor, was overpopulated by 31.12 percent. Senator Dial refereed extensive negotiations between the Republican incumbent in District 7 and the Republican incumbents from the neighboring districts. Under the final plan, Act 603 brings District 7 within the target deviation by eliminating the left foot of the district and moving 10,151 blacks from the western edge of the district into District 1, a

majority-white district represented by a Democrat.  Although District 1 had not previously shared a border with District 7, the Act brought the majority-white district across the northern border of the State into Madison County to gain this population. Under the new plan, District 7 has a total population that is 65.56 percent white and 27.34 percent black.  (Ex. SDX 400).  It is more compact than its predecessor and is still located entirely within Madison County.

We find that the Legislature did not subordinate traditional redistricting principles to race when it created District 7.  The Legislature maintained most of District 7 in accordance with the traditional respect for existing districts.  The Legislature reduced the population in Senate District 7 to bring it within the allowable range of population deviation in an effort to comply with the requirement of one person, one vote.  After extensive negotiations among the Republican incumbents, the Legislature took the excess population from the western edge and put the population, which is largely black and votes heavily Democratic, in the district of a Democratic incumbent.  The new district is more compact, falls within the target population deviation, and maintains a substantial minority population.  We find that the new district lines comply with traditional redistricting principles and that the movement of the black population from the western edge of the district was made largely for partisan, not racial, purposes.  *See Vera*, 517 U.S. at 968, 116 S. Ct. at 1956 ("If district lines merely correlate with race because they are drawn on the basis of

political affiliation, which correlates with race, there is no racial classification to justify . . . .").

### iii. Senate District 11

The Democratic Conference plaintiffs next argue that the Legislature subordinated neutral districting principles to race when it drew Senate District 11. District 11 changed substantially in Act 603.  Under the old plan, District 11 had a crescent shape that included all of Talladega County, Coosa County, and a small portion of Elmore County.  In 2010, District 11 was underpopulated by 8.39 percent and had a total population that was 62.59 percent white and 33.95 percent black.  (Ex. SDX 402).  Under Act 603, District 11 has moved north and now follows the shape of a backwards C that begins in the southern part of St. Clair County, swoops through Talladega County, and ends in the southwestern portion of Shelby County.  The new plan moves the central portion of Talladega County, which has a substantial black population, into District 15 with a portion of Shelby County, which is heavily white. (Trial Tr. vol. 3, 173, Aug. 12, 2013).  The total population of District 11 is 81.66 percent white and 14.96 percent black.  (Ex. SDX 400).

The Democratic Conference plaintiffs have not proved that the Legislature subordinated neutral districting principles to race when it created District 11.  Despite substantial shifts of other districts, Hinaman preserved the core of the district in Talladega County, where the incumbent lived.  Hinaman also largely followed county lines on the western borders.  The district is also contiguous and complies with the

overall deviation in population of 2 percent.  Although the Democratic Conference plaintiffs introduced evidence that the maps could have been drawn to make District 11 more compact by swapping the population from Shelby County in District 11 with the population from Talladega County in District 15, that fact does not establish that race was the predominant factor.  Partisanship could have similarly explained the decision to place the central portion of Talladega in District 15.  As Reed testified, a redistricting plan can be drawn many ways, and we find that the evidence does not support a finding that race predominated over other factors in the creation of this district.  Even if the Democratic Conference plaintiffs could prove that they have standing to bring their claim of racial gerrymandering about Senate District 11, the claim would fail because we find that the Legislature did not subordinate neutral districting principles when it drew that district.

### iv.  Senate District 22

The Democratic Conference plaintiffs next argue that the Legislature subordinated neutral districting principles to race when it drew Senate District 22.  District 22 is a sprawling district located in southwest Alabama.  In 2010, District 22 had a total population that was 65.96 percent white, 28.30 percent black, and 3.44 percent Native American.  (Ex. SDX 402).  It is sandwiched between the Black Belt to its north and the Mobile County area to its south.  Although its population was within 1 percent of the ideal population in 2010, it bordered several severely malapportioned districts.  The majority-black districts to its north were underpopulated by 42,357

people.  The three districts located within Mobile County to its south were underpopulated by 15,656 people.  And the district located in Baldwin County to its south was overpopulated by 19,055 people.  Although the drafters considered whether they could bring one of the districts in Mobile County across Mobile Bay to capture some of the overpopulation from Baldwin County, the Republican incumbent in Baldwin County objected to that proposal.  Because of that objection, Act 603 extended District 22 into Baldwin County and reduced its population in Mobile County, thereby dividing the MOWA Band of Choctaw Indians among three districts.  Act 603 also repopulates the majority-black districts from contiguous portions of the former District 22.  Despite these population shifts, District 22 maintains a similar shape under the Act and crosses into all of the same counties that it had crossed into in 2001.  The total population of the district is 73.17 percent white, 21.52 percent black, and 2.68 percent Native American.

We find that the Legislature did not subordinate traditional neutral districting principles to race when it drew District 22.  The need to bring the neighboring districts into compliance with the requirement of one person, one vote served as the primary motivating factor for the changes to District 22.  The protection of the interests of incumbents also served as a motivating factor to the changes to District 22 because the drafters decided to bring District 22 into the overpopulated areas of Baldwin County in part because the incumbent rejected any proposal in which a district from Mobile County would cross Mobile Bay into Baldwin County.  Finally,

the preservation of existing districts served as a motivating factor in the shape of District 22 and the locations at which it crossed county boundaries. Although the Legislature moved the northern boundaries of District 22 to repopulate the majority-black districts without retrogression, that decision was motivated as much by the effort to comply with the requirement of one person, one vote as by the effort to avoid retrogression. Finally, there is a practical, geographical feature that materially restricts redistricting options in Mobile County: it is cabined in by Mississippi, the Gulf of Mexico, and Mobile Bay. And, on this record, we cannot find that the effort to avoid retrogression or to preserve the majority-black district "had a qualitatively greater influence on the drawing of the district lines" than the other traditional criteria. *See Vera*, 517 U.S. at 969, 116 S. Ct. at 1956.

### v. Senate District 26

The Democratic Conference plaintiffs did not plead in their complaint a claim of racial gerrymandering about District 26, but we heard substantial testimony about Senate District 26 at trial. District 26 is a majority-black district in Montgomery County currently represented by Senator Quinton Ross (D). Under the old plans, Senate District 26 included most of Montgomery County, following the county lines, except for a boot shaped segment of Montgomery included within District 25. In 2010, District 26 was underpopulated by 11.64 percent and had a total population that was 22.03 percent white and 72.75 percent black. To repopulate District 26, Hinaman added populous precincts in the City of Montgomery, which shared many

characteristics with the other areas of District 26 and included both black and white persons. Hinaman removed most of the rural portion of Montgomery County from District 26 to create a land bridge between the former area of District 25 and Crenshaw County. As Hinaman explained, District 25 needed to gain population when Act 603 moved District 30 entirely north of Montgomery. Under the new plans, District 26 is still slightly underpopulated and has a total population that is 19.51 percent white and 75.22 percent black.

The Democratic Conference plaintiffs have failed to prove that the Legislature subordinated neutral districting principles to race when it created District 26. Race was a factor in the drawing of District 26. The Legislature preserved the District as majority-black and the percentage of the population that was black. But the Legislature also preserved the core of the existing District. District 26 follows the county lines at its northwestern border and follows the existing district lines along its northeastern border. It maintains a similar shape around the City of Montgomery, and it includes two protrusions into Montgomery County that largely follow highway lines. The inclusion of additional precincts in the City of Montgomery north of Alabama Route 80 is a reasonable response to the underpopulation of the District. On this record, we cannot find that the Legislature subordinated traditional districting principles to race.

Because the Democratic Conference plaintiffs failed to prove that the State subordinated traditional districting criteria when they drew Senate Districts 7, 11, 22,

and 26, we need not consider whether the Districts would satisfy strict scrutiny.  The

claims of racial gerrymandering fail.

4.  Even if the Plaintiffs Had Proved that the Acts Were Primarily Motivated by a
    Discriminatory Purpose, the Acts Would Satisfy Strict Scrutiny.

Even if the State defendants had subordinated traditional districting principles

to racial considerations when they drew the challenged Districts, the Districts would

satisfy strict scrutiny.  Although the Supreme Court has never decided whether

compliance with the Voting Rights Act is a compelling state interest, we conclude that

compliance with the Act is a compelling state interest.  *See* U.S. Const. Art. VI, § 2

("This Constitution, and the Laws of the United States which shall be made in

Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every

State shall be bound thereby; any Thing in the Constitution or Laws of any State to

the Contrary notwithstanding."); *see also League of United Latin Am. Citizens*, 548 U.S. at

518, 126 S. Ct. at 2667 (Scalia, J., joined by Chief Justice Roberts and Justices Thomas

and Alito, concurring in part and dissenting in part) (concluding that "compliance

with § 5 of the Voting Rights Act can be [a compelling state] interest . . . [otherwise] a

State could be placed in the impossible position of having to choose between

compliance with § 5 and compliance with the Equal Protection Clause").  And we

conclude that a plan will be narrowly tailored to achieve that interest when the race-

based action taken was reasonably necessary under a constitutional reading and

application of the Act.  *See Miller v. Johnson*, 515 U.S. 900, 921, 115 S. Ct. 2475, 2490–

91 (1995); *see also Shaw v. Hunt*, 517 U.S. 899, 916, 116 S. Ct. 1894, 1906 (1996) (holding that where the claimed interest is avoidance of liability under section 2, "the legislative action must, at a minimum, remedy the anticipated violation or achieve compliance to be narrowly tailored"); *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 161, 97 S. Ct. 996, 1007 (1977) ("Implicit in [our previous cases] is the proposition that the Constitution does not prevent a State subject to the Voting Rights Act from deliberately creating or preserving black majorities in particular districts in order to ensure that its reapportionment plan complies with § 5.").

The Alabama Legislature maintained the number of majority-black districts and avoided significantly decreasing the percentages of black voters in those districts to comply with section 5 of the Voting Rights Act. All parties agree, and our dissenting colleague admits, that "Senator Dial and Representative McClendon believed that their obligation under the Voting Rights Act included preserving the existing number of black majority districts." (Doc. 176, 8). We find that Senator Dial and Representative McClendon also believed that they needed to maintain approximately the same percentages of black voters in those majority-black districts to avoid retrogression of black voting strength in violation of section 5 of the Voting Rights Act. And we find that Senator Dial and Representative McClendon believed that any significant reduction of the black population in the majority-black districts would also likely cause a problem with preclearance of the plans by the Department of Justice.

The Black Caucus plaintiffs argue that, in *Shelby County, Alabama v. Holder*, ---U.S. ---, 133 S. Ct. 2612 (2013), the Supreme Court nullified the interest of the State defendants in complying with section 5 of the Voting Rights Act, but we disagree.  In *Shelby County*, the Supreme Court declared the coverage formula in section 4 of the Voting Rights Act unconstitutional because it was "based on decades-old data and eradicated practices."  *Id.* at 2627.  *Shelby County* expressed no opinion about the constitutionality of section 5 and, even if it had, that decision would not change our analysis.  All parties agree that the State of Alabama was governed by the preclearance requirement of section 5 when the Committee drafted and the Legislature approved the new districts.  We evaluate the plans in the light of the legal standard that governed the Legislature when it acted, not based on a later decision of the Supreme Court that exempted Alabama from future coverage under section 5 of the Voting Rights Act.

But we cannot uphold the districts unless the Acts are narrowly tailored to comply with section 5.  "Although [the Supreme Court] ha[s] not always provided precise guidance on how closely the means (the racial classification) must serve the end (the justification or compelling interest), [the Supreme Court] ha[s] always expected that the legislative action would substantially address, if not achieve, the avowed purpose."  *Hunt*, 517 U.S. at 915, 116 S. Ct. at 1905.  "[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their

effective exercise of the electoral franchise." *Johnson*, 515 U.S. at 926, 115 S. Ct. at 2493 (quoting *Beer v. United States*, 425 U.S. 130, 141, 96 S. Ct. 1357, 1364 (1976)). "By enacting section 5, Congress aimed to guarantee that minorities' new gains in political participation would not be undone." *Texas v. United States*, 831 F. Supp. 2d 244, 250 (D.D.C. 2011).

When the Legislature confronted the task of redistricting after the 2010 Census, Congress had recently made the standard for preclearance under section 5 of the Voting Rights Act "more stringent." *Shelby Cnty.*, 133 S. Ct. at 2617. In 2006, Congress extended the operation of section 5 and amended its text "to prohibit more conduct than before." *Id.* at 2621. Congress stated in its findings that "[t]he effectiveness of the Voting Rights Act of 1965 has been significantly weakened by the United States Supreme Court decisions in [*Reno v. Bossier Parish School Board*, 528 U.S. 320, 120 S. Ct. 866 (1997), and *Georgia v. Ashcroft*, 539 U.S. 461, 123 S. Ct. 2498 (2003),] which have misconstrued Congress' original intent in enacting the Voting Rights Act of 1965 and narrowed the protections afforded by section 5 of such Act." Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act, Pub. L. No. 109-246, § 2, 120 Stat. 577, § 2(b)(6) (2006). *See generally* Pamela S. Karlan, Georgia v. Ashcroft *and the Retrogression of Retrogression*, 3 Election L.J. 21, 36 (2004) (describing *Georgia v. Ashcroft* as "itself a retrogression in minority voters' effective exercise of the electoral franchise").

In *Reno v. Bossier Parish*, the Supreme Court ruled that section 5 "does not prohibit preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose," 528 U.S. at 341, 120 S. Ct. at 878, but Congress overturned that decision and amended section 5 to prohibit any change in voting practice or procedure with a racially discriminatory purpose.  In *Bossier Parish*, the plaintiffs argued that the Bossier Parish School Board had a racially discriminatory purpose when it refused to create any majority-black districts, even though the black population of that jurisdiction was approximately 20 percent of the total population. *Id.* at 323-24, 120 S. Ct. at 869.  The Supreme Court ruled that it was irrelevant whether the Board acted with a racially discriminatory purpose so long as its redistricting plan was not enacted with a retrogressive purpose.  The Court explained that "§ 5 prevents nothing but backsliding, and preclearance under § 5 affirms nothing but backsliding." *Id.* at 335, 120 S. Ct. at 875.  Congress rejected this interpretation by adding the following language to section 5:  "[t]he term 'purpose' . . . shall include *any* discriminatory purpose."  Voting Rights Act § 5(c), 42 U.S.C. § 1973c(c) (emphasis added).

In *Georgia v. Ashcroft*, the Supreme Court ruled that section 5 allows states to consider "the totality of the circumstances," including "the extent of the minority group's opportunity to participate in the political process [and] the feasibility of creating a nonretrogressive plan," 539 U.S. at 479, 123 S. Ct. at 2511, when drawing district lines, but Congress overturned that holding and limited consideration to the

minority voters' ability to elect their preferred candidate.  42 U.S.C. § 1973c(d).  In *Georgia*, the Court stated that "a court should not focus solely on the comparative ability of a minority group to elect a candidate of choice . . . [because this factor] cannot be dispositive or exclusive."  539 U.S. at 480, 123 S. Ct. at 2511.  The Court also explained that section 5 "gives States flexibility to choose," *id.* at 482, 123 S. Ct. at 2512, between two options:  a covered jurisdiction may either create "safe" majority-black districts "in which it is highly likely that minority voters will be able to elect the candidate of their choice," *id.* at 480, 123 S. Ct. at 2511, or spread out minority voters over a greater number of districts where the voters "may have the opportunity to elect a candidate of their choice," *id.* at 481, 123 S. Ct. at 2512.  The Court stated that the "other highly relevant factor in a retrogression inquiry is the extent to which a new plan changes the minority group's opportunity to participate in the political process," including whether the new plan creates "'influence districts'—where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process."  *Id.* at 482, 123 S. Ct. at 2512.  The Court reversed a denial of judicial preclearance because the district court had "focused too heavily on the ability of the minority group to elect a candidate of its choice in the majority-minority districts."  *Id.* at 490, 123 S. Ct. at 2516.  The Court then remanded for the district court to consider whether a districting plan that reduced the percentages of black voters in several majority-black districts and increased the number of influence districts was retrogressive.  *Id.* at 491, 123 S. Ct. at 2517.

Congress rejected the interpretation in *Georgia* and "sought to make clear that it was not enough that a redistricting plan gave minority voters 'influence'; a plan cannot diminish their ability to elect candidates." *Texas*, 831 F. Supp. 2d at 251. "In making its Amendments, Congress sought to restore the 'ability to elect' standard promulgated by the Supreme Court in *Beer* [*v. United States*, 425 U.S. 130, 96 S. Ct. 1357 (1976)]." *Id.* at 260.

   To overturn *Bossier Parish* and *Georgia*, Congress added subsections (b) through (d) to section 5 to prohibit "[a]ny" voting change that "has the purpose of or will have the effect of diminishing the ability of any" voter "on account of race or color . . . to elect their preferred candidates of choice" and stated that the purpose of that new language was "to protect the ability of such [voters] to elect their preferred candidates of choice." Voting Rights Act § 5, 42 U.S.C. § 1973c. "The 2006 Amendments clarified that Congress intended a Section 5 inquiry to focus on whether a proposed voting change will diminish the 'ability of minority citizens *to elect* preferred candidates of choice.'" *Texas*, 831 F. Supp. 2d at 251 (quoting H.R. Rep. No. 109-478, at 71, 2006 U.S.C.C.A.N. at 671) The relevant question now is "whether the candidate minorities voted for in the general election under the benchmark plan is equally likely to win under the new plan.  If not, then minorities' ability to elect their preferred candidate is diminished." Nathaniel Persily, *The Promise & Pitfalls of the New Voting Rights Act*, 117 Yale L.J. 174, 223 (2007).

To comply with this "more stringent" version of section 5, *see Shelby Cnty.*, 133 S. Ct. at 2617, the Alabama Legislature correctly concluded that it could not reduce the number of majority-black districts and that it could not significantly reduce the percentages of black voters in the majority-black districts because to do so would be to diminish black voters' ability to elect their preferred candidates. Congress eliminated the option that a state could choose, under *Georgia*, to create "opportunity" or "influence" districts instead of "safe" districts that guarantee the ability of minorities to elect their preferred candidates. The 2006 amendments created one consideration for a state: whether minority voters are *less able to elect* their preferred candidate under the new plan, not whether they have the *opportunity to elect* their preferred candidate. *See Texas*, 831 F. Supp. 2d at 261. Congress limited the redistricting options of states so that any diminishment in a minority's ability to elect its preferred candidates violates section 5. Contrary to the plaintiffs' arguments, the Legislature could not spread black voters out to other districts and substantially reduce the percentages of black voters within the majority-black districts because that change, by definition, would diminish black voters' ability to elect their preferred candidates. To comply with section 5, the Alabama Legislature chose the only option available: to protect the voting strength of black voters by safeguarding the majority-black districts and not substantially reducing the percentages of black voters within those districts. The purpose of section 5 has always been to insure that minorities did not lose the political gains they have acquired, and "plans that preserve or actually

167

increase minority voting strength [are not retrogressive]." *Texas*, 831 F. Supp. 2d at 250.

The Legislature sought to avoid diminishing black voters' ability to elect their preferred candidates. The Legislature preserved, where feasible, the existing majority-black districts and maintained the relative percentages of black voters in those majority-black districts. The Acts maintain 8 majority-black districts in the Senate and increase the number of majority-black districts in the House from 27 to 28 based on total population. The population levels in the existing majority-black districts had proven sufficient to provide the black voters in those districts the opportunity to elect the candidates of their choice. All of the current 27 majority-black House districts are represented by Democrats, and 26 of those 27 districts are represented by black Democrats. (Ex. NPX 350, 60–62). All of the majority-black Senate districts are represented by Democrats, and 7 of those 8 districts are represented by black Democrats. Using the 2010 Census data, the percentages of the black voting-age populations in the majority-black districts under the Acts remain relatively constant when compared to the 2001 plans. The percentages of the black voting-age populations in 21 of the 28 majority-black House districts vary less than plus or minus 5 percent. (Ex. APX 6). And 16 of the 28 majority-black House districts vary less than plus or minus 2 percent. (Ex. APX 6). The largest deviation occurs in House District 59 where the black voting-age population increased from 64.25 percent to 74.28 percent. (Ex. APX 6). But the Legislature fairly balanced the overall

percentages of the black voting-age populations in the majority-black House districts, with 13 districts decreasing and 15 districts increasing.  (Ex. APX 6).  The deviations in percentages of the black voting-age populations in the majority-black Senate districts are perfectly divided:  4 decreased and 4 increased.  (Ex. APX 7).  And 4 of the 8 majority-black Senate districts vary less than plus or minus 2 percent.  (Ex. APX 7).  The largest deviation occurs in Senate District 20 where the black voting-age population decreased from 74.44 percent to 59.03 percent.  (Ex. APX 7).

We conclude that the Acts are narrowly tailored to comply with section 5 as amended in 2006.  The Legislature correctly concluded that the more stringent version of section 5 that Congress enacted in 2006 required the Legislature to maintain, where feasible, the existing number of majority-black districts and not substantially reduce the relative percentages of black voters in those districts.  And our conclusion is consistent with the decision of the Department of Justice to preclear the Acts.

Our dissenting colleague disagrees with our reading of section 5 and contends that the new districts fail strict scrutiny, but he declines to explain how the Legislature could have satisfied section 5 without maintaining the same number of majority-black districts and the same relative percentages of black voters in those districts.  Our dissenting colleague never denies that section 5 prohibited the Legislature from reducing the overall number of majority-black districts in the House and Senate, and the plaintiffs also do not suggest otherwise.  Our dissenting colleague instead argues that section 5 permitted, but somehow did not require, the Legislature to maintain the

same relative percentages of black voters in the majority-black districts. We are left to wonder how the Legislature could have applied our dissenting colleague's vague standard of changes that are both required and permitted without violating the plain text of the amended section 5, which forbids "[a]ny" voting change that "has the purpose of or will have the effect of diminishing the ability of any" voter "on account of race or color . . . to elect their preferred candidates of choice." 42 U.S.C. § 1973c(b).

Our dissenting colleague gives the Legislature no credit for relying on the best evidence available to them. The Republican-controlled Legislature followed the example of their Democratic colleagues who a decade earlier, when members of the Black Caucus were majority leaders, corrected the malapportionment of the majority-black districts by adding similar percentages of black voters to those districts. The Legislature followed that example from an era when section 5 allowed states more flexibility in redistricting, and Alabama nevertheless obtained preclearance under the stricter standard adopted by Congress in 2006. The leaders of the Reapportionment Committee also followed the advice of black legislators who stated at public hearings that the majority-black districts ordinarily needed to be at least 60 percent black in total population. And the leaders of the Committee sought the assistance of black legislators in drawing the new majority-black districts and then incorporated virtually all of their suggestions for the design of those districts.

Our dissenting colleague instead faults Hinaman for failing to review unidentified "studies of black voter participation in Alabama" and credits the least credible witness on this topic, Arrington, who testified that the new districts "are part of a strategy to put the Republican Party in the same position that the segregationist white-only Democratic Party occupied in Alabama." (NPX 323 at 13). But our dissenting colleague ignores the credible testimony of the Chairman of the Democratic Conference, Reed, that majority-black districts in Alabama ordinarily need to be 60 percent black and sometimes 65 percent black.

Our dissenting colleague charges that "[t]here is a cruel irony" in allowing Alabama to take credit for complying with section 5 even though state leaders argued successfully in *Shelby County* that the coverage formula in section 4 was so outdated as to be unconstitutional, but we see the irony working in the opposite way. The Voting Rights Act was enacted in an era when Alabama persistently defied federal authority and could not be trusted to enact racial-neutral laws in voting. *See, e.g., Beer v. United States*, 425 U.S. 130, 140, 96 S. Ct. 1357, 1363 (1976); H.R. Rep. No. 89-439, at 5 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2441. But nearly a half-century later Alabama had a record of regular compliance with section 5. The Department of Justice had not even objected to a state-wide preclearance submission in more than 16 years, and in the decade before the amendment of section 5 in 2006, the Department had not objected to any submission from any level of government—state, county, or municipal—save for one submission from the City of Calera. *See* Brief of State of

171

Alabama as Amicus Curiae Supporting Petitioner at 12, *Shelby Cnty., Ala. v. Holder*, ---
U.S. ---, 133 S. Ct. 2612 (2013) (No. 12-96).  Governor Wallace and segregation are
long gone, and Alabama has virtually eliminated any racial gap in voter registration or
participation. *See id.* at 11.  Even though state leaders expressed the view that
Alabama now deserves to be treated on equal footing with other states, for decades
they nevertheless obeyed section 5 because controlling precedents of the Supreme
Court held that this extraordinary measure remained operative.  The real irony would
come from punishing Alabama for striving in good faith to comply with section 5
even though that law was enacted to remedy a pattern of defiance and evasion.

### III.  CONCLUSION

Redistricting has been called a "political thicket," *see Colegrove v. Green*, 328 U.S.
549, 556, 66 S. Ct. 1198, 1201 (1946), where judicial decrees can "cut deeply into the
fabric of our federalism," *Reynolds*, 377 U.S. at 624, 84 S. Ct. at 1414 (Harlan, J.,
dissenting), but our review of a redistricting plan, once adopted, is limited.  We do not
consider whether a redistricting plan is "bad," as Reed described the redistricting Acts
adopted by the Legislature last year.  Nor do we consider whether a plan is good or
one that we would have drawn.  We consider only whether a plan violates the Voting
Rights Act and the Constitution.  These plans violate neither.  We **DISMISS** the
claims of racial gerrymandering filed by the Democratic Conference plaintiffs for lack
of standing; in the alternative, we **GRANT** judgment in favor of the State Defendants
on the claims of racial gerrymandering filed by the Democratic Conference plaintiffs.

We **DISMISS** as not justiciable the claim of vote dilution based on the local House delegation in Jefferson County; in the alternative, we **GRANT** judgment in favor of the State Defendants on the claim of vote dilution based on the local House delegation in Jefferson County.  We **GRANT** judgment in favor of the State defendants on all remaining claims.  A separate final judgment will follow.