IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ALABAMA LEGISLATIVE BLACK CAUCUS; et al.,

Plaintiffs,

vs. CASE NO.: 2:12-cv-691-WKW-MHT-WHP

THE STATE OF ALABAMA, et al.,

Defendants.

---

DEMETRIUS NEWTON, et al.,

Plaintiffs,

vs CASE NO.: 2:12-CV-1081-WKW-MHT-WHP

THE STATE OF ALABAMA, et al.,

Defendants.

* * * * * * * * * * * * * * *

NON-JURY TRIAL - VOLUME III

* * * * * * * * * * * * * * *

BEFORE THE HONORABLE WILLIAM H. PRYOR, United States Circuit Judge, presiding, THE HONORABLE MYRON H. THOMPSON, United States District Judge, and THE HONORABLE W. KEITH WATKINS, United States District Judge, at Montgomery, Alabama, on Monday, August 12, 2013, commencing at 9:03 a.m.

APPEARANCES

FOR THE PLAINTIFFS:

Mr. James U. Blacksher
Attorney at Law
Post Office Box 636
Birmingham, Alabama 35201-0636

Mr. John K. Tanner
Attorney at Law
3743 Military Road, NW
Washington, DC 20015

Mr. James H. Anderson
Mr. Brannan Ward Reaves
Mr. William F. Patty
Attorneys at Law
JACKSON ANDERSON PATTY
250 Commerce Street
Montgomery, Alabama 36102

FOR THE DEFENDANTS:

Mr. John Joseph Park, Jr.
Attorney at Law
STRICKLAND BROCKINGTON LEWIS, LLP
1170 Peachtree Street NE, Suite 2200
Atlanta, Georgia 30309

Mr. J. Dorman Walker
Attorney at Law
BALCH & BINGHAM
Post Office Box 78
Montgomery, Alabama 36101

Mr. James William Davis
Ms. Misty Shawn Fairbanks Messick
Assistant Attorneys General
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130

Proceedings reported stenographically;
transcript produced by computer

* * * * * * * * * * * * * *

EXAMINATION INDEX

LAURA HALL

DIRECT BY MR. PATTY 3-5
CROSS BY MR. PARK 3-34

JOE HUBBARD

DIRECT BY MR. ANDERSON 3-37
CROSS BY MR. WALKER 3-43

THEODORE S. ARRINGTON

DIRECT BY MR. ANDERSON 3-49
CROSS BY MR. WALKER 3-69

ALLAN J. LICHTMAN

DIRECT BY MR. REAVES 3-87
CROSS BY MR. DAVIS 3-98
REDIRECT BY MR. REAVES 3-111

RANDY HINAMAN

DIRECT BY MR. PARK 3-114
CROSS BY MR. BLACKSHER 3-138
CROSS BY MR. TANNER 3-146
REDIRECT BY MR. PARK 3-187
RECROSS BY MR. TANNER 3-190

TOM BRUNELL

DIRECT BY MR. PARK 3-191
CROSS BY MR. BLACKSHER 3-209
DIRECT BY MR. TANNER 3-213

JAMES H. MCCLENDON

DIRECT BY MR. PARK 3-219
CROSS BY MR. BLACKSHER 3-236
CROSS BY MR. TANNER 3-246
REDIRECT BY MR. PARK 3-257
RECROSS BY MR. BLACKSHER 3-259

(The following proceedings were heard before the HONORABLE WILLIAM H. PRYOR, United States Circuit Judge, presiding, the HONORABLE MYRON H. THOMPSON, United States District Judge, and the HONORABLE W. KEITH WATKINS, United States District Judge, at Montgomery, Alabama, on Friday, August 9, 2013, commencing at 9:03 a.m.:)

* * * * * * * * * * * * * *

(Call to Order of the Court)

JUDGE PRYOR: Morning. So, Mr. Anderson, I understand we're going to have Representative Hall?

MR. ANDERSON: Yes, sir. Mr. Patty will take her.

JUDGE PRYOR: Very good. And I don't believe Representative Hall has had an oath administered yet.

MR. ANDERSON: That's correct.

MR. PATTY: She has not.

MR. WALKER: There are some other witnesses in the courtroom if you want to swear them all at the same time.

JUDGE PRYOR: We could do that. Anyone who is expected to testify, come forward. Get them all done.

(Witnesses sworn)

LAURA HALL

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. PATTY:

Q. Representative Hall, please state your full name for the record.

A. My name is Laura Hall.

Q. And where do you live?

A. Huntsville, Alabama.

Q. And what's your address?

A. 5024 Lyngail Drive Northwest.

Q. And are you a member of the Alabama House of Representatives?

A. Yes, sir.

Q. How long have you been a member?

A. I just finished my 20th year.

Q. And are you a Democrat --

JUDGE PRYOR: Representative Hall, if you could, speak a little bit closer to the microphone.

JUDGE WATKINS: Might need to pull it down just a little bit. You probably can't even see the lawyer behind that screen, can you?

A. I'm sorry.

Q. And are you a Democrat or Republican?

A. Democrat.

Q. And when does your term end?

A. 2014.

Q. And are you in house district -- what house district are you in?

A. House District 19.

Q. And that's the district you represent?

A. That's the district I'm in.

Q. Let me show you what we have marked as NPX 353A. And for the record, this is a still shot from the Alabama reapportionment Web site where they have maps of the old districts versus the maps of the way -- the plan in the new districts. If you look on the right side, that will be the way the district was -- excuse me -- the left side is the way the district was, and then the right side is the district under the plan, the new districts.

A. Yes.

Q. Now, tell us a little bit about your district. Where is it located?

A. My district presently is located in northwest Huntsville, all within the city of Huntsville.

Q. Okay. Is it pretty much an urban district?

A. It is.

Q. And it starts down here in the southwest Huntsville, does it?

A. Yes, that's correct.

Q. And then goes north, and the bulk of the district is in northwest Huntsville?

A. It is.

Q. Okay. What is the demographics of your old district?

A. The old district, about 68, 69 percent African American.

Q. Okay. And under the proposed plan or the new plan for the district, your district will no longer have the southwest part of the district, southwest Huntsville part?

A. That's right.

Q. And instead, it moves toward the northwest toward Harvest?

A. Yes. It moves into the county area.

Q. Does it -- by that does it become more -- have more rural areas that it's picking up?

A. I've never represented the rural area. Yes, this will be the first time, and it does have the rural areas much more visible and a part of District 19.

Q. Okay. Now, how long have you lived in District 19?

A. Forty years.

Q. And what did you do for a living there in District 19?

A. I taught at Johnson High School, which was located in my district.

Q. How long did you teach at Johnson High School?

A. Twenty-five and a half years.

Q. Now, over the years that you have lived in that area of Huntsville, in District 19, have you noticed any changes in the demographics of District 19 and that area?

A. Yes. The demographics has changed quite a bit. When I moved into the district, it was 76 percent white, 24 percent African American. It is probably more closely -- more 90

percent African Americans.

Q. Okay. Is the population of African American population, is that growing in that district, increasing?

A. The black population growing?

Q. Yes.

A. Growing in terms of the percentage, yes. If you look at the percentages, the makeup of the district, yes.

Q. Okay. And in the southwest part of Huntsville, the southern portion of your present district, what demographic changes have occurred there?

A. In the southwest area of the district, the Hispanic community is much more viable now.

Q. Okay. Is there any growth in the African American population towards the west of Huntsville, toward the rural areas toward Harvest and these areas?

A. Do we have African Americans moving to that area? Yes.

Q. All right. Now I want to talk to you briefly about Senate District 7. In 2009 did you run for Senate District 7?

A. I did.

Q. Did you have any opposition in the democratic primary for that seat?

A. I did.

Q. Did you win?

A. I won the primary, yes.

Q. Did you win the overall general election?

A. No, I did not.

Q. During that campaign, were there -- was there an incident where a radio show host did some announcement as to when different folks were supposed to vote?

A. There was an announcement that was sent out under the Secretary of State's stationery indicating that African Americans should vote on Wednesdays, and the Republicans should go to the polls on the day of the election, which was that Tuesday. Yes.

Q. And this came out from a radio show host?

A. It did, yes.

Q. Conservative talk show host?

A. Yes.

Q. Who is that, do you know?

A. Mr. Dale Jackson.

Q. And you say it went out. How did it -- how did this release go out?

A. It was distributed to -- it was distributed -- the information I received was a sheet of paper that was distributed that someone brought to my attention. But the announcement I understand was made -- and I don't listen to that station, so I can't give you the specifics.

Q. Okay. And was it another issue that came up during that election regarding governmental assisted housing?

A. There was a major issue related to the Housing Authority's

purchase of property in the southeast part of Huntsville which has, over the years, even today, divided the community. And as a result of that, there was also a bill introduced which required the Housing Authority to provide notice when they were about to purchase property.

Q. Okay. And in that -- and along with that particular issue, the housing project that was going in the southeastern section of Huntsville, is that a predominantly white neighborhood?

A. It is.

Q. And so there was some opposition from that area for the project to be there?

A. It was major opposition due to the purchase that was made. Yes.

Q. And as a result, there was some -- a bill introduced in the Alabama Legislature?

A. It was.

Q. And what was -- again, what was the purpose of that bill?

A. The purpose of the bill was that the Housing Authority had to provide notice of when they were going to purchase property in any area of the city.

Q. And that bill was directed toward this particular issue?

A. It came as results of the Housing Authority disagreement that occurred when they made that initial purchase.

Q. What position did you take with regard to that bill?

A. I was very much opposed to that bill, because I felt it was

unfair and that it was discriminatory that the only group that was purchasing property had to notify individuals that they were making a -- purchasing property for housing.

Q. And did you -- was that a controversial position for you to take in that election?

A. Well, it became a controversial issue. And as a part of the election, much of the information that was shared relative to my position was underground or by e-mail. It wasn't anything that was verbalized or at a debate. It was not that type of information being provided. But it was very much part of the election.

Q. And what type of attacks or verbalizations were directed towards that issue?

A. I'm sorry.

Q. What kind of attacks were verbalized or passed on or communicated regarding your position on that issue?

A. Well, I didn't receive any direct attacks. It's just that I was supportive of the Housing Authority's position, which meant that I was in favor of low income individuals being placed in different communities, which would lower the property value of those communities.

Q. Now, let me show you again, which is NPX 353B, which is a map of Senate District 7 as it was -- as it was, the old district when you ran. And then I'll also show you the proposed, on the right-hand side of this exhibit, Senate

District 7 as it is proposed under the reapportionment plan that was passed by the Legislature.

In the old District 7 that you ran in, this area down in the southwest part of Huntsville, what is the demographics generally of that area?

A. Predominantly white.

Q. And is there any Hispanic community area that's in that area of southwest Huntsville?

A. Oh, in southwest Huntsville, yes. The Hispanic community is very viable in that community.

Q. Okay. And then in the north and west part of District 7, was that -- does that make up part of your old District 19?

A. It does, yes.

Q. And, again, what is the demographics of that area?

A. Predominantly black.

Q. Okay. Now, under the plan -- and I'll show some additional pictures to you in just a second. But under the redistricting plan, this area in the southwest part of Huntsville was -- that is shown on the left side that was in District 7, that was moved into District 2; is that correct?

A. Yes.

Q. Whose district is District 2?

A. I think that's Holtzclaw, Senator Holtzclaw.

Q. Okay. And then in the northwest, whose district was the northwest part of District 7 moved into?

A. District 1. I think that's Tammy Irons.
Q. And Senator Irons is from Lauderdale County?
A. Yes.
Q. And Representative Holtzclaw, is he a Republican or Democrat?
A. A Republican.
Q. What is his race?
A. White.
Q. Now I show you what we've marked as Exhibit 353-C, NPX 353-C. And this shows a little closer view of that area in southwest Huntsville that was moved into Representative Holtzclaw's district. That area, is there any particular neighborhoods or areas that are in that district -- that section of southwest Huntsville that have a substantial number of Hispanics living in it?
A. Yes.
Q. What are those areas?
A. The area that goes to the Ridgecrest area, that voting box.
Q. Okay. And so would it be in this -- this area of the district that I'm indicating?
A. Yes.
Q. Okay. Now, has the Hispanic community in Huntsville been growing?
A. Yes. It has grown since -- the 40 years since I've been there to the point that even in my district, about two -- half a

mile over, there's a section that a large number of Hispanics live in. So we've seen an increasing number of Hispanics in the Huntsville area.

Q. Do you think it's been growing substantially since even the census that was taken in 2010?

A. I think so, yes.

Q. Are a large number of the Hispanics who live in that area military retirees or they come with families associated with the military?

A. A large number of military and education. A large number that have come in are the military or engineers, et cetera. Yes.

Q. Okay. Now, have you done well with the Hispanic community in the elections that you've run in Senate District 7 and -- I mean, in House District 19?

A. Well, House District 19, when I ran, my district had changed quite a bit. That was the first time I had Hispanics in my district in the last census. And I was very pleased and honored to have an opportunity to work with individuals of the Hispanic community in getting their vote. And one of the methods that was used was putting my signs in Spanish in the different businesses that were in the area.

Q. Who worked with you on that?

A. Mrs. Rosa Toussaint.

Q. And so did you -- in those different elections in their

Senate race and in your House race, did you have the support of Hispanic voters in that southwest Huntsville area?

A. I felt that I did, yes.

Q. And Rosa Toussaint, is she an activist in the Spanish community?

A. She's very active. She's an advocate and an activist.

Q. And she worked with you with your campaign.

A. Yes.

Q. And made or produced signs that were in Spanish for your campaign?

A. That's right.

Q. Did she contact Hispanic businesses in those communities to get them to post those signs and to help you with your campaign?

A. That's how I was able to have them placed in the businesses. She interceded for me.

Q. Okay. And this -- looks like a lot of that area, like I say, that Ridgecrest area, the southwest Huntsville area, is now in Holtzclaw's section now; is that correct?

A. Yes.

Q. Have you noticed more support from the Hispanic community since HB 56 towards Democrats?

A. I've had quite a bit of I would say support, requests, conversations, dialogue with individuals in the Hispanic community concerned about the bill; the impact that it has and had on their community; wanting to insure that the challenges

that they face were not unbearable or that they could not meet and having someone to serve as a voice for them.

Q. The area in southwest Huntsville, has that been -- is that referred to in the Huntsville community as Little Mexico?

A. Recently I've heard that term being used, yes.

Q. Now, going to District 7 and the part of District 7 that was moved into Tammy Irons' District 1. This area that has been moved into -- from District 7 into Tammy Irons' District 1, are there any large precincts in that district that used to be in your -- or that were in your District 7 when you ran and are in your District 19 currently?

A. Yes. As a matter of fact, Johnson High School, which was -- I would say was my base during -- for my campaigns, which is a large box, is now in that district.

Q. Okay. So Johnson High School was in District 19 and was a big base or core for your district?

A. Yes.

Q. And it was in District 7 and has now been moved into District 1?

A. Yes.

Q. Okay. Did you carry that precinct in the senate race in 2009 with 89 percent of the vote?

A. Yes.

Q. And, again, that area, that Johnson High School precinct, what is the predominant race of that district?

A. African Americans.

Q. Do you know roughly percentage population African American in that district?

A. At the time of the election or now?

Q. At the time of the election.

A. I'd say it's probably close to 90 percent.

Q. Okay. And now, what would you think?

A. I'd say it may be like 90 plus.

Q. Now, are there any other large boxes or precincts that are in -- that were in District 7, now in District 1, that you know about?

A. I'm thinking the West Mastin Lake may be one that was a large box as well.

Q. Was it predominantly African American --

A. Yes.

Q. -- or is predominantly African American?

A. Yes.

Q. Yes. Was that box an area of strength for you in your senate race as well?

A. It was.

Q. Any other areas that you can think of right offhand that would have been moved out?

A. Any other area that would do what?

Q. Any other areas that were in 7 that have been moved to 1. Any other precincts that you can think of.

A. No.

Q. I want to show you a demonstrative exhibit that has been produced in this case that's marked NPX-T. And I represent to you it shows the black voting age population under the Dial 2 plan. Where I have "other," it is other minorities. We didn't make that clear, but the "other" means other minorities. It also shows those percentages for the Reed Buskey plan and the Newton plaintiffs' illustrative plan.

Now, do you believe, based on these percentages of the black and other minority population, that under the Reed Buskey plan a minority candidate would have -- excuse me -- minorities would have a reasonable opportunity to elect a candidate of their choice?

A. Sure.

Q. What about under the Newton illustrative plan?

A. Yes.

Q. Can you explain why you believe that minorities, particularly blacks, would have a reasonable opportunity to elect a candidate of their choice under these two plans, the Reed Buskey and the Newton plaintiffs?

A. Well, when you look at the Reed Buskey plan, you have 47.17 percent and 9.25 percent other. If there's a coalition formed there, you have more than 56 percent population. And under the Newton plan, you have 48.36 and 9.62, so you have 55 percent, 56 percent chance of minorities and -- African American and

minorities together, that possibility is very good, I think.

Q. Okay. What about with -- compare the Reed Buskey plan and the Newton Plaintiff's illustrative plan compared to the Dial plan 2 as to how, under the Reed Buskey plan and the Newton illustrative plan -- would differ with the Dial plan 2 in terms of minority candidates -- excuse me -- minorities having the opportunity to elect candidates of their choice.

A. Well, the numbers are much lower. You only have 34 percent versus more than 50 percent in the other two plans.

Q. Okay. So the Reed Buskey plan and the Newton plaintiff's illustrative plan would provide much more opportunity for minorities to elect the candidates of their choice?

A. Yes.

Q. Okay. Can you tell us a little bit about your -- in the senate -- excuse me -- in the house districts, when the house districts were split under the new plan, there's -- the -- 19 is -- part of the population of 19 is going into what was House District -- or what is now House District 53.

A. Yes.

Q. Okay. So where there was 19, now we have 19 and 53; is that correct?

A. That's right.

Q. Okay. Let me show you another exhibit. And this shows, under the combined McClendon plan 3, the total population in House Districts 19 and 53. And if you look at -- those two

districts would have a total population of 90,000 together.

A. Yes.

Q. And would have a black population of 52,798, combined minority population of 60,986. And in order to have a majority of that Senate District, if you were in the ideal population range, a majority -- a person to have a majority would have to have 68,283 votes. Again, the difference between the two districts and the ideal would be about 45,000 votes.

A. Yes.

Q. Do you have an opinion as to whether or not, using 19 and 53 as a core, does it appear to you that there would be the opportunity to have a Senate District with 19 and 53 as the core that would be -- the majority of that district would be minorities?

A. Most definitely, yes.

Q. Okay. And based on these numbers, do you believe that if that was the case, where you had the majority of the population were minorities, that that would provide minorities a reasonable opportunity to elect a candidate of their choice in those districts?

A. Yes.

Q. Now, there was -- Tammy Irons, Senator Irons has testified in this case, and she talked a lot about the Tri-City district, Muscle Shoals, Florence, Decatur, over in northwest Alabama. Are you familiar with that district?

A. I am.

Q. And she now has -- comes across northwest -- or comes across north Alabama and into the Huntsville area --

A. Yes.

Q. -- with the proposed plan with her Senate District 1.

A. Yes.

Q. Could you give us what you observe as a contrast between the socioeconomic community interests of the Huntsville area versus the Tri-City areas?

A. Well, when you take the area, I recall during the hearings there was quite an appeal to the redistricting committee. The request was to leave those -- the district intact because of the work that was being done within the governmental agencies there. But even if you look at that district in terms of the contrast of the individuals, you will find a very hard-working union type of community in the Florence area. You come to the -- in the Florence area. And then you move to the Huntsville area, and you have the engineering, the education differences. And people tend to want to think or feel that all African Americans, everybody think the same way, move the same way, which is not true. And so when you look at those contrasts, I would think you would want to have individuals to represent you that are sensitive to the needs and issues of your area. And I think it's unfair that that district would extend its way all the way into Huntsville, which changes the makeup in

terms of the people that she would be representing or the individuals she would be representing.

Q. Are there -- the Huntsville area, of course, is called the Rocket City.

A. It is.

Q. It has a high population of engineers, scientists, service industries.

A. It does. Yes.

Q. Is there a difference between the community of interest within the African American community, the Tri-City areas, versus the Huntsville area?

A. I would think so. I mean I just -- I base the information based on what I deal with from individuals in my district that are working at Redstone Arsenal, their concerns about furloughs and those type things, as opposed to the individuals' concerns in the Florence area maybe concerned about layoffs for other reasons. But I would say those differences do occur, and how they're addressed or how they're listened to certainly makes a difference.

Q. Those two areas, in your opinion, are very different, not only geographically, but they're different in the communities, difference in the community of interest between those two areas?

A. I think so.

Q. Now I want to ask you a little bit about the reapportionment process. When the reapportionment process was going on, did you

have much input into how your district was going to be shaped?

A. Well, the input I had was to sit with the chair of the reapportionment committee in the House and look at what the district was and where there -- possibility of making some adjustments.

Q. Okay. And that was with Representative McClendon?

A. That's correct.

Q. Was that your only meeting, was that one time with Representative McClendon?

A. Yes.

Q. When you met with Representative McClendon, did he have a computer program where he could show you what they were thinking about doing with the district or possible changes with the district?

A. No.

Q. Have you ever been shown a computer program with this is what we're thinking about doing with your district or proposing to do with your district?

A. No.

Q. Did you meet with Randy Hinaman?

A. No.

Q. Did you know who Randy Hinaman was?

A. I know the name.

Q. Okay. And so did you ever -- you never sat down with him and went through the possibilities with the reapportionment

plan?

A. No. I've never -- looking at a computer and looking at different ways to draw the district, no, I did not have that experience.

Q. All right. Now, when you sat down with Representative McClendon, was that basically looking at a piece of paper that he had of what your old district was?

A. Right. And looking at where the adjustments or the changes would be possibly made in that district.

Q. Did he provide you much information about what the committee was thinking about doing or thought needed to be done in your district?

A. The conversation, as I recall it, was basically looking at and asking me to show areas where I thought that we might add or delete from my area, since I had lost. But beyond that, there was no other conversation relative to the district.

Q. Okay. When did you first see how your district was going to be shaped under the McClendon plan?

A. When it was announced that the plan was introduced, I guess, for us to consider -- that would be considered in committee.

Q. Okay. And did you --

JUDGE PRYOR: When you say that you had lost, do you mean that your district had lost population that needed to be made up? Is that what you were referring to?

THE WITNESS: Yes.

JUDGE PRYOR: Thank you.

Q. And when did you find out that District 53 was going to be moved from Jefferson County to Birmingham -- I mean to Huntsville?

A. I think it was at a time when we received that, there had been conversation that there was going to be a new district in Huntsville. But that was -- I was able to see that once the plans had been introduced.

Q. So when you met with Representative McClendon, did he go -- did he explain to you that there was going to be a new district in Huntsville?

A. I don't recall having that conversation.

Q. So was this something you just heard, I guess, as a rumor or information around the House?

A. There was conversation within my delegation that we were going to probably get a new district, but my focus with my meeting with the chairperson was to focus on District 19.

Q. Okay. And so there was conversation in the House that there was going to be a new district in Huntsville?

A. Yes.

Q. New House district. When did you learn that that House district, the new House district in Huntsville, was coming from Birmingham?

A. When it was introduced.

Q. Okay. When the plan was introduced at the committee?

A. Yes.

Q. Okay. How long after the -- well, first, did you have a chance to speak at the committee hearing?

A. Did I speak at the hearing?

Q. Yes.

A. I don't -- no.

Q. Was that committee hearing a short process, or was it a long debate, or how long did that whole process last?

A. The committee hearing, I don't recall it being a very long hearing. I think it was a hearing to provide an opportunity during the committee for individuals to speak. And then the next opportunity was when it was -- after it had gone through the committee and was then presented on the floor.

Q. How long after -- do you recall how long it was after it was presented in the committee that it came to a vote on the floor?

A. I think we may have had -- from Thursday to that following week.

Q. Okay.

A. I'm not sure.

Q. So you basically had the -- saw your plan or saw the plan for your District 19, the changes to be taken -- to take place there for less than a week before it was before a vote before the House?

A. I'm thinking that's the case, yes.

Q. Okay. Now, I don't want to -- Senator Ross has testified

about some of the things that happened with the Legislature, and I don't want to go through all that, but I did have some questions I wanted to clarify with his testimony with you.

You were on the conference committee with the Accountability Act, weren't you?

A. Yes, I was.

Q. Okay. And when that -- a conference committee is essentially where each house appoints members to a committee to resolve the difference between a House version of a bill and a Senate version of a bill; is that correct?

A. Yes.

Q. And how they resolved those differences is how the bill will be presented to the house and the senate for vote.

A. For the final vote. Yes.

Q. And the rules for governing conference committees basically limits the conference committee to essentially resolving the differences that are before the two bodies; is that correct?

A. That is correct.

Q. And the committee that y'all met regarding the accountability bill, at the time it was meeting about a bill called school flexibility?

A. That was right.

Q. And that issue, the difference between the two houses in that bill, were basically an issue over tenure?

A. That's correct.

Q. Because the school flexibility bill would allow local school systems to waive or get waivers from following certain educational laws; is that correct?
A. That's correct.
Q. One bill said they could waive tenure, one said they couldn't; is that right? Is that the difference that was between the two bills?
A. No. The difference was utilizing having the tenure portion that had been passed earlier, to make sure that that was a part of the bill so there would not be any misunderstanding about the impact of the tenure bill.
Q. And it was roughly the student -- I mean, the school flexibility bill was about a 7 or 8-page bill?
A. That's correct. Yes.
Q. And there were six members on the committee. You and Senator Ross were the two Democrats.
A. Right.
Q. And there were four Republicans on the committee; is that right?
A. Right.
Q. And all four Republicans were white; is that right?
A. That's right.
Q. The committee conference started and then immediately recessed; is that correct?
A. It did.

Q. Okay. And the four white Republicans left the committee -- conference committee, and you and Senator Ross remained.
A. Yes. They left and said we would be back in about 45 minutes.
Q. And did they come back in 45 minutes?
A. No.
Q. So a substantial amount of time went by.
A. Sure.
JUDGE PRYOR: Where is the new portion of this, Mr. Patty?
MR. PATTY: I'm just trying --
JUDGE PRYOR: I've heard all of this before.
MR. PATTY: Just a few more points and I'll be done, Your Honor.
Q. When they came back and voted, it was a 21-page -- when the committee came back, it was a 21-page bill; is that correct?
A. Much different than when we started. Yes.
Q. It was 21 pages; had a new name. Now it was the Student Accountability Act; is that right?
A. That's right.
Q. And it included tax credits for individuals to send their kids to private schools, did it not?
A. Yes.
Q. It had appropriations in it?
A. Yes.

Q. And it had a -- it set up a special trust that people could qualify for, charitable trust for scholarships?

A. Scholarship grant organization, yes.

Q. Now, there was no debate when this new bill came to the conference; is that correct?

A. Did not have an opportunity to debate that bill at all.

Q. And y'all's legislative rules required that if there is an appropriation -- that you can't use appropriation bills or can't come up with a new appropriation bill in committee on conference; is that right?

A. One of the most interesting things about that bill, there was no fiscal notes, so we had no idea what the cost would be. And that was also a part of what happens in committee. You generally had -- you had some fiscal note indicating what the cost would be.

Q. Okay. And that's typically any time you're dealing with appropriations, you have a fiscal note?

A. Yes.

Q. And the state superintendent wasn't made aware of this.

A. No, he was not.

Q. State superintendent of education.

A. That's right.

Q. Now, did you have a chance to read the bill before it was passed?

A. The --

Q. New bill.

A. The new bill? No.

Q. And it was passed by a 4-2 vote out of committee on conference?

A. That's right.

Q. And went immediately to the House and the Senate and was passed?

A. That's right.

Q. And by the time it got to the House and the Senate to pass, did you have a chance to read it then?

A. Well, we may have had an opportunity, but the disgust or the -- the amazement in terms of the process and how it was treated was one that it was up for discussion at that particular point on the floor. So there was very little time given for any discussion or clarity for that bill. It was one of those things that happened within an hour's time, I would say, we were -- we had passed that bill.

Q. Okay. So within an hour or so time out of coming out of the conference on committee, that very night, it was passed by both houses.

A. Yes.

Q. All right. Now, has this become a norm of the way the legislative process is being done since 2010?

A. I would say that there have been -- the challenge that I faced that I think many legislators have faced is the number of

times we've been clotured or debates have been stopped. I am -- I'm one of those individuals, as a minority, I've always felt that minorities should have a voice. And when you have a voice, cloture is not one of those things that you do to deter that, and we've had that happen quite a bit.

Q. In terms of putting some relative -- and to quantify it, how many times has cloture occurred this session that you've been -- since you've been in this session that you've been representing House 19 versus the time that you've been in the House all together?

A. I think I stated earlier, I've been in the Legislature 20 years, and over those 20 years I feel that I've been clotured more during this last quadrennium than the entire 20 years I've been in session.

Q. Okay. How would you describe the role of the black legislators in the now legislative process?

A. The role of the black legislators is -- any legislator is to advocate for the people that they represent.

Q. Do you feel like the way that the business is being conducted in the Legislature that that has changed, your ability to do that, the ability to advocate?

A. It is challenging at best. Yes.

Q. Okay. Now, have you ever been asked to change parties from Democrat to Republican?

A. No.

Q. And one final area. Were you ever interviewed by the Department of Justice?

A. No.

Q. Now, your new House District 19, it changed from around, what, 68 percent African American --

A. Yes.

Q. -- to about 60, 63?

A. Yes.

Q. And the Department of Justice did not contact you about any concerns regarding that change?

A. No.

MR. PATTY: That's all.

JUDGE PRYOR: You need to answer for the record, Representative Hall. You need to say yes or no. I didn't hear it.

THE WITNESS: I said no. I'm sorry.

MR. PATTY: I need to clarify, too, for the record. I think I put Decatur in the Shoals area, and it should be Sheffield, Florence, and Tuscumbia.

THE WITNESS: Thank you.

MR. PATTY: So I correct that. And Your Honor, also I would move to admit NPX A, B, C, D, and E.

JUDGE PRYOR: Any objection?

MR. PARK: No, Your Honor.

JUDGE PRYOR: Admitted. Mr. Blacksher?

MR. BLACKSHER: I have no questions, Your Honor.

JUDGE PRYOR: Thank you, Mr. Blacksher. Mr. Park?

CROSS-EXAMINATION

BY MR. PARK:

Q. Representative Hall, Senate District 2 was dramatically overpopulated coming into this redistricting cycle, wasn't it? That's Mr. Holtzclaw's district.

A. Yes.

Q. And it was about 42,000 people over. Is that your understanding?

A. Yes.

Q. So those people needed to go somewhere, didn't they?

A. Sure.

Q. You had an opportunity to talk with Representative McClendon about what you wanted in your district; is that right?

A. Yes.

Q. And you got the chance to tell him -- basically, you needed to add population because you were underpopulated coming into the cycle.

A. Yes.

Q. And you told him what you wanted to add, didn't you?

A. Yes.

Q. And what of that did you get in your new district?

A. Well, House District 53 took part of the district, portion that could have stayed in my district, which did not, so which

helped to create the new district.

Q. So you contributed to that new district, right?

A. It appears.

Q. Yes, ma'am. Mr. Patty showed you the percentage for various populations. The Dial senate plan is plus/minus 1 for its overall deviation. Isn't that right?

A. I'm sorry. Your statement again?

Q. The Dial Senate 2 plan is plus/minus 1 for its overall deviation; is that right?

A. From what I understand, yes.

Q. And the Reed Buskey plan is plus/minus 5 for its deviation; is that right?

A. Yes.

Q. And I would like to show you -- let me represent to you that -- the Newton plaintiffs' illustrative remedy, I believe it's Newton Plaintiffs' Exhibit 302. And does this show that the proposed new Senate district plan would be 4.96 percent under the ideal population? Up at the right-hand corner --

A. Yes.

Q. -- up at the top.

A. I see that, yes.

Q. And that's with the black community and the Hispanic community that you thought should go into a new Senate district; is that correct?

A. Yes.

Q. You said you hadn't been asked to switch parties. What would you say if you were asked to switch and become a Republican?

A. I don't think you would be very happy with me in your party.

Q. Would you be happy with the Republicans?

A. Would I be happy with the Republicans?

Q. Yes, ma'am.

A. I have not thought of asking them if I could be a member, so I would think not.

Q. Okay. You mentioned the advertisement Dale Jackson ran.

A. Yes.

Q. Didn't the Secretary of State tell Mr. Jackson to cease and desist, to stop?

A. I am told that happened, but that was after the damage had already been done.

Q. And they were talking about Republicans and Democrats, right?

A. Yes.

Q. And there are white Democrats, aren't there, in north Alabama?

A. Are there white Democrats in north Alabama?

Q. Yes, ma'am.

A. Yes.

Q. Are there any black Republicans in north Alabama?

A. Yes, there are.

Q. Thank you, ma'am.

MR. PARK: Nothing further.

A. Thank you.

MR. PATTY: No redirect.

JUDGE PRYOR: Thank you, Representative Hall. It's good to see you.

MR. ANDERSON: We'll call Representative Joe Hubbard.

JUDGE PRYOR: Mr. Hubbard, you were administered an oath earlier, right?

THE WITNESS: Yes, sir.

JOSEPH HUBBARD

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Representative Hubbard, could you state your name and your address.

A. Joseph Hubbard. 1631 Wentworth Avenue, Montgomery, Alabama.

Q. And for the record, you represent?

A. District 73.

Q. You're my representative in Montgomery, right?

A. I'm told, yes.

Q. And the judges have heard, District 73 -- we're going to talk about this briefly. District 73, under the plan that was

adopted, was moved from Montgomery County to Shelby County.

A. That's correct.

Q. All right. When is the first time that you found out that there was a plan that drew your district from Montgomery to Shelby?

A. It was at a committee hearing held by the joint committee on reapportionment.

Q. How long was this before the vote that they had on the floor?

A. It may have been the week prior.

Q. All right. Prior to that time, had anybody told you your district was going to be abolished and moved to Shelby County?

A. No.

Q. Had you had an opportunity to talk to anyone about the redistricting that was coming up in the Legislature prior to then?

A. Yes.

Q. All right. And did you ever meet with Mr. Hinaman, who drew the districts?

A. No.

Q. Now, who did you talk with about the redistricting prior to?

A. I spoke with Chairman McClendon. I spoke with the Speaker of the House. I spoke with members of my delegation.

Q. All right. Let me ask you about your conversations with the chairman. Did he mention to you prior that you were going to

have your district moved and gone?

A. No.

Q. What was that conversation about?

A. Well, I was told -- I believe we were all told that we needed to speak with the chairman and share with him our view on the districts and how they might change. And up to this point, I had worked extensively with our reapportionment software on the computer up in the reapportionment office to draw a district that accommodated the demographic shift and the population shift in Montgomery County, so I took that map to Chairman McClendon and shared that with him.

Q. And for the record, District 73 in Montgomery County in the prior census, in the 2000 census, was a majority white district, right?

A. That's correct.

Q. And prior to 2010, the 2010 election, District 73 had been represented by white Republicans?

A. For about 30 years. Yes.

Q. Now, even with the changes, am I correct, in 2010, were you the only Democrat, white or black, that defeated an incumbent Republican in the state of Alabama?

A. That's correct.

Q. All right. District 73, by 2010, had become -- well, what do you understand how the -- how the district had changed racially?

A. My understanding was the minority vote by 2010 was around 38 percent, and the remainder was white, a white district. So it was what I call an influence district.

Q. Okay. Now, under this -- if you had kept the same -- if District 73 had been left intact, in fact, it would have been close to 50 percent black.

A. Populationwise or --

Q. Populationwise. Not voting age, but populationwise.

A. Correct.

Q. So the district was changing.

A. Correct.

Q. You mentioned you spoke with the Speaker of the House.

A. That's correct.

Q. Could you tell us about that?

A. Sure. Early in the 2012 session, we had a very controversial vote on a jobs bill. It was the governor's jobs proposal. And I broke ranks and voted with the Republicans on this bill and had worked with some other Democrats to bring them along to get the bill passed because I thought it was a good bill for my district. And soon thereafter, the speaker's chief of staff arranged a meeting for me with the speaker, and I went to meet with the speaker after this vote.

Q. Did you talk about your political future and what might happen to your district?

A. The first thing he said to me, he thanked me for my vote.

And I explained to him that the vote was what was in the best interests of my district. And he then said to me, well, how can we help you in redistricting? And my response to him, I believe I told him, Mr. Speaker, I have only one request, and that is that you do not put me in Representative Knight's district. And he went on to tell me that I showed a lot of promise as a legislator and that if I played my cards right, I could have a long future in the Alabama House of Representatives.

Q. Did he indicate to you what "playing your cards" right was or did anyone else indicate that to you?

A. Well, given prior conversations I had had with the speaker's chief of staff where I was asked to switch parties, I assumed that's what he was talking about.

Q. All right. Now, they didn't put you in Representative Knight's district, did they?

A. Well, ultimately --

Q. They put you in Jay Love's, District 74.

A. No. Ultimately they did put me in Representative Knight's district. Because when they moved 73 to Shelby County, my house and my neighborhood was taken into District 77, I think, is Representative Knight's. But the neighborhoods in District 73 now were split between three districts: Representative Knight's district, Representative McClammy's district, and Representative Love's district.

Q. So this offer to change to the party, and you didn't change,

and your district was gone.
A. That's correct.
Q. Did you have any conversations with Representative Love, who was District 74, the neighboring district, about the changes after the plan came out?
A. Yes.
Q. Tell us about that.
A. It was during the debate in that special session. I was working very hard to change some of the district lines under the proposed map.
Q. So this was with 73 gone?
A. Correct.
Q. Okay.
A. And I was not trying to put 73 back into Montgomery County, because I realized that ship had sailed. What I was trying to do was put the neighborhoods I represented back together. They had been carved up pretty extensively under the new map, and I was simply trying to reconstitute these neighborhoods to protect the interests of the folks who lived there whom I currently represented. And I had a map that had the support of all the members of my delegation, with the exception of Representative Love.
Q. What was his opposition to that?
A. His objection to it was that my map had his white population at 69 percent.

Q. Was he opposed to that being too high or too low?

A. He said that that was too low. And I said to him, well, Jay, that's considerably more than you have right now. I believe you're at 64 percent. Something like that. And he says, well, you know as well as I do, Joe, that in 10 years that 69 percent will be below 60. And my response to him was, do you really intend to be here in 10 years? And so that's about how that conversation went.

MR. ANDERSON: I have nothing further, Your Honor.

JUDGE PRYOR: Mr. Blacksher, do you have any questions of this witness?

MR. BLACKSHER: I have no questions.

JUDGE PRYOR: Thank you. Mr. Walker?

CROSS-EXAMINATION

BY MR. WALKER:

Q. Good morning.

A. Good morning, Mr. Dorman.

Q. Mr. Hubbard, did you speak with DOJ during the preclearance process?

A. I did not.

Q. You did not? Did you have any communication with DOJ at all?

A. I did not --

Wait. I take that back. I believe there was a conference call.

THE WITNESS: I apologize, Your Honors.

A. I believe there was a conference call with which I was a part -- in which I was a part.

Q. And who else was in that conference call?

A. I believe Mr. Parks, if I recall. I could be wrong about that, but I believe Mr. Parks was on that call as well.

Q. Okay.

A. Some DOJ lawyers maybe.

Q. And you were interviewed, were you not, about what happened to your district?

A. That's correct.

Q. Okay. You mentioned that you beat an incumbent, a Republican, in 2010. Was that David Grimes?

A. That's correct.

Q. And do you know whether Mr. Grimes was suffering from serious health problems during that campaign?

A. Whether or not they were serious, I don't know. He maintained that they did not impact his ability to run or to serve.

Q. Do you know whether or not there was campaign literature that said he would not be physically fit or medically fit to serve in that office?

A. I do not know. I did not have any literature to that effect.

Q. Most of your district that was -- is now in 77, that's

Mr. Knight's district; is that not correct?
A. My understanding is the black portions of my district have been moved to Representative Knight and Representative McClammy's districts. Yes, sir.
Q. And did you understand that Mr. Knight's district had been underpopulated in the 2001 redistricting and needed to add significant population?
A. I did understand that there was some underpopulation in the western part of the county. I also understood that there was overpopulation in the eastern part of the county and my district was, in fact, overpopulated, as was a number of other districts. I believe Representative Love's was underpopulated.
Q. Okay. And his needed, therefore, to add population, too?
A. That's my understanding.
Q. Do you know whether or not -- how emergency rooms are handled in Montgomery?
A. I'm sorry? How --
Q. Emergency rooms by the hospital. Do we have one hospital? Do we have two who rotate? Do you know how that's handled here?
A. I'm no -- I'm an attorney by trade. I believe a doctor may testify better to that. But I do know that we have Jackson Hospital and Baptist, both of which have emergency rooms, and my understanding is that the ambulances rotate between the emergency rooms in this county.
Q. Thank you. You have purchased a new home in District 74; is

that correct?

A. No, sir. It's in District 73.

Q. It's in District 73?

A. Yes, sir.

Q. Okay. Thank you very much.

JUDGE PRYOR: No further? Okay. Thank you, Representative Hubbard.

JUDGE THOMPSON: District 73, that's new or old?

THE WITNESS: My current district.

JUDGE PRYOR: What about the new districts? Where would it be in the new districts?

THE WITNESS: Under the new map, it would be in District 74.

JUDGE PRYOR: Okay.

MR. ANDERSON: Call Dr. Arlington.

JUDGE PRYOR: Dr. Arrington, you took the oath earlier?

THE WITNESS: Yes, sir.

MR. ANDERSON: Your Honors, by agreement of the parties, we have -- it's Exhibit MPX 323 that is Mr. Arrington's direct testimony. And I think at Your Honor's request, you want me to read it. No, I'm just kidding.

JUDGE PRYOR: His deposition testimony?

MR. ANDERSON: No, sir. This is the testimony he prepared as direct testimony.

We also have an agreement that the deposition can be

 introduced in its entirety, which would represent most of the cross-examination. There was a few things, Dr. Arrington, I want to --

JUDGE THOMPSON: Let me just clarify this. You're saying that his statement, not deposition, is admissible by agreement; is that correct?

MR. ANDERSON: Yes, sir.

JUDGE THOMPSON: And also his deposition is admissible by agreement?

MR. ANDERSON: Yes, sir.

JUDGE THOMPSON: What are the document numbers on those two?

MR. ANDERSON: The document number for his statement, and it's entitled Direct Testimony of Theodore S. Arrington, is NPX 323.

JUDGE THOMPSON: And the deposition?

MR. ANDERSON: The deposition is -- We have his deposition. I don't know if we've had it marked. This was an agreement we reached yesterday.

MR. WALKER: Your Honor, it will be Exhibit 486, but we haven't tendered it yet.

JUDGE THOMPSON: And you've agreed that that's admissible as well?

MR. WALKER: Yes, sir.

JUDGE THOMPSON: So will there be any cross?

MR. WALKER: There will be some brief cross.

JUDGE THOMPSON: So the deposition is the cross, and the statement, essentially, is the direct.

MR. ANDERSON: Yes, sir.

MR. WALKER: Yes, sir.

In addition, while we're on this, we would also like to put in his report, tender the report.

JUDGE THOMPSON: What's the document number of the report?

MR. WALKER: It was 125, but it doesn't -- but it's not in yet. It's going to be added as an exhibit.

JUDGE PRYOR: They're all admitted.

MR. ANDERSON: Thank you, Your Honor.

JUDGE WATKINS: Are those Defendant's Exhibits 486 and 125?

MR. WALKER: No, sir, Your Honor. I misspoke. It's Defendant's Exhibit 486, which is the deposition. 125 was the filing number in the court docket sheet, but that's not relevant today. So I'm sorry.

MR. ANDERSON: And Your Honor, I'd like to, since he's already been crossed, redirect Dr. Arrington with a few questions and a short summary.

JUDGE PRYOR: Okay.

JUDGE THOMPSON: Could I interrupt you one second? The deposition, has that been provided to us with extra copies?

MR. WALKER: I have got copies for you now, Your Honor, and we'll give them to you at lunch or whenever you want them.

JUDGE PRYOR: Okay.

THEODORE S. ARRINGTON

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q. Dr. Arrington, we're here live in Court today, and we've had these stipulations we've put on the record. For the record, could you state your name and address.

A. Theodore S. Arrington. I live in Albuquerque, New Mexico.

Q. And your credentials? You've attached this to your statement about your --

A. That is correct.

Q. -- CV. And I'm going to ask, in the -- in the course of this trial and during the -- your deposition, you were asked about prior plans that were adopted by the Alabama Legislature, and particularly the 2000 census plan. And you mentioned in the -- in your deposition that you called this a dummymander?

A. That's a technical term. That's correct.

Q. Okay. As a technical term -- we've all heard gerrymander, but explain to the Court what you mean by the -- that you thought the 2000 plan that was adopted by the Legislature was a

dummymander.

THE WITNESS: Your Honor, there's such a thing as being too smart for your own good, and sometimes legislatures do things where they think it's to their advantage, and they get greedy. And it turns out, after a while, that what they thought was to their advantage turns out to be to their disadvantage. And that's sort of what a dummymander is.

JUDGE PRYOR: Is that like being hoisted on your own petard?

THE WITNESS: That's correct, Your Honor.

And I had said in the deposition, and I still agree with this, that if the Republicans had come to me when the 2000 plan was being enacted, I would have been willing to be their expert witness to say that this is a bad plan. It has a number of bad features. One of them is it continues to pack the black districts. And I would have said that's something that shouldn't be done in 2000 and shouldn't be done in 2010.

Q. Why is packing bad and illegal?

A. Sure.

Packing restricts the black community to just those districts that are packed, so that, essentially, their ability to participate in the political process is limited. This is a state that's about 70 percent white. If you're restricted to just 25 to 30 percent of the districts in the Legislature, and you have no ability to form coalitions with whites, then your

ability to participate politically is restricted. It's not participating equally in the political process.

JUDGE PRYOR: Dr. Arrington, were you saying that the 2000 plan was packed?

THE WITNESS: Absolutely, Your Honor. In fact, the 1990 plan was packed. And Your Honor, the reason for that is that after the *Gingles* case, state legislatures understood that they had to create majority black districts. But we didn't know -- and I include myself in that because I was drawing districts at that time -- we didn't know what level of concentration was necessary to give minorities a reasonable opportunity to elect candidates of their choice. Also, since that redistricting and since the 2000 redistricting, the ability of blacks especially to mobilize, to get registered and to actually get out and vote, has exploded. And the Chief Justice noted that when he declared Section 4 of the Voting Rights Act unconstitutional, that blacks are mobilized today at the same rate as whites. And if they're mobilized today at the same rate as whites, and you have a district that's just majority black by voting age population, and the cohesion of blacks tends to be 90 percent plus, and you're getting at least 20 percent of the whites to vote for them, that's plenty for them to have a reasonable opportunity to elect a candidate of their choice without restricting their ability to deal in the adjoining districts; to join with white Democrats and have a fighting

chance to win. Not a sure thing, but a fighting chance to win.

Q. You mentioned packing throughout your testimony. You also mentioned cracking. What do you mean when you say that they're cracking a district?

A. The process of gerrymandering is very simple. First you take the other guy's voters and pack them as much as you can. But you can't pack all of them into a few districts -- some are left over -- so you take the ones that are left over and you distribute them in the remaining districts in such a way as they're powerless there. So you pack and then you crack what's left over.

And you can see that in these plans, in the sense that in addition to the packing, they then took the remaining blacks and separated them so they were always less than about 35 percent of the population in any of the remaining districts. Which means that's small enough that blacks would not be able to say to white Democrats in such districts, hey, if we move together, we can win this district. But if you go to white -- white officeholders, white voters and the like, and you say, coalesce with us and we can win this district, if that's not possible, then no such coalitions will ever be formed.

JUDGE WATKINS: Dr. Arrington, you said "these plans."

THE WITNESS: The enacted plans.

JUDGE WATKINS: Are you talking about historical plans, the two prior ones, or are you just talking about the plans that

are at issue in this case?

THE WITNESS: All three of them.

JUDGE WATKINS: The 1990, the 2000, and the current one?

THE WITNESS: But Your Honor, here's the difference. In 2000 Democrats were getting 35, 40 percent of the white vote. And if you're getting 35 or 40 percent of the white vote, then you can pack the black districts to some extent, you can engage even in some cracking, and the white Democrats can still win. But if the Democrats are only getting 20 percent of the white vote, then it becomes a very different game. And that's what really changed.

That's why the Democrats did what they did in 2000, and they thought they were being smart. But once things changed, especially after 2010, then what looked smart in 2001 and 2002 turns out to have been very bad; especially bad for blacks because it means it cuts them off from the ability to form those coalitions that they have to have if they're going to be players in Alabama politics.

BY MR. ANDERSON:

Q. There's been testimony that the local representatives and the local senators were shown their district isolated, particularly the black representatives and black senators, and they liked the plan. They mentioned that there was the senatorial plan from Jefferson County that had blacks packed in.

Do you have an opinion about these individual senators, individual representatives that say, well, this is good, this is what I want?

A. Every sitting incumbent representative wants as many of his kind of voter in his district as he can get. And so if you -- if you play the game of divide and conquer where you talk to each of them individually and say, have we got a deal for you, we're going to give you a district you can't possibly lose, they aren't going to turn that down. But when they see the way the whole plan works, it becomes very different. But even given that, in the hearings there were several representatives -- and I think some senators, too -- who said, don't pack these districts.

Now, they may have been saying, don't pack his district, but the point is still the same. That's not unusual behavior. Nobody in this process has acted irrationally. I don't make that argument at all. Everything they've done is rational, but it still may have a racial base.

Q. Let's take the two examples where they moved District 73 from Montgomery County to Shelby County, and they moved 53 from Jefferson County to Madison County. There's been testimony before the Court that Montgomery County -- the black districts in Montgomery County, majority black districts, needed numbers. They were low. Shelby County had grown tremendously, and so they needed to move 73 from Montgomery County to Shelby County,

and then you could pack in or have the higher numbers in Montgomery County.

Same thing. The numbers had increased. Madison County -- you were in here -- saw one senatorial district went up 42,000. The population of Madison County had grown, population in Jefferson County had shrunk, and so we had to move some districts somewhere. Do you have an opinion that it showed some intent on behalf of the drafters by moving 73 to Shelby and 53 to Madison? Do you have an opinion about that?

A. Your Honor, in both Montgomery County and in Jefferson County, it wasn't the black population that declined. It was the white population. In fact, the black population in both of those counties increased. So if you look at it in terms of representing those regions -- and I think that's the way you have to look at it. I think that's what the *DeGrandy* decision says that you have to do.

I was involved in a case along with Dr. Lichtman in Maryland where, again, the Court said the same thing. You have to look at Baltimore separate from the rest.

When I was working in Louisiana for the Department of Justice -- this was pre-Katrina -- New Orleans had lost population, but it had lost white population and gained black population, but they deleted a black district. And the Department of Justice, on my advice, said, you can't do that. Delete a white district.

The same thing applies here. You've got an increasing black population. If you have to move a district because of population, you have to do that. But what you move, you move a white district, because that's what makes sense within the context of those regions.

And creating the additional district in Madison County, that's a good thing. I have no objection to doing that. The black population there is increased. You should increase additional districts. But there's no reason to see that as balancing off something else, unless your motive is to limit black ability to participate in the process as much as you can and still get approval from the Department of Justice under Section 5. And that was the goal that they had in mind.

Q. You had some criticism in your direct, and they asked you this on your cross, about what I call the 2 percent rule, which is 1 percent variance each side, vis-a-vis the 5 percent rule that -- in previous plans. Can both of these percentages be manipulated, and, compound question, is one easier to manipulate than the other?

A. Just on the face of it, just on the face of it, there's more room for manipulation, good or bad, in the 10 percent rule than in the 2 percent rule. That's not the way the 2 percent rule has been used here, I think. I think the 2 percent rule was used as a way of saying, once we've done that, once we've said we have to pack these black districts because we won't get

approval from the Department of Justice, and we have to stay within 2 percent, that allows them to draw a plan which, essentially, has no redeeming features at all. If you say you didn't follow county boundaries, well, you can't. If you say you have to shift a district out of Birmingham, well, you have to do that.

It's what I call the devil-made-me-do-it approach. It gives them protection against any argument that the plan is deficient on any basis, either when presenting it to the public or when presenting it to the courts.

Here's the problem, the way I see it. The Legislature can adopt a 2 percent plan. That's not on its face unconstitutional. I understand that. But you have to ask the question of some kind of proportions. The advantage of a single-member district system is that you're representing people, but you're representing them in terms of the places where they live and identify with. The district has a meaning because the people who live there know what it is and the representative knows what he represents or what she represents.

If you go to 2 percent, then you essentially create districts where they're all about the same size, same population, but they have no meaning. You can't say, well, this is the central Birmingham district and this is the -- this is the Dauphin Island tourist district. They're just collections of people. Which it's one person, one vote, all right, but it

lacks any meaning.

And once you -- once you've freed Mr. Hinaman to draw a plan which has no meaning at all, he can pack and crack as much as he wants to, and it doesn't matter, because everything he did, the devil made me do it.

Q. Have you seen this other places than in Alabama?

A. Little louder?

Q. Have you seen this in other places other than Alabama, this --

A. I've seen them, yeah. I want to point out, I haven't drawn any plans for Alabama, so I don't know some of the nitty-gritty of some of the districts.

Q. Let me show you -- this is table one to NPX 323. And why did you -- tell the Court what this table is.

A. What this shows is the extent of the packing, again, based on Dr. Lichtman's analysis, based on academic studies of elections in Alabama, based on court reports in many voting rights cases. Fifty-one to 55 percent is plenty to give minorities in Alabama a reasonable opportunity to elect candidates of their choice. As you can see in both the enacted plans and in the 2002 plans, you've got, for the most part, far above that; in the seventies in some cases.

You'll also notice that in Representative Hubbard's district, down from 52, down to 16 percent voting age population. In my view, that's a retrogression. I realize

these plans were precleared by the Department of Justice. I understand that. But if you look at it carefully, that's a retrogression.

And it's not balanced off by 85, which went from 48.5 percent voting age population to 50.2, because that district is already a district in which African Americans have a reasonable opportunity to elect candidates of their choice. They've been doing so. They've been doing so consistently.

So what you've done is you've changed the character of Joe Hubbard's district, and you haven't changed the character of District 85. That, in my view, is a retrogression in the simplest terms; the simplest terms of counting the number of districts.

This doesn't show the '90 redistricting, but the packing goes back that far. And, again, we didn't know what to do in '90, and blacks were not as well mobilized as they are today, so there was a reason to do that before now. There's no reason to do it anymore.

JUDGE THOMPSON: How do you define retrogression?

THE WITNESS: I'm a little hard of hearing.

JUDGE PRYOR: How do you define retrogression?

THE WITNESS: Oh. Well, the way I would define it is that they have less of an opportunity to participate in the political process in the new plan than they had in the old plan. One simple measure is they have fewer districts in which they

have a reasonable opportunity to elect the candidate of their choice. We just call that, for short, an opportunity district. That's one measure. It's not the only measure, because as a political scientist, not lawyer, I don't -- but as a political scientist, it seems to me the Voting Rights Act has two goals: elect candidates of their choice and participate in the political process on an equal basis.

JUDGE PRYOR: I thought that this new plan created more majority minority districts. Did it not?

MR. ANDERSON: No, sir. It's the same number.

JUDGE PRYOR: Same number in the House? I thought it created one more.

MR. ANDERSON: It's the same number. Okay. Maybe. 53 moved -- under the 2000 census, 73 was majority white number.

JUDGE PRYOR: Right.

MR. ANDERSON: So they kept it -- as far as the actual district, that's why he's pointing that out.

JUDGE PRYOR: Okay. So the number of majority minority districts, with that understanding, remained the same?

MR. ANDERSON: Yes.

JUDGE PRYOR: Okay.

JUDGE WATKINS: But you're using voting age population, not total population?

MR. ANDERSON: Yes, sir.

THE WITNESS: Yes, Your Honor. You use total pop to

determine one person, one vote. No question about that. But when you're look at the ability to elect, you have to use voting age population. And if you have a very large Hispanic population, you might even have to use citizen voting age population. But since blacks in Alabama are all citizens, that is really not --

JUDGE PRYOR: Dr. Arrington, you testified earlier that the earlier plans, that is, the plans adopted following the 2000 census and the '90 census, were packed. I was under the impression -- under the understanding that those earlier plans had substantially underpopulated the majority black districts. Is that right?

THE WITNESS: Yes, Your Honor.

JUDGE PRYOR: And when you would pack a plan, wouldn't you overpopulate the majority minority district?

THE WITNESS: No, sir. We're dealing with two separate things. The under or overpopulating of the district is one question.

JUDGE PRYOR: Isn't that part of packing?

THE WITNESS: Well, but whether they have more than they need of concentration of African Americans to elect candidates of their choice is a separate one.

One of the clear things --

JUDGE PRYOR: Well, wait a minute, now. Wait a minute. If the district has a greater percentage of black voters than

you think that it needs, but it's underpopulated, then that means that those minority voters are more available to distribute to the other districts. Isn't that right?

THE WITNESS: (Nods head)

JUDGE PRYOR: If you were going to pack it, it would --

You need to answer yes or no, not just nod your head, for the record.

THE WITNESS: Yes, Your Honor. You're on the right track.

JUDGE PRYOR: All right. But if you were going to pack the district, you would not only want to have a high percentage of black voters, but you would want to overpopulate the district, too, wouldn't you, if you were going to pack the district?

THE WITNESS: You wouldn't have to do that, but you could do it.

JUDGE PRYOR: But if you did that, that would be a better way to pack the district; isn't that right?

THE WITNESS: Not necessarily, but it would be a another way to --

JUDGE PRYOR: Why wouldn't it be?

THE WITNESS: Well, because the critical factor is how those blacks are distributed rather than just how many.

JUDGE PRYOR: I'm not talking about how you would crack them. I'm talking about how you would pack them.

THE WITNESS: That would be another good way to do it.

JUDGE PRYOR: Is there any better way to do it than that? Is there any more way to pack the district other than to increase the percentage of minority voters within the district and overpopulate the district?

THE WITNESS: Clearly if you did both, that would clearly be better than doing either one.

JUDGE PRYOR: Okay.

THE WITNESS: If that's what you're saying.

BY MR. ANDERSON:

Q. And when you say "better," Dr. Arrington, you mean a better job at packing?

JUDGE PRYOR: Yes. I'm not speaking in terms of better districting principles. I'm only speaking about if your goal is packing.

THE WITNESS: Yes, Your Honor. That's exactly right. And what you're speaking of is one of many features of the 2000 plan that were bad.

JUDGE PRYOR: But I thought the 2000 plan substantially underpopulated the majority minority districts.

THE WITNESS: That's correct.

JUDGE PRYOR: And in many cases by almost as much as 5 percent.

THE WITNESS: (Witness nods head)

JUDGE PRYOR: Is that right?

THE WITNESS: That's my understanding. And one of the things they did is they didn't look at where the population was increasing and where it was decreasing.

One of the things you can do if you've got more possible deviation in population is you can say, here is where population is increasing rapidly. Shelby County, for example. So what we should do is make that district smaller and then --

JUDGE PRYOR: But they did the opposite of that, didn't they?

THE WITNESS: That's right.

JUDGE PRYOR: Is that right?

THE WITNESS: That's right.

JUDGE WATKINS: Dr. Arrington, I hear you saying that the demographic rules of voting behavior have changed since the '90s and since the 2000 census. Is that what you're saying?

THE WITNESS: That's correct, Your Honor.

JUDGE WATKINS: When did you come to that realization?

THE WITNESS: By 2000 I had come to that realization, because I was reading the literature, but not all legislatures responded to that. But we are increasingly doing so.

It's been a long time since I have seen an expert that I respect who works, for example, with the Department of Justice, who has said, oh, we need 60 or 65 percent. In most places. Now, it varies. One of the things I said when I was doing work in New Orleans is 50 or 51 percent in New Orleans is

not enough for blacks to have a reasonable opportunity because of the peculiar way in which they run their elections, the two-phase thing. But in Alabama, 51 percent is plenty. In North Carolina, 41 or 42 percent is plenty.

JUDGE WATKINS: I read that in your report.

JUDGE PRYOR: We're going to take a break.

MR. ANDERSON: I don't have much more, Your Honor.

JUDGE PRYOR: All right. Then finish up and we'll take a break.

MR. ANDERSON: Okay.

BY MR. ANDERSON:

Q. Let me real quick -- this is the figure one to NPX 324. Tell the Court what this shows. There were some questions about these.

A. Yeah. This just shows that Republicans really can only win, with one exception, in 2010 -- 2010 was a great year for Republicans -- they only win when districts are less than 40 percent black.

White Democrats can win in all kinds of districts, even occasionally in a district that's more than half black.

Black Democrats really only win in districts that are 50 percent or more, with that one district that's 48 percent being the one exception.

So blacks only win if you get over 50 percent, basically. Whites can win in any number of kinds of districts. But

Republicans really can only win if you stay less than 40.

So what they've done, if you'll show the next chart, is they've created that -- with that in mind, these are the enacted plans. And you can see they've clearly kept -- they've got two kinds of districts: Those in which blacks are more than half and those in which blacks are 40 percent or less. And in fact, it's 36 -- 36 to 50 percent, there are no districts, and one district between 50 and 51.

JUDGE PRYOR: When you say 2010 was a really good year for Republicans, you're comparing legislative election years to legislative election years?

THE WITNESS: That's correct, Your Honor.

JUDGE PRYOR: You're not considering presidential election years when legislators are not on the ballot?

THE WITNESS: No, I'm not, Your Honor.

MR. ANDERSON: That's all I have at this time. Now, during the break, my colleagues may have reminded me if there's something that came out.

JUDGE PRYOR: If so, you won't be prejudiced by that, Mr. Anderson. We'll take a 15 minute break.

MR. ANDERSON: Thank you, Your Honor.

(Recess was taken from 10:15 a.m. until 10:47 a.m., after which proceedings continued, as follows:)

JUDGE PRYOR: Please be seated.

What did your cocounsel tell you? They had more

questions, didn't they, Mr. Anderson?

MR. ANDERSON: Absolutely, but I'm going to limit it to really only one.

BY MR. ANDERSON:

Q. Dr. Arrington, in your direct examination you've covered some of this, and they asked you these questions -- Judge Pryor asked you about this 2010 plan as opposed to the 2000. That's what we're here about, 2010.

Now, first, would you agree they did a better job of packing in 2010?

A. Yes, but as Your Honor pointed out, they could have done a better job. I mean, there were other tools available if they really wanted to pack in 2000 that they could have done, and they didn't use those.

Q. And they took some of those and used them in this plan in 2010?

A. That's correct.

Q. Now, you not only have an academic background, but you have a practical background? You served --

A. That's right. For 12 years I administered elections in Mecklenburg County, that's Charlotte, which has 700,000 people, something like that.

Q. And based on your experience and your background and what you've done, have you looked at the factors the Supreme Court set out in *Arlington Heights* to show intent?

A. I have.

Q. Do you have an opinion, in this 2010 plan, what was the intent?

A. Yes. My opinion is the intent was to district black population -- black participation as much as possible, including preventing them from forming effective cross-race coalitions. And here you've got the effect which we've been discussing, probably too much. You've got the fact that the plan had -- was enacted with a number of irregularities, including not passing it when the state constitution says you're supposed to; ignoring the hearings; ignoring county boundaries, which were the primary element of those hearings. The black and the white representatives were treated very differently in the redistricting process, and that's already been introduced to the Court this morning in terms of lay experience. The whites, the white Republicans had hands-on experience with the computer to design their districts. The black Democrats had input maybe of some kind.

So all of these are factors which courts could take into account in determining whether there was an intent to discriminate under *Arlington Heights*. And my job is just to highlight those elements so you can make the decision.

Q. Thank you.

MR. ANDERSON: Pass the witness.

JUDGE PRYOR: Mr. Blacksher?

MR. BLACKSHER: No questions, Your Honor.

JUDGE PRYOR: Thank you.

CROSS-EXAMINATION

BY MR. WALKER:

Q. Thank you, Your Honor. Hey, Dr. Arrington.

A. Good morning.

MR. WALKER: Your Honors, before I start, let me, just so I don't forget -- I'd like to tender the deposition of Dr. Arrington as Exhibit 486. I'll provide the Court with a physical copy of that exhibit, I think, before we break for lunch. And then I was telling Judge Pryor that we'll also provide you, not in a filed way, I guess, unless you tell me to, a disk which has the depositions, any depositions, in a word searchable manner.

MR. ANDERSON: No objection, Your Honor.

JUDGE PRYOR: No objection. It's admitted.

MR. WALKER: In addition, we would tender the report as opposed to the direct testimony of Dr. Arrington, which would be Exhibit 487.

MR. ANDERSON: No objection, Your Honor.

JUDGE PRYOR: It's admitted.

BY MR. WALKER:

Q. Dr. Arrington, you talked just now about various factors which you believed relate to or are indicia of discriminatory intent. One of those was ignoring county boundaries. And you

agree, I believe, that county boundaries to some extent are a victim of the decision to go to a 2 percent deviation? Is that not correct?

A. That's right.

Q. And I believe you also agree that in redistricting, not all of the factors can get equal respect. Some have to yield to others at different points in the redistricting process or in different decisions. Is that not correct?

A. That's right. I've categorized it as having a lot of balls in the air at the same time like a juggler. Sure.

Q. And in your experience, based on your experience with this redistricting, would you have an opinion as to whether or not it's uncommon for each side to keep its plan to itself until it's revealed in committee?

A. Are you asking where everybody -- that everybody likes to gerrymander?

Q. No, not at all. I'm saying that have you not observed that in other places, the Republican party -- where redistricting is done in a -- not by a nonpartisan committee or something like that, that each party may prepare its own plan, or in this case we have several versions of a Democratic plan, and it's not uncommon for them to keep that in whole or in part to themselves until they introduce it? Is that not true?

A. Sure. You typically have various plans, and those plans have partisan and racial implications. And what I would note is

that when you pass a plan, you already know what those partisan and racial implications are. They're known when you pass the plan.

Q. But the point is that keeping your team's plan to yourself until you've got it ready to be introduced is not in and of itself an indicia of intent to discriminate, is it?

A. Not in and of itself, but it can be used in conjunction with various other devices to have that effect.

Q. Sure.

A. That's correct. And what seems to me is that the notion that it should be done in the general session and the notion that you have to present it 10 days before -- present it to the reapportionment office 10 days before you introduce it, this all suggests very much to me that the process is supposed to be done in leisure rather than in the rushed fashion at which it was done. And the effect of the rushed procedure was to prevent blacks from fully airing for the public the implications of these plans.

Q. And you believe that because the plan was done in a special session where it was the only topic, that it got less scrutiny or less opportunity for comment than if it had been done in a regular session?

A. Yes. I think that -- well, what you're saying is a regular session is already so busy that it might not get good scrutiny there, too. But that would depend on when it's introduced.

It's not a matter of how many hours the Legislature spends debating it on the floor. The question is how long does the public have to look at it between when it's presented to them and when it's finally debated, amended, and passed. That's the critical thing. And we're talking about little more than a week here. That, to me, is the critical factor, rather than whether it was in the general session or the special session. The importance of not doing it in the general session is that that's what the constitution says, as a regular idea, what you're supposed to do.

Q. And so --

A. So it was an irregularity, and irregularities are what you look for in *Arlington Heights*.

Q. If there had been an opportunity to have a public hearing on the plan as drawn in every legislative district, would you believe that would comport with your view of how things should be done to receive public input?

A. If I were designing to do it, that's what I certainly would want to do. But I would want people to be able to look at the plan --

Q. Exactly.

A. -- and not just their district.

Q. Okay. Let me make sure my question is clear to you. If there had been an opportunity for every legislative district to see not only how that district was going to be, but the plan as

a whole, you would agree, then, that that comported with your notion of the ability of public comment participation and was nondiscriminatory?

A. Yes. If there's enough time between introduction and when you have to end the session, sure.

Q. Okay. You've also talked several times, including just now, about the constitutional requirement for redistricting to be done in the first regular session after the release of the census. And the value of that is, to you, that it shows the fact that it was not done that way this time. If I understand you correctly, you're relating that to the *Arlington Heights* factor of a deviation from normal procedures; is that correct?

A. That's what *Arlington Heights* says. That's one of the indicators.

Q. And when something is a deviation from normal procedure, that can be an indication of discriminatory intent.

A. That's true of all of the factors. Yes.

Q. All right.

A. Sure.

Q. How many times has the Alabama Legislature redistricted itself, since passing of the 1901 constitution, in the first regular session after the release of the census?

A. I don't know.

JUDGE PRYOR: Let me tell you the answer, Dr. Arlington. Zero. Did you know that?

THE WITNESS: No.

Q. Dr. Arrington, you seem to believe, if I understood your testimony right, that -- and I may misunderstand you, actually -- that voters identify with their district in some way that I don't understand. And you link that to why, as I understand it, you objected to moving districts from Montgomery and Jefferson County to Shelby and Madison County.

A. No. If I made that connection, I didn't mean to.

Q. I may have misunderstood.

A. We're talking two separate things.

Q. Okay.

A. I was simply indicating that the only real virtue of the single member district system is the ability of people to recognize what is being represented in terms of place. That was the point. And the numbers on the districts are irrelevant in that sense.

Q. Does that matter in terms of your testimony about discriminatory intent? If not, I don't want to ask you about it.

A. Well, it goes, again, to the question of why the 2 percent. The 2 percent notion, again, allows Mr. Hinaman relative freedom to ignore communities of interest and counties, and that gives him more freedom, then, to pack and crack. That's the point.

Q. And you're critical in your report and in your testimony and in your deposition of the understanding of *Larios*, which was

adopted by the committee in its guidelines, which suggested that it needed to move away from 10 percent deviation to something much lower; is that correct?

A. Well, remember, I'm not an attorney.

Q. Yes.

A. But as a political scientist, I don't think that's what that case is all about. It's all about not what the deviation is; it's all about how you use that deviation, whatever it is. If it's 2 percent, you could still use it in a way that would be discriminatory.

Q. Yes. Would you agree that after the 2010 census was released, a number of states used 2 percent or less, and an even greater number of states moved from overall deviation of 10 percent to 5 percent? In other words, there was a great shift that narrowed the allowable deviation after the 2010 census, not only in Alabama but in many other states. Is that not correct?

A. No, I don't know that. I've never counted the number of states that did that.

Q. Well, let's look at Exhibit APX 76. And I've highlighted in green every state for which, in the Senate or the House, the total deviation was less than 2 percent. Then I highlighted in yellow the states where the total deviation was less than 5 percent. And it looks to me like -- let's just stick with the less than 2 percent. That would be Alabama, California, Georgia, Illinois, Indiana -- one house -- Iowa, Minnesota,

Nevada, Oklahoma -- one house -- Utah, Virginia -- one house, right at 2 percent -- Washington, and Wisconsin. Is that correct?

A. Yes. And one of the things I said in my reports is that where you have particularly Republican control -- this has been a general thing, I think, promulgated from the Republican National Committee -- that if you go down to a much lower deviation, that makes it much less likely that the plan can be challenged on any other basis, with the notion that we've got such a low deviation, nothing else could be wrong.

Q. Do you know whether all of these states, the Legislature is controlled by the Republicans?

A. Well, it varies. In Florida, they do. Georgia, they do. Illinois, they don't. California, they don't. It varies.

Now, as I say, I haven't -- this is -- you're showing me this. I haven't studied this question.

Q. Okay. I want to ask you about packing. And I'm not quite sure what your position is on that, so I want to get it straight. In your report, on page 39 -- paragraph 39, you state that the level where a minority can elect its representative of choice occurs at 50 percent plus one VAP.

JUDGE THOMPSON: You said his report. Which document are we talking about?

MR. WALKER: The report has to be introduced, Your Honor. And that would be -- I think I said that's going to

be -- the report will come in as 487, Your Honor.

JUDGE THOMPSON: That's not the direct testimony you're talking about?

MR. WALKER: No. That is the report that he initially filed. And there's actually a lot -- actually, the direct testimony overlaps with the report, and I can -- well, not with this version. I could have told you what paragraph that was in the direct report. But I'll give that to you.

A. If I could, I think that sentence is in both, but I may have changed the word "ability" to "opportunity."

Q. I was going to ask you why did you -- every time in the report you used the word "ability," and in your direct testimony you changed it to "opportunity," and I wanted to understand what you thought the difference was.

A. Well, because the Supreme Court declared Section 4 of the Voting Rights Act unconstitutional, so I went back to Section 2 language. I regard "ability" and "opportunity" to be simultaneous -- to be synonymous.

Q. Okay. Moving over to paragraph 46 of your report, you again repeat 50 percent non-white VAP. And then you say: In any case, there's no reason for any district to be above 55 percent nonwhite VAP in order to create an ability --

JUDGE PRYOR: Pull it down.

MR. WALKER: Thank you, Your Honor.

Q. In order to create an ability for minority voters to elect a

candidate of their choice if their choice is a minority.

And then in your direct testimony, in paragraph 44, you say Dr. Brunell, who has not testified yet but who will, has opined that the concentration at which the opportunity to elect as president would not be the same everywhere in Alabama. You agree with him, but then you say a minimum can be set that would apply everywhere, which seems contradictory to me, so I wanted you to explain that, but not just yet.

A. No. That minimum is 50 plus one. The point is that based upon Dr. Lichtman's testimony -- he'll testify later -- my own examination of the academic literature on Alabama elections and miscellaneous other voting rights cases in this state, it's clear that 51 percent minority VAP --

Now, we're talking VAP, not pop, remember --

Q. Right.

A. Pop would be somewhat higher than that.

Q. I understand.

A. -- is enough to give minority voters that opportunity anywhere in the state. Now, in some places in the state, that's more than you need. But everywhere in the state, that's enough.

Q. Then why do you come down here and later say, certainly 54-56 -- and I assume you mean VAP concentrations -- is enough?

A. Yes. Well, all I'm saying is, okay, if you want to fight about 51, you don't think that's enough, certainly when you get to 54 or 56, there's no longer any reason for anybody to doubt

it.

Q. And that would be statewide, you're telling the Court, without any variation according to where you are in the state?

A. No. I'm only saying if you want to fight about 51, if you don't think that's quite enough, all right. Maybe you go to 54 or 56. But 51 is enough. And Dr. Lichtman's data shows that. And that's all I'm saying in saying, you know, in some places you're going to have difficulty finding whites to bring into those districts. So if it drifts up to 54 or 56, that may be what you need to do.

Q. Look at this sentence that I'm indicating right here: A minimum can be set which would apply everywhere. Everywhere in Alabama.

What is that minimum? Where do you see that minimum?

A. It's 51 percent.

Q. 51 percent?

A. Yes. Or 50 percent plus one person, if you want to look at it that way.

Q. Okay.

A. I mean there is law that suggests that it has to be that if you're going to count it as a minority district. And I say that in the report as well, that it may be that there is a legal standard that requires it to be majority minority in that sense. And that's -- you know, that's the *Bartlett versus Strickland* case. So okay. So up it to that. But in some places in

Alabama, that's not what you need politically.

Q. And above that you would consider packing?

A. Above that considered packing? Again, you look at -- if you can make it -- if you can do that. If there are places in the back belt where you can't do that, then you might have to go a little bit above that. And that's understandable.

Q. Let's talk about that. Do you remember *Wilson v. Jones* before Judge Hand in 2000?

A. I'm sorry. Would you repeat?

Q. *Wilson v. Jones*, the case I'm showing you right now. Judge Hand. I believe you participated in that case.

A. I did.

Q. And who were you representing in that case?

A. Well, let me go back. There are various -- yes. That case, as you know, went on for quite a while. I participated in an aspect of that case.

Q. You drew a plan, did you not?

A. I was working for the Department of Justice. Yes.

Q. You drew a plan for the county commission for the Department of Justice?

A. That's correct.

Q. And you testified in that case that it was not possible to pick a firm percent black for a district that would assure the election of a black candidate. The percentage needed would depend upon a number of factors and would vary from jurisdiction

to jurisdiction. Is that what Judge Hand found you testified in that case?

A. That's correct. And that's what Dr. Brunell said and what I said I agreed with.

Q. Okay. And you also testified in that case that a 61 percent VAP black majority district would be a swing district which, in the context of the rest of your testimony here, was less than an ability district. Is that correct?

A. At that time and in that place, that's correct.

Q. Okay. And it says, the only explanation he offered for why a district in which blacks made up 61 percent of the potential voters --

A. Bring it down. I can't see it.

Q. I'm sorry.

Made up 61 percent of the potential voters was not a clear opportunity district was that past discrimination and lower socioeconomic status of blacks meant that blacks were not mobilized to vote at the same rate as whites and that black voters were less able to raise money.

Was that your testimony in that case?

A. That's correct, and that's -- you'll notice that that's a 2000 date.

Q. Exactly. Are you saying that there has been some radical change in the ability of African Americans to vote that did not exist in 2000 which exists in 2013?

A. No. What I'm saying is there has been greater mobilization.

Q. And what's your basis for that?

A. Dr. Lichtman's report, for one thing. But for another, the data that's in the Gaddie book, which I cite in my declaration as well, which shows relatively current figures for all of the southern states, including Alabama, in terms of mobilization. Mobilization just means not only registering, but actually getting them to the polls.

Q. And your testimony is that African Americans in Selma in 2000 were not already fully mobilized?

A. That's what I found on the basis of the data that I had to work with in that case 13 years ago. That's correct.

Q. Okay. Let me ask you one more line of questions, I believe, Dr. Arrington, and then I'll be done.

In all of your testimony, you cite to a case, *Central Alabama Fair Housing Center versus Magee*, which you cite at length in paragraph 88 of your report. Let me just turn to that. And you cite this case because in it the Court found that four legislators had made racist comments, I think, basically. And those were Representative Rich, Representative Rogers, Representative Jackson, and Representative Hammon; is that correct?

A. That's correct.

Q. And Representative Hammon is a white Republican, is he not?

A. I believe that's true. That's why in my -- in the direct

testimony I corrected that.

Q. Yes.

A. Because we talked about it in the depo, and I didn't, in fact, know the race.

Q. Well, I'll get to that, but let me just ask you the questions.

Representative Rich is a white Republican, is he not?

A. I think that's correct.

Q. Representative Rogers is a black Democrat?

A. I think that's correct.

Q. And Representative Jackson is a black Democrat?

A. I think that's correct.

Q. So these discriminatory comments towards Hispanics were made by blacks and whites and by Democrats and Republicans in equal number, as cited in this case?

A. That's correct.

Q. And in your report, you had them all in there; but in your direct testimony, you took out any reference to the African Americans and Democrats, didn't you?

A. No. That's not true.

Q. I believe --

A. If you'll look at that report, you will see that it says that some of those comments were made by blacks.

Q. Okay. Well, we'll leave that to the Court. But I believe the record will show that the parts that you initially quoted

from Central Alabama Fair Housing were deleted when they showed Rich, Rogers, and Jackson, and you left only in there Representative Hammon, a white Republican.

A. I did not misrepresent my prior testimony. If you'll look at my direct testimony, it clearly says that some of those remarks that were cited were made by black Democrats. However, the legislation was a Republican vehicle from the beginning. Most of the blacks and most of the Democrats voted against it, and all of the Republicans save one voted for it. So I did not disguise what I had done, but I did correct what was a misapprehension in my initial report when I went through the testimony.

Q. And there were African American Democrats who supported that bill and spoke out against Hispanics. Is that not correct?

A. Couple. I give the numbers in my testimony.

Q. Okay. That's all I have. Thank you, Dr. Arrington.

A. Thank you, Mr. Walker.

MR. ANDERSON: Nothing further.

MR. BLACKSHER: No questions.

JUDGE PRYOR: Thank you, Dr. Arrington.

MR. REAVES: Call Dr. Allan Lichtman.

JUDGE PRYOR: Dr. Lichtman. You were administered the oath earlier?

THE WITNESS: Yes.

JUDGE PRYOR: Exactly what is our agreement as to

Dr. Lichtman?

MR. REAVES: Our agreement on Dr. Lichtman is --

JUDGE PRYOR: What's admitted and --

MR. REAVES: His direct testimony was offered as NPX 324. It's in all the notebooks. It's been agreed to that that would constitute his direct --

JUDGE PRYOR: I'm sorry. Slow down.

MR. REAVES: I'm sorry.

JUDGE PRYOR: You are speaking quickly.

MR. REAVES: I'm new at this.

JUDGE PRYOR: Speak distinctly. I need to hear it, and it needs to be on the record.

MR. REAVES: Yes, Your Honor.

We've agreed that NPX 324, which constitutes Dr. Lichtman's direct testimony, will be submitted as his direct testimony. And the agreement we made on Friday was that we would give Dr. Lichtman basically just an opportunity to summarize his direct testimony and then tender him for cross-examination. I do not know if the defendants are planning to include his deposition. Are y'all planning to?

JUDGE PRYOR: All right. Do you agree with all that has been said so far, state defendants?

MR. WALKER: Yes.

MR. DAVIS: We do, Your Honor.

JUDGE PRYOR: And what about the deposition testimony?

MR. DAVIS: We'll confer on that, if that's okay. If we do decide to admit it, we will provide copies.

JUDGE THOMPSON: Will there be a report as there was with Dr. Arrington as well?

MR. REAVES: There was a report that was submitted to the Court at an earlier date, and then this was --

JUDGE PRYOR: Is that being offered?

MR. REAVES: It's not being offered. It's already in the record. It's not included in our -- in the Newton plaintiffs' exhibits.

JUDGE PRYOR: Okay.

MR. REAVES: I don't know if the defendants plan to offer it.

JUDGE THOMPSON: Are we to use it or not?

MR. REAVES: I'm sorry, Your Honor?

JUDGE PRYOR: The report. Are we supposed to use it for purposes of this trial or not?

MR. REAVES: I have no objection to you using it.

JUDGE THOMPSON: That doesn't answer the question. Do we use it or not?

MR. ANDERSON: Just the testimony.

JUDGE THOMPSON: Just the --

JUDGE PRYOR: We have -- we have a statement or a direct -- what is labeled already as direct testimony that you have offered for admission without objection; is that right?

MR. REAVES: Yes, Your Honor.

JUDGE PRYOR: And is that all you intend to offer, plus whatever direct testimony you elicit now?

MR. REAVES: Yes, Your Honor.

JUDGE PRYOR: Okay. Thank you.

ALLAN J. LICHTMAN

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. REAVES:

Q. Would you please state your name for the record.

A. Allan J. Lichtman.

Q. And what is your -- if you'll say where you reside and your title currently.

A. I reside at Bethesda, Maryland, and I am a distinguished professor of history at American University in Washington, D.C.

Q. And what I'm showing on the screen to you, is that what you submitted as your direct testimony, which has been marked as NPX 324?

A. That's correct.

Q. And in lieu of more of a question-and-answer session, if you would, for the Court, please provide a summary of that direct testimony.

A. I'll try to be unprofessorial and brief, Your Honor.

What I did in my direct testimony, and supplied many tables

and charts in support of it, was a standard social science analysis of a districting plan. Same thing I've done in scores of other redistricting cases that I've been involved with. Sometimes this is shorthanded as the *Gingles* factors: Black voter cohesion behind candidates of their choice, white block voting against those candidates, and whether or not it is possible to draw additional districts that provide reasonable opportunities for, in this case, African American voters to elect candidates of their choice.

And briefly, before going into a little more detail, what I found was that, indeed, voting was highly polarized along racial lines in Alabama in general elections, which I looked at, with African Americans extremely cohesive behind candidates of their choice, nearly unanimous, and whites very powerfully block voting against those candidates, although not to the same degree of nearly 100 percent as African Americans. I found that this reflected racial issues in the histories of the Democratic and Republican parties that are well known and I point out in my testimony. I also wrote about that in one of my books called White Protestant Nation: The Rise of the American Conservative Movement.

And also that there was a separate effect from party that made a difference whether an African American candidate, as opposed to a white candidate, was running as a Democrat, not for African American cohesion, but for white block voting; that

 whites were substantially more willing to vote for a white Democrat than a black Democrat.

I also found that these findings on racial polarization, black cohesion, and white block voting had significant implications for the ability of African Americans to elect candidates of their choice in Alabama. Particularly clearly in districts dominated by white voters, African Americans would have limited opportunities to elect candidates of their choice. But in all of the illustrative districts, and there were three of them presented by plaintiffs, African Americans would have a reasonable or even an excellent opportunity to elect candidates of their choice.

To go over those points individually. First, polarized voting reflected in African American cohesion and white block voting. That is sustained by several separate analyses.

First, I analyzed statewide elections, some of them involving African American candidates like Obama and Figures, some of them involving white candidates like Vance and Kerry. I looked at six of them, and I found a very consistent pattern of polarized voting, stronger when you had the African American candidates like Figures and Obama. Secondly, I looked at -- and to do that, I used the standard statistical technique called ecological regression, the same technique used by the expert in *Thornburg versus Gingles*; the same technique that was cited in the recent Texas congressional redistricting case by the Supreme

Court for my work.

Secondly, I looked at a totally different methodology, and that is the exit polls. For senatorial elections and presidential elections we have exit polls in Alabama, and it showed the same pattern.

Third, I looked at, for key counties where there are additional districts being drawn -- Jefferson, Madison, and Montgomery -- I looked at statewide elections within the counties at the precinct level, obviously. Not the county level in this case. Again, the same patterns.

And finally, I looked at state legislative elections, some, again, white versus white, some black versus white, in eight legislative districts. Again, the same general pattern in polarized voting.

And as I said, you have a party effect. Parties are not empty symbols, they stand for things, and the racial history of the parties since the 1960s have created what many have called the great transformation of the south. The south was once the most reliably democratic region, typically the white south, and African Americans at one time were Republicans. That's all turned around now; different racial history over the last 50 percent. Plus, all of this information also showed that when you have an African American Democrat, the polarization expands.

Critically, I also found the patterns were common across the

state. And I have a number of ways of demonstrating that. First of all, we have what we call scattergrams. That sounds complicated, but it's really very simple. It's just plotting the percent African American registrants in a county against the vote for the democratic candidate, whether white or black, and seeing how the patterns unfold.

For example, we have on page 33 of my report one of these scattergrams, which is up, which shows a nonpolarized situation. There's no particular relationship between the percent black in a county and, in this just concocted example, the percentage of the vote for a particular candidate.

Now, we can contrast that county by county with what we found, for example, on page 28, for Barack Obama in 2008. The pattern could not be more different. You don't have to be a statistician to figure this out, which is why I like looking at the real data itself. And you can see two things. A clear, you know, very strong upwardly sweeping pattern and very little deviation from it. This is about as linear, as clear a pattern as you get in social science. The counties are not bouncing all over the place. It's pretty much a consistency across the entire state of Alabama.

And it's not just Obama. If you look at another African American candidate, Figures, in that same year, you see an almost identical pattern. Different candidates, different offices, and identical pattern.

We see the same thing in 2012 as well. If we look at Obama in 2012, four years later, it looks the same. Different election four years later. Again, not only do you have a clear pattern of polarization, but you don't have the counties jumping around a lot.

The second way in which I was able to establish that patterns are similar across the state is I looked internally at Jefferson, Madison, and Montgomery counties, and I reported pretty much the same patterns of near universal cohesion for African Americans and white block voting.

Now, you do get more variability here, because you're looking at very small units like precincts. If you look at Jefferson County, for example, on page 38, Obama, 2012. It's still the same upsweeping pattern, but you can see there are some white areas in Jefferson County that are willing to vote for Obama.

You can see that even more clearly when there isn't an African American candidate. Just this contest between Vance and Moore on the next page, 39, if you can show that, you can see there are a number of precincts in Jefferson County quite willing to vote for Vance rather than Moore. But, again, you see the same upsweeping pattern. Jefferson does kind of stand out in that regard.

If we look next at --

JUDGE PRYOR: You don't think that's because Vance was

a white candidate, do you?

THE WITNESS: I think it might have had something to do with that, but I also think it may have had to do with who Vance was and what he -- you know, these precincts --

JUDGE PRYOR: Do you think it might have had something to do with who Moore was?

THE WITNESS: I think it had something to do with who Moore was.

JUDGE PRYOR: You do?

THE WITNESS: Absolutely, Your Honor, without saying anything more.

A. And let's look -- you know, Jefferson is a bit unique. Let's look at Madison. You know, you don't have those precincts in Madison that are more willing to vote for a black Democrat.

The same thing in Montgomery. If we look at -- this was Obama 2012. If we look at Montgomery in 2012, we see the same kind of pattern. So even within counties, you're getting a similar pattern.

And finally, I looked at eight legislative elections covering about 15 to 20 counties. Again, the pattern is -- it's never identical. You don't find identities in social science. But for practical purposes, it is precisely the same pattern of near universal African American cohesion and white block voting against the candidates of choice of African Americans. And that means, obviously, that districts dominated by whites are not

going to provide equal opportunities for African Americans or even reasonable opportunities for African Americans to elect candidates of their choice.

But you get a very different situation when you look at districts with strong concentrations of minorities; that is, majority minority districts or districts with at least 45 percent or more African American voting age population. And so what I did was I did an actual test of the three alternative districts based on county specific data. The districts are from Jefferson, Madison, and Montgomery County. And I used turnout and polarization findings for those specific counties to project what you would expect for an African American candidate of choice generically and what you would expect when an African American candidate of choice -- when that candidate was, in fact, African American.

If we can turn to table eight on page 23, you can see in every instance --

Q. I do want to bring up one thing, because we're talking now about the illustrative districts. We provided to you three illustrative districts representing Jefferson County, Montgomery County, and Madison County. And in preparing for your testimony today, did you happen to notice that the table -- some of the tables in your report actually included earlier data for Montgomery County? And if you could --

A. If you can go back to the previous table, I'll explain that.

Q. Sure.

A. The previous table shows that these are all majority minority districts. Two of them are black majority districts. One is a black voting age majority. But I've learned yesterday that for the Montgomery district, they had actually updated it to make it majority black voting age population. The new district, its total black is 55 percent, and its black voting age population is 51.4 percent, not 46.6 percent. So my analysis actually understates for this district the ability of African Americans to elect candidates of their choice because I have it about 5 percentage points too low because I wasn't aware that they had updated the district.

MR. REAVES: I will represent to the Court that the updated information -- this was part of the discrepancy that defendants' counsel brought to our attention between some of the numbers for Montgomery County, which was NPX 300. The updated exhibit is included with Dr. Lichtman's final report. Just the updated information did not get transferred into these tables. And we took up the issue with the -- and discrepancy with Judge Watkins on Friday and have since taken care of that with defendant's counsel.

Q. Dr. Lichtman, if you could then go to table eight and explain your findings with regards to table eight.

A. Okay. If we go to table eight, if you look at the Montgomery County findings where, just looking at an African

American candidate of choice in a general election regardless of race, the projected vote is 57 percent. It should actually, based on the updated data, be 61 percent. It's about four points too low. And in the Montgomery County district where we're only looking at a black candidate, it should be 58 percent. So these are understated by about four points.

But the bottom line is in all three of these illustrative additional districts, they provide clearly a reasonable or even more than reasonable, a very good or excellent opportunity for African American voters to elect candidates of their choice. They're sufficiently African American. And these are district-specific results -- not district. County specific. I used the county data for the districts in which the counties are -- the counties in which the districts are placed.

And this result is consistent with the actual results of elections in the state of Alabama if we turn to the next chart, table nine. I looked at districts, and only three of them that were over 40 percent African American VAP but under 50 percent. They ranged pretty narrowly from about 46.1 to 49.7. They've all elected candidates of choice of African Americans, and two of those three districts elected African American candidates who are African American candidates of choice.

So my projections are not simply castles in the air; they're very much grounded in what's actually happening. And this is 2010, which we all know was a very bad year for Democrats in

 Alabama and across the country.

So in sum, I clearly found all three of the so-called *Gingles* factors: Strong black cohesion, white block voting against the candidates of choice of African American voters, and additional districts that provide very good or excellent opportunities for African American voters to elect candidates of their choice.

MR. REAVES: And unless the judges have any other questions, we'll tender Dr. Lichtman for cross-examination.

JUDGE PRYOR: Mr. Blacksher?

MR. BLACKSHER: No questions, Your Honor.

JUDGE PRYOR: Before you start, Mr. Davis, I do have one question.

You looked at these illustrative districts, Dr. Lichtman?

THE WITNESS: I did.

JUDGE PRYOR: Did you look at any plan, though, that created more majority minority districts than either the one that the Legislature adopted or the alternatives that had been offered by Democratic legislators in that session?

THE WITNESS: I did not examine any plans offered by anyone. I simply was asked to determine whether or not the additional illustrative districts were -- call it what you want. I think I, like Dr. Arrington, use the terms interchangeably, opportunity or ability districts. And quite

clearly, they were.

JUDGE PRYOR: Right. But you didn't look at what the effect, for example, would be on the creation of those illustrative districts on a total statewide plan as to whether that would increase or decrease the number of majority minority districts?

THE WITNESS: I did not do an analysis of statewide plans. My understanding was that these are additional majority minority districts.

JUDGE PRYOR: But you don't know that?

THE WITNESS: I do not know that.

JUDGE WATKINS: Dr. Lichtman, from a social science standpoint, what's the difference in cohesion and block voting?

THE WITNESS: No -- none. I used the terms the way the *Gingles* court used them.

JUDGE WATKINS: That's where it started.

THE WITNESS: Yes. But there's absolutely no difference. They're simply the percentages of support for candidates of choice. The only difference is cohesion is the candidate of choice. Block voting is the candidate that isn't your candidate of choice; block voting against the candidate of choice of African Americans. But you could use cohesion on both sides. You could use block voting on both sides. You're absolutely right.

CROSS-EXAMINATION

BY MR. DAVIS:

Q. Good morning, Dr. Lichtman.

A. Good morning.

Q. Dr. Lichtman, when you speak of the candidate of choice for black voters, you mean the Democratic candidate in a two-party race, correct?

A. That's what the analysis showed. I didn't go into it, you know, saying that, but that's what the analysis showed.

Q. And when you give an opinion that the proposed districts provide an excellent opportunity for African American voters to elect their candidate of choice, you mean there is an excellent opportunity that those districts will produce a legislator who represents a particular party, correct?

A. More than that. Also a legislator who is African American as well.

Q. If that is the candidate of choice.

A. Well, of course. It has to be the candidate of choice.

Q. You testified or you offered an opinion in paragraph 10 of your report that party loyalty in Alabama is tied closely to race in the civil rights history of this state, correct?

A. Civil rights history of the state, the south, and the entire country.

Q. Do you have any evidence or have you studied whether any voters in Alabama today, 50 years later, are choosing party identity because they're mad at what LBJ did in 1963 or '64?

A. I'm not looking at any individual voter today. I'm looking at the patterns of political change that have occurred over those past 50 years. The racial identities of the parties are quite different.

Q. You compare various elections in your report, including presidential elections such as Obama-McCain, Obama-Romney, Bush-Kerry. Could some of the differences and the results of that -- of those elections not be attributed to factors other than race, such as, for example, the strength of the candidates as campaigners.

A. You know, what's remarkable about this is you've got some very different campaigners with very different strengths producing very similar patterns of results. So it does not appear to be that my results are due to candidate-specific factors that you are suggesting; rather, the racial patterns are consistent among many different offices, three election cycles, and different strengths of candidates.

Q. Romney and McCain did not perform identically in the state, though, did they?

A. Run that by me again?

Q. Mitt Romney, Governor Romney, and Senator McCain did not perform identically in the state, did they?

A. Well, I've got the results. I will check them out. I think they're quite similar.

They're very similar. Obama got 98 percent estimated of the

African American vote against McCain. 91 percent against Romney. You know, statistically insignificant. Difference, he got 20 percent of the white vote in 2008 and 17 percent of the white vote in 2012, according to the ecological regression results. Very, very similar results, despite, you know, very, very different candidates. And you have the same thing in the exit poll results.

Q. You don't suggest that issues are irrelevant in elections, of course?

A. I'm not suggesting issues are irrelevant. I am suggesting you have very clear racial patterns of voting here in Alabama that transcend individual candidacies, election years, and offices being sought.

Q. Well, wouldn't an examination of a Democratic primary contest between a white candidate and a black candidate inform us about racial patterns of voting?

A. Yeah. And -- but the reason I didn't look at primary contests is twofold. One, I didn't have the data; but two, in any district that is substantially African American, certainly the illustrative districts presented here, the Democratic primary is going to be overwhelmingly African American, super majority African American, for the obvious reason. African Americans are almost 100 percent Democratic, and whites are overwhelming Republican. So if you have even a 40 percent African American district, it's still going to be overwhelmingly

African American in the Democratic primary.

Q. But white voters do participate in the Democratic primary in Alabama, correct?

A. Yes, but at a much smaller level than black voters, who are nearly 100 percent Democratic. That's true not only in Alabama. It's true across the south.

Q. But your analysis does not include elections such as the election between Patricia Todd and Gaynell Hendricks in the Democratic primary in 2006 for House District 54.

A. That's correct.

Q. Or the primary contest in 2008 between Barack Obama and Hillary Clinton.

A. That's correct.

Q. Or the 2010 gubernatorial primary between Artur Davis and Ron Sparks.

A. That's correct.

Q. By the way, do you know which of these candidates were supported by leadership of black political organizations in the state?

A. I don't.

Q. There are differences in elections around the state, though, aren't there? I mean an election in the Wiregrass area isn't exactly the same as an election in Dallas County or Sand Mountain.

A. That's right; but that's why it's quite striking that

despite these differences, the patterns of racial polarization across the state are very, very similar. I'm not making any points about any other aspects of elections. That's not what I studied. I simply studied the *Gingles* factors.

Q. Did you consider at all the affluence of the district as to how that might relate to the success of the democratic candidate?

A. Whatever factors may be district specific, I found that in all of these districts, African American candidates or generally -- both African American candidates of choice, regardless of race, and African American candidates of choice who were African Americans would be clearly projected winners. And that is consistent with what has actually happened in comparable districts, comparable simply in the sense of comparable percentages of African Americans. All of those other things kind of, you know, come out in the wash here.

Q. You don't think there's a relationship between the affluence of a district and how successful the Democratic candidate might be or the Republican candidate might be?

A. All I was looking at was the relationship between the racial composition of the district and the outcome of the district. And I found that to be consistent across the illustrative districts and consistent across the actual districts in which elections took place, including elections in a very bad Democratic year.

Q. Now, you offer an opinion that white voters are more likely to support a white candidate than a black candidate. Correct?
A. Yes.
Q. I want you to imagine an election -- well, hypothetical election between a white Republican and a white Democrat. If a voter identifies himself with the Republican party, which of those candidates is he more likely to support?
A. If it's a white Republican against a white Democrat, the voter who is a Republican is more likely to vote Republican.
Q. Okay. Now imagine the same election between a white Republican and a black Democratic candidate. And, again, the voter is identified with the Republican party. Which of those candidates is the Republican voter more likely to support?
A. Likely to support a Republican, of course.
Q. So if a voter identifies with the Republican party, he's more likely to support the Republican candidate, whether the opponent is black or white. Would you agree with that?
A. Yes, but you're presuming that's deterministic. You're presuming, you know, party identification is so strong that it absolutely determines the vote.

Secondly, you're not taking into account independents who are not necessarily strong party identifiers one way or another. So obviously, there was some give with respect to the willingness of voters to vote for a Democratic -- white voters to vote for a Democratic candidate, whether that candidate is

white or black. And that's empirically demonstrated both by the ecological regression results and by the exit poll results. That's what happens.

Q. But did your analysis take into account party loyalty at all or test it in any way?

A. My analysis tests party loyalty only indirectly. I'm not concerned with the party loyalty of voters in Alabama. I am concerned with patterns of racially polarized voting, which do manifest themselves in differences in party voting but are not fully captured by differences in party voting.

Q. You would agree that most legislators would be party loyal.

A. Would be what?

Q. Loyal to their party, whichever party they represent.

A. I cannot comment about legislators in Alabama.

Q. In paragraph 23 of your report you offer an opinion or a statement that black participation in Alabama is slightly higher than whites.

A. About equal or slightly higher across the state.

Q. You agree that in voter registration and voter turnout, black citizens are doing well in Alabama at this time?

A. Black citizens what?

Q. Are doing well in Alabama in terms of voter registration?

A. Yes. Much better than before, and -- you know, at least at the moment, they are doing quite well.

Q. Did you do any comparative analysis as to how black voter

registration and turnout is today as compared to 2000 or before?
A. Not for this paper, no. I'm concerned with analyzing the plan as it exists.
Q. You speak briefly of Native American voters in your report. To be clear, your analysis of Native American voters is based on one precinct in Washington County, correct?
A. Oh, yeah. I'm very clear both in my depo and my reports, you can't do statistical analysis of Native Americans. But there is at least some evidence that you can look at, and I'm -- you know, I'm not saying anything more than that.
JUDGE WATKINS: Did you say you can or cannot?
THE WITNESS: You cannot do statistical analysis, no. There's just not enough concentration or enough population.
Q. What about Hispanic voters?
A. You can't do statistical analysis either, but, again, I present some evidence in my report that's fairly simple. We know across the country, everywhere that it can be measured, Hispanics are overwhelmingly Democratic with one exception.
JUDGE PRYOR: Cuban Americans.
A. Cuban Americans. Because I was an expert in the *DeGrandy* case. I know all about that. And there's virtually no Cuban Americans among the Hispanics in the state of Alabama. So by inference, it seems to me very clear and common sense that the Hispanics are going to be Democratic in the state of Alabama. They are almost 99 percent non-Cuban.

Q. Dr. Lichtman, you offer an opinion that in your view, 46.5 percent African American population to 53 percent African American population is sufficient in a district for election of the African Americans' candidate of choice.

A. I didn't catch the question, because you seem to be using two numbers that were different. So can you rephrase the question?

Q. Of course. I'll see if I can turn to -- well, in your conclusion, you note, in looking at the proposed districts that the plaintiffs have offered, that they range from 46.5 percent African American to 53 percent. What you're looking for --

A. Could you back up? I think that's voting age. We've got to be careful here. That's voting age population, right?

Q. I'm not sure. I have lost my page, so I'm not sure which number we're using.

A. That makes a difference.

Q. Here's the question, Dr. Lichtman. If you're using 46.5 or 53 percent voting age population --

A. Yes.

Q. -- would you disagree, then, with Joe Reed, who said that in his view, you need about 60 percent?

A. For these districts, I would absolutely disagree, and I think the numbers more than bear that out.

Q. Would you disagree with black legislators who said they thought that they should have 65 percent or so?

A. I've been redistricting advisor to a number of states, and my experience is no legislature -- legislator ever thinks they're safe enough. They don't want to be 99 percent safe. They want to be 99.99999 percent safe. So I'm not --

Let me finish.

I'm not surprised if what you say is true, but that is not an analysis based on the evidence.

Q. You don't know --

JUDGE PRYOR: No. It is. It is based on the evidence --

THE WITNESS: Yeah, right.

JUDGE PRYOR: -- isn't it?

THE WITNESS: Yes, for 99.999999 --

JUDGE PRYOR: You want a safe district. That's the evidence, right?

THE WITNESS: Even then, sometimes strange things happen.

BY MR. DAVIS:

Q. You don't know of any African American legislators, then, who are saying that they want a district that's in the mid forties or that they can win a district that's in the mid forties?

A. I'll answer your question. I don't know what any African American or non-African American legislator has said about anything, because that's not within the scope of my analysis.

Q. To be clear, if the proposed districts are based on some standard other than plus or minus 1 percent, you're not offering any opinion on the propriety of using plus or minus 1 percent.

A. I've not studied deviations at all.

Q. You have a view that glues party and race. Does the ability of African Americans to participate in the political process depend in part on the strength of the Democratic party?

A. I didn't hear the first part of your question.

Q. If I understand your report correctly, you say that race and party are linked; they're inseparable in Alabama.

A. Well, I don't know if I used the word "inseparable," but they are linked, absolutely. And not just in Alabama. Everywhere.

Q. Would the success, then, of African American voters to participate in the political process depend in part on the strength of the Democratic party?

A. It could in any individual instance, sure.

Q. If the party is strong, there would be more opportunity for people who support the party.

A. I'm not sure what you mean by strong. Can you -- can you explain that?

Q. Stable leadership. Fund raising. Winning elections.

A. Fund raising helps. Absolutely.

Q. All right.

A. No question.

Q. And if the party is doing poorly, there would be less opportunity for supporters of that party to participate in the political process.

A. If there's less fund raising, that can be a problem.

Q. And would you agree that fortunes of a political party -- well, they rise and fall, don't they?

A. Of course they do.

Q. And they rise and fall for many reasons that have nothing to do with race.

A. Of course. They can rise and fall for reasons that have to do with race, but, of course, there are other factors.

Q. Do you contend that anything that benefits the Republican party makes it harder for African Americans to elect the candidate of their choice?

A. Not necessarily. There are ways of benefiting the Republican party, yet still providing equal opportunities for African Americans. There are also ways of benefiting the Republican party that undermines opportunities for African Americans to participate fully in the political process and elect candidates of their choice.

Q. Do you contend that it's one political party's job to make sure that the other party has the best possible prospects for being successful?

A. I'm not contending anything in my report or my testimony about the jobs of political parties.

Q. Thank you, Dr. Lichtman.

MR. DAVIS: No further questions at this time, Your Honor.

REDIRECT EXAMINATION

BY MR. REAVES:

Q. Dr. Lichtman, I just have one follow-up. The stability of a party, that doesn't change your opinion with relation to the racial cohesiveness that you studied.

A. Nothing about, you know, other factors that affect political parties in any way affects any of my opinions.

Q. What you looked into in this report, you know, was based solely on, you know, racial, you know, cohesiveness and block voting against other candidates; is that right?

A. I did a straightfoward *Gingles* analysis, looking at African American cohesiveness, white block voting, and black voter opportunities. That's all I did.

MR. REAVES: I don't have any additional questions.

JUDGE PRYOR: Any further questions?

MR. DAVIS: No.

JUDGE PRYOR: Thank you, Dr. Lichtman. Do the plaintiffs rest?

JUDGE THOMPSON: You have some more short people tomorrow.

MR. ANDERSON: We've got three witnesses tomorrow.

JUDGE PRYOR: Okay. Very good. All right. So we're

going to -- are we going to go next with Mr. Hinaman?

MR. PARK: Yes, Your Honor. We would suggest, given the time, we start after lunch.

JUDGE PRYOR: All right. Let's start back at one o'clock with Mr. Hinaman.

MR. PARK: Yes, Your Honor.

JUDGE THOMPSON: Could I ask a question before we recess? Will these two witnesses, Mr. Hinaman and Dr. Brunell, take the full afternoon?

MR. PARK: Depends on cross, Your Honor.

JUDGE PRYOR: Will they?

MR. BLACKSHER: May I inquire? We plan to introduce Mr. Hinaman's deposition in lieu of an extensive cross-examination if the Court permits.

JUDGE PRYOR: Any objection?

MR. PARK: No, Your Honor.

JUDGE PRYOR: Then it will be done. So that's good to know.

JUDGE THOMPSON: You're saying in lieu of cross?

JUDGE PRYOR: In lieu of extensive cross is what he said.

JUDGE THOMPSON: Right. But we'll still have --

MR. BLACKSHER: I can't promise I won't ask any questions, but that would certainly limit very much.

JUDGE THOMPSON: So it will just be direct for Hinaman,

right? Is that it?

MR. PARK: Mr. Tanner might.

MR. TANNER: I believe there will be a fair amount of crisp cross-examination of Mr. Hinaman.

JUDGE PRYOR: A fair amount of crisp cross-examination?

MR. TANNER: A fair amount of crisp, and probably some soggy, and not much on Mr. Brunell. So I would be surprised if the two of them took all afternoon.

JUDGE PRYOR: Took all afternoon?

MR. TANNER: I would be surprised if that were to be the case.

JUDGE PRYOR: What about Brunell with the depositions and reports?

MR. TANNER: We do not have -- well, we haven't talked about introducing Dr. Brunell's deposition. We may want to do that. But the cross-examination should not take long in any event.

JUDGE PRYOR: What about the state? Do you intend to offer his -- any kind of written statement as part of his direct testimony?

MR. PARK: Yes, Your Honor.

JUDGE PRYOR: Thank you.

(Recess was taken from 11:54 a.m. until 1:00 p.m., after which proceedings continued, as follows:)

JUDGE PRYOR: Please be seated. Who are we going to

 hear from?

MR. PARK: Your Honor, the state calls Randy Hinaman.

JUDGE PRYOR: Okay. Mr. Hinaman.

Mr. Hinaman, have you been administered the oath?

THE WITNESS: Yes, sir. Yes, Your Honor.

JUDGE THOMPSON: Were the defendants going to rely on cross of Hinaman or something like that? I mean the plaintiffs. Or did I --

JUDGE PRYOR: The plaintiffs are going to rely on in part, at least, their deposition cross of Mr. Hinaman, but they're also going to examine him; is that right?

MR. ANDERSON: Yes, Your Honor.

JUDGE THOMPSON: Has that been made a record, the deposition?

MR. BLACKSHER: Ask again, please, Your Honor?

JUDGE PRYOR: Have the plaintiffs offered his deposition yet?

MR. BLACKSHER: No. I'm going to, though. I've got it marked.

JUDGE PRYOR: Okay. Very good. Mr. Park?

MR. PARK: Thank you, Your Honor.

RANDY HINAMAN

The witness, having been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. PARK:

Q. Would you please state your full name for the record.

A. Yes. Randy Hinaman.

Q. Randy, where do you live?

A. Alexandria, Virginia.

Q. And what kind of work do you do?

A. I do political consulting.

Q. In addition to the political consulting that you've done, have you had any experience in drafting redistricting plans?

A. Yes, sir. I've worked on a number of congressional plans, including the Alabama congressional plan that was in -- that's in place right now, the 2001 Alabama congressional plan. I was the Republican point person on that. I also drew the plan that was submitted in 1992 with the lawsuit on congressional and did some legislative work in Virginia.

Q. With respect to the 1992 congressional plan, who did you draw that plan for?

A. Drew it for a lawsuit filed by Paul West of Mobile to a three-judge panel.

Q. And what was the disposition of that plan, if you remember?

A. The three-judge panel implemented the plan without change, I believe.

Q. To the best of your recollection, did that plan require preclearance?

A. I don't believe it required preclearance because it was

administered by -- implemented by a three-judge panel, although I think it may have been appealed to the -- it's 21 years ago, so I'm going to be -- weak memory here. But I believe it was appealed to the Supreme Court and was affirmed. I don't think they -- I don't remember whether they heard the case or they just affirmed it, but --

Q. And then in the 2001 plan, your work in 2001, how did the plan that was adopted during that cycle reflect your work?

A. Well, I was basically the Republican point person on the congressional plan in 2001 and worked with the Democrat leaders, Senator Emfinger primarily, to come to resolution on the districts. We came to agreement, and that plan was passed by the Legislature and precleared by Justice.

Q. And then in 2012, how did you get -- after the 2010 census, how did you get involved with redistricting in Alabama?

A. Congressional?

Q. Yes, sir.

A. I was hired by the seven members of the Alabama congressional delegation to draw a map for them that we would share with the folks in Montgomery and work with the Legislature to get something similar to that adopted.

Q. And was that plan passed by the Legislature and signed by the governor?

A. With changes, yes, sir.

Q. And is that the plan that was used in the 2012 congressional

elections?

A. Yes, sir.

Q. And in 2012, you worked with the entire delegation?

A. Yes, sir. Six Republicans, one Democrat.

Q. And each of those plans was a statewide plan; is that right?

A. Yes, sir.

Q. And each of those plans, being congressional plans, was drawn with zero tolerance?

A. Zero deviation. Yes, sir.

Q. After doing the congressional plan, one question that has come up, did you have any involvement with the State Board of Education plan in Alabama?

A. I did not. I did not draw that plan.

Q. How did you come to be involved in working on the legislative plans for Alabama?

A. Well, after working on the congressional with Senator Dial and chairman -- and also Representative McClendon, they talked to me and leadership talked to me about helping out with the legislative districts. Speaker talked to me about helping out as well.

Q. And what kind of schedule did you have?

A. I went to work, basically, September -- early September of 2011, yeah, and then worked through the session, end of the session, May 2012.

Q. How did you get started?

A. Got started, came down and did a meeting with leadership and Senator Dial and Representative McClendon and talked about some of the rules, the guidelines that were in place that the committee established, as well as some other procedural things that we talked about. And then I went back and started drawing -- roughing out a map where I could come back and meet individually with members and fine tune it from there.

Q. Before you were in a position to show a map to anybody, what did you have to do mechanically?

A. Well, mechanically, I wanted to get some vote performance data in so I could look at the various -- how districts would perform. So I had to apply election returns from the last eight or so general elections into the plan by precinct. Which obviously, is somewhat more complicated the further back you go, because precincts names change and so forth. So that took a while. And then I roughed out a plan where everything was basically within deviation so that somebody could look at their district in deviation and go from there.

Q. You mentioned some guidelines. What do you recall about the guidelines with respect to deviation?

A. Well, we were overall deviation of 2, plus or minus 1.

Q. And what with respect to any other guideline?

A. Well, the other guidelines were to follow the Voting Rights Act and to not retrogress the overall total number of African American majority districts, as well as to try individually to

not retrogress the individual districts from the numbers that existed in 2001.

Q. And by retrogress, did that mean that the percentage of total population couldn't come down?

A. I looked at -- yeah. Essentially, I tried where possible to not lower the total population of African American population in those minority majority districts.

Q. And what was your reference point?

A. Reference point was 2010 census in 2001 districts.

Q. In the work you did loading information, did you have incumbent addresses?

A. I did have incumbent addresses. Unfortunately, a couple of them ended up either being their office address when it should have been their home address, and they needed to be sorted out at the very end. But, yes, sir, I did have incumbent addresses. And I was also instructed that we were not putting incumbents together to the extent we could avoid it.

Q. At about the turn of the year, January 2012, you wrote a letter saying you had initial drafts. How far along were you at that point?

A. Those initial drafts basically meant that I had gotten every district with one incumbent in it, 2 deviation, and had roughed out the majority districts' overall number and -- you know, generally what they were going to look like, and then was ready to meet more specific with individual legislators and get

information from the two cochairs from their meetings with legislators to draw -- to fine tune the map.

Q. The 2012 --

JUDGE PRYOR: Hold on. When you were testifying earlier about guidelines, Mr. Hinaman, when were those guidelines established? Were those established before or after you started your work on the redistricting plan for the Legislature?

THE WITNESS: Before, Your Honor. I think in May, and I started in September.

BY MR. PARK:

Q. The 2012 legislative session began on February 7 and adjourned on May 16. During the time between February 7 and May 16, what was the nature of your work?

A. I would come to Alabama for two or three days every -- virtually every other week and meet with the two cochairs and then, obviously, meet with individual legislators.

Q. Now, when you met with individual legislators, did you meet with individual legislators from both houses?

A. Both houses. Yes, sir.

Q. And we've heard testimony you met only with the Republican legislators; is that correct?

A. That's correct at that time, although when the plans were on the House and Senate floor, I did then meet with some Democrats who wanted changes in their districts. But, yes, up until they

were introduced, I only met with Republican legislators.

Q. Why was that?

A. Well, that's what I was contracted to do.

Q. While you met only with Republicans, did you get input from Democratic members?

A. Yes. Both cochairs, Senator Dial and Representative McClendon, met with their colleagues, Democratic colleagues, and would give me information on their meetings.

Q. And we'll talk about this more as your testimony goes on. Did you also receive a map from Senator Dial of the black majority Senate districts in Birmingham that he said came from Senator Smitherman?

A. That's correct. I was handed a map, which did not -- was just basically a map, didn't have any demographic information with it, that I endeavored to duplicate in our Senate plan.

Q. And did you also receive from Mr. McClendon a map that he said -- of the Montgomery area House districts that came from Mr. McClammy?

A. I did.

Q. Okay. I'd like to direct your attention to the Senate districts.

MR. PARK: And with the Court's permission, what I'd like to do for illustrative purposes -- Can y'all see this? This is the 2001 senate plan, and I'd like to direct --

JUDGE PRYOR: You're showing us a map, Mr. Park, of the

2001 Senate districts. Have y'all seen this, plaintiffs?

MR. TANNER: I've seen maps of the 2001 Senate districts. If the witness is going to be examined on the document, it would be good if we could actually see it while he's being examined. I think that they are in the record.

JUDGE PRYOR: It would be hard for you to see it and us to see it, too, Mr. Tanner.

MR. TANNER: Unless he uses one of the many exhibits that are in the record on the Elmo.

JUDGE PRYOR: That's true. You could bring it over here, Mr. Park.

That's a good idea, Mr. Walker. Bring the easel over. That will -- I think that will do it.

Mr. Tanner, if you would like, you can move a little bit.

Are we all in agreement that this is an accurate representation of the 2001 Senate districts?

MR. TANNER: Upon counsel's representation.

MR. BLACKSHER: I agree. If counsel says it is, it must be.

JUDGE PRYOR: It must be.

BY MR. PARK:

Q. Mr. Hinaman, when you started work on the Senate plan, which districts did you start with?

A. Well, I started with the majority African American districts

first. And then, obviously, after that, worked around the edges of the map and moved inward, for the most part.

Q. Which are the black majority districts in this plan?

A. In this plan, that would be 18, 19, and 20 in the Jefferson County area; 23 and 24 and 28 and 33 in Mobile.

Q. And also 26?

A. And 26 in Montgomery. Yes.

Q. And when you started work for all -- what was the nature of the population status of these black majority districts?

A. They were all underpopulated in comparison to ideal, and I had to find population to repopulate them.

Q. And as a general matter, where would you find that population?

A. Well, obviously, it has to be contiguous, so it would be in a neighboring district by definition.

Q. Now, as you worked on -- let's start with Senate District 23 and 24. Senate District 24 was underpopulated. What did you try to do with that?

A. Well, I believe I moved -- took it down further into Choctaw and Clark, rural areas, and also took it -- about half of Pickens County and put it in there. Probably a little bit more in the Tuscaloosa area, although the differences aren't -- it's in more of an urban area, so it doesn't look that different, but it added a few precincts in there as well.

Q. Let me direct your attention to Senate District 30 at this

time. Senate District 30 includes Butler County, Crenshaw, Pike, and goes through Lowndes to Autauga and Elmore County; is that right?

A. That's correct.

Q. What did you do with Senate District 30?

A. I thought that that -- a number of those districts were all underpopulated south of Montgomery, and I thought that what would make the most sense would be to draw a more compact District 30 north of Montgomery. So those areas, including Lowndes, that were south and west of Montgomery were put in other districts. The rest of Lowndes and Butler went in 23, Crenshaw went into 25, and Pike went into 31.

Q. Now, what happened when you pushed Senate District 24 north into Pickens County?

A. Obviously, that had the effect of also moving Senate District 21 north into Lamar.

Q. And in connection with that, was Senate District 5 underpopulated?

A. It was. And obviously, it couldn't very easily go directly east because of the three African American senate districts in Jefferson County, so it took up part of Fayette County or all of Fayette County.

Q. And when you take Lamar and Fayette County away from Senate District 6, what happens?

A. Well, it was obviously -- considering started

underpopulated, and once you did that it was even further underpopulated. Again, about the only place it could go was north, so it went north into Senate District 1.

Q. What was the status of Senate District 2?

A. Senate District 2 was very much overpopulated. I think close to like 40,000 citizens. So 1 moved into 2, the northern part of 2.

Q. And you had to redistribute the population in 2 to meet the ideal population; is that right?

A. That's correct.

Q. So you moved 30 north of Montgomery, and you redistributed down here. When you moved Senate Districts 23 and 24 south into Choctaw and Clark counties, what happens to 22?

A. Well, obviously, it needs population, but that works out well because Senate District 32 in Baldwin County was very overpopulated. So basically, everything north of I-10 in Senate District 32 went into Senate District 22 in Baldwin County.

Q. Let's take a look now at the 2014 senate map.

MR. BLACKSHER: Objection, Your Honor. This plan hasn't made it to 2014.

MR. PARK: The 2012 proposed map for the 2014 plan.

Q. Again, starting with Senate Districts 23 and 24.

A. Yeah. They picked up population -- well, Senate District 24 went north into Pickens and picked up a few extra precincts in Tuscaloosa, and then it went south into the northern part of

Clark and a considerable amount of Choctaw.

Q. And 23?

A. And 23 picked up the rest of Lowndes, picked up Butler, and picked up a little bit more of Clark, I believe.

Q. And what happened to Crenshaw County?

A. Crenshaw went into Senate District 25, and Pike went into Senate District 31.

Q. And 30 went on north --

A. 30 went all north of Montgomery, which had the effect of pushing Senate District 11 further north as well.

Q. And then 21 moves north into Lamar County; is that right?

A. Yes, sir.

Q. And 5 moves west into Fayette County?

A. Yes, sir.

Q. What happened with Senate District 6?

A. Senate District 6 moved north into Lauderdale County --

Q. And Senate District 1 --

A. -- and a portion of Lawrence.

Q. And then Senate District 1 moves along --

A. Moved east along the top of the map into Limestone and also into a little bit of -- portion of Madison.

Q. Let's look at what's been marked as Exhibit 469. Can you tell me what this is.

A. That would be a blow-up of the senate districts that I was given by Senator Dial, who told me that Senator Smitherman had

given him that map of the three majority African American senate districts in Jefferson County.

Q. And did you try to put Senator Smitherman's map into the Senate plan?

A. I did. I think I -- I mean percentages are hard to use, but I put, you know, 95, 97 percent of it into the Senate map.

Q. What part of the -- of Senator Smitherman -- did you change any of the internal boundaries in Senator Smitherman's map?

A. If I did, it was unintentional. I tried to follow those lines entirely. And I got no feedback that I was wrong, so I think I did those correctly as that map represents.

Q. And what changes did you make in Senator Smitherman's map?

A. The biggest visible change is these few precincts to your left sticking out this way were precincts that were in Senator Reed's Senate District, Senate District 5, I believe, and he wanted to keep those like two or three precincts. In exchange for that, obviously, I had to have equal population, put in two or three precincts at the very southern tip of Jefferson County.

Q. And were those precincts the Rock Creek Church Road --

A. They were.

Q. -- in this area and Rock Creek Church Road to what would be the west?

A. Yes, sir.

Q. And are those precincts majority white or majority black?

A. Majority white.

Q. And the precincts to the south that you added to Senator Smitherman's district, are they majority white or black?

A. Majority white.

(Brief pause)

JUDGE PRYOR: Any day now, Mr. Park.

MR. PARK: Yes, sir, Your Honor.

Q. Let me show you what I believe to be marked Defendant's 476, which I'll represent to you to be a map of the 2001 Montgomery area Senate districts; is that correct?

A. Yes. Looks to be.

JUDGE PRYOR: Y'all have multiple 476s, don't you?

MR. WALKER: It's a group exhibit of Senate maps, and then there's one, I think -- yes. Yes, Your Honor.

Q. And what is the pink part of that?

A. That's Senate District 25.

Q. And is Senate District 25 Mr. Wren's district?

A. No. It's a Senate district.

Q. Oh. Senator Brewbaker's?

A. It is.

Q. And is that a majority white district?

A. It is.

Q. And then Senate District 26 is Mr. Ross's district; is that right?

A. Yes, sir.

Q. And it's majority black?

A. Yes, sir.

Q. And coming into the cycle, was Senator Ross's district underpopulated?

A. It was.

Q. Let me show you what's marked as 477, which I'd represent to be the map for the new districts.

JUDGE WATKINS: That's actually 476.

JUDGE PRYOR: 477 is the old. 476 is the new, I think.

MR. PARK: Yes, Your Honor.

JUDGE WATKINS: That's the way we have it.

Q. Now, Senate District 25 picked up -- you testified that it picked up Crenshaw County, and it always had some of Montgomery and Elmore counties; is that right?

A. That's correct.

MR. PARK: This would be, I believe, tab 6, Your Honor.

JUDGE THOMPSON: Maybe you should just refer to them by tabs.

MR. PARK: Yes, Your Honor.

JUDGE THOMPSON: I've got it.

Q. And before -- in the old plan, was Senate District 25 contiguous to Crenshaw County?

A. It was not.

Q. So what did that require you to do?

A. I took some of the rural parts of Montgomery County and put those into Senate District 25, so it was able to, obviously,

connect up to Crenshaw County.

Q. And then Senator Ross's district, did it keep the core of his old district?

A. It did. Although geographically that looks like a large area, which it is geographically, but populationwise, it's not that large. But, yes, he kept the bulk of his core district and then added some precincts in the city of Montgomery to get back to ideal population.

Q. Now, when you created the land bridge and took population from the south part of Montgomery County, was that population white and black -- white or black?

A. It was probably about 65 percent white.

Q. And in the course of repopulating Senator Ross's district, did you put white folks and black folks back in the district?

A. I did.

Q. And they came in from other parts of the new district; is that right?

A. Yes. Came in from other parts of 25 in the city.

Q. Let's go to tab eight. And what I'll represent to you is this is the southwest Alabama Senate districts.

A. Yes, sir.

Q. And as you look at the old districts, what constraints -- Senate District 33 is a black majority district. That's the district of Senator Figures. Were there any constraints on what you could do with her district in repopulating it?

A. Well, there were some constraints. One, we didn't want to cross the bay into Baldwin County, so we couldn't really go east. The two senators -- the senator who represents District 34, Senator Glover, lives essentially north -- well, sort of northwest of 33, and the senator who represents District 35 at that time, Senator Brooks, lives southwest of 33, so going west was somewhat problematic in terms of going into their neighborhoods. And going north could have had the unintended consequence of cutting off the transportation, shall we say, from District 22 to Escambia County, so that was somewhat problematic. So going south was essentially the easiest course.

Q. Let's look at the new district. And --

A. New District 33?

Q. Well, new districts in this area. What changes did you make to District 35? That would be Senator Brooks' district, former district.

A. District 35, I believe, picked up some of the western part of Mobile County and lost some of its northern -- northeastern part to Senate District 33.

Q. And then what effect did the change in Senate District 35 have on Senate District 34?

A. Pushed it a little further north; took up a little bit further north part of the county.

Q. Now, when you talked about the transportation or the land bridge, is that the kind of green between Washington County and

Baldwin County in District 22?
A. Yes, sir.
Q. Now, with respect to 22, Senator Sanders and Senator Singleton had pushed it south, and Senator -- the Mobile districts moved it up out of Mobile largely. Where did you get the additional population for Senate 22?
A. The additional population for Senate 22 came from northern Baldwin County.
Q. And was that area -- was Senate District 34 -- 32 overpopulated?
A. Yes, sir.
Q. I'd like to direct your attention now to the House plan. One of the issues that's come up is the movement of House District 53 from Jefferson County to Madison County. Did you recommend that move?
A. I did.
Q. And as far as whether that move was made or not, was that your call, or whose call would that have been?
A. Well, ultimately it was the Legislature's, but initially it was Representative McClendon's.
Q. And why did you make that recommendation?
A. Because every one of the minority majority districts in Jefferson County were underpopulated, some quite dramatically. And when we looked at it as a whole, they were around 70,000 folks short of ideal, those districts added together, which is

basically a district and a half. And looking at the map, I knew that most of the -- if not all of the minority neighborhoods were already included in those districts. So trying to repopulate them to get them back to deviation was going to retrogress most if not all of them, some of them maybe to the point where I was very concerned about Section 5 preclearance of the plan.

Q. You were in the courtroom this morning when Dr. Arrington talked about how the black population in Jefferson County went up and the white population went down over the course of the time between 2000 and 2010. Does that change in the population distribution in Jefferson County show up in districts?

A. It does. As I said, those nine districts were 70,000 folks short. I think the overall change in the black population in the county may have been 7,000, maybe 8,000. I'm trying to remember that number. But it was not a dramatic -- it was nowhere close to 70,000.

Q. And it didn't show up in the black majority districts, did it?

A. It did not.

Q. And did it show up in the black majority Senate districts?

A. No. That's why -- I mean, that's why we were adding -- you know, we were adding more white precincts to the Senate districts to get to ideal population.

Q. And as a general matter, how did the black majority Senate

districts and black majority House districts in Jefferson County correspond? Do they occupy similar space?

A. They do.

Q. With respect to moving House District 73 to Shelby County, was that your recommendation?

A. It was, and it was also a feature of the map that Representative McClammy had given Representative McClendon to give to me.

Q. Why move -- why move a district to Shelby County, a House district?

A. Well, two reasons. One, we needed population to repopulate the three majority black districts in Montgomery County, and the only -- or most of the only logical population was in 73. Obviously, why move it to Shelby County? That was the fastest growing county in the state, I believe. And it also -- every district whole or part that was in Shelby County was overpopulated, so something was going to need to take -- one district there, I think, was dramatically overpopulated. House District, I think, 41. So it made sense to move that district to a much faster growing area.

Q. And you talked about the McClammy map. Are you familiar with the concept of the package that Mr. McClammy gave Mr. McClendon?

A. I am.

Q. And what was the nature of that concept?

A. It was a map, a couple of maps, and then corresponding demographic information.

Q. And did that demographic information include House District 73?

A. It did not. He drew the districts inside Montgomery County without a District 73.

Q. Did you use that concept in drawing the districts in Montgomery County?

A. I did. Obviously, it wasn't identical, because I also had to bring in House District 69, which is another majority African American House district that was short of population, so that changed the nature of it slightly, somewhat. But I tried to use the concept of using District 73 to repopulate the minority districts in Montgomery County.

Q. And did you also bring House District 90 into Montgomery County in the southern part?

A. I did, but that was 3,000 people. It was a minor part of the --

Q. Were those changes that you made, were the changes you made in Montgomery consistent with the concept of the McClammy map?

A. I believe they were.

Q. One other issue that's come up is -- relates to the splitting of counties. Blount County is majority white and represented by Republicans. How did it get split four ways?

A. Well, when there were no voting rights concerns in a

predominantly white county, then the legislators I sat down with talked about the areas that they wanted. And essentially, if there were no reason not to draw it that way, I would draw it the way the legislators requested it being drawn -- be drawn.

Q. And if that resulted in splitting the county?

A. Well, those counties were split, but if it resulted in an additional split, yes. Yes, sir.

Q. You come up with a plan. What involvement did you have with the plan after it was produced and in the hands of Mr. McClendon and Senator Dial?

A. I was here during the session, and when there were changes that were made to the map, I would -- I didn't do all of them, but I sat down with some of the legislators who had changes that they wanted made and remade them.

Q. Like who did you sit down with?

A. I sat down with Oliver Robinson; Patricia Todd; Mary Moore was on the phone with Oliver Robinson when I did that. I may have sat down with Marcel Black and a couple of changes that were made in that area.

Q. And Mr. Robinson and Mary Moore and Patricia Todd, are they all representatives from Birmingham?

A. Yes, sir.

Q. And what about Mr. Black and the folks there? Where are they from?

A. Those were changes in Lauderdale and Colbert County.

Q. And is Mr. Black a Republican or Democrat?

A. Democrat.

Q. How about Mr. Robinson, Ms. Moore, and Ms. Todd?

A. Democrats.

Q. Can you think of anybody else you worked -- helped work with?

A. Well, I made a few changes, again, to the map because I had had a couple of people who were outside their district because I had the wrong address. Or in one case, my computer program, Maptitude, put it in a different place than the state's computer program. So to be sure, I went back and made some minor corrections to make sure everybody had their own district to the extent possible.

JUDGE PRYOR: Do you know the race of those legislators with whom you made those changes in Birmingham and then the Lauderdale and Colbert counties?

THE WITNESS: Yes, I do. Oliver Robinson and Mary Moore are African American, and Patricia Todd and Marcel Black are white.

Q. And in the course of your work, to the extent you got input from legislators or from legislators through Senator Dial or Representative McClendon, do you think you carried out the wishes of those legislators?

A. Well, as you well know, no one gets everything they want in redistricting. But to the extent possible, I tried to, yes.

Q. One second.

Pass the witness, Your Honor.

JUDGE PRYOR: Mr. Blacksher?

MR. BLACKSHER: Can't work without my computer, Your Honor.

JUDGE PRYOR: Good for you.

MR. BLACKSHER: It's going to take longer for me to move this than it is for the examination, but let me do it.

APX 75 is Mr. Hinaman's deposition, and I move its admission.

MR. PARK: No objection, Your Honor.

JUDGE PRYOR: It's admitted.

MR. BLACKSHER: APX 68 is Mr. Hinaman's declaration, and I move its admission.

MR. PARK: No objection, Your Honor.

JUDGE PRYOR: It's admitted.

MR. BLACKSHER: And may it please the Court, for the most part, the deposition contains my cross-examination, which I will refer to in the post trial brief, as I've already done so. There are just a few more questions I wanted to ask my friend, Mr. Hinaman.

CROSS-EXAMINATION

BY MR. BLACKSHER:

Q. To be clear, Mr. Hinaman, your instructions were to pursue two goals: One, not to retrogress the size of the black

majorities in the majority black districts, and two, to the -- I think you said to the extent possible, to comply with the wishes of incumbents with whom you met; is that correct?

A. That's correct. There were more goals than that, obviously. To stay within deviation and --

Q. Plus or minus 1 percent?

A. Yes. And comply to the extent possible with the guidelines set forth by the reapportionment committee.

Q. But as you said in your deposition, to the extent that the guidelines called for trying to preserve county boundaries, that was subordinated to these other goals; isn't that correct?

A. Certainly to one person, one vote. Yes, sir.

Q. Well, it was subordinated as well, as you just said in your direct testimony, to the desires of incumbents.

A. Yes, sir.

Q. I'm going to show you --

MR. BLACKSHER: Ms. Roy, you can turn me on now, please. Thank you.

Q. This is APX 35, and it's a Maptitude picture of --

A. We're off. I don't have anything.

Q. Oh, we don't. Did I not --

Did it not work? Oh, heavens. Never mind the map. I can ask the question without the map. Everybody's seen the maps of the Senate District 1 that goes from Lauderdale over into Madison County.

A. Yes, sir.

Q. And Senator Irons testified that you could have accomplished --

JUDGE THOMPSON: What tab is that?

MR. BLACKSHER: It's APX 35. If you can look at APX 35, I think everybody's got his or her --

JUDGE WATKINS: It's on tab three.

MR. BLACKSHER: May I approach the witness, Your Honor?

JUDGE PRYOR: Yes.

Q. Just so we're all looking at the same map, can you find it, Mr. Hinaman, APX 35?

A. Yes, sir. I believe I have it.

Q. Okay. Do you recognize that as a Maptitude map of northwest Alabama? So if we look at Senator Holtzclaw's SD 2, which straddles the Limestone-Madison line -- and I will tell you that Senator Irons testified that she demonstrated to Senator Dial that if you simply swapped, I think it was like 23,000 people, that she has in Madison County with 23,000 people that Senator Holtzclaw has in Limestone County, you would get the plus or minus 1 percent deviation, but you would keep Limestone -- you would keep Senator Irons' SD 1 all in Lauderdale and Limestone and Senator Holtzclaw all in Madison County.

Now, my question to you is, isn't it a fact that the reason that the Senate District 2 goes into Limestone County and the way Senate District 7 is drawn is a result of a negotiation that

you had at some length with Senators Holtzclaw and Sanford, who are the incumbents in 7 and 2?

A. Well, first of all, I mean, you may be correct, but I'm not entirely sure that the population in Limestone in Senate District 2 is equal to the population of Senate District 1 in Madison. I'm not -- I don't recollect that, but you may be correct. But that doesn't ring a bell to me.

Q. Okay. Well, I haven't checked it either. I'm telling you what Senator Irons testified. And there were certain numbers that were produced in an exhibit, and they could be examined.

But my question, didn't you say in your deposition that you spent a lot of time negotiating with Holtzclaw and Sanford?

A. Holtzclaw more than Sanford.

Q. Holtzclaw. And basically, Senator Holtzclaw didn't want all of the black precincts that SD 7 had to give up. Isn't that the problem?

A. No. He preferred to have the split that he has now in Madison and Limestone.

Q. As opposed to having more of the Madison County precincts that you gave to Senator Irons in District 1?

A. Right.

Q. Right. And when I asked you, well, was Senator Irons happy with having those Madison County precincts, and your response was, well, that would be better. She would probably prefer that over X thousand Limestone Republicans.

A. That would have been my guess.

Q. Yes. Your guess. And by Republicans, you're -- you're dealing strictly in terms of the demographics and identifying Republicans and Democrats here, right?

A. No. I have voting data for every voting district.

Q. But you didn't refer to the voting data when you were actually drawing the plans. You were -- as per your deposition, you were looking at the racial demographics.

A. Only in drawing minority majority districts. Not in this -- those precincts were all evaluated -- to the extent they were evaluated at all politically, were evaluated based on political data, not racial data. There's no majority district there.

Q. No, there's not.

Let me ask you this. When you were attempting to bring all majority black districts up to the size of the black majorities with 2010 census on top of 2001 plan -- and you were reaching out to find black precincts, right?

A. Yes, sir.

Q. I did not ask you in your deposition this question, so let me ask it now. When you were trying to make -- get the black population you needed, did that mean that you could only pick up a precinct that was majority black, or was there some cut point where you decided the precinct would not serve your purpose?

A. I'm assuming you're not referring to this map anymore, and you're talking about --

Q. No. I'm not referring to this map anymore.

A. No. When I was adding population to majority black districts, my goal was not to retrogress the number that they had in 2001, meaning 2010 census, as applied to the 2001 lines. And in toto, whatever I added to a various district, I would look to see what change that made to the overall black percentage in that district. And so in some districts I could add in anything I wanted, and it didn't matter because they were -- you know, either they didn't need that much population, or the changes I added didn't matter. But, yes, where it was something that I was concerned about retrogressing, I did look at the nature of the precincts I was adding, certainly.

Q. Yes. So, I mean, and we had an earlier demonstration. Bill Cooper showed how the Maptitude works. When you're doing it, as you take a precinct and add it, let's say, to -- the majority black district we're talking about here is Senator Sanders' SD 23. Okay? And as you put a precinct into SD 23 with Maptitude, it pops up -- you look at the table and see how much that's increased the black percentage. Right?

A. Correct. Yes, sir.

Q. And if that precinct did not increase the black percentage, or at least it didn't increase it as much as you wanted, you would simply split the precinct and go down to the block level and look for a majority black block or several blocks.

A. Well, that's a little bit of a simplification. I mean, I

tried to look at the additions en masse, not just a precinct. I may add a white precinct, a majority white precinct and a majority African American precinct; but if you look at the end number, if it did not retrogress the overall end number for that precinct, then they were added in. If for some reason they retrogressed that number, then, yes. So I would split precincts.

Q. And when you split precincts, you would have to go to the block level?

A. Yes, sir.

Q. And could you see -- you could see on the screen, couldn't you, which blocks on your screen had black populations of substantial numbers, right?

A. Certainly.

Q. Right. It shows up -- did you actually color code the black precincts?

A. You can. I didn't usually, but you can.

Q. Did you just look at the numbers that pop up?

A. But, again, I was trying to look at the overall total change to the district, not any one specific precinct.

Q. Right. You would look at the numbers on the screen, and you would pick some blocks, and you would put them into SD 23 from my example. And then you would see how that affected the black percentage in SD 23.

A. You could.

Q. I'm sorry?
A. That's possible, yes.
Q. No, I'm not saying whether it was possible. That's what you --
A. My point is I would look at the changes I made in toto to see what it did to the overall black percentage of the district, and the fact that I may have added a white precinct along the way did not trouble me in any way. It was the overall number.
Q. As long as the black percentages continued to go up to where you needed --
A. Not go up. Did not retrogress.
Q. Well, I assume that you were grabbing black precincts -- okay. All right. We're quibbling over --

If you were not at the number that you wanted to establish to maintain the black percentage, you had to increase black population, right?
A. Yes, sir.
Q. Okay.

JUDGE THOMPSON: Let me ask you this. How do you define retrogression?

THE WITNESS: I define it, in terms of my work, in two ways: One, not lowering the overall total number of majority African American districts in either plan. Actually, we added one in the House plan. The number stayed the same in the Senate plan. And then looking at 2010 census as applied to 2001 lines,

whatever that number was, I tried to be as close to that as possible. And if I was significantly below that, I was concerned about that being retrogression that would be looked upon unfavorably by the Justice Department under Section 5.

Q. And you've had experience dealing with the Justice Department in preclearance proceedings in other cases?

A. I've drawn plans that were precleared. Yes, sir.

Q. Okay.

A. I didn't personally deal with the Justice Department, but --

Q. All right.

MR. BLACKSHER: I pass the witness, Your Honor.

JUDGE PRYOR: Thank you, Mr. Blacksher. Who from the Newton plaintiffs? Mr. Tanner?

THE WITNESS: Sir, would you like your book back?

MR. BLACKSHER: I'll get it in a moment.

JUDGE PRYOR: Mr. Tanner, who has a substantial but crisp presentation prepared.

MR. TANNER: And substantive, too, I hope, Your Honor.

Is the Elmo working?

CROSS-EXAMINATION

BY MR. TANNER:

Q. Good afternoon, Mr. Hinaman.

A. Good afternoon.

Q. During your deposition, you testified that you started and

drew the black districts first, majority black districts in the House and the Senate, and then you went to the corners of the state and worked in, right?

A. Correct.

Q. Well, your testimony today sounds like you drew the black districts and then worked out from the center. You talked about how you moved up from 23 and how you moved -- you split Senate Districts 23 and 24. And you went -- you split Senate District 30, which is right in the center of the state, straddling Montgomery. And that seems, from your testimony today, to have affected everything else, but that was not your testimony in your deposition.

A. Well, I did -- I did -- point A, I did start with the minority districts, as you pointed out. And then I started in the corners. Maybe more specifically I should have said the southern corners and worked north. Because those areas that you mentioned, Senate 30, a number of those counties south of Montgomery were put into various districts to repopulate them. So I essentially started in the corners and worked north. But as you well know, when you're along a border, you can't go into another state, so you have to be mindful of where you end up on those. But I basically started in the corners, primarily the southern corners, and move north.

Q. Well, once you got through Montgomery into the northern part of the state, did you then go back to the corners?

A. No. I continued north, for the most part.
Q. Doesn't that create the danger that you'll get into a corner of the state and find yourself painted into a corner?
A. Yes. There are four corners, and I suppose you have to -- you can't start in all four of them simultaneously, so --
Q. Wasn't that your rationale for testifying before that you started in the corners of the state after you had drawn the black majority districts?
A. I just said I started in the southern corners, those two corners, and primarily worked north.
Q. Now, I'm not sure I got this right, but you had a complete plan in January 2001 that was an initial plan.
A. Yes, sir.
MR. ANDERSON: '11.
Q. 2011. I'm bad with years. I apologize.
A. Yes.
Q. And that included the majority black districts, did it not?
A. It did. But what I said, it was an initial plan in that I had districts that had one Senator or House member, and then per district. And they were drawn to deviation plus/minus 1, but they were devoid of input from legislators in terms of their interests and their various districts.
Q. Had you taken into consideration comments people made at the hearings in shaping that plan?
A. Some, but, again, it was just at a starting place where I or

members would work from.
Q. Did you print out a copy?
A. Did not.
Q. To whom did you show it?
A. Didn't really show it to anybody. I showed individual districts to the members who came to meet with me.
Q. Now, also in January of 2011, did you attend a National Conference of State Legislators redistricting conference at National Harbor in the Washington area?
A. I did not.
Q. Now, what sort of studies did you do or receive to determine whether black voter participation levels varied across the state or in different parts of the state?
A. I did not review any studies.
Q. You didn't review any studies?
A. That's correct.
Q. So did you have any information on that?
A. I did not.
Q. Did you -- were you aware of any related studies, for example, about variations among the state's black communities in terms of voting or anything else?
A. Well, "anything else" covers a lot of subjects, but I was --
Q. I'll be more specific. How about socioeconomic characteristics such as income, type of employment, educational level achieved?

A. I did not look at those factors.
Q. Attitudes?
A. No, sir.
Q. Did you obtain or already have any information about the black population, variations in the black population in various areas such as Birmingham and Mobile, any differences?
A. Differences in terms of?
Q. Of any of the characteristics I've mentioned: Either voting or education, employment, types of employment.
A. No, sir.
Q. Excuse me?
A. No, sir.
Q. Are you personally familiar with any of the black populated areas of the state?
A. I've done statewide campaigns and local campaigns in Alabama, so, yes, to some extent.
Q. What parts?
A. Mobile and south Alabama and two statewides.
Q. Okay. So you've been around the state, and you have some awareness that Mobile and Birmingham are different cities.
A. Yes, sir.
Q. And that the economy in Huntsville has a different base than the economy in Montgomery.
A. Yes, sir.
Q. And the -- but you don't -- you didn't communicate with any

black members of the Legislature about the specific problems or issues or characteristics of their districts in drawing the plans, did you?

A. I did not. Senator Dial and Representative McClendon met with the African American members.

Q. And did they share with you any information about the particular nature of the communities with which you were dealing?

A. They shared with me the information they got from those meetings in terms of what was -- whatever was discussed.

Q. And that would just be Senator so and so is interested in these areas or Representative Jones wants to move in this direction? Is that --

A. Primarily, yes, sir.

Q. What else?

A. That was primarily it.

Q. Well, you said primarily. Was there anything else?

A. I can't recollect every conversation I had a year and a half ago.

Q. And you only looked at the black population in creating the districts. You didn't look at other minorities or the ratio between the white and the black population.

A. That's correct.

Q. And in drawing the plan, you sat down with the Legislature and used a computer in Mr. McClendon's office?

A. Usually, yes, sir.

Q. Where else?

A. That was primarily where it was done.

Q. Representative McClendon, I believe you testified, approved all of the precinct splits that you did?

A. He looked at the entire House map. Yes, sir.

Q. But did you talk to him about any of the precinct splits?

A. I didn't go precinct by precinct, if that's what you're asking me.

Q. Do you recall talking about any of them?

A. I'm sure I talked about a number of them.

Q. Okay. But you can't recall any specifically?

A. Actually, the only specific one I actually recall was a minor change -- the small precincts -- that were small blocks we added in I believe it was Greene County for Representative Harper that we --

Q. We'll get to that.

You also had political data loaded in your computer.

A. Yes, sir.

Q. You mentioned in your deposition the 2006 Attorney General's race between Luther Strange and James Folsom, Jr.

A. I think it was the lieutenant governor's race.

Q. Oh, lieutenant governor.

A. I believe.

Q. I think you're right.

A. Yes.

Q. The 2008 presidential and the 2010 gubernatorial?

A. Yes, sir.

Q. Did you have any other elections loaded in?

A. I did, but those were primarily the ones I looked at.

Q. Those three?

A. Primarily.

Q. What other elections did you have in there?

A. I had virtually every statewide election from 2002 through 2010.

Q. And you obtained that information from the Republican National Committee?

A. That's correct, or a vendor they hired.

Q. Excuse me?

A. Or a vendor they hired. Yes, sir.

Q. Did they give it to you or did you have to pay for it?

A. They gave it to me.

Q. Now, earlier you testified that Senate District 2 was driving the changes affecting District 1, but now you're changing that testimony.

A. I'm not. There are two factors that were driving the changes to Senate District 1. One was the overpopulation of Senate District 2, which you alluded to. The other was the fact that Senator Bedford's district needed population after the changes that were made to it, which drove it further north and

required -- they go hand in hand, obviously.

Q. Well, in terms of the push up from the north from 23 and 24, there wasn't all that many people, was it? I mean you -- in the northern direction, you picked up about 7,000 people in Pickens County. You gave up more than that out of Bibb County.

A. There was probably some changes in Tuscaloosa as well, which I can't --

Q. Right. But it wasn't 49,000 people. It wasn't the population of Lamar and Fayette.

A. No. But also Senate Districts 4 and 5, I believe, were underpopulated as well.

Q. So 4, 5, and 6 are underpopulated.

A. Correct. And 6 started underpopulated.

Q. Well, 5 was only underpopulated by about 15, 1600 people, correct? So it was a small change.

A. Well, but it may have been underpopulated by more than that once I repopulated the minority districts in Jefferson County.

Q. But the districts in Jefferson County that involved Jefferson County netted out even in terms of total population, correct?

A. Try that again? I'm sorry. They all needed population. Their population had to come from somewhere.

Q. And it came from the over -- it could have come from the overpopulated districts within Jefferson County or that had part of Jefferson County.

A. It could have. But some of it, I think, did come from Senate District 5.

Q. The way you drew it.

A. Yes, sir.

Q. Okay. Well, in terms of Senate District 1, whose idea was it to reach over the top of Limestone County and go down into Madison County and grab the Johnson High School precinct, of which Representative Laura Hall, a recent candidate for the state Senate District 7, where she had taught for 25 years? Whose idea was that?

A. That was a function of meeting with Senator Holtzclaw and what he wanted in his district, and then that determined where one had to go.

Q. Well, there were also choices with respect to Senator Sanford's district. I mean, that wasn't the only area you had to take in. You could have gone -- continued straight east, could you not?

A. I could have.

Q. But Senator Sanford didn't want you to.

A. I don't know. There was never any discussion of where Representative Hall lived or who lived in what precincts, if that's what you're asking.

Q. That's not something that they shared with you?

A. They did not, no.

Q. And it was Senator Holtzclaw who decided to split both

Madison and Limestone, that that district should straddle Madison and Limestone counties?

A. Correct. Well, he had -- I think he had Limestone County before we started this process, I believe.

Q. So the answer is yes?

A. Yes, but I'm not sure that the populations are exactly equal there. I think we would have had to split Limestone in any case. Maybe you can tell me the numbers. I don't have them in front of me. But my recollection was that that was going to have to happen anyway.

Q. Now, you testified that you eliminated House District 53 because you couldn't draw that nine majority black House districts in Jefferson County because of the underpopulation.

A. Yes, sir. Without retrogressing them.

Q. Without retrogressing them. But isn't it true that the black population within the county increased by nearly 36,000?

A. I don't know what the number was, but it was nowhere near the 70,000 that those nine districts were short. I thought it was more like 7,000, but you may be correct.

Q. Well, the census will --

A. But in any case, whatever number it was, it was nowhere near 70,000.

Q. And it increased by over 15,000 among the Latino population, correct?

A. If you say so, sir.

Q. And it increased by about -- decreased by about 16,000 among the white population.
A. Which was somewhat irrelevant to drawing nine black districts in Jefferson County.
Q. Well, you drew three black majority Senate districts in Jefferson County, did you not?
A. That's correct, and they were at lower percentage than where we started.
Q. And no one had a problem with that, as far as you are aware; is that correct?
A. The senators, you mean?
Q. Or anyone else.
A. I can't speak for anyone else. I don't know that the senators had any problem with it.
Q. And you testified that you drew the House and Senate districts concurrently. You were working on both of them at the same time; is that correct?
A. Yes, sir.
Q. Okay. Now, Alabama has how many Senate districts?
A. 35.
Q. And how many House districts?
A. 105.
Q. And 35 goes into 105 how many times?
A. I would believe three.
Q. So every Senate district basically could constitute three

House districts, correct?
A. That's correct.
Q. And as a matter of fact, they used to be nested. Three House districts were within each Senate district. You're aware of that, aren't you?
A. Yes, sir.
Q. So you've got three Senate districts. And you're testifying that it never occurred to you that you could have drawn nine House districts?
A. Of course it occurred to me, but they would all be retrogressed to the extent that I was concerned about preclearance.
Q. So you didn't even try.
A. I can do math. They were 70,000 short. That's a district and a half.
Q. And the Senate districts were 80,000 short, weren't they?
A. Right, but they had more flexibility in terms of lowering of the percentages than some of those House districts that were 54, 55 percent.
Q. And they were electing the choice of the black communities, each one of them was, at that level.
A. Possibly. One of them is represented by a white Democrat rather than an African American Democrat.
Q. Who was unopposed in the 2010 primary, which shows a level of satisfaction, does it not?

A. Usually.

Q. And you were also aware that there had been substantial black growth in some of the adjacent districts such as 44 and 45? The districts -- white majority districts adjacent to the black districts?

A. That there were -- that those districts grew or the African American population did --

Q. The African American population was substantial in those districts.

A. And some of that would lead to, you know, redrawing of House --

Q. So there was population available?

A. Yes. It was put into the House and Senate districts, some of it.

Q. And then your -- that position -- you also testified that in Montgomery County, you could not have drawn an additional black majority district, among other things, because of the ripple effect. Correct?

A. Yes, sir. You're referring to bringing District 69 into Montgomery County?

Q. I'm actually referring to drawing another -- a new majority black district in Montgomery County.

A. But the ripple effect I was referring to was the fact that I had to bring -- in addition to repopulating the three majority black districts in Montgomery County, I also had to bring House

District 69 into Montgomery County to repopulate it as well.

Q. Well, you didn't have to bring it into Montgomery County, did you? You could have gone elsewhere.

A. Well, it would have been hard to do without eliminating another black district.

Q. Well, how did you -- what did you add to -- excuse me. You added Butler County to Senate District 23, did you not?

A. I did.

Q. And it has a substantial black population, does it not?

A. I believe. It's less than a majority, but it has some population, certainly.

Q. Well, there are -- are there not sufficient black voters in Lowndes, Wilcox, Butler, and Autauga, the Autauga County part that was included in that district, to comprise a majority black district?

A. Well, I'd like to look at that on the map, but I'll say this --

Q. Well, here --

A. I would say this: That you can pull out any district and draw it without taking regard to all the things that are around it; but unfortunately, the whole map has to fit together.

Q. Well, what is around it when you were drawing districts, when you were starting in this area? When you were starting in this area? What prevented it? At this point, there's no ripple effect, is there? You're starting with the black district, so

there's no impediment to including Butler County or a portion of Butler County, the predominantly black portion of Butler County, in the western part of the county.

A. There may be no impediment to it, but I don't know that that -- I did not do -- you know, I don't know if those numbers work out or not.

Q. Well, there they are. And I'll represent that those are the numbers from the papers in this case.

A. Okay.

Q. I mean the three counties, Lowndes, Wilcox, and Butler, which are adjacent, are combined in the Senate District. Have almost enough population for a district. And it's under 40 percent white, almost 60 percent black. And then you have a substantial black population in Autauga County, the part that they've -- that's put into House District 69. And you could take some -- you know, move people around. Take some of the white folks out of Butler County and put into relatively black areas of --

A. Sir, as I said, you could draw any one district any way you want.

Q. And the fact is that the black population was there, and you did not utilize it; is that not correct? And instead, you went into Montgomery County.

A. I did go into Montgomery County. That's correct.

Q. One of your considerations that I believe you adverted to

earlier is -- it was a substantial goal, according to your deposition, one of the top two or three, or the top three, I believe it was, to change each district as little as possible within the framework of one person, one vote and separating incumbents, the 1 or 2 percent deviation.

A. It was a goal, but it's certainly down on the list from one person, one vote and not retrogressing the minority districts and so forth.

Q. And so forth. What else? Separating incumbents?

A. Separating incumbents.

Q. Is it a goal that you volunteered in your deposition when you were being questioned.

A. Well, it was a goal. It was a nice goal. Didn't always work out.

Q. No, it didn't.

You testified that in your mind, it was not -- it was okay to lower black percentages some, just not a whole lot, correct?

A. I think, if I'm remembering a question you asked me during my deposition, I think you gave an example of a district that was 75 percent or -- and said would it be okay to lower that somewhat to 72 or 73, and I said I didn't -- in my mind, I didn't see that as a significant problem.

Q. And 62 to 60?

A. Again, I don't know where -- I don't know where the Justice Department or the Court will split those hairs. I can't answer

that.
Q. Well, you lowered House District 19, which was 69.82 percent, to 61.25 percent. Correct?
A. Yes, I did, but for the greater good of creating another African American majority district.
Q. But you could have done the same thing elsewhere, couldn't you? You could have done that in Birmingham for the greater good, and you could have done that in Montgomery for the greater good, but you didn't.
A. The population was not there in Birmingham to have nine districts at 60 percent or whatever number you just spit out.
Q. I didn't mean to spit out a number in connection with this.
A. You said, I think, 61 percent or --
Q. Well, that was you lowered House District 19 by eight and a half plus points.
A. To 61 percent, I believe you said.
Q. Right. And then you also lowered House District 98 from 65.22 to 60.02. And House District 103 as well, didn't you?
A. Sometimes there's no way to avoid it. The senate districts in Birmingham were lowered, obviously.
Q. Right. And at no point did any black legislator complain about the lowering of the black percentage in any district.
A. Not to me.
Q. And you were aware in the hearings of the admonitions and pleas of black legislators and others not to pack districts,

were you not?

A. Certainly.

Q. And it's fair to say that you did not heed those pleas.

A. No. I don't believe -- I tried to draw those districts as close to the numbers as possible and practicable as they were in the 2001 plan to avoid problems with potential Section 5 preclearance.

Q. But you had never talked to the Justice Department. You just testified --

A. I've never talked to a cloud, but I've gotten wet when it rains.

Q. You're waxing philosophical, Mr. Hinaman.

JUDGE PRYOR: Pretty well, I might add.

MR. TANNER: If the Court will bear with me for just one moment, I'll -- I've created a mess over here, and it is my fond hope to unravel it. Starting with the wrong map.

I'll move along to something else. I'll represent to the Court that this is Newton Plaintiff Exhibit NPX -- NPX 353-R which, unless I forget, I will offer into evidence. And it, as other maps you had seen when Representative Hall was testifying, comes from the Alabama reapportionment Web site. And it's a split screen of the old and new districts.

Q. You testified in your deposition that maintaining the original form of districts necessitated putting House District 23 -- 43 into Jefferson County. House District 43 is primarily

in Shelby County; is that correct?
A. It is primarily in Shelby County, and under both maps it has a very small portion of Jefferson County.
Q. And they're different portions, are they not?
A. They are, but they're similar in number, I believe.
Q. Well, but you put in a different portion. So it's not fair to say or accurate to say that you added that to maintain the original form of the district. Instead --
A. Well, before the district was a district that included mostly Shelby County and a part of Jefferson, and that's how it was on both maps.
Q. So including a part of Jefferson County would be consistent with a goal of getting rid of the even 9-9 black/white split in the Jefferson County House delegation.
A. No. Including that part of Jefferson County was in keeping with the goal of continuing that district the way it was drawn ten years ago where it had a majority of -- a majority of Shelby and a part of Jefferson. And as a matter of fact, I did not change the Republican/Democrat shift in Jefferson County.
Q. I'm sorry. Could you repeat that, please?
A. That map does not change the number of Republicans and Democrat legislators that represent Jefferson County.
Q. Right. It maintains the number of Republicans, correct?
A. And Democrats.
Q. And by moving House District 53, you eliminated one of the

majority black districts. And you have explained why. We don't need --

A. Let me say the 2012 passed plan in Jefferson County contains 18 districts, as does the 2001 plan contained 18 districts. And both, as in 2001 and the 2012 plan, both have nine Democrats and nine Republicans.

Q. And that was intentional.

A. I'm not saying it's intentional. I'm saying it's a fact.

Q. Well, let's take a look at the data. The Jefferson County part of that little -- the little bump in Jefferson County contains 224 people. You recall that, do you?

A. Yes, sir.

Q. Okay. Which if you removed it or -- on the surface would appear to be necessary to achieve the 1 percent population deviation. Correct?

A. Correct.

Q. But, in fact, you had done a three-way split of the Helena United Methodist precinct, Helena United Methodist Church precinct among districts 43, 15, and 73, had you not?

A. If you say so. I mean, I -- I don't --

Q. I'll represent that.

A. Okay. Fair enough.

Q. I'm sorry.

And so you easily could have moved -- done a different split, correct? To put a few hundred -- several hundred more

people into District 43 --

A. Yes, sir.

Q. -- from either of those overpopulated districts.

A. Yes, sir.

Q. And when you split a precinct, you do extra work, right?

A. I don't think I got any extra credit for splitting precincts.

Q. But it takes additional actions to split a precinct.

A. Yes, sir.

Q. You testified in your deposition rather than one click on a whole precinct, you click on each block that you're moving.

A. Yes, sir.

Q. And so you did a lot of clicking to achieve this artificial result, did you not?

A. I received -- I achieved a result that was in the 2001 map.

Q. The political result; the maintaining of the --

A. The makeup of that district was vastly majority Shelby and a small chunk of Jefferson in the 2001 map, as it remained --

Q. And were you told to keep it in Jefferson County?

A. I wasn't told. I was asked -- talking to that legislator, she preferred it that way.

Q. Okay. Let's talk about Greene County.

A. Yes, sir.

Q. That's another one where you needed -- and I'll put that in quotes -- 12 people to avoid going over 1 percent.

A. Yes, sir.

Q. And, in fact, you put 12 people into District 61 from District 71, and you would split two precincts on the border of those two districts, the Carollton 4 Service Center and the Aliceville 2 National Guard Armory, had you not?

A. Yes.

Q. And if you had moved from either of those split precincts anywhere from 12 to 279 people, there would have been no need, one person, one vote need for District 61 --

Which is majority white, is it not?

A. It is.

Q. -- to go into Greene County; is that correct?

A. That's correct.

Q. And you stated that the reason was that the representative from District 61 owned some property in Greene County and dreamed of retiring to Greene County; is that correct?

A. I believe he said he had a house or a cabin on that property in Greene County and was thinking of potentially moving there, yes, sir.

Q. And did you meet with him?

A. Representative Harper? Yes, sir.

Q. And he's a healthy way away from turning 65, isn't he? Doesn't turn 65 until after the next census, does he?

A. I wouldn't know what his age is.

Q. That evidence is of record, so we'll move forward.

You also split precincts in both the House and Senate plans, correct?

A. Certainly.

Q. And you did not pay attention or much attention to how you split them in one plan as compared to the other.

Well, here to explain this further. Now, in both the House and the Senate, Washington County is split along -- pretty close to the same lines, correct? I can put it up on the Elmo, referring to the ever popular House District 76. You see Washington County --

A. Yes, sir.

Q. -- in the southeastern portion, the split?

A. Yes.

Q. And having stuck the pages together, there is a very similar split in the house plan.

A. Yes, sir. I mean I can't say that it's identical, but it's very similar.

Q. Well, it's not identical, as a matter of fact.

In a number of precincts, you split along different lines, correct? Very similar but different lines. So that in, for example, the Chrysler Eliska McGill precinct, there is a difference of 24 people between the way you split the House map and the Senate map; is that correct? Representing that these data are accurate and based on the exhibits noted below.

A. If that data is accurate, that appears to be the case.

Q. And so in administering elections in Monroe County -- you have a precinct -- you have to have a precinct with 24 people, correct?

A. If you say so.

Q. Well, they've got a different ballot style. They'll have different people on the House and Senate ballot as opposed to the others in the precinct, correct?

A. Correct.

Q. Which adds a certain cost and inconvenience and confusion to the election process.

A. I'm not sure that requires it to be a new precinct.

Q. Well, a new ballot style so they would not have to have a brand new polling place necessarily, correct?

A. They could have -- I mean there are numerous -- I've seen in other states -- I don't know Alabama's practice, but I've certainly -- where I vote, I've seen where the same polling place has ballots -- has, you know, voting machines for two different races.

Q. Right. Rather than have a new polling place, you can buy an additional voting machine.

A. Correct. Or paper ballots, whatever the normal procedure is.

Q. An accessible voting machine is now required, is it not?

A. Yes, sir.

Q. So it's not just a paper ballot.

A. I don't know how the ballots are cast in those counties.

Q. All right. And the Perdue Hill precinct, it was split along different lines so that there are 41 people who would have their own voting machine. Correct?

A. If you represent that.

Q. The Days Inn Ollie precinct is -- 303 people are in a new precinct, new machine, new ballot style. Correct?

A. If you represent that.

Q. Mexia Fire, it's a little under 200. Shiloh Grimes, four people, total population, have their own voting machine. In the Macintosh Community Center and in the Mexia Fire, there are currently -- or I should say in 2010, there were areas that were unpopulated. But if someone builds a retirement home or other residential facility in there, then you've got a new precinct, correct?

A. If you say so.

Q. And similarly, the Macintosh voting House precinct is split along different lines. The Cortelieu -- I'm probably mispronouncing that -- precinct in Washington County, 103 people get their own precinct. And the Carson Preswick precinct in Washington County, 88 people get their own precinct.

A. Or get to cast ballots in a different race.

Q. Or get their own voting machine.

A. Yes, sir.

Q. Do you know how much voting machines cost?

A. I do not.

Q. Okay. This is another split screen from the state reapportionment Web site.

MR. TANNER: It is marked as Newton Plaintiffs' Exhibit 353-Q, Your Honors.

Q. And this reflects -- well, you can tell what it shows. It shows Senate District 11 as reconstituted, correct?

A. Correct.

Q. And just within Senate Districts 11 and 15, with no ripple to any other districts, there's an exchange of population, correct? So that central Talladega County goes to District 15, and southern Shelby County goes to District 11; is that correct?

A. Obviously, there were other changes to Senate District 11 than that, but you're --

Q. Right. Well, this is -- that's one.

A. Yes, sir.

Q. And the populations of the two districts or the two segments are very similar?

A. They are.

Q. Less -- fewer than a thousand people apart. And that was unnecessary, wasn't it, for one person, one vote? You could have -- it would have put --

A. Well, Senate District 15 was either going to go east or south, so it had to go one or the other.

Q. Why did it have to go anywhere?

A. Well --

Q. I mean it's basically a swap of population. Now you've got -- to fix it, the Senate District 15 would be within 1 percent. Senate District 15 is -- you know, it doesn't need to go anywhere. That's just a swap.

A. Well, I'm not sure.

Q. There's a little ripple, but it's --

A. I'm not sure -- I'd have to look at the old map. I'm not sure all of that part of Shelby County was in Senate District 15 to begin with. Maybe it was. I'm not sure.

Q. Well, let's look at the map again. In the old plan, Senate District 15 is basically the eastern part of Shelby County and some of eastern Birmingham, Leeds and around there. Correct?

A. Correct.

Q. And Talladega County was intact. And so you substantially reconfigured both districts, changing the core or changing the configuration of both districts fairly dramatically.

A. Well, I wouldn't say the core, but it changed the configuration of both districts.

Q. Both districts dramatically. And you know from campaigning around the state that there's a lot of difference between Talladega County and Shelby County.

A. Yes, sir.

Q. And the -- basically, it moved a black majority population out of Talladega County in Senate District 11 and put it in

rapidly growing, heavily white Shelby County. Correct?

A. Or put it into Senate District 15.

Q. Yes. To Senate District 15 with the Shelby County voters, the Shelby County dominated district.

A. But there was no --

Q. Suburban district.

A. Yes, sir. But there was no African American district there.

Q. And the --

A. There was no opportunity to draw a majority African American district there.

Q. I'm just asking what you did.

You also split the community of interest in deconstructing Senate District 11 and House District 32, did you not?

A. You'll have to try me on that one again. I'm sorry, sir. I did what?

Q. House District 32, which included part of Talladega and part of Calhoun counties, was represented a community of interest. Correct? It's a majority black district.

A. It was a majority black -- it is a majority black district.

Q. Do you think that that district does not represent a community of interest?

A. No. It may, but what I was -- you know, when you're comparing a house map -- House district to a Senate map is not something I -- you know, we had discussions about this. You know, to get the votes in agreement on a map, we certainly

couldn't worry about where various House members were on the Senate map.

Q. Moving on to Montgomery County, which is another Alabama reapportionment Web site split screen. This one is Newton Plaintiff Exhibit 353-O.

District 26 needed population, correct? Senate District 26. You testified --

A. Yes, sir.

Q. Senate District 26 needed to gain population, about 15, 16,000 people, correct?

A. Yes, sir.

Q. And you added Crenshaw County to Districts 25 and 26, to that mix.

A. Added it to District 25, yes, sir.

Q. Well, Crenshaw County, under the old plan, was adjacent to Senate District 26, was it not?

A. It was.

Q. Why didn't you add it to Senate District 26?

A. Well, because Senate District 26 --

Q. I mean it's right there.

A. Senate District 25 also, once 30 was moved north of Montgomery, needed to pick up population. So that's where Senate District 25 went. As I described, all the areas that were in Senate District 30, old Senate 30, south and west of Montgomery were put in other districts.

Q. So you're saying 25 needed population?

A. It did after 30 went entirely north of Montgomery. Yes, sir.

Q. Senate District 25 was overpopulated, according to the -- old Senate 25 under the 2000 --

A. Not once Senate District 30 was moved entirely north of Montgomery County.

Q. But that didn't change Senate District 25.

A. I believe it did. The lines between 30 and 25 did change in Elmore County.

Q. But, again, why didn't you add the population to Senate District 26? I mean you had to, again, reconfigure the districts.

A. It's going to reconfigure one or the other of the districts.

Q. Well, you know, as it was, you reconfigured the heck out of both of them.

A. I reconfigured 25. 26 is -- the core of 26 is -- well --

Q. 25 lost a whole lot of population, didn't it, from its original configuration? It lost all the southern part and much of the eastern part of Montgomery County, did it not? The map speaks for itself.

A. It's a large geographical area that really is probably less than 12,000 people in all of that.

Q. 12,000 people?

A. In Montgomery County, portion that was changed.

Q. 12,000 people here, 12,000 people there. Pretty soon, you have enough. Crenshaw County has 13,906 people, according to Newton Plaintiffs' Exhibit 328. That would have about taken care of most of the underpopulation of Senate District 26, wouldn't it?

A. Possibly. You could have put the same amount of number of people in Autauga in Senate District 26.

Q. Sure.

A. So, I mean, you know, obviously, in drawing any one district, you have many options.

Q. Why didn't you?

A. Excuse me?

Q. Why didn't you put part of Autauga County into Senate District 26?

A. I didn't think it made any sense for that senate district to go outside Montgomery County. It didn't need to. You know, you're always talking about splitting counties. Why split another one?

Q. Well, if you had added Crenshaw County to Senate District 26, you would not have split another county, would you?

A. No, sir. Wouldn't have split Crenshaw.

Q. So it's not about splitting another county. This is what you did to Senate District 26, correct?

A. If you say so, although one of the things that -- one of the factors in a number of these districts that this representation

does not really address is it's not only what I'm doing, moving, adding precincts or subtracting precincts; it's also the demographic shifts that happened in the preceding 10 years. And if you would look at that, I think you would find that Senate District 26 lost a considerable amount of white population during those 10 years so that your representation of this skews those numbers slightly.

Q. How? I mean it lost population, and you added white people to it.

A. Well, but what I mean -- I think --

Q. It's a remarkable feat.

A. I added more than 36, I believe. I added more than 36 white people to District 26.

Q. And you took out more than 36 --

A. It was down like 11,000, I believe, in white population, just demographically.

Q. It's a rapidly changing area. Montgomery County is turning -- has turned majority black and continues to change, doesn't it?

A. Yes. But what this graph shows me, adding 36 white people does not take into account, I don't believe, the demographic shift that happened from 2001 to 2010 that actually lost 10,000 white people.

Q. Well, that is the -- I should make clear, these are the 2010 numbers for the 2001 Senate District. That's what made it

underpopulated.

A. As you know, as we explained, there were two different moves there. There was taking the rural part of Montgomery County to connect up 25.

Q. Removing majority white areas. You testified that there were about 65 percent white --

A. Yes, sir.

Q. -- in the rural areas.

A. And adding in Montgomery precincts to get the deviation.

Q. Well, actually, you split Montgomery County precincts, didn't you, to put the black parts in 26 and the white parts in 25?

A. It's the majority African American precinct, yes, sir -- I mean district. Yes, sir.

Q. And it didn't need additional population, black population, did it?

A. It needed additional population.

Q. So you could have put in Crenshaw County, and it still would have had a large black majority. Plenty.

A. I could have.

Q. As a matter of fact, if you compare the 2010 population of old 2001 Senate District 26, when it only had 120,000 people, you see that that population, much less the 102,500 people you wound up with, black people you wound up with in that district, the -- the underpopulated district had more black population

than most other districts after the deviation had been cured; after you've added in new black areas. After you pulled down all the black areas of Jefferson County. You thought to include that. After you had added to the black belt districts. After you had added to Senate District 28, black population from Dothan. I mean it was already there. You could have added nothing but white people, could you find an area with nothing but white people from Autauga County, for example, and it still would have been an above average district in terms of its black percentage. Correct?

A. Correct. It would have probably been retrogressed, but, yes, nevertheless.

Q. But it would have been better than most of the other districts. And you had absolutely no indication, absolutely no indication that a district with that kind of majority, over 64 percent if you added all white people, would not be entirely effective for the black voters of that district. They would be able to elect someone of their choice, wouldn't they?

A. Probably so.

Q. Well, didn't your data from the Obama election give strong indication of that?

A. I didn't specifically look at it, but I'm sure it would have.

Q. But didn't even look how your black majority districts had performed in any election?

A. I was more concerned in drawing minority districts as to whether I was retrogressing the overall population, black percentage, than voter results.

Q. So you only looked at the voter results of the Obama race and the lieutenant governor's race when you were looking at the white districts.

A. Well, "only" is a dangerous word, but that was not primarily what I was looking at when I was drawing the minority districts. You're correct.

Q. You were just going by the numbers?

A. You're correct.

Q. That it had X number of black people or X percentage of black people. And you wanted to match X percent of black people, regardless of where you got them, regardless of who they were, and regardless of whether there was a need for that population in order to comply with the requirement that minority voters have an equal opportunity to elect -- participate in the political process and elect representatives of their choice.

A. Is that a question?

Q. Isn't that true?

A. Is that a question?

MR. TANNER: Would you read it back, please?

JUDGE PRYOR: It will take a while.

Why don't you just ask the question again? Otherwise, we're really at a time for a break. I hate to interrupt if

we're at an absolutely critical point.

MR. TANNER: It is not an absolutely critical point, and I'm happy to accommodate the Court's desire for a break and, frankly, share it.

JUDGE PRYOR: We'll take a 15-minute break.

(Brief recess was taken from 2:59 p.m. until 3:16 p.m., at which time the proceedings continued, as follows:)

THE COURTROOM DEPUTY: Court is in session.

JUDGE PRYOR: Mr. Hinaman, return to the stand, please. Please be seated.

BY MR. TANNER:

Q. Let me shorten my last question, Mr. Hinaman. You did not, as I understand it -- and you'll correct me if I'm wrong. You had political data, including the Obama election, and you did not match it with the majority black districts that were already there that you drew to determine whether or not those districts would be effective minority districts.

A. No. The political data was matched to every precinct, including all the precincts in the majority districts.

Q. But I believe you indicated that you did not examine that issue; that is, whether it was necessary -- how these districts performed in the Obama election, for example.

A. That's correct. I looked more at the overall number and whether I was retrogressing the total black population in those districts.

Q. And by the overall number, you mean --
A. Total population.
Q. -- total population black?
A. Yes, sir.
Q. And by retrogressing, you mean lowering that percentage?
A. Yes, sir.
Q. Getting back to Montgomery briefly. Yesterday --

MR. TANNER: The Elmo, please?

JUDGE PRYOR: Pardon me? What?

MR. ANDERSON: The screen.

Q. There we are. Again, Newton Plaintiffs' Exhibit 353-P, which shows the southeastern portion of Montgomery under the old and new plans. And as it was pointed out yesterday, the Southern Bypass, which is this -- are you familiar -- can you orient yourself? I don't want to --
A. Yes, sir.
Q. Okay. So you're familiar with this area?
A. Yes, sir.
Q. The Southern Bypass, which under the old plan formed a boundary, was a natural boundary and a community dividing line. And as the map on the right shows, you crossed that boundary and went block by block to take in population, correct?
A. Yes, although I found precincts don't necessarily follow boundaries like the Southern Bypass or -- I mean I put some precincts back together, as I recollect, in drawing both of

those districts, but I sure -- I split some as well. But I can't tell you whether any of those lines on that map to the right are -- if they're all block lines or if they're actually some precinct lines there. I can't tell you that.

Q. Okay. But it's --

A. Precincts -- as you know, I think precinct lines don't necessarily follow roads and boundaries.

Q. They usually follow district boundaries and that sort of thing, correct? And then like legislative district boundaries, they're generally --

A. Precinct lines?

Q. Yes.

A. Not necessarily. As you well know, they change quite often as well.

Q. Well -- very briefly. I'd like for you to point out some -- in Senate District 22, this is 2000 senate districts, and this is 477. I'm zooming in on the southeastern portion of the state and you'll notice that there's a break at the northern end of Senate District 22. There's a portion of Clarke County that's put in Senate District 23, taken from old Senate District 22. Correct?

A. Correct.

Q. All right. And that was not necessary, was it?

A. I don't know. I don't know -- off the top of my head, I don't know how many people live in that section.

Q. Well, here it is. The Clarke County portion of Senate District 24, under the new plan, has 3,800 people plus. And you could have exchanged that population, restoring a county boundary within the 1 percent framework, by adding part of Hale County, and had over 62 percent black population; or by adding part of Tuscaloosa County and, again, having over 62 percent black population. And are you -- or you could have added a portion of Bibb County that was taken out of that district before. It's a majority black area, is it not?

A. I have no idea what those corresponding changes would do to the surrounding districts you just mentioned. But as we've said, when you look at any one district in and of itself, you could do a number of different things.

Q. Well, the Bibb County part is in Senate District 14, which is a suburban district, correct?

A. Correct, but maybe Senate District 14 needs that to be within deviation.

Q. Well, you drew the black districts first, correct? So you could have included that when you drew the district. And then 14 would have picked up a deviation somewhere else.

A. I suppose it would have. I mean obviously, they have to fit together. No matter what I drew first, they all have to fit together at the end.

Q. Indeed they do.

And by fixing some of those split precincts that I

laboriously went through before, in Monroe County you could have put Washington County back together, could you not? Based on these numbers?

A. If you say so, based on these numbers. But, again, you know, any district you can look at and say you could have made it just this county or you could have made it just this part of this county, blah, blah, blah, they all have to fit together.

Q. Well, both of those last two changes to put counties back together would have restored the Senate District 22 black population that had been there before. That's correct, isn't it?

A. If you say so. Would it have retrogressed either of those districts?

Q. Well, the numbers speak for themselves. You know, they're both well over 60 percent, 64 percent, and the widest under -- you know, 35 percent in that adjustment to Senate District 23, for example. And also Senate District 23 formerly had a part of Autauga County with substantial black population, did it not?

A. Both of those senate districts, though, when I was working with them, both 23 and 24, were quite -- they were underpopulated, obviously, but they -- the map that we worked on that was passed by the Legislature, you know, it was very close to getting back to the identical numbers that they were 10 years ago.

Q. The identical?

A. By total black percentage.

Q. You were focused pretty heavily on the black percentage. You also added population to District 22 from Baldwin County.

A. Yes, sir.

Q. You added a net -- and this is a net -- of nearly 18,000 black people, according to those plaintiffs' exhibits. And you actually lowered the black population within the Baldwin County portion of that district, did you not?

A. If you say so.

Q. According to this exhibit?

A. Yes, of course. And Senate District 22 is not a minority district, as you know.

MR. TANNER: At this point, I would move in the Newton Plaintiffs' Exhibits 353-0, 353-P, 353-Q, and 353-R that I've just used in examining the witness.

JUDGE PRYOR: Any objection?

MR. PARK: No, Your Honor.

JUDGE PRYOR: They're admitted.

MR. TANNER: Mr. Blacksher?

Pass the witness to Mr. Blacksher.

MR. BLACKSHER: No.

REDIRECT EXAMINATION

BY MR. PARK:

Q. Just a few questions, Mr. Hinaman. When you were putting the senate plan together, did you look at the possibility of

drawing another African American majority district in the Madison County, north Alabama area?

A. Yes, sir, I did.

Q. And what did you find when you tried to do that?

A. When I -- I tried a couple of different attempts and a couple of different approaches to draw a majority district in north Alabama, either using just mostly Madison County, or at one point I even tried to take Madison County all the way over to Florence, which I'm not sure would have been a *Shaw* compliant district, but nevertheless. And I was never -- in either of those attempts, about the best -- when drawn to deviation, about the best I could do is in the 45 to 46 percent African American percentage total pop.

Q. When you worked in Mr. McClendon's office, were you using a state computer or your laptop?

A. My laptop.

Q. Let's take a look at Exhibit 477 for a second. And this is the 2001 Senate districts. What does that map say about whether Senate District 2 includes Limestone and Madison -- portions of Limestone and Madison counties?

A. It appears to me that Senate District 2 includes parts of -- well, includes all -- well, no, it doesn't. Includes a majority of Limestone and part of Madison, from my reading of it.

Q. And was that consistent with what Senator Holtzclaw wanted in this new plan?

A. Yes. He very much wanted to retain parts of Limestone County.

Q. Let's look at the 2001 House plan. I'll represent to you that that's what this is. Now, District 69, which is Mr. Colston's district; is that right?

A. Yes, sir.

Q. And it's a black majority district?

A. Yes, sir.

Q. In the 2001 plan, it doesn't go into Montgomery County, does it?

A. That's correct.

Q. And District 90 includes portions of Conecuh, all of Butler, and all of Crenshaw County; is that right?

A. That's correct.

Q. In the 2000 -- in the new House plan, District 69 keeps Wilcox and Lowndes and a portion of Autauga County. Was that enough to keep it as it was?

A. No. We needed to add the portion of Montgomery County or a portion of something, which was in my -- this map, Montgomery County.

Q. And as far as District 90 goes, it had -- did it have to add population?

A. I believe it did. I don't recall the overall numbers of District 90 to start with.

Q. Well, let's go back to the 2001 map. District 90 had the

eastern -- some of Monroe County and some of Conecuh County there, looks like, and Butler and Crenshaw counties?

A. Correct. And I'm also -- to follow up, I'm not sure off the top of my head where Representative Newton lives; but if he lived in Butler County, which I'm not sure where he lives, that would -- if we would put that into another district, then we would be combining two members.

Q. In the new map, it includes a portion of Conecuh County, is that Monroe, perhaps Monroe, Butler, Crenshaw, and then goes into south Montgomery County; is that right?

A. Yes. I don't think it has any of Monroe, but I think it's just Conecuh, Butler, Crenshaw. My eyes are getting bleary. I'm sorry.

Q. Does the new senate plan put Calhoun County back together?

A. Yes, it does.

MR. PARK: I believe that's all I have at this time.

MR. BLACKSHER: No further questions.

RECROSS-EXAMINATION

BY MR. TANNER:

Q. In Madison County, House Districts 19 and 53 as redrawn form a community of interest, do they not?

A. They're two African American districts. Yes.

Q. Is there any other characteristic about them that would prevent two African American districts in the same city from forming a community of interest?

A. Not that I can think of, no, sir.

Q. Okay. Thank you very much.

JUDGE PRYOR: You're excused, Mr. Hinaman. Thank you. Last witness today?

MR. PARK: The state calls Thomas Brunell.

JUDGE PRYOR: Is this our last witness for today, Mr. Park?

MR. PARK: Depends how far it goes.

JUDGE PRYOR: What do you mean, it depends? What would happen -- are you saying there might be someone else to testify today?

MR. PARK: We could start -- we may or may not be in a position to start --

JUDGE PRYOR: Okay. Fair enough.

TOM BRUNELL

The witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. PARK:

Q. Would you please state your name for the record.

A. Tom Brunell.

Q. And you're a Ph.D., right?

A. Yes, sir.

Q. And what's your Ph.D. in?

A. I got my Ph.D. in political science in 1997 from the University of California Irvine.

Q. And since getting your Ph.D., have you taught in institutions of higher education?

A. Yes, several.

Q. And where have you taught?

A. My first job was at State University of New York Binghamton. Then I moved to Northern Arizona University, and now I'm at the University of Texas at Dallas.

Q. And what subjects do you teach?

A. I teach American politics mainly. My real specialty is elections and the U.S. Congress, particularly redistricting and representation.

Q. Are you published?

A. Yes. I've published dozens of articles in peer-reviewed journals and a book.

Q. And have you testified before?

A. Yes, sir.

Q. You prepared a C.V. and a report; is that right?

A. Correct.

MR. PARK: Your Honor, we've designated the report as Defendants's 456 and the C.V. as 457. We would offer those at this time.

JUDGE PRYOR: Any objection?

MR. BLACKSHER: No objection.

MR. ANDERSON: No objection.

JUDGE PRYOR: They're admitted.

Q. You've been in the courtroom today, haven't you?

A. Yes.

Q. Where does the term dummymander originate?

A. Actually, Bernie Grofman and I coined the term in a book, an article that went in an edited volume. I can't remember when the book was published. Maybe 1994, but I honestly don't remember. But we coined that term.

Q. And how do you define a dummymander?

A. A dummymander is when one political party or the other is in charge of redistricting, and they draw a map in such a way that at some point during the decade, the other party takes over. So it kind of -- it looks like a map that if the Democrats drew it, it ends up looking like a map that the Republicans drew.

Q. And how would we identify a dummymander?

A. It's always kind of -- you have to kind of look backwards to identify a dummymander. And I don't want to back off the term too much, because I'm sort of -- you know, when we made it up, I never thought I would be sitting in a federal court talking about the intricacies of the definition. You know, quite frankly, I'm thrilled, because I think this is my best shot at immortality, is the term dummymander. So I don't want to discourage its use.

Whenever you gerrymander, the gerrymandering party is the

 party at risk. So you pack -- if the Republicans have gerrymandered, they pack all the Democrats, and they try to use their votes very efficiently. You would really like to win districts by one vote, but you can't gerrymander like that.

So you try to -- you want to win by as few votes as possible to be efficient so if the political tide shifts, then all your districts, you know, all those very efficient districts that you win by small margins can be washed away and end up on the other side.

So at some level, whenever you gerrymander, you're at risk. So I think it's a little unfair to sort of classify it, every time somebody gerrymanders and things go wrong, as a dummymander.

And sometimes, you know, like in the last round, you know, kind of the biggest gerrymandering case came out of Pennsylvania, a congressional case. This is the *Vieth v. Jubelirer* case. And kind of everybody agreed that this was a good Republican gerrymander, but that delegation over the next five elections went back and forth. The Republicans won it immediately, so, well, of course, it was a gerrymander. Then the Democrats won it. Then a couple of years later, Republicans took it back. So these things can happen, and they can go back and forth between the parties.

And, you know, maybe this is a dummymander. Maybe in 10 years we'll say, oh, boy, the Republicans really screwed up.

They drew a bad map, and the Democrats ended up taking over.

Q. Can a redistricting plan be overcome by events?

A. I'm sorry?

Q. Can a redistricting plan be overcome by events during the course of its 10-year life?

A. Sure. Absolutely.

Q. And when events overcome a redistricting plan, does that contribute to the conclusion that maybe the gerrymander was a dummymander?

A. Yes.

Q. Do you think Dr. Arrington is correct in his characterization of the 2001 Alabama legislative plans as dummymandering?

A. I mean looking at the data, I think it was kind of a straightforward -- it was clearly a partisan gerrymander. Right? But I think the thing about the south in the most recent past is kind of everybody knew, right -- I'm not breaking news here -- that there was a secular, you know, partisan realignment going on from a one-party Democratic stronghold to a one-party Republican stronghold. So the tides are shifting. Everybody knew the tides were shifting.

They held on for a long time. In Texas, too, in my home state, the Democrats held on for a long time; but, you know, eventually, just enough people went from one party to the other that it was clear the Republicans were eventually going to be

the majority.

So you know, is it a dummymander? I don't know if that's -- I don't know if I would call it a straightforward dummymander, but, you know, I wouldn't necessarily object to it either.

Q. Let me represent to you that in an amicus brief filed in the *Vieth versus Jubelirer* case by the then Democratic leadership, the brief asserted that the Democrats gained 52 percent of the Senate votes statewide and won 70 percent of the Senate seats and gained 51 percent of the House votes statewide and won 60 percent of the House seats. What does that tell you about the likely success of any attempt to gerrymander?

A. Yeah. I mean, that's clearly a gerrymander. A gerrymander is in place. The Democrats are using their votes very effectively. But again, we know this is during a period of time where the tide is shifting in the south and in Alabama from the Democrats to the Republicans. So that's kind of the last -- you know, the last remaining stronghold from when they went to a majority party to a minority party. So all that, you know, once you start getting under 50 percent of the vote, things fall apart rather rapidly.

Q. Do the statistics indicate that the gerrymander was a stable one or was based on a stable foundation?

A. Just from those statistics, I can't necessarily tell. I think, knowing that -- knowing what I know -- knowing what we know now about the changing partisanship of the region, I think

it was clearly unstable. But like I said, no gerrymander is perfectly stable. You're always at risk.

Q. And those statewide votes that the Democrats got for Senate and House seats, a good number of them likely came from black majority districts in both houses, right?

A. Certainly.

Q. You've also suggested that there are a variety of legitimate race-neutral redistricting policies that conflict with one another, and you tend to favor one person, one vote over other considerations; is that correct?

A. That's correct.

Q. Can you tell us why you favor one person, one vote over other considerations?

A. Some of the other -- I mean I just -- you know, kind of trying to think of them as in some sort of hierarchy, I think a lot of the other ones -- for instance, like communities of interest -- for me come at a much lower level than one person, one vote.

One person, one vote is sort of where we started in the 1960's. This is what got the courts involved in redistricting, and I think the underlying notion of equal voting power is critical. I think it makes perfect sense, and it's something that we should put ahead of some of these other things like a community of interest.

I mean, I've heard -- I mean, anything can be a community of

interest. Right? I mean, so at some level, the notion has lost any worth at all. I've heard -- I was involved in a Texas case where a lawyer was saying, well, our communities of interest are what the districts looked like in the 1950's. So at that point, for me, the notion of a community of interest, once anything can be a community of interest, well, I'm no longer interested in that because it has no value at all to anybody involved.

So communities of interest, for instance, I think are less important. Compactness is less important than one person, one vote. Protecting artificial lines like municipal lines or county lines is less important than equalizing voting power, in my opinion. I'm sure some people disagree with me.

For me, those -- I think that those things come at a secondary level or even a tertiary level relative to equalizing voting power of residents; of citizens.

Q. The 2001 and previous plans used plus or minus 5, and these plans use plus or minus 1 as far as overall deviations. Which do you prefer?

A. I prefer no deviations, but I vastly prefer a plus or minus 1 deviation over plus or minus 5.

Q. Why do you prefer the smaller deviation to the larger?

A. The only -- any deviation that we pick is necessarily arbitrary. Right? One percent is arbitrary. Five percent is arbitrary. You know, 2.2968 is arbitrary. Whatever we pick is arbitrary. You get back to, why 5? Why not 5.5? Well -- you

know. So drawing these arbitrary bright lines is very, very difficult, whereas if we have zero population deviations, that's immediately defensible and obvious to everyone.

So that's one of the major reasons I prefer it. But then also because I favor equalizing voting power across -- you know, across the state, across districts within the state, for all the citizens.

Q. Is a smaller deviation related in some way to the ability to generate a political gerrymander?

A. Yes. Yeah, that's another key reason, is that this was kind of a very simple tool that we've kind of handed over to map makers to fiddle with, to use for partisan purposes. Right?

And the Court talked about it earlier. Right? I mean, if you're gerrymandering, you are underpopulating your own districts, right, because you want to use your population more efficiently and overpopulate the opposition's districts.

Q. And the larger deviation allows you to do that.

A. Yeah. That's right.

Q. Now, are you saying that a zero deviation plan can never be politically gerrymandered?

A. No. You could still gerrymander a zero deviation plan. But it is one tool that we can take away. Right? This is just like a wrench in the toolbox. Get rid of that wrench, and then we can strain the map makers in very useful ways.

Q. Have you prepared an exhibit that would illustrate the

effect of population deviations in the 2000 and 2010 cycles?
A. Yes.
Q. Let me show you what's been marked as Defendant's 458. Can you tell me what this chart shows?
A. Sure.
Q. Let's start, what is the vertical axis?
A. Okay. The vertical -- let me start --
Q. Yes. Why don't you start --
A. Let me start from the start.
JUDGE PRYOR: That's a good place to do it.
A. So what I've done here for this -- And this is a paper that I'm writing. It wasn't necessarily for this case.
I gathered the population deviations for the -- just -- I only did the lower chambers of state legislatures across the country for both the current and the most recent round, but also the round prior, the 2000 round of redistricting, which is pre-*Larios v. Cox*. And so I have every -- the population for every single district in every single state. And then what I did is I ascribed partisanship to each district based upon whichever party won the election immediately following the redistricting. Okay?
So now we can kind of compare, well, what do Arizona's Democratic districts look like in terms of population deviations to their Republican districts? And so that's how I created this chart.

So the vertical axis is a measure of partisan population deviation in percentages. So it takes the Republican -- it takes all of the Republican seats in Arizona -- I'll just start with Arizona because it's the leftmost item. It takes all the Republican districts, the ones won by Republicans, averages their deviations, and then takes the Democratic districts and does the same thing. So now we have two averages. And I subtract the Democratic average from the Republican average. So negative values indicate a Democratic advantage. The Democratic seats were, on average, smaller, right, their population deviations were smaller than the Republicans ones.

So as we move from left to right, we go from heavy Democratic advantage to, in the middle, neutral. And then to the far right, these are the states where the Republicans enjoyed bigger advantages.

And then the color coding of the bars indicates who was in charge -- who the redistricting authority was. And it's kind of hard to tell, but there are three different colors here. There's black, there's white, and then there's gray. The gray is a lot easier to see on the bottom. Maybe there's just not as many gray bars in the top one.

So the black bars are states where Republicans had unified control over redistricting. White bars are states in which Democrats -- no. I'm sorry. That's wrong. White -- wait. White bars are -- hang on. White bars are either a court or a

commission or divided government drew the plan.

Gray bars -- I don't know why the colors look different -- I'm sorry -- between the two charts, but they really shouldn't. Maybe it's my eyes.

But it's clear from the bottom chart that the gray bars are the Republican controlled states, so I assume that's true on the top, too. But I know that the ones, North Carolina and Utah, should be gray on the picture.

Is that what it looks like on the hard copy, Jack?

Q. North Carolina --

A. The top one. Yes. The two ones on the far right, I know those are both Republican states.

Q. They both look black.

A. Do they? Okay. Well, that's unhelpful. But --

Q. Utah and Delaware look gray in the 2000 round.

A. Right. Are there three different colors on that top one?

Q. There do not appear to be three different colors on the top one.

A. Okay.

Q. Okay. Let's take a look at the 2000 round. Is Alabama in the 2000 round?

A. Yes. Alabama is in the 2000 round.

Q. And where is Alabama?

A. Alabama is the one, two, three, four -- the sixth state from the left on the bottom chart. So that's indicating -- right.

So that indicates that they were one of the biggest democratically advantaged states in the 2000 round.

Q. And if Alabama is designated with black, what does that mean?

A. That means it was a Democratic plan.

Q. All right. Let's go to --

A. And Alabama is not on the 2010 one because they haven't had the election yet, so I can't classify the seats.

Q. And then have you prepared a table that supports what you did in the chart?

A. Yes.

Q. And tell us what -- how the table works.

A. Sure. So the state is obvious -- the number of districts -- I'll only point this out because some states use multimember districts. So this isn't the number of seats, but it's the number of districts. And then the lower and the upper indicate the smallest district, the percent below ideal population for the smallest -- for the lowest populated district, and then the upper is the most heavily populated district, represented in percentage terms above ideal. The total range is just the absolute value of the lower deviation added to the upper, so it gives us the total range of the deviation.

And then the next two numbers are the -- where I've classified it as either a Democratic seat or a Republican seat, and those are merely -- those are just simply the averages for

those two distributions.

JUDGE WATKINS: Mr. Park, give us an exhibit number, for the record.

MR. PARK: 458, Your Honor.

Q. And when you -- now, these Democrat averages and Republican averages, did you do calculations to put them on the chart on the previous page?

A. Yes. That's correct.

Q. And what calculation did you do?

A. I subtracted the Democratic average from the Republican average.

Q. And so that -- so Arkansas would be a negative 40 or should be a negative 40? Is that the calculation? The Democrat from the Republican?

A. Negative .04 or -- you know, I'm not sure, given the negative, but that sounds right that you would -- that it actually would be -- if you're subtracting a negative, it would actually be -- the spread between those two is .78. Right?

Q. Oh, I'm sorry. I was reading Alaska as Arkansas.

A. Right.

Q. My problem.

The last column is significance. And tell us what that means.

A. Sure. So that's just a simple test of whether or not the difference between these two numbers is statistically

significant. It's called a T test; difference of means test. So we have two distributions of numbers. Here's all the Democratic seats, and here's the average; here's all the Republican seats, and here's the average in the middle. Using a very simple test, we can see whether there's a statistically significant difference between these two, which would indicate some sort of systematicness to the difference between the averages.

Q. And have you counted the number of statistically significant results in the 2010 cycle and the number of statistically significant results in the 2000 cycle?

A. Yes.

Q. And what did you find?

A. We did this last night, and I don't remember the exact numbers. You'll have to remind me, or I could count them again. But I know that the 2010 round has far fewer, I think it's like 14 states, and then there's maybe 23 in 2000.

Q. But if we counted them, we would see more in the 2000 round than in the 2010 round?

A. Yes. Far more.

Q. What do you attribute that to?

A. I think this is a direct result of *Larios*. I think that a lot of states took notice and said, you know, this is no longer -- we can't -- this tool is no longer available to us, particularly -- perhaps particularly in Section 5 states, but I

think it happened in other states as well, that, you know, this is -- this isn't something we should do. We don't want to lose our whole map just to use plus or minus 5, so let's be safe and go to a plus or minus 1 or something like that.

Not all states did that. Some states still use plus or minus 5 or even higher, but a lot of states reduced it. And you can clearly see that this sort of -- you know, deviations went down. The systematic partisanship went down. So I think these are all really beneficial effects as a direct result of the *Larios* decision.

Q. Dr. Arrington talked about a bimodal distribution of districts; that they're either clearly Democratic districts or clearly Republican districts. Is there a problem if seats for both parties are less competitive than they might be in your judgment?

A. No, I don't. I don't think that there is. And I think that was kind of -- for me, that was kind of the take-away, was that, you know, there are some districts that are very heavily African American and also heavily Democratic, of course, but the Republicans also drew lots and lots of safe Republican seats by virtue of exactly what Dr. Arrington showed us. So as long as there's kind of that symmetry, right -- I think that that's the critical thing, is that there's not -- the Republicans aren't trying to win more seats by winning seats with very efficient districts, but there is this bimodal distribution of seats.

And I think that -- you know, I'd just like to talk a little bit more about -- I think the competitive seats -- everybody thinks we should have more competitive seats in redistricting, and I think that's totally wrong. I mean, because we're Americans, right? All competition is good, right? But for -- I don't think the marketplace analogy is appropriate for electoral democracy for lots of reasons.

I mean, it's very simple to think about -- competitive districts are incredibly hard to represent. Right? Because half the people want X and half the people want not X. Right? And regardless of what -- how the representative votes, nearly half the people are upset, and they're not well represented.

It's kind of like we're trying to build institutions based upon -- we're trying to take a single-member district system, which isn't the best system already, right, and we're trying to, you know, use it in the worst possible way.

And since we have primary elections in American, there's no reason -- the reason we want competition is to keep representatives honest. I want to keep them honest, too, but we could do that at the primary election stage. We don't have to rely on the general election stage.

So in some very real sense, homogeneous, ideologically homogeneous districts are really a good thing. There's lots of benefits. Right? And I've been -- that has been my mission for the last ten years, talking about this. Most people disagree

with me, right, but I'll keep saying it because I think it's true. I think it's obviously true that drawing competitive districts has really bad implications for representation. And everybody thinks quite the opposite.

MR. PARK: Tender the witness. And Your Honor, we would move the admission of Exhibit 458. We'll be happy to check the first table. It may just be the print that we're working with.

JUDGE PRYOR: Okay. Any objection?

MR. TANNER: No objection. But since there are colors on it --

JUDGE PRYOR: Yeah. I think we need to get the colors straight.

MR. PARK: Yes, Your Honor.

JUDGE PRYOR: Well, let's make sure we do, and make sure that we present it tomorrow.

MR. PARK: Yes, Your Honor.

JUDGE PRYOR: I don't remember. Do we have anything other than his testimony today? Do we have a report that's already been admitted?

MR. PARK: We have a report that I offered and admitted. We also -- there was his testimony, which was filed. We would move the admission of that previously filed testimony.

JUDGE PRYOR: The report is 456?

MR. PARK: Yes, Your Honor.

JUDGE PRYOR: And his deposition testimony has been filed?

MR. PARK: No, Your Honor.

JUDGE PRYOR: No?

MR. PARK: The other parties may wish to do that, but they haven't done so yet.

JUDGE PRYOR: Okay. Just wanted to make sure. Okay. Mr. Blacksher?

CROSS-EXAMINATION

BY MR. BLACKSHER:

Q. Professor Brunell.

A. Good afternoon.

Q. So was Bernie Grofman your dissertation advisor?

A. He was.

Q. So you think one person, one vote is the most important criterion employed?

A. Certainly one of the most.

Q. You do know that it was -- until 2012, it was not the most important criterion, official criterion, for the state of Alabama.

A. There was an official criterion that was higher than this?

Q. Yes. From 1919 until 1974, seats were apportioned to the House and Senate among the counties.

A. Right.

Q. And no county was split. Do you think that was an

irrational policy for the state of Alabama to follow?

A. I don't know if I would use the word irrational. I don't think it was a good idea. You know, counties are arbitrary. These are -- it talks about -- I think it's natural for them to be building blocks. Right? And I totally understand that. But I don't think it's the right way to do it. Right? I mean, so you start with a whole map of the whole state and you say, well, we'll put county line on there, and that gives us a way to start building larger blocks. So that makes sense. But counties, to me, are subgovernmental units, substate governmental units designed to deliver services. It's not a community of interest. I think that I -- the communities of interest are ideological, not geographic.

I mean, like, if you look at my home state, western Texas actually looks like -- the counties look like a sheet of graph paper. So they just drew vertical and horizontal lines that are parallel and perpendicular to each other. You know, those are all of a sudden communities of interest? Now, from this day forward, you know, this 10-mile square is a community of interest. I just don't buy it. And of course, the population between these districts deviates, you know, widely, so why should that be the method of apportioning seats? I don't get it.

Q. Okay. Well, I don't know -- I know about Texas, but you don't know -- it's a fact, isn't it, that Alabamians -- well,

you don't know whether Alabamians think counties are important political subdivisions or not, traditionally or at present. You just don't know about Alabama, do you?

A. I haven't seen any survey data about the relative import of counties among residents of Alabama. No, sir.

Q. And as a matter of fact, the first federal court to address redistricting or malapportionment in Alabama was headed by Judge Frank Johnson in this court, and the first plan they drew simply apportioned seats to the counties as called for by the Alabama constitution. But you would have opposed that plan by Judge Johnson, right?

A. Assuming that there were populations that were grossly malapportioned, absolutely I would have opposed it.

Q. Now, with respect to competitive districts, and in your very logical sounding explanation why you think they're not a good idea, if you really believed seriously in the importance of each individual vote and the accumulation of voting according to ideology or philosophy or whatever, then Alabama simply ought to go to a proportional representation form of election, shouldn't it?

A. It wouldn't be a bad idea. I don't know -- I mean, I think it would be okay for -- it doesn't solve all the problems, right, and that's true for every state or the whole country.

Q. But the whole origin of first pass territorial districting comes from England, right?

A. Yes.

Q. Okay. And it was always about where the rotten boroughs came from and all that sort of thing. But it was all built around the idea that people who lived together in a political subdivision share a very strong community of interest that's political in nature. Whether it's ideological or economic or otherwise, it certainly constitutes a form of government that they have a very important interest in. Right?

A. I think that's become less and less true the more mobile the country has become. I think that's obviously untrue.

You know, how -- I live in Collin County, Texas. Are we a community of interest? People that run Collin County would say that we are, but there's people that I disagree with on every issue that live in my county.

Q. Well, you certainly -- you certainly aren't going to propose to the state of Alabama that they adopt proportional representation, are you?

A. I'm sorry? Could you say it again?

Q. You're not proposing that the state of Alabama adopt proportional representation?

A. Not today.

Q. First pass -- I mean, single transferable voting, cumulative voting?

A. No.

Q. Okay. Thank you.

A. No, sir.

DIRECT EXAMINATION

BY MR. TANNER:

Q. Good afternoon.

A. Mr. Tanner.

MR. TANNER: The Newton plaintiffs would move in as Newton Plaintiffs' Exhibit 373 Dr. Brunell's deposition testimony, unless there was some objection.

MR. PARK: No objection, Your Honor.

JUDGE PRYOR: It's admitted.

MR. TANNER: We'll provide copies at the break.

Q. Very quickly, Dr. Brunell. In your deposition, you testified that you hadn't reviewed any election returns or any data at all in preparing your expert report. And have you done any in preparing your testimony?

A. I suppose the ones with those charts, those were election returns. So at this point, yes.

Q. That's the --

A. The bar chart.

Q. -- bar chart?

A. Yes.

Q. Okay. And nothing else?

A. I believe that's correct.

Q. And as to the bar chart, you found a high rate of partisan abuse in Arizona?

A. Yes. For the 2010 round, that was the most offensive, for lack of a better word, the state with the highest partisan deviation.

Q. And in Arizona, the redistricting plan, as in the previous decade, was drawn by a bipartisan commission.

A. That's correct.

Q. And there was testimony earlier about the California plan. That was drawn by a commission as well?

A. Yes, sir.

Q. And they're under a state constitutional mandate to have low deviations?

A. That's right.

Q. You did some work in Florida. Does their new constitutional mandate include low deviations, or do you recall?

A. I don't think that it does.

Q. Okay. When we had the deposition, you had not read a number of cases relative to population deviations, including *Rodriguez v. Pataki*, which for the record is 304 F. Supp. 2d 346.

A. That's correct. I hadn't at the time.

Q. Have you since?

A. I think I have read that one, yes.

Q. Okay. Did you read Jefferson County Commission v. Tennant, this recent Supreme Court case in West Virginia?

A. Yes, I did read that one, too.

Q. And you caught up on *Brown v. Thompson*, the Wyoming case

where the Supreme Court allowed the over 60 percent deviation?

A. I don't think I read that one.

Q. Okay. And at that time, you had never looked into the role of the Alabama Legislature in terms of county government; is that correct?

A. That's correct.

Q. Have you since looked into it?

A. No. I mean, I've heard the lawyers talking about this county delegation rule and stuff, but I would not -- I have not looked into it.

Q. In terms of the rationality or the importance of respecting county boundaries, would it matter -- would it affect your opinion at all to know that the Alabama Legislature controls matters such as the expense allowance of a coroner? That has to go through the Legislature, the expense account of a county coroner.

A. Okay. I don't -- I don't know how coroners usually work, so I can't compare it to anything.

Q. Well --

A. I mean, so the coroners usually get paid by the county and the county decides, but in Alabama the state Legislature decides?

Q. So you don't know much about county government, I take it.

A. I mean, I suppose --

Q. I don't want to say you don't know much. As an expert, you

have not studied county government functions.

A. That's correct.

Q. Let me try one more. I don't want to belabor this a lot. But I do know that Section 45-14-150 of the Alabama Code authorizes nonprofit organizations to hold raffles, cake walks, and turkey shoots in Clay County, Alabama. Do you understand that to be the state Legislature controlling relative minutiae at the county level?

A. That sounds minute, yes.

Q. And would the control of such minutiae and important local functions affect your opinion at all as to the importance of county boundaries?

A. I think the Legislature should turn over all those functions to the counties and be done with it. Why do they care who's going to hold a raffle and when?

Q. That's a very good question.

A. I don't know.

Q. You've testified -- well, you were retained in several lawsuits recently in Colorado and Florida, but they never used your reports in those cases; is that correct?

A. I think that's true, yes.

Q. And the same thing in North Carolina where you had done a racial block voting analysis.

A. That's wrong. They used my report in North Carolina.

Q. Was it admitted into evidence, I mean, by your clients as

opposed to the other side?

A. I don't know. I mean, but it -- they relied on it -- the decision -- in the decision the judges relied on what I did in the reports, so I assume that it must have been in evidence. But --

Q. Well, in your initial report, you determined -- you filed a report, sworn report, that included your determination that in the 2008 presidential election, only 41.3 percent of all black voters in Durham County, North Carolina, voted for then Senator Obama for president.

A. Yes. There was -- I made a mistake in my initial report, a simple mistake in my initial report. I discovered it some months later, contacted the attorneys, wrote a corrected report, we filed it immediately, and --

Q. Well, it was many months later, wasn't it?

A. It was after I had discovered -- first, I had to discover the error. So shortly after discovering the error, I corrected it.

Q. But that's the sort of error that would jump out at one before one files a report, wouldn't it? I mean, it's completely counterintuitive, correct?

A. Which is why I -- as we went over in my depo, for quite some time I -- that's why I used lots of different elections to look at -- so the reason -- so in the counties that particularly have lots of white crossover voting in North Carolina, for instance,

like in Wake and Durham, you'll get these artificial -- well, you get a high white crossover vote. So that's going to affect the other part of the regression as well, which is the coefficient, the slope coefficient. So I saw those results. I knew, you know, that's got to be wrong, so that's why I used other elections to further investigate what happened in Wake. And I also used homogeneous precinct analysis to do it as well. So it was complete analyses. None of the -- given my mistake, none of the -- absolutely none of the conclusions changed. I mean, not even a single one of the conclusions changed.

Q. But in preparing your report, you didn't check your math?

A. I made a mistake. Yes.

Q. Okay. And basically, that -- doing a whole lot of jargon --

A. Yes. Right.

Q. -- which will go beyond my ken, you're supposed to add the constant, what is called the constant, and what is called the coefficient. So you have a formula, A plus B equals C.

A. Yes.

Q. And you performed that formula so that A equals C.

A. Right. I didn't add the two together to get the estimate for the proportion of black voters that voted for the black candidate.

Q. And then in your deposition, you would not acknowledge that A equals C, where it should be A plus B equals C, is a fundamental error?

A. No, that's not true. You know I never adopted your terminology.

Q. No. I said you would not acknowledge that.

A. I would not acknowledge it. That's right.

MR. TANNER: No further questions.

MR. PARK: Nothing further of this witness.

JUDGE PRYOR: Thank you, Dr. Brunell.

Are we going to have Mr. McClendon?

MR. PARK: Do you want to start with him today?

JUDGE PRYOR: Sure.

Representative McClendon, were you administered an oath earlier?

THE WITNESS: Yes, Your Honor.

JUDGE PRYOR: Okay. You're still under oath.

JAMES H. MCCLENDON

The witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. PARK:

Q. Would you please state your name for the record.

A. James H. McClendon.

Q. And are you a member of the Alabama Legislature?

A. Yes, sir, I am.

Q. Are you also a physician?

A. On optometrist.
Q. Optometrist. Do you go by Dr. McClendon?
A. I do, or Representative or Jim.
Q. Representative McClendon, which district do you represent?
A. House District 50.
Q. And where is that?
A. Largest part of that is in St. Clair County, and a portion of it is in Shelby.
Q. Were you member of the reapportionment committee?
A. Yes, sir.
Q. How did you become a member of the reapportionment committee?
A. Appointed by the speaker.
Q. And were you appointed to represent a particular district, or were you appointed at large?
A. I believe I was an at-large member.
Q. And how were you -- were you selected as chair, cochair of the committee?
A. I was selected as House chair, which made me -- that would be chair of the House Reapportionment Committee, which made me cochair of the joint committee. That was done by an election of the committee members.
Q. You've been in the courtroom throughout the trial, and you've heard the testimony about the adoption of the guidelines. What's your view about the appropriateness of using

plus, minus 1 percent as the overall deviation?

A. Well, just makes good sense to me. If you're interested in one person, one vote, that's a lot closer than 5 percent, or actually, plus or minus 5, which gives you 10 percent deviation. You know, we had already gone through this with the congressional, which has zero percent, and state board of education with 1 percent. And we went right through with DOJ preclearance, so I didn't have a problem at all with 1 percent. It made sense to me.

Q. And you've heard testimony about the Voting Rights Act. What was your understanding of what the state wanted to do with respect to Section 5 and its obligations under Section 5?

A. On the Voting Rights Act -- are we talking about retrogression now?

Q. Yes, sir.

A. Well, my understanding of retrogression is that a district or -- an individual or district is retrogressed if the minorities in that district, whether by race or language, are worse off after redistricting than they were before redistricting. And of course, we don't have any minorities by language, so it's a racial thing.

Q. And was the goal of the redistricting effort to get the approval of the Department of Justice?

A. Yes, sir. We knew that we were going to be subject to preclearance by DOJ, and we knew that was a major hurdle.

Q. Did you know exactly what DOJ looked for when it reviewed plans?

A. Well, when it came to retrogression and talking about percentages, to the best of my knowledge, there wasn't any hard numbers. There were relative numbers, but there were not any hard numbers. There was nothing that said 50 plus -- 50 percent plus one is okay. In fact, my impression was that was not the case. So really, what we targeted was we tried to look at the 2010 census, overlay it on the districts, and try not to change the percentages of the citizens, the black citizens, in a district any more than we had to. Tried to keep them in about the same proportion as they were.

Q. You heard Randy Hinaman's testimony about the process of redistricting. When was the first time you saw anything in the form of a draft plan or portions of it from Mr. Hinaman?

A. 2011. Probably -- I think Mr. Hinaman -- it probably was in February, maybe late February of '11, when he started making trips to Montgomery. He would set up in my office. And I guess the first time he operated on a computer and we would have folks come sit down and talk to him -- and I would really -- I never saw initially a statewide map. There was no hard copies, and he was working off of a laptop, so I would see sections of a map as legislators came in to work on them or as I relayed information from other legislators. So I think I guess a quick answer would be probably sometime in February or maybe early

March.

Q. These plans were adopted in 2012. Was he -- did he start working on them in late 2011?

A. In '12? Is that right? Was it '12? Yeah. '13. That's right. It was '12. So it had to be -- so it had to be March or -- February or March of '12 when -- the first time I saw them. I'm off by a year. I'm sorry.

Q. The 2012 regular session was a February session; is that right?

A. Let's get this right.

Q. We're in '13 now.

A. That's right. We're good. That was the second year of the quadrennium, and we start in February. That's correct.

Q. And you heard testimony from Senator Dial that he offered to meet -- or that he met with every one of his 34 colleagues to talk about the new districts. What kind of offer -- or what did you do about meeting with your colleagues?

A. I made the offer to all 104 members of the House to come sit down and either work with Mr. Hinaman or myself. As far as the Democrats, I went to Representative McCampbell, who is minority chair, I guess, of the House caucus, black caucus. I spoke to him personally on the House floor. Informed him that I was available. I did the same thing with Representative Craig Ford, who was minority chair for the Democratic caucus in the House. I offered that to them. I gave them a phone number to call and

set up a time with the lady that worked with me up in my office, and we set up schedules. Did the same thing with the Republican members in my caucus. So I made the offer to every House member. Not every House member came.

Q. And Mr. Hinaman testified that he met with Republicans. Did you meet with any of the Democrats?

A. I met with all of them that wanted to meet. I made myself available to them.

Q. And in the course of your work during the session, did you prepare a notebook? Did you keep a notebook?

A. I did.

Q. Let me show you what's been marked as Exhibit 459.

JUDGE PRYOR: Has that been admitted?

MR. PARK: There's been no objection to it, Your Honor.

JUDGE PRYOR: Well, did we admit it earlier? That's what I was asking.

MR. PARK: Not yet, Your Honor.

MR. WALKER: Yes, Your Honor. I thought we admitted all of your exhibits.

MR. PARK: All of our exhibits are admitted, Your Honor.

JUDGE PRYOR: That's right. That's what I thought. Just get -- let's go.

MR. PARK: Yes, Your Honor.

BY MR. PARK:

Q. Does this appear to be the first page of your notebook?
A. I believe it is. That was the first activities we really got into.
Q. And what does that -- what do the dates on there indicate?
A. Those dates, Senator Dial and I and Dorman Walker -- those are the dates we -- during the month of October, we traveled the state holding public hearings. And all of those -- you can see them there in red, but 18, 19, 20 locations throughout the state. Invited people to come in and talk to us and express anything they wanted to talk to us about as far as the House and Senate redistricting.
Q. Okay. Let me direct your attention to State DMC 001517 of Exhibit 459. Can you tell us what this is?
A. Well, that's pretty typical of what I did. In this case, we had -- I wish I knew who 98 is. I'm looking at the bottom, and I can't read that signature. But there was someone who wanted -- this was discussing how to put these districts together, and there were common lines in there. And this was a pretty good example. I believe this involved people from two different parties that sat down and worked out how they wanted to work out a common line. And as long as they could do that without affecting the deviations, I would turn this over to Mr. Hinaman and ask him to do his best to incorporate it into what he had in his computer. But this is pretty typical of the way I went about doing this. And in this case, we had both of

them initial it.
Q. And the two districts that are involved are House Districts 102 and 98; is that right?
A. That's --
Q. Does that appear to be?
A. Correct.
Q. Let me show you what has been marked as 480, the 2001 House plan, and direct your attention to Mobile. Is that what we're talking about, District 98 and the contiguous district to its north, District 102?
A. That would have to be.
Q. And does the note on 1517 read: Please move from HD 98 to HD 102. This move has been approved by Rep. C. Fincher and Rep. N. Bracy.
A. Yes.
Q. Those two.
A. Fincher is Republican, Bracy is the Democrat, and they just got together and worked out something. That's what they wanted to do.
Q. And is Fincher a white Republican?
A. Yes, sir, he is.
Q. And Bracy is a black Democrat?
A. That is correct.
Q. Let's see. Let's look at 1522. Can you tell us what this appears to be? It looks like it's in north Alabama. Is it

 Lauderdale County?

A. Lauderdale. I guess that's the river right there. This is where we were drawing on this. I guess District 1 would be -- I believe that's Burdine, House District 1. And this was -- he had looked at his district over or under, and he and I sat down. I'd usually get them to at least initial a map, but maybe I didn't that day. But you can see -- these are his comments. This is how he thought we could get his district within the deviations that we were targeting. And then I would take this and we would go over it, and he would be happy, and I would ask Mr. Hinaman to see what he could do to work it into the big plan.

Q. And does the note on the left say, take rest off here?

A. Yes. You see the dotted line?

Q. Uh-huh.

A. Yes. So apparently, he wanted to reduce that -- he wanted to eliminate that section of District 1. And then over on the right, he had a particular box he would like to eliminate.

Q. And then in the middle, does it say, he wants city?

A. Yeah, he would like -- whatever city is involved in this process, he wants to keep the city intact if he possibly could. And he would like that to be his voters.

Q. Let's look at the 2001 plan and its District 1, which is pink, in northwest Alabama.

A. Yes.

Q. And then a new district. Does that appear to be what he was looking for?
A. It does. It does. Looks like we caught the city there, and we did the trimming on the right and trimmed off the left.
Q. Let me show you what's been marked as 1526. And let's see. Madison County. And do you know who this would involve?
A. I'm having a hard time reading this.
Q. Well, in the middle, does it indicate that someone --
A. District 19 is in the green. I see that. Is that Representative Hall? I can't remember from this morning's discussion.
Q. 19 is Representative Hall. That's correct.
A. All right. So this is where she and I -- she came in, and we talked to her about -- I mean, I listened to her.
Q. This is section 19 and 20; is that right?
A. Where is 20? Oh, yeah. There's 20, and there's 19. Yes, sir.
Q. And does this look like someone's marking up part of 20 to get rid of? Is that -- in the middle; is that correct?
A. It looks like she's -- that yellow portion, the blue line going through the yellow, looks like she's wanting to add some in and take some off.
Q. Okay. Is this kind of the way you worked, these three exhibits kind of the way you worked?
A. It's exactly the way I worked.

Q. And we've heard -- and the rest of your notebook would be consistent with these three pages we've looked at?

A. They would be.

Q. You talked about McClendon 1. The difference between McClendon 1 and McClendon 2 was what?

A. McClendon 1 was the initial map that was generated, and we had 2 -- pardon me -- incorrect resident addresses. And I believe it was for A. J. McCampbell and Elaine Beech. So when McClendon 1 was produced, first thing I heard was from those two legislators that they weren't in their district. And I thought, oh, my goodness. We either put a business district or a PO box or something in there. I don't know what it was, but it -- so we turned around and immediately turned out McClendon 2, which made the correction on those addresses. And that was the only thing -- I believe that was the only difference between McClendon 1 and McClendon 2.

Q. Let me go back a step or so. Did you get anything from Mr. McClammy with respect to the Montgomery area House districts?

A. Oh, yes, sir, I certainly did.

Q. What did you get from Mr. McClammy?

A. He brought a really nice map. And it was a big map. It wasn't one of these small, you know, letter size maps. It was a big map. And I took a look at that map, and he said that he had had -- he and the other -- I believe the other black legislators

in Montgomery County had agreed upon this and thought it was a good plan. And so I turned that over to Mr. Hinaman and asked that he see what he could do to work it into the Montgomery area for representation.

Q. What did Mr. McClammy tell you about using that plan or any other?

A. You know, he mentioned another group, minority, black folks, that had maybe had some maps, and he suggested that his map would be a better map.

Q. Now, after you had come out with McClammy 2, did you have meetings with legislators to try and resolve disputes among them?

A. No, I really did not, because I didn't seem to generate any interest among -- from anybody else to talk about it. And so Mr. McClammy and I spent a good bit of time with what he had done, and it looked like it resolved some issues, so I just turned that over to Mr. Hinaman and said, see what happens when we try to plug this in to what you've got.

Q. Okay. And during the course of your work, did you talk with Representative Harper about his District 61?

A. Harper?

Q. Yes, sir.

A. I did. And actually, most of Mr. Harper's conversations was sitting at the table with Mr. Hinaman rather than with me. I would overhear -- all the stuff was in my office, and so I would

overhear it. But he had worked out something with Representative McCampbell about a small area that, apparently, had been in Representative McCampbell's district, but Mr. McCampbell had agreed to what Mr. Harper was wanting. And it was a common line, it didn't mess up the deviations, so it didn't bother me. If they were both happy, I would be happy.

Q. Okay. Now, after the folks had seen the plan, did you work with Representative Black and Representative Johnny Mack Morrow and another representative in northwest Alabama?

A. I did. Actually, Marcel Black was sort of the spokesman for Representative Morrow and Representative Burdine, Greg Burdine. They were all three white Democrats from north Alabama, but Marcel sort of carried the torch for them. And we sat down and worked. They wanted -- they had three different districts. They were contiguous. And they had some changes to make within the -- that affected only the three of them, and it didn't spill over into adjacent districts, and so that's exactly what we did.

Q. And do you recall which district Mr. Black represents?

A. No.

Q. All right. Did you have a chance to work with Mr. Robinson, Mr. Oliver Robinson, and Ms. Todd and Mary Moore to resolve something that --

A. Yes, sir. We had a very similar situation -- of course, this was inside Jefferson County. And Representative Robinson came to me and he said that he had a solution; that he could

make everybody happy. And I called Ms. Moore. She was at a meeting, a caucus meeting, but she answered the phone, and I told her that Representative Robinson was there and that he had made this proposal and I wanted to make sure she was happy. And we all met up in the reapportionment office, and we got one of the ladies that worked up there to help us work on the lines. And Ms. Todd, Representative Todd, joined us and got involved in the process.

But once again, we had contiguous districts, and they were essentially trading folks, keeping the deviation in line and making changes that didn't affect anybody on the outside, and I thought that was fine. I was happy to do that.

Q. And for the record, Mr. Oliver Robinson's an African American Democrat, right?

A. That is correct.

Q. And Ms. Todd's a white Democrat?

A. That's correct. She's a white lady.

Q. Mary Moore is an African American Democrat; is that correct?

A. And that is correct.

Q. Now, did you also get a request from Representative Juandalynn Givan to make some changes to her district?

A. This is a little convoluted. Actually, it was that Merika Coleman that was -- contacted me on behalf of Representative Moore, but it affected Representative Givan's district. And they had some swapping that they wanted to do. And I got a

sketch to work with. And then we ran the numbers, and it was like a 3700 or 3600 one-way swap. It just went in one direction, and I didn't have anything to offset it. So I was concerned about that. So I didn't have Representative Moore's phone number, but I did have Representative Coleman's number, so I called her. And this was on -- I remember, this was on a Saturday. I called her up. And I said, can you get ahold of Ms. Moore and let's see if we can figure out what we're going to do? Let her know this won't work as a one-way swap. You're throwing everything off. Get back with me, and we'll make it happen. But I never did hear -- I didn't get a response back from any of them on that, so it didn't happen.

Q. If someone brought you a proposed fix, what did you look for when they said, I want to do something different with my district? What did you do?

A. First thing I asked them is if they had had the redistricting office print off the deviations so I could see the demographics, so I could see what they were doing.

Q. And what difference, if any, would it make if they had the agreement or didn't have the agreement of their neighbor?

A. Well, that -- every time you change one line, you're bound to affect somebody else. And so I always had to have at least two people in sync, because I can't -- no sense making one happy and really making the other one mad. So sometimes we would have to sit down and work together so everybody -- well, nobody was

ever perfectly happy, but at least they were the least amount of disgruntled.

Q. Well, other than the people we've talked about, Mr. Black and Mr. Oliver Robinson, did you work with anybody else that you recall?

A. We had a group that involved Marshall County, Dekalb, Blount. I had about five legislators, and they -- and these were all Republican guys. And did they go round and round. About wore us out. But they finally came out with not everybody 100 percent happy, but came out -- and of course, what I told them, I said, look. You guys cut a deal here, and you got to be happy enough to vote for this plan when it comes on the House floor. That's the idea. And they finally did work it out. I bet they were in the office three or four times at least working on this.

Joe Hubbard came to me, and he had a plan for House District 73. Of course, his plan didn't fit in sync with Representative McClammy's plan. Representative McClammy, I could make several people happy. With Representative Hubbard's, I would just make him happy. In fact, with Representative McClammy's plan, House District 73 was gone, so, of course, I don't think Representative Hubbard liked that too much.

Q. In adopting the overall deviation of plus/minus 1, did you have any intention of discriminating against the African American voters of Alabama?

A. Absolutely not.

Q. And in putting together the House plan, did you have any intent to discriminate against the African American voters?

A. I did not.

MR. PARK: Tender the witness.

JUDGE PRYOR: Have I read the agreement correctly that we were going to have direct of Representative McClendon and then cross by deposition only? Is that right?

MR. BLACKSHER: I have a few questions, but I would make the bulk of my cross-examination by introducing his deposition.

JUDGE PRYOR: Okay. Go ahead. You, Mr. Tanner?

MR. TANNER: I'm sorry, Your Honor. I do not expect to have a great deal of cross.

JUDGE PRYOR: Okay. Mr. Blacksher?

MR. BLACKSHER: Ms. Roy, will you connect my computer to the monitor, please?

First of all, I offer Dr. McClendon's deposition as APX 67.

MR. PARK: No objection.

JUDGE PRYOR: Then it is admitted.

MR. BLACKSHER: According to my exhibit list, I don't have a check by Gerald Dial's deposition, which is APX 66. Did I get that in? If not, I offer it.

MR. PARK: If not, no objection.

JUDGE PRYOR: If not, if it hasn't already been admitted, it is admitted.

MR. BLACKSHER: Okay.

CROSS-EXAMINATION

BY MR. BLACKSHER:

Q. Let me ask you about House District 16, Dr. McClendon, Dan Boman's district.

A. I'm looking at it.

Q. It starts in Sulligent on the Mississippi border, then goes over into Jefferson County.

A. Not -- that's not what I see.

Q. You don't see --

A. Oh, is that -- oh, 16 is the blue one; is that right?

Q. Yes, it is.

A. This map we have in front of us, what -- is that the 2014 proposed plan?

Q. It is.

A. All right. I'm with you.

Q. But I really object to calling it the 2014 plan.

A. I'll call it the 2014 proposed plan.

Q. Okay.

A. How does that sound?

Q. Not too good.

A. I'll try again if you would like for me to.

JUDGE PRYOR: Why don't we call it the plan adopted by

the Legislature?

MR. BLACKSHER: Or the Act 602 plan.

Q. I'm showing you APX 14, which is a newspaper article dated June 19, 2012. Would you read the highlighted part, please.

A. McClendon said the 18-member Jeff Co House delegation, which in the past has been split evenly along party lines, is expected to become majority Republican in the next legislative election. Jefferson County is less likely to have a 9-9 tie vote on important issues in the future, McClendon said.

JUDGE PRYOR: You might read that -- you don't need to read that over again, but when you do that, you might want to read it a little more slowly.

MR. BLACKSHER: It's hard for the court reporter, but this court reporter hasn't complained once. I'm impressed.

BY MR. BLACKSHER:

Q. So did you say that?

A. You know, I believe I did.

Q. Okay.

A. I don't remember it, but that -- I certainly don't deny it. I might have said that.

Q. Well, since you moved Demetrius Newton, House District 53, to Madison County and moved Dan Boman, a white Democrat in House District 16, into Jefferson County, how do you get to 10 Republicans?

A. You know, right now, it's 9 and 9, in that Mr. Boman is now

a Democrat. So it would be 9 and 9. So it's really up to the voters. The voters in that district will make a decision, and probably the basis for the statement was when Mr. Boman first ran, he was -- he ran in that district and was elected as a Republican.

Q. He did not run in that district.

A. Yeah, he was -- yeah -- well, 16. He was elected as a Republican, and then he changed.

Q. 16 looked like the picture on the left there.

A. Right. Right.

Q. Okay. So you expect the new HD 16 to go Republican?

A. I would not be surprised. They elected a Republican in the old 16.

Q. I just have this because we've gone over everything in your deposition.

Mr. Walker, when he was examining I believe it was Senator Smitherman, he asked Senator Smitherman if he thought Senator Dial is a racist. And what would you say if I told you that I don't trust anybody who doesn't admit that he or she is a racist?

A. What would I say to that?

Q. Uh-huh.

A. I probably wouldn't even comment on it.

Q. Well, you'll have to comment.

A. Ask me a question.

Q. Isn't it true, what I mean, Dr. McClendon, isn't it true that we were all raised in a racist political and social culture?

A. You know, I think you're probably right.

Q. Okay. And so we all have some of that in us somewhere in our upbringing, right?

A. You know, I would hope we can outgrow that; overcome it.

Q. Absolutely.

A. That's a worthy goal.

Q. But we can't outgrow it and overcome it if we're not constantly aware of it, right?

A. I can agree with that, yeah.

Q. Okay. Let me bring up an exhibit here. I'm showing you APX 5, which is a Montgomery Advertiser article captioned, Redistricting Bill Stalls in the Senate. Would you read the highlighted portions slowly, please.

A. The highest ranking member of the Alabama Senate believes there could be as many as 27 Republicans in the 35 member Senate after the 2014 election if the Legislature passes the plan being considered now. Senate President Pro Tem Del Marsh, R, Anniston, also expects Republican gains in the 105-member House of Representatives. He said the gains would reflect the politics of the conservative state.

Q. Now, you have heard Senator Marsh make that or similar comments, haven't you?

A. You know, I don't know that I've actually -- I don't doubt he made that comment. I don't know that I've actually heard him say that. I mean, he's in the Senate. I'm in the House. We don't mix too much.

Q. Let me show you APX 58, which is captioned -- it's a news article captioned McClendon Discussing Redistricting with the Greater Birmingham Young Republicans. You've seen this article, haven't you?

A. Yes, I have.

Q. Please read slowly this highlighted section here.

A. Representative McClendon said, our constitution creates House and Senate districts independent of county lines. There is no requirement to respect county boundaries. Federal Court cases and guidelines are interested in population distribution, not county lines. Redistricting considered county lines, but they are not paramount. Legislators whose reelection is most affected by moving district lines will likely rate their political survival ahead of county lines. McClendon said that it is important to always remember that redistricting is a political process.

Q. And did you say that, Dr. McClendon?

A. Yes, sir, I believe I did.

Q. Now read the next highlighted portion slowly, please.

A. The Alabama Senate -- the one that starts, the Alabama Senate?

Q. Yes. And this is still characterizing what you said. Yes.
A. The Alabama Senate has the same number majority minority districts, and the House actually gained one majority minority district. McClendon said that he is projecting that after the 2014 election, the number of Republicans in the Alabama House should increase to 68-70. There are 66 now. In the Alabama Senate he is predicting that the Republicans will have 23 to 25 of the 35 senate seats.
Q. Now, aren't both you and Senator Marsh, President Pro Tem Marsh, talking about the prospect that all of the white Democratic seats are going to eventually turn to Republican in both the Senate and in the House?
A. Did I understand you to say that all?
Q. All.
A. Okay. Now that I've got that, ask the question again so I can get it right.
Q. Aren't you and Senator Marsh essentially projecting that eventually, and you're working toward eventually changing all the white Democratic seats into Republican seats?
A. I cannot speak for Senator Marsh, but I'll speak for myself, and, no. I've never even had the thought of all the white Democratic seats being gone.
Q. None of the seats that you in this article propose or suggest will eventually become Republican is a majority black district, right?

A. I'm sorry, Mr. Blacksher, but I'm having trouble getting your question right.

Q. You're not projecting that any of the majority black districts will go Republican, are you?

A. I am not projecting that. That is correct.

Q. When you took the oath of office as a member of the House of Representatives, did you swear to uphold the constitution of Alabama?

A. I did.

Q. And you do know that the constitution of Alabama of 1901 was adopted for the purpose of preserving white supremacy?

A. I have heard that. I don't know that, but it wouldn't surprise me.

Q. Well, let me read you from a Supreme Court decision to see if you've heard this.

The delegates to the all-white convention were not secretive about their purpose. John B. Knox, president of the convention, stated in his opening address, quote: And what is it that we want to do? Why, it is within the limits imposed by the federal constitution to establish white supremacy in this state. Close quote.

And the Supreme Court, again, indeed neither the District Court nor appellants seriously dispute the claim that this zeal for white supremacy ran rampant at the convention. That's *Hunter versus Underwood*, 471 U.S. 222, 229, 1985.

Are you aware that there are judicial decisions that said that?

A. That there are what decisions?

Q. Judicial decisions that said that our constitution was designed to preserve white supremacy.

A. I am now, assuming everything -- and I'm sure everything you're telling me is true, but I am now. I'm not -- I hadn't previously been familiar with any of those decisions.

Q. That's what I was getting at. This is new history to you, isn't it?

A. Well, it's old history to anybody.

JUDGE PRYOR: He has a point, Mr. Blacksher.

Q. Well, what is your understanding of what white supremacy means?

A. White supremacy? It's purely a racial thing, I would have to guess. I really haven't put much thought into it. But I would say white supremacy pretty much defines itself by the words.

Q. Well, let me tell you -- let me read to you from another decision. And this is from Knight versus Alabama, 787 F. Supp. 1030, at page 1068. And this is the Northern District of Alabama, 1991. It was affirmed by the Eleventh Circuit in 1994. Let me just read this to you, please: The white supremacist attitude of this period is one which desires to preserve blacks in a subordinate position within society, and as those whites

who held this idea would have understood it, to preserve civilization in the republic. They understand themselves to be fighting to preserve the essence of the republic.

And this is quoting J. Mills Thornton, who is the dean of Alabama historians.

The Court goes on to say as follows: The dilemma for the Republican party was always gaining and holding the support of enough white voters to parlay solid black support into electoral victory.

JUDGE PRYOR: What was the last three words? Parlay solid --

MR. BLACKSHER: Solid black support into electoral victory.

Q. This is talking about in the 1870's now, okay? The Democrats -- the Democrats used the Ku Klux Klan and other means of violence, intimidation, and social ostracism against those white persons who aligned with the Republican party. Even white Republicans openly hostile to blacks' interests were ostracized merely for appearing on the same ticket with black candidates or for sitting in the Legislature with black Republicans.

And, of course, in the case of some scalawags, which, by the way --

JUDGE PRYOR: Mr. Blacksher, I'm having a hard time following what this is about.

MR. BLACKSHER: I'll get to it, Your Honor, if you'll

allow me to finish.

Q. That had the effect of driving them to an ostentatious desire to demonstrate that they do not accept black goals, and eventually it has the effect in some cases of simply driving them out of the Republican party, and they joined the Democratic party. By 1874, that had happened on quite a broad front. And that's what we mean by drawing the color line, forcing all whites on one side and leaving the other side essentially black.

Now, that's what the Court wrote about 1874. Did you know that that had happened in 1874?

A. Did I know that the Court ruled that in 1874?

Q. Did you know that the Democratic party drew the color line in 1874?

A. I did not.

Q. Okay. If you knew that, would you want to make sure that the Republican party in 2012 was not drawing the color line?

A. I'm not interested in drawing a color line, regardless of what's happened in the past. That's --

Q. And you would not consider trying to have all whites Republicans, leaving all blacks as Democrats, as drawing the color line?

A. I don't have anything to do with that. That's the voters of Alabama that make those decisions.

MR. BLACKSHER: I have no further questions.

I'm sorry. There are -- no, I don't have any further

questions.

CROSS-EXAMINATION

BY MR. TANNER:

Q. Good afternoon, Representative McClendon. It's been a long day, hasn't it?

A. It's been delightful.

Q. You're under oath, Representative McClendon.

Just to clarify, the 1 percent or plus or minus 1, the 2 percent deviation rule, is separate from the Department of Justice preclearance issue. You understand that, or do you not understand that?

A. I thought the deviation was part of what they reviewed in deciding whether or not to give preclearance.

Q. Who -- I'm sorry.

JUDGE PRYOR: I'm not doing anything. I'm waiting for your question.

MR. TANNER: Okay.

Q. Who told you that?

A. Who told me that?

Q. Yes.

A. You know, I believe in their -- when they called to talk about -- when they did their interview about this, I think that was part of the conversation with them.

Q. So this was after the plan had been adopted?

A. And --

Q. They being the people at Justice Department?

A. They being DOJ. But after it had passed and we submitted it, or it was submitted by the AG.

Q. Okay. What -- to clarify one thing, you offered to meet individually with each Democratic member of the House, correct?

A. Correct.

Q. But you did not offer to let any of them meet with Mr. Hinaman.

A. Correct.

Q. Okay. And then you talked to them individually. You sat down one on one when you went through those maps and so forth.

A. Correct.

Q. Okay. And once the plan became public or after -- we've been talking about phase one that is before McClendon 1 was introduced. That's when you met with them individually, right?

A. It was -- yeah. It was an ongoing process. I mean there was a lot of things happening simultaneously, putting this together. There was a lot of work to be done.

Q. There usually is in the Legislature, isn't there?

A. Can be very busy.

Q. And then drawing a line between the prior to the introduction of McClendon 1 and afterwards, after you would meet with multiple Democrats and anyone else, I guess, who wanted to swap population.

A. Uh-huh, after. If there was a question there, I missed it.

Try me again. I might be getting a little slow this time --

Q. Well, it may be me. It may be me.

Once you had introduced the McClendon plan, you would meet again with legislators --

A. Correct.

Q. -- to talk about the plan?

A. Yes, sir.

Q. And the legislators, the Democratic legislators, were allowed to make changes as long as they were changes that were agreeable to the other affected members.

A. You know, I'm trying to think. Are you talking about introducing it as if it went to the House floor? Actually, I'm not sure we made it to the House floor with 1. It was 3 that made it to the House floor. But the committee was continually working on these plans, and so when you say introduce, I don't think that's exactly right. I think it was what we were working on within the redistricting committee.

Q. Okay. Well, at what stage in the process did you meet with Mr. Black, Representative Black, and Representative Morrow and Representative Burdine?

A. Prior to McClendon 3 being --

Q. Okay. Thank you.

Now, you testified in your deposition that you went to the National Conference of State Legislators' meeting on redistricting in the Washington area in January of 2011.

A. I think that's right. I know it was very cold, and I didn't have an overcoat.

Q. It was very cold. And Mr. Walker was present at that meeting also?

A. No.

Q. He wasn't?

A. No.

Q. Oh, I'm sorry.

A. I didn't know -- I don't -- I guess I knew Mr. Walker because of congressional, but -- no, he was not there.

Q. I was confused, apparently, because I believe he testified or he remarked on that conference in one of the hearings, I believe. We'll get to that.

And did other Alabama legislators attend?

A. Yes. I saw Senator Smitherman there, and I think -- I guess Randy Davis was there with me, and maybe somebody else. We got split up into work groups. It was a pretty interesting process.

Q. Well, there were a lot of Republicans from around the country at that conference, weren't there?

A. Oh, there probably were 100 or more legislators there from around the country. I was just thinking about from Alabama.

Q. Right. And who paid for your trip?

A. I believe the caucus, the House Republican caucus paid my expenses. They paid the hotel and plane.

Q. Right. Okay. And there were a number of side discussions

at that conference, I imagine. Y'all talked about redistricting?

A. We had meetings galore.

Q. You also testified that the first time you heard the term packing was on the House floor.

A. I've thought about that since we did that deposition, and more than likely that term came up in the reapportionment committee meetings that we had where we would look at these plans. So I probably would -- I'm sure it must have come up before getting on the House floor, but I guess I didn't pay much attention to it. I really didn't know -- the packing I figured out the first time I heard it. What was the other one? The cracking? After being here for several days, I've kind of figured out what that's about.

Q. Well, actually, you heard about packing at the NCSL conference, didn't you?

A. Well, I could have, but it didn't stick. I was much more interested in the map drawing.

Q. As a matter of fact, you heard from a former chief of the voting section of the Justice Department, the office that reviews plans under Section 5, warning against packing, didn't you?

A. Well, I might have. I don't know.

Q. And actually, after the 2010 election, the Alabama Law Institute had an orientation session for legislators which you

attended, did you not?
A. I was there, yes, sir. I was -- that was in Tuscaloosa you're talking about?
Q. Yes, sir. And at that conference, there was also a former chief of the voting section who specifically warned against packing.
A. I don't know if I went to that or not. I was at several different meetings, so I don't -- I don't remember that.
Q. But there were many legislators present at that conference, weren't there?
A. Right. Plenty. A lot of them.
Q. And during the hearings, a large number of black legislators -- well, a number of black legislators spoke out against packing while you were present at the hearing.
A. Right. You're talking about the public hearings in October?
Q. Yes.
A. Right.
Q. So you had heard from Representative Scott, Representative Coleman, Perry County Commissioner Albert Turner, who was here earlier, Representative Chris England, Senator Hank Sanders, Representative Darrio Melton, and others about packing and asking that you make sure you not pack minority districts.
A. Could well be true. I wouldn't deny any of those.
Q. And as a matter of fact, your counsel, Mr. Dorman Walker, at these hearings advised against packing and specifically stated

 that while in the past it used to be 65 -- above 65 percent, I'm pretty sure that if you were to send a district that was 65 percent black to the Department of Justice now, they would wonder why you were packing it. And they'll be looking for, my understanding is, much lower levels. I mean a black majority could certainly be above 50, but 55 may be extreme in some cases.

Do you recall that?

A. No, I really don't. I don't deny it, but I don't recall that conversation. We hit a lot of places, and there was a lot of comments made.

Q. Well, that's what you were hearing, was it not, from --

A. Sir? That's what I was what?

Q. Hearing. That is, the arguments against --

A. From testimony, you mean, at the meetings?

Q. And the hearings.

A. Yes. Right.

Q. Right.

A. Right. We did hear that.

Q. You were hearing a chorus of objections to packing and please not to pack --

A. Yeah.

Q. -- from the black members of the Legislature?

A. Correct.

Q. Is that correct? And also from information from your

counsel about that. Did you discuss with Mr. Walker, what's all this packing business?

A. We probably had that conversation. I did rely on him to help me.

Q. And he told you the same thing he told the public, correct, being --

A. Right.

MR. TANNER: Is the Elmo on?

Q. You received some materials from the Republican National --

JUDGE PRYOR: Mr. Tanner, about how much longer do you have to go?

MR. TANNER: Oh, less than 15 minutes, I believe.

JUDGE PRYOR: Okay.

JUDGE THOMPSON: Do you expect any redirect?

MR. PARK: Minimal.

JUDGE PRYOR: I don't want to go much further than that.

BY MR. TANNER:

Q. I've put on the Elmo -- and this is, as you can see, Exhibit 459, which is your notebook, correct?

A. It's up in the -- now it's gone. Okay. Okay. I've got the upper left corner of it now. Now I have nothing. And now I see McClendon, 0059, and I see RNC on that.

Q. Yes. That material in your notebook came from the Republican National Committee, specifically in Defendant's

Exhibit 459, pages 1422 through 1452 and 1454 through 1476, for the record.

Let me just show another. And I'm not going to go through all these, of course. Up in the corner, did you -- is that your handwriting, House total?

A. That is definitely my handwriting or printing.

Q. And this reflects data for each House district, does it not, with the white population and percentage, non-Hispanic white population percentage, and the black non-Hispanic black and so forth for each House district. That's what this table shows, and I'm only showing you one piece; is that correct?

A. Yes, sir. I believe that is correct.

Q. And, again, this is page 1454. And you received a number of these charts from the Republican National Committee, didn't you?

A. Right.

Q. When did you receive them and under what circumstances?

A. I think they came in early on when we were just going to start the project. It just came in like the census data came in. I don't even know how I got it, other than it was provided to me. Might have been through the attorney, might have been through the speaker's office, but it was in with a bundle of data -- demographic data for individual House districts and, of course, for the state as well. I don't know. I --

Q. Did you receive any other communications from the Republican National Committee about redistricting?

A. No. I mean as far as talking to anybody or anything like that, no.

Q. Or other materials?

A. If I had, it would have been in the back. That came out of my folder.

Q. I'm putting on the screen Exhibit 459. Can you read that?

A. Fairly well.

Q. Okay. Let me zoom in a little.

A. Oh, that makes it really good.

Q. You have district numbers on the left, correct? Corresponding. And then the population figure, the next column, correct?

A. Correct.

Q. The last name, sometimes first initial, of the member of the Legislature, correct?

A. That would be correct.

Q. And then a race and party designation; is that correct?

A. That is correct.

Q. Okay. Who prepared that?

A. I do not know.

Q. You reside in Springfield, Alabama?

A. Springville, Alabama.

Q. Springville. Thank you. And that used to be in Senate District 17 under the old plan, correct?

A. It is in State 17 today.

Q. Today. That is under the 2001 plan. We're still under the 2001 plan.

A. Yes. That is correct.

Q. And under the plan the Legislature adopted for the Senate, that is now in your district or you are now in Senate District 11?

A. That is correct. My home is, yes, sir.

Q. Okay. And you were a candidate for the senate in --

A. I am working in that direction.

Q. With whom did you discuss your candidacy during the redistricting process, your prospective candidacy?

A. Well, there was not a prospective candidacy until Senator Dial was working with I believe it was Senator Williams and Senator Beason on drawing those districts. And of course, they're working in my office, and I went over there and took -- I just looked over their shoulder to see what they were doing. And I saw the way Senate 11 was drawn, and that kind of piqued my curiosity. I didn't draw it. In fact, Senator Dial and I had a deal. If he would leave the House districts alone, I would leave the Senate districts alone, and we pretty much abided by that. So the first time I saw it, I started thinking about it. And then later on after -- they worked out some -- they did some fine tuning, the current -- the incumbent senators. And it was sometime after that -- I had a lot going on -- sometime after that I had got the demographics and

considered running for the Senate.

Q. And the data from the Republican National Committee, as I mentioned, they've got -- they have data on ethnicity as well as race. You saw the non-Hispanic white, and they also provided you with data on the Hispanic population of the districts.

A. I did see that, yes, sir.

Q. Okay. But you did not consider that during the redistricting at all?

A. Did not consider what?

Q. The Hispanic population.

A. That is correct.

Q. And in terms of Voting Rights Act, I believe the testimony is that the state Legislature focused solely on the black percentage in terms of the majority black districts in terms of drawing those districts.

A. I would agree with that statement.

MR. TANNER: I have no further questions, Your Honor.

REDIRECT EXAMINATION

BY MR. PARK:

Q. Just briefly. Senator -- or Representative McClendon --

A. Good word. Good word.

Q. Soon enough.

Representative McClendon, Mr. Blacksher showed you a portion of APX 58, and at the carryover he had you read the part down at the bottom of the first page about the prediction. Can you read

the sentence that follows on the next page?
A. Can you put your finger where -- okay. You want me to read that?
Q. Please.
A. Starting with that, McClendon cautioned, however, you don't always know what the voters are going to do.
Q. Did you talk to Representative Boman on the floor of the House?
A. I did. In fact, Representative Boman came up to me after the redistricting plan was passed by the House -- probably by the Senate, and I think it was later he came up and he said that -- he said he could win that new House District 16 the way it was drawn. He said he didn't have a problem with it at all. Said, I can win that district.
Q. And counting Mr. Boman as a Democrat, does that keep the ratio in Birmingham at 9 Democrats to 9 Republicans?
A. In the House of Representatives, it's 9 and 9. Just like it's been for the last at least ten years.
Q. Did you serve in the Navy during --
A. I was in the Navy, yes, sir.
Q. What does your Navy service tell you about the way you treat people of other races and colors?
A. The USN was a great experience. There were no -- there was only one race. That was Navy folks. We had some Marines, too, but --

MR. PARK: Nothing further.

JUDGE PRYOR: Mr. Blacksher?

MR. BLACKSHER: Real quick.

RECROSS-EXAMINATION

BY MR. BLACKSHER:

Q. Dr. McClendon, when you said you got the demographics and decided to run in Senate District 11, you're talking about the demographics of race, right?

A. No, sir. That's not what I was talking about.

Q. What were you talking about?

A. I was talking about how the county -- what percentage each county -- the county composition of Senate 11. That was what I was talking about.

Q. What demographics besides black and white were you looking at in those counties?

A. The only thing that I was looking at was the percentage of the voters from each county in Senate 11. I didn't make --

Q. No further questions.

A. Yes, sir.

MR. TANNER: Nothing, Your Honor.

JUDGE PRYOR: Very good. Okay. Representative McClendon, you may be excused.

Now, tomorrow, is there going to be an unidentified rebuttal witness or not?

MR. PARK: At this stage, no, Your Honor.

JUDGE PRYOR: I'll take that as a not.

MR. PARK: Nothing that we've heard so far.

JUDGE PRYOR: We know that the Newton plaintiffs intend to call Ms. Toussaint, Mr. Weaver, and Ms. Rubio. Right?

MR. ANDERSON: Yes, sir.

JUDGE PRYOR: And that's all you expect to do? That's right?

MR. ANDERSON: If we have any rebuttal, it will be very brief, and we'll know that first thing in the morning after we confer. But our experts have heard their experts.

JUDGE PRYOR: Okay. Well, then, we'll be in recess until nine o'clock tomorrow morning.

JUDGE THOMPSON: Can I ask just how long you think your case is going to take tomorrow?

MR. TANNER: We'll be through before lunch, Your Honor.

JUDGE THOMPSON: Before lunch?

(Proceedings concluded at 5:24 p.m.)

* * * * * * * * * * * * *

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

This 2nd day of July, 2014.

/s/ Patricia G. Starkie
Official Court Reporter