IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| ALABAMA LEGISLATIVE BLACK | ) | |
| CAUCUS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:12cv691 |
| | ) | (Three-Judge Court) |
| THE STATE OF ALABAMA, | ) | (WO) |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |


| | | |
|---|---|---|
| ALABAMA DEMOCRATIC | ) | |
| CONFERENCE, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:12cv1081 |
| | ) | (Three-Judge Court) |
| THE STATE OF ALABAMA, | ) | (WO) |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

THOMPSON, District Judge, concurring in part and dissenting in part:

I concur with the majority that 12 of the districts at issue do not pass constitutional muster: Senate Districts 20, 26, and 28 and House Districts 32, 53, 54, 70, 71, 77, 82, 85, and 99.  I also concur that 12 districts are constitutional: Senate Districts 18, 19, and 33 and House Districts 19, 58, 59, 72, 76, 78, 84, 98, and 103.

However, for the reasons given below, I respectfully dissent from the majority's conclusion that an additional 12 districts are constitutional: Senate Districts 23 and 24 and House Districts 52, 55, 56, 57, 60, 67, 68, 69, 83, and 97.  Two of the districts for which the majority concluded that race predominated, SD 23 and HD 68, cannot survive strict scrutiny.  In the other ten districts, for which the majority held that race did not predominate, I conclude that race predominated and they cannot survive strict scrutiny.

2

In this case, involving the constitutionality of
Alabama's 2012 House and Senate plans, the Supreme
Court vacated the judgment previously adopted by the
majority and remanded it back to our three-judge panel
to consider racial-gerrymandering with respect to
individual districts for the purposes of resolving
plaintiffs' equal-protection claim. <u>Ala. Legislative
Black Caucus v. Alabama</u>, 135 S. Ct. 1257, 1274 (2015).
That opinion provided us guidance about the importance
of direct evidence demonstrating the State's policy of
using "mechanical racial targets" and a roadmap for
assessing the districts challenged by plaintiffs. <u>Id.</u>
at 1267, 1271. Specifically, as to racial
predominance, the Court provided a roadmap for our
district-specific analysis, instructing us to examine
evidence indicating the State's policy of achieving
racial targets had an impact on "at least some of [a
district's] boundaries," such as through the district's
shape, the racial composition of the population added

3

to the district, or the preservation of the percentage of the population that was black. <u>Id</u>. at 1271. The Court also directed our attention to split precincts, especially where the population was "clearly divided on racial lines." <u>Id</u>. Finally, the Court instructed that certain factors could not be considered traditional race-neutral factors overcoming the use of race, including the State's equal-population objective and factors "not mentioned in the legislative redistricting guidelines." <u>Id</u>. at 1271-72. To survive strict scrutiny, the Court instructed that the State must have a "'strong basis in evidence' in support of the (race-based) choice that it has made." <u>Id</u>. at 1274. The Court further concluded that the State "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)," <u>id</u>. at 1267, and described that approach as asking "the wrong question with respect to narrow tailoring." <u>Id</u>. at 1274.

4

Because the majority does not adhere to all of the Court's guidance in its analysis of the strict-scrutiny and racial-predominance prongs of plaintiffs' equal-protection claim, I cannot accept the majority's analysis. Our disagreement is not merely a question of evidentiary disputes; the majority commits clear legal errors in its analysis of both the two districts where it found strict scrutiny satisfied and the ten districts where I disagree with the majority's conclusions as to racial predominance.

## I. Two Additional Districts

Because I partially agree with the majority as to SD 23 and HD 68, I will begin with them. The majority correctly concludes that race predominates with respect to these two districts. But I do not agree that the State has met its burden to demonstrate that its use of race survives strict scrutiny.

5

SD 23 and HD 68 are drawn in the largely rural West Black Belt region of Alabama. Each district consists of a majority-black population that was represented by a black legislator during redistricting. In each, the State hit its racial target--based on preserving the same percentage of the black percentage when applying the 2010 census to the 2001 district lines--almost to a tee: in SD 23, the drafters took a district that had been 64.76 % black under the old lines and drew it with a 64.84 % black population in the new plan; in HD 68, the drafters took a district that had been 62.55 % black and left it 64.56 % black. The State met its targets despite adding significant new population to each district to achieve its equal-population objective.

For evidentiary support on the strict-scrutiny prong, the majority relies principally on comments made by incumbent legislators during public hearings in the redistricting process. But these comments are

inadequate to provide a strong basis in evidence. In the first comment, Representative Thomas Jackson, incumbent for HD 68, while expressing concern about packing too many blacks into majority-black districts, stated that instead Alabama's majority-black districts "<u>could</u> <u>be</u> sixty-two percent or sixty-five percent" black. Reapportionment Comm. Oct. 13, 2011 Hrg. Tr. (doc. no. 30-23) at 8 (emphasis added). And that is it: Jackson offered no demographic support whatsoever for his comment. A few days later, Senator Henry Sanders, incumbent for SD 23, while expressing concern about drawing majority-black districts with too few blacks, suggested they "ought not to be less than 62 percent" black. Reapportionment Comm. Oct. 18, 2011 Hrg. Tr. (doc. no. 30-28) at 6 (emphasis added). The only demographic support Sanders offered for his comment is this: "<u>Sometimes</u> a lot of people don't vote. <u>Sometimes</u> a lot of people can't vote. ... <u>Sometimes</u> a lot of folks are discouraged for one reason or

7

another." <u>Id</u>. (emphasis added).   Moreover, Sanders

unequivocally  directed  his  comments  at  "majority

African-American district<u>s</u>," <u>id</u>. (emphasis added); that

is, in the plural and thus generally.

    As  I  will  explain  later  and  in  detail,  these

generic  and  conclusory  "could  be"  and  "sometimes"

comments  provide  inadequate  evidentiary  support  for

government  action  based  on  race  under  strict  scrutiny.

Strict  scrutiny  is  designed  to  ensure  that,  before

declaring  a  State's  use  of  race  constitutional,  the

court  must  be  reasonably  confident  that,  as  I  believe

the  United  States  aptly  put  it  in  an  amicus  brief

recently  filed  with  the  Supreme  Court,  the  State

"relied  on  information  about  district-specific

characteristics--localized  assessments  drawn  from

knowledge  of  actual  constituents,  rather  than

stereotypes."  Brief  for  United  States  as  Amicus  Curiae

at 32, <u>Bethune-Hill v. Va. State Bd. of Elections</u> (U.S.

2016) (No. 15-680), 2016 WL 4916822, at *32.   Because

8

the record is insufficient for this court to determine, one way or the other, that Alabama did not rely on stereotypes about black voting behavior, the two districts cannot survive strict scrutiny and the majority's conclusion otherwise is clearly erroneous.

## A. Strict-Scrutiny Standard

Where a court concludes that race predominated in the design of a district, the court must further determine if that district can survive strict scrutiny--that is, "whether the [district] is narrowly tailored to further a compelling governmental interest." <u>Shaw v. Reno ("Shaw I")</u>, 509 U.S. 630, 658 (1993). <u>Shaw I</u> adopted, for racial-gerrymandering claims in the redistricting context, the two strict-scrutiny prongs from ordinary equal-protection analysis: first, "any racial classification 'must be justified by a compelling governmental interest,'" and, second, "the means chosen by the State to effectuate

its purpose must be 'narrowly tailored to the achievement of that goal.'" <u>Wygant v. Jackson Board of Education</u>, 476 U.S. 267, 274 (1986) (plurality opinion) (citations omitted).

As to the first prong, the parties do not dispute that the State held a compelling interest in compliance with a correct interpretation of § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Accordingly, my review centers on the second prong--the narrow-tailoring requirement.

To satisfy the narrow-tailoring prong here, the State must show that it had a strong basis in evidence for the way it used race in the design of a district. <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1274. Elaborating on the standard, the Supreme Court explained that the State "may have a strong basis in evidence to use racial classifications to comply with a statute when [it] ha[s] <u>good reasons</u> to believe such use is required, even if a court does not find that the

actions were necessary for statutory compliance." Id. (quoting Brief for the United States as Amicus Curiae 29). Put differently, while the State need not show that a compelling interest actually required it to use racial classifications, the State must show a strong basis in evidence for believing that the racial classification it used was required.

In adopting the strong-basis-in-evidence standard to satisfy the narrow-tailoring prong, the Supreme Court directed us to the standard for strict scrutiny that has been applied in both the voting-rights and racial-preference contexts. See Ala. Legislative Black Caucus, 135 S. Ct. at 1274 ("[W]e agree with the United States that a court's analysis of the narrow tailoring requirement insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made." (citing Brief for United States as Amicus Curiae 29 and Ricci v. DeStefano, 557 U.S. 557, 585 (2009)).

11

In _Ricci_, an affirmative-action case that
confronted a race-discrimination claim under Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e _et_
_seq._, the Supreme Court concluded that, to survive
strict scrutiny, the government needed more than a
"good-faith belief" that its racial preferences were
necessary for statutory compliance.   557 U.S. at
581-82.   Even though the government reached its
decision on the recommendation of an industry expert,
that expert's "few stray (and
contradictory) ... statements" could not qualify as a
strong basis in evidence, especially because he had not
"studied the [issue] at length or in detail" and had
not seen relevant data.   _Id_. at 591 (quotations and
internal alterations omitted).

Beyond the Court's recent application of the
standard in _Ricci_, the strong-basis-in-evidence
standard originally derived from equal-protection cases
in the racial-preference context.   The plurality

12

opinion in Wygant explained that a governmental actor using racial classifications for a remedial purpose must have "a strong basis in evidence for its conclusion that remedial action was necessary," which, in turn, required that government actors proceed with "extraordinary care" and assemble "convincing evidence" before taking such action.  476 U.S. at 277.

The same standard was applied in City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989), which determined that a race-based measure, supported by the testimony of government officials that was neither geographically specific nor accompanied by an explanation of the basis of their opinions, could not pass strict scrutiny, because such "highly conclusionary" and "generalized assertion[s]" lacked the rigor necessary to establish a strong basis in evidence.  Id. at 500.

The majority asserts that the strict-scrutiny standard developed in racial preference cases has no

application to this context. But well before the
Supreme Court's decision in this case, the
strong-basis-in-evidence standard was imported into the
racial-gerrymandering context. See Shaw I, 509 U.S. at
656 (citing and applying strong-basis-in-evidence
standard from Wygant and Croson). Similarly, in Bush
v. Vera, Justice O'Connor, who authored the plurality
opinion, explained in a separate concurrence that a
State's "'strong basis in evidence' need not take any
particular form," but made clear that it "[could not]
simply rely on generalized assumptions" about voting
behavior, such as "the prevalence of racial bloc
voting." 517 U.S. 952, 994 (1996) (O'Connor, J.,
concurring). She concluded that the State's reliance
on a recent federal court ruling that had made
extensive, geographically specific factual findings
about voting behavior and was corroborated by expert

14

testimony provided a strong basis in evidence. Id. at 994-95 (O'Connor, J., concurring).[1]

In Shaw v. Hunt ("Shaw II"), the Supreme Court concluded that the State's evidentiary burden on strict scrutiny can be met only by using evidence it actually considered at the time of redistricting; after-the-fact justification does not count. 517 U.S. 899, 908 n.4 (1996) (stating that strong-basis-in-evidence standard requires interrogation of a legislature's "actual purpose," not "speculation about what 'may have motivated'" it). The Court refused to credit the State's proffer of historical and social science reports, generated only after the challenged districts had been drawn, to prove that it had a strong basis in

---

[1] Justice O'Connor and the other members of the plurality ultimately concluded that the new majority-black district was not narrowly tailored because it was not compact and was oddly shaped. Bush, 517 U.S. at 979, 995.

evidence for its creation of two majority-black
districts.  Id. at 910.

Shaw II also required a district at issue to be
designed in a manner tailored to the evidence
justifying it.  The Supreme Court held that, although
North Carolina had established a strong basis in
evidence to draw a remedial district based on its
failure to give effect to minority voting strength in
one region of the State, that evidence did not
establish a broad license to draw a remedial district
elsewhere in the State.  Id. at 917.

The majority observes that strict scrutiny does not
require that a State engaged in redistricting must
precisely guess what the Voting Rights Act demands; the
State is entitled to "a limited degree of leeway."
Bush, 517 U.S. at 977.  I fully agree.  But here the
question put is simply whether the record is adequate
to determine that the State has not made its
race-conscious decision based on stereotypes about

black voting behavior and instead has based its decision on localized, district-specific characteristics.

Stated simply, while the strong-basis-in-evidence standard adopted by the Supreme Court in this case, Ala. Legislative Black Caucus, 135 S. Ct. at 1274, "need not take any particular form," Bush, 517 U.S. at 994 (O'Connor, J., concurring), it does require the State to point to concrete and specific evidence, which it actually relied upon before reaching its decision and which is sufficient for the court to interrogate the basis for the State's approach. Further, the race-based decision must be narrowly tailored to address the harm to citizens in the district at issue, and it must be fully supported by the evidence. If the State cannot establish a strong basis in evidence consistent with these standards, redistricting undertaken with race as the predominant consideration

17

is not narrowly tailored and cannot survive strict scrutiny.

## B.   SD 23 and HD 68

The majority's strict-scrutiny conclusion for SD 23 and HD 68 rested primarily on the suggestions made by the districts' incumbent legislators, Representative Jackson and Senator Sanders, which, the majority believes, gave the State a strong basis in evidence to draw majority-black districts within the range of a 62 % to 65 % black population.  The majority correctly recognizes the legislators' comments cannot provide a strong basis in evidence for majority-black districts across the entire State, as the State had argued. Nonetheless, the majority, relying on those same legislators' suggestions, resuscitated the legislators' two districts, transforming the State's statewide argument into one specifically about SD 23 and HD 68

solely by virtue of the fact that Jackson and Sanders served as incumbents in those districts.

For the reasons discussed below, this approach is profoundly mistaken. The legislators' comments on which the majority relies do not exhibit the "extraordinary care" demanded in strict-scrutiny analysis. <u>Wygant</u>, 476 U.S. at 277. Instead, on their face, they betray that even the speakers themselves lacked precise recommendations: the appropriate percentage of black population "<u>could be</u> sixty-two percent or sixty-five percent" black, according to Representative Jackson, the incumbent for HD 68; the percentage in <u>all</u> majority-black districts "ought not to be less than 62 percent," according to Senator Sanders, the incumbent for SD 23. Reapportionment Comm. Oct. 13, 2011 Hrg. Tr. (doc. no. 30-23) at 8; Reapportionment Comm. Oct. 18, 2011 Hrg. Tr. (doc. no. 30-28) at 6 (emphases added). But Sanders referred to <u>all</u> majority-black districts in Alabama--so we know

19

that his recommendation was not tailored for SD 23 and HD 68. Jackson's suggested "could be" percentages provide neither a precise suggestion nor a reason to think his passing comment was tailored to the districts at issue. Sanders's 62 % minimum sets a bright-line rule for all majority-black districts based on things that happen, by his own words, only "sometimes": he went on to explain that, "<u>Sometimes</u> a lot of people don't vote. <u>Sometimes</u> a lot of people can't vote. ... <u>Sometimes</u> a lot of folks are discouraged for one reason or another." In the districts where, "sometimes," a high proportion of the black population exercises its right to vote, one would expect a more tailored approach to adopt a lower percentage of black population. Sanders did not tell us whether those conditions exist in his district, and the record does not disclose it. What Jackson and Sanders told us "could be" relevant to the districts at issue "sometimes"; but without district-specific evidence,

20

the record gives us no way to know.   These comments do not provide a strong basis in evidence sufficient to satisfy strict scrutiny.

### i.   Background

In October 2011, before draft redistricting maps were available, the Permanent Legislative Committee on Reapportionment held 21 public hearings across the State to solicit public input.   At one such hearing, on October 13 in Thomasville, Representative Jackson cautioned against packing: "I know they've compacted those districts, put the minorities in one district they could put them in, but we didn't feel that was fair."   Reapportionment Comm. Oct. 13, 2011 Hrg. Tr. (doc. no. 30-23) at 8.   Jackson's concern about packing apparently derived from the recently completed redistricting process for Congressional and school-board districts.   Suggesting that the drafters had not taken into account statements he had made at

public hearings during that process, Jackson asked if the public hearings reflected a genuine attempt to solicit input: "[I]s this something that we're just going around getting people to come out and say you're doing this to make us feel good?  Because when it's to come for these -- the vote for this stuff ... you-all had your minds all made up and you did what you was going to do."  Id. at 7-8.

Jackson then urged the drafters not to pack too many black people into a single district:

> "REPRESENTATIVE JACKSON: ... You know, and having a minority district over there, it's got to be ninety-nine percent minority.
>
> "HEARING OFFICER:  Right.
>
> "REPRESENTATIVE JACKSON:  It could be sixty-two percent or sixty-five percent.  That's what we're trying to tell our good friends before on that. Nobody listens too well to us."

Id. at 8 (emphasis added).

At another public hearing on October 18, 2011 in Selma, Senator Sanders urged the drafters not to place too few black people into majority-black districts:

> "One of many concerns is we are not to have any less African-American--the majority African-American districts than you have, and that those districts ought not be less than 62 percent. And I just want to say why 62 percent, ought not to be less than 62 percent. Many times a population of a district is not reflective of the voters at all in that district. Sometimes a lot of people don't vote. Sometimes a lot of people can't vote. They might be in prison or other kinds of institutions. Sometimes a lot of folks are discouraged for one reason or another. So I would hope that 62 percent is a minimal for the majority African-American district."

Reapportionment Comm. Oct. 18, 2011 Hrg. Tr. (doc. no. 30-28) at 6 (emphasis added). In essence, Sanders expressed concern about cracking, a gerrymandering tactic that involves spreading the population of a voting bloc among many districts to deny its members a sufficiently large population to elect the candidate of

23

their choice in any particular district.  Sanders also
expressed a procedural concern, requesting a further
hearing after the drafters had proposed a concrete
redistricting plan because he did not believe a hearing
absent one held much value: "Whenever you are talking
in the abstract, it really doesn't mean anything.  It
just doesn't mean anything."  Id.  In June 2012, after
a draft redistricting plan had been shared with
senators, Sanders proposed an alternative plan that
included a 57.75 % black population in his district, SD
23.  Sanders Senate Plan, C-47, at 5.  Sanders's
alternative plan suggests he did not believe the
"sometimes" conditions applied in his district.

The State presented no evidence that the drafters
of the redistricting plan relied upon the legislators'
statements in drafting SD 23 or HD 68.  At his
deposition, Representative Jim McClendon, the principal

legislative architect of the House districts,[2] attested that he did not remember testimony at the public hearings about packing, and did not otherwise testify about Jackson or Sanders's statements.[3]   At trial, Senator Gerald Dial, the principal legislative architect of the Senate districts, recalled Sanders's statement about a 62 % minimum black population for majority-black districts,[4] but did not instruct Hinaman

---

2.   McClendon worked on House districts while Senator Gerald Dial worked on Senate districts.   Tr. Vol. III (doc. no. 217) at 256:18-21; Affidavit of Gerald Dial, APX 63 (doc. no. 76-4) ¶ 8.

3.   McClendon was asked if "any of the legislators or any of the folks speaking at the public hearings express [sic] any concerns that the plan that was being proposed was going to result in pulling blacks from certain districts and concentrating them in black-majority districts?"   McClendon testified that "if that came up, it was not a constant theme by any means" and it "wasn't a high priority issue that I recall these folks talking about that."   McClendon Dep. (doc. no. 125-4) at 110:4-15.   He could not "remember a specific conversation on that."   Id. at 111:9-14.

4.   The majority suggests that Dial "considered" Sanders's opinion, see ante, at 126, but Dial merely (continued...)

to incorporate that advice.[5]  Dial did reject certain
alternative plans for Senate districts, including
Sanders's own plan, because "[i]t didn't even meet the
requirements [Sanders] had said would keep [the
majority-black districts] 62 percent at least."  Tr.
Vol. I (doc. no. 215) at 77:14-15.  But there is no
evidence that Dial actually considered Sanders's
statement when constructing the enacted majority-black

---

testified that he remembered hearing it.  Tr. Vol. I
(doc. no. 215) at 37:9-25 – 38:1 (Dial recalling that
Sanders "felt like that the minority districts should
be at a minimum 62 percent minorities").  Even if Dial
actually 'considered' Sanders's statement,
consideration remains at least one step removed from
reliance.

5.    When Dial was asked to identify the
instructions he gave Hinaman, the suggestions of
Jackson and Sanders were not among them.  Tr. Vol. I
(doc. no. 215) at 67:20 – 68:1, 69:16-25.  Dial
testified that he instructed Hinaman about "fill[ing]
in the number of minorities to insure that we did not
regress the minority districts," but he also testified
that his approach to doing so consisted of maintaining
the black percentage of the population in each
district.  Id. at 67:23-25 – 68:1, 136:8-14.

Senate   districts;   to   the   contrary,   the
ultimately-enacted plans also included majority-black
districts below Sanders's suggested 62 %.[6]

For his part, Hinaman testified that he discussed
with Dial and McClendon information they learned from
meetings with black legislators, but the nature of the
advice consisted of geographic-specific requests to
incorporate or exclude specific areas.   Tr. Vol. III
(doc. no. 217) at 151:4-16.   Hinaman testified that he
took "some" comments from public hearings into
consideration in his initial plan and "tried to get an
overall feel for them as a group of all the hearings,"
but that "[i]t's not something you could implement all
of their comments."   See Tr. Vol. III (doc. no. 217) at
148:23-25; Hinaman Dep., APX 75 (doc. no. 134-4) at
70:20-25.

---

6.   SD 18 (59.10 % black) and SD 28 (59.83 %
black).   District Statistics Report, Def. Ex. 400 (doc.
no. 30-39) at 2, 3.

27

In short, the statements relied on by the majority to conclude that strict scrutiny has been met consist of imprecise statements made by legislators addressing different topics at public hearings that neither legislator viewed as a serious forum for input. On top of that, the State presented no evidence that the drafters actually incorporated Sanders's or Jackson's guidance into the design of the relevant districts.

### ii.   Analysis

As stated, the majority holds that the Jackson and Sanders comments provided the State a strong basis in evidence to conclude that it should draw both SD 23 and HD 68 within a range of 62 to 65 % black. See <u>ante</u>, at 121 ("We conclude that [SD 23] satisfies strict scrutiny because the state had a strong basis in evidence to believe that ability to elect for purposes of the Voting Rights Act required black population percentages of 62 to 65 percent in this area. The

28

drafters drew a district in that range."); <u>id</u>. at 304
(applying same approach to HD 68).  With this holding,
the majority errs in at least eight ways.

   <u>First</u>, the comments were not geographically
specific.  As the majority acknowledges, <u>see ante</u>, at
60, neither Sanders nor Jackson offered a proposal
specific to the conditions in SD 23 and HD 68.[7]
Conclusory, geographically imprecise descriptions have
"little probative value" in equal-protection analysis.
<u>Croson</u>, 488 U.S. at 500-01 (rejecting reliance on

---

      7.  As the majority acknowledges, Sanders referred
to all majority-black districts in the State, and,
consistently, Dial understood Sanders's 62 % statement
as applicable to "all districts," in contrast to other
instructions Sanders provided that were specific to SD
23.  Tr. Vol. I (doc. no. 215) at 37:13-25 - 38:1.  As
for Jackson's comments, the State argued he addressed
"that part of the State" (without defining "that
part"), Def. Remand Br. (doc. no. 263) at 54, and the
majority understood him to refer to "his area."  <u>See
ante</u>, at 60.  For my part, I have been unable to
discern Jackson's intentions, given his various vague
and nonspecific references to "these House and Senate
districts," "those districts," and "a minority
district."  Reapportionment Comm. Oct. 13, 2011 Hrg.
Tr. (doc. no. 30-23) at 8.

legislator's statement that racial discrimination existed "in this area, and the State, and around the nation" because it was not specific to the relevant city); accord Shaw II, 517 U.S. at 902 (concluding that remedy tailored to one region of the State could not justify remedy applied to a different area of the State). Indeed, without district-specific demographic evidence, there is no way to be sure that the two districts are not based on stereotypes about black voting behavior.

Second, the legislators proposed imprecise remedies. Because Jackson was concerned about packing, his suggestion that a majority-black district "could be sixty-two percent or sixty-five percent"--in contrast to his earlier reference to a hypothetical district that is 99 % black--is most logically read as a casual reference to theoretically possible lower percentages that would sustain majority-black districts. In contrast, Sanders proposed a flat 62 % floor,

suggesting that, "sometimes," a higher or lower percentage of total black population would be necessary to achieve a district-specific tailored approach.

**Third**, the majority fails to recognize that Jackson and Sanders made proposals that, on their face, do not address the precise question: Jackson was concerned about racial packing and Sanders about cracking, or spreading the black population too thin across districts. Neither focused on the relevant question: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1274. Without underlying demographics, we do not know if they would have reached the same result if they had provided an answer to the relevant question.

**Fourth**, and relatedly, there is no evidence that the remedy proposed by Sanders was tailored to the State's compelling interest in achieving § 5 compliance

instead of a different goal, such as a legitimate
self-interest in re-election.[8]   As Dial testified, "I
never had a senator [in a majority-minority district]
tell me to not put too many minorities in his or her
district."   Tr. Vol. I (doc. no. 215) at 96:14-15.   The
narrow tailoring requirement demands a fit between the
means and the particular end justifying the State's use
of race--not some altogether different end.

   <u>Fifth</u>, that Sanders felt comfortable proposing a
noticeably lower percentage (57.75 %) in his own Senate
district just months after recommending a 62 % floor in
all majority-black districts, <u>see</u> Sanders Senate Plan,

---

   8.   Because Jackson focused on reducing the
percentage of black voters, I assume that he was not
motivated by incumbency protection.   To this end, I
take judicial notice that Jackson--who expressed
concern about placing <u>too</u> <u>many</u> blacks within a
district--has never faced a general election opponent,
but Sanders--who expressed concern about establishing a
minimum floor of black would-be supporters--usually has
faced general election competition.   <u>See</u> Alabama Votes,
Elections          Division          Data,
https://www.alabamavotes.gov/ElectionsData.aspx.

C-47, at 5, suggests one of two things: either his original recommendation was never intended to apply to his own district, or it was not based on a "reasoned, principled explanation." <u>Fisher v. Univ. of Texas at Austin</u>, 136 S. Ct. 2198, 2208 (2016) (citation omitted). The majority insists that the legislature was "entitled" to rely on Sanders's oral public hearing comments instead of his written plan because "the legislature chose to gather input about its redistricting effort through public hearings." <u>Ante</u>, at 129. But without underlying data or analysis, it is impossible to determine whether it was reasonable to rely on either proposal.

Moreover, the majority's acceptance of the legislature's unreasoned dismissal of Sanders's alternative plan belies its attempt to bolster Sanders's credibility. The majority declares Sanders "an expert in the politics of the Black Belt and Senate District 23" and recites a litany of his experience.

33

See ante at 125. But if the majority truly believes
Sanders is so qualified, why does it accept the
legislature's unexplained rejection of Sanders's
written plan for his own district? Sanders's knowledge
and credibility is not disputed; rather, I question the
court's ability to evaluate, while applying the
rigorous strict-scrutiny standard, the State's
purported reliance on one of his suggestions but
dismissal of the other, without evidence in the record
adequately explaining the basis of that choice. See
ante at 19 (citing Dial's testimony that the State
rejected Sanders's own Senate plan solely because it
did not comply with Sanders's public hearing comments).
Indeed, that Sanders himself said that abstract public
hearing testimony "doesn't mean anything,"
Reapportionment Comm. Oct. 18, 2011 Hrg. Tr. (doc. no.
30-28) at 6, should at least give a court applying
strict scrutiny pause about the State's supposed
preference.

Sixth, the State presented no evidence that it actually relied on the legislators' comments when designing the relevant districts.[9]  The State can hold a strong basis in evidence only if that evidence reflects its "actual purpose," and not mere "speculation about what 'may have motivated'" it.  Shaw II, 517 U.S. at 908 n.4.

Seventh, in the absence of evidence of whether and how the drafters actually used the legislators'

---

9.  For the same reason, trial testimony from Alabama Democratic Conference member Dr. Joe Reed and prior testimony from plaintiffs' expert Dr. Theodore Arrington relating to recommendations for total black percentage in majority-black districts may not play any role in the strict-scrutiny analysis.  Compare ante, at 122 (stating that Reed and Arrington testimony "confirm the reliability" of statements made by Jackson and Sanders).  Because there is no evidence that the State relied on this testimony to craft district lines for SD 23 and HD 68--and, of course, it could not possibly have relied on after-the-fact trial testimony--it cannot establish a strong basis in evidence.  See Bush, 517 U.S. at 971 n. * (finding that legislature's purported reliance on 1992 election results cannot justify challenged redistricting where those results "were not before the legislature when it drew the district lines.").

comments, the majority assumes that the drafters determined that Sanders's statement set a 62 % floor and Jackson's passing reference set a 65 % ceiling, and the majority apparently finds this range applicable to both Senate and House majority-black districts in the West Black Belt. See ante, at 121, 307, 345-46, 379. But there is no evidence the State ever applied, or even contemplated, that range. Nor is there evidence that the State understood the comments as applicable solely to the West Black Belt region; in fact, Dial said the exact opposite: he understood Sanders's comments applied to "all [majority-black] districts" across the State. Tr. Vol. I (doc. no. 215) at 37:13-25 - 38:1. The final redistricting plans provide ample evidence that, despite Dial's understanding, the drafters did not adhere to this imagined range: five of eight majority-black Senate districts[10] and 18 of 28

_____

10. Two majority-black Senate districts fell below (continued...)

majority-black House districts, including two of the
West Black Belt's six House districts, fell outside the
range.[11]

Eighth, and finally, the comments were not
"sufficiently measurable to permit judicial scrutiny of
the policies adopted to reach them," Fisher, 136 S. Ct.
at 2211, so that the court can reasonably assure itself
that the State did not rely on racial stereotypes.

---

Sanders's 62 % minimum:   SD 18 (59.10 % black) and SD
28 (59.83 % black).    Three fell above Jackson's 65 %
suggestion:    SD 19 (65.31 % black), SD 26 (75.13 %
black), and SD 33 (71.64 % black).   See District
Statistics Report, Def. Ex. 400 (doc. no. 30-39).

11.    Seven majority-black House districts fell
below Sanders's 62 % minimum: HD 19 (61.25 % black), HD
32 (60.05 % black), HD 52 (60.13 % black), HD 53
(55.83 % black), HD 54 (56.83 % black), HD 97 (60.66 %
black), and HD 98 (60.02 % black).    Eleven
majority-black House districts fell above Jackson's
65 % suggestion:   HD 55 (73.55 % black), HD 57 (68.47 %
black), HD 58 (72.76 % black), HD 59 (76.72 % black),
HD 60 (67.68 % black), HD 67 (69.15 % black), HD 71
(66.90 % black), HD 76 (73.79 % black), HD 77 (67.04 %
black), HD 78 (69.99 % black), and HD 103 (65.06 %
black).   See District Statistics Report, Def. Ex. 403
(doc. no. 30-36).

This is, after all, strict <u>scrutiny</u>.  The record reflects no data, studies, or even anecdotal accounts relied on by Jackson or Sanders to formulate their suggestions.[12]  We must be able to ask: How did the legislators formulate their ideas?  What time period and geographic scope did they address?  What data did they rely upon as the basis for their comments?  How did the State understand and implement the suggestions?  Here, with only a "few stray ... statements" plucked from a voluminous hearing record, we are left with only guesses.  <u>Ricci</u>, 557 U.S. at 591.  (I suspect that, if answers to these questions were in the record, Sanders and Jackson might have admitted that their opinions were formed less by careful analysis and more by an off-the-cuff invocation of the now-discarded rule of

---

12.  The majority's reliance on testimony from Dr. Reed suffers from the same problems as the comments of Jackson and Sanders; that is, Dr. Reed offered only generalizations about the appropriate percentage of black population in all majority-black districts, without offering district-specific evidence.

thumb which had long considered a 65 % total black
population necessary for black voters to elect the
candidate of their choice.  See, e.g., Barnett v. City
of Chicago, 141 F.3d 699, 702–03 (7th Cir. 1998) ("[I]t
is a rule of thumb that blacks must be at least 65
percent of the total population of a district in order
to be able to elect a black.").  To say the least,
their comments come suspiciously quite close to, if not
coincide with, this racially stereotypical rule, a
circumstance which should raise a red flag and warrant
our inquiry into the underlying district-specific
demographic bases, if any, for the comments before we
can rely on them.)


### C.   Racial Targets

While I have observed that the comments of Sanders
and Jackson are inadequate to assess whether the State
used impermissible stereotyping about black voting
behavior, it cannot be overlooked that affirmative

evidence in the record demonstrates that racial stereotyping did occur. The record makes abundantly clear that, in redrawing the majority-black districts at issue here, the State of Alabama attempted to achieve mechanical racial targets based on a thoughtless repetition of the black percentage of each district's population under district lines as drawn in 2001. Since that approach is profoundly inconsistent with the State's burden to demonstrate that its use of race in each district was carefully considered, narrowly tailored, and supported by a strong basis in evidence, it serves as an important complement to the district-specific strict-scrutiny analysis.[13]

---

13. It is an open question whether direct evidence of a statewide redistricting approach that is incompatible with a narrowly tailored approach to the use of race could alone be sufficient to conclude that the State has failed to meet strict scrutiny in a particular district. The Supreme Court remanded for this panel to conduct a district-specific analysis with respect to racial predominance, but made no such statement as to strict scrutiny. Ala. Legislative (continued...)

An assessment of narrow tailoring first requires a precise understanding of the State's compelling interest. To narrowly tailor its approach to a compelling interest in compliance with the retrogression requirement of § 5 of the Voting Rights Act, the State's approach should have been "reasonably necessary" under § 5. Miller v. Johnson, 515 U.S. 900, 921 (1995) ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws."); accord Shaw II, 517 U.S.

---

Black Caucus, 135 S. Ct. at 1266. In fact, in its strict-scrutiny analysis, the Supreme Court concluded that both "the District Court and the legislature asked the wrong question with respect to narrow tailoring," which "may well have led to the wrong answer." Id. at 1274 (emphasis added). As strict scrutiny requires the court to interrogate the legislature's actions leading up to its race-based decision, one could conclude that this wrong approach may well have been fatal. However, because the State has failed to establish it had a strong basis in evidence for the particular districts at issue, I need not reach that conclusion here.

41

at 911 (holding that State's remedy, creating an additional majority-black district, was not narrowly tailored because it was "not required under a correct reading of § 5"). Although the State's approach need not have been "actually necessary" to comply with § 5, the State must still have held a "strong basis in evidence" to "believe" its use of race was required. Ala. Legislative Black Caucus, 135 S. Ct. at 1274.

Here, the State's interest in § 5 compliance "does not require a covered jurisdiction to maintain a particular numerical percentage. It requires the jurisdiction to maintain a minority's ability to elect a preferred candidate of choice." Ala. Legislative Black Caucus, 135 S. Ct. at 1272 (citing 52 U.S.C. § 10304(b)). The State should have known the correct requirement during drafting: Department of Justice Guidelines provided that its § 5 preclearance determinations are not based "on any predetermined or fixed demographic percentages.... Rather, in the

42

Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district.... [C]ensus data alone may not provide sufficient indicia of electoral behavior to make the requisite determination." <u>Id</u>. (quoting Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7471 (2011)). In simple terms, the State should have asked itself: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect its candidate of choice?" <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1274.

By any measure, the approach actually taken by the State was woefully misguided: the drafters applied "mechanical racial targets," <u>id</u>. at 1267, even though information about black electoral behavior, which would have furthered the State's ability to conduct a functional, district-specific analysis of black

43

citizens' ability to elect the candidates of their choice, was readily available. See Ala. Legislative Black Caucus, 989 F. Supp. 2d at 1345 (Thompson, J., dissenting) (describing drafters' failure to consult readily available political data); accord Bush, 517 U.S. at 967 (plurality opinion) (concluding that it was "evidentially significant that at the time of the redistricting, the State had compiled detailed racial data for use in redistricting, but made no apparent attempt to compile, and did not refer specifically to, equivalent data regarding communities of interest."). Randy Hinaman, the State's technical adviser, explained that he instead "tried to draw those [majority-black] districts as close to the [black percentage] numbers as possible and practicable as they were in the 2001 plan to avoid problems with potential Section 5 preclearance." Tr. Vol. III (doc. no. 217) at 164:4-7. Senator Gerald Dial acknowledged that he did not examine the voting behavior of individual districts

when guiding the drafting of Senate districts. Tr. Vol. I (doc. no. 215) at 136:8-14. Because the State mechanically maintained minority percentages in majority-black districts, the Court has already recognized that "the legislature asked the wrong question with respect to narrow tailoring." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1274.

District-specific evidence corroborates that the State's misguided approach extended to the two districts at issue here. Hinaman touted his achievement of drawing an SD 23 that was "very close to getting back to the identical numbers that [it was] 10 years ago," by which he meant that the resulting "total black percentage" was identical. Tr. Vol. III (doc. no. 217) at 186:19-25 – 187:1. Although the State added a net 23,399 people to SD 23, Hinaman managed to maintain almost identically the black percentage, from 64.76 % under the old lines to 64.84 % under the new ones. Senate Districts Pop. Changes from 2010 to 2012,

ADC Supp. Ex. 5; Comparison of Minority Percentages
(doc. no. 263-2) at 4. Indeed, the majority
acknowledges that, "The plaintiffs argue <u>with some</u>
<u>force</u> that, given the extent of the changes to the
districts, the only way the drafters could have
maintained black population percentages as close as
they did was through a policy of racial targets."
<u>Ante</u>, at 119-20 (emphasis added).

Under-populated HD 68 similarly reflects the
application of a mechanical racial target. The State
managed to keep the black population to within two
percentage points--increasing it from 62.55 % to
64.56 %--even though the State added a net 8,835 people
to address substantial under-population. Comparison of
Minority Percentages (doc. no. 263-2) at 2; House
Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex.
4. Stated differently, the State increased HD 68's
total population by 24 % while maintaining a black
percentage within just 2 % of the prior plan.

46

With its mistaken conception of § 5 compliance, the State reduced the likelihood that it would reach the right result--in other words, that it would tailor its race-based action as narrowly as possible under the circumstances.  But asking the "wrong question," <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1274, also meant that the information the State actually reviewed and the analysis it conducted when tailoring its race-based approach had little, if any, correlation with the approach "reasonably necessary" for statutory compliance.  This leaves the court--required to conduct our analysis using strict scrutiny--in a difficult position.  We have no demographic evidence before us specific to SD 23 or HD 68 about black voting behavior, past election results, or other relevant factors necessary for determining how to preserve black citizens' ability to elect the candidate of their choice in those districts--because the State never considered that kind of information.  We have no

47

evidence about how the State weighed that information--because it did not. We have no evidence about how the State considered alternative approaches--because it did not. In other words, the types of evidence the State would need to establish a strong basis in evidence are simply absent from the record because they were absent from its decision-making in the first instance. Under these circumstances, I cannot conceive how the majority could conclude that the State had a strong basis in evidence and the State's approach was narrowly tailored.

Similarly, other courts have made short work of the State's narrow-tailoring arguments where the State failed to make even the barest showing that it has conducted an appropriate inquiry. Reviewing a redistricting plan adopted by the Virginia legislature, it was easy for a three-judge court to conclude that the plan was not narrowly tailored where the legislature used "a [black voting-age population]

48

threshold, as opposed to a more sophisticated analysis of racial voting patterns," to draw district boundaries. Page v. Virginia State Bd. of Elections, No. 3:13-cv-678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015). Likewise, when the South Carolina legislature mechanically drafted each majority-black district with a 55 % black population, another three-judge court found that the legislature's approach was not narrowly tailored and could not survive strict scrutiny. Smith v. Beasley, 946 F. Supp. 1174, 1210 (D.S.C. 1996). That court recognized that consideration of the relevant facts "was not done in the present cases because of the insistence that all majority-minority districts have at least 55 % [black voting-age population] with no evidence as to registration or voter turnout," facts that "should be considered when district lines are drawn" for a district to be narrowly tailored. Id.

Because the State of Alabama did not conduct an
even minimally sufficient analysis about what was
"reasonably necessary" for it to achieve § 5
compliance, this court's ability to scrutinize the
State's use of race has been severely, if not fatally,
hampered.

Moreover, it could be reasonably argued that,
because Sanders's and Jackson's "could be" and
"sometimes" comments were generic and conclusory and
were not supported by district-specific demographics,
they constitute exactly the type of stereotyping about
black voting behavior that strict scrutiny is intended
to prohibit.


***


The point is not that Sanders, Jackson, or the
State of Alabama reached the wrong result.  It might be
the case that a range of 62 to 65 % is appropriate to

50

maintain black voters' opportunity to elect the
candidate of their choice in SD 23 and HD 68, and thus
a design of those districts within that range could
theoretically be narrowly tailored to meet the State's
interest in § 5 nonretrogression.  Nor does it follow
from my conclusion that the legislature was obligated
to reject the suggestions of Sanders and Jackson, as
the majority suggests.  See ante, at 124-25.  Rather,
the State, having opted to utilize race in drawing the
boundaries of SD 23 and HD 68, needed to do so with
sufficient support to satisfy strict scrutiny.  But the
State has not presented--and the record does not
otherwise contain--sufficient evidence to conclude that
the State's approach was narrowly tailored.  Absent an
adequate record, this court cannot evaluate the State's
use of race in drawing SD 23 and HD 68.  And that
inability is fatal, for "blind judicial deference to
legislative or executive pronouncements of necessity

has no place in equal protection analysis." <u>Croson</u>, 488 U.S. at 501.

Because the State has not met its burden of demonstrating that its use of race was narrowly tailored, I cannot give these districts my imprimatur.

## II. Ten Additional Districts

I now turn to ten additional districts for which the majority concluded mistakenly that race did not predominate. In the racial-predominance inquiry, a plaintiff must "show, <u>either</u> through circumstantial evidence of a district's shape and demographics <u>or</u> more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1267 (quoting <u>Miller</u>, 515 U.S. at 916) (emphasis added). As the standard's name suggests, the use of race must be not merely present,

but predominant; the drafters' mere "consciousness of race" does not suffice. <u>Bush</u>, 517 U.S. at 958 (plurality opinion). Race predominates when "race for its own sake, and not other districting principles, was a legislature's dominant and controlling rationale in drawing district lines." <u>Miller</u>, 515 U.S. at 913. The use of racial targets "provides evidence" that race predominated, but must be accompanied by a showing that the use of a target "had a direct and significant impact on the drawing of at least some of [a district's] boundaries." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1267, 1271. When determining whether race or race-neutral factors predominated, a court should take a holistic approach, reviewing the entirety of the drafters' decisions that resulted in the district's boundaries.

While the racial-predominance standard is rightfully demanding, the majority's application of it errs in several ways, causing it to conclude mistakenly

that race did not predominate in ten districts.  First,
I will explain several significant legal errors that
led to significant factual errors in the majority's
analysis.  Then, I will explain why the evidence
supports a racial-predominance finding in each of those
ten districts.

### A.   Racial-Predominance Standard

#### i.   Race-Neutral Districting Criteria

First, the majority goes astray when it
categorically states: "When the plaintiffs proceed with
only indirect evidence that race predominated and the
design of a district can be explained by traditional
districting criteria, the plaintiffs have not satisfied
their burden of proof."  Ante, at 25.  The majority
erroneously finds dispositive the mere possibility that
traditional race-neutral criteria could explain a
district's boundaries.  This categorical approach does
not comport with the Supreme Court's guidance.

The injury underlying a racial gerrymandering claim stems from the racial classification itself, not the classification's outward manifestations. <u>Miller</u>, 515 U.S. at 913 (observing that the "racial purpose of state action, not its stark manifestation" is "the constitutional violation"). The harms stemming from a racial gerrymander "include being personally subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1265 (brackets, ellipses, citations, and internal quotation marks omitted). Therefore, if a plaintiff can prove that the State predominantly relied on race when drawing district lines, a cognizable injury exists even if that classification did not distort the district's shape or otherwise violate traditional redistricting principles. <u>Miller</u>, 515 U.S. at 910-914.

Race predominates when race dwarfs other considerations and functions as an overriding factor determining the placement of district lines. See Shaw II, 517 U.S. at 906-907 (rejecting the argument that predominance cannot occur "where a State respects or complies with traditional districting principles," because the legislature's ability to "address[] these interests does not in any way refute the fact that race was the legislature's predominant consideration") (brackets, citation, and internal quotation marks omitted).

Indeed, race sometimes strongly correlates with race-neutral criteria, such as partisan politics and communities of interest, including "shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches." Bush, 517 U.S. at 964 (plurality opinion). In other words, a boundary line actually drawn for race-based reasons could easily be explained after-the-fact by pointing

instead to party affiliation or a railroad boundary. Were our analysis focused merely on identifying 'race-neutral justifications' for a district's boundaries, we would frequently be able to find them, even in the most egregious circumstances where race served as the one and only factor actually motivating the drafters.

Moreover, the majority's requirement of "direct evidence" when "the design of a district can be explained by traditional districting criteria" cannot be reconciled with the thrust of the Supreme Court's decisions in <u>Miller</u> or this case.  In <u>Miller</u>, the Court stated that a plaintiff may establish racial predominance "<u>either</u> through circumstantial evidence of a district's shape and demographics <u>or</u> more direct evidence going to legislative purpose."  <u>Miller</u>, 515 U.S. at 916 (emphasis added).  The Court proceeded to rely heavily on circumstantial evidence of the district's shape and its use of land bridges, together

with the relevant racial demographics, in reaching its conclusion that race predominated, even though the State offered "various alternative explanations" for the district based on traditional districting principles. Id. at 918-19. In our case, the Court reiterated the principle that circumstantial evidence alone may be enough to establish predominance. Ala. Legislative Black Caucus, 135 S. Ct. at 1267. This analysis forecloses the majority's insistence that race predominates only when a district contains direct evidence of race-based decisionmaking or explanations based on traditional districting criteria are impossible.

As an analytical matter, direct evidence is not an inherent aspect of the constitutional harm or an essential element of a racial gerrymandering claim. Circumstantial evidence of racial intent can be just as potent as direct evidence, and the mere fact that traditional race-neutral districting principles 'might'

explain what the legislature did does not mean that the legislature in fact predominantly utilized those principles.  For example, if the evidence shows the jurisdiction set a particularly high racial target and the drafter states that he moved large numbers of voters in and out of the district to reach that target, with those moved in being almost all black and those moved out being almost all white, a court could conclude from this circumstantial evidence that race predominated, even if the district were relatively compact and consistent with other traditional redistricting principles.  See Ala. Legislative Black Caucus, 135 S. Ct. at 1263 (indicating that stark demographic evidence is significant when observing that the legislature sought to maintain a black population of 72.75 % in a challenged district that added 15,785 new individuals, only 36 of whom were white).

Similarly, a showing that the legislature relied on racial data and did not consider non-racial information

that might otherwise explain the challenged district's lines could establish predominance even in the absence of direct evidence based on the drawing of district lines.  See, e.g., Bush, 517 U.S. at 966-967 (plurality opinion) (emphasizing that the State had detailed racial data available but not other data concerning traditional districting principles).

Accordingly, racial-predominance analysis should involve a holistic determination whether "the legislature subordinated traditional race-neutral districting principles ... to racial considerations." Ala. Legislative Black Caucus, 135 S. Ct. at 1270 (quoting Miller, 515 U.S. at 916).  The key word here is "subordinated."  That is to say, because the statewide evidence establishes that the legislature's approach prioritized race, see, e.g., Tr. Vol. I (doc. no. 215) at 63:4-9, 124:16-22 (Dial describing avoiding retrogression as the "ultimate goal" and "first priority"), then so long as there is some evidence,

direct or circumstantial, corroborating the application
of that overarching approach to a district, it is
appropriate to find that race predominated over
race-neutral criteria. A demonstration that
race-neutral factors might also explain some of a
district's boundaries does not necessarily negate that
conclusion.

The majority's analysis of SD 24 demonstrates its
error: It credits the State's argument that the
district's expansion into a portion of Pickens County
that was 74 % black and exclusion of a portion of the
county that was 75 % white did not count as evidence of
racial predominance because the State did so using
smooth lines that hugged the state border. See ante,
at 136. But that use of valid race-neutral criteria
does not end the analysis. Instead, we must consider
evidence of the State's application of its policy to
the district and its role in the overall design of the
district; in SD 24, the plaintiffs pointed to both

preservation of the racial target--exceeded by just +0.44 %--and testimony from two legislators that the State was keenly aware of its mechanical targets when drawing at least some of the district's boundaries. See infra at 131-34.  Indeed, Dial frankly admitted that SD 24 expanded into Pickens County because the district "had to have more minorities."  Tr. Vol. I (doc. no. 215) at 48:19-25.  Viewed as a whole, the evidence clearly establishes racial predominance even though the State's use of valid race-neutral criteria also affected some of the district's boundaries.

Instead of halting the predominance analysis where traditional race-neutral criteria can explain some of a district's boundaries, I would consider whether there is evidence, direct or circumstantial, that race affected some of the district's boundaries and then determine whether race or race-neutral criteria predominated over those criteria when looking at the district as a whole.  In equal-protection analysis, we

must ask why the drafters actually made the choices they did--that is, what was their motive--regardless of the range of other possible explanations; that a drafter could have drawn a boundary in a particular way to achieve ends other than race does not prove that racial considerations did not in reality predominate over race-neutral ones in the State's ultimate design of the district. Shaw II, 517 U.S. at 908 n.4 (stating that strict scrutiny requires interrogation of a legislature's "actual purpose," not "speculation about what 'may have motivated'" it). Where two possible explanations exist, those possibilities must be viewed in the context of the State's policy of meeting racial targets if the evidence reflects that it had an overarching role in the design of the district.

  ii.  State's Policy of Meeting Racial Targets

  Moreover, the majority's statement and repeated application in its district analyses that "When the

plaintiffs proceed with only indirect evidence that race predominated and the design of a district can be explained by traditional districting criteria, the plaintiffs have not satisfied their burden of proof," overlooks, or at least places too little weight, on the State's express policy of meeting racial targets.  In other words, while this policy, by itself, is insufficient direct evidence to establish racial predominance, it is still important evidence in making a determination as to whether race predominated as to any district.

As the Supreme Court found, when drawing the 2012 House and Senate plans, the State employed a policy of attempting to draw majority-black districts in such a way that the percentage of black population in the new districts matched the percentage under the district's old lines.  Ala. Legislative Black Caucus, 135 S. Ct. at 1267.  The State prioritized that policy "above all

other districting criteria (save one-person, one-vote)." Id.

To be sure, as stated, the existence of a racial target does not, by itself, establish predominance. A racial target may end up playing little or no role in how a particular district's lines are actually constructed. And even when a racial target is one motivating factor in the drawing of some lines, race may still not predominate over other non-racial factors in the design of the district as a whole.

Nevertheless, the existence of a racial target does not drop out of the picture in a court's analysis whether the racial-predominance standard is met. It "provides evidence," Ala. Legislative Black Caucus, 135 S. Ct. at 1267--and sometimes very compelling evidence--of the State's use of race. But all racial targets should not be treated equally. They may vary in nature, the circumstances of their creation, and the circumstances of their application.

A legislature might use a racial target to preserve (not too many and not too few) the same percentage of minority voters in a district.  A legislature might use a racial target as a floor that could be low (for example, at or slightly above 50 % minority) or high (for example, above 60 % minority).  A legislature might use a racial target as a general guide or range or it might insist on mathematical precision such that the target becomes a driving force behind the district's boundaries.  Each of these factors impacts the evidentiary weight to be given the existence and use of a racial target.

Here, the targets were set at high percentages of minority population; they were most constraining (not too many and not too few); and reflected a rigorous intent to reach as many majority-black districts as possible.  Ample testimony from the drafters provides direct evidence that the State had a policy of maintaining, to the extent practical, black percentages

in every majority-black district.  Hinaman explained that he "tried to draw those [majority-black] districts as close to the [black percentage] numbers as possible and practicable as they were in the 2001 plan."  Tr. Vol. III (doc. no. 217) at 164:4-7.  Senator Dial testified that avoiding retrogression was the "ultimate goal" and "first priority."  Tr. Vol. I (doc. no. 215) at 63:4-9, 124:16-22.  Dial instructed Hinaman that, "We didn't want to regress any of the [majority-black] districts" and, "We wanted to make sure the [majority-black] districts stayed as they were and we did not do away with any and that the population, as they grew, that they grew into the same proportion of minorities that they originally had or as close to it as we could get it."  Dial Dep., APX 66 (doc. no. 125-3) at 17:7-22 (emphasis added).  Representative McClendon explained the same approach for House districts: "[W]e tried to look at the 2010 census, overlay it on the districts, and try not to change the

percentages of the citizens, the black citizens, in a district any more than we had to. Tried to keep them in about the same proportion as they were." Tr. Vol. III (doc. no. 217) at 222:8-12. Hinaman explained his focus on maintaining the black percentage in each district, which superceded the race-neutral criterion of keeping precincts whole: He "may add a white precinct, a majority white precinct and a majority African American precinct; but if you look at the end number, if it did not retrogress the overall end number [in that district], then they were added in. If for some reason they retrogressed that number, then ... [he] would split precincts." Tr. Vol. III (doc. no. 217) at 144:2-7.

Indeed, where other three-judge panels have applied <u>Ala. Legislative Black Caucus</u> to <u>Shaw</u> claims, they have each recognized that racial targets deserve significant weight. <u>See</u> <u>Covington v. North Carolina</u>, 316 F.R.D. 117, 140 (M.D.N.C. 2016) (three-judge court)

68

(concluding, after describing legislative purpose to achieve racial target of 50 % plus 1 in majority-black districts, that "[f]or <u>all</u> the challenged districts, the overwhelming statewide evidence provides decisive proof that race predominated." (emphasis added)); <u>Harris v. McCrory</u>, 159 F. Supp. 3d 600, 610 (M.D.N.C. Feb. 5, 2016) (three-judge court), prob. juris. noted, 136 S. Ct. 2512 (2016) (concluding that race predominated where "overwhelming evidence in this case shows that a BVAP [black voting age population]-floor, or a racial quota, was established in [the challenged districts]"); <u>Bethune-Hill v. Va. State Bd. of Elections</u>, 141 F. Supp. 3d 505, 524 (E.D. Va. 2015) (three-judge court), prob. juris. noted, 136 S. Ct. 2406 (2016) ("[<u>Ala. Legislative Black Caucus</u>] could not be clearer that use of racial BVAP floors constitutes

evidence--<u>albeit</u> significant evidence--of predominance.").[14]

Moreover, one must also not lose sight of the big picture presented by circumstantial evidence. Here, the drafters hit their racial target within three percent in 21 of 36 majority-black districts, and even more precisely within one percent of the target in 16 of those districts, including all ten districts for which I conclude that race predominated but the majority does not. If something happens once, it could be a coincidence; if it happens again and again and again--indeed, most of the time--that is unmistakable evidence of intent. The fact that, over and over

---

14. Although each panel recognized that racial targets deserved significant evidentiary weight, factors specific to each State's application of the targets impacted the ultimate predominance conclusions. For example, in <u>Bethune-Hill</u>, the 55 % BVAP target was relatively low and the panel found only that the target was "used in structuring the districts," not that the legislature mechanically applied it. 141 F. Supp. 3d at 519.

again, the drafters hit their racial target provides very compelling circumstantial evidence that it is what they intended to do.

Finally, my approach--which considers the nature of the racial target, the circumstances of its creation, and the circumstances of its application--does not result in a "per se" finding of racial predominance or a "rebuttable presumption," ante at 48, 247, as I agree with the majority that race did not predominate in 12 districts in large part because this circumstantial evidence does not apply in those districts. Indeed, I am not saying that my approach compels a finding of racial predominance; I just think the evidence should not be ignored.

### iii. Alternative Plans

The majority states that, "If an alternative district has identical lines, we take the plaintiffs' offering of that plan as a concession that race did not

predominate in the enacted district." <u>Ante</u>, at 35. The majority overstates its case.

In racial-discrimination cases, whether the defendant intentionally discriminated turns on information the defendant considered before its decision. Thus, in <u>McKennon v. Nashville Banner Pub. Co.</u>, 513 U.S. 352 (1995), the Supreme Court rejected an after-the-fact justification for the challenged action because "[t]he employer could not have been motivated by the knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." <u>Id.</u> at 360. While the inquiry is more challenging when a <u>Shaw</u> claim depends on circumstantial evidence of legislative intent, the same equal-protection principle applies: what ultimately matters is the State's intent at the time it drew district lines. <u>See, e.g.,</u> <u>Shaw II</u>, 517 U.S. at 910 (refusing to credit State's reliance on historical and social science reports to justify its race-based

approach because reports were created after districts
had been drawn).  Alternative maps generated only after
the enacted districts have been drawn do not
necessarily preclude a finding that race predominated
where the plaintiff has otherwise met its burden.
Because, as I have indicated previously, application of
race-neutral criteria can sometimes create the same
result as racial ones, see supra at 56-57, alternative
plans do not always dispositively establish that race
did not predominate, especially in the face of clear
evidence, direct or circumstantial, of the
legislature's intent.

Relying on Easley v. Cromartie, 532 U.S. 234
(2001), the State argues that the plaintiffs "'must
show at the least that the legislature could have
achieved its legitimate political objectives in
alternative ways that are comparably consistent with
traditional districting principles' and 'that those
districting alternatives would have brought about

significantly greater racial balance.'" Def. Remand
Br. (doc. no. 263) at 19 (quoting _Easley_, 532 U.S. at
258). The State's argument distorts _Easley_'s
evidentiary rule, applicable where the
racial-predominance inquiry depends entirely on
circumstantial evidence, and transforms it into a legal
element of all _Shaw_ claims, including those with direct
evidence of racial purpose.

This case is quite different from _Easley_, a case in
which the State defended a racial-predominance claim
with persuasive evidence that political gerrymandering,
rather than race, was the predominant motive of the
legislature, and had also demonstrated that race and
political party closely correlated. _Easley_ concerned a
North Carolina Congressional district that had been
redrawn after a finding that race unconstitutionally
predominated in _Shaw II_. The primary issue was whether
the legislature was predominately motivated by race or
partisan politics when it redrew the district. The

74

district court's conclusion that race predominated depended on an exhaustive examination of circumstantial evidence, including precinct splits, voter registration data, and alternative decisions the State could have made, to parse whether the legislature was predominately motivated by race or by creating a safe partisan district. Reviewing the district court's factual findings, the Supreme Court emphasized that "[c]aution is especially appropriate in this case" because "the State ha[d] articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." Easley, 532 U.S. at 242. In those circumstances, plaintiffs "must show at the least that the legislature could have achieved its legitimate political objective in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would

75

have brought about significantly greater racial balance." Id. at 258.

Easley does not apply to a case, like this one, where direct evidence of legislative intent indicates that the State "expressly adopted and applied a policy of prioritizing mechanical racial targets," Ala. Legislative Black Caucus, 135 S. Ct. at 1267, rather than pursuing a policy that prioritized partisan politics. While the State now attempts to justify its actions on political grounds, it previously relied on evidence of legislative intent which reflected prioritization of compliance with its understanding of § 5 nonretrogression. Indeed, instead of presenting evidence that the legislature pursued a legitimate political gerrymander, the State has consistently highlighted evidence showing that the Republican-led drafters accommodated the requests of Democrats. See Def. Remand Br. (doc. no. 263) at 19 n. 1 (cataloguing testimony that drafters incorporated requests of

76

incumbent Democrats).  The Supreme Court recognized as much in our case, citing <u>Easley</u> only as a contrast to the relevant predominance standard of <u>Miller</u>, and noting that <u>Easley</u> explained "the plaintiff's burden in cases, <u>unlike these</u>, in which the State argues that politics, not race, was its predominant motive." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1267 (emphasis added).  Three-judge panels have agreed that <u>Easley</u> does not apply in circumstances comparable to those here.  <u>See, e.g.,</u> <u>Covington</u>, 316 F.R.D. at 139 n.21 (three-judge court) (citing evidence that State defended partisan results of redistricting on grounds of Voting Rights Act compliance as "easily distinguish[ing] this case from the <u>Cromartie</u> cases, where there was substantial direct evidence supporting the State's 'legitimate political explanation for its districting decision'" (quoting <u>Easley</u>, 532 U.S. at 242)).

### iv.    District-Specific Evidence

The     majority     incorrectly     disregards
district-specific circumstantial evidence that reflects
actions   that   reduced   the   proportion   of,   or
inconsistently allocated, black residents.  Rather than
looking  for  corroboration  that  the  State  brought  its
racial  target  to  bear  in  a  particular  district,  the
majority  treats  the  plaintiffs'  claim  as  if  it  were
based  on  a  packing  concept,  citing  any  actions  the
drafters   took   to   reduce   the   black   population   to
repeatedly conclude that race did not predominate in a
particular  district.   But  because  this  case  is  not
about   packing,   but   rather   is   about   <u>preserving</u>
majority-black population percentages (not too many <u>and</u>
not too few), the majority's approach is wrong.

For  example,  despite  committee  guidelines  to  keep
precincts whole, the majority considers precinct splits

78

suspicious only if the precinct is split between a majority-black and majority-white district where the majority-black district received a greater percentage of black people. See ante, at 55 (concluding that precinct splits alone do not create inference of racial predominance, in part because several splits "placed a higher black population percentage in a majority-white district than a majority-black district"). Frequently, however, where the State achieved a racial target exactly, its calculation of the racial makeup of that district without split precincts demonstrates that it would not have been able to hit its target without splits. For example, in HD 52, the State accomplished its racial target (60.11 %) almost exactly (60.13 %); without the use of six split precincts, the State would have exceeded its target significantly, raising the black percentage to 64.50 %. Def. Precinct Split Analysis (doc. no. 263-3) at 5. Nonetheless, the majority accorded no weight to the precinct splits

because they did not demonstrate a "clear pattern." See ante, at 246. Although the splits reduced the black percentage of the population, they ultimately helped the drafters reach their target; the precinct splits therefore provide evidence that race predominated when viewed in the context of the statewide policy.

The crucial problem with the drafters' approach is not that they used non-traditional districting criteria to create improperly majority-minority districts, but that they disregarded traditional race-neutral criteria to achieve racial targets in their maintenance of existing majority-minority districts. When conducting a district-specific analysis of racial predominance, that statewide goal must guide our approach. Circumstantial evidence that the State ignored traditional race-neutral districting criteria to inch closer toward its racial target--even if it lowered the percentage of black population in the district--serves

as powerful evidence that the State's racial target was brought to bear in a district.

Historically, the Court has identified evidence of racial predominance in a _Shaw_ claim where a legislature's disregard of traditional race-neutral criteria placed more minority than white citizens in a challenged district. But, in each prior case, the racial-gerrymandering claim involved a challenge to the _creation_ of a majority-minority district, which necessarily involves efforts to add high percentages of minority population. _See Shaw I_, 509 U.S. at 635-636 (citing evidence that district "winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas until it gobbles in enough enclaves of black neighborhoods" (internal quotation marks and citation omitted)); _Miller_, 515 U.S. at 917 (affirming racial-predominance conclusion based in part on evidence "of narrow land bridges to incorporate within the district outlying appendages containing nearly 80 %

of the district's total black population"); <u>Bush</u>, 517 U.S. at 973 (plurality opinion) (relying on evidence that district's "many narrow corridors, wings, or fingers ... reach out to enclose black voters, while excluding nearby Hispanic residents." (internal citation and quotation marks omitted)).

In our case, in contrast, the plaintiffs' racial-predominance theory rests on direct evidence concerning the drafters' method of <u>maintaining</u> (not too many <u>and</u> not too few) the percentage of blacks in majority-minority districts using mathematically precise ways. Here, a racial-predominance finding could be supported by evidence that the drafters applied a race-based approach to achieve a racially precise allocation of residents in existing majority-black districts. In some districts, the drafters needed to add large amounts of new black population to achieve that goal; but to achieve that goal in other districts, the drafters needed to add new

82

white population so they could reduce the black population percentage, or they needed to sweep in and out large amounts of populations of both races. In other words, evidence that the State swooped large amounts of black population into a district is not the only type of evidence that supports a racial-predominance finding here.

To be sure, the Supreme Court's model analysis based on SD 26 also looked to the exceptionally high percentages of black population added to the district using non-traditional districting criteria. The Court described the drafters' "remarkable feat" of adding a mere 36 white individuals to the district despite adding a total population of 15,785. Ala. Legislative Black Caucus, 135 S. Ct. at 1271. The Court also noted that precincts split between a majority-black and a majority-white district were "clearly divided on racial lines," with heavily black portions of the precincts added to majority-black SD 26 and heavily white

portions of the precincts added to majority-white SD
25. Id.

But the Court also recognized the importance of the
drafters' approach to determining the racial
composition of existing majority-minority districts.
The Court approvingly cited the majority's prior
conclusion that the legislature "'preserved' 'the
percentage of the population that was black,'" Ala.
Legislative Black Caucus, 135 S. Ct. at 1271 (quoting
Ala. Legislative Black Caucus, 989 F. Supp. 2d at
1306). SD 26 had a remarkably high 75.13 % black
population, the district with the second highest black
percentage of any majority-black district in Alabama.
See District Statistics Report, Def. Ex. 400 (doc. no.
30-39) at 3. As such, in that district, preserving the
black percentage of the population required obvious
disregard of race-neutral criteria to add sufficient
black population. But preserving a black percentage
with mechanical precision does not only require adding

84

black population; it requires achieving a racial
balancing that sometimes involved the use of precinct
or county splits, irregular appendages, and land
bridges to discard 'excess' black population that would
have otherwise left the State too far afield of its
target. Where a district's shape is "unexplainable on
grounds other than the racial quotas established for
those districts," evidence of "utter disregard for
traditional redistricting criteria" provides strong
evidence that race predominated--regardless of whether
that evidence reflects an additive or subtractive
effect on the minority population in that district.
Bush, 517 U.S. at 976 (plurality opinion) (citation and
quotation marks omitted).

    By any measure, the State routinely disregarded
race-neutral districting criteria to achieve a racial
target, even if its failure to apply race-neutral
criteria reduced the minority percentage in the
district.

v.   "Significant Number of Voters"

Finally, the majority used an overly rigid numerical minimum in its predominance analysis. To establish racial predominance, the plaintiffs "must show that 'race was the predominant factor motivating the legislature's decision to place a <u>significant number of voters</u> within or without a particular district." <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1270 (quoting <u>Miller</u>, 515 U.S. at 916) (emphasis added). The Supreme Court has never quantified a "significant number of voters." Frequently, the Court has relied on dramatic statistics that made a racial-predominance conclusion obvious in that case, but provides little clarity for three-judge panels required to navigate "the complex interplay of forces that enter a legislature's redistricting calculus." <u>Miller</u>, 515 U.S. at 915-16. For example, in <u>Miller</u>,

the Court approvingly cited the panel's conclusion that the use of a narrow land bridge to incorporate 80 % of a district's total black population made it "exceedingly obvious" that the drafters deliberately used race.  Id. at 917.  In Bush, the plurality found "utter disregard of ... local election precincts" where 60 % of the challenged districts' residents lived in split precincts.  517 U.S. at 974.

In our case, the Court likewise did not clarify the statistical minimum extent of racial impact.  The Court's model analysis concluding that race predominated in SD 26 relied on seven precinct splits, "with the population in those precincts clearly divided on racial lines," without quantification of that racial division.  Ala. Legislative Black Caucus, 135 S. Ct. at 1271.  The Court also cited the relative proportion of new population, noting that adding just 36 white individuals out of 15,785 total residents was a "remarkable feat."  Id.

Other three-judge panels have concluded that race predominated in districts where race explained the placement of only a small percentage of a district's population.  In fact, facing evidence that a white incumbent legislator was excluded from a district because of her race, the panel contemplated the possibility that this alone was enough for race to predominate: "It is not clear whether the addition or removal of one person on the basis of race could be sufficient to establish that race predominated in the drawing of a district."  Covington, 316 F.R.D. at 149 n.28 (three-judge court).  Nonetheless, the panel concluded that a "significant number of voters" had been excluded where direct evidence established that the legislature arbitrarily increased a recommended minority percentage by less than one percentage point (0.58 %).  Id.  Another panel in that district described a 6.89 % increase in the black voting age population as "whopping," and, where it corroborated

direct evidence of legislative intent to achieve a racial quota, sufficient to establish racial predominance. <u>Harris</u>, 159 F. Supp. 3d at 618 (three-judge court).

Sometimes, my racial-predominance analysis considers the number or proportion of voters in a given district that were placed within or without the district because race-neutral criteria had been ignored. But the degree the drafters hit their racial target also matters here. The Supreme Court approvingly cited, as evidence of racial predominance, the majority's previous finding that SD 26 "preserved" its percentage of minority population, where the district had a 72.69 % black population and was redrawn with a 75.13 % black population. <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1271. In other words, the Court agreed that coming within 2.44 % of a racial target provided circumstantial evidence of racial predominance. In each of the districts I discuss

89

below, the State came within less than 1 % of hitting its racial target.

Although the Court and prior panels offer statistical guideposts for the predominance analysis, I proceed not with unwavering reliance on a calculator and statistically precise determinations, but with adherence to first principles. Race-conscious redistricting that separates a "significant number of voters" or "preserves" the minority percentage in a district obtains constitutional significance because it signals state-sponsored endorsement of the idea that voters may be identified and sorted principally based upon race. In Shaw I, the Supreme Court applied equal-protection principles to redistricting because it recognized that legislative action that classifies citizens based on race is inconsistent with principles of equality and stigmatizes individuals solely by reason of their membership in a racial group. 509 U.S. at 643. A district warrants a racial

90

predominance-finding where race had a significant
enough impact to realize these harms.

B.   Application of Racial-Predominance Standard

Having laid out my disagreements with the
majority's approach to racial predominance, I will now
turn to the individual districts and, applying the
Supreme Court's guidance in this and past cases,
explain why I would reach different conclusions from
the majority's on a number of the challenged districts.

In assessing each district, I will follow the
three-step approach the Supreme Court used in assessing
SD 26: <u>First</u>, I start with direct evidence reflecting
the "primary redistricting goal [] to maintain existing
racial percentages in each majority-minority district,
insofar as feasible"; <u>second</u>, I look at circumstantial
evidence in the record to see whether "this goal had a
direct and significant impact on the drawing of at
least some of [the district's] boundaries"; and, <u>third</u>,

I look for evidence of race-neutral factors actually considered by the drafters and determine whether those factors, or race-conscious decisions, predominated in the overall design of the district.  Ala. Legislative Black Caucus, 135 S. Ct. at 1271.

In the discussion of individual districts that follows, I focus in particular on the following corroborating circumstantial evidence: (1) how closely the drafters hit the prior percentage of black population in each district; (2) the frequency of county and precinct splits, and the comparative racial composition of those splits; (3) the ratio of blacks to whites added to the district; and (4) the shape of the district.  See Ala. Legislative Black Caucus, 135 S. Ct. at 1271 (assessing each factor).  Like the majority, I also weigh the net population change relative to the level of under-population--in other words, I examine whether the State reshuffled the

district's inhabitants significantly more than its equal-population objectives required.

Moreover, with regard to the ten districts for which I conclude that race predominated, it must be kept in mind that evidence that the drafters hit, within one percentage point, their admitted target of maintaining existing racial percentages paints a clear picture that the racial percentage in each district was specifically intended.   As previously stated, if something happens once it may be coincidence, but, if it happens again and again and again, that is unmistakable evidence that it was intended.


   i.   Jefferson County (HDs 52, 55, 56, 57, and 60)

   I conclude that race predominated in five Jefferson County House Districts:   HDs 52, 55, 56, 57, and 60. At the heart of assessing the drafters' approach to race in Jefferson County--and indeed, across the State--was the decision to extract a majority-black

93

House district from the County (HD 53) and move it far
north to create a new majority-black district composed
entirely of Madison County residents.   Although the
majority and I agree that race predominated in HD 53,
the majority bases its decision solely on factors
specific to the district's new location in Madison
County.   In doing so, the majority fails to account for
testimony from the drafters that serves as direct
evidence that race played a central role in their
decision to unnecessarily reshuffle residents of
Jefferson County House districts based on an incorrect
interpretation of § 5 compliance.   Under the 2001 map,
HD 52, 55, and 60 were each contiguous to HD 53 and, as
a result, experienced substantial unnecessary
population change under the new plan as each inherited
black population from HD 53.   HD 56 and 57, although
located southwest of HD 53 in the 2001 map and
separated from it by HD 52, also experienced
substantial population change because of the

94

significant reshuffling of Jefferson County's black population.

Beyond this direct evidence, significant corroborating evidence that race predominated in the drafters' approach may be found in each district: precise matches of racial targets; substantial reliance on split precincts, without which those targets would not have been achievable; the movement of significantly more population in and out of the district than necessary; and sometimes irregularly shaped districts. These factors contribute to my conclusion that race predominated in five Jefferson County House districts not recognized by the majority.

> a.   Impact of Racial Predominance in HD 53
>         on Surrounding Districts

Although, as stated, I agree with the majority that race predominated in the drawing of HD 53, I reach that conclusion on different grounds. Race played a

95

significant role in the drafters' decision to move HD
53 from Jefferson County.  That transfer, which enabled
House districts within Jefferson County to achieve
mathematically precise racial targets, should be given
significant weight in the predominance analysis of its
surrounding districts.

As I previously explained, the drafters created for
themselves an enormous challenge through their very
specific (but incorrect) understanding of § 5
compliance, combined with a no-greater-than-2 % ideal
population-size deviation.  See Ala. Legislative Black
Caucus, 989 F. Supp. 2d at 1314-17 (Thompson, J.,
dissenting).  Because of the reapportionment
committee's decision to tighten significantly the
deviation, many majority-black districts required the
addition of significant black population to avoid
'under-population.'

Nowhere was the effect of that unnecessary
challenge felt more acutely than Jefferson County,

96

where compliance with the drafters' approach required the addition of approximately 70,000 black people to the county's existing majority-black House districts--the equivalent of a district and a half. Tr. Vol. III (doc. no. 217) at 132:22-25 - 133:1. Because Hinaman "knew that most of the--if not all of the minority neighborhoods were already included in those districts," he concluded that "trying to repopulate them to get them back to deviation was going to retrogress most if not all of them." Id. at 133:1-5; see also McClendon Dep., APX 67 (doc. no. 125-4) at 100:12-14 (testifying that "[a]ll of the districts--Jefferson County minority districts were underpopulated, and we had to get the people from somewhere"). To overcome that self-inflicted challenge, Hinaman recommended and the legislature ultimately adopted a plan that moved HD 53 from Jefferson County to Madison County, reducing by one the number of majority-black House districts in Jefferson

County.   Hinaman then used the black Jefferson County
residents living within former HD 53 to add population
to the remaining majority-black districts in the area.

The majority concludes that the relocation of HD 53
"provides no evidence that race predominated," although
it finds that race still predominated in the drawing of
the district because of five suspicious precinct splits
specific to the district's new location in Madison
County.   See ante, at 206, 223-28.   For the majority,
HD 53's move can be explained solely on the ground of
"massive underpopulation."   Id. at 238.   To the
drafters, however, the tight deviation that resulted in
such dramatic under-population in Jefferson County was
inseparable     from     their     mechanical     view     of
retrogression.

The drafters' incorrect approach to retrogression
meant   that   even   Jefferson   County's   majority-black
districts with a population well-above 50 % black, such
as HD 55 (73.55 % black) and HD 57 (68.42 % black),

98

required a massive influx of black population to avoid even the slightest reduction in the percentage of black population. The drafters appeared to be completely oblivious to the ripple effects caused by unnecessarily high requirements for black population in any given district--and completely oblivious to the level of black population actually necessary to elect black voters' candidates of choice. When Representative McClendon was asked if he had been advised that certain percentages of minority population in specific districts would be too high and could raise concerns about packing, McClendon testified that he had not. McClendon Dep. (doc. no. 125-4) at 106:10-18 ("I haven't been advised that if you go over a certain number [of minorities out of the total population in a district], you're in trouble."). Senator Dial likewise testified that he "did not consider any [black percentage] too high," and agreed that his objective was to construct "guaranteed black safe districts,"

99

without any apparent concern about packing.  Tr. Vol. I
(doc. no. 215) at 56:5-12, 18-21.



Jefferson County House Districts, 2001 Map, showing HD 53 at its
center.  Def. Ex. 480 at 2 (excerpt).



Jefferson County House Districts after redistricting, reflecting
departure of HD 53.  Def. Ex. 479 at 2 (excerpt).


District-specific evidence corroborates the
drafters' intent to flood Jefferson County House
districts with new black population to preserve the
existing percentages: six of the eight majority-black
Jefferson County House districts reached a black

101

percentage of the population within one percentage point of the target, reflecting an unmistakable pattern that stretches credulity to view as a coincidence.[15] Despite these efforts to achieve mathematical precision, the record reflects not even a modest effort by the drafters to determine the actual percentage necessary for black voters in Jefferson County to have the opportunity to elect their candidate of choice. See 52 U.S.C. § 10304(b). Had the drafters undertaken this analysis, they would have concluded that black voters in Jefferson County districts would have safely maintained the opportunity to elect their candidate of choice with a lower percentage of black population, in part because of support from other minorities and whites for the preferred candidate of black voters. Lichtman Witness Summary (doc. no. 168-1) ¶ 25 & Table

---

15. HD 52 (+.02 %); HD 54 (+.10 %); HD 55 (identical match); HD 56 (+.01 %); HD 57 (+.05 %); HD 60 (+.27 %). Comparison of Minority Percentages (doc. no. 263-2) at 2.

7 (concluding, as to illustrative alternative districts, that 55.7 % black population would have maintained safe black opportunity to elect in Jefferson County).[16]   Further, the drafters' approach made no attempt to preserve all of Jefferson County's majority-black districts by eliminating unnecessarily high black percentages.  The ALBC plaintiffs' 1 % House Plan demonstrates that doing so was possible: it preserved all nine majority-black House districts in Jefferson County, including HD 53, by reducing the percentages of black population in certain districts. See ALBC Plfs. Comparison of Black Percentages and Deviations, APSX 492.  For example, the plan drew HD 52 with a 56.64 % black population (instead of 60.13 % in the State's plan); HD 55 with a 57.85 % black population (instead of 73.55 % in the State's plan);

---

        16.  The majority previously credited Lichtman's testimony on this subject.  See Ala. Legislative Black Caucus, 989 F. Supp. 2d at 1271.

and HD 60 with a 53.49 % black population (instead of 67.68 % in the State's plan).  Id.

Because "race was the predominant factor motivating the legislature's decision to place a significant number of voters ... <u>without</u>" HD 53, it was also the predominant factor motivating the decision to place those same voters "within" the remaining majority-black districts of Jefferson County.  <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1270 (quoting <u>Miller</u>, 515 U.S. at 916) (emphasis added).


      b.    HD 52 (Central Birmingham)

The State's devotion to a racial target is convincingly demonstrated in HD 52.  The State matched the percentage of black population nearly identically: from 60.11 % black in 2001 to 60.13 % in 2012.  That feat is extraordinary in and of itself, but takes on added significance given the extent of the changes to the district.  Although the district was

104

under-populated by a relatively modest 2,362 people, see District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 4--the least under-populated of any majority-black Jefferson County district--the State nonetheless moved 19,284 people in and out of the district and still achieved virtually the exact same racial proportion. House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4.  In other words, the drafters moved eight times more people than necessary to address under-population, and shifted a population 43 % of the size of the district's total population (45,083) to accomplish its racial target.  Id.; District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 4.  The State's quota required an additional 1,157 black people; the drafters added a net total of 1,134.  House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4.  This feat "represents racial sifting down to the finest level, a racial exactitude that would be admirable in its skill if it were not

105

illegal." <u>Ala. Legislative Black Caucus</u>, 989 F. Supp.
2d at 1330 (Thompson, J., dissenting).

Nonetheless, the majority concludes that the
percentage match was not "suspicious" because the
alternative plans were close enough to the same racial
percentage, and two proposals even reflected a higher
percentage of black population than the enacted plan.
<u>See</u> <u>ante</u>, at 243-44. But there is a crucial
distinction between a district with a 55.64 % black
population under the ALBC 1 % Plan or 57.90 % black
population under the Democratic Conference Plan and the
ultimately enacted plan with a 60.13 % black
population. Beyond the principle that alternative
plans created after the challenged redistricting shed
little light on the drafters' intent, the difference in
percentages in the alternative plans--compared to the
near-identical black percentage in the enacted
plan--belies this argument. While the enacted plan was
only 0.02 % removed from the targeted percentage of

106

black population, achieving a mathematical precision
that creates a strong inference of intent, the
plaintiffs' post-remand plans were 4.47 % and 2.21 %
away from the target, which suggests only that
demographic realities in Jefferson County led to a
result in the same ballpark.

The State also used six split precincts in HD 52 to
achieve the nearly identical racial percentage. The
majority concludes that split precincts in HD 52 "prove
nothing with respect to race," explaining that the two
precincts split between majority-black and
majority-white districts contain nearly identical
percentages of black population, while the remaining
precincts divided between majority-black districts
display no clear pattern. Ante, at 246. But the six
precinct splits incorporated into HD 52 are notable not
because the State used them to pack black people into
existing majority-black districts--as the majority's
disregard for this evidence assumes--but because,

107

without them, the State would have been too far afield of its racial target.  The State reports that unsplitting all of the split precincts in HD 52 would increase the black percentage in HD 52 from 60.13 % to 64.50 %.  Def. Precinct Split Analysis (doc. no. 263-3) at 5.  As the majority has itself concluded as to another district, precinct splits that "appear[] to make the difference between hitting and missing the target" contribute to a finding of racial predominance. See ante, at 247 (explaining basis for finding racial predominance as to HD 54).  Because the drafters were not concerned if majority-black districts were packed with too many black people, see supra, at 99-100, the only logical inference to explain their use of split precincts to lower the black population percentage is that the race-neutral districting principle and committee guidelines that required keeping precincts whole were subordinated to the goal of meeting the drafters' racial target.

108

As HD 52 demonstrates, the crucial improper feature of the drafters' approach is not that it used non-traditional districting criteria to place significantly more black people into majority-black districts (although it may well have done that in certain districts), but that it used non-traditional criteria to achieve racial targets. Because the majority weighs evidence of the former but not evidence of the latter in its predominance analysis, it fails to identify clear examples of racial predominance. By any measure, that latter approach--using non-traditional criteria to achieve a racial target--was brought to bear in the drawing of HD 52.

c.   HD 55 (Northwest Birmingham)

The story is similar in HD 55. The drafters inherited a district that was 73.55 % black, and they spit out a district that remained exactly 73.55 % black See Minority Percentages Comparison (doc. no. 236-2) at

109

2.  Even though the district borders HD 52 (which has a
black population more than 13 % lower than HD 55), and
even though HD 55 experienced substantial geographic
and  population  change,  its  proportion  of  black
residents did not.  The State managed to accomplish its
racial target to a tee even though HD 55 was among the
most  under-populated  districts,  9,949  people  (or
21.86 %)  short  of  the  ideal  population.   District
Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 5.
The State moved in and out 28,143 people to reach its
target, with a net total of 6,967 blacks (73 %) and 730
whites  (8 %)  added  to  the  district.   Minority
Percentages Comparison (doc. no. 236-2) at 2; House
Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex.
4.





HD 55 (2001).  Map, Def. Ex. 480
        at 2 (excerpt).

HD 55 (2012).  Map, Def. Ex. 479
        at 2 (excerpt).

Geographically, the new district became substantially more irregular, transformed into a thin, snake-like band that runs primarily north-south except for the addition of a portion of former HD 53 in its new southeastern corner.  Map, Def. Ex. 479, at 2.  HD 55 includes four precincts that had been encompassed by the former HD 53 and are now shared with other Jefferson County majority-black districts:  Center Street Middle School, Glen Iris Elementary School,

111

Legion Field Lobby, and Ramsey Alternative High School.
2001 House District Precinct Splits, Def. Ex. 413, at
31; 2012 House District Precinct Splits, Def. Ex. 405,
at 106-07.

The State attributes the high black percentage in
HD 55 to black population growth specific to "this
portion" of Jefferson County.  Def. Remand Br. (doc.
no. 263) at 120.  But the State overlooks that the new
HD 55 is substantially different geographically under
the 2012 plan than it was in 2001.  While the district
previously extended further west along the natural
boundary of Birmingport Road (State Highway 269), the
district's western stretches were engulfed by HD 16 and
HD 57.  In addition, the southern portion of the
district now extends further east into what had been HD
53.  Compare 2014 Map, Def. Ex. 479, to 2001 Map, Def.
Ex. 480.  Of the 19 precincts that comprise the new HD
55, 12 precincts were not within the district in 2001.
2012 House District Precinct Splits, Def. Ex. 405, at

112

106-07; 2001 House District Precinct Splits, Def. Ex. 413, at 32-33.  The State's attempt to justify a race-neutral approach, like the lines of HD 55, rests on shaky ground.

Because it is impossible to explain the State's preservation of the identical racial percentage in HD 55 for reasons other than the State's laser focus on race and because applying that percentage target significantly affected the district's lines, I conclude that race predominated over traditional race-neutral factors in the drawing of HD 55.

### d.   HD 56 (Southwest Birmingham)

Once again, the drafters hit their racial quota nearly spot on: HD 56 was 62.13 % black before redistricting and 62.14 % under the new plan.  The drafters drew a district just <u>four black people</u> removed from its target.  In light of the 14,241 people that entered or exited the district, that mathematical

precision qualifies as stunning circumstantial evidence that the statewide policy was brought to bear in HD 56. The drafters shifted substantial residents in and out of the district despite its relatively manageable under-population of 4,457 people--movement of more than three times the population size necessary to cure its under-population.  While doing so, the State added a net total of 2,489 blacks to the district compared to just 906 whites: 62.12 % of its new population was black, matching the district's 62.13 % racial target almost exactly.  House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4.

Like other Jefferson County majority-black districts, the legislature placed many black people "within" HD 56 because of the transfer of HD 53 to Madison County.  See Ala. Legislative Black Caucus, 135 S. Ct. at 1270 (quoting Miller, 515 U.S. at 916). Although HD 56 was not contiguous to the former HD 53 and thus its new boundaries did not encompass any of

that transferred district's residents, HD 56 swallowed many precincts from neighboring HD 52, which in turn replenished its supply from the previously contiguous, transferred HD 53.  See 2012 House District Precinct Splits, Def. Ex. 405, at 99-101, 108-09; 2001 House District Precinct Splits, Def. Ex. 413, at 31; 2001 Map, APX 40 (doc. no. 60-26); 2012 Map, APX 41 (doc. no. 60-27).

The majority makes much of the fact that alternative plans drawn by the plaintiffs appeared geographically similar to the enacted HD 56, while the proposed black percentages fell within four points of the enacted plan.  See ante, at 260-61.  Even according some weight to the alternative plans, there is a difference at the magnitude of 100 between the enacted plan, which falls 0.01 % away from the target, and the alternative plans, with even the tightest fit falling 1 % away from the target.  One plan and one plan only--the State's--demonstrates remarkable proximity to

a racial target; the alternative plans, even if in the same ballpark, are not so precise that they are "unexplainable other than by race." <u>Miller</u>, 515 U.S. at 917.

The majority and I agree that the shape and compactness of HD 56 are not suspicious.  We also agree that the manmade boundaries apparently used to split the Hunter Street Baptist Church precinct, <u>see</u> Precinct Map, APSX 114, relied on by the ALBC plaintiffs, likewise demonstrate another valid race-neutral criterion that defines at least some of the district's boundaries.  <u>See</u> Katherine Inglis Butler, <u>Redistricting</u> <u>in a Post-Shaw Era: A Small Treatise Accompanied by</u> <u>Districting Guidelines for Legislators, Litigants, and</u> <u>Courts</u>, 36 Univ. Rich. L. Rev. 137, 218 (2002) ("[P]recinct boundaries generally correspond to known landmarks and encompass reasonably compact geographic areas."). Nonetheless, HD 56's four split precincts allowed the district to hit its racial target:  without

doing so, the district would have been 61.34 % black, or 0.79 % above the target. Def. Precinct Split Analysis (doc. no. 263-3) at 9. Splitting precincts allowed the drafters to minimize that discrepancy to an almost unnoticeable 0.01 %.

The plaintiffs have established that the State matched its target racial percentage while addressing significant under-population, in the process shifting many more people within and without the district than necessary. This provides sufficient evidence that race had a "direct and significant impact" on the drawing of HD 56's boundaries. Ala. Legislative Black Caucus, 135 S. Ct. at 1271.


            e.    HD 57 (West Birmingham)

    HD 57 provides yet further evidence of the drafters' success at reaching their racial target in Jefferson County following the transfer of HD 53. With a racial target of 68.42 %, the State managed to enact

117

a plan with a 68.47 % black population in the district, leaving it just 20 black people over an exact match. District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 5; District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 5.   The drafters did so despite under-population of 9,322 people below the ideal population, or 20.48 % of the entire district. District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 5.   To accomplish those goals, the drafters moved 21,590 people in and out of the district.   House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4.



HD 57 (2001).  Def. Ex. 480 at 2    HD 57 (2012).  Def. Ex. 479
      (excerpt).               (excerpt).

Geographically, HD 57 had been compact under the old plan, but the drafters constructed an elongated district that runs north and south adjacent to and to the west of HD 55.  See Map, Def. Ex. 479.  In shape, the new district appears something akin to the naturally occurring landmass of the United Kingdom, with southwestern portions alternately jutting into and away from majority-white HD 15 (instead of toward Ireland), and a southeastern tip that extends so far

**119**

east it might have obviated the need for the Channel
Tunnel.   I do not agree with the majority that its
shape remains "compact" and is "not suspicious," see
ante, at 266-67, a criterion required under the
guidelines.   Reapportionment Comm. Guidelines (doc. no.
30-4) at 3 (requiring, pursuant to Alabama
Constitution, that "[e]very district should be
compact.").

The majority notes but accords little, if any,
weight to the "almost unchanged" black population
percentage, focusing its attention instead on
alternative plans that purportedly prove the resulting
percentage is not suspicious.   Were my analysis to
focus on alternative plans, I would reach the opposite
conclusion: the State's plan (at 68.47 % black) met its
target (68.42 %) so precisely while the alternative
plans fell several percentage points away (72.51 % and
66.1 %), providing strong evidence that race
predominated in the State's plan.   Comparison of New

Plans with 2012 Plans, Def. Supp. Ex. 64 (doc. no. 296-1) at 2.

The majority discounts the five precinct splits used to construct HD 57, including a split of the Pleasant Grove First Baptist Church precinct with majority-white HD 15. Through this split, the drafters placed a 51 % black population in majority-black HD 57 and a 22 % black population in majority-white HD 15, but the majority found that racial allocation non-problematic because the split was accomplished through a "relatively smooth J-shaped line." Ante, at 269. The reapportionment committee's guidelines do not support that result: valid criteria include respecting "voting precinct boundaries," Reapportionment Comm. Guidelines (doc. no. 30-4) at 3-4, but does not include an exception if those boundaries can be split through smooth lines. Accordingly, because this criterion, although race-neutral, was "not mentioned in the legislative redistricting guidelines," it may not

121

factor into our analysis.   See <u>Ala. Legislative Black</u>
<u>Caucus</u>, 135 S. Ct. at 1271-72.   In any event,
regardless of whether the split was "smooth" or not,
the State's neglect of a race-neutral criterion
(keeping precincts whole) had a sizeable effect on the
racial composition of the district.   Further, had the
State not split any precincts, HD 57 would have been
66.59 % black, almost two percentage points below its
goal. Def. Precinct Split Analysis (doc. no. 263-3) at
10.   Although these precinct splits are not
dispositive, they provide further circumstantial
evidence of the drafters' racial intentions.

The State's only attempt to offer a race-neutral
explanation for HD 57 pointed to a map of the
district's 2001 lines in McClendon's notebook, which
includes hand-drawn lines sweeping two new areas into
the district.   <u>See</u> McClendon Notebook, Def. Ex. 459, at
125.   According to McClendon's testimony about his
notebook generally, the hand-drawn additions could

122

reflect input from incumbents.[17]  The State, noting that
the resulting district had a "slightly higher"
percentage of black population than "Hinaman's
so-called target," Def. Remand Br. (doc. no. 263) at
122, apparently suggests that Hinaman would have met a
racial target exactly but for the interjection of
feedback from legislators.  That the State's technical
adviser would have hit the racial target precisely by
default only further demonstrates--not detracts
from--the central role that race played in the
formulation of the district's lines.  At any rate,
because the final district population fell a
statistically insignificant 20 black people above its
target, this justification is unconvincing.

---

17.  McClendon Dep. (doc. no. 125-4) at 78:2-16
(testifying that his notebook contained drawings made
by incumbent legislators reflecting requested changes
to districts).  McClendon did not testify specifically
about the drawing for HD 57.

Accordingly, I conclude that race predominated in the drawing of HD 57.

### f.   HD 60 (North Birmingham)

HD 60 provides further proof that Hinaman's transfer of HD 53 out of Jefferson County allowed the State to meet its racial targets in Jefferson County. The State drafted a district approximately one-quarter percentage point over its target, taking a district that had been 67.41 % black and leaving it 67.68 % black (+0.27 %). Especially when considered in light of the drafters' need to add 8,817 people to meet its ideal population target (19.37 % of the total district population), this feat is impressive. District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 5.

This district is an outlier in the State's otherwise inefficient resolution of its under-population dilemma: it efficiently moved only 9,170 people in or out of the district despite adding

124

8,380 people to address under-population. House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4. But that apparently aberrational approach can be explained because the drafters quite simply tacked on a southeastern tip to the district that had previously belonged to HD 53, resulting in an irregularly shaped district that snakes south to encompass more black population. See Map, Def. Ex. 480. For the reasons previously discussed, the displacement of former residents of HD 53 to meet the State's incorrect view of § 5 retrogression provides substantial evidence that race predominated in the surrounding Jefferson County districts, including HD 60.



HD 60 (2001).  Def. Ex. 480 at 2 (excerpt).

HD 60 (2012), reflecting new southeastern tip from former HD 53.  Def. Ex. 479 at 2 (excerpt).

Although the drafters split 11 precincts to construct HD 60, the majority analyzes only the two precincts split between the district and majority-white districts, ignoring the nine precincts split between majority-black districts.  Because the majority's analysis considers those two precinct splits separately, it concludes that the effect was

126

negligible.   <u>See</u> <u>ante</u>, at 277-78.   The State has indicated, however, that had it not used any split precincts, HD 60 would have been 72.5 % black--more than 5 % above its racial target.   Def. Precinct Split Analysis (doc. no. 263-3) at 13.   The split of Gardendale Civic Center precinct is particularly troubling:   the drafters placed a 47.3 % black population in majority-black HD 60 but only a 6.1 % black population in majority-white HD 51, carving out a small sliver at the southern end of the precinct to include in HD 60.   2012 House District Precinct Splits, Def. Ex. 405, at 98, 116; Map, APSX 108.   The use of split precincts, including those split with other majority-black districts, contributes to an inference that race predominated in HD 60.



Gardendale Civic Center Precinct, reflecting small sliver added
to HD 60 in orange.  Map, APSX 108.

The State suggests that HD 60 passes constitutional
muster because it preserved the core of the old
district and protected its incumbent.  Def. Remand Br.
(doc. no. 263) at 125.  The first justification, core
preservation, "is not directly relevant to the origin
of the new district inhabitants," Ala. Legislative

128

Black Caucus, 135 S. Ct. at 1271, and thus cannot
preclude a predominance finding. At any rate,
protecting the district's core cannot explain the
addition of an irregularly shaped southeastern tip with
heavily-black census blocks from the former HD 53, see
Maps, ADC Supp. Ex. 16B & 16C, which resulted from the
State's decision to shift population among Jefferson
County majority-black House districts to meet its
equal-population goals consistently with its approach
to retrogression.

As to the State's asserted race-neutral
justification of incumbency protection, the evidence in
the record gives no indication that anything about that
goal was unique or predominated in the drafters'
approach to HD 60. The incumbent's residence in the
mid-central portion of the district, a portion of the
district which remained constant from the 2001 map,
cannot explain HD 60's precise match to the racial
target, the use of 11 precinct splits, or the addition

of an irregularly shaped southeastern tip swallowed from the former HD 53.  <u>See</u> House Addresses, Def. Supp. Ex. 1; 2014 House Districts Map, Def. Supp. Ex. 2.

Because the plaintiffs have advanced sufficient evidence suggesting racial predominance that cannot be explained on race-neutral grounds, I find that race predominated in the drawing of HD 60.


   ii.  West Black Belt (SD 24 and HDs 67 and 69)

Direct evidence specific to districts in the Western Black Belt establishes that the drafters equated under-population in majority-black districts with the need to add heavily-black population to the districts.  Beyond direct evidence, the majority fails to place appropriate weight on circumstantial evidence that the State's racial policy was brought to bear in these districts, meeting racial targets with mathematical precision and unnecessarily splitting counties and precincts in search of new heavily-black

130

population to add to the district. For these reasons, I conclude that race predominated in the drafters' approach to SD 24, HD 67, and HD 69.

   a. SD 24 (Choctaw, Clarke, Green, Hale, Marengo, Pickens, Suffolk, and Tuscaloosa Counties)

Overwhelming direct and circumstantial evidence reflects the State's use of race to draw SD 24: the drafters said they were targeting a racial percentage for the district, and they in fact met that target. In light of this direct evidence, I disagree with the majority's analysis that the racial-predominance inquiry in this district requires a "close call." See ante, at 130. In fact, the State's direct evidence has made our job quite easy. See Shaw II, 517 U.S. at 906 (placing substantial weight on "direct evidence of the legislature's objective").

Discussing SD 24's under-population, Dial testified that it "had to have more minorities." Tr. Vol. I

(doc. no. 215) at 48:19-23.   Just like Hinaman's
decision to move HD 53 from Jefferson County because of
his conclusion that under-population in majority-black
districts could only be remedied by adding more black
population, Dial's testimony serves as an admission
that he also correlated under-population with the
racial composition of the residents purportedly
required to address the under-population.[18]

In addition, Senator Marc Keahey, the incumbent for
neighboring SD 22, offered uncontroverted testimony
that Dial's mechanical view of retrogression limited
the options for drawing SD 24's boundaries.[19]   Dial

---

[18]. No such automatic correlation was necessary.
Had the drafters addressed SD 24's under-population
without adding a single black person to the district,
it would have remained a majority-black district at
54.63 % black.   ADC Remand Br., Table 1 (doc. no. 258)
at 21.

[19]. Keahey's testimony was previously credited by
the majority.   See Ala. Legislative Black Caucus, 989
F. Supp. 2d at 1260.

would consider any amendments proposed by Keahey under two criteria: first, affected incumbent senators agreed to the amendment, and, second, the amendment would not retrogress the minority population, by which Keahey understood Dial to mean lowering by any amount the percentage of black population in the district from the level of the 2000 census used to draft the 2001 lines.[20] Tr. Vol. I (doc. no. 215) at 192:2-24. Keahey proposed, among other amendments, smoothing the southern boundary of SD 24 at the Marengo County border so that it did not extend into a portion of Clarke County--a recommendation consistent with the committee's guidelines of keeping counties whole. Id. at 199:24-25 – 200:1-4. The incumbent senator for affected SD 24 agreed to the amendment, meeting the

---

20. As other testimony established, the drafters' concept of retrogression looked at 2010 census data applied to the 2001 lines. See, e.g., Tr. Vol. III (doc. no. 217) at 222:8-12.

first of Dial's two stated criteria for approval, but Dial rejected it because of race: he stated that it would retrogress majority-black districts. <u>Id</u>. at 198:2-5, 200:7-8. Keahey later learned that Dial's understanding of retrogression measured a reduction in the black population using <u>2010 census data</u> applied to the 2001 lines, consistent with overwhelming evidence of the statewide policy. <u>Id</u>. at 198:8-15. Because Dial rejected the incumbent's proposal based on his now-discredited understanding of retrogression, Keahey's testimony provides direct evidence that the statewide policy was brought to bear in SD 24.

The majority agrees that the testimony of Dial and Keahey shows that the drafters "considered race in the drafting of the district" but nonetheless concludes that the evidence falls short of establishing predominance. <u>Ante</u>, at 133. But because the drafters "considered race" when solving under-population, significantly more black people were added to the

district than white people (23,241 compared to 19,606),
while significantly more white people were removed from
the district compared to black people (14,099 compared
to 10,828).  Because the drafters' admitted use of race
motivated the movement of "a significant number of
voters within or without" the district, the testimony
strongly supports a predominance conclusion.  <u>Ala.
Legislative Black Caucus</u>, 135 S. Ct. at 1267 (quoting
<u>Miller</u>, 515 U.S. at 916).

By the time the legislature had completed
redistricting, the drafters had accomplished their
goal:  SD 24, which had been 62.78 % black when
applying the 2010 census to the old lines, stood at
63.22 % black, just 0.44 % above the target.
Comparison of Minority Percentages (doc. no. 263-2) at
4.  At trial, Hinaman boasted that, although SD 24 had
been severely under-populated, it was ultimately "very
close to getting back to the identical numbers that [it
was] 10 years ago," by which he meant identical "[b]y

135

total black percentage."   Tr. Vol. III (doc. no. 217)
at 186:19-25 – 187:1.



SD 24 and its eight counties, six of which were split.
Map, Def. Supp. Ex. 5.

By adding a northern portion of Clarke County and a
southwestern portion of Pickens County to SD 24, the
drafters violated the traditional districting criterion
of keeping counties whole.   Although the State
maintains that changes to the district lines "largely
resulted from the wishes of incumbent senators in the

136

area," Def. Remand Br. (doc. no. 263) at 70, it offered no evidence disputing Keahey's testimony about his rejected request pertaining to Clarke County.[21]   The State argued merely that it needed to add slivers of Clarke and Pickens Counties because of under-population and geographically mandated limitations, since the district faced Mississippi on its western border and under-populated SD 23 on its eastern border.

Merely addressing under-population does not explain the substantial racial disparities in those portions of the counties added to SD 24.   In Pickens County, which had previously belonged wholly to majority-white SD 21, the State added 7,303 people, of whom 74.01 % were

---

21. Although the State maintained that the drafters' approach to Clarke County was constrained by an incumbent residing on the boundary of SD 22 and SD 23, the incumbent's residence was swallowed up by SD 23 in a southern portion of the State far removed from the portion of the county added to SD 24.   2014 Senate Map, Def. Supp. Ex 5; Map, Def. Ex. 476.   Thus, the incumbent's location had no effect on SD 24's boundaries.

black, to SD 24.   District Splits, Def. Ex. 401 (doc. no. 30-40) at 8.   It kept the northern and eastern portions of Pickens County--which just so happened to contain a 75.00 % white population--in majority-white SD 21.   Id. at 7.   The majority dismisses this racial division because the shape of the SD 24 portion of Pickens County is tied to the western border of the State and has a "relatively smooth line" to the Greene County border, ante, at 136, but the State did not describe these race-neutral explanations as its "actual purpose," see Shaw II, 517 U.S. at 908 n.4.   Instead, the evidence shows that the State specifically intended to add black population: Dial testified that SD 24 "had to have more minorities, and so [it] had to grow as well," so it "grew up into the north district," referring to Pickens County.   Tr. Vol. I (doc. no. 215) at 48:19-25.   To the extent that creating a 'smooth line' creates a race-neutral inference, it cannot overcome the plaintiffs' direct evidence that

138

traditional districting factors were "subordinated to racial objectives." Miller, 515 U.S. at 919.

In Clarke County, which had previously belonged solely to majority-white SD 22, the drafters added a 61.13 % black northern slice to SD 24 and a 70.67 % black southeastern section to majority-black SD 23 while preserving in majority-white SD 22 a portion of the county that was only 22.02 % black. District Splits, Def. Ex. 401 (doc. no. 30-40) at 7-9. The State's addition of heavily black portions of split counties to majority-black SD 24 without a race-neutral explanation provides further substantial evidence that race predominated over traditional districting criteria.

Precinct splits tell a similar story. Although the 21 precinct splits in SD 24 do not in and of themselves demonstrate that race predominated, several are quite striking. In particular, in two Choctaw County precinct splits with majority-white SD 22, the State

139

placed hundreds of the precinct's black residents in SD 24 but <u>not a single one</u> in SD 22.  <u>See</u> District Splits, Def. Ex. 475, at 88, 109; Precinct Map, APSX 291 (split of Silas-Souwilpa-Isney-Toomey precinct with 850 blacks and 818 whites placed in SD 24, but no blacks and 237 whites in SD 22); Precinct Map, APSX 290 (split of Riderwood-Rock Springs precinct with 335 blacks and 339 whites placed in SD 24, but no blacks and 43 whites in majority-white SD 22).  The majority concludes without explanation that it could find "no racial pattern" in the Silas precinct split, <u>ante</u>, at 145, but splitting a precinct by placing black people on only one side of the line seems an obvious racial pattern to me.



Silas-Souwilpa-Isney-Toomey precinct, which added significant
black population to SD 24 but no black people in the
irregularly-shaped portion drawn in majority-white SD 22.
Precinct Map, APSX 291.

Moreover, these stark racial divisions cannot be
explained solely by under-population, as the State
attempts to do.  SD 24 was 17,732 people short of the
ideal population target; in redistricting, the State
moved 70,988 people in and out of the district--four
times the number of people necessary to address

141

under-population.   Pop. Summary Report, Def. Ex. 402
(doc. no. 30-41) at 1; Senate District Pop. Changes
from 2010 to 2012, ADC Supp. Ex. 5.   Combined with the
stark racial divisions in the new geographical areas
added to address under-population, this race-neutral
explanation cannot overcome a finding that race
predominated in drawing SD 24.

> b.   HD 67 (Dallas and Perry Counties)

I agree with much of the majority's conclusions as
to HD 67, but not the ultimate one.   I find that race
predominated in the State's drawing of this district
because of sufficient circumstantial evidence that the
State's racial target "motivate[d] the legislature's
decision to place a significant number of voters within
or without" the district.   Ala. Legislative Black
Caucus, 135 S. Ct. at 1267 (quoting Miller, 515 U.S. at
916).   The district was 69.14 % black after the 2010
census; by adding just the right amount of Perry County

that would **address** both under-population and its racial target, the State achieved a new district that was 69.15 % black. Race is the "[o]ne factor and one factor alone [that] explains the fact that" the drafters hit HD 67's target so precisely, and is sufficient to establish that race predominated. <u>Ala. Legislative Black Caucus</u>, 989 F. Supp. 2d at 1325 (Thompson, J., dissenting).

 

HD 67 (2001). Map, Def. Ex.     HD 67 (2012). Map, Def. Ex.
480 at 1 (excerpt).       479 at 1 (excerpt).

As the majority explains, HD 67 fit entirely within Dallas County under the old lines. Most of Dallas

143

County belonged to HD 67, with approximately 13 % of
the county's population in neighboring, majority-black
HD 69.  2001 District Splits, Def. Ex. 412, at 7.  The
drafters moved all Dallas County residents to HD 67,
serving the race-neutral principle of keeping the
county whole.   Nonetheless, with the new ideal
population guidelines, the district remained 1,701
people short of the ideal population target.  District
Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 6;
County District Splits, Def. Ex. 404, at 15.  Needing
to move beyond Dallas County's borders, the drafters
added 1,258 residents from Perry County (59.54 % of
whom were black), a rural Black Belt county that had
previously been encompassed entirely by majority-black
HD 72.  County District Splits, Def. Ex. 404, at 16.
To do so, the drafters added six precincts from Perry
County, four of which were split.  2012 House District
Precinct Splits, Def. Ex. 405, at 135-36.   The
drafters' final HD 67 remained 443 people short of its

144

equal-population target (but within the -1.00 % allowable deviation), but just <u>three black people</u> above an exact match to its racial target. District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 6. That uncanny match provides strong circumstantial evidence that race predominated in the drafters' exact placement of the Perry County boundary of HD 67.

The majority criticizes my reliance here on circumstantial evidence that the State met its racial target, <u>see ante</u>, at 285-86; however, the majority misreads the Supreme Court's instruction that a statewide policy of racial targets "provides evidence" that race motivated the drawing of a district's lines, <u>Ala. Legislative Black Caucus</u>, 135 S. Ct. at 1267, as a prohibition on finding racial predominance where there is direct evidence that the State set a racial target and circumstantial evidence that it met the target precisely in a particular district. As I have explained, where the State sets a high racial target

145

(here, a 69.14 % black population), applies it with strict constraints (there must not be too many black people above the target, nor too few black people below the target), and does so as part of a rigorous intent to reach as many majority-black districts as possible (this is one of the 16 districts for which the drafters hit their racial target within one percent), that qualifies as strong evidence of racial predominance. Nevertheless, I agree with the majority that race did not predominate in 12 districts in large part because this circumstantial evidence does not apply in those districts.

I agree with the majority that race-neutral criteria explain some of HD 67's boundaries, but not so much to negate the conclusion that race predominated over traditional districting criteria in the district as a whole. The State had valid, race-neutral reasons to use Perry County as opposed to a portion of a contiguous majority-white county, as some of the

plaintiffs' alternative plans proposed, so that it could conjoin two Black Belt counties, a coherent community of interest, into a single district.[22]

Nonetheless, several line-drawing decisions are unexplainable on race-neutral grounds. Maps at the precinct level along the border with HD 72 demonstrate that the State could have made boundary choices that would have resulted in smoother lines. See, e.g., Precinct Map, APSX 245 (National Guard Armory); Precinct Map, APSX247 (UCH Airport Armory split). Similarly, the new territory from Perry County was drawn with several uneven tentacles that swept in majority-black populations. Map, ADC Suppl. Ex. 17C. The State could have drawn an equally compact district with more or less of Perry County, but it instead drew

---

22. The analysis might be different if the plaintiffs had a § 2 claim based on packing too many black residents into HD 67, but such a claim is not currently before the court.

147

the line to match its racial target exactly.  This
satisfies the racial-predominance standard.

   c.   HD 69 (Autauga County, Lowndes County, Montgomery
             County, and Wilcox County)

     Once again, I find that race predominated primarily
based on a disagreement with the majority about
evidence of racial targets.  To the majority, the
"negligible" increase of the percentage of black
population--from 64.16 % to 64.21 % black--is not
suspicious, apparently because the drafters did not
place a noticeably higher percentage of black people
within the district.  Comparison of Minority
Percentages (doc. no. 263-2) at 2.  But the State
unquestionably used race to place people "within" the
district according to a target, and that supports the
plaintiffs' showing of racial predominance.  <u>Miller</u>,
515 U.S. at 916.  As I previously observed, this
evidence of hitting a racial target is particularly

148

convincing not only because it happened in this district, but because it occurred in 21 of the challenged districts. This obvious pattern provides clear evidence that race predominated.

In HD 69, although the State had substantial under-population to remedy (7,949 people), it swept with a much broader brush than necessary, moving in and out 24,373 people--more than half of the district's population. District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 6; House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4. Most notably, the State's shuffling removed heavily white rural precincts and added majority-black urban districts. The State removed several Autauga County precincts, even though this county was already split, and added portions of heavily-black Montgomery County. The drafters removed Autauga County's Billingsley Government Center and White City Fire Station precincts from HD 69, a total of 2,161 people that were only 14.48 % black, and

placed them in majority-white HD 42, which was already 6.19 % over-populated.    ADC Ex. W, C-41 (doc. no. 140-2) at 84-85; 2001 House District Precinct Splits, Def. Ex. 413, at 43; District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 4.    To fill HD 69's population gap, the drafters added 15,190 people from urban Montgomery County, 60.45 % of whom were black, to this otherwise rural district.    Direct evidence demonstrates that the State merely assumed that re-population of a majority-black district required the addition of new population that was also majority black.   Hinaman testified that "it would have been hard to [repopulate HD 69 without going into Montgomery County] without eliminating another black district," Tr. Vol. III (doc. no. 217) at 160:4-5, but then said he did not know what prevented him from using population from other counties to re-populate the district.   Id. at 161:4-6.

Nor could the State demonstrate that the ADC plaintiffs' alternative, which would have repopulated HD 69 with rural population from the less heavily majority-black Butler County, was unworkable.  Tr. Vol. III (doc. no. 217) at 160:12-25 - 161:1-6 (Hinaman stating "[t]here may be no impediment to [using Butler County], but I don't know that--I did not do--you know, I don't know if those numbers work out or not.").  The State suggests that it needed to use Montgomery County's heavily-black population to re-populate HD 69 or else it risked losing a majority-black district, but in contiguous HD 90, Butler County's heavily-black population was drawn into majority-white HD 90.  The State's generalized assertion that it had limited options in its pursuit of population for HD 69 because of rural under-population throughout the Black Belt districts carries little weight when it cannot explain its failure to use specifically proposed alternatives.

The drafters' extension of HD 69 into Montgomery County also relied on a land bridge accomplished with precinct splits that even the majority acknowledges is "suspicious." Ante at 320. The Snowdoun Womens Club precinct splits HD 69 and majority-white HD 75. See Precinct Map, APSX 239. If one were to look at precinct-specific demographics alone, the split seems race-neutral: it resulted in 51 whites and three blacks in majority-black HD 69, no whites and three blacks in majority-black HD 76, and 202 blacks and 493 whites in majority-white HD 75. 2012 House District Precinct Splits, Def. Ex. 405, at 145, 158, 160. More consequentially, the split precinct map shows that the split--along with a further split in the contiguous Fitzpatrick Elementary School precinct--allowed the drafters to append a highly-irregular land bridge to the easternmost end of HD 69, which facilitated the inclusion of significant black census blocks from the urban Peter Crump School precinct. Precinct Map, APSX

152

239.   By doing so, the drafters were able to add an additional 1,701 people to HD 69, nearly all (95.47 %) of whom were black.   ADC Ex. W, C-41 (doc. no. 140-2) at 146.   This serves as "quite compelling" evidence that the borders of HD 69 are "unexplainable other than by race."   <u>Miller</u>, 515 U.S. at 917 (holding that "drawing of narrow land bridges to incorporate within the district outlying appendages ... considered in conjunction with its racial and population densities" provides evidence of racial gerrymandering).[23]

---

23. Although the majority suggests the large hook extending into Montgomery County, which encompassed this land bridge, was required to avoid the HD 78 incumbent's Montgomery residence, it cannot explain the drafters' need to add a small but concentrated pocket of black people from Montgomery County to HD 69.   Only race can do that.   The additional 1,701 mostly black people gained from the Crump precinct is very close to the 2,161 mostly white people the State extracted from the Autauga County precincts.   In other words, if the State did not unexplainably remove predominantly-white population from HD 69, it would not have needed to use a suspicious land bridge into Montgomery County at all.



**Precinct splits used to build land bridge to scoop majority-black census blocks from the Peter Crump School precinct into HD 69. Precinct Map, APSX 239.**

Because the drafters met a racial target while disregarding race-neutral criteria, I find that race predominated in drawing HD 69.

154

iii. HD 83 (East Black Belt: Lee and Russell Counties)

Race predominated in the drawing of HD 83 because the State shifted a significant number of voters in and out of the district, used split precincts to incorporate the vast majority of the district's residents and exclude portions of precincts with high percentages of white population, and met its racial target. With a 56.92 % black target, the State drew a district 57.52 % black (+0.60 %), just 277 black people short of an exact match. To accomplish that, the State moved 18,466 people in and out of the district, even though the district was only under-populated by 4,482 people. House Districts Pop. Changes from 2010 to 2012, ADC Supp. Ex. 4.

The majority acknowledges that two precinct splits appear "suspicious," but disregards them because they "do not account for the assignment of a significant number of people." Ante, at 396. The majority assesses the affected population as "less than half of

155

a percent of the total population of the district," but it counted only black people within one of the splits, the Ladonia Fire Department precinct, see ante, at 398. Because the precinct splits also facilitated the placement of a significant white population "without" HD 83, that population must be taken into account as well. Miller, 515 U.S. at 916. Specifically, the Ladonia Fire Department precinct placed an 85.9 % black population into HD 83 but only a 12.5 % black population into majority-white HD 80, while the Old Salem School precinct added a 42.3 % black population to HD 83 but only an 8.9 % black population to majority-white HD 38. 2012 House District Precinct Splits, Def. Ex. 405, at 78, 166, 172. The high proportion of black population added to HD 83 appears particularly suspicious because both precincts had previously been wholly encompassed by majority-white districts. 2001 House District Precinct Splits, Def. Ex. 413, at 24, 49. Combined, the two precinct splits

156

allowed the State to place an additional 204 black people into majority-black HD 83 while retaining 7,541 white people in majority-white districts, equivalent to 16 % of HD 83's total population.  2012 House District Precinct Splits, Def. Ex. 405, at 172-73.  That population rises to the level of a "significant number of voters" placed without the district on account of race.  See Miller, 515 U.S. at 916.  Indeed, another three-judge panel concluded that 0.58 % of a district qualified as a "significant number of voters" sufficient to establish racial predominance. Covington, 316 F.R.D. at 149 n.28 (three-judge court).

Similarly, the split of Opelika B precinct allowed the State to place a large, overwhelmingly black population in HD 83 and a large, overwhelmingly white population in majority-white HDs 38 and 79.  The drafters placed 18,201 people into HD 83, 58.81 % of whom were black, and 9,598 people into majority-white districts, only 10.58 % of whom were black.  2012 House

District Precinct Splits, Def. Ex. 405, at 78, 165, 172.  The placement of majority-black census blocks into HD 83 accounts for the odd shape of the northwestern limb of the district.  Precinct Maps, APSX 140 & ADC Supp. Ex. 27F.



Opelika B precinct split between majority-black HDs 82 and 83 and majority-white HDs 38 and 79.  Census blocks with a majority-black population are shaded in green.  Precinct Map, APSX 140 (excerpt).

158

The State suggests that an inconsistent racial pattern in the Opelika B precinct split negates a showing that a large proportion of the precinct's population was allocated according to race, but the supposed inconsistencies are in fact consistent with the drafters' statewide approach to racial targets. In contrast to the heavily black population added to HD 83, the drafters placed a largely white portion of the precinct into majority-black HD 82 (2,140 people total, only 19.44 % of whom were black). 2012 House District Precinct Splits, Def. Ex. 405, at 171. But extending HD 82 to the majority-black census blocks of that part of the precinct--not contiguous to the majority-black census blocks of the precinct included in HD 83--would have placed HD 82 well over the +/- 1 % ideal population target. Id.; Precinct Map, APSX 140. Unlike many of the other majority-black districts, the drafters had already exceeded the ideal population of

HD 82 with a deviation 0.74 % above ideal.   District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 7. A racial-predominance finding does not require a showing that the drafters utilized racial considerations to the maximum extent possible; it only requires a showing that race predominated over other, race-neutral criteria.[24]

In addition to the three already mentioned precincts, the drafters split eight other precincts in HD 83.  In all, a substantial 75.7 % of the district's population resides in split precincts.   2012 House District Precinct Splits, Def. Ex. 405, at 172-73.  The district also shares its two counties with numerous

---

24. Further, because the predominance inquiry must focus on the drafters' intentions when drawing district lines, I place little weight, unlike the majority, on the somewhat similar district boundary reflected in the ADC's plan.  ADC Alternative Plan Map (doc. no. 287-18) at 9.  The record provides no indication that the alternative plan, which reflects some variation from the State plan, had any effect on the racial split in the heavily populated Opelika B Voting Precinct.

other districts, ignoring the guideline to keep counties whole; it shares parts of both Lee and Russell Counties with three other districts.

The State contends that HD 83 was drawn in a race-neutral manner because it "preserves the core of the former district" and "is compact." Def. Remand Br. (doc. no. 263) at 153. While it is difficult to envision this odd-shaped district, essentially comprising five different 'legs' that jut out at various irregular points, as compact, the State accurately notes that the shape, driven by the need to join the population centers of Opelika and Phenix City, does not vary significantly from its 2001 lines. With that said, the plaintiffs have established that where the drafters needed to add population, they did so in a race-conscious manner, selectively extending the boundaries of the district to include majority-black census blocks. For example, in a north-central limb, the drafters extended the length of the limb further

north into Lee County by drawing boundaries closely
tailored to several majority-black census blocks.   <u>See</u>
Precinct Maps, ADC Supp. Ex. 27C & 27D.



HD 83.  Map, Def. Ex. 479 (excerpt).



New north-central limb of HD 83 reflecting addition of
heavily-black census blocks.  Map, ADC Supp. Ex. 27C.

162

For all of these reasons, I must conclude that race predominated in the design of HD 83.

### iv.   HD 97 (Mobile County)

The drafters hit their racial target on the head in Mobile County's HD 97, retaining the previous 60.66 % black population exactly.   Comparison of Minority Percentages (doc. no. 263-2) at 2.   Tellingly, the State accomplished this feat despite adding a net total of 9,665 people, addressing a district that had been 22.22 % under-populated.   District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 8; District Statistics Report, Def. Ex. 406 (doc. no. 30-37) at 8.   The State offers no explanation for achieving this exact racial match using race-neutral methods, and the majority apparently does not take this precision into account.[25]

---

25. The State argued that "all [majority-black Mobile County House districts] have a lesser percentage of black population than Hinaman's alleged target." (continued...)

The exact racial match provides strong circumstantial evidence that the drafters pursued the statewide policy in HD 97.

The plaintiffs have demonstrated, and the State has not rebutted, that race, and not an equal-population objective, drove the drafters to meet HD 97's racial target.  For example, the redrawn HD 97 remained under-populated by 0.99 %, just barely meeting the State's allowable minus-one-percent total population deviation.  District Statistics Report, Def. Ex. 403 (doc. no. 30-36) at 8.  Neighboring HD 96, a majority-white district, was over-populated by 0.99 %, just barely meeting the allowable plus-one-percent total population deviation.  Id.  Nonetheless, the northernmost tip of HD 97--referred to by the majority as the "bishop's mitre"--was drawn in a highly irregular shape through a racially divided split of the

---

Def. Remand Br. (doc. no. 263) at 159.  This is, of course, incorrect as to HD 97.

Saraland Civic Center Precinct, avoiding majority-white census blocks that were instead drawn into HD 96. Had the State prioritized compactness, it could have added additional majority-white census blocks from HD 96 into HD 97 to smooth out the district's shape and bring both districts closer to the ideal population target. See Precinct Map, APSX 197. Of course, had the State added additional majority-white census blocks to HD 97, it would not have hit the racial target. The State offered no explanation for its apparent prioritization of a racial target above regularly-shaped district lines and its ideal population target. Instead, it noted only that the Saraland precinct split added more whites than blacks to the district. Def. Remand Br. (doc. no. 263) at 160-61. But where the resulting district has achieved an exact racial match, a suspicious precinct split provides evidence of racial predominance even if it allocated more whites than blacks to a majority-black district.

165



Saraland Civic Center precinct split.  Map, APSX 197.

The same principle holds true for the district as a whole.  The State's unsplitting exercise demonstrates that, had it not included a single precinct split in HD 97, its majority-black population would have increased to 64.8 % of the total population.  Def. Precinct Split Analysis (doc. no. 263-3) at 28.  Given the testimony of the principal architect for the House districts that he had not "been advised that if you go over a certain

[percentage of minority population]" it would be a problem, see McClendon Dep. (doc. no. 125-4) 106:10-18, the use of precinct splits to reduce the percentage to a result identical to the racial target strengthens the conclusion that race predominated over traditional districting principles, including keeping precincts whole.

Because the plaintiffs demonstrated that the drafters applied a racial target to the drawing of HD 97 and disregarded race-neutral criteria to do so, I conclude that race predominated.


C.   Strict Scrutiny

As I have concluded that race predominated over traditional districting criteria when the State drafted ten additional districts, I must also determine whether the districts would survive strict scrutiny. Because my racial-predominance analysis determined that the drafters applied a statewide policy of reaching racial

targets for each of the ten identified districts, I also conclude, for the reasons explained above, that the State did not narrowly tailor its use of race in these districts. See supra at 39-50. Moreover, the State has not submitted evidence or arguments specific to the identified districts sufficient to carry its burden of showing that its approach was narrowly tailored. Accordingly, I conclude that, although the State had a compelling interest in complying with § 5 of the Voting Rights Act, its approach to SD 24 and HDs 52, 55, 56, 57, 60, 67, 69, 83, and 97 was not narrowly tailored to meet that interest and therefore could not survive strict scrutiny.

## III. Twelve Remaining Districts

In addition to the 12 districts deemed unconstitutional racial gerrymanders by the majority and the additional 12 I deem unconstitutional, the plaintiffs have sought to establish that race

168

predominated in the State's drawing of an additional 12 majority-black districts. As to these remaining 12 districts, I agree with the majority that the plaintiffs have not satisfied their burden to demonstrate district-specific proof of racial predominance in the remaining districts: SDs 18, 19, and 33 and HDs 19, 58, 59, 72, 76, 78, 84, 98, and 103.

## IV. Conclusion

For the above reasons, I concur with the majority that 12 of the districts (Senate Districts 20, 26, and 28 and House Districts 32, 53, 54, 70, 71, 77, 82, 85, and 99) do not pass constitutional muster and that 12 districts (Senate Districts 18, 19, and 33 and House Districts 19, 58, 59, 72, 76, 78, 84, 98, and 103) do pass constitutional muster.

I respectfully dissent from the majority's conclusion that an additional 12 districts (Senate

Districts 23 and 24 and House Districts 52, 55, 56, 57, 60, 67, 68, 69, 83, and 97) are constitutional.

DONE, this the 20th day of January, 2017.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE