IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ALABAMA LEGISLATIVE BLACK CAUCUS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF ALABAMA, et al.,<br><br>Defendants. | CASE NO. 2:12-CV-691<br>(Three-Judge Court) |
| ALABAMA DEMOCRATIC CONFERENCE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF ALABAMA, et al.,<br><br>Defendants. | CASE NO. 2:12-CV-1081<br>(Three-Judge Court) |

## MEMORANDUM OPINION AND ORDER

Before this Court are the objections of the Alabama Legislative Black Caucus plaintiffs to the remedial redistricting plans enacted by the State of Alabama and a motion to intervene to object to the remedial plans filed by Sandra Arnold and Louella Kelly. (Docs. 345, 350, 363). First, we deny the motion to intervene as untimely, Fed. R. Civ. P. 24. Second, because the Black Caucus plaintiffs lack standing to challenge House Districts 14 and 16 and Senate District 5, we dismiss their

objections that are based on racial gerrymandering. Third, we dismiss the Black Caucus plaintiffs' partisan gerrymandering objection to the same districts because the Black Caucus plaintiffs lack standing to bring a partisan gerrymandering challenge to the relevant districts. In the alternative, we hold that the Black Caucus plaintiffs have not articulated an adequate standard for adjudicating the partisan gerrymandering objection.

## I. BACKGROUND

In a memorandum opinion and order entered January 20, 2017, this Court declared 12 of Alabama's legislative districts unconstitutional racial gerrymanders and enjoined the use of those districts in future elections. (Doc. 316 at 4–5). In a separate order entered the same day, this Court directed the parties to confer and, if possible, agree to a joint procedure for the remedial phase of this litigation, (Doc. 318 at 3), which they did. (Docs. 326, 327). The joint procedure gave Alabama until May 23 to enact a remedial redistricting plan and gave the Alabama Democratic Conference plaintiffs and Alabama Legislative Black Caucus plaintiffs until June 13 to file objections to the plan. (Doc. 326 at 2; Doc. 327 at 2, 4).

Alabama met its deadline and enacted Senate Bill 403 and House Bill 571 to cure the constitutional violations identified by this Court. (Doc. 318 at 2; Doc. 335-1 at 273; Doc. 337-1 at 584). Although we enjoined only the use of twelve of the majority-black house and senate districts, (Doc. 316 at 4–5), the remedial plans redrew

all of the majority-black districts. (Doc. 335 at 4). The drafters of the remedial plans did not consider race when they initially drew the remedial districts. (Doc. 335 at 4–5). The drafters considered the racial composition of a district only if, after changes had been made to the district, the black voting age population fell below 50 percent. (Doc. 335 at 5).

The plaintiffs posed no objection to the majority-black districts in the remedial plans. The Democratic Conference plaintiffs agreed with Alabama that Senate Bill 403 and House Bill 571 cured the impermissible use of race in the former majority-black districts. (Doc. 349). The Democratic Conference plaintiffs explained that "[t]he new plans for both the House and Senate split significantly fewer counties and precincts, and reduce black population percentages in the vast majority of the black-majority House and Senate districts, without compromising the ability of [Alabama Democratic Conference] members to elect representatives of their choice." (*Id.* at 1). The Black Caucus plaintiffs also posed no objection to the majority-black districts as drawn in Senate Bill 403 and House Bill 571. (Doc. 345 at 2).

The Black Caucus plaintiffs instead moved to object to three majority-white districts never before challenged in this litigation—House Districts 14 and 16, and Senate District 5. (*Id.*). House Districts 14 and 16 are part of the Jefferson County House Delegation, and Senate District 5 is part of the Jefferson County Senate Delegation. (*Id.* at 19, 23). The Black Caucus plaintiffs argue that the drafters included

3

these districts in Jefferson County to "maintain more majority-white than majority-black districts in the Jefferson County" House and Senate delegations. (*Id.* at 19, 23). The Black Caucus plaintiffs complain that all three districts protrude into Jefferson County but none of the representatives of the districts reside in Jefferson County, establishing that the districts are racial gerrymanders. (*Id.* at 2, 13, 19, 23). The Black Caucus plaintiffs contend that their proposed alternative remedial plans, which removed Senate District 5 and House District 14 from Jefferson County, cured the racial gerrymanders of the Jefferson County delegations. (*Id.* at 2).

The Black Caucus plaintiffs also argue that the Jefferson County districts are partisan gerrymanders that violate the First and Fourteenth Amendments. (Doc. 363 at 3). In support of this objection, the Black Caucus plaintiffs point to the possibility that the Supreme Court will address partisan gerrymandering in the October 2017 term. (*Id.* at 2).

Sandra Arnold, a resident and registered voter of House District 14, and Louella Kelly, a resident and registered voter in House District 16, moved to intervene in the case, Fed. R. Civ. P. 24, to join the Black Caucus plaintiffs in their challenge of these districts. (Doc. 350 at 1, 3). Arnold and Kelly assert that they have an interest in this action now that Alabama has enacted remedial plans that altered the design of House Districts 14 and 16. (*Id.* at 2). Arnold and Kelly acknowledge, however, that if their "motion to intervene is denied, . . . the plaintiffs may be held to

4

lack standing to challenge" House Districts 14 and 16 because no plaintiff lives in those districts. (*Id.* at 3). In their defense of the motion to intervene, the Black Caucus plaintiffs also admit that neither intervenor resides in Senate District 5, "[s]o neither movant nor any [Black Caucus] plaintiff has standing to pursue a racial gerrymandering claim with respect to [Senate District] 5." (Doc. 357 at 2).

## II.   DISCUSSION

We divide this discussion in three parts. We first explain that the motion to intervene to challenge House Districts 14 and 16 is untimely. We next explain that the Black Caucus plaintiffs lack standing to challenge Senate District 5 and House Districts 14 and 16 as racial gerrymanders. Finally, we explain that the Black Caucus plaintiffs lack standing to raise their partisan gerrymandering challenge, and we hold, in the alternative, that the Black Caucus plaintiffs have failed to articulate a standard for adjudicating their partisan gerrymandering objection.

*A. The Motion to Intervene Is Untimely.*

To succeed on their motion to intervene, Arnold and Kelly must establish as a threshold matter that their motion is timely. *See* Fed. R. Civ. P. 24; *Howse v. S/V Canada Goose I*, 641 F.2d 317, 320 (5th Cir. 1981) ("Timely application is a requirement for both intervention of right and permissive intervention."). We consider four factors to determine if a motion to intervene is timely:

> (1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before he

5

> petitioned for leave to intervene; (2) the extent of prejudice to the existing parties as a result of the would-be intervenor's failure to apply as soon as he knew or reasonably should have known of his interest; (3) the extent of prejudice to the would-be intervenor if his petition is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*United States v. Jefferson Cty.*, 720 F.2d 1511, 1516 (11th Cir. 1983). Although Arnold and Kelly contend that these factors favor intervention, (Doc. 350 at 2–5; Doc. 357 at 4–5), we disagree.

First, Arnold and Kelly should have reasonably known of their interest in this litigation in 2014, and they should have moved to intervene then. House Districts 14 and 16 changed little under the remedial redistricting plan. (Doc. 353 at 5; Doc. 355-1 at 5–6). And the issues that Arnold and Kelly seek to challenge existed under the 2012 legislative redistricting plan, which was first used in the 2014 election. (Doc. 353 at 5). The borders of House District 14 did not change under the remedial plan. As it did under the 2012 lines, House District 14 still includes parts of Winston, Walker, and Jefferson counties. (Doc. 355-1 at 5). And the representative of House District 14 who was elected in 2014 resided outside of Jefferson County in Winston County. (Doc. 353 at 5). Although the borders of House District 16 changed slightly under the remedial plan, the district continued to include portions of Jefferson, Tuscaloosa, Fayette, and Lamar counties. (Doc. 355-1 at 6). And the representative of House District 16 elected in 2014 resided outside of Jefferson County in Fayette County. (Doc. 353 at 5). Arnold and Kelly argue that their motion is timely because the 2017

6

remedial plan did not exist in 2014, (Doc. 350 at 2; Doc. 357 at 5), but this point misses its mark. The issues identified by Arnold and Kelly existed under the 2012 redistricting plan and could have been challenged as early as 2014. The Black Caucus plaintiffs also argue that Arnold and Kelly's motion is timely because their claims "are based on constitutional standards that were not clearly explicated" before the Supreme decided *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), *Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788 (2017), and *Cooper v. Harris*, 137 S.Ct. 1455 (2017). (Doc. 357 at 5). But the Supreme Court has long recognized claims of racial gerrymandering. And the Black Caucus plaintiffs have litigated this case under the more "clearly explicated" "constitutional standard[]" the Supreme Court articulated in *Alabama Legislative Black Caucus* since remand. The Black Caucus plaintiffs give no reason why Arnold and Kelly could not have done the same.

Second, if we granted the motion to intervene, Alabama would suffer substantial prejudice. Intervention would cause further delay of already protracted litigation that is in its final stage. This litigation began in 2012, proceeded through extensive discovery, a trial, an appeal to the Supreme Court of the United States, and two years of proceedings on remand. Arnold and Kelly now seek to challenge majority-white districts never before challenged in this litigation on grounds that have existed since 2014. In addition to depriving Alabama of its interest in a "prompt disposition of the[] controversy," *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1302 (11th

7

Cir. 2008), granting the motion to intervene would delay the use of legislative districts that all parties agree cure the constitutional violations found by this Court. (Doc. 345 at 2; Doc. 349 at 2; Doc. 354 at 1–2).

Third, Arnold and Kelly will not suffer prejudice by the denial of their motion to intervene as untimely. A movant will suffer prejudice sufficient to support intervention only when she has an identity of interest with a party and that party does not sufficiently represent her interests. *Jefferson Cty.*, 720 F.2d at 1517. Arnold and Kelly do not assert that they have identity of interests with the Democratic Caucus plaintiffs or the Black Caucus plaintiffs. Indeed, that Arnold and Kelly move to intervene to challenge districts that they acknowledge the Black Caucus plaintiffs lack standing to challenge suggests that Arnold and Kelly's claims are beyond the scope of this litigation. That is, the remedial plan addressed the districts at issue in this litigation, which did not include House Districts 14 or 16. At most, Arnold and Kelly argue that the Black Caucus plaintiffs will be prejudiced by denial of the motion to intervene because, absent intervention, the Black Caucus plaintiffs "lack standing to challenge districts in which they do not live." (Doc. 350 at 3). But Arnold and Kelly fail to point to any "common question of law or fact" that will be "determined to [their] disadvantage" by denial of their motion. *Jefferson Cty.*, 720 F.2d at 1517. As a result, they will not suffer prejudice.

Fourth, neither Arnold nor Kelly identify "the existence of unusual circumstances militating . . . for . . . a determination that the application is timely," *id.* at 1516. To the contrary, the parties agree that the remedial plans cured the constitutional injury suffered by the residents of the twelve enjoined districts. Any further delay would be an unnecessary protraction of the case.

Considered together, these four factors establish that the motion to intervene is untimely. And because Arnold and Kelly's application is untimely, we deny their motion to intervene. *Reeves v. Wilkes*, 754 F.2d 965, 972 (11th Cir. 1985) (holding that a motion to intervene should be denied if untimely).

### B. *The Black Caucus Plaintiffs Lack Standing for Their Racial Gerrymandering Claim.*

We must also deny the motion to object to Senate District 5 and House Districts 14 and 16 filed by the Black Caucus, (Doc. 345), because the Black Caucus plaintiffs lack standing to challenge these districts. A plaintiff has standing to challenge a racially gerrymandered district if he resides in that district. *United States v. Hays*, 515 U.S. 737, 744–45 (1995); *see also Alabama Legislative Black Caucus,* 135 S. Ct. at 1268–70 (explaining that an organization may have standing to challenge a racially gerrymandered district where members of the organization reside in the district). But as the Black Caucus plaintiffs acknowledge, none of Black Caucus plaintiffs reside in House Districts 14 or 16, or Senate District 5. (Doc. 350 at 3; Doc. 357 at 2, 10); *see*

*also* (Doc. 182 (listing residences of the plaintiffs))). As a result, the Black Caucus plaintiffs lack standing to object to those districts.

  C. *The Black Caucus Plaintiffs' Partisan Gerrymandering Objection Fails.*

The Black Caucus plaintiffs do not have standing to challenge Senate District 5 and House Districts 14 and 15 as partisan gerrymanders. In the alternative, the partisan gerrymandering challenge fails because the Black Caucus plaintiffs have not articulated a standard for evaluating this objection.

    1. The Black Caucus Plaintiffs Lack Standing.

In *Hays*, the Supreme Court held that a plaintiff in a racial gerrymandering case has standing only when he or she lives in the challenged district or can "otherwise demonstrate[] that [he or she], personally, ha[s] been subjected to a racial classification." 515 U.S. at 739. The Court identified two injuries inflicted by racial classification in the voting context. First, the Court concluded that the very act of racial classification "threaten[s] to stigmatize individuals by reasons of their membership in a racial group." *Id.* at 744 (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)). Second, the Court "also noted representational harms." *Id.* (internal quotation marks omitted). "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Id.* (quoting *Shaw*, 509 U.S. at 648). The

Court reasoned that these injuries permit residents of the affected districts to "[d]emonstrat[e] the individualized harm our standing doctrine requires." *Id.* "On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745. Unless "other evidence in the record" establishes that nonresidents "have been subjected to racially discriminatory treatment," these citizens cannot establish standing. *Id.*

We conclude that this analysis controls the question of standing in the context of political gerrymandering. *Id.* In *Hays*, the Supreme Court reasoned that alleged victims of racial gerrymandering could establish individual harm either by living in an affected district or by proving that they had been personally classified on the basis of race. Assuming that partisan classifications are also constitutionally suspect, an alleged victim of partisan gerrymandering must make the same showing of residency or individual harm. The Black Caucus plaintiffs do not allege that the new district map has classified the Black Caucus plaintiffs in an unconstitutional manner. (*See* Doc. 363). Like racial gerrymandering, partisan gerrymandering has the effect of muting the voices of certain voters within a given district. Although these district-specific power allocations have consequences for statewide politics, the *Hays* Court required that

11

plaintiffs establish an individual harm that directly stems from an unconstitutional classification.

We acknowledge that the Western District of Wisconsin reached a different conclusion in *Whitford v. Gill*, 218 F. Supp. 3d 837, 927 (W.D. Wis. 2016), when it held that Democratic voters had standing to pursue a statewide partisan gerrymandering challenge. The court distinguished *Hays*, reasoning that *Hays* addressed the harm caused "not [when] the racial group's voting strength has been diluted, but [when] race has been used as a basis for separating voters into districts." *Id.* at 929 (internal quotation marks omitted). According to the district court, this individual racial stigma is different from the "statewide" injury of being unable to "translate . . . votes into seats." *Id.* The court also cited *Baker v. Carr*, 369 U.S. 186, 207–08 (1962), a pre-*Hays* decision that held that voters in "disfavor[ed]" counties had standing to challenge a statewide apportionment statute. *Whitford*, 218 F. Supp. 3d at 928.

We respectfully disagree. The *Whitford* court distinguished the inherent harm an individual suffers when he is categorized on the basis of race from the universal injury all Wisconsin Democrats suffered when the redistricting plan hindered their efforts to "translate their votes into seats." *Id.* at 929. According to the court, the first kind of harm affects only the residents of a race-based district, while the latter injury has statewide repercussions. This reasoning would be persuasive if the only harm *Hays* addressed was the stigma of racial classification. But the *Hays* court also found that

12

racial gerrymandering creates the "special representational harm[]" of a district's "elected officials [being] more likely to believe that their primary obligation is to represent only the members of that [racial] group." *Hays*, 515 U.S. at 744–45 (quoting *Shaw*, 509 U.S. at 648). *Hays* specifically tied racial classifications to the political injuries that emerge when members of a group lack influence within their district. And when "a plaintiff does not live in such a district, he or she does not suffer those special harms" absent specific evidence that the plaintiff personally has been the subject of an unconstitutional classification. *Id.* at 745. Under this analysis, the Black Caucus plaintiffs lack standing to challenge districts in which they do not live because they cannot establish an individual constitutional injury.

2. Alternatively, the Black Caucus Plaintiffs Have Not Articulated a Standard For Adjudicating Their Partisan Gerrymandering Objection.

The Black Caucus plaintiffs' partisan gerrymandering objection is familiar, and it alternatively fails for a familiar reason. The Black Caucus plaintiffs' original complaint alleged unconstitutional partisan gerrymandering. (*See* Doc. 1 at 22; *see also* Doc. 60 at 23). On August 2, 2013, we granted summary judgment in favor of the State on this claim, basing our analysis on Justice Kennedy's controlling concurrence in *Vieth v. Jubelirer*, 541 U.S. 267, 306 (2004) (Kennedy, J., concurring) (Doc. 174 at 16–19). Unlike the *Vieth* plurality, Justice Kennedy was not willing to hold that all partisan gerrymandering claims were nonjusticiable. *Id.* He instead proposed a high

standard for such claims, concluding that any "determination that a [partisan] gerrymander violates the law . . . must rest . . . on a conclusion that the classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Id.* at 307.

In our 2013 grant of summary judgment, we applied this test and explained that the "plaintiffs bear the burden of providing [the court with] a standard to adjudicate" a claim of unconstitutional partisan gerrymandering. (Doc. 174 at 19). The Black Caucus plaintiffs "failed to do so," for they had proposed a "standard of adjudication" that made "no distinction between racial and political gerrymandering." (*Id.* at 18–19). And because "[c]laims of racial gerrymandering 'implicate a different inquiry' from claims of partisan gerrymandering," this standard was insufficient. (*Id.* at 17 (quoting *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring))). Indeed, the Black Caucus plaintiffs admitted "that the standard of adjudication for their claim of partisan gerrymandering is 'unknowable.'" (*Id.* at 18). After the Supreme Court later vacated our rulings that related to racial gerrymandering claims, *Alabama Legislative Black Caucus*, 135 S. Ct. at 1263, "[w]e readopted our order[] on . . . partisan gerrymandering." (Doc. 316 at 23 (citing Doc. 242 at 2)).

The Black Caucus plaintiffs again fail to identify a standard for evaluating their partisan gerrymandering challenge to the new district maps. The amended objection simply makes the following allegations: (1) "partisan reasons explain" the relevant

14

districts; (2) the Supreme Court might reconsider partisan gerrymandering in the October 2017 term; and (3) "[t]he partisan purposes of the Jefferson County gerrymanders in the instant action would violate many of the constitutional standards that have been proposed to the Supreme Court." (Doc. 363 at 2–3). These assertions offer us no guidance for adjudicating the claim and do not support a conclusion that the alleged partisan gerrymanders "were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring). Even if the Black Caucus plaintiffs had standing, their partisan gerrymandering objection would fail on the merits.

### III. CONCLUSION

On consideration of the motions, replies, and response (Docs. 335, 345, 349, 350, 353, 354, 357, 363) as well as supporting and opposing authority, it is **ORDERED** that the motion to intervene by Kelly and Arnold is **DENIED** as untimely filed. It is further **ORDERED** that the motion filed by the Black Caucus plaintiffs is **DISMISSED** for lack of standing with respect to the racial and partisan gerrymandering claims. In the alternative, the Black Caucus plaintiffs' partisan gerrymandering claim is **DENIED** because the plaintiffs failed to identify a standard for evaluating this claim.

**DONE** this 12th day of October, 2017.

/s/ William H. Pryor, Jr.
UNITED STATES CIRCUIT JUDGE
PRESIDING

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT
JUDGE

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE